**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **CONTINENTAL CASUALTY COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO.:    2:07cv221-WHA** |
| ) | |
| **ALABAMA EMERGENCY ROOM** ) | |
| **ADMINISTRATIVE SERVICES, P.C.** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S *MOTION TO COMPEL DEFENDANT
TO PROVIDE FULL AND COMPLETE RESPONSES TO DISCOVERY***

COMES NOW the Defendant, Alabama Emergency Room Administrative Services, P.C.,

and responds to Plaintiff's *Motion to Compel Defendant to Provide Full and Complete Responses

to Discovery* as follows:

**A.      Factual Background**

Plaintiff is an insurance company that issued a policy of workers' compensation insurance

to Defendant.  Defendant is a company that contracts with various hospitals and clinics to provide

emergency room doctor and nursing service personnel.  Defendant was quoted and paid a premium

to Plaintiff for the issuance of the policy of workers' compensation insurance.  Subsequently, the

Plaintiff conducted a self-described "audit" and invoiced Defendant for additional claimed premium

due.  Defendant disputed the additional charge as it was based upon Plaintiff's erroneous conclusion

that certain physicians utilized by Defendant in its contracting with various facilities were

employees and not independent contractors.  Defendant cancelled its policy of insurance with

Plaintiff and sought and obtained coverage elsewhere.  Plaintiff filed this lawsuit for the unpaid,

claimed additional premium from Defendant.  This matter can be resolved by a determination as to

the status of the physicians utilized by Defendant in its contracts with various hospitals and medical care facilities.  If these doctors are independent contractors as Defendant asserts, the premiums charged by Plaintiff were in error and thus, Plaintiff's claims fail.

This discovery dispute involves a limited number of interrogatories and production requests from Plaintiff to Defendant, such issues remaining after good faith efforts on the part of the parties hereto to resolve such.

**B.    General Assertions of Plaintiff Regarding Defendant's Objections**

Plaintiff generally asserts that Defendant has waived objections to the discovery requests at issue in that no such objections were made within the thirty (30) day period following service of the same.

While no formal objections were filed, the communication between counsel amounted to such and, at the very least, amounted to an agreed extension of the time for which to respond to this discovery.  Specifically, beginning on August 30, 2007 (prior to the due date for discovery responses/objections), the undersigned wrote counsel for Plaintiff, expressing the need for a protective order in this matter relative to various discovery requests of Plaintiff.[1]  Included in this correspondence was a proposed protective order. [Exhibit A].  This letter followed a face-to-face communication between counsel, with there being an agreement in principle to such an order.

Without addressing the issue of the protective order, counsel for Plaintiff wrote the undersigned on September 17, 2007, inquiring as to the whereabouts of the discovery responses. [Exhibit B].  On September 21, 2007, the undersigned emailed counsel for Plaintiff , again reiterating the issue of the protective order and the Defendant's position that such needed to be

---

[1] Although Plaintiff never raised an issue as to such, the reason for the protective order was that much of the information requested through discovery involved personal financial and other data of numerous non-parties.

addressed prior to any discovery response. [Exhibit C]. There was no issue to such raised by Plaintiff and the responsive email from Plaintiff's counsel of September 21, 2007 simply stated that they were reviewing the proposed order and "will get back to you on that." [Exhibit D].

On September 24, 2007, counsel for Plaintiff emailed the undersigned with corrections to the proposed protective order. [Exhibit E]. A Joint Motion for a Protective Order was filed with this Court September 28, 2007 [Doc. 18], with such being granted and the Order entered October 11, 2007. [Doc. 19].

The following day, on October 12, 2007, counsel for Plaintiff emailed the undersigned requesting discovery responses within fourteen (14) days. [Exhibit F].

On October 29, 2007, one business day after the requested 14 days, Defendant served responses to Plaintiff's production requests and unsigned interrogatory responses with objections to various discovery requests of Plaintiff. [Exhibit G]. Signed interrogatory responses were forwarded November 30, 2007. [Exhibit H].

On November 30, 2007, counsel for Plaintiff wrote the undersigned raising numerous issues with the Defendant's discovery responses and objections. [Exhibit I]. A response to such was sent by the undersigned on December 27, 2007. [Exhibit J].

Plaintiff asserts that the objections raised by Defendant to any discovery are due to be denied as they were untimely, regardless of any merit to such objections. This assertion is without merit. As set forth above, prior to the expiration of the thirty (30) day time period for discovery responses, discussions ensued between counsel regarding the need for a protective order. This was a joint venture as set forth in the *Joint Motion for Protective Order* filed with this Court. [Doc. 18]. It was made clear to counsel for Plaintiff that Defendant's position was that the entry of such a protective order was necessary prior to discovery responses. To ignore this agreement and clear understanding

now, in an effort to thwart any objection to discovery requests of Plaintiff, is an attempt to also ignore that these communications amounted to an agreed discovery response extension as contemplated in Rule 33(b)(3) and (4).

Even should this Court find that there was no agreement to extend the discovery responses due from Defendant, the above time line clearly reflects "good cause shown" as to why there was a delay in Defendant's responses and objections to discovery served, such being the joint request for the entry of a protective order.

**C.    The Specific Requests**

As to each specific discovery request set out in Plaintiff's instant motion, Defendant addresses such herein.

Interrogatory 15.  Plaintiff merely asserts that no timely objection was made to this request. As set forth above, this is simply not accurate.  As to the request, it is moot in that Plaintiff has subpoenaed and received voluminous documents from many workers' compensation insurers, as well as the agency that Defendant utilized to procure insurance, answering this inquiry.  To the extent a response is still needed, Defendant would refer to the records received from The Frederick Agency.

Interrogatory 17.  Again, Plaintiff merely asserts the timeliness of the objection.  As to the objection, Defendant withdraws that dealing with privilege.[2]  As to the request of Plaintiff of all prior litigation involving Defendant, such is overly broad in that it is not limited in scope or time. Further, it is inconceivable how every other lawsuit or bankruptcy involving Defendant would have any bearing on this matter or lead to any discoverable information.  The issue, as stated by Plaintiff

---

[2] In fact, as to all objections as to privilege and trade secret, Defendant withdraws the same unless specifically set forth herein.

in numerous filings with this Court, is the status of the various physicians utilized by Defendant as either employees or independent contractors. [Doc. 22, p. 2]. This request is clearly meant to harass and burden Defendant.

Interrogatory 23. Plaintiff again asserts that no timely objection was made to this request. As set forth above, this is simply not accurate. As to the request, it is clearly over broad in that it seeks detailed training information from all of Defendant's employees, workers, etc. Such would include the secretarial and janitorial staff. Again, as Plaintiff asserts, the issue in this matter is as to the status of the physicians. Defendant has provided the training and other informational documents provided to physicians as set forth in the responses to Plaintiff's request for production (documents labeled AERAS 0898-0946)[3]. To request training information on any individual other than the physicians clearly is outside the scope of permissible discovery.

Interrogatories 29 and 30. Plaintiff reasserts the timeliness of the objections and such has been addressed herein. These requests are not limited in scope or time. As to the specific requests for expenses incurred and reimbursed, that of the employees and other non-physicians is beyond the scope of permissible discovery and only seeks to harass and burden Defendant. Regardless, in response to production requests, this information was provided (documents labeled AERAS 0892). As to the physicians, this information was also provided in response to Plaintiff's requests for production (documents labeled AERAS 0140-0345, 0826-0854).

Interrogatory 33. Plaintiff reasserts the timeliness of the objections and such has been addressed herein. These requests are not limited in scope or time. As to the specific requests of "all pension, bonuses, vacation, and/or sick pay", this information was likewise provided in responses to Plaintiff's document requests (documents labeled AERAS 0140-0345, 0826-0854, 0855-0897).

---

[3] AERAS documents referenced herein are collectively attached as Exhibit K.

Interrogatories 34-36.   Plaintiff reasserts the timeliness of the objections and such has been addressed herein.  These requests are not limited in scope or time.   Interrogatory 36 is clearly vague in that it asks how Defendant reports income to the IRS and Plaintiff does not accept the response that Defendant complies with all applicable law, along with the numerous documents showing the actual reporting (documents labeled AERAS 0346-0367, 0438-0483, 0547-0614, 0826-0854). Further, as to the requests of interrogatories 34 and 35, this is clearly set out in the documents produced (documents labeled AERAS 0346-0367, 0438-0483, 0547-0614, 0826-0854).

Requests for Production 17-20.   Again, as with the interrogatories, Plaintiff incorrectly asserts that objections by Defendant have been waived.   Regardless, much of that requested has been produced (documents labeled AERAS 0346-0367, 0438-0483, 0547-0614, 0826-0854, 0855-0897, 0140-0345, 0947-1276).  To request each and every financial book kept by Defendant is without question over broad, even if limited to the one year period.  This delves into matters that clearly have nothing to do with the issue of whether physicians utilized are independent contractors versus employees for purposes of workers' compensation coverage, the sole issue as identified by Plaintiff in his motion and other filings with this Court.  Further, this request is not likely to lead to such information.

Request for Production 24.   Again, as with the interrogatories, Plaintiff incorrectly asserts that objections by Defendant have been waived.   Further, this request is over broad in time and scope as it requests tax filings from 2000, when the policy at issue is from 2005.  There is no legitimate need for Plaintiff to have anything related to five (5) years prior to the matters subject to this litigation.  Further, the request is over broad in that it seeks information that has nothing to do with the issues at hand.  Defendant has produced numerous tax filing documents related to Defendant and the physicians pertinent to the time frame of the policy made the basis of this suit

(documents labeled 0346-0367, 0438-0483).   The request beyond that produced is beyond that discoverable.

Requests for Production 29-30.   Again, as with the interrogatories, Plaintiff incorrectly asserts that objections by Defendant have been waived.   This request seeks to delve into the personal matters of several physicians who are not parties to this action.  Defendant has already provided the contracts between the physicians and Defendant (documents labeled AERAS 0140-0345).  No other documents deemed responsive exist in the possession of Defendant.

Request for Production 32.  Again, as with the interrogatories, Plaintiff incorrectly asserts that objections by Defendant have been waived.  The response to this request has been made through documents already produced, clearly setting out the financial and other relationships between these hospitals and Defendant (documents labeled AERAS 0947-1276).

**D.    Conclusion**

As set forth above, Defendant has fully complied with the discovery requests of Plaintiff, either through production or proper objection to such.  It is important to note that the extensive discovery requests of Plaintiff have been attempted to be justified by Plaintiff claiming that it needs this information to determine whether the physicians at issue were employees versus independent contractors.  This determination was supposedly already made by Plaintiff in determining the massive premium increase billed to Defendant.   Obviously, all this now deemed pertinent information was not really in the possession of, nor considered by, Plaintiff in coming up with its theoretical justification for the premium increase.

For the reasons stated herein, Plaintiff's *Motion to Compel Defendant to Provide Full and Complete Responses to Discovery* is due to be denied.

Respectfully submitted this the 16th day of January, 2008.

_____/s/   Michael J. Cohan_____
MICHAEL J. COHAN  (ASB-6887-A56M)
Attorney for Defendant

OF COUNSEL:
Hill, Hill, Carter,
Franco, Cole & Black, P.C.
Post Office Box 116
Montgomery, Alabama 36101-0116
Telephone: (334) 834-7600
Facsimile: (343) 832-7419
Email: mcohan@hillhillcarter.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and foregoing upon all parties by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following via: email this the 16th day of January, 2008.

Brenen G. Ely, Esq.
Joel S. Isenberg, Esq.
Candace L. Hudson, Esq.
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209


    /s/   Michael J. Cohan
MICHAEL J. COHAN  (ASB-6887-A56M)

 **Hill Hill Carter**

Michael J. Cohan
Facsimile: 334-832-7419
mcohan@hillhillcarter.com

Hill, Hill, Carter,
Franco, Cole & Black, P.C.
*Attorneys at Law*

Post Office Box 116
Montgomery, AL 36101-0116

425 South Perry Street
Montgomery, Alabama 36104

Telephone: 334-834-7600
www.HillHillCarter.com

August 30, 2007

Brenen G. Ely, Esq.
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209

Re:     ***Continental Casualty Company v. Alabama Emergency Room Administrative
Services, P.C. (U.S. District Court, Middle District of Alabama, Northern
Division; 2:07cv221-WHA)***

Dear Brenen:

I am finalizing responses to your Requests for Production; however, much that you request involves personal information regarding employees and contract physicians, as well as proprietary information. While I would like to cooperate in providing much of that requested, I cannot without some sort of protective order. I have attached a proposed order. Let me know if it is agreeable.

Sincerely,

Michael J. Cohan

MJC/lrs

Enclosure

> **EXHIBIT**
> **A**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONTINENTAL CASUALTY COMPANY, )
                                           )
         Plaintiff,                       )
                                           )
v.                                             )    CASE NO.:   2:07cv221-WHA
                                           )
ALABAMA EMERGENCY ROOM        )
ADMINISTRATIVE SERVICES, P.C.      )
                                           )
         Defendant.                   )

## PROTECTIVE ORDER

Compliance with discovery in this case will involve review of confidential information of

Defendant and non-parties to this action, as well as commercially sensitive, confidential, and private

business and personal information. In order to protect the legitimate privacy and proprietary interests

of the Plaintiff and non-parties, as well as to provide Defendants and counsel certain documents

potentially relevant to the subject matter of this action, the parties agree to the following:

      a.      "Confidential Information" shall include documents, files, and manuals maintained

               by Defendant, Alabama Emergency Room Administrative Services, P.C. ("AERAS")

               containing any commercially and/or personally sensitive information concerning

               AERAS's business, its employees and/or its contractors and/or entities and

               individuals with whom Defendant do es business. "Confidential Information"

               includes but is not limited to all portions and sections of AERAS's internal corporate

               files and/or any files in the possession and control of AERAS.

      b.      Access to these protected materials shall be limited solely to the Plaintiff, the

               Defendants, their attorneys of record, the support and clerical personnel of those

attorneys, and their expert witness(es), if any. All those who see the confidential information, with the exception of counsel, shall sign a statement that they have read this Order, understand it, and agree to keep confidential any material seen.

c.  Any information designated as Confidential Information under this Order shall, if and when filed with the Court, be clearly marked "Confidential."

d.  Any documents, exhibits or other materials (or portions thereof) which are to be designated as Confidential Information pursuant to the terms hereof shall be marked on the front page of a multi-page document and on each applicable single page document with a stamp or written statement clearly indicating that it is regarded as containing Confidential Information; or as to voluminous productions, they may be marked in any manner agreeable to all counsel that will assure that the documents can be clearly identified as Confidential Information. A stamp or clearly printed statement in the form as follows shall be regarded as sufficient classification:

"CONFIDENTIAL"

Further, where the Confidential Information is in such a form that such a stamp or mark cannot be reasonably placed thereon, then such information shall be designated Confidential Information in such a manner as is reasonable under the circumstances.

a.  Nothing in this Order shall prevent disclosure beyond the terms of this Agreement if AERAS consents in writing to such disclosure or if the Court, after notice to all affected parties, orders such disclosure. This Agreement shall not limit AERAS's right to use its own Confidential Information in any manner it chooses. Nor shall this Agreement regulate the manner of receipt of any evidence at trial or the use of

documents in the taking of depositions. AERAS may, however, move the Court for an Order that the evidence be received *in camera* or under other conditions to prevent unnecessary disclosure. The Court will then determine whether the proffered evidence should continue to be treated as Confidential Information and, if so, what protection, if any, may be afforded such information at trial or hearing, including the filing of such information under seal. The purpose of this provision is to prevent the unnecessary disclosure of Confidential Information resulting from such documents being filed and becoming part of the public record.

a.      AERAS's or the plaintiff's inadvertent or unintentional disclosure of any Confidential Information shall not be construed to be a waiver, in whole or in part, of AERAS's claims of confidentiality, either as to the specific Confidential Information disclosed or as to other related information.

g.      The provisions of this Order shall not affect the admissibility of evidence at trial, before the grand jury, or at any preliminary evidentiary proceeding in open court, except as directed by separate order entered for good cause shown, and this Order shall not be construed as a waiver by any party of any objection that might be raised as to the discoverability or admissibility at trial of any document, information or testimony.

h.      Within thirty days after final verdict and the conclusion of all appeals, if any, Defendants and his counsel shall return all Confidential Information (including all copies and/or summaries thereof) to AERAS.

i.      Either party or affected non-party may at any time seek modification, revision,

-3-

clarification, or termination of this Order.

IT IS SO ORDERED, this___day of _____, 2007.


_____
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE



AGREED AND ACCEPTED:



_____
BRENEN G. ELY (ASB-0366-E54B)
Attorney for Plaintiff




_____
MICHAEL J. COHAN (ASB-6887-A56M)
Attorney for Defendant

# ELY & ISENBERG, L.L.C.

### Attorneys at Law

600 Beacon Parkway West, Suite 104 • Birmingham, Alabama 35209
Telephone 205.313.1200 • Facsimile 205.313.1201

E-mail Address: CHudson@elylawllc.com

Candace L. Hudson

September 17, 2007

Michael Cohan
HILL, HILL, CARTER, FRANCO,
COLE & BLACK, P.C.
Post Office Box 116
Montgomery, AL 36101

Re:     *Continental Casualty Company v. Alabama Emergency Room Administrative Services, P.C.*

Dear Mike:

As of the date of this letter, we have not received your client's responses to the interrogatories and requests for production issued by Continental Casualty. Please forward the responses within the next fourteen (14) days.

Thank you in advance for your cooperation and assistance in this regard. Should you have any questions please do not hesitate to call.

Sincerely,

Candace L. Hudson

CLH/km

EXHIBIT
B

## Mike Cohan

**From:**    Mike Cohan
**Sent:**    Friday, September 21, 2007 12:42 PM
**To:**      'Candace Hudson'
**Subject:** AERAS

Candace:  Got your letter regarding the discovery responses from my client.  I spoke with Brenen earlier about a Protective Order and I sent him a proposed one.  Until this is entered, I am holding off on responding to the discovery.  Let me know if the proposed order is an issue.  Also, Brenen and I missed each other last week or so regarding whether your client wishes to try and resolve this matter without further time and money.  Let me know something on that as well, please.  Thanks, Mike

Michael J. Cohan

Hill, Hill, Carter, Franco, Cole & Black, P.C.

425 South Perry Street

Montgomery, Alabama 36104

(334) 834-7600

(334) 832-7419 [facsimile]

**NOTICE:**  This e-mail is from a law firm, Hill, Hill, Carter, Franco, Cole & Black, P.C. ("HHC"), and is intended solely for the use of the individual(s) to whom it is addressed.  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail and any attachments from your computer, and do not copy or disclose this email or any attachments to anyone else.  If you are not an existing client of HHC, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to HHC in reply that you expect it to hold in confidence.  If you properly received this e-mail as a client, co-counsel or retained expert of HHC, you should maintain its contents in confidence in order to preserve the attorney-client, work product and other privileges that may be available to protect confidentiality.

Although this email is believed to be free of any virus or other defects that might affect any computer system in which it is received, it is the responsibility of the recipient to ensure that it is virus free; HHC accepts no responsibility for any loss or damage arising in any way from its use.

**IRS CIRCULAR 230 DISCLOSURE:** Pursuant to U.S. Treasury Regulations, we are now required to advise you that (1) unless explicitly stated above to the contrary, the contents and conclusions (if any) contained in this communication (including any attachments) are preliminary in nature and do not express a formal opinion contemplated by IRS Circular 230; (2) nothing contained in this communication (including any attachments) is intended to be used, or may be relied upon or used, by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (3) any statement contained in this communication (including any attachments) relating to any federal tax issue may not be used by any person to support the promotion, marketing of, or used to recommend any transaction or matter addressed in this communication.



EXHIBIT

C

## Mike Cohan

| | |
|---|---|
| **From:** | Candace Hudson [chudson@elylawllc.com] |
| **Sent:** | Friday, September 21, 2007 1:10 PM |
| **To:** | Mike Cohan |
| **Subject:** | RE: AERAS |

Mike --

Thanks for your response.  We're taking a look at the proposed Protective Order and will get back to you on that.

I talked to Brenen.  He asks that you call him regarding settlement when you get time.  He was actually waiting on you to call (he remembers you saying that you'd call this week).

Thanks.

Candace


-----Original Message-----
From: Mike Cohan [mailto:mcohan@hillhillcarter.com]
Sent: Friday, September 21, 2007 12:42 PM
To: Candace Hudson
Subject: AERAS

Candace:  Got your letter regarding the discovery responses from my client.  I spoke with Brenen earlier about a Protective Order and I sent him a proposed one.  Until this is entered, I am holding off on responding to the discovery.  Let me know if the proposed order is an issue.  Also, Brenen and I missed each other last week or so regarding whether your client wishes to try and resolve this matter without further time and money.  Let me know something on that as well, please.  Thanks, Mike

      Michael J. Cohan

      Hill, Hill, Carter, Franco, Cole & Black, P.C.

      425 South Perry Street

      Montgomery, Alabama 36104

      (334) 834-7600

      (334) 832-7419 [facsimile]



      NOTICE:  This e-mail is from a law firm, Hill, Hill, Carter, Franco, Cole & Black, P.C. ("HHC"), and is intended solely for the use of the individual(s) to whom it is addressed.  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail and any attachments from your computer, and do not copy or disclose this email or any attachments to anyone else.   If you are not an existing client of HHC, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to HHC in reply that you expect it to hold in confidence.  If you properly received this e-mail as a client, co-counsel or retained expert of HHC, you should maintain its contents in confidence in order to preserve the attorney-client, work product and other privileges that may be available to protect confidentiality.

      Although this email is believed to be free of any virus or other defects that might affect any computer system in which it is received, it is the responsibility of the recipient to ensure that it is virus free; HHC accepts no responsibility for any loss or damage arising in any way from its use.

      IRS CIRCULAR 230 DISCLOSURE: Pursuant to U.S. Treasury Regulations, we are now

## Mike Cohan

**From:**   Candace Hudson [chudson@elylawllc.com]
**Sent:**   Monday, September 24, 2007 5:03 PM
**To:**   Mike Cohan
**Cc:**   Brenen Ely
**Subject:** Continental Casualty v. AERAS

Mike –

We've reviewed the proposed Protective Order and have no problems with its content. However, the second full sentence of the proposed Protective Order is incorrect. The references to Defendant and Plaintiff appear to be reversed. Please have that revision made before the proposed Protective Order is presented to the Court. Thanks.

Candace
Candace L. Hudson
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209
(205) 313-1200 telephone
(205) 313-1201 facsimile
chudson@elylawllc.com

Ely & Isenberg, LLC intends that this electronic message be used exclusively by the individual or entity to which it is addressed. This message may contain information that is attorney privileged, confidential, and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (205) 313-1200 and delete the original message from your e-mail system. Thank you.

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.488 / Virus Database: 269.13.30/1027 - Release Date: 9/24/2007 11:27 AM



EXHIBIT

E

1/3/2008

# Mike Cohan

**From:**    Candace Hudson [chudson@elylawllc.com]
**Sent:**    Friday, October 12, 2007 3:23 PM
**To:**    Mike Cohan
**Cc:**    Brenen Ely
**Subject:** AERAS

Mike –

Now that the Court has entered the Protective Order, we would appreciate you forwarding AERAS's responses to the outstanding discovery within the next fourteen (14) days.

Also, please let us know the status on getting proposed dates for the depositions of the doctors and witnesses that we identified in our letter of August 15, 2007.

Candace

Candace L. Hudson
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209
(205) 313-1200 telephone
(205) 313-1201 facsimile
chudson@elylawllc.com

Ely & Isenberg, LLC intends that this electronic message be used exclusively by the individual or entity to which it is addressed.  This message may contain information that is attorney privileged, confidential, and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, be aware that any disclosure, dissemination, distribution or copying of this communication, or the use of its contents, is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone at (205) 313-1200 and delete the original message from your e-mail system.  Thank you.

No virus found in this outgoing message.
Checked by AVG Free Edition.
Version: 7.5.488 / Virus Database: 269.14.8/1066 - Release Date: 10/12/2007 11:10 AM

EXHIBIT
tabbies®
F

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONTINENTAL CASUALTY COMPANY, )
　　　　　　　　　　　　　　　　　　　 )
　　　　　Plaintiff,　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　　　　) 　　CASE NO.:　2:07cv221-WHA
　　　　　　　　　　　　　　　　　　　 )
ALABAMA EMERGENCY ROOM　　　　 )
ADMINISTRATIVE SERVICES, P.C.　　　 )
　　　　　　　　　　　　　　　　　　　 )
　　　　　Defendant.　　　　　　　　　 )

**DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR PRODUCTION**

COMES NOW the Defendant, Alabama Emergency Room Administrative Services, P.C.,

and responds to Plaintiff's Requests for Production as follows, subject to and in accordance with any

and all protective orders entered in this matter:

1.　　　To the extent they exist in the possession of Defendant, see attached.

2.　　　To the extent they exist in the possession of Defendant, see attached.

3.　　　To the extent they exist in the possession of Defendant, see attached.

4.　　　To the extent they exist in the possession of Defendant, see attached.

5.　　　To the extent they exist in the possession of Defendant, see attached.

6.　　　To the extent they exist in the possession of Defendant, see attached.

7.　　　To the extent they exist in the possession of Defendant, see attached.

8.　　　To the extent they exist in the possession of Defendant, see attached.

9.　　　To the extent they exist in the possession of Defendant, see attached.

10.　　To the extent they exist in the possession of Defendant, see attached.

11.　　To the extent they exist in the possession of Defendant, see attached.



EXHIBIT
G

12.    To the extent they exist in the possession of Defendant, see attached.

13.    To the extent they exist in the possession of Defendant, see attached.

14.    To the extent they exist in the possession of Defendant, see attached.

15.    To the extent they exist in the possession of Defendant, see attached.

16.    To the extent they exist in the possession of Defendant, see attached.

17.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain information that is protected as trade secrets and/or proprietary information, not otherwise discoverable. Further, this request seeks to delve into the personal and private matters involving a number of physicians and employees not parties to this action. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harass, oppress and annoy Defendant.

18.    To the extent they exist in the possession of Defendant, see attached.

19.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain information that is protected as trade secrets and/or propriortary information, not otherwise discoverable. Further, this request seeks to delve into the personal and private matters involving a number of physicians and employees not parties to this action. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harrass, oppress and annoy Defendant.

20.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain information that is protected as trade secrets and/or propriortary information, not otherwise

discoverable. Further, this request seeks to delve into the personal and private matters involving a number of physicians and employees not parties to this action. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harrass, oppress and annoy Defendant.

21.    To the extent they exist in the possession of Defendant, see attached.

22.    To the extent they exist in the possession of Defendant, see attached.

23.    To the extent they exist in the possession of Defendant, see attached.

24.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Without waiving said objections, see attached.

25.    Not applicable.

26.    This information is readily available from the offices of the Alabama Secretary of State.

27.    To the extent they exist in the possession of Defendant, see attached.

28.    To the extent they exist in the possession of Defendant, see attached.

29.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain information that is protected as trade secrets and/or proprietary information, not otherwise discoverable. Further, this request seeks to delve into the personal and private matters involving a number of physicians not parties to this action. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harass, oppress and annoy Defendant.

30.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain

information that is protected as trade secrets and/or proprietary information, not otherwise discoverable. Further, this request seeks to delve into the personal and private matters involving a number of physicians not parties to this action. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harass, oppress and annoy Defendant.

31.    To the extent they exist in the possession of Defendant, see attached.

32.    Defendant objects to this request as it is vague, overly broad, overly burdensome and not reasonably calculated to lead to discoverable information. Further, this request seeks to obtain information that is protected as trade secrets and/or proprietary information, not otherwise discoverable. Further, this request has absolutely nothing to do with the pending litigation and is clearly meant to harass, oppress and annoy Defendant.

33.    To the extent they exist in the possession of Defendant, see attached.

34.    To the extent they exist in the possession of Defendant, see attached.

35.    To the extent they exist in the possession of Defendant, see attached.

36.    To the extent they exist in the possession of Defendant, see attached.

Respectfully submitted this the 29th day of October, 2007.

MICHAEL J. COHAN (ASB-6887-A56M)
Attorney for Defendant

OF COUNSEL:
Hill, Hill, Carter,
Franco, Cole & Black, P.C.
Post Office Box 116
Montgomery, Alabama 36101-0116
Telephone: (334) 834-7600
Facsimile: (343) 832-7419
Email: mcohan@hillhillcarter.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all parties by U.S. Mail this the _____ day of _____, 2007.

Brenen G. Ely, Esq.
Joel S. Isenberg, Esq.
Candace L. Hudson, Esq.
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209

MICHAEL J. COHAN  (ASB-6887-A56M)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CONTINENTAL CASUALTY COMPANY, )
                                         )
       **Plaintiff,**                )
                                           )
**v.**                                          )     **CASE NO.:   2:07cv221-WHA**
                                           )
**ALABAMA EMERGENCY ROOM**     )
**ADMINISTRATIVE SERVICES, P.C.**   )
                                           )
       **Defendant.**              )

### DEFENDANT'S RESPONSES TO PLAINTIFF'S INTERROGATORIES

COMES NOW Defendant Alabama Emergency Room Administrative Services, P.C. (AERAS) and responds to Plaintiff's First Interrogatories, in order and as numbered in the interrogatories propounded by Plaintiff, as follows:

1.      For each requested Admission that you denied, please provide a detailed explanation of the reason for each such denial and state what you assert to be the facts relevant to each request.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, the following is provided as to each denied request for admission, referenced by the requests as numbered in the Requests for Admissions to Defendant:

      3.  The policy at issue was cancelled by AERAS prior to May 3, 2006. Documents previously produced support these facts.

      6.  While AERAS never submitted a claim to Plaintiff needing "service", the erroneous billing practices, claimed audits and service related to such were well below par.  Documents previously produced support these facts.

      7.  This is a contention of Plaintiff.  AERAS was told what the premium would be when it purchased the coverage from Plaintiff.  AERAS paid the premium quoted for the coverage desired.  AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed "actual" premium has any merit.  Documents previously produced support these facts.

**EXHIBIT**

tabbies®

H

8. This is a contention of Plaintiff. AERAS disputes that any legitimate and accurate "audit" was performed. AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed "actual premium" has any merit. Documents previously produced and the deposition testimony of Tom Dyer support these facts.

9. This is a contention of Plaintiff. AERAS disputes that any legitimate and accurate "audit" was performed. AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed "actual premium" has any merit. Documents previously produced and the deposition testimony of Tom Dyer support these facts.

10. This is a contention of Plaintiff. AERAS disputes that any legitimate and accurate "audit" was performed. AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed "actual premium" has any merit. Documents previously produced and the deposition testimony of Tom Dyer support these facts.

11. AERAS paid sums to Plaintiff for what AERAS was told was the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. The amounts paid by AERAS are reflected in the documents previously produced and the deposition testimony of Tom Dyer.

12. This is a contention of Plaintiff. AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. Insofar as Plaintiff contends that AERAS owes any further monies to it, AERAS disputes that premiums payments were "properly credited". Documents previously produced support these facts.

13. This is a contention of Plaintiff. AERAS disputes that any legitimate and accurate "audit" was performed. AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed premium has any merit. Documents previously produced and the deposition testimony of Tom Dyer support these facts.

14.  This is a contention of Plaintiff.  AERAS was told what the premium would be when it purchased the coverage from Plaintiff.  AERAS paid the premium quoted for the coverage desired.  AERAS disputes that any further premium is owed.  Documents previously produced support these facts.

15.  This is a contention of Plaintiff.  AERAS was told what the premium would be when it purchased the coverage from Plaintiff.  AERAS paid the premium quoted for the coverage desired.  AERAS disputes that any further premium is owed.  Documents previously produced support these facts.

16.  This is a contention of Plaintiff.  AERAS was told what the premium would be when it purchased the coverage from Plaintiff.  AERAS paid the premium quoted for the coverage desired.  AERAS disputes that any further premium is owed.  Documents previously produced support these facts.

17.  This is a contention of Plaintiff.  AERAS was told what the premium would be when it purchased the coverage from Plaintiff.  AERAS paid the premium quoted for the coverage desired.  AERAS disputes that any further premium is owed.  Documents previously produced support these facts.

2.      Please state the full name, home and work addresses, and job title of the person or persons answering these interrogatories.

**RESPONSE:** Mark Edward Platt, RN.  Mr. Platt may be contacted through counsel for AERAS.  Mr. Platt is the Chief Operating Officer (COO) of AERAS.

3.      Please state the names and addresses of all persons who have knowledge of any fact relating to the incidents made the basis of this lawsuit.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.  Without waiving any objection, the following is provided:

Mark Edward Platt, RN
Kelli D. Destin
Beppy Hassey
Ashley Rogers
Jeanie M. Shaw
Beebe R. Frederick, Jr.
John Moorehouse, MD
Any individual listed by Plaintiff in any discovery response
Any individual identified in any document produced by AERAS to Plaintiff
Any individual identified in any document produced by Plaintiff to AERAS

4.    As to each person named above, please describe in detail his/her knowledge of the facts regarding the claim made the basis of this lawsuit.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, the above individuals have knowledge of the issues relative to this lawsuit, including communications between the parties hereto, as well as the business structure and operations of AERAS. The documents previously produced to Plaintiff by AERAS reflect the knowledge of each individual listed.

5.    Please identify and describe in detail each and every communication that AERAS or any of its representatives had had with Continental Casualty or any of its employees, agents, or representatives regarding the incident made the basis of this lawsuit, specifically identifying the person(s) between whom each communication was made, the manner of communication, and the substance of each communication.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, this has been produced previously to Plaintiff.

6.    Please identify and describe in detail each and every communication that AERAS or any of its employees, agents, or representatives have had with its insurance agent or any other person not a party to this lawsuit regarding the incidents made the basis of this lawsuit, specifically identifying the person(s) with whom AERAS or its employees, agents, or representatives communicated and the substance of each such communication.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, this has been produced previously to Plaintiff.

7.    If AERAS claims that the Workers' Compensation insurance failed to conform to that which AERAS requested, please identify and describe in detail how such insurance failed to conform and state the method by which these alleged failures were communicated to Continental Casualty.

**RESPONSE:** While AERAS never submitted a claim to Plaintiff, the erroneous billing practices, claimed audits and service related to such were well below par. Documents previously produced support these facts and clearly identify communications between the parties hereto.

8.    If AERAS claims any defect or problem in any of the insurance services provided, please state the nature of each alleged defect or problem, the date on which each defect or problem was first observed by AERAS, and identify the person who first observed the alleged defect or problem.

**RESPONSE:** While AERAS never submitted a claim to Plaintiff, the erroneous billing practices, claimed audits and service related to such were well below par. Documents previously produced support these facts and clearly identify those individuals involved in such issues.

9.    If AERAS claims any defect or problem with the Workers' Compensation insurance upon which this lawsuit is based, please state whether AERAS notified Continental Casualty of such a problem, and, if so, please identify the date on which AERAS notified Continental Casualty of such problem, the manner in which AERAS notified Continental Casualty, the person at AERAS who communicated the notification to Continental Casualty, the substance or content of the notification, and to whom the notification was given.

**RESPONSE:** While AERAS never submitted a claim to Plaintiff, the erroneous billing practices, claimed audits and service related to such were well below par. Documents previously produced support these facts and clearly identify those individuals involved in such issues and the communications as between the parties hereto.

10.    Please identify each and every payment made by AERAS for the initial or final premium amount for the Workers' Compensation coverage that is the basis of this lawsuit. Your response should include the date and manner of each payment, and the recipient for same.

**RESPONSE:** This has been produced previously to Plaintiff.

11.    If AERAS has not paid, in full, the final premium amount that is the subject matter of this litigation, please state your reason for not paying the full amount of the final premium that

has been invoiced to AERAS.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, this has been produced previously to Plaintiff. Further, AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed premium has any merit. AERAS disputes that any legitimate and accurate "audit" was performed. Documents previously produced support these facts.

12.    Please state the name and address of the person who is the custodian of books and records of AERAS.

**RESPONSE:** Kelli D. Destin. Ms. Destin may be contacted through counsel for AERAS.

13.    Please state the name and address of the person who maintains the payroll records of AERAS.

**RESPONSE:** Kelli D. Destin. Ms. Destin may be contacted through counsel for AERAS.

14.    Please state the name, job description, and monthly payroll amounts for each workers, employee, subcontractor and independent contractor for AERAS during the policy period of May 3, 2005 to May 3, 2006.

**RESPONSE:** This has been produced previously to Plaintiff.

15.    If AERAS claims that another company provided alternative coverage for its employees and/or subcontractors during the policy period of May 3, 2005 to May 3, 2006, please state the name and business address of the company providing alternative coverage, the policy number under which alternative coverage was provided, and identify the individual at said company with whom you had contact regarding the alternative coverage.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

16.    Please state the name and address of the insurance agent through whom AERAS

placed its workers' compensation coverage with Continental Casualty.

**RESPONSE:** The Frederick Agency, 624 South Perry Street, Montgomery, Alabama 36101.

17.    Please state whether AERAS has ever been a party to another other lawsuit, bankruptcy, claim for nonpayment of workers' compensation insurance premiums, dispute over premiums due on workers' compensation insurance, or dispute over calculation of workers' compensation insurance premiums.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

18.    Please state the amount that AERAS contends that it owes or owed under the workers' compensation policy issued to AERAS by Continental Casualty for the May 3, 2005 to May 3, 2006 policy period.

**RESPONSE:** Nothing other than that which has already been paid.

19.    Please identify and describe in detail how AERAS determined or calculated the amount that it identified in the previous interrogatory response.

**RESPONSE:** Defendant objects to this interrogatory in that it is vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, AERAS was told what the premium would be when it purchased the coverage from Plaintiff. AERAS paid the premium quoted for the coverage desired. AERAS disputes that any further premium is owed. AERAS disputes that the Plaintiff's claims of any additional owed premium has any merit.

20.    Please state whether each AERAS worker, employee, subcontractor, and/or independent contractor is responsible for carrying his or her own workers' compensation policy.

**RESPONSE:** AERAS ensures that its employees are afforded workers' compensation coverage as required by and to the extent of the Alabama Workers' Compensation Act.

21.    Please state whether each AERAS worker, employee, subcontractor, and/or independent contractor is responsible for carrying his or her own liability policy.

**RESPONSE:** It is unclear as to what is meant by "liability policy" and thus AERAS cannot respond to this interrogatory.

22.    Please state whether the work performed by each worker, employee, subcontractor, and independent contractor of AERAS is performed pursuant to a written agreement.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, applicable written agreements have previously been provided to Plaintiff by AERAS.

23.    Please describe fully and in detail the training that AERAS provides to each of its workers, employees, subcontractors and independent contractors.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

24.    Is each AERAS worker, employee, subcontractor, and independent contractor given instructions in the way that work is to be performed?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, as to independent contractors, no.

25.    Does AERAS have the right to change the methods used by its workers, employees, subcontractors, and independent contractors or to direct those persons on how to perform their work?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, as to independent contractors, no.

26.    Is each AERAS worker, employee, subcontractor, and independent contractor required to follow a routine or a schedule established by AERAS? If so, please identify and fully describe the routine or schedule that must be followed by each.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, as to independent contractors, no.

27.    Does each AERAS worker, employee, subcontractor, and independent contractor furnish a time record to AERAS?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. It is unclear as to what is meant by "time record" and thus AERAS cannot respond to this interrogatory.

28.    Who is responsible for providing all tools, equipment, supplies, and materials necessary for completion of work to the AERAS workers, employees, subcontractors, and independent contractors?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. It is unclear as to what is meant by "tools, equipment, supplies, and materials necessary for completion of work " and thus AERAS cannot respond to this interrogatory. Without waiving any objection, AERAS provides employees with that necessary to effectively complete their tasks. As to independent contractors, AERAS provides no tools, equipment, supplies or materials.

29.    What expenses are incurred by AERAS's workers, employees, subcontractors, and/or independent contractors in the performances of services for AERAS?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

30.    Please identify and fully describe all expenses for which AERAS reimburses its workers, employees, subcontractors, and/or independent contractors.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

31.    Please identify and fully describe the type of pay that each worker, employee, subcontractor, and independent contractor receives.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, all such individuals are paid via negotiable instruments with the equivalency of United States currency.

32.    Does AERAS guarantee a minimum amount of pay to its workers, employees, subcontractors, and independent contractors?

**RESPONSE:** No.

33.    Please identify and specifically describe all pension, bonuses, vacation, and/or sick pay available to AERAS's workers, employees, subcontractors, and independent contractors.

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information.

34.    Does AERAS deduct social security tax from the amounts it pays to its workers, employees, subcontractors, and independent contractors?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, AERAS complies with all local, state and federal tax laws.

35.    Does AERAS deduct federal income tax from the amounts it pays to its workers, employees, subcontractors, and independent contractors?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, AERAS complies with all local, state and federal tax laws.

36.    How does AERAS report the income of its workers, employees, subcontractors, and independent contractors to the Internal Revenue Service?

**RESPONSE:** Defendant objects to this interrogatory in that it is unduly burdensome, vague, overly broad, seeks privileged information and is not calculated to lead to discoverable information. Without waiving any objection, AERAS complies with all local, state and federal tax laws.

37.    Please identify by name and address all workers, employees, subcontractors, and/or independent contractors to whom AERAS provided medical malpractice or professional liability coverage during the policy period of May 3, 2005 to May 3, 2006.

**RESPONSE:** None.

38.    For each individual identified in AERAS's response to the preceding interrogatory, please state how said individual was classified for purposes of medical malpractice or professional liability coverage.

**RESPONSE:** Not applicable.

Submitted this the _28_ day of _November_, 2007.

_Mark Edward Platt_
Mark Edward Platt, RN


STATE OF ALABAMA                    )

COUNTY OF MONTGOMERY                )

Before me, the undersigned authority in and for said State and County, personally appeared Mark Edward Platt, RN, who is known to me and having been duly sworn, deposes and says that the answers given in the foregoing are true and correct to the best of her knowledge, information and belief.

SWORN TO and SUBSCRIBED before me on this the _28th_ day of _November_, 2007.

_Barbara A. Green_
NOTARY PUBLIC                    MY COMMISSION EXPIRES
My commission expires:_____    8-30-08


MICHAEL J. COHAN (ASB-6887-A56M)
Attorney for Defendant


OF COUNSEL:
Hill, Hill, Carter,
Franco, Cole & Black, P.C.
Post Office Box 116

Montgomery, Alabama 36101-0116
Telephone: (334) 834-7600
Facsimile: (343) 832-7419
Email: mcohan@hillhillcarter.com

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and foregoing upon all parties by U.S. Mail this the _____ day of _____, 2007.

Brenen G. Ely, Esq.
Joel S. Isenberg, Esq.
Candace L. Hudson, Esq.
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209

MICHAEL J. COHAN  (ASB-6887-A56M)

# ELY & ISENBERG, L.L.C.

### Attorneys at Law

600 Beacon Parkway West, Suite 104 • Birmingham, Alabama 35209
Telephone 205.313.1200 • Facsimile 205.313.1201

E-mail Address: CHudson@elylawllc.com

Candace L. Hudson

November 30, 2007

**VIA FACSIMILE & U.S. MAIL**
Mr. Michael J. Cohan
HILL, HILL, CARTER, FRANCO,
COLE & BLACK, P.C.
Post Office Box 116
Montgomery, AL 36101

Re: *Continental Casualty Company v. Alabama Emergency Room Administrative Services, P.C.*

Dear Mike:

We have received your client's Responses to Requests for production and unverified Responses to Interrogatories. This letter is written to request that AERAS reconsider certain of its objections and provide supplemental responses within the next fourteen (14) days.

As an initial matter, we note that the Responses to Interrogatories have not yet been verified (sworn) by your client. However, pursuant to your correspondence, we understand that you are working to obtain those and expect that the verified responses will differ very little from those originally provided.

Second, we note that AERAS asserts objections in response to many of the interrogatories and requests. However, AERAS failed to assert these objections within the period prescribed by the Federal Rules of Civil Procedure. Therefore, the objections are waived, and we request that AERAS provide the requested information and/or documents.

Further, if there is document that AERAS is withholding from production on the basis of privilege or work-product, we request that you provide us with a privilege log in accordance with Federal Rule of Civil Procedure 26(b)(5)(A).

In addition, we request supplementation of the following Interrogatories and Requests:

Interrogatory 3 requests AERAS to state that names and addresses of all persons with knowledge of any fact related to the incidents made the basis of this lawsuit. AERAS attempts to



EXHIBIT
1

Mr. Michael J. Cohan
November 30, 2007
Page 2

assert objections to the interrogatory and contends it is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. However, AERAS failed to timely object to this, or any other interrogatory or request. Thus, pursuant to Federal Rule of Civil Procedure 33(b)(4), AERAS waived its right to object to this interrogatory. Nevertheless, AERAS has provided some information in response to the interrogatory. Please clarify whether all information and/or documents responsive to this request have been produced. If not, and AERAS withheld any information on the basis of its objections, we request that AERAS immediately supplement the responses to provide the requested information.

Interrogatory 4 requests AERAS to describe in detail the knowledge that each person identified in response to Interrogatory 3 has regarding the incidents made the basis of this lawsuit. AERAS attempts to assert objections to the interrogatory and contends it is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. However, AERAS failed to timely object to this, or any other interrogatory or request. Thus, pursuant to Federal Rule of Civil Procedure 33(b)(4), AERAS waived its right to object to this interrogatory. Nevertheless, AERAS has provided some information in response to the interrogatory. If AERAS has provided all information or documents its has in its possession that respond to the interrogatory, please clarify your response to state this. However, to the extent that AERAS withheld any information on the basis of its objections, we request that AERAS immediately supplement the responses to provide the requested information.

Interrogatories 5 and 6 request AERAS to identify and describe in detail each and every communication that AERAS or any of its representatives had with Continental Casualty, any insurance agent, or any third party regarding the incidents made the basis of this lawsuit. Again, AERAS attempts to assert objections to these interrogatories and contends that they are vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. AERAS failed to timely object to this, or any other interrogatory or request. Thus, pursuant to Federal Rule of Civil Procedure 33(b)(4), AERAS waived its right to object to this interrogatory. Subject to its objections, AERAS states that the information has been produced. If all of the requested information has been provided, please advise us of this. However, if any information or documents were withheld by AERAS on the basis of its objections, we request that the responses be immediately supplemented to provide the requested information.

Interrogatory 11 requests that AERAS state its reasons for not paying the full amount of the final premium that has been invoiced in this matter. AERAS attempts to assert objections to the interrogatory on the basis that it is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. As set forth above, AERAS failed to timely object to this interrogatory and, therefore, its objections are waived. Nevertheless, AERAS provides some information in response to the interrogatory. Please clarify the answer to this interrogatory and state whether all requested information was provided in the response. If so, supplementation of this interrogatory response is not necessary. If, however, any information was withheld by AERAS on

Mr. Michael J. Cohan
November 30, 2007
Page 3

the basis of an objection, please immediately supplement the response to provide the requested information.

Interrogatory 15 seeks information regarding any alternative coverage that might have been available for AERAS's employees and/or subcontractors during the Continental Casualty policy period. AERAS asserts objections on the basis that the interrogatory is vague, overly broad, seeks privileged information, and not calculated to lead to discoverable information. However, AERAS failed to timely assert its objections to this interrogatory. Accordingly, pursuant to Federal Rule of Civil Procedure 33(b)(4), AERAS waived its objections to this interrogatory. Thus, we request that AERAS immediately supplement its responses to provide the requested information.

Interrogatory 17 requests AERAS to state whether it has been a party to any other lawsuit, bankruptcy, or claim for nonpayment of workers' compensation insurance premiums, dispute over premiums due on workers' compensation insurance, or dispute over calculation of workers' compensation insurance premiums. AERAS again attempts to assert objections and contends that the interrogatory is vague, overly broad, seeks privileged information, and not calculated to lead to discoverable information. However, AERAS failed to timely assert its objections to this interrogatory. Accordingly, pursuant to Federal Rule of Civil Procedure 33(b)(4), AERAS waived its objections to this interrogatory. Thus, we request that AERAS immediately supplement its responses to provide the requested information.

Interrogatory 19 asks AERAS to identify and describe how AERAS determined or calculated the amount of premium that it contends was appropriate for the workers' compensation policy in issue. In response, AERAS asserts objections and states that the interrogatory is vague, overly broad, seeks privileged information, and not calculated to lead to discoverable information. Subject to its objections, AERAS does, however, provide some information in response to the interrogatory. If all information responsive to the interrogatory has been provided, please clarify your response to so state. If, however, information was withheld on the basis of the stated objections, said objections are waived by their untimely submission. Accordingly, we request that AERAS immediately provide all information and/or documents that might have been withheld.

Interrogatory 20 specifically requests that AERAS state whether each AERAS worker, employee, subcontractor, and/or independent contractor is responsible for carrying his or her own workers' compensation policy. In response, AERAS simply states that it "ensures that its employees are afforded workers' compensation coverage as required by and to the extent of the Alabama Workers' Compensation Act." This answer is non-responsive. We request that AERAS immediately supplement its response to answer the question posed.

Interrogatory 21 specifically requests that AERAS state whether each AERAS worker, employee, subcontractor, and/or independent contractor is responsible for carrying his or her own liability policy. In response, AERAS states that it cannot answer the interrogatory on the basis that

Mr. Michael J. Cohan
November 30, 2007
Page 4

it is unclear that is meant by "liability policy." Please allow this letter to clarify the request as follows: "Please state whether each AERAS worker, employee, subcontractor, and/or independent contractor is responsible for carrying his or her own commercial general liability and/or professional liability policy."

Interrogatory 22 asks AERAS to state whether the work performed by each worker, employee, subcontractor, and independent contractor of AERAs is performed pursuant to a written agreement. AERAS objects that the interrogatory is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. However, subject to its objections, AERAS provides a response to this interrogatory. Please clarify the response to indicate whether any information or documents were withheld on the basis of the asserted objections. If so, the objections were untimely and are, therefore, waived. Accordingly, we request that you immediately produce any and all information that may have been withheld.

Interrogatory 23 requests that AERAS describe the training that AERAS provides to its workers, employees, subcontractors, and independent contractors. Although AERAS attempts to assert objections on the basis that the interrogatory is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information, AERAS waived these objections by failing to timely assert any objection to the interrogatory. Therefore, we request that you provide a full and complete response to Interrogatory 23.

Interrogatories 24, 25, and 26 request that AERAS state whether its workers, employees, subcontractors, and independent contractors are given instructions or directions on how their work is to be performed or required to follow an AERAS-provided schedule or routine. In response to each of these interrogatories, AERAS asserts untimely objections on the basis that the interrogatories are vague, overly broad, seek privileged information, and are not calculated to lead to discoverable information. Subject to the objections, AERAS states that as to independent contractors, it does not instruct or direct their work or require them to follow a schedule or routine established by AERAS. The response does not, however, provide a full and complete response to the interrogatories as it does not include information regarding AERAS's workers, employees or subcontractors. As the objections to these interrogatories are untimely, they are waived. Accordingly, we request that AERAS provide full and complete responses to these interrogatories.

Interrogatory 27 requests AERAS to state whether AERAS's workers, employees, subcontractors, and independent contractors furnish time records to AERAS. AERAS asserts untimely objections on the basis that the interrogatories are vague, overly broad, seek privileged information, and are not calculated to lead to discoverable information. Moreover, AERAS states that it is unable to respond to the interrogatory as it is unclear what is meant by use of the phrase "time record." Thus, please allow this letter to clarify the request as follows: "Does each AERAS worker, employee, subcontractor, and independent contract furnish a time card, time sheet, or other form of written verified confirmation of hours worked to AERAS for the purpose of calculating

Mr. Michael J. Cohan
November 30, 2007
Page 5

payroll or remuneration for each such worker, employee, subcontractor, and independent contractor?" Please provide a full and complete response to the clarified interrogatory.

Interrogatories 29 and 30 request AERAS to identify those expenses that are incurred by AERAS's workers, employees, subcontractors, and independent contractors and those expenses that are reimbursed by AERAS. AERAS fails to answer the interrogatories. Instead, it attempts to assert objections on the basis that the interrogatories are vague, overly broad, seek privileged information, and are not calculated to lead to discoverable information. Pursuant to Federal Rule of Civil Procedure 33(b), the objections are untimely and, therefore, waived. Accordingly, please provide full and complete responses to these interrogatories.

Interrogatory 31 requests AERAS to identify and describe the type of pay that each worker, employee, subcontractor, and independent contractor receives. AERAS asserts untimely objections to this interrogatory on the basis that it is vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. Subject to these objections, AERAS states that all individuals are paid via negotiable instruments. Please allow this letter to clarify the foregoing interrogatory with respect to the term "type of pay." The interrogatory seeks information regarding whether employees, workers, subcontractors, and independent contractors are salaried, paid hourly, paid per project, or paid per a specific contract amount. Please reconsider your answer and provide a full and complete response to the interrogatory as revised.

Interrogatory 33 asks AERAS to identify and describe all pension, bonuses, vacation, and/or sick pay available to its workers, employees, subcontractors, and independent contractors. AERAS failed to answer this interrogatory. Instead, AERAS attempts to assert untimely objections and contends that the interrogatory is unduly burdensome, vague, overly broad, seeks privileged information, and is not calculated to lead to discoverable information. As AERAS did not timely assert its purported objections, the objections are waived pursuant to Federal Rule of Civil Procedure 33(b). Moreover, the requested information is relevant to which no applicable privilege applies. Accordingly, please provide a full and complete response to the interrogatory.

Interrogatory 34 requests that AERAS state whether it deducts social security tax from the amounts it pays to its workers, employees, subcontractors, and independent contractors. AERAS first asserts untimely objections that the interrogatory is unduly burdensome, vague, overly broad, seeks privileged information and not calculated to lead to discoverable information. Subject to the purported objections, AERAS states that it "complies with all local, state and federal tax laws." The answer that has been provided is not responsive to the question posed. Moreover, the purported objections are waived by AERAS's failure to timely assert same. Accordingly, please provide a full and complete response to the interrogatory.

Interrogatory 35 requests that AERAS state whether it deducts federal income tax from the amounts it pays to its workers, employees, subcontractors, and independent contractors. AERAS

Mr. Michael J. Cohan
November 30, 2007
Page 6

again asserts untimely objections and contends that the interrogatory is unduly burdensome, vague, overly broad, seeks privileged information and not calculated to lead to discoverable information. Subject to the untimely objections, AERAS again states that it "complies with all local, state and federal tax laws." As with Interrogatory 34, the answer that has been provided with respect to this interrogatory is not responsive to the question posed. As the purported objections are deemed waived by AERAS's failure to timely assert same, we request that AERAS provide a full and complete response to the interrogatory that has been posed.

Interrogatory 36 requests that AERAS identify how it reports the income of its workers, employees, subcontractors, and independent contractors. As with the foregoing interrogatories, AERAS asserts untimely objections on the basis that the interrogatory is unduly burdensome, vague, overly broad, seeks privileged information and not calculated to lead to discoverable information. Subject to the objections, AERAS again states that it "complies with all local, state and federal tax laws." The answer is wholly non-responsive to the interrogatory. Moreover, AERAS's failure to timely assert any objection to the interrogatory constitutes waiver of the objections. Therefore, we request that AERAS provide a full and complete response to the interrogatory.

Requests for Production 17, 19, and 20 request production of AERAS's payroll ledger, disbursement journals, general ledger, books, or records kept in the usual course of AERAS's business pertaining to workers, employees, subcontractors, and/or independent contractors of AERAS for the policy period of May 3, 2005 to May 3, 2006. AERAS objects to the request as vague, overly broad, overly burdensome, and not reasonably calculated to lead to discoverable information. AERAS states further that the request seeks to obtain information that is protected as trade secret and/or proprietary information, not otherwise discoverable. Further, AERAS contends that the request seeks personal and private information involving physicians and employees who are not parties to this action. Finally, AERAS objects to producing the request information and states the request is not related to the pending litigation and is meant only to harass, oppress, and annoy AERAS.

Initially, please note that just as with each and every objection AERAS attempted to assert to the above-referenced interrogatories, AERAS's objections with respect to the requests for production were not asserted within the time prescribed by the Federal Rules of Civil Procedure. Accordingly, the objections are waived. Moreover, with respect to AERAS's concern regarding maintaining the confidentiality or privacy regarding the requested information, you are aware that the Court has entered a detailed Protective Order. Thus, as long as the produced documents are marked Confidential, the parties are prohibited from disseminating the information to third parties. Finally, the requested information consists of documents that AERAS would have been compelled to produce to Continental Casualty regardless of this litigation. Accordingly, as the requested documentation is relevant information to which no timely objection has been asserted, we respectfully request that the information be produced.

Mr. Michael J. Cohan
November 30, 2007
Page 7

Request for Production 24 seeks production of all federal and state income tax filings for AERAS for the years 2000 to the present. AERAS asserts untimely objections on the basis that the request is vague, overly broad, overly burdensome, and not reasonably calculated to lead to discoverable information. Subject to the objections, AERAS has produced its 941 Employer's Quarterly Tax Returns for the last 3 quarters of 2005 and the first 2 quarters of 2006. However, this is an incomplete response to the request. Because the request seeks relevant information to which no timely objection was asserted, please produce copies of AERAS's federal and state income tax filings for the years 2000 to the present, which include, but are not limited to, any Form 1120 or 1120-S tax returns filed by AERAS for the years 2000 to the present.

Requests for Production 29 and 30 seek the personnel files and applications of any physician that performed work or services on behalf of AERAS pursuant to its agreements with any Baptist hospital during the period of May 3, 2005 to May 3, 2006. AERAS objects to the request as vague, overly broad, overly burdensome, and not reasonably calculated to lead to discoverable information. AERAS states further that the request seeks to obtain information that is protected as trade secret and/or proprietary information, not otherwise discoverable. Further, AERAS contends that the request seeks personal and private information involving physicians and employees who are not parties to this action. Finally, AERAS objects to producing the request information and states the request is not related to the pending litigation and is meant only to harass, oppress, and annoy AERAS.

AERAS's objections with respect to the requests for production were not asserted within the time prescribed by the Federal Rules of Civil Procedure. Thus, the objections are waived. Moreover, with respect to AERAS's concern regarding maintaining the confidentiality or privacy regarding the requested information, the Court has entered a detailed Protective Order that will protect dissemination of any "Confidential" information to third parties. As the information is relevant information to which no timely or applicable objection was asserted, we request that AERAS immediately produce the requested information.

Request for Production 32 requests that AERAS produce copies of each and every invoice issued to any Baptist Hospital for emergency room physician services during the period of May 3, 2005 to May 3, 2006. AERAS objects to the request as vague, overly broad, overly burdensome, and not reasonably calculated to lead to discoverable information. AERAS states further that the request seeks to obtain information that is protected as trade secret and/or proprietary information, not otherwise discoverable. AERAS also objects to producing the request information and states the request is not related to the pending litigation and is meant only to harass, oppress, and annoy AERAS. However, because the information is relevant to which no timely objection or applicable objection was asserted, we respectfully request that AERAS produce the requested information.

Mr. Michael J. Cohan
November 30, 2007
Page 8

Please supplement AERAS's responses to the above-referenced interrogatories and requests for production within the next fourteen (14) days.

We look forward to receiving the responses. Should you have any questions or wish to further discuss the matters addressed in this letter, please contact Brenen or me.

Sincerely,

Candace L. Hudson

CLH/km

cc:    Brenen G. Ely

# Mike Cohan

**From:**  Mike Cohan
**Sent:**  Thursday, December 27, 2007 2:23 PM
**To:**  'Candace Hudson'; 'Brenen Ely'
**Subject:** AERAS

Brenen and Candace:

Hope you both had a great Christmas.  Below, I will try to address your recent correspondence regarding discovery issues in this matter.

Regarding  the multiple depositions you requested, I would suggest you first depose Mark Platt and Dr. Moorehouse.  You may find you really don't want the others.  Of course, that's your call.  I am getting some January dates from all of them regardless, but suggest we at least start with Platt and Moorehouse.

You should have now received signed interrogatory answers.

As to the discovery request disputes, it seems the majority of your assertions are based upon AERAS waiving any objections under FRCP 33 for late submission of the responses.  I'm not going to address that and, if that is to be pursued, you are going to have to contact the Court on this one.

As to the specific responses and further issues taken to the same, I provide the following.  Those not listed below are omitted as it appears as though your only contention with them is as above with regard to Rule 33:

Interrogatories:
3.    Fully responded to.
4.    Fully responded to.
5.    Fully responded to.
6.    Fully responded to.
11.   Fully responded to.
19.   Fully responded to.
20.   Fully responded to.
21.   I assume for this and the following requests that "workers" and "employees" are the same.  AERAS employees are not required to carry any such policies.  All others would be as required by practice, law or professional organizations or licensure boards to which they belong or are subject.  This will obviously vary for each individual or type of profession they engage in.  Further, some carry such policies by personal choice.
22.   Fully responded to.
24.   AERAS employees are given such direction.  All others are not.
25.   AERAS employees are subject to such direction.  All others are not.
26.   AERAS employees are.  All others are not.
27.   Yes.
31.   AERAS employees are paid either salary or hourly wages.  All others are paid based upon agreement/contract.

Requests for Production:
17.   Fully responded to.
19.   Fully responded to.
20.   Fully responded to.
24.   AERAS stands by the objections and limitations on the response to this request.
29.   AERAS stands by the objections and limitations on the response to this request.
30.   AERAS stands by the objections and limitations on the response to this request.
32.   AERAS stands by the objections and limitations on the response to this request.



Let me know if you have any questions.  Mike

Michael J. Cohan

Hill, Hill, Carter, Franco, Cole & Black, P.C.

425 South Perry Street

Montgomery, Alabama 36104

(334) 834-7600

(334) 832-7419 [facsimile]

**NOTICE**:  This e-mail is from a law firm, Hill, Hill, Carter, Franco, Cole & Black, P.C. ("HHC"), and is intended solely for the use of the individual(s) to whom it is addressed.  If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail and any attachments from your computer, and do not copy or disclose this email or any attachments to anyone else.   If you are not an existing client of HHC, do not construe anything in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to HHC in reply that you expect it to hold in confidence.  If you properly received this e-mail as a client, co-counsel or retained expert of HHC, you should maintain its contents in confidence in order to preserve the attorney-client, work product and other privileges that may be available to protect confidentiality.

Although this email is believed to be free of any virus or other defects that might affect any computer system in which it is received, it is the responsibility of the recipient to ensure that it is virus free; HHC accepts no responsibility for any loss or damage arising in any way from its use.

**IRS CIRCULAR 230 DISCLOSURE**: Pursuant to U.S. Treasury Regulations, we are now required to advise you that (1) unless explicitly stated above to the contrary, the contents and conclusions (if any) contained in this communication (including any attachments) are preliminary in nature and do not express a formal opinion contemplated by IRS Circular 230; (2) nothing contained in this communication (including any attachments) is intended to be used, or may be relied upon or used, by any taxpayer for the purpose of avoiding penalties that may be imposed under the Internal Revenue Code; and (3) any statement contained in this communication (including any attachments) relating to any federal tax issue may not be used by any person to support the promotion, marketing of, or used to recommend any transaction or matter addressed in this communication.

12/27/2007



# THE T SYSTEM®

## TRAINING MANUAL
## FOR
## EMERGENCY PHYSICIANS

© Copyright 2000 T-System, Inc.

ESTIMATED TIME
Manual:  30–45 minutes
Quiz:  10 minutes

---

**IMPORTANT NOTE:**

Templates are not designed or intended to influence a physician's clinical judgement or suggest any standard of care. In some cases, it may be appropriate for physicians to complete only a portion of the template.  In other situations, it may be appropriate to record more information than that found on the template.  The content, quantity and method of documentation may vary depending on the clinical situation and/or the physician's judgement.

---

REV. 11/1/00



**AERAS 0898**

# CONTENTS AND OBJECTIVES

## TABLE OF CONTENTS

*SECTION 1*
OVERVIEW ......................................................................................1 – 3

*SECTION 2*
MARKING THE TEMPLATE.............................................................4 - 11

*SECTION 3*
HCFA GUIDELINES .......................................................................12 - 13

*SECTION 4*
DOCUMENTING COMPLEX HISTORIES ......................................14 – 17

*APPENDIX 1*
*TEMPLATE EXAMPLES* .....................................................................19 – 27

*APPENDIX 2*
*TEMPLATE SELECTION* .....................................................................29 – 34

*APPENDIX 3*
*PATIENT VIGNETTES* .........................................................................35 – 38

*APPENDIX 4*
*CODER'S APPENDIX (MORE HCFA INFO)* ..........................................39 – 43

*T-SYSTEM QUIZ* ................................................................................45 – 47

## OBJECTIVES

Upon completing this instruction manual, you should:

- **Understand the advantages of template charting.**

- **Understand the organization of the T-System and the layout of its component templates.**

- **Learn to effectively use templates at the bedside.**

- **Understand the keys to quality in template charting.**

- **Know how to document complex histories using templates.**

AERAS 0899

# SECTION 1  OVERVIEW

## What is the T-System®?

- A **bedside** charting system—a tool to help doctors to provide documentation of healthcare services.

- Over 50 templates **based on chief complaint.**

  *Each template is a single two-sided document. Typically the physician uses only ONE template for each patient.*

- Covers 90–98% of emergency problems.

## What the T-System® is Not:

- It is not intended to guide or replace professional clinical judgment.

- It is not intended to replace discharge instructions or order sheet.

## Advantages for Emergency Physicians:

- Reduces documentation time.

- Enhances the quality of the record.

- Organizes the patient encounter.

- Decreases fatigue.

- Simplifies compliance with HCFA guidelines.

- Improves reimbursement.

## How Does the T-System® Work?

**T-Tip**

Mark the template with a blue pen such as the Uniball™ fine tip pen, if permitted by your hospital. Blue ink is easily seen against the black formatting of the template.

- Nurse (or physician) selects a template from a special shelving unit (see page 3).

- Physician records history and physical exam findings on the template **at the bedside.**

- The template serves as the physician's note.

- Physician marks a (**T**) on the chart to show that the template is complete.

[1]

AERAS 0900

# The Templates

- Templates are organized by category —

  > Medicine
  > CNS and Critical Care
  > Multiple Trauma
  > Regional Trauma
  > Pediatrics    *(medical & trauma)*

  > *Templates are based on the CHIEF COMPLAINT, not the diagnosis*

- Within each category the templates have a similar layout. Diagrams of body areas make it easy to record findings.

- Special shelving makes it quick to find a template … just look next to the affected body part to find the corresponding template.

- Each template is a single page (front and back). You can usually use only one template even when the patient has multiple complaints. Just choose an **"organizing chief complaint,"** and record other symptoms on that template as well. The organizing chief complaint is typically the most serious or immediate complaint. You may have additional templates chosen specifically by your facility. You will find these in the mini-shelf at the base of your shelving unit.

- The System also includes certain "add-on" templates. Use these when needed in addition to the main template, but do not use add-on templates alone. Add-on templates include:

  > Radiographic Interpretation templates
  > EKG Interpretation templates
  > Additional laceration repair
  >   notes/conscious sedation
  > Progress Notes
  > Major trauma procedure/progress notes

### T-Tip

Choose a Multiple Trauma template if the MECHANISM of injury could have caused multiple areas of trauma. The Multiple Trauma templates include a "whole body exam," which is necessary for falls, MVA, etc.

Choose a Regional Trauma template for localized injuries such as lacerations and sprains.

All trauma templates have "built-in" procedure notes for lacerations and other procedures.

### T-Tip

Each template is labeled with a HCFA formatting level next to the template title. For example, on page 5, note the "5" next to the title "abdominal pain." This template includes Level 5 requirements for history and physical. (Of course, the case must also have the necessary HCFA medical decision making for Level 5.)

AERAS 0901

# TEMPLATE SELECTION

The template list is shown below as arranged in the standard shelving unit. The graphics will help you locate the most useful template.

### "HURT MAN"

### "SICK MAN"

## REGIONAL TRAUMA

Use a regional trauma template (arranged anatomically along "Hurt Man") for localized injuries such as an isolated sprained ankle or a hand laceration. Certain templates can also serve for non-trauma complaints (e.g., *Back Pain, Neck Pain,and Eye Problems*.) Use the *Hip Injury* template for hip fracture.

## PEDIATRICS

Use the *Pediatric Illness* template (#14) for all illnesses in infants & toddlers, including febrile seizures and ingestions. You may use the other templates as well for older children.

## MULTIPLE TRAUMA

Use one of the seven multiple trauma templates (#16–22) when multiple injuries are present or possible, such as *MVA* or *Significant Fall.* These are grouped by mechanism of injury. The *Major Burn* template is for severe, extensive burns or smoke inhalation. Use a regional trauma template for most burns.

## MEDICAL TEMPLATES

The medical templates are arranged anatomically along the "Sick Man" diagram. Use the *Cough/Fever* template for "fever of uncertain origin."

## NEUROLOGY TEMPLATES

The neurology templates (by the brain diagram) are a diverse and useful group. The *Changed Mental Status* template is appropriate for an insulin reaction. The *Focal Neuro Deficit* template is useful for generalized (non-focal) weakness as well as focal complaints.



**TRAUMA / PEDIATRICS**

1  HEAD INJURY
2  EYE COMPLAINTS
3  FACIAL, SCALP
4  NECK & UPPER BACK PAIN
5  SHOULDER
6  UPPER EXTREMITY INJURY
7  TRUNK INJURY
8  LOW BACK PAIN / INJURY
9  HAND, WRIST or FINGER
10  HIP INJURY
11  LOWER EXTREMITY INJURY
12  ANKLE, FOOT or TOE INJURY
13  PLANTAR PUNCTURE WOUND
14  PEDIATRIC ILLNESS
15  PEDIATRIC WHEEZING / ASTHMA
16  PEDIATRIC TRAUMA
17  MVA
18  MULTIPLE TRAUMA
19  FALL
20  ASSAULT
21  ANIMAL BITE
22  MAJOR BURN / Smoke Inhalation
23  SUTURE REMOVAL / Wound Recheck
23A. ADD ON - MAJOR TRAUMA
23B. ADD-ON - LACERATION NOTE
23C. ADD-ON - MEDICAL PROGRESS
24  GENERAL

**MEDICINE**

26  HEADACHE
27  EAR COMPLAINTS
28  NOSE
29  THROAT or DENTAL PAIN
30  COUGH  Fever / Flu
31  WHEEZING / ASTHMA
32  DYSPNEA
33  CHEST PAIN
34  PALPITATIONS / ARRHYTHMIA
35  UPPER EXTREMITY PAIN
36  ABDOMINAL PAIN / FLANK PAIN
37  VOMITING, DIARRHEA
38  GI BLEEDING / RECTAL PAIN
39  FEMALE GU
40  OB PROBLEMS
41  MALE GU
42  LOWER EXTREMITY PAIN
43  SKIN RASH / ABSCESS
44  ALLERGY
45  CHANGED MENTAL STATUS
46  FOCAL NEURO DEFICIT
47  DIZZY
48  SYNCOPE
49  SEIZURE
50  CPR
51  CRITICAL CARE
52  PSYCH PROBLEMS / ∞

[3]

AERAS 0902



# SECTION 2  MARKING THE TEMPLATE

## Use the template at the bedside and mark as follows

### T-Tip

You will find graphics throughout the templates.

Shade or circle pain locations like this:



NOT THIS



### T-Tip

Use blank lines provided to record any additional information pertinent to the patient's care. The template is not intended to establish a standard of care or replace your clinical judgement.

- circle (or check) positive items

____(chest pain) X 4 hrs  = "chest pain for four hours"

✓ ___breath sounds nml  = "breath sounds normal"

It is best to **circle** items that you want the reader to note, such as all **positives and abnormals**. The reader can thereby rapidly grasp the "story of the case" by following the circled items.

- **back-slash** negative items — mark through the body of the word from 10 to 4 o'clock

____vomiting _____  = "no vomiting"

**NOT THIS:**

___vomiting _____

*this forward slash could be confused with a check mark*

**NOT THIS:**

\vomiting _____

*put the backslash through the BODY of the word to avoid confusion*

**NOT THIS:**

___vomiting _____
___nausea _____
___abdominal pain___

*slashing several at a time suggests that questions were not asked individually — **slash each separately***

## Shaded areas

- Shaded areas generally indicate items that are less central to the problem.

- Conversely, the unshaded areas can be viewed as a "fast track" through the template.

- Shaded areas indicate data to be recorded at doctor's discretion.

[4]                    **AERAS 0903**

© 2000 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

**36**
Your Hospital Name Here
# EMERGENCY PHYSICIAN RECORD
**Abdominal Pain / Flank Pain** (5)

TIME SEEN: **0045**          ROOM: **11**     _EMS Arrival

HISTORIAN: (patient) __spouse __paramedics

__HX / __EXAM LIMITED BY: _____

**HPI**
**chief complaint:** (abdominal pain)  vomiting
flank pain ( R / L )  diarrhea

**started:** _12 hrs. ago, after eating pizza_
_____
_____
_____

**time course:**
(still present)    __waxing / waning    __sudden-onset
__better    (constant)
__gone now    __intermittent episodes lasting ___
lasted: ___    __worse / persistent since ___

**quality:**                **location:**
("pain")
__aching
__dull
__burning
__cramping
__sharp
__stabbing
__fullness

__migration  ( show migration: _____ m → )

**associated with:**               X 2
(loss of appetite)    (vomiting)
(nausea)      __bloody __blood-streaks __coffee-grounds
          __diarrhea
          __blood streaks __grossly bloody __mucous

| **severity:** | **exacerbated by:** | **relieved by:** |
|---|---|---|
| maximum (1–10) __ | supine / upright pos. | supine / upright pos. |
| mild    moderate | (movements) /walking | remaining still |
| severe | (cough  deep breaths) | antacids |
| when seen in ED | food | food |
| (1–10) __ | nothing | nothing |
| none   almost gone | | |
| mild   moderate | | |
| severe | | |

__Similar symptoms previously
_____

__Recently seen/treated by doctor _4 days ago for bronchitis_
_— cough improved now._
_____

**ROS**
**GI**
__constipation
last BM: ___
__black / bloody stools
**URINARY**
__bloody / dark urine
__frequent/painful urination

**FEMALE REPRODUCTIVE**
LNMP ___
__vaginal discharge
__abnormal bleeding

**CONST.**
__fever ___
__chills ___
**NEURO & EENT**
__headache ___
(sore throat) **x 7 days**
__blurred vision ___
**CVS & PULMONARY**
(cough)
__trouble breathing
__chest pain

**M/S & SKIN**
__skin rash ___
__joint pain(s) ___
__back pain ___
□ all systems neg. except as marked

**PAST HISTORY** ✓ negative
__peptic ulcer
documented? yes  no
__gall stones
__kidney stone(s)
__bladder/kidney infection
__heart disease
__diabetes  insulin / oral / diet

__other problems

__abdominal aneurysm
__pancreatitis
__diverticulitis
__ovarian cyst(s)
__pelvic infection
__high cholesterol
__high blood pressure
__+HIV / AIDS

**Surgeries/Procedures:**
✓ none / __noncontributory
__cholecystectomy
__appendectomy
__endoscopy

__tonsillectomy
__c-section
__bilat tubal ligation
__hysterectomy
__cardiac bypass

**Medications** ✓ none __see nurses note    **Allergies** __NKDA
__ASA __NSAID __acetaminophen        ✓ see nurses note
__BCP's

**SOCIAL HX** (smoker) **x 10 years** drugs ___
alcohol (recent / heavy / occasional)

**FAMILY HX** __gall stones __ovarian cysts __CAD __ulcer
__kidney stones

[5]

**AERAS 0904**

REVIEWED- ☑Nursing Notes. ☑BP, HR, RR, Temp ☐Posturals

**PHYSICAL EXAM:** ☑Alert __Anxious __IV_____

Distress- __NAD __mild (moderate) __severe

**HEENT**
☑ENT inspection nml
☑pharynx nml
__scleral icterus / pale conjunctivae_____
__pharyngeal erythema
__abnml TM / hearing deficit_____

**NECK**
☑nml inspection
__thyromegaly_____
__lymphadenopathy ( R / L )_____

**RESPIRATORY**
☑no resp. distress
__breath sounds nml
__wheezing_____
__rales (rhonchi) *coarse, bilat.*

**CVS**
☑regular rate, rhythm
☑heart sounds normal
__irregularly irregular rhythm_____
__tachycardia / bradycardia_____
__JVD present_____
__gallop ( S3 / S4 )_____
__murmur grade__/6 sys / dias

__decreased pulse(s)
R __carotd__ fem__ dors ped__
L __carotd__ fem__ dors ped__

| |
|---|
| T = tenderness |
| G = guarding |
| R = rebound |
| m = mild |
| mod = moderate |
| sv = severe |
| Example- |
| Tsv = sev. tendernss |

**ABDOMEN**
__soft
__non-tender
☑no organomegaly
☑nml bowel sounds
☑no pulsatile mass
__distention_____
(tenderness)_____
(guarding)
(rebound)
__abnormal bowel sounds _____
  *increased / decreased / absent / tympanic*
__prominent aortic pulsations_____
__hepatomegaly /splenomegaly / mass_____

**PELVIC EXAM**
__external exam nml
__speculum exam nml
__bimanual exam nml
__vaginal bleeding / discharge_____
__cervical motion tenderness_____
__adnexal tenderness ( R / L )_____
__enlarged / tender uterus_____
__adnexal mass ( R / L )_____

**MALE GENITAL**
__normal inspection
__tenderness / swelling  *testicular / inguinal*

**RECTAL**
__non-tender
__heme neg stool
__black / bloody / heme pos. stool_____
__tenderness_____

**BACK**
☑normal inspection
__CVA tenderness ( R / L )_____

**SKIN**
☑color nml, no rash
☑warm, dry
__cyanosis / diaphoresis / pallor_____
__skin rash_____

**EXTREMITIES**
☑non-tender
☑normal ROM
☑no pedal edema
__pedal edema_____
__calf tenderness_____

**NEURO / PSYCH**
☑oriented x3
☑mood / effect nml
☑CN's nml as tested
☑no motor / snsry deficit
__disoriented *to: person / place / time*_____
__depressed effect_____
__facial droop / EOM palsy / anisocoria _____
__weakness / sensory loss_____

Abdominal Pain-36

**LABS, XRAYS, and PROGRESS**

| EKG MONITOR STRIP __NSR __Rate |
|---|
| __NML ☐Interp. by me ☐Reviewed by me __Rate__ |
| __NSR __nml intervals __nml axis __nml QRS __nml ST/T |
| not / changed from: |

| ☐Interp. by me ☑Reviewed by me ☐Discsd w/radiologist |
|---|
| ☑nml / NAD ☑nml bowel gas ☑no free air ☑no mass |
| ☑no infiltrates ☑nml heart size ☑nml mediastinum |
| not / changed from: |
| IVP- |
| CT- |

**Ultrasound** __nml __GB stones / pericolic fluid / thick GB wall
__dilated common duct __abnml pancreas / aorta / pelvic / appendix

| CBC | Chemistries | | UA | |
|---|---|---|---|---|
| (normal) except | (normal) except | Lipase____ | (normal) except | |
| WBC **14.7** | Na____ | Amylase____ | WBC____ | |
| Hgb____ | K____ | Alk Phos____ | RBC's____ | |
| Hct____ | Cl____ | SGPT____ | bacteria____ | |
| Platelets____ | CO2____ | | dip:____ | |
| segs____ | Gluc____ | | | |
| bands____ | BUN____ | | | |
| lymphs____ | Creat____ | SHCG | | |
| monos____ | | POS NEG | | |
| eos____ | | | | |

**Pulse Ox**
Time_____ __unchanged __improved __re-examined

*0235 vomited x2, still tender in RLQ*

*0340 less nausea after IV phenergan*
*still tender in RLQ*

☑Discussed with Dr. **Gump  0350**   __CRIT CARE - 30–74 min
  will see patient in: office ☑ED hospital   __75–104 min ___min
☑Counseled patient / family regarding   __Prior records ordered
  lab results (diagnosis) need for follow-up   __Additional history from:
__Rx given __Admit orders written   family  caretaker  paramedics

**CLINICAL IMPRESSION:**
(Abdominal Pain - acute)   (Appendicitis – acute)
(Vomiting)   Aortic Aneurysm - ruptured
Ureterolithiasis / Renal Colic  *R l L*   M.I. / Angina / Mesenteric Ischemia
U.T.I. / Pyelonephritis - *acute*   Bowel Perforation / Obstruction
Gastroenteritis / Gastritis *acute*   Pancreatitis - *acute*
Peptic Ulcer Disease   Cholecystitis - *w/ cholelithiasis acalculus*
Pelvic Inflammatory Disease   Biliary Colic
Ovarian Cyst *ruptured  torsed*   Diverticulitis - acute

**DISPOSITION -** ☐home ☑admitted ☐transferred
**CONDITION -** ☑unchanged ☐improved ☑stable

*Robert Smith M.D.*

[6]

**AERAS 0905**

# Reverse side of medicine template

**Physical exam** (left half of page)

- Check normals down the **far left** column.

- ✓ breath sounds normal

  *If we circled normals in the record it would become quite cluttered. The effect is to allow the reader to quickly grasp the **positives** of a case by following **circled** items. Anything marked with a line (i.e. check or slash) is either negative or normal.*

- Circle positive findings in the abnormal column on the right.

- The physical exam for level 5 templates includes at least 8 systems in the unshaded area. Mark each normal statement, or explain by marking in the "abnormals column."

## Lab, Progress and Clinical Impression
(right half of page)

- Record **recheck times** whenever possible. This is very helpful for clinical documentation and reimbursement purposes.

- You can also use recheck times to document actions taken in the ED or meds given, e.g. "1405 - improved after albuterol updraft."

- Lab and X-ray findings must be documented either as normal or with pertinent findings.

- **Clinical Impression** is in two columns. The left contains more common problems. The right has more **serious** disorders. You may indicate that you have considered these possible diagnoses by backslashing or adding a note.

  *Example -*

  Pulmonary Embolism   *no risk factors, no dyspnea*

[7]                                                      **AERAS 0906**

# Front side of a multiple trauma template 

- In history section, use a circle for positives and backslash negatives. Notice that you can indicate "no chest, abdominal or back pain" by backslashing.

  see **1** opposite

- The shaded ROS area contains additional systems and Social History to support Level 5. Complete this when there are multiple extremity injuries, truncal trauma or life threatening injuries. If the patient is too unstable to give a complete history, indicate the reason, e.g. ROS limited by clinical condition - decreased LOC.

  see **2** opposite

- Diagram injuries with abbreviations as shown. A key to these is found at the bottom of page.

  see **3** opposite

**T-Tip**

*You don't need to mark every item on every template.*

T-System templates are tools to allow the doctor to record important information quickly and easily. They don't define the information necessary for any given case and should not be viewed as clinical standards.

We advise that you record "everything important to the case" but don't record things that, in your opinion, are not significant.

Conversely, don't hesitate to "write in" information that you believe is pertinent for a given patient.

Remember: What is clinically significant before the T-System is clinically significant after the T-System.

**AERAS 0907**

© 2000 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

17    **Your Hospital Name Here**
**EMERGENCY PHYSICIAN RECORD**
**MVA**    (5)

TIME SEEN: **1624**    ROOM: **4**    (EMS Arrival)
HISTORIAN: (patient) spouse    (paramedics)
__ HX / ___ EXAM LIMITED BY: _____

**HPI** chief complaint: (MVA) injury to: _____

**occurred:** (just PTA)    **position in vehicle:** (driver) passenger    front    back

**context: 2** - car collision    overturned vehicle
single-car accident ( lost control | fell asleep / unknown cause )

**location of pain/injuries:**
(head) face    mouth
(neck) chest    abdomen
back    upper    mid-    lower
radiating to ( R / L ) thigh / leg

|         | - right - |        | - left - |       |
|---------|-----------|--------|----------|-------|
| shldr   | hip       | shldr  | hip      |       |
| arm     | thigh     | arm    | thigh    |       |
| elbow   | (knee)    | elbow  | knee     |       |
| f-arm   | leg       | f-arm  | leg      |       |
| wrist   | ankle     | wrist  | ankle    |       |
| hand    | foot      | (hand) | foot     |       |

1

**severity of pain:**
mild
(moderate)
severe

**associated symptoms:**
___ lost consciousness / dazed
duration: _____
remembers:
___ impact    coming to hospital
___ seizure

**site of impact:**
"P" = primary  "S" = secondary

**P** [image of car]
force    low  mod.  high
direct  glancing

**restraints:**
none    (lap / shoulder)
doesn't recall
car seat
air bag deployed
thrown from vehicle
ambulated at scene
long extrication

**ROS** ☐ all systems neg exept as markd    2
___ loss feeling / power  arms/legs
(headache)
___ double vision / hearing loss
___ trouble breathing / chest pain
___ nausea / vomiting
___ loss of bladder function
(skin laceration) **left hand**
___ recent fever / illness

*headache: similar to previous but milder*

**SOCIAL HISTORY** ___ recent ETOH    ___ smoker    ___ drug abuse

**PAST HISTORY** ___ negative

*asthma x 15 yrs, frequent migraine*

Meds- ___ none /  (see nurses note) _____
Allergies- √ NKDA /  ___ see nursees note _____

☑ Nurses note reviewed  ☑ Tetanus immun. UTD.  ☑ Vital signs reviewed
**PHYSICAL EXAM** √ Alert  ___ Lethargic  ___ Anxious
Distress- ___ NAD √ mild  ___ moderate  ___ severe
Other- (c-collar) (PTA) in ED )  ___ back-board  ___ IV  ___ splint

**HEAD**
___ no evidence of trauma    (see diagram)
___ Battle's sign / Raccoon Eyes _____

**NECK**
___ non-tender    (see diagram)
√ painless ROM    ___ vertebral point-tenderness _____
√ trachea midline    (muscle spasm) / decreased ROM _____
___ pain on movement of neck _____

3    T,S



**EYES**
√ PERRL    ___ unequal pupils  R- ___ mm  L- ___ mm
√ EOMI    ___ EOM entrapment / palsy
          ___ subconjunctival hemorrhage _____

**ENT**
√ nml external    ___ hemotympanum
√ inspection    ___ TM obscured by wax _____
√ no dental injury    ___ clotted nasal blood _____
          ___ dental injury / malocclusion

**RESP & CVS**
√ chest non-tender    ___ see diagram (on reverse)
√ breath sounds nml    ___ decreased breath sounds _____
√ heart sounds nml    ___ wheezing / rales _____
          ___ splinting / paradoxical movements _____

**ABDOMEN**
√ non-tender    ___ see diagram (on reverse)
√ no organomegaly    ___ tenderness / guarding / rebound _____
          ___ mass / organomegaly _____

**GENITAL/RECTAL**
___ nml genital exam    ___ perineal hematoma
___ nml vaginal exam    ___ blood at urethral meatus
___ nml rectal exam    ___ decreased rectal tone
___ heme negative stool

**NEURO/PSYCH**
√ oriented x3    ___ confusion / disorientation
√ mood & effect    ___ EOM palsy / anisocoria
√ CN's nml    ___ facial asymmetry
  as tested    ___ unsteady / ataxic gait
√ sensation &    ___ sensory / motor deficit
  motor nml

[stick figure diagram]
Reflexes

[9]

**AERAS 0908**

**SKIN**
- __ intact
- ✓ warm, dry

**BACK**
- ✓ no CVA
- __ tenderness
- ✓ no vertebral tenderness

**EXTREMITIES**
- __ atraumatic
- ✓ pelvis stable
- ✓ hips non-tender
- ✓ no pedal edema
- ✓ nml ROM

(see diagram)
- __ crepitus / diaphoresis

- __ see diagram
- __ vertebral point-tenderness
- __ CVA tenderness
- __ muscle spasm / limited ROM

(see diagram)
- __ bony point-tenderness
- __ painful / unable to bear weight
- __ pulse deficit

[1] (Joint Exam:) (R) knee
limited ROM / ligaments laxity / joint effusion



| T=Tenderness |
| PtT=Point Tenderness |
| S=Swelling |
| E=Ecchymosis |
| C=Contusion |
| Lac=Laceration |
| A=Abrasion  B=Burn |
| 0=without  m=mild |
| mod=moderate |
| sv=severe |
| Tsv=Tenderness on palpation (severe) |

**PROGRESS:**

1830    drsg applied – walking in hall, cheerful, alert.

_____

- ☐ Interp. by me   ✓ Reviewed by me   ☐ Discsd w/radiologist

- ✓ nml / NAD
- ✓ no fracture
- ✓ nml alignment
- ✓ soft tissues nml
  - __ reversal / straightening of cerv. lordosis
  - __ DJD / spondylosis / spurring

- (✓ nml / NAD)
- ✓ no infiltrates
- __ nml heart size
- __ nml mediastinum
  - __ rib fracture
  - __ infiltrate / atelectasis

- ☐ See separate report.

_____

**Wound Description/Repair**
length  4  cm location  (L) hand   [2]
- __ superficial   (SQ)   __ muscle   (linear)   __ stellate   __ irregular
- (clean)   __ contaminated   moderately / heavy

distal NVT: (neuro & vascular status intact)   (no tendon injury)
anesthesia:   (local)   __ digital block   ____ cc
- (lidoc) 1%  (2%)   __ epi / bicarb   __ marcaine   .25%   .5%   __ LET

prep:
- __ Shur-Clens   (Betadine) / Hibiclens   __ debrided / undermined
- (irrigated/washed w/ saline)   *extensively
- *extensively   __ foreign material removed
- (explored)   minimal  moderate   *extensive

repair:  Wound closed with:  wound adhesive / steri-strips
- SKIN–  #  6      5  -0  nylon / prolene / staples
- *SUBCU–  #  ____  -0 vicryl / chromic

* may indicate intermediate repair   ^ may indicate intermediate or complex repair

_____

- Discussed with Dr. _____
  - will see patient in: office / ED / hospital
- __ Counseled patient / family regarding:
  - lab results  diagnosis  need for follow-up
- ✓ Rx given   __ Admit orders written

CRIT CARE – 30–74 min
75 – 104 min   ____ min
- Prior records ordered
- ✓ Additional history from:
  - family  caretaker (paramedics)

**CLINICAL IMPRESSION:**   (MVA)

| contusion | | |
|---|---|---|
| (head) | wrist | R / L |
| face | hand | R / L |
| chest | hip | R / L |
| abdomen | thigh | R / L |
| back | (knee) | (R) / L |
| shoulder  R / L | leg | R / L |
| arm  R / L | ankle | R / L |
| elbow  R / L | foot | R / L |
| forearm  R / L | | |

**sprain / strain**
(neck)  dorsal  lumbar

**concussion**
with LOC      w/o LOC

**laceration**
L hand

_____

DISPOSITION–   ✓ home   ☐ admitted   ☐ transferred ____
CONDITION–   ☐ unchanged   ✓ improved   ☐ stable ____

*Robert Smith, MD*

MVA-17

[10]

AERAS 0909

# Reverse side of trauma template

- Like other templates, trauma templates are two-sided documents. Exam, X-rays, progress and clinical impression are on the back.

- Document **joint exam** in extremities section.

  see **1** opposite

- Circle elements of **wound repair**. It is important to document if the wound was **undermined, debrided** or **irrigated extensively** to support higher CPT codes. Always give length of laceration in centimeters (cm).

  see **2** opposite

- If the wounds are more complex with alignment of multiple flaps or revision of wound margins, you may use the laceration add-on.

---

**T-Tip**

**Correcting Mistakes**

What do you do if you circle an item but meant to backslash it? What if you backslashed it but meant to circle it? The key is to make the documentation **unambiguous.**

If you circled but meant to backslash, then make a bold backslash through the item and write "NO" next to it.

If you backslashed but meant to circle, then circle the item and write a comment such as "mild" or "for 3 days" or "now gone."

It is also advisable to initial the item. If you make the change at a time after the patient's visit, you should also date the entry.

---

[11]                                              **AERAS 0910**

# SECTION 3   DOCUMENTATION GUIDELINES

## Layout for HCFA Requirements

- The physician is legally responsible for the CPT code even when the code is assigned by someone else. Failure to support CPT codes along HCFA documentation guidelines can lead to fraud and abuse charges.

- A frequent deficiency is failure to meet requirements in the **history.** In a busy ED, we may forget to record ten systems in the ROS as required for Level 5 cases or forget to document 4 elements of the chief complaint required for Levels 4 and 5.

- To simplify the task of meeting HCFA requirements in the history, **medical templates** are designed with the following layout. This provides an easy visual guide for both physician and coder.



**DOCUMENT YOUR HCFA COMPLIANCE EFFORTS**

**Level 3 Record HPI**

**LEVEL 4**
Add pertinent ROS and Past History

**LEVEL 5**
Add remaining ROS (to total ten systems) and Social or Family

**Level 5 Key Point**
The ROS section is designed to capture **10 systems** when completed.
Also record **at least one** item in the Social/Family Hx in addition to HPI.

## The Take-Home Point

Mark the Level 5 items on those patients who are **admitted** or have **several studies** in the ED. This does not automatically assign a high charge to the patient. Rather, it assures that if the HCFA medical decision making merits a higher CPT level, the history requirements will be met.



**AERAS 0911**

# HPI Requirements

**T-Tip**

**The "Timing" Section**

Most templates include an area initially to describe the timing of the symptoms in some detail. For example, chest pain can be described as intermittent, lasting 5–30 minutes, now persistent for two hours, but better upon arrival in the emergency department.

The template therefore allows more than one option to describe the history. Most physicians find that it works best to use the chief-complaint centered style, beginning with the most immediate and severe symptom.

- You must include at least 4 of the 8 defined HPI elements. The T-System uses two different methods to record this information.

- Method #1 – In many templates, the elements are explicitly labeled (i.e., time course, quality, location, etc.) The *Abdominal Pain* template (page 5) is a good example of this layout.

- Method #2 – In other templates, such as the *Female GU* template, the elements are listed with the symptom:

```
__pelvic pain _____
        • sudden / intermittent / constant
        • cramping / pressure / "pain"
              burning / sharp
__vulvar/vaginal pain _____
__low back _____
__flank pain _____
_____
```

In this example, the symptom "pelvic pain" is followed by "modifiers" from two categories (timing and quality). We use the bullet symbol to distinguish these categories. You must backslash or circle these items to receive credit for these elements in the HPI.

# Other Requirements

**T-Tip**

**Handing off a case**

When turning a case over to another physician to finish evaluation and treatment, the first physician should write a brief progress note to that effect. The physician assuming care should write an acceptance note. If the second physician records information in the body of the template, he should clearly mark and initial the entry to avoid any confusion about who recorded the data.

- ROS and PAST/FAMILY/SOCIAL HISTORY – Record at least two systems in the ROS for Level 4 and ten for Level 5. We suggest that you record Past History for Level 4 and add Family or Social History for Level 5.

- PHYSICAL EXAM – Complete all the unshaded areas of the physical exam or "explain why not" in the abnormals column in order to cover eight systems on templates formatted for Level 5.

- DECISION-MAKING – See the coder's appendix.

[13]                                        **AERAS 0912**

# SECTION 4   DOCUMENTING COMPLEX HISTORIES

# The Chief-Complaint Centered History

### *T*-Tip

**Add handwritten notes**

There are two areas where it may be especially important to write in additional information:

1) The HPI.  Add a note in the blank lines after "started" to describe the context of the case, for example the patient's activity during onset of symptoms.

2) ED Progress. Add notes in the blank lines after Lab, X-ray to document response to treatment, changes in clinical condition, complications, etc. Without this, the record may not adequately describe the ED visit.

- Many physicians are accustomed to recording the history of the present illness beginning with the first symptom. This "time-line" history is less useful with formatted documentation. The T-System templates begin with the **onset of the current chief complaint.** Premonitory or prodromal symptoms are then recorded in other fields which further explain the chief complaint.

- **Migraine Headache Example.** Consider a patient with a classic migraine headache. A "time-line" history would begin with the onset of the aura. Then the headache would be described. The T-System *Headache* template begins with the onset of the **headache.** The aura is described in a later section of the template, for example "associated symptoms."

- **Unstable Angina Example.** Consider a patient with unstable angina progressing over the last week, followed by severe persistent pain for the last two hours prior to arrival. The chief-complaint centered history would begin at the onset of the current chief complaint, which began two hours prior to arrival. The preceding symptoms of progressive anginal pains would be described in a later section ("previous similar symptoms").

The chief-complaint centered history is well-suited to emergency medicine. We are generally most interested in the immediate complaints that prompted the visit to the emergency department. However, preceding symptoms can also be described fully with this method.

**AERAS 0913**

# BEDSIDE CHARTING - following the patient's story

- <u>The importance of using the template at the bedside cannot be overemphasized.</u> A poorly documented record often indicates that the physician has not taken the template to the bedside.
- A key technique in bedside charting is the style of recording HPI data in a "non-sequential" order. In other words, HPI information is not recorded in the sequence of the template, but rather it is plugged into the appropriate areas (HPI, ROS, Past Hx, etc.) as the patient gives the history.
- For example, the patient below first describes a recent visit to her family doctor, then aspects of the Past History, before answering any questions about the chief complaint. The ED physician documents the information at the bedside, jumping between areas of the template in a "non-sequential manner."
- **So be prepared to jump to different areas of the template when documenting at the bedside!**

**EXAMPLE:**

**Doctor:** *When did you start feeling dizzy?*

**Patient:** *Well, I saw Dr. Jones yesterday. He stopped my Triavil and started me on aspirin. He was worried that I might be having another stroke.*

**Doctor:** *You've had a stroke?*

**Patient:** *I've had three strokes...heart trouble too. He said aspirin would help my heart.*

**Doctor:** *But didn't you tell us that you were dizzy? When did that start?*

**Patient:** *Hmm... I guess...one week ago.*



**AERAS 0914**

# When the History Doesn't Start with the Chief Complaint

T-System templates begin with the onset of the current chief complaint. However, some patients may describe events that precede the chief complaint. How do we use templates at the bedside when the history does not begin with the onset of the chief complaint? It's easy if you know how **common history patterns** fit into the standard T-System layout.

*When the patient describes...*

**...a recent visit to the doctor**   go to *Recently seen/treated by a doctor*   **"A"**

> *Example –* "I saw my doctor last week and he prescribed erythromycin for my cough. Now I have a really bad stomach ache."
> *Example –* "I am undergoing chemotherapy, and now I have a fever."
> *Example –* "I was seen here in the E.D. 3 days ago but my leg pain is getting worse."

**...similar prior symptoms**   go to *Similar symptoms previously*   **"B"**

> *Example –* "I began having chest pains 2 weeks ago. Three hours ago, I developed this severe chest pain that is still present now."

**...symptoms other than the current complaints**   go to the *ROS*   **"C"**
> *Example –* "I am so tired of being sick. I have been coughing for weeks, and now I have this severe headache with vomiting." *(chief complaint of headache)*

**...premonitory symptoms**   go to the *HPI*   *(context or assoc. symptoms)*  **"D" or "E"**

> *Example –* "I felt dizzy, then fainted."
> *Example –* "I saw flashing lights, then developed a headache."
> *Example –* "I began vomiting, then had onset of abdominal pain."

*If the history contains all these aspects... it's no problem!*
> *Example –* "Doc, I've been to Dr. Smith every few weeks (**"A"**) for the last 6 months with these headaches (**"B"**). I know I've got high blood pressure but I don't think that's causing these headaches. I've been coughing so much (**"C"**) from these damn cigarettes that I wonder if I've busted something loose in there! It's funny, I always get this weird smell before the headache starts" (**"D"**).

[16]             **AERAS 0915**

© 2000 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

| 26 | **Your Hospital Name Here** |
|---|---|
| | **EMERGENCY PHYSICIAN RECORD** |
| | **Headache**    (5) |

TIME SEEN:_____ ROOM:_____ ___EMS Arrival

HISTORIAN: __patient __spouse __paramedics _____

__HX / __EXAM LIMITED BY:_____

**HPI**

**chief complaint:**    headache    facial pain    fever    *migraines hx*

**started:** _____
_____
**E** _____
_____

**time course:**    ___intermittent episodes lasting
__abrupt / gradual onset    _____
__still present  __better    _____
__gone now    _____
_lasted_____    ___worse/persistent since

**quality:**                          **location:**

similar to
previous
headaches

"pain"
tightness
throbbing
sharp



**associated symptoms:**
__preceding symptoms        __nausea
   *visual disturbance  scotoma*     __vomiting
   *typical of prior aura(s)*      __power loss R/L  arm/leg_____
**D** _____
_____        __tingling/numb sensation
__light bothers eyes        _____
__blurred vision        _____
                    _____

**severity:**
              _maximum_
   mild    moderate    severe    relieved by OTC meds
           _when seen in ED_
       gone    mild    moderate    severe

__Similar symptoms previously _____
**B** _____
_____
__Recently seen/treated by doctor_____
**A** _____

**ROS**
*CONST*
__fever_____
       *subjective / to*_____°F
__muscle aches_____
*ENT*
__sore throat_____
__sinus pressure/drainage_____

_For new, gradual-onset HA-_
__CO exposure
__tick bite(s)
__head injury
**C**

**PULMONARY & CVS**
__chest pain_____
__cough_____
__sputum_____
__trouble breathing_____

*GI and GU*
__abdominal pain_____
__diarrhea
__pain on urination_____

*Skin & Lymphatic & MS*
__skin rash / swelling
__back pain_____

☐ all systems neg. except as marked

**PAST HISTORY**    __negative
__chronic headaches        __cancer history_____
   *occasional  frequent  "migraine"*    __immunosuppressed_____
   *mild   moderate   severe*      __glaucoma
__high blood pressure_____    __diabetes  *insulin / oral / diet*
__sinus problems_____    __asthma
                    __+HIV / AIDS_____

__other problems_____
_____
_____
_____
_____

**Medications**  __none  __see nurses note | **Allergies**  __NKDA
__ASA  __NSAID  __acetaminophen    __see nurses note
_____
_____
_____

**SOCIAL HX**   smoker_____    drugs_____
alcohol (recent / heavy / occasional)_____

**FAMILY HX**  __cerebral aneurysm    __migraine headaches
__stroke    __HTN_____

[17]

**AERAS 0916**

AERAS 0917

# Appendix One
# Template Examples

AERAS 0918

# APPENDIX ONE   TEMPLATE EXAMPLES

## What's RIGHT About this Template?   ⟶

FRONT SIDE

- The history is complete.

- The HPI starts with the onset of the current chief complaint  (3 hours PTA).

- The physician used the T-System documentation conventions effectively, circling positive elements and back-slashing pertinent negatives.  You can follow the circles to quickly understand the history.

- Positive findings have further explanatory comments.

- The diagram shows the location and radiation of pain quite clearly.

- The "Similar symptoms previously" and "Recently seen/treated by doctor" fields explain the preceding history.

**AERAS 0919**

© 2000  T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

**33**

## Your Hospital Name Here
## EMERGENCY PHYSICIAN RECORD
### Chest Pain    (5)

TIME SEEN: **1405**    ROOM: __ **14** __ ___ EMS Arrival

HISTORIAN: (patient) (spouse) _paramedics_
__HX / __EXAM LIMITED BY: _____

### HPI

**chief complaint:** (Chest pain) _discomfort_

**started:** *3 hours ago*
_____
_____

**time course:**
(still present)  __better    (constant)  __"waxing & waning"
__gone now    __intermittent episodes lasting
__lasted ___    (worse) _persistent since_
__resolved on arrival in E.D.    *X 30 min.*

**quality:**    **Location of pain:**
(pressure)
(tightness)
indigestion
burning
dull
aching
sharp
stabbing
"pain"
"numbness"
(like prior MI)



**radiation:**  none  (diagrammed above)

**associated symptoms:**
(nausea)    _shortness of breath_
(vomiting) x 1    (sweating) *at onset of*
*pain*

**worsened by:**    **relieved by:**  NTG  1 (2)(3)
change in position    sitting up    (patient's own supply)
deep breaths / turning    rest    given by paramedics
exertion    antacids    *relief:* none / partial /
(nothing)    (nothing)    complete / transient
__Oxygen __NRB __L

**onset during:**    **severity:**
sleep  rest  light activity    *maximum:* (1-10)
mod. / heavy exertion    mild  moderate  severe
(emotional upset)    *when seen in ED:* (1-10)
cannot recall    gone  almost gone  mild  moderate  severe
    residual discomfort in arm  (R / L)

(Similar symptoms previously) *MI 8 months ago*
*given TPA - Vtach while*
*in hospital*

(Recently seen / treated by doctor) *Smith - Friday*
*for c/o upper gastric pain*
*scheduled UGI*

### ROS
**CHEST-CONST**
__fever
__chills
(cough) *mild X 2 wks*
__sputum
__ankle swelling
__calf / leg pain

**FEMALE REPRODUCTIVE**
LNMP _____
__vaginal discharge
__abnormal bleeding

### NEURO
(headache) *since NTG*
__blackouts
**EYES-ENT**
__blurred vision
(sore throat) *last wk.*
**GI and GU**
__abdominal pain
__black / bloody stools
__problems urinating
**SKIN & LYMPH & MS**
__skin rash / swelling
__joint pain
□ all systems neg. except as marked

**PAST HISTORY** __negative    * = MI risk factors
* (high blood pressure)    __emphysema
* (diabetes) insulin / oral / diet    __collapsed lung
* (high cholesterol)    __stroke
* (heart disease) *Oct. 95*    __peptic ulcer
    heart attack (MI)    documented?  yes  no
(angina) / heart failure    __gall stones
    *rarely*
__DVT / PE / risk factors
__other problems

*irritable bowel syndrome*

**Surgeries / Procedures** __none  __non-contributory
__cardiac bypass ___    __tonsillectomy
(cardiac cath) *Nov. 95*    __cholecystectomy
__angioplasty    (appendectomy)
__thrombolytics    __hysterectomy
__pacemaker

**Medications** __none __ASA __NSAID    **Allergies** (NKDA)
__acetaminophen __BCP's    __see nurses note
(see nurses note) _____

**SOCIAL HX** (smoker) *1 ppd*    *drugs
(alcohol) (recent / heavy / occasional)

**FAMILY HX** *(CAD) (<55yo)(>55yo)* *father*

[21]

AERAS 0920

☑ Nursing Assessment Reviewed  ☑ BP, HR, RR, Temp reviewed

## PHYSICAL EXAM
☑ Alert ___ Anxious ___ IV
Distress: ___ NAD ___ mild (moderate) ___ severe

**HEENT**
☑ ENT nml inspection
☑ pharynx nml
___ scleral icterus / pale conjunctivae
___ pharyngeal erythema
___ abnml TM / hearing deficit

**NECK**
☑ nml inspection
___ thyromegaly
___ lymphadenopathy ( R / L )

**RESPIRATORY**
☑ no resp. distress
☑ chest non-tender
___ nml breath sounds
___ see diagram
___ respiratory distress
___ manifests distinct pain on movement
    of ( R / L ) arm  of trunk
___ splinting / dcrsd air mvmnt
(rales) _mild bilat bases_
___ rhonchi
___ wheezing

**CVS**
☑ regular rate, rhythm
☑ no murmur
☑ no gallop
☑ no friction rub
___ irregularly irregular rhythm
___ extrasystoles ( occasional / frequent )
___ tachycardia / bradycardia
___ PMI displaced laterally
___ JVD present
___ murmur__ grade__/6  sys / dias
        crtsc / cresc-decresc / decresc
___ gallop ( S3 / S4 )
___ friction rub

___ decreased pulse(s)
    R  carotd___  fem___  dors ped ___
    L  carotd___  fem___  dors ped ___

| T = tenderness |
| G = guarding |
| R = rebound |
| m = mild |
| mod = moderate |
| sv = severe |
| (e.g., Tsv = |
| severe tendernss) |

Tm

**ABDOMEN**
___ non-tender
☑ no organomegaly
(tenderness)
___ guarding
___ rebound
___ abnml bowel sounds
___ hepatomegaly /splenomegaly / mass

**RECTAL**
☑ non-tender
☑ heme neg stool
___ black / bloody / heme pos. stool
___ tenderness

**SKIN**
☑ color nml, no rash
☑ warm, dry
___ cyanosis / diaphoresis / pallor
___ skin rash

**EXTREMITIES**
☑ non-tender
☑ normal ROM
___ no pedal edema
☑ no calf tenderness
(pedal edema) _trace_
___ calf tenderness
___ clubbing

**NEURO / PSYCH**
☑ oriented x3
☑ mood/affect nml
☑ CN's nml as tested
☑ no motor / snsry deficit
___ disoriented  to: person / place / time
___ depressed affect
___ facial droop / EOM palsy / anisocoria
___ weakness / sensory loss  _grossly_

---

## EKG, LABS, and XRAYS

**EKG MONITOR STRIP** ☑ NSR ___ Rate

| EKG | ☑ NML | ☐ Interp. by me | ☑ Reviewed by me | Rate _62_ |
| ☑ NSR | ___ nml intervals | ___ nml axis | ___ nml QRS | ___ nml ST/T |

_2-mm ST elevation II, III, AVF_

not / changed from: _____
Repeat EKG- __ unchanged / _____

| CXR | ☐ Interp. by me | ☑ Reviewed by me | ☐ Discsd w/radiologist |
| ☑ nml / NAD | ☑ no infiltrates | ___ nml heart size | ___ nml mediastinum |

not / changed from: _____

| CBC | Chemistries | CK _112_ | UA |
| normal except | (normal) except | CKMB ___ | (normal) except |
| WBC _8.5_ | Na ___ | Troponin ___ | WBC ___ |
| Hgb ___ | K ___ | | RBC's ___ |
| Hct _36_ | Cl ___ | | bacteria ___ |
| Platelets _165_ | CO2 ___ | | dip: ___ |
| segs ___ | Gluc ___ | | |
| bands ___ | BUN ___ | | |
| lymphs ___ | Creat ___ | PT ___ | |
| monos ___ | | PTT ___ | |
| eos ___ | | INR ___ | |

**Pulse Ox** _98_ % on  RA / _2_ L / ___ % at (time) _14:20_

Time _1445_ ___ unchanged ☑ improved ___ re-examined

_Less pain after morphine -remains NSR_
_B/p 110/75  HR-68  discussed risks/_
_benefits of TPA._
_1500-TPA running  B/p 85/50  Bolus_
_NS 500cc_
_1530 BP 100/72,  pain free_

| ☑ Discussed with Dr. _Hart_ | ___ CRIT CARE-  30-74 min |
| will see patient in: ___ office ☑ED ☐ hospital | 75-104 min _____ min |
| ☑ Counseled (patient / family) regarding: | ☑ Prior records ordered |
| lab results (diagnosis) need for follow-up | ___ Additional history from: |
| ___ Rx given  ☑ Admit orders written | family caretaker paramedics |

## CLINICAL IMPRESSION:

| (Chest Pain - acute precordial) | (Acute MI) _inferior_ |
| Chest Wall Pain - acute | Unstable Angina |
| Dyspnea - acute | Pericarditis - acute |
| Costochondritis - acute | Acute Aortic Dissection |
| Myofascial Strain - acute | Pulmonary Embolism |
| Viral Syndrome - acute | Acute Pulmonary Edema  /  CHF |
| Bronchitis - acute | Atrial Fibrillation -  rapid vent. response |
| Viral Pleuritis (Pleurisy) | controlled uncontrolled new-onset chronic |
| Abnormal EKG | Pneumonia |
| | Pneumothorax |

_Recent epigastric pain, possible_
_peptic ulcer. No evidence of GI bleed_

DISPOSITION- ___ home ☑ admitted ___ transferred _____
CONDITION- ___ unchanged ☑ improved ☐ stable

PHYSICIAN SIGNATURE- _Marcus Welby MD_

[22]

# What's RIGHT About this Template?

REVERSE

- You can quickly identify the positive findings on physical exam by looking for the circled items. The physician marked the normal findings with checks and the negatives with back-slashes.

- Positive items have additional explanatory comments (i.e., "trace" pedal edema)

- The physician recorded several progress notes and marked the "decision-making" box.

- In the Clinical Impression section, the physician used back-slashes and circles. Additionally, he included further explanatory comments.

- In general, the template is very legible and complete. Because the physician adhered to the T-System documentation conventions, the reader can easily orient to the information contained in this document.

[23]

AERAS 0922

# What's WRONG About this Template?

FRONT

- The physician did not record much information and left important data fields incomplete.

  - What is the quality of the pain?
  - Did it radiate elsewhere?
  - Did the patient have nausea or vomiting?

- The document contains no explanatory information about positive findings.

  - Was the shortness of breath severe?
  - There is insufficient information about the patient's prior MI.
  - The ROS reveals the patient had a headache. Is it severe? When did it begin?

- The diagram is marked with an "**X**." This does not show the position of pain very clearly.

- The ROS contains a large backslash through multiple items. Did the physician ask about each of these items?

- The physician used forward slashes to indicate negatives in the Past History section. These look too similar to check-marks. Use back-slashes instead, and place the backslash through the body of the word or phrase.

- The physician circled "none" in the Medications section and "NKDA" in the Allergies section. Instead, check these normal statements and reserve circles for abnormal findings. This will make the document easier to read.

[24]                                    **AERAS 0923**

© 2000 T-System, Inc. Circle or check affirmatives, backslash (\) negatives.

**33**  Your Hospital Name Here
# EMERGENCY PHYSICIAN RECORD
## Chest Pain    (5)

TIME SEEN:_____ ROOM: 5 ____ EMS Arrival

HISTORIAN: __patient __spouse __paramedics_____
____HX / __EXAM LIMITED BY:_____

**HPI**

**chief complaint:**    chest pain / discomfort

**started:**    2 hours

**time course:**
_✓_still present    __better    __constant    __"waxing & waning"
__gone now    __intermittent episodes lasting
__lasted____    __worse / persistent since
__resolved on arrival in E.D.

**quality:**
pressure
tightness
indigestion
burning
dull
aching
sharp
stabbing
"pain"
"numbness"
"like prior MI"

**Location of pain:**



**radiation:**    none    diagrammed above_____

**associated symptoms:**
_✓_nausea_____    _✓_shortness of breath_____
_✓_vomiting_____    _✓_sweating_____

**worsened by:**
change in position
deep breaths / turning
exertion
nothing

**relieved by:**
sitting up    __NTG 1 2 3 ____
rest    *patient's own supply*
antacids    *given by paramedics*
nothing    *relief- none / partial /*
_____    *complete / transient*
_____    __Oxygen __NRB ____L

**onset during:**
sleep  rest  light activity
mod. / heavy exertion
emotional upset
cannot recall

**severity:**
*maximum:* (1-10)
mild   moderate   severe
*when seen in ED:* (1-10)
gone  almost gone  mild  moderate  severe
residual discomfort in arm  ( R / L )

__Similar symptoms previously MI

_____

__Recently seen / treated by doctor_____

**ROS**

**CHEST-CONST**
__fever_____
__chills_____
__cough_____
__sputum_____
__ankle swelling_____
__calf / leg pain_____

**FEMALE REPRODUCTIVE**
LNMP_____
__vaginal discharge_____
__abnormal bleeding_____

**NEURO**
__headache_____
__blackouts_____
**EYES-ENT**
__blurred vision_____
__sore throat_____
**GI and GU**
__abdominal pain_____
__black / bloody stools_____
__problems urinating_____
**SKIN & LYMPH & MS**
__skin rash / swelling_____
__joint pain_____
☐all systems neg. except as marked

**PAST HISTORY** __negative    * = MI risk factors
* __high blood pressure    __emphysema
* __diabetes  insulin / oral / diet ____    __collapsed lung
* __high cholesterol_____    __stroke
* __heart disease    __peptic ulcer_____
    heart attack (MI)    documented?  yes  no
    angina / heart failure    __gall stones_____

__DVT / PE / risk factors_____
__other problems_____

**Surgeries / Procedures** __none    __non-contributory
__cardiac bypass_____    __tonsillectomy_____
__cardiac cath_____    __cholecystectomy_____
__angioplasty_____    __appendectomy_____
__thrombolytics_____    __hysterectomy_____
__pacemaker_____

**Medications** __none  __ASA    __NSAID  __Allergies    __NKDA
__acetaminophen    __BCP's_____    __see nurses note
__see nurses note_____

**SOCIAL HX** __*smoker_____    __*drugs_____
__alcohol (recent / heavy / occasional)_____

**FAMILY HX** *CAD ( <55yo / >55yo )_____

[25]

**AERAS 0924**

☐ Nursing Assessment Reviewed  ☐ BP, HR, RR, Temp reviewed

## PHYSICAL EXAM

Distress-  __NAD  (mild)  __moderate  __severe   Alert  __Anxious  __IV

**HEENT**
__ENT nml inspection
__pharynx nml
__scleral icterus / pale conjunctivae
__pharyngeal erythema
__abnml TM / hearing deficit

**NECK**
__nml inspection
__thyromegaly
__lymphadenopathy ( R /L )

**RESPIRATORY**
__no resp. distress
__chest non-tender
__nml breath sounds
__see diagram
__respiratory distress
__manifests distinct pain on movement of ( R /L ) arm  of trunk
__splinting / dcrsd air mvmnt
__rales
__rhonchi
__wheezing

**CVS**
__regular rate, rhythm
__no murmur
__no gallop
__no friction rub
__irregularly irregular rhythm
__extrasystoles ( occasional / frequent )
__tachycardia / bradycardia
__PMI displaced laterally
__JVD present
__murmur  grade__/6  sys / dias
    cresc / cresc-decresc / decresc
__gallop ( S3 / S4 )
__friction rub

__decreased pulse(s)
    R  carotd___  fem___  dors ped___
    L  carotd___  fem___  dors ped___

| T = tenderness |
| G = guarding |
| R = rebound |
| m = mild |
| mod = moderate |
| sv = severe |
| (e.g., Tsv = severe tenderness) |



**ABDOMEN**
__non-tender
__no organomegaly
__tenderness
__guarding
__rebound
__abnml bowel sounds
__hepatomegaly /splenomegaly / mass

**RECTAL**
__non-tender
__heme neg stool
__black / bloody / heme pos. stool
__tenderness

**SKIN**
__color nml, no rash
__warm, dry
__cyanosis / diaphoresis / pallor
__skin rash

**EXTREMITIES**
__non-tender
__normal ROM
__no pedal edema
__no calf tenderness
__pedal edema
__calf tenderness
__clubbing

**NEURO / PSYCH**
__oriented x3
__mood/affect nml
__CN's nml as tested
__no motor / snsry deficit
__disoriented  to: person / place / time
__depressed affect
__facial droop / EOM palsy / anisocoria
__weakness / sensory loss

Chest Pain - 33

### EKG, LABS, and XRAYS

**EKG MONITOR STRIP**  __NSR  __Rate

**EKG**  __nml  ☐Interp. by me.  ☐Reviewed by me  Rate
__NSR  __nml intervals  __nml axis  __nml QRS  __nml ST/T

not / changed from:
Repeat EKG-  __unchanged /

**CXR**  ☐Interp. by me  ☐Reviewed by me  ☐Discsd w/radiologist
__nml / NAD  __no infiltrates  __nml heart size  __nml mediastinum

not / changed from:

| CBC | Chemistries | | UA |
|---|---|---|---|
| normal except | normal except | CK | normal except |
| WBC | Na | CKMB | WBC |
| Hgb | K | Troponin | RBC's |
| Hct | Cl | | bacteria |
| Platelets | CO2 | | dip: |
| segs | Gluc | | |
| bands | BUN | PT | |
| lymphs | Creat | PTT | |
| monos | | INR | |
| eos | | | |

**Pulse Ox** ____% on RA/___L / __% at (time)
Time ____ __unchanged  __improved  __re-examined

__Discussed with Dr.
. will see patient in:  office / ED / hospital
__Counseled patient / family  regarding:
    lab results  diagnosis  need for follow-up
__Rx given  __Admit orders written

__CRIT CARE-  30-74 min
    75-104 min _____ min
__Prior records ordered
__Additional history from:
    family caretaker paramedics

### CLINICAL IMPRESSION:

Chest Pain - acute  precordial
Chest Wall Pain - acute
Dyspnea - acute
Costochondritis - acute
Myofascial Strain - acute
Viral Syndrome - acute
Bronchitis - acute
Viral Pleuritis (Pleurisy)
Abnormal EKG

Acute MI
Unstable Angina
Pericarditis - acute
Acute Aortic Dissection
Pulmonary Embolism
Acute Pulmonary Edema /  CHF
Atrial Fibrillation -  rapid vent. response
    controlled  uncontrolled  new-onset  chronic
Pneumonia
Pneumothorax

DISPOSITION-  ☐ home  ☑ admitted  ☐ transferred
CONDITION-  ☐ unchanged  ☐ improved  ☑ stable

PHYSICIAN SIGNATURE- _M Sloppy_

[26]



# What's WRONG About this Template?

REVERSE

- The physician circled "Alert". Reserve circles for abnormal findings.

- Notice that the check-marks are large and poorly positioned. Does this convey a sense that the physician carefully assessed each system? Or, does it suggest that the physician rushed through the exam?

- There are no progress notes and no information in the "HCFA medical decision-making box."

- The clinical impression is rather sketchy. It would be best to include more information. For example, is the chest pain precordial?

- Formatted records can be strong documentation tools. However the template is only as good as the documentation provided by the physician.

**It's worth an extra moment to make the template look good.**

[27]

AERAS 0926

**AERAS 0927**

# Appendix Two
# Template Selection

[29]

AERAS 0929

# APPENDIX TWO    TEMPLATE SELECTION

## Select the Organizing Chief Complaint

- When a patient presents with more than one complaint, ask which complaint made the patient decide to come to the E.D. at this particular time. If the patient still lists several complaints, choose the one which is most dangerous or would require the most detailed HPI. Determine whether the chief complaint is related to trauma (injury). There will occasionally be some cases in which the treating physician believes that a more extensive record will be required than a single T-Sheet. The physician should always be guided by his or her professional judgment in determining what, if any, additional documentation is appropriate for clinical purposes.

## The Injury Templates

**T-Tip**

**Burns**

Consider the *Burn* template (#22) in very extensive burns or smoke inhalation. For most burns, use a regional trauma template.

- **Regional vs. Multiple Trauma Templates.** Select from among the *regional trauma* templates if the mechanism could cause injury to only one area, such as a twisted ankle. Select one of the *multiple trauma* templates if multiple injuries are present or possible, such as an MVA or significant fall.

  There are a total of seven multiple trauma templates, organized by mechanism. The *Multiple Trauma* template (#18) is for "other" mechanisms.

- **Head Injury vs. Facial Injury.** Note that there are two "head injury" templates. The *Head Injury* template (#1) is for patients with significant neurological risk. The *Facial/Scalp Injury* template (#3) includes diagrams of the face, mouth, and chin. In most cases, you can use either template.

- **Shoulder vs. Upper Extremity Injury.** The *Shoulder Injury* template (#5) does not include a laceration procedure note, but does

[31]

AERAS 0930

include a procedure note for reduction of a dislocated shoulder. For a shoulder laceration, use *Upper Extremity Injury* (#6).

- **Hip vs. Lower Extremity Injury.**
The *Hip Injury* template (#10) is designed for patients with hip fracture or dislocation. For a hip contusion or laceration, the *Lower Extremity Injury* template (#11) is appropriate.

- **Combined Trauma/Medicine Templates**.
Certain templates on the trauma side can also be used for medical problems. These include *Eye Problems* (#2), *Neck Pain* (#4), and *Back Pain* (#8). It is sometimes difficult to determine initially whether a patient with one of these complaints has sustained trauma.

## Add-On Templates (do not stand alone)

**T-Tip**

**Animal and Human Bites**

Consider the *Assault* template or the appropriate regional trauma template for human bites. Use the *Animal Bite* template for animal bites.

- **Laceration Repair Add-On.**
Most trauma templates have built-in laceration notes, but in some case the laceration add-on can be useful. An example is a seizure patient with a scalp laceration. The laceration add-on includes a conscious sedation note on the reverse.

- **Progress Note Add-Ons.**
The *Major Trauma* and *Major Medical* add-on templates (#23a and 23c) include multiple formatted procedure and progress notes.

## Medical Templates

**T-Tip**

**General Template**

Choose the *General* template (#24) infrequently — less than 1% of the time. Usually, it's better to use a complaint-specific template even if it is not an exact fit.

- **Pediatric Illness.**
The *Pediatric Illness* template (#14) is appropriate for otitis media, bronchitis, croup, bronchiolitis, sepsis, febrile seizures, ingestions, and other illnesses in infants and toddlers.

- **Cough and Fever.**
Consider the *Cough/Fever* template (#30) not

[32]

**AERAS 0931**

*T-Tip*

**Selection Tips**

For KIDNEY STONES, consider the *Abdominal/Flank Pain* template.

For ANXIETY or PANIC ATTACK presenting with palpitations, consider the *Palpitations* template.

For SVT, consider the *Palpitations* template.

For a HERNIA, consider the *Male GU, Female GU,* or *Abdominal Pain* template.

For URINARY RETENTION, consider the *Male GU* template.

For HEMORRHOIDS, consider the *GI Bleeding* template.

only for URI's and pneumonia, but also for fever of uncertain origin in older children and adults. This template works well even if the diagnosis turns out to be pyelonephritis. This is also the template for immunosuppressed patients.

- **Female GU vs. Obstetric Problems.** *Female GU* #39 works best for threatened miscarriage or possible ectopic pregnancy less than 20 weeks. *Obstetric Problems* (#40) template is used for uterine contractions after 20 weeks gestation.

- **Upper and Lower Extremity Problems.** These templates (#35 and #43) are for non-injury complaints and provide a full H&P. For minor problems, it is often better to consider one of the injury templates (such as for a nail fold infection).

- **Skin Rash vs. Allergy.** The *Skin Rash* template (#43) is also used for skin abscess, pilonidal abscess, and Bartholin's abscess. You can consider the *Allergy* template (#44) if the problem is clearly hives. This is the tool of choice for anaphylactic shock and for edema of the lips, tongue, or uvula.

*T-Tip*

**Diabetic Ketoacidosis**

Which template would you consider?

It depends on the chief complaint! These patients present with a variety of chief complaints, so you might find yourself considering any of the following templates: *Dyspnea, Altered Mental Status, Vomiting, Abdominal Pain, Critical Care* or even *CPR.*

Vomiting is by far the most common presentation.

# The Neurological Templates

- **Altered Mental Status vs. Neuro Deficit.** *Altered Mental Status* template (#45) works well for coma, intoxication, insulin reaction, stroke, meningitis, or other causes of obtundation. This template finds frequent use in the geriatric patient sent from the nursing home with fever and decreased alertness. In such cases, the diagnosis is often UTI or pneumonia.

The *Focal Neuro Deficit* template (#46) works well not only for CVA or Bell's Palsy, but also for the elderly patient who is falling frequently or who is having trouble standing or walking.

[33]                    **AERAS 0932**

This is the template for various functional problems like trouble swallowing or speaking. It's also a good tool for generalized (non-focal) weakness.

- **Syncope, Near-Syncope, and Dizziness.** *Syncope* template (#48) works well for syncope and for near-syncope when there is an episode with a distinct start and end. Otherwise, consider the *Dizziness* template (#47). As mentioned above, the *Altered Mental Status* template (#45) is preferred for patients with insulin reaction.

- As you become familiar with the T-System you will find the templates that work best for you.

## Critical Care and Psychiatric Templates

- **Critical Care.** You will probably document most cases requiring critical care using one of the complaint-specific templates. However, when a patient presents in critical condition initially, the *Critical Care* template (#51) can be a good choice.

- **CPR.** The *CPR* template (#50) is for out-of-hospital cardiac arrest. For in-hospital "code blue", use the *Code Blue* template (#53).

- **Psychiatric Problems and Overdose.** The *Psych/OD* template (#52) is useful for patients with depression, suicidal ideation, overdose, or other attempted self-harm (including attempts to slash the wrists). The *Altered Mental Status* template (#45) is more useful for patients with psychosis or agitation.

You may use one of a variety of templates for overdose patients: *Psych/OD* (#52), *Altered Mental Status* (#45), *Critical Care* (#51), or even another template such as *Seizure* (#49).

**T-Tip**

**Template Crossover**

T-System templates have significant crossover among similar templates. Hence, there is often more than one choice. However, if you find that the chief complaint is not what you first thought and the template is a poor fit, stop and get the template you feel will work best. It's worth it.

---

**FINAL NOTE:** The preceding section is designed to assist you in template selection. However, it cannot replace your clinical judgement and experience. Each template should be chosen according to the individual presentation in your best clinical judgement.

[34]                                        **AERAS 0933**



# Appendix Three
# Patient Vignettes

AERAS 0934

## The "Recently Seen/Treated by Doctor" Section

- Many ED patients had recent treatment or hospitalization for their problem. Record this in the **Recently Seen/Treated by Doctor** section.

- For example, use this section to record these stories:
  *"…I had an IVP in your emergency room for a kidney stone two days ago. This pain medicine just isn't working…."*
  *"…My doctor gave me a stress test in his office yesterday. He said if my chest pain got worse I should come to the hospital and be admitted…."*
  *"…I've been getting radiation treatment for lung cancer in St. Louis for the last four weeks…."*

- The example below shows how you could record a patient's account of a recent admission.

**EXAMPLE:**

**Doctor:** *When did this start?*

**Patient:** *Well, I was just in the hospital last week for a collapsed lung and emphysema. I had that tube stuck in my chest for four days. But I was okay when I got out.*

**Doctor:** *So when did your breathing difficulty start?*

**Patient:** *Just last night. I had fever and some terrible chills.*

**Doctor:** *Were you coughing any phlegm up?*

**Patient:** *Yeah, a lot of green stuff.*

(Physician proceeds with remainder of history/template)



[36]

## When the patient has multiple complaints

- Identify the most acute symptom and consider that template, e.g. patient complains of vaginal discharge and acute chest pain - use the chest pain template, recording the vaginal discharge in the **ROS section.**

- If a patient has **multiple prodromal symptoms**, record these in the ROS section.  For example fever, chills and dysuria preceding severe flank pain would be in the ROS of an Abdominal / Flank Pain template.

- Sometimes the most serious complaint is less obvious, e.g. nursing note indicates only back pain and headache.  In this case, we would take two templates into the room, and ask a few questions to identify the **most serious** complaint.

- If a patient has multiple unrelated complaints, you do not necessarily need to use multiple templates.

**EXAMPLE:**

**Doctor:** *The nurses tell me that you've had back pain and headache. Which is bothering you the most?*

**Patient:** *Oh, I've had back pain like this for years. But the headache is what's killing me. (Doctor begins Headache template.)*

**Doctor:** *When did your headache start?*

**Patient:** *This just hit me like a thunderclap real severe two hours ago. I never get headaches.*

**Doctor:** *What part of your head hurts?*

**Patient:** *The whole thing, all over.*

(Physician proceeds with remainder of history/template)



[37]

**AERAS 0936**

## The "Similar symptoms previously" section

- We often ask patients whether they have had symptoms similar to their chief complaint before. Record this in the **Similar symptoms previously** section.

- Use this section to record milder premonitory symptoms or the stuttering, intermittent course of a chief complaint:

- In the example below the patient's major complaint, acute chest pain, has been preceded by several days of milder exertional discomfort:

**EXAMPLE:**

**Doctor:** *How long have you had chest pain?*

**Patient:** *Two weeks.*

**Doctor:** *Did you have it continually during that time?*

**Patient:** *No, at first I only had it when I walked too fast and it only lasted a few minutes.*

**Doctor:** *How long have you had it today?*

**Patient:** *It started up again three hours ago, but this time it won't go away.*

**Doctor:** *Where is it located in your chest?*

**Patient:** *Right here in the center and it goes down my arm.*

(Physician proceeds with remainder of history/template)

# Appendix Four

## Coder's Appendix
## (More HCFA Info.)

[39]

AERAS 0938

# APPENDIX FOUR   CODER'S APPENDIX

# Quick CPT Coding Method

1.  **Determine the level of service that can be supported by the physician's HCFA medical decision-making.**

    Determine the level of decision-making by the character of the presenting problem, the quantity of tests and other data required, and the degree of risk in the case. HCFA's documentation guidelines require a clinical impression, but do not require the physician to record a differential diagnosis or a "decision-making section."

    See essay *"Making Sense of HCFA Medical Decision-Making".*

2.  **Verify that the required history and physical exam components are present.**

    Refer to the "HCFA Layout" on page 12.   See the summary table on the next page.

3.  **Assign the CPT code(s) and "marry" them to the appropriate ICD9 codes.**

---

## DOCUMENTATION REQUIREMENTS

Physicians must understand HCFA's documentation standards for each level of E&M service. Submitting a bill for a given E&M level of service is tantamount to stating that you have fulfilled the specified documentation requirements.

Carriers hold the treating physician personally responsible for the accuracy of these codes regardless of who did the coding, submitted the bill, or received the payment. Penalties for fraudulent billing can be onerous, including recoupment of past payments and exclusion from the Medicare and Medicaid programs. The Kassebaum-Kennedy bill of 1996 now makes it a federal crime for anyone to make any "false representation" to any health care benefit program in connection with the payment for health care benefits.  Hence, third-party billing entities can also be held responsible.

The table on the next page summarizes HCFA's 1995 documentation requirements. However, you should refer to the CPT Manual and AMA/HCFA Documentation Guidelines for further details.

Contact T-System at 1-800-667-2482 to obtain a copy of the Documentation Guidelines.

---

## HCFA DOCUMENTATION REQUIREMENTS SUMMARY

| | | LEVEL 2 | LEVEL 3 | LEVEL 4 | LEVEL 5 |
|---|---|---|---|---|---|
| **HPI**<br>Location<br>Severity<br>Timing<br>Quality | Duration<br>Context<br>Modifying Factors<br>Associated Symptoms | 1–3 elements | | 4 or more elements | |
| **ROS**<br>Constitutional<br>Eyes<br>ENT<br>CVS<br>Pulmonary<br>GI<br>GU | Musculoskeletal<br>Skin/breasts<br>Neurologic<br>Psychiatric<br>Endocrine<br>Hemat./Lymphatic<br>Allergic/Immun. | 1 system<br>(including main affected system) | | 2 or more systems<br>(including main affected system) | 10 or more systems<br>(including main affected system) |
| **"PFSH"**<br>*PAST HX*<br>Immunizations<br>Current Meds<br>Allergies<br>Hospitalizations<br>Surgery<br>Illnesses<br>Injuries<br>Personal Doctor | *FAMILY HX*<br>Parents, Siblings,Children<br>SOCIAL HX<br>Marital Status<br>Living Arrangement<br>Occupational Hx<br>Drugs,Alcohol<br>Education, Sexual Hx | Not required | | At least one statement from one of the three components (i.e., Past Hx) | At least one statement from two of the three components |
| **PHYSICAL EXAM**<br>**10 AREAS** - Head/Face, Neck, Chest (including breasts and axillae), Abdomen, Genitalia/groin/but-tocks, Back/spine, and each of the four extremities.<br>**12 SYSTEMS** - Constitutional, Eyes, ENT, CVS, Respiratory, GI, GU, Musculoskeletal, Skin, Neurologic, Psychiatric, and Heme/Lymph/Immun | | 2 or more systems and/or areas | | 5 or more systems and/or areas | 8 or more systems |

| **DECISION-MAKING**<br>*(Must satisfy requirements for level in 2 of 3 categories)*<br>*1) Scope of Differential Diagnosis*<br>• "Diagnosed" vs. "Undiagnosed" Problem<br>• Extent of Work-Up Required<br>• Consultation Required<br><br>*2) Extent of Data Analysis*     *pnts*<br>• Lab or pathology    1<br>• Radiology    1<br>• Other tests (EKG, PFT)    1<br>• Discussion with radiologist, etc.    1<br>• Decision to obtain prior records    1<br>• Review & summary of prior records and/or other data (i.e., hx from family)    2<br>• Independent review of complex test results (i.e., tracing or image)    2<br><br>*3) Level of Risk*<br>• Intrinsic to Illness<br>• Related to Procedures<br>• Related to Therapy | **Low Complexity**<br>DATA includes at least 2 points as listed to left under "Extent of Data Analysis"<br><br>*or RISK IS LOW*, i.e., uncomplicat-ed illness or injury | **Moderate Complexity**<br>*For an E.D. patient with an "undiagnosed" problem, climb the "data ladder" or the "risk ladder:"*<br><br>DATA includes at least 3 points as listed to left under "Extent of Data Analysis"<br>*or RISK IS MODERATE*, i.e., care requires prescription drugs, IV fluids with additives, or a procedure such as lumbar puncture.<br><br>Also, chronic illness with mild exacerbation or side effects of treatment, new problem with uncertain prognosis, acute systemic illness, or acute complicated injury. | | **High Complexity**<br>*For an E.D. patient with an "un-diag-nosed" problem requiring workup, climb "data ladder" or "risk ladder:"*<br><br>DATA includes at least 4 points as listed to left under "Extent of Data Analysis"<br>*or RISK IS HIGH*, i.e., symptoms could represent a possible threat to life or function (including psych problems, TIA's, seizures, other neurological problems, or severe exacerbation of chronic illness), or<br><br>*treatment or procedures include* parenteral controlled substances, multiple drugs with potential toxi-city, major surgery, or decisions such as establishing "DNR". |

*If patient presents with a "previously diagnosed" problem, both data and risk requirements must be met. However, most ED patients are unscheduled visits for undiagnosed problems.*

| **EXAMPLES**<br>Cases which would often meet the outlined requirements.<br><br>*(from CPT Manual)* | • sunburn<br>• simple conjunctivitis | • severe acute ankle sprain w/ x-ray<br>• gastroentritis w/ lab and/or IV fluids<br>• head injury- no LOC<br>• febrile infant<br>• vag. discharge, wet prep | • head injury with brief LOC<br>• kidney stone<br>• elderly hip fx/injury<br>• pelvic pain<br>• asthma with peak flow | • complicated overdose<br>• active UGI bleeder<br>• chest pain, r/o MI<br>• SVT needing IV drugs<br>• multiple or serious injury MVA<br>• acute severe headache- r/o SAH<br>• sepsis<br>• CVA |

*Note: The history and physical exam guidelines above are brief summaries of HCFA Rules. Refer to HCFA publications for further information. In each case, a "reasonable person" test should also be applied with reference to HCFA medical decision-making complexity.   -T-System, rev. 4/00*

[41]

AERAS 0940

## HISTORY OF PRESENT ILLNESS
### ELEMENTS

| 1. Location | Area of the Body |
|---|---|
| 2. Severity | For example, mild, moderate or severe |
| 3. Timing | For example, constant or intermittent |
| 4. Quality | Characteristics of the symptom. For example, a dull ache or a stabbing pain |
| 5. Duration | Length of time the presenting illness has lasted |
| 6. Context | Situation surrounding onset of symptom(s)/illness. Serves as backdrop for HPI. For example, "I broke my leg while running from the police." |
| 7. Modifying Factors | An influence that impacts the symptom(s) /illness making it better or worse. For example, "Pain lessens when I lie down." |
| 8. Associated Symptoms | Other symptom apart from the presenting complaint that may be related to presenting illness. |

## REVIEW OF SYSTEMS
### ELEMENTS

| 1. Constitutional | Fever, weight loss, aches, weakness, sick feeling, etc. |
|---|---|
| 2. Eyes | Eye/vision symptoms |
| 3. ENT | Ear, Nose, or Throat symptoms (e.g., sore throat) |
| 4. CVS | Cardiovascular system (chest pain, palpitations) |
| 5. Pulmonary | Lungs, lower airway symptoms such as trouble breathing |
| 6. GI | Gastrointestinal symptoms such as nausea, vomiting, diarrhea |
| 7. GU | Genitourinary symptoms such as trouble urinating |
| 8. Musculoskeletal | Muscle/bone symptoms such as pain |
| 9. Skin/Breasts | Rash, etc. Includes symptoms related to nails. |
| 10. Neurologic | Confusion, numbness, weakness, etc. |
| 11. Psychiatric | Depression, hallucinations, anxiety, etc. |
| 12. Endocrine | Related to internally secreting glands (e.g., diabetic symptoms such as excessive urination) |
| 13. Hematologic/ Lymphatic | Blood and lymph glands (symptoms like lymph node swelling) |
| 14. Allergic/ Immunological | Symptoms such as allergic swelling of mouth or lips, hives, or hayfever |

AERAS 0941

# TEMPLATE LIST by CATEGORY

## REGIONAL TRAUMA

1. Head Injury, w/detailed neuro exam
2. Eye Problems
3. Head Injury, facial w/suture note
4. Neck/Back Pain or Injury
5. Shoulder Injury
6. Upper Extremity Injury
7. Trunk Injury
8. Low Back Pain or Injury
9. Hand/Wrist Injury
10. Hip Injury
11. Lower Extremity Injury
12. Ankle/Foot Injury
13. Plantar Puncture Wound

## PEDIATRICS

14. Pediatric Illness
15. Asthma- pediatric
16. Pediatric Trauma

## MULTIPLE TRAUMA

17. MVA
18. Multiple Trauma
19. Fall
20. Assault
21. Animal Bite
22. Major Burn / Smoke Inhalation

## RECHECK, ADD-ON AND GENERAL

23. Suture Removal / Wound Recheck
23a. Trauma Progress and Procedures
23b. Add-On Laceration Note
23c. Medical Progress and Procedures
24. General

## MEDICINE

26. Headache
27. Ear
28. Nose
29. Sore Throat / Toothache
30. ENT
31. Asthma- adult
32. Dyspnea
33. Chest Pain
34. Palpitations
35. Upper Extremity Problems
36. Abdominal Pain
37. Vomiting / Diarrhea
38. GI Bleed
39. Female Urogenital Problems
40. Obstetric Problems
41. Male Genitourinary Problems
42. Lower Extremity Problems
43. Skin Rash / Abscess
44. Allergic Reaction

## NEURO-ICU

45. Changed Mental Status
46. Focal Neuro Deficit
47. Dizziness
48. Syncope
49. Seizure
50. Cardiopulmonary Resuscitation
51. Critical Care
52. Overdose and Psychiatric Problems

AERAS 0942

AERAS 0943

# T-System Quiz

1.  Which is the best way to mark "abdominal pain for 6 hours?"

    a)  ✓ abdominal pain _____ x 6 hrs. _____
    b)  ___ abdominal pain _____ x 6 hrs. _____
    c)  (abdominal pain) _____ x 6 hrs. _____
    d)  (abdominal pain) _____

2.  Which is the correct way to mark "no fever, chills, headache, sore throat, blurred vision?

    a)                          b)                          c)                          d)
    ___ fever _____            ___ fever _____            \ fever _____              ___ fever _____
    ___ chills _____           ___ chills _____           \ chills _____             ___ chills _____
    ___ headache _____         ___ headache _____         \ headache _____           ___ headache _____
    ___ sore throat _____      ___ sore throat _____      \ sore throat _____        ___ sore throat _____
    ___ blurred vision _____   ___ blurred vision _____   \ blurred vision _____     ___ blurred vision _____

3.  Which is the correct way to mark "central chest pain?"

    a)                          b)                          c)



4.  At which location should the history portion of the template be completed?

    a)  at the nursing station, after seeing the patient
    b)  at the nursing station, after the end of the shift
    c)  at the bedside while interviewing the patient
    d)  in the medical library

5.  Which statement most accurately describes bedside use of templates?

    a)  Questions and documentation must follow the sequence of the template.
    b)  Data may be recorded in different areas of the template in a non-sequential way as the patient gives the history.
    c)  If the patient describes many symptoms, the template must be abandoned.

[45]

AERAS 0944

6.  Which is the appropriate way to record normals in the physical exam?

a)
**ABDOMEN**
✓ non-tender
✓ no organomegaly
✓ nml bowel sounds

b)
**ABDOMEN**
___ non-tender
___ no organomegaly
___ nml bowel sounds

c)
**ABDOMEN**
___ non-tender
___ no organomegaly
___ nml bowel sounds

d)
**ABDOMEN**
___ non-tender
___ no organomegaly
___ nml bowel sounds

7.  Why are the normals in the physical exam checked while the positive findings are circled?

a)  No reason - the practice is completely arbitrary
b)  This method allows the reader to rapidly identify positive findings among the many normals usually recorded in an exam. Circling all normals would clutter the document.
c)  This method reduces physician fatigue.

8.  When the level of service is assigned by a coder rather than the ED physician, who is legally responsible for coding violations involving fraud or abuse?

a)  billing company
b)  ED staffing company
c)  coder
d)  ED physician

9.  Which template(s) would be used for a patient with acute chest pain and urinary frequency?

a)  female GU and chest pain - treating each problem with separate templates.
b)  general - with a written description of each symptom
c)  chest pain - documenting the urinary frequency in the ROS section

10. Which is true of multiple patients arriving simultaneously by ambulance?

a)  Templates cannot be used initially because the clerks have not made a chart.
b)  By using templates at the bedside the doctor can complete documentation for multiple patients before the registration clerk has generated charts.
c)  The doctor cannot use templates at the bedside initially because there is no ER number.

11. Shaded areas in templates designate which of the following?

a)  optional areas which contain data less central to the chief complaint
b)  areas of special mediocolegal concern
c)  information that must be recorded for every patient
d)  areas of reduced eye strain

12. A 55 YO diabetic male with a history of CAD and two prior angioplasties has onset of intermittent exertional chest pains two weeks prior to arrival, then developed severe persistent chest pains 3 hours prior to arrival. Which of the following would be true?

   a) The doctor should use the "Chest Pain" template
   b) The HPI would begin with the pain that started 3 hours PTA
   c) The history of CAD, prior angioplasties, and diabetes would be recorded in the history section as "Past History"
   d) The preceding complaints of exertional chest pains for two weeks could be recorded in the HPI as "previous similar symptoms."
   e) all of the above

13. A 22 YO female developed cough and fever, was seen by her doctor in the office and given an antibiotic, but now presents because of trouble breathing and persistent cough. Where would you record the fact that she had recently been seen by the doctor and started on and antibiotic?

   a) in the ROS section
   b) at the beginning of the template
   c) in the section of the HPI titled "recently seen/treated by doctor."
   d) on the palm of your hand, for later reference

14. A known diabetic presents with vomiting and fruity breath. She has not taken insulin for 2 days. Which template would you use?

   a) "Vomiting/Diarrhea"
   b) "DKA"
   c) "General"
   d) "Fruity Breath"

**ANSWERS TO QUIZ**

1. C
2. B
3. A
4. C
5. B
6. A
7. B
8. D
9. C
10. B
11. A
12. E
13. C
14. A

AERAS 0946

Alabama Emergency Room Administrative Services, P.C.

# Employee Handbook

The purpose of this handbook is to provide employees with information regarding the human resources policies and procedures of Alabama Emergency Room Administrative Services, P.C.

The Company reserves the rights to alter, modify, amend or terminate these policies and benefits in any manner that it believes to be in the Company's best interest.

**THIS HANDBOOK AND THE POLICIES CONTAINED HEREIN DO NOT IN ANY WAY CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, A CONTRACT OF EMPLOYMENT BETWEEN THE EMPLOYER AND EMPLOYEE, OR A PROMISE OF EMPLOYMENT.**

Employment with Alabama Emergency Room Administrative Services, P.C. is based on mutual consent. At all times while you are employed with Alabama Emergency Room Administrative Services, P.C. your employment will be at will. Alabama Emergency Room Administrative Services, P.C. hopes your employment with the Company is both satisfying and rewarding, but recognizes that you have the right to resign your employment with the Company at any time and for any reason. Similarly, Alabama Emergency Room Administrative Services, P.C. has the right to end the employment relationship of any employee at any time and for any lawful reason, as the Company deems appropriate.

The language in this manual or any oral statements (past and future) are not enforceable as contracts or covenants of any sort including expressed or implied covenants of good faith and fair dealing.

**Note:  Throughout the handbook, Alabama Emergency Room Administrative Services, P.C., and its related companies will be referred to "the Company."**

AERAS 0855

Alabama Emergency Room Administrative Services, P.C.

---

**To All Employees:**

We are very pleased that you have decided to be associated with our exciting, dynamic company. I have chosen the word "associate" purposefully. It implies a partnership – a special relationship based on mutual respect and support. Some common synonyms for the word *associate* include: teammate, friend, ally, peer and colleague.

At our company we are all part of the same team with all of us working toward the same goals and realizing the same vision: to provide our customers, stakeholders and employees with superior services. To achieve this objective, we must all look for ways to add value to what we offer our customers and what we provide to our employees.

The opportunities for all of us are boundless. I encourage all of you to be creative, energetic and positive. Share the vision…share the dream.

Once again, welcome aboard!


John D. Moorehouse, M.D., F.A.C.E.P.
President

---

**AERAS 0856**

Alabama Emergency Room Administrative Services, P.C.

Introduction................................................................4
Background................................................................5
EEO Compliance........................................................6
Harassment Free Workplace.........................................7
Open Door Policy.......................................................9
No Solicitation.........................................................10
Company Equipment and Property................................11
Breaks....................................................................12
Telephone Calls........................................................13
Internet/E-mail Usage...............................................15
Computer Maintenance..............................................16
Dress Requirements..................................................17
Organization and Cleanliness of Office Space................18
Drug-Free Workplace................................................19
Conflict of Interest...................................................21
Jury Duty...............................................................22
Leave of Absence.....................................................23
Attendance & Punctuality Expectations........................24
Benefits.................................................................26
Probationary Period..................................................27
Employee Performance Evaluation...............................28
Change of Address/Emergency Contact Information.........29
Verification of Employment........................................30
Employment of Relatives...........................................31
Corrective Counseling...............................................32
Employee Compensation...........................................35
Compensatory Time Policy.........................................36
Promotions............................................................37
Reimbursed Expenses..............................................38
Employment Procedures............................................39
Safety and Housekeeping..........................................40
Work Injuries.........................................................41
Group Health Insurance............................................42
Drug and Alcohol Policy Concerning Unemployment Compensation
    Benefits.............................................................43

AERAS 0857

Alabama Emergency Room Administrative Services, P.C.

# INTRODUCTION

This handbook is designed to provide a basis for answers to questions or problems that may arise during your employment at the Company. Please use this handbook as your main reference, and consult the President/COO if you need additional information or clarification on a particular topic. The Company reserves the right to alter, amend or delete any information in this handbook when necessary. Employees will be notified if any such changes, amendments, or deletions are made.

**AERAS 0858**

Alabama Emergency Room Administrative Services, P.C.

# BACKGROUND

It is important to know about the company, its history, and the population it serves. AERAS, P.C. is a for-profit company that provides staffing of licensed emergency department physicians and physician extenders on a 24 hour a day, 365-day a year basis. AERAS, P.C. has been in operation since 1979.

Owner/President, AERAS, P.C. – John D. Moorehouse, MD, FACEP
Owner/Vice-President, AERAS, P.C. – Wallace G. Falero, MD
Chief Operating Officer, AERAS, P.C. – Mark Platt, RN
Chief Compliance Officer, AERAS, P.C. – Wallace G. Falero, MD, FACEP
Medical Director, Baptist East Emergency Department – Wallace G. Falero, MD, FACEP
Medical Director, Prattville Emergency Department – James Bradwell, MD
Medical Director, Baptist South Boulevard ED – Julio E. Rios, MD, FACEP

In order to ensure our Companies' continued success, it is necessary for every employee to be dedicated and to strive to consistently perform high quality work. Employees are expected to have the interest and desire to perform their jobs to the utmost of their capabilities.

AERAS 0859

Alabama Emergency Room Administrative Services, P.C.

## EEO COMPLIANCE

It is The Company's objective to provide equal opportunity in employment. The Company recruits, hires, trains, promotes, and compensates individuals without regard to race, color, sex, age, national origin, religion, disability or veteran status. It is the Company's intent to comply with all Federal and state fair employment legislation. The Company's policy is to provide equal treatment of all employees with regards to wages, hours, benefits, working conditions, training and availability of advancement opportunities.

The Company will not tolerate discrimination of any kind. Upon becoming aware of such treatment, the Company will investigate and take appropriate action. It is your and every employee's responsibility to report any discriminatory practices (whether they impact you or other employees) to the President, Vice President or COO at (334) 272-1050.

**No employee will be retaliated against as a result of reporting discriminatory treatment to the attention of management.**

AERAS 0860

Alabama Emergency Room Administrative Services, P.C.

# HARASSMENT FREE WORKPLACE

The Company is committed to providing a work environment that is free from discrimination and harassment. Any employee who commits any of the acts described below may be disciplined in any manner deemed appropriate by the Company including discharge without notice. Harassment includes verbal or physical conduct that insults or shows hostility or aversion toward an individual because of his or her race, color, religion, gender, national origin, age or disability, and that 1) has the purpose or effect of creating an intimidating, hostile, or offensive working environment, 2) has the purpose or effect of unreasonably interfering with an individual's work performance, 3) otherwise adversely affects an individual's work performance, or 4) otherwise adversely affects an individual's employment opportunities.

The following are descriptions of behaviors that are not acceptable. These descriptions are not all-inclusive, but are meant to serve as a guide.

**Unwelcome Behavior:**
- Unwanted or unwelcome verbal or written comments or behavior that have overtones related to an individual's race, color, religion, sex, national origin, age or disability
- Epithets, slurs, negative stereotypes or threatening, intimidating or hostile acts that relate to race, color, religion, sex, national origin, age or disability
- Verbal or written comments which a reasonable employee would regard as offensive
- Displays placed on walls, bulletin boards or elsewhere on the employer's premises or circulated in the workplace

## Sexual Harassment:

The Company strictly prohibits any form of harassment in the workplace, including sexual harassment. Sexual harassment does not refer to occasional compliments or comments that are socially acceptable. The Equal Employment Opportunity Commission (EEOC) defines sexual harassment as:
- Unwelcome sexual advances,
- Requests for sexual favors when submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or employment opportunities,
- When submission to or rejection of such conduct by an individual is used as a basis for employment decisions affecting the individual, or
- When such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

AERAS 0861

Alabama Emergency Room Administrative Services, P.C.

**Harassment Free Workplace (Continued)**

Sexual harassment may include a wide variety of behaviors and occurs on various levels, including but not limited to the following:
- Unwelcome physical contact of a sexual nature such as patting, pinching or unnecessary touching
- Overt or implied threats against an individual to induce him or her to perform sexual favors or to engage in an unwelcome sexual relationship
- Verbal harassment or abuse of a sexual nature including hints of a desire for sexual relations or making jokes or remarks of a sexual nature to or in front of a person who finds them offensive
- Use of sexually suggestive terms or gestures to describe a person's body, clothing or sexual activity
- Displaying, forwarding or posting offensive, sexually suggestive pictures, jokes or materials (including e-mails) in the workplace

**If you ever feel that you or another employee have been subjected to the types of harassment mentioned above, you are responsible for bringing it to the attention of the President, Vice President or COO of the Company by calling (334) 272-1050. Do not assume that the Company knows about your concerns. It is your responsibility to properly report each and every incident you believe violates this policy against harassment in the workplace.**

It is extremely important that you review your attitudes and actions towards co-workers to ensure that what might be intended as a harmless joke, comment, or touching is not interpreted by another employee as a form of harassment.

Supervisory employees who become aware of conduct that is or may be in violation of this policy must report such conduct immediately to the Company's President, Vice President or COO rather than initiating any investigative steps on their own. Failure to do so may result in disciplinary action.

The Company will not tolerate or condone any form of retaliation or reprisal against any employee who has made a good faith complaint of harassment or discrimination. All such claims will be investigated, and will be treated confidentially to the extent that confidentiality is consistent with a thorough investigation of the reported incident. Any employee found to have engaged in conduct prohibited by this policy will be disciplined. The discipline imposed will be subject to the Company's discretion but may include immediate termination depending on the circumstances.

AERAS 0862

Alabama Emergency Room Administrative Services, P.C.

# OPEN DOOR POLICY

The Company strongly believes that open communication is important. The Company has a simple process for you to use to express ideas, concerns or to solve problems. This process is called the "Open Door." The Open Door signifies open and honest communication among employees.

Most concerns can be resolved with a supervisor or location/department manager. This is usually your best approach because issues are generally better understood and more easily resolved at the closest level of communication.

The Company encourages you to communicate directly to your immediate supervisor or manager. If you do not feel comfortable discussing your concerns with your supervisor or manager, you may bring your concerns to the attention of any other manager, or any owner of the Company.

Expressing your concerns through the Open Door is not a guarantee that you will agree with the ultimate resolution. It does mean that your suggestions and concerns will be heard and that they will be addressed.

It is every manager's responsibility to take a concerned interest in employees, to bring issues to resolution and to involve other managers if necessary.

**No employee will be retaliated against as a result of using the open door policy.**

AERAS 0863

Alabama Emergency Room Administrative Services, P.C.

## NO SOLICITATION

An associate is not permitted to engage during working time in any solicitation of any kind in his/her working areas or in the working areas of the employees to whom the employee is attempting to solicit. Likewise, an associate is not permitted to engage during working time in the distribution of literature in his/her working areas or in the working areas of the employees to whom the employee is attempting to solicit. Any solicitation or distribution of literature by any third party on the Company property is strictly prohibited.

For purposes of this rule, working time does not include break periods, meal times or other specified periods during the workday when employees are properly not engaged in performing their work tasks.

The word "solicitation" as used in this policy means, but is not limited to, requesting or urging anyone to give or pay or obligate himself or herself to pay money to any cause for any reason. "Solicitation" also includes, but is not limited to, requesting anyone to sign any document or authorization card indicating membership in any pool, organization, association or group, or indicating support for a pledge to any cause.

"Distribution of literature" as used in this policy means passing out any type of advertising, handbills, circulars, forms or other documents or memoranda, except for materials prepared by the Company for a business reason.

AERAS 0864

Alabama Emergency Room Administrative Services, P.C.

# PRIVACY RIGHTS

There should be no expectation that any privacy exists on Company property or in connection with any Company equipment.

Computer files or disks, e-mail and voice mail and any related phone or computer systems are Company property, and should be used for business related purposes only. The Company reserves the right to monitor these systems to ensure they are being used for appropriate purposes only. There is no personal right of privacy for any material created, received or sent from these systems. There is no right to privacy pertaining to messages or content, and the Company may at any time require access to and disclosure of messages or content to authorized employees. The Company reserves the right to read and disclose the contents of messages and content for any purpose consistent with the business interests of our Company. There is no guarantee of confidentiality or security when using these systems. Electronic messages should only be sent to those individuals who have a business need to receive them. The Company reserves the right to retain e-mail and voice mail files for a set period and to systematically erase them after that time. The use or distribution of offensive, harassing or inappropriate materials on the computer, network, e-mail or voice mails systems is strictly prohibited, and will be grounds for disciplinary action up to and including termination.

Your safety and welfare is of utmost importance. In order to protect our employees, the Company may find it necessary to conduct inspections for weapons, illegal drugs, controlled substances, alcohol, drug paraphernalia or missing property owned by the Company, a visitor to the Company or another employee. Your cooperation with such inspections is required. A Company-initiated search does not necessarily imply an accusation of theft or that you have broken a rule.

The Company may inspect Company property such as desks, file cabinets, lockers, computer files, e-mail and voice mail or any other area or article on our premises. Inspections of your personal property such as purses, lunch boxes, baggage, briefcases, etc. may be conducted when circumstances or workplace conditions justify such action.

AERAS 0865

Alabama Emergency Room Administrative Services, P.C.

# BREAKS

All employees are allowed two (2) fifteen minute breaks throughout the day, along with an hour for lunch.  However, employees should be careful not to allow break times to interfere with their work.  It is mandatory that the telephones be covered by at least two people at all times; therefore, all employees should schedule and coordinate their breaks beforehand in order to accomplish this.

**AERAS 0866**

Alabama Emergency Room Administrative Services, P.C.

# TELEPHONE CALLS

### Personal Calls:

Employees are allowed to place and receive brief personal telephone calls. Frequent personal telephone calls are not permitted. Lengthy personal calls are strongly discouraged and should occur only in an emergency.

### Monitoring of Phone Calls:

The Company reserves the right to monitor phone calls on an as-needed basis for the purpose of training and/or quality control, or if reasonable suspicion exists of violation of Company rules. Employees will not be informed in advance as to when phone calls may be monitored.

### Telephone Etiquette

All calls answered should be done so in a courteous and polite manner. The Company prides itself on excellent communication skills and customer service. Although the receptionist regularly monitors the telephones, each employee should be aware of times when he/she may need to answer the telephones themselves. The goal is to ensure that the telephone lines are answered in a prompt manner. Upon answering the telephone, each employee should always identify the name of the company and himself/herself (**i.e. "ER Services, this is [name], may I help you?**). After the caller has requested the person to whom they would like to speak with, each employee should answer with, **"One Moment Please"**.

### Returning Phone Calls

We realize there are times when employees are unable to take telephone calls. When this happens, the caller should always be given the option of being put to a person's voicemail or taking a message. If the caller prefers a message to be taken, each employee should always be sure to obtain as much of a detailed message as possible so the employee receiving the message will know what the customer is looking for and can be prepared before calling back. All messages and voicemails left for employees should be returned in a prompt manner. Our goal is to guarantee that all matters are taken care of as soon as possible and no customer or stakeholder will have to wait an extended period of time for a response.

AERAS 0867

Alabama Emergency Room Administrative Services, P.C.

**Telephone Calls (Continued)**

**Reporting Test Results**
The following procedures should be taken in order to ensure the highest quality of
reporting test results to the proper physician in a timely manner:

1. Employees at the Company should **never** accept test results for any patient
   via the telephone (this practice will promote patient confidentiality).
2. Refer the call to the patient's Primary Care Physician (PCP).
3. If the patient does not have a PCP, refer the call to the physician that was
   involved in the patient's care.
4. If the physician is not on the schedule, refer the call to the facility in which
   the patient was treated or notify the physician of the name and number of
   caller.

**AERAS 0868**

Alabama Emergency Room Administrative Services, P.C.

# INTERNET/E-MAIL USAGE

The Internet/E-mail connection in the Company office is for business purposes. Any information through the Company's computer system is subject to review and any unprofessional subject matter found will result in disciplinary action up to termination.

AERAS 0869

Alabama Emergency Room Administrative Services, P.C.

# COMPUTER MAINTENANCE

The Company employs several computer programs, networks and operating systems. It is recognized that problems will exist from time to time. Employees are urged to attempt common sense solutions to any problem before notifying an outside vendor for assistance. In the event assistance is needed from an outside vendor the employee shall exercise proper notification and documentation of work performed. All computer related problems are to be routed and directed by the company's designated system administrator. Employees are to notify the system administrator and not the vendor directly. Once the administrator is involved, direct communication between the employee and the vendor may be necessary and prudent.

**Current Systems Administrator: Kelli Destin**

**AERAS 0870**

Alabama Emergency Room Administrative Services, P.C.

## DRESS REQUIREMENTS

Employees' dress is expected to be neat and appropriate for a professional environment. Ties are required for males on days when business meetings are being conducted. Dress may vary slightly from day to day and from employee to employee, depending on the employee's position and duties for the day. Employees may dress casually on any day, unless they are required to visit a facility or have a meeting. On days the employee wears casual clothes, neat jeans and a casual shirt are acceptable dress for all employees. Absolutely no shorts are allowed.

Clothing that is revealing or exceptionally form fitting may not be worn. The definition of revealing clothing includes, but is not limited to, see-through blouses, shirts, skirts, pants, or dresses; low-cut blouses or shirts; half-shirts or cropped-tops; shorts; and clothing that is torn or designed so as to be revealing. If you have a question about whether a piece of clothing is appropriate, ask the President, Vice President, COO or your immediate supervisor.

AERAS 0871

Alabama Emergency Room Administrative Services, P.C.

## ORGANIZATION AND CLEANLINESS OF OFFICE SPACE

The following things should contribute to a clean and organized office space:

- Files properly organized and filed.
- Desk reasonably clean and neat.
- Dust free.
- Floor reasonably clear.
- Space heaters unplugged at the end of the day.
- Candles extinguished anytime office is unattended.
- Music devices such as radios can be at reasonable volume levels and the selection of music can be one that is professionally acceptable.

AERAS 0872

Alabama Emergency Room Administrative Services, P.C.

# DRUG-FREE WORKPLACE

The Company recognizes that its future is dependent upon the physical and mental well being of all employees. The use and misuse of drugs and alcohol pose a threat to the Company and its clients. The possession, use or sale of illegal drugs (including drug paraphernalia) is prohibited. The misuse of any legal drugs and/or the use of alcohol, either in the workplace, while on Company time or during breaks or meals, if the employee is returning to work after the meal, is strictly prohibited. Alcohol may be served at Company functions. Under all circumstances, temperance is expected. Alternative transportation at the Company's expense will be provided if necessary.

Any employee under the influence of alcohol or drugs which may impair judgment, performance or the safety of the employee or others while on Company property, Company business, or during work hours, is subject to discipline including termination. Employees are required to promptly notify the Company if they are taking any medication that may affect their judgment, performance or behavior.

The Company conducts post-accident drug testing for employees when an on-the-job accident requiring medical attention occurs.

A Company-designated licensed laboratory will conduct all drug testing. The testing is conducted with appropriate chain of custody procedures in place to ensure accuracy and continuity in specimen handling, transfer and storage.

The Company will pay the costs of initial and confirmation drug testing which it requires. Should you wish to dispute any results, you will pay the costs of any additional drug testing.

In order to help ensure a safe working environment, the Company may conduct reasonable suspicion drug and/or alcohol testing if an employee is having work performance problems or is displaying behavior that may be alcohol or drug related. A manager, with the approval of a company officer, may require that the employee submit to a breath test and/or urinalysis. In such circumstances, the employee will be suspended without pay until the test results come back. If the results are negative, the employee will be reimbursed for all work time lost.

As an ongoing condition of employment, employees are required to notify, in writing and within five (5) days of the violation, his/her manager of any criminal drug statute conviction they receive.

AERAS 0873

Alabama Emergency Room Administrative Services, P.C.

**Drug-Free Workplace (Continued)**

**Consequences of Positive Test Results**

A positive drug test will result in termination of employment. Refusal to comply with the testing requirements of this policy will be considered as a positive result. A positive result may impact your eligibility for worker's compensation.

All positive results are reviewed by a Medical Review Officer (MRO). The MRO is also responsible for contacting employees who test positive to inquire about possible medications or other factors that may have caused the positive result. If an employee refuses to talk to the MRO, the test results will be considered "positive."

The current Medical Review Officer is Wallace G. Falero, MD, FACEP

AERAS 0874

Alabama Emergency Room Administrative Services, P.C.

## CONFLICT OF INTEREST

**OUR CONFLICT OF INTEREST POLICY PROHIBITS YOU FROM ENGAGING IN PERSONAL ACTIVITIES OR BUSINESS DEALINGS INCONSISTENT WITH THE COMPANY'S BEST INTERESTS WHILE EMPLOYED BY THE COMPANY. YOU HAVE THE OBLIGATION TO AVOID SITUATIONS THAT WOULD CAUSE A CONFLICT OF INTEREST OR THE APPEARANCE OF A CONFLICT OF INTEREST INCLUDING BUT NOT LIMITED TO:**

- Using Company information for personal gain
- Unauthorized disclosure of confidential or proprietary information including patient information
- Acquiring interests in or independently servicing competitors or clients
- Working for a direct competitor
- Holding another job (moonlighting) if it interferes with your ability to effectively perform your duties for the Company.

All employees are required to attend a compliance training session and are asked to sign a confidentiality agreement upon hire.

Violation of this policy will result in disciplinary action, which may include termination.

AERAS 0875

Alabama Emergency Room Administrative Services, P.C.

## JURY DUTY

The Company is legally obligated to allow employees time off from work to serve jury duty.  Employees must notify the office (or President/Vice President/COO) of their summons to serve as soon as possible and present written verification from the court.  Employees are expected to return to work after they are excused or released from jury duty.  The Company will pay the difference between the employee's regular hourly pay and the amount of pay received for jury duty.  The employee must provide to the Company written documentation of the payment he/she received from the court.  The Company will not reimburse the employee for mileage or meals related to jury duty.

AERAS 0876

Alabama Emergency Room Administrative Services, P.C.

# LEAVE OF ABSENCE

Employees wishing to take a leave of absence should contact the company President, Vice President or COO as soon as possible. Employees will not be paid for absences that do not receive prior approval from a supervisor. The only exception is a case in which the absence is due to an emergency or unsuspected illness and the President, Vice President, COO or immediate supervisor is notified as soon as possible.

A written excuse is not generally required for an employee's absence. If the extended absence is taken for medical reasons, a statement of medical verification could be required, along with an estimated length of absence.

Employees are also allowed maternity leave. Maternity leave is usually limited to three months. Vacation and sick leave benefits will continually be accrued each pay period while an employee is out. These benefits may be used towards their leave of absence under the conditions that: (1) the benefits accrued are available and not at a negative balance (i.e., the employee is not in the hole), and (2) it is approved by the President, Vice President or COO.

Upon the death of an immediate family member, the employee is allowed up to two days (16 hours) paid at regular hourly rate.

Alabama Emergency Room Administrative Services, P.C.

## ATTENDANCE AND PUNCTUALITY EXPECTATIONS

Every job at the Company is critical to meeting our clients' needs. It is important for you to be present and ready to begin work as scheduled. This includes both at the start of your workday as well as after returning from breaks and lunch.

**Time Clock**

All administrative office employees are required to utilize the computerized time-keeping system to record working time. Employees are expected to clock in and out diligently upon all arrivals and departures. This includes clocking out for meals and other extended breaks, regardless of whether or not the employee actually leaves the company premises. Any changes to recorded time must be made to the timekeeper in writing. While "on the clock", all employees are expected to be conducting official company business. Personal business (i.e. balancing checkbook, paying personal bills, reading magazines, etc.) should not be done while on the clock. Also, employees should have business reasons for coming to work early, not to attend to personal matters.

The time-keeping system provides weekly reports. Reports of an employee's time worked are available upon request.

**Taking Time Off**

Time off must be scheduled in advance in accordance with the needs of your department and supervisor. Personal time is always subject to management approval. Taking time without approval may result in disciplinary action. If you exceed your personal accrued time or are excessively absent, you will be subject to disciplinary action subject to the requirements of the Family and Medical Leave Act (if applicable). In addition, employees who exhibit a pattern of poor attendance, for example, consistently missing a certain day of the week, may be subject to disciplinary action as well. Please ask your immediate supervisor for details on attendance and punctuality expectations.

Exceptions may be allowed in the following circumstances provided you promptly contact your supervisor to provide notification of your expected absence as described below:

- If you or an immediate family member (spouse, child or parent) is ill or injured
- If due to unusual circumstances and if business needs permits, management approves an unpaid leave of absence.
- If the absence is covered by the Family and Medical Leave Act.

**Sick or Late Call-In**

Because of the nature of the Company's business, it is important that you are at work daily and on time. Your co-workers depend on your attendance and punctuality, as do the Company's clients. If something unexpected arises that prevents you from coming to work or means you will be reporting to work late, you must call your supervisor or manager before your scheduled start time. Excessive tardiness will result in corrective

AERAS 0878

Alabama Emergency Room Administrative Services, P.C.

**Attendance Punctuality Expectations (Continued)**

action up to and including termination.  All employees must call in prior to the start of the shift and speak directly with the immediate supervisor.  Failure to call in and properly report an absence or tardiness will result in disciplinary action up to and including termination.

**No Call/No Show**
Failing to call in at all will result in disciplinary action up to and including termination.

If three consecutive days of no-call/no-show occur, the Company will assume you have resigned your position.  You will be sent a letter of separation from the Company.

AERAS 0879

Alabama Emergency Room Administrative Services, P.C.

# BENEFITS
## (Administrative Employees Only)

**Vacation Leave:**
Generally, earned vacation time is based on length of continuous employment (unless otherwise arranged). During the first year of employment with the Company until the completion of the fifth year of employment, each employee will receive ten (10) paid vacation days. After five years of employment, each employee will receive fifteen (15) paid vacation days per year. The employee and President, Vice President or COO, must schedule vacation time in advance. Due regard will be given to permitting the fullest use of vacation time while maintaining efficient office operations.

Vacation pay is used in one-hour blocks, eight hours per day not to exceed 40 hours per week. When a paid holiday occurs during the week of an employee's vacation, the employee will receive one extra day of vacation. Employees may accumulate vacation leave up to forty (40) days. However, no compensation for vacation time will be allowed, except upon resignation. Employees terminated from the Company are not eligible for compensation for remaining vacation time. Vacation time and sick/personal days may not be taken immediately following one another to create an extended leave of absence, without prior approval or in the case of an extended illness or leave under the Family and Medical Leave Act. Employees are eligible for vacation leave after six months of employment.

**Sick Leave:**
Administrative employees will be paid for time away from work due to illness of the employee or his/her immediate family. Illness includes time off for visits to a healthcare provider, whether scheduled or unscheduled. Sick leave is granted at a rate of 7 days per year. The total amount of sick leave that may be carried over is 520 hours. In addition, each administrative employee will receive 3 personal days each year. However, personal days must be used prior to using sick leave. Any unused personal days at year-end will be lost and will not rollover to the next year.

**Holidays:**
The administrative offices of the Company will be closed in observation of the following holidays:
- New Year's Eve
- New Year's Day
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day – 2 days
- Christmas – 2 days

Note:  Medical staff employees otherwise scheduled to work on these days should report to the location as scheduled.

AERAS 0880

Alabama Emergency Room Administrative Services, P.C.

# PROBATIONARY PERIOD

The first 90 days of an individual's employment with the Company is considered a trial period or probationary period. This time gives the employee an opportunity to become familiar with the company and the job requirements. This time period also gives the President or immediate supervisor an opportunity to evaluate the new employee as to his/her ability to perform the job. If, following the 90 trial period, it is determined that the employee does not meet the job requirements or cannot adequately perform the job, the employee will be terminated. If it is determined that the employee meets the job requirements and adequately performs the job, the employee will gain regular employee status and will become eligible for various benefits.

During this 90-day trial period, employees become eligible to receive health benefits one month after their employment date. However, employees are not eligible for dental benefits until after 90 days. In addition, employees will not be eligible for vacation, personal, sick or compensatory time until after their 90-day probationary period.

**AERAS 0881**

Alabama Emergency Room Administrative Services, P.C.

## EMPLOYEE PERFORMANCE EVALUATION

All employees will be evaluated on their work performance at least annually. This evaluation will be made by the President and immediate supervisor, and will be discussed with the employee. The evaluation also serves as an opportunity for the employee to address any questions he/she may have regarding his/her job or duties. Employees will be evaluated in three major categories: primary abilities – including attitude, learning ability, and attendance; general job skills – including knowledge, problem solving, quantity and quality of work, and communication; and management traits – including accomplishments, decision making, leadership, loyalty and trust.

AERAS 0882

Alabama Emergency Room Administrative Services, P.C.

## CHANGE OF ADDRESS/EMERGENCY CONTACT INFORMATION

Employees are expected to notify the Company of any changes in address/telephone number, emergency contact information or insurance dependents/beneficiaries. New information should be submitted to the payroll department within three working days of the effective date of the change.

AERAS 0883

Alabama Emergency Room Administrative Services, P.C.

## VERIFICATION OF EMPLOYMENT

For the employee's and the Company's protection, it is the Company's policy not to provide work references for current or former employees. The Company will verify employment dates and titles over the phone and confirm rates of pay if the request is made in writing. All requests for employment and wage verification from banks, legal and financial institutions, landlords, etc. must be made in writing and must be signed by you. Please allow sufficient time for the Company to respond to such requests. The Company will do everything it can to respond in a timely manner. If you are contacted directly for any such references or verification, please refer the request to the Accounting Department, Office Manager, President, Vice President or COO.

AERAS 0884

Alabama Emergency Room Administrative Services, P.C.

## EMPLOYMENT OF RELATIVES

The Company may prohibit the employment of an individual where he or she would be under the direct supervision of a relative. In addition, the Company may prohibit the employment of a relative where:

- One relative would audit, verify or be entrusted with monies received or handled by another relative; or
- One relative has access to payroll information and processing

The Company reserves the right to determine when such a conflict exists.

AERAS 0885

Alabama Emergency Room Administrative Services, P.C.

# CORRECTIVE COUNSELING

The Company is justifiably proud of its employees and the manner in which they conduct themselves. The Company and each of its employees are expected to conduct all work-related matters in accordance with the law and the highest ethical standards. For the protection of our property, business interests and the health and safety of all employees, we have established certain standards of conduct, performance and production. These standards will also ensure superior service to our clients.

Corrective action may result from not following or meeting these standards. If the breach is considered serious, immediate discharge will occur. The Company will evaluate the severity and appropriateness of the corrective action based on the circumstances of the situation and will handle each situation accordingly.

The Company, at its sole discretion, will determine when and if a progressive discipline should be used. Nothing in this policy should be considered to be a promise or agreement that the Company will use progressive discipline. The Company always retains the right to terminate any employee's employment without warning, cause, or notice.

The President will approve all terminations. If these individuals cannot be reached, the employee will be suspended until the termination can be reviewed and approved. If management decides not to terminate, the employee is issued a final written warning.

**Warnings for Violation of Major Company Rules**
Violation of a major company rule will generally result in immediate termination. These rules, although not all-inclusive, are listed below.

**Major Company Rules (do not consider this list all-inclusive)**
- Violation of security and critical safety rules
- Abusing, destroying or intentionally damaging Company or client equipment or property
- Possession of firearms, weapons or explosives on Company premises or while conducting Company business
- Falsification of Company records, including but not limited to falsification of hours worked
- Theft or any dishonest act impacting either the Company, client, other employees, or organizations serving the Company
- Disclosure of proprietary or confidential information
- Misusing or removing Company records or confidential or proprietary information without proper authorization
- Withholding information from the Company concerning the theft of Company property or assets
- Abusive or threatening physical or verbal acts against co-workers or clients

AERAS 0886

Alabama Emergency Room Administrative Services, P.C.

**Corrective Counseling (Continued)**
- Insubordination
- Sexual, racial or other prohibited forms of harassment of employees, clients or other business associates
- Possession, use, dispensing or sale of illegal drugs including drug paraphernalia while on Company time or on Company property
- Possession or consumption of alcoholic beverages on Company property
- Reporting to work while under the influence of alcohol or a controlled substance
- Failure to report anyone violating a major Company rule

**Other Performance Issues**
The purpose of this process is to present a planned method of improving performance or correcting policy violations. The following serves as a GUIDE as to how corrective action should be administered.

The various corrective action/counseling steps will give consideration to the following, and each case will be reviewed individually:
- The circumstance and/or explanations given by the employee
- The past work, service record and position/level of the employee
- The policy violated
- The extent and severity of the violation
- The frequency of the infraction
- The consistency with action taken with other employees for similar violations under similar circumstances

**Oral Conversation:** the immediate supervisor informs the employee of the misconduct or substandard performance. If the problem is corrected and not repeated within a six-month period following the conversation, no further action will be taken. The supervisor will make a record of such conversations.

**First Written Action:** your immediate supervisor will document performance issues that reoccur on a Corrective Action form and identify the steps necessary to correct the problem. You, your supervisor and his/her manager will all sign the form. You are welcome to make written comments on the form or attach another sheet if necessary. The original of this form will be filed in your personnel file. You and the supervisor will both keep a copy.

AERAS 0887

Alabama Emergency Room Administrative Services, P.C.

**Corrective Counseling (Continued)**

**Second Written Action:** if you do not correct a performance issue addressed by a first written action, your supervisor will complete another Corrective Action form. You, your supervisor, and his/her manager will all sign the form. You are welcome to make written comments on the form or attach another sheet if necessary. The original of this form is filed in your personnel file. You and the supervisor will both keep a copy.

If at this point the performance issue reoccurs within a twelve-month period, the supervisor has a number of options, depending on the circumstances. Some options are, but are not limited to, the following:

- Suspension without pay
- Termination
- Decision making leave: This is one day off with pay. The purpose is to give employees the opportunity to think about whether they wish to continue to work for the Company. Supervisors will only select this option if they feel there is good potential for the employee to continue with the Company. The supervisor will complete a final written corrective action indicating that the employee is being granted a decision making leave. The employee will return to work with a written letter to the Company explaining why he/she would like to continue employment with the Company and indicate the changes in behavior that the supervisor might expect. This letter will be given to the supervisor when the employee returns to work. In addition, a final written warning will usually accompany such a leave.

**Suspension**

Suspensions may be used when an employee is suspected of a serious violation requiring further investigation by management. Examples of such investigations that may result in suspensions might include: theft, falsification of company records, fighting with a co-worker, harassment of a co-worker, and using abusive language with a customer, etc. Non-exempt (hourly) employees are suspended without pay. Salaried (exempt) employees may not be suspended without pay unless the suspension will last at least one week (five days). If the Company finds the employee committed no wrongdoing, the employee will be reinstated with back pay. If the Company finds that the employee committed wrongdoing of a nature that does not require termination, the employee will be reinstated without back pay.

**AERAS 0888**

Alabama Emergency Room Administrative Services, P.C.

# EMPLOYEE COMPENSATION

**It is a violation of Company policy to discuss your employee compensation with anyone other than the President, Vice President, COO or Accounting Department.**

<u>Overtime:</u>
Overtime is any time that a non-exempt employee works in excess of 40 hours in a week unless otherwise required by state law. Overtime is paid at a rate of one and one half times the normal hourly rate for all hours in excess of 40. Paid time off (including company recognized holidays, vacation, sick and personal days) is not counted toward time worked and therefore is not considered in the computation of overtime. Your immediate supervisor must approve overtime before being worked. **Physician extenders and nurse practitioners, although paid on an hourly basis, are considered exempt employees and are not eligible for overtime pay.**

<u>Keeping a Record of Hours Worked:</u>
Administrative hourly employees are expected to keep an accurate record of their hours worked. Administrative office employees do so through use of the time and attendance system (see "Attendance and Punctuality Expectations"). Medical staff employees are expected to submit signed time sheets detailing time worked by the fifth day following the end of the pay period. You must never record the hours of another employee or misrepresent the hours you have worked.

<u>Pay Period and Pay Days:</u>
Salaried employees are paid semi-monthly on the fifteenth and the end of the month for the periods ending on those dates. If the fifteenth or the end of the month is a Saturday, a Sunday or a holiday, employees will be paid on the preceding business day. Hourly employees are paid biweekly on Friday [effective September 29, 2000] for the period ending the previous Sunday. Any employee with a question about the pay period, pay rate, or a particular paycheck should contact the accounting office. Any errors will be investigated and corrected promptly.

<u>Physician Extenders:</u>
Timesheets for physician extenders are due the 5th of the month (for the period ending on the end of the month) and the 20th of the month (for the period ending on the 15th). All physician extenders are required to fax their timesheets to the Company, mail them to the Company or bring them to the office personally to be received on the due date. The Company may elect to withhold an extender's compensation until the timesheet is complete and submitted to the Company. Any delay caused by the failure of the extender to submit the timesheet may result in a delay in payment of compensation. The physician extenders are asked to use the new timesheets that will be provided to them in order to report hours worked. Any questions regarding this new policy towards our physician extenders should be directed to the accounting office.

AERAS 0889

Alabama Emergency Room Administrative Services, P.C.

# COMPENSATORY TIME POLICY

Compensatory time is provided to reward employees for time committed to the performance of their duties in excess of a normal (i.e., forty-hour) workweek.

The details of the compensatory time policy are as follows:

- Comp time begins to accrue at the 40th hour of a normal workweek (Monday through Sunday). However, if an employee works under 40 hours in a workweek the difference between their time worked and 40 hours will be deducted from their comp time accrual. For example, if an employee works only 38 hours in a workweek, then 2 hours will be deducted from their comp time accrual. This will begin effective January 1, 2007.
- Comp time must be used prior to using sick/personal leave. Leave will be deducted in the following order: (1) comp time, (2) personal leave, (3) sick leave.
- Comp time must either be used as leave or paid out by the end of the calendar year. Comp time accrued but not taken at year-end will be paid at straight-time rates. In addition, comp time may not be "cashed in" prior to year-end except upon approval by the chief operating officer or resignation.
- Comp time is intended to be a reward for the extra hours required to complete a project or task before an imminent deadline. It is not intended to be accrued for simply working through lunch on a regular basis in order to accumulate additional time off.
- This policy replaces any compensatory time policies previously in effect and includes no provisions to include any previous comp time accrued.
- Hourly employees are not eligible to accrue comp time. Overtime for these employees is paid at one and one-half the employees' regular hourly rate, as required by law.
- Employees may only accrue up to a total of 100 compensatory hours. Any comp time after the maximum amount will be null and void. Furthermore, regardless of the amount of compensatory hours accumulated only the maximum of 100 hours will be paid out for the entire year.

AERAS 0890

Alabama Emergency Room Administrative Services, P.C.

# PROMOTIONS

Whenever possible, the Company will consider all qualified current employees when filling vacant positions within the company.  Promotions are based on training and education, individual ability, dependability, work quality, past performance and length of service.

AERAS 0891

Alabama Emergency Room Administrative Services, P.C.

## REIMBURSED EXPENSES

The following expenses for business seminars, conventions, client meetings, and other business activities approved by the President, Vice President or COO will be reimbursed:
- Registration fee
- Reasonable hotel expenses
- Reasonable meal expenses
- Cab fares
- Tips
- Use of personal vehicle

A supervisor or the President should preapprove all out-of-pocket expenses paid by an employee. Reimbursement requests should be submitted on a company-provided expense report and approved by the COO. In addition, all out-of-town travel expenses (mileage, lodging, alternate transportation, etc.) should be approved in advance by the President without exception. Requests for reimbursement should be submitted as outlined above.

Use of personal vehicle is reimbursed at a per mile rate. The rate of reimbursement will be determined by the President and may change from year to year. This rate of reimbursement includes gasoline and other maintenance on the employee's vehicle. These types of expenses are not reimbursable in addition to the per mile rate. Other expenses particular to a specific event may be reimbursed. Consult the Company accounting and records office for information on reimbursed expenses not mentioned here.

Requests for reimbursement should be made at least monthly. Expenses submitted more than 3 months after the date of occurrence are no longer eligible for reimbursement. Reimbursements will be made on designated days on a periodic basis.

AERAS 0892

Alabama Emergency Room Administrative Services, P.C.

# EMPLOYMENT PROCEDURES

### Temporary Employment:

Employees hired on a temporary basis will receive no benefits and will be paid only for those hours they work.

### Part-Time Employment:

A part-time employee is defined as an employee who works less than 30 hours per week. Group health insurance and vacation time are not provided to part-time employees; however, part-time employees do earn scheduled paid holidays and workers' compensation.

### Termination of Employment – Involuntary:

Employment termination or discretionary dismissal will be initiated as a result of continuing minor infractions or as a result of unacceptable behavior or performance. The Company will terminate any employee for any actions or conduct which, in the Company's sole discretion, warrants dismissal. In circumstances that do not require immediate termination, employees will be warned both verbally and in writing that their actions or conduct is unacceptable and may result in termination. Suspension may also be utilized as a warning.

*Dismissal may occur at once without verbal or written warning in the event of job neglect, breach of confidentiality agreement, theft or vandalism.*

Upon being dismissed from the company, an employee automatically forfeits any accrued vacation time in accordance with the policies outlined in this handbook. (See "Benefits.") An insured person and his/her dependents are eligible for continued coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) as required by law.

### Resignation:

Employees resigning from employment with the Company should inform their supervisor and the President as soon as possible, and provide written notice at least ten working days before their last day of employment. A resigning employee's group health insurance will terminate on the last day of employment. An insured person and his/her dependents are eligible for continued coverage under the Consolidated Omnibus Budget Reconciliation Act (COBRA) as required by law. Upon resignation, an employee will be compensated for any accrued vacation and compensatory time in accordance with the policies outlined in this handbook. (See "Benefits.")

AERAS 0893

Alabama Emergency Room Administrative Services, P.C.

## SAFETY AND HOUSEKEEPING

Safety is everyone's business. The Company needs your help to ensure that work places are safe and clean and that risks are minimized. In order to accomplish this goal, the Company has established the following safety requirements and housekeeping rules. Your immediate supervisor may provide you with additional safety rules. Be aware that these rules are not meant to be all-inclusive. Violation of safety and housekeeping rules and requirements may result in corrective action up to and including termination. The rules are as follows:

- Learn and know your job thoroughly.
- Know the location of and be able to use first aid, fire protection and safety equipment, and hazardous material.
- Do not clean or make repairs or adjustments to equipment without proper authorization. Shut down an unplug equipment when making repairs, adjustments, or for cleaning.
- Store supplies and equipment safely and neatly.
- Report unsafe conditions and defective equipment immediately to your supervisor or designated management.
- Keep all tools and equipment in proper working condition.
- Use the proper tool for each job.
- Do not use equipment unless you have been properly trained to do so.
- Do not lift items that are too heavy for you.
- Do not operate equipment unless required shields or safety guards are in place.
- Wear or use all required protective equipment.

**AERAS 0894**

Alabama Emergency Room Administrative Services, P.C.

# WORK INJURIES

The Company takes its responsibility as an employer very seriously and goes to great lengths and expense to provide a safe working environment and worker's compensation insurance for employees. The Company will deal promptly with legitimate claims and injuries and investigate any fraudulent claim.

- Report all injuries, no matter how slight to your immediate supervisor and/or President. They will walk you through the claims process.
- Company-authorized providers must perform all medical treatment (unless otherwise required by state law).
- A listing of company-authorized providers is posted at each work site.
- All injuries requiring medical treatment are subject to the Company's drug-free workplace policy. Failure to go to approved doctors or to submit to drug testing may jeopardize your worker's compensation benefits.
- Claims may be denied if an on-the-job injury/illness occurs and you fail to report the injury/illness within 30 days of the initial manifestation.
- On-the-job injury/illness caused by your failure to use personal protective equipment or to follow safety rules may result in a reduction in your worker's compensation benefits.
- Report all work related injuries to the Company's COO within three (3) days.
- Complete the Initial Report/Incident Report (this may be obtained from the Company's COO).
- Needle sticks should be handled in the following manner:
  a) Whichever facility the injury occurs, be sure to follow that facility's Protocols
  b) Complete the Initial Report/Incident Report.
- In case of emergency, call 911.

AERAS 0895

Alabama Emergency Room Administrative Services, P.C.

# GROUP HEALTH INSURANCE

Eligible employees and their families may receive group health insurance coverage. Eligibility is based on full-time employment status and approval by the insurance company. There may by a 30-to-90-day waiting period (from the time the employee is hired) before the coverage becomes effective. The company pays for the employee portion of the coverage. Dependent coverage is paid by the employee through payroll deduction. Group health insurance is provided through Blue Cross Blue Shield of Alabama. Guardian provides dental insurance.

AERAS 0896

Alabama Emergency Room Administrative Services, P.C.

## DRUG AND ALCOHOL POLICY CONCERNING
## UNEMPLOYMENT COMPENSATION BENEFITS

Pursuant to Section 25-4-78(3) of the Code of Alabama, any employee who tests positive, refuses to submit to or cooperate with blood or urine tests as set forth in the Company's drug and alcohol testing policy or an employee who knowingly alters or adulterates a blood or urine specimen taken in connection with the administration of said drug and alcohol testing policy shall forfeit his or her rights to recover Unemployment Compensation Benefits.

AERAS 0897

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the **1st** day of **April, 2000**, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **David G. Alexander, DO** ("Independent Contractor").

### RECITALS:

**WHEREAS**, Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS**, the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS**, Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS**, the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS**, Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

a.    **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

b.    **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor.  The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

1

AERAS 0140

iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills.  This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**c.    Administrative Services**.  Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(a)    All typing and other clerical duties;

(b)    Scheduling appointments;

(c)    Answering telephones;

(d)    Facilities and equipment maintenance and cleaning services; and

(e)    Financial management, bookkeeping and related services.

**d.    Facilities and Equipment**.  Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

**e.    Billing Services**.    Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers.  Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently.  Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers.  Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually.  Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

**f.    Contract Amount**.  During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

2

**AERAS 0141**

g.    **Cost of Administration and of Services**.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

h.    **Term**.

i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, with a 90 day probationary period and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period.  **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon sixty (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i)  The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii)  The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

3

AERAS 0142

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than ninety-six (96) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.      Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.      **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required

4

AERAS 0143

prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

  **j.**  **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

  **k.**  **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement.

5

**AERAS 0144**

Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

**l.** **Independent Contractor's Warranties.** The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

**m.** **Maintain Certifications.** The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a) BNDD Registration;
(b) Medical License;
(c) Advance Cardiac Life Support Provider Level Card;
(d) Advance Trauma Life Support Provider Level Card;

(e) Medical Control Director's Course; and

(f) A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 0145

**n.    Outside Professional Activities**.  It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement.  However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder.  The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.    Confidential, Trade Secret Information**.  The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.    Agency**.  Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing.  Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.    Restrictive Covenant**.

i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company.  The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement.  Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians.  In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities

7

AERAS 0146

imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

**AERAS 0147**

**r.    Injunctive Relief.**

i.        Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.        In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.        In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.        Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

**s.    Notices.** Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

| | |
|---|---|
| **Independent Contractor:** | **David G. Alexander, MD** |
| | **116 Allen Douglas Drive** |
| | **Richmond, KY  40475** |
| | |
| **Company:** | **Alabama Emergency Room** |
| | **Administrative Services, P.C.** |
| | John D. Moorehouse, M.D. |
| | President |
| | 4160 Carmichael Road, |
| | Suite 200 |
| | Montgomery, AL 36106 |
| **With a copy to:** | Gerald W. Hartley, Esq. |
| | Hill, Hill, Carter, Franco, |
| | Cole & Black, P.C. |
| | 425 South Perry Street |
| | Montgomery, AL 36104 |

9

AERAS 0148

**t.**    **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

**u.**    **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

**v.**    **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

**w.**    **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

**x.**    **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

10

AERAS 0149

y.    **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

z.    **Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

aa.    **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

bb.    **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

cc.    **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

dd.    **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

ee.    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

ff.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

11

AERAS 0150

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                    **ALABAMA EMERGENCY ROOM**
                                           **ADMINISTRATIVE SERVICES, P.C.**

_____              By: _____
Secretary                                  John D. Moorehouse, M.D.
                                           Its President
                                           "Company"

(Corporate Seal)

Witness:

_____              _____
                                           "Independent Contractor"

12

AERAS 0151

**EXHIBIT 1**
**CONTRACT AMOUNT/AERAS**

(a)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Medical Center East** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$93** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(d)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Prattville Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$93** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**                                    **ALABAMA EMERGENCY ROOM**
                                               **ADMINISTRATIVE SERVICES, P.C.**

(Corporate Seal)

Secretary                              By: _____
                                           John D. Moorehouse, M.D.
                                           Its President

Witness:

_____              _____
                                           "Independent Contractor"

13

AERAS 0152

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the 1st day of **November, 1998**, even though executed on a later subsequent day by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Jesse W. Austin, Jr., MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

**a.**     **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

**b.**     **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

   i.     The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

   ii.     All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and

1

**AERAS 0153**

regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

        iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

        iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

    **c.**    **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

        i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

        ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

        (a)    All typing and other clerical duties;

        (b)    Scheduling appointments;

        (c)    Answering telephones;

        (d)    Facilities and equipment maintenance and cleaning    services; and

        (e)    Financial management, bookkeeping and related services.

    **d.**    **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

    **e.**    **Billing Services**.    Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

AERAS 0154

 **f.**  **Contract Amount**.  During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

 **g.**  **Cost of Administration and of Services**.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

 **h.**  **Term**.
  i.  Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

  (i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

  (ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

  (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

  (iv) The conviction of the Independent Contractor for a crime punishable as a felony;

  (v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

  (vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar

3

**AERAS 0155**

controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor.  Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.    **Malpractice Insurance.**  The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement.  Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor.  At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect.  Upon termination of Independent Contractor's obligations

4

AERAS 0156

under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

     **j.**     **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

     **k.**     **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal

5

AERAS 0157

relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

     **l.**     **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

     **m.**     **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

     (a)     BNDD Registration;
     (b)     Medical License; Controlled Substance
     (c)     Advance Cardiac Life Support Provider Level Card;
     (d)     Advance Trauma Life Support Provider Level Card;
     (e)     Medical Control Director's Course; and

     (f)     A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 0158

**n.    Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.    Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.    Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.    Restrictive Covenant**.
i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities

7

**AERAS 0159**

imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii. The territory referred to in this section shall be designated as the State of Alabama.

iii. Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

AERAS 0160

**r.    Injunctive Relief**.

i.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.    In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

**s.    Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**          **Jesse W. Austin, Jr., MD**
                                      **5550 Woodside Circle**
                                      **Montgomery, AL   36117**

**Company:**                          **Alabama Emergency Room**
                                      **Administrative Services, P.C.**
                                      John D. Moorehouse, M.D.
                                      President
                                      4160 Carmichael Road,
                                      Suite 200
                                      Montgomery, AL 36106

9

**AERAS 0161**

**With a copy to:**              Gerald W. Hartley, Esq.
                                 Hill, Hill, Carter, Franco,
                                     Cole & Black, P.C.
                                 425 South Perry Street
                                 Montgomery, AL 36104

**t.    Waiver of Breach.**  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

**u.    Completion and Execution of Additional Documents.**  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

**v.    Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

**w.    Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

**x.    Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

10

AERAS 0162

**y.    Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

**z.    Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.    Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

**bb.    Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

**cc.    Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

**dd.    Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**ee.    Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

11

**AERAS 0163**

     **ff.**    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

     **IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**

         **ALABAMA EMERGENCY ROOM**
         **ADMINISTRATIVE SERVICES, P.C.**

_____
Secretary

By: _____
     John D. Moorehouse, M.D.
     Its President
     "Company"

(Corporate Seal)

Witness:

     2-8-99
     Date

_____

_____
     "Independent Contractor"

**EXHIBIT 1**
**CONTRACT AMOUNT/AERAS**

12

AERAS 0164

(a)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due <u>81%</u>of the <u>59%</u> of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, <u>81%</u> of the <u>55%</u> of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Hospital Downtown** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of <u>$80</u> per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(d)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Prattville Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of <u>$80</u> per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

ATTEST:                                    **ALABAMA EMERGENCY ROOM**
                                              **ADMINISTRATIVE SERVICES, P.C.**

(Corporate Seal)

_____           By: _____
Secretary                                    John D. Moorehouse, M.D.
                                              Its President

                                              _2_-8-99_____
Witness:                                    Date

_____        _____
Kathryn Kitchens                          "Independent Contractor"

13

AERAS 0165

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the 1st day of **June, 2001**, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Victoria L. Beckman, MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

a.    **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

b.    **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

    i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

    ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor.  The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and

1

**AERAS 0166**

regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

        iii.     The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

        iv.     The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

    **c.**    **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

        i.     Maintenance of business records, to include the filing and indexing of all correspondence and communications;

        ii.     Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

        (a)     All typing and other clerical duties;

        (b)     Scheduling appointments;

        (c)     Answering telephones;

        (d)     Facilities and equipment maintenance and cleaning services; and

        (e)     Financial management, bookkeeping and related services.

    **d.**    **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

    **e.**    **Billing Services**.    Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

**AERAS 0167**

   **f.**  **Contract Amount**. During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Prattville Hospital** and **Baptist Medical Center East**. The **Independent Contractor** will be guaranteed a minimum of **$93** per hour.

   **f.**  **Cost of Administration and of Services**.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

   **g.**  **Term**.

     Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written with a ninety day probationary period, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

    (i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

    (ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

    (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

    (iv) The conviction of the Independent Contractor for a crime punishable as a felony;

    (v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

    (vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor

3

**AERAS 0168**

of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

iii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

**h.    Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent

4

AERAS 0169

Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

      **i.**      **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

      **j.**      **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under

AERAS 0170

contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

     **k.**    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

     **l.**    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

       (a)    BNDD Registration;
       (b)    Medical License; Controlled Substance
       (c)    Advance Cardiac Life Support Provider Level Card;
       (d)    Advance Trauma Life Support Provider Level Card;
       (e)    Medical Control Director's Course; and

       (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

     **m.**    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right

6

**AERAS 0171**

of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

     **n.**     **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

     **o.**     **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

     **p.**     **Restrictive Covenant**.
       i.     Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined,

7

AERAS 0172

directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

      ii.     The territory referred to in this section shall be designated as the State of Alabama.

      iii.     Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

**q.**     **Injunctive Relief**.

      i.     Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

      ii.     In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the

AERAS 0173

Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

       iii.     In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

       iv.     Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

       **r.**     **Notices**.  Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**         **Victoria L. Beckman, MD**
**863 Portland Avenue**
**Montgomery, AL 36111**

**Company:**         **Alabama Emergency Room**
**Administrative Services, P.C.**
John D. Moorehouse, M.D.
President
4160 Carmichael Road,
Suite 200
Montgomery, AL 36106

**With a copy to:**         Gerald W. Hartley, Esq.
Hill, Hill, Carter, Franco,
     Cole & Black, P.C.
425 South Perry Street
Montgomery, AL 36104

9

**AERAS 0174**

s.    **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

t.    **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

u.    **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

v.    **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

w.    **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

x.    **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any

10

**AERAS 0175**

such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

     **y.**    **Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

     **z.**    **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

     **aa.**    **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

     **bb.**    **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

     **cc.**    **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

     **dd.**    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

     **ee.**    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

AERAS 0176

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                                          **ALABAMA EMERGENCY ROOM**
                                                     **ADMINISTRATIVE SERVICES, P.C.**

_____                      By: _____
Secretary                                          John D. Moorehouse, M.D.
                                                   Its President
                                                   "Company"

        (Corporate Seal)

Witness:                                           03·20-01
                                                   Date

_____                      _____
                                                   "Independent Contractor"

12

AERAS 0177

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the **1st** day of **July, 2001**, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **James M. Bradwell, MD** ("Independent Contractor").

## RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

a.      **Recitals Approved.** The above Recitals are true and correct and are incorporated herein by this reference.

b.      **Duties of the Independent Contractor.** Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

i.      The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.      All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The

1

AERAS 0178

Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

      iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

      iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

    c.    **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

      i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

      ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

      (a)    All typing and other clerical duties;

      (b)    Scheduling appointments;

      (c)    Answering telephones;

      (d)    Facilities and equipment maintenance and cleaning      services; and

      (e)    Financial management, bookkeeping and related services.

    d.    **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

    e.    **Billing Services**.    Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

AERAS 0179

     **f.**     <u>**Contract Amount**</u>. During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

     **g.**     <u>**Cost of Administration and of Services**</u>. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

     **h.**     <u>**Term**</u>.

     i.     Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING,** this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

     (i)  The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

     (ii)  The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

     (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

     (iv) The conviction of the Independent Contractor for a crime punishable as a felony;

     (v)  The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

     (vi)  The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar

3

**AERAS 0180**

controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.     Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.     **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations

4

AERAS 0181

under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

    **j.**    **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

    **k.**    **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal

AERAS 0182

relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

     **l.**    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

     **m.**    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

       (a)    BNDD Registration;
       (b)    Medical License;
       (c)    Advance Cardiac Life Support Provider Level Card;
       (d)    Advance Trauma Life Support Provider Level Card;
       (e)    Medical Control Director's Course; and
       (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

**AERAS 0183**

**n.    Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.    Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.    Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.    Restrictive Covenant**.
    i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The

7

AERAS 0184

covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

AERAS 0185

**r.** **Injunctive Relief**.

i.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.    In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

**s.** **Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**          **James M. Bradwell, MD**
                                      **1332 Moss Rose Lane**
                                      **Hoover, AL 35244**

**Company:**                          **Alabama Emergency Room**
                                      **Administrative Services, P.C.**
                                      John D. Moorehouse, M.D.
                                      President
                                      4160 Carmichael Road,
                                      Suite 104
                                      Montgomery, AL 36106

9

**AERAS 0186**

**With a copy to:**                    Gerald W. Hartley, Esq.
                                       Hill, Hill, Carter, Franco,
                                            Cole & Black, P.C.
                                       425 South Perry Street
                                       Montgomery, AL 36104

   **t.    Waiver of Breach.**  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

   **u.    Completion and Execution of Additional Documents.**  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

   **v.    Captions.**  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

   **w.    Reconciliation Clause.**  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

   **x.    Patient Medical and Surgical Records.**  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

10

**AERAS 0187**

    **y.**    <u>Assignment; Binding Agreement</u>.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

    **z.**    <u>Entire Agreement</u>.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

    **aa.**    <u>Severability of Provisions</u>.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

    **bb.**    <u>Prior Agreements</u>.  This Agreement supersedes any prior Agreement of the Parties.

    **cc.**    <u>Governing Law</u>.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

    **dd.**    <u>Construction</u>.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

    **ee.**    <u>Time is of the Essence</u>.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

    **ff.**    <u>Counterparts</u>.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

**AERAS 0188**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                                           **ALABAMA EMERGENCY ROOM**
                                                      **ADMINISTRATIVE SERVICES, P.C.**

_____                    By: _____
Secretary                                           John D. Moorehouse, M.D.
                                                      Its President
                                                      "Company"

        (Corporate Seal)

Witness:

_____          _____
                                                      "Independent Contractor"

12

**AERAS 0189**

# EXHIBIT 1
## CONTRACT AMOUNT/AERAS

(a)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, <u>75%</u> (with yearly increments of 2% until reaching 81%) of the <u>59%</u> of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.**   The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, <u>75%</u> (with yearly increments of 2% until reaching 81%) of the <u>46%</u> of gross professional charges paid by **Jackson Hospital on "city days"** and <u>75%</u> of the <u>50%</u> of gross professional charges paid by **Jackson Hospital on "non-city days"** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Prattville Hospital** and **Baptist Medical Center East**. The **Independent Contractor** will be guaranteed a minimum of <u>$93</u> per hour.


ATTEST:                                          **ALABAMA EMERGENCY ROOM**
                                                 **ADMINISTRATIVE SERVICES, P.C.**


_____                          By: _____
Secretary                                             John D. Moorehouse, M.D.
                                                      Its President


(Corporate Seal)


Witness:

_____                          _____
                                                 "Independent Contractor"

13

**AERAS 0190**

## MEDICAL AND SURGICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the <u>1st</u> Day of <u>June</u>, <u>1995</u>, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C. ("AERAS")** and <u>Wallace G. Falero, M.D.</u> **("Independent Contractor").**

### RECITALS:

**WHEREAS, AERAS** is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the **Independent Contractor** is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS, AERAS** is obligated under Agreements with various hospitals ("hospitals") to coordinate physician services in the emergency departments of such hospitals;

**WHEREAS,** the Agreements between **AERAS** and such hospitals permit **AERAS** to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of **AERAS** thereunder to the hospitals; and

**WHEREAS, AERAS** desires to engage the **Independent Contractor** to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the **Independent Contractor** desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

1.    **Recitals Approved.**

   The above Recitals are true and correct and are incorporated herein by this reference.

2.    **Duties of the Independent Contractor.**

   **AERAS** hereby engages the **Independent Contractor**, and the **Independent Contractor** hereby agrees to perform, hospital emergency room medical and surgical services for and on behalf of **AERAS** subject to the following:

   (a)    The **Independent Contractor** shall render medical and surgical services to all members of the general public presenting at such hospitals, and at all other places designated by **AERAS** and approved by such hospitals;

   (b)    All services required of, and rendered by, the **Independent Contractor** shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such hospitals. The **Independent Contractor** hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the

**AERAS 0191**

term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the **Independent Contractor**. The **Independent Contractor** further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the **Independent Contractor's** professional practice, whether pursuant to this Agreement or otherwise;

(c)    The **Independent Contractor** shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by **AERAS** or such hospitals; and

(d)    The **Independent Contractor** shall perform all things reasonably desirable to maintain and improve the **Independent Contractor's** professional skills. This shall be done solely at the expense of the **Independent Contractor**, and also done when, where and how the **Independent Contractor** determines it best to do so.

3.    **Administrative Services.**

**AERAS** shall provide the **Independent Contractor** all of the day-to-day clerical, billing and administrative assistance required by the **Independent Contractor** in connection with the **Independent Contractor's** provision of services under this Agreement, including, without being limited to, the following:

(a)    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

(b)    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(c)    All typing and other clerical duties;

(d)    Scheduling appointments;

(e)    Answering telephones;

(f)    Facilities and equipment maintenance and cleaning services; and

(g)    Financial management, bookkeeping and related services.

4.    **Facilities and Equipment.**

Through the hospitals, **AERAS** shall provide to the **Independent Contractor** the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the **Independent Contractor's** rendition of services to patients at the hospitals, as determined by mutual agreement of the Parties.

5.    **Billing Services.**

(a)    AERAS will provide to the **Independent Contractor** a central fee billing and disbursement system to provide for the orderly and timely billing and collection of the fees billed by the **Independent Contractor** for professional services rendered at the hospitals. AERAS shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the **Independent Contractor** at least as often as annually. AERAS agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the **Independent Contractor** for professional services.

(b)    (This section applies only if Independent Contractor works for a fee-for-service hospital where AERAS bills and collects for Independent Contractor services.) **Independent Contractor** hereby assigns to Corporation, its affiliates or assigns, the authority to bill any and all third party payors on his behalf (including the right to sign claims forms on **Independent Contractor's** behalf) and to receive and retain the proceeds therefrom. **Independent Contractor** hereby grants a limited power of attorney to AERAS to carry out the intent of this section. **Independent Contractor** grants to AERAS the right to edit and correct CPT coding based on **Independent Contractor's** documentation in order to comply with CPT coding guidelines.

6.    **Compensation.**

Refer to Addendum I for compensation at the individual hospitals.

7.    **Cost of Administration and of Services.**

All expenses incurred by AERAS in connection with AERAS' administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of AERAS. Likewise, the **Independent Contractor** shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the **Independent Contractor** shall save, fully indemnify (including attorney's fees and expenses) and hold AERAS harmless therefrom. The **Independent Contractor** shall not incur, on behalf of AERAS, any debts, liabilities or obligations, in any way whatsoever, or in any form whatsoever, and the **Independent Contractor** shall also save, fully indemnify and hold AERAS harmless therefrom.

8.    **Term.**

a.    Except as otherwise provided herein, this Agreement shall be effective for a period of two years, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING,** this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately

3

AERAS 0193

terminated by **AERAS** at any time, without notice, upon the occurrence of any one of the following events, to-wit:

    (i)    The expulsion, suspension or disciplining of the **Independent Contractor** as the final action of any professional or scientific organization;

    (ii)    The resignation of the **Independent Contractor** from any professional or scientific organization while under threat of disciplinary action;

    (iii)    The breach by the **Independent Contractor** of the American College of Emergency Physicians Rules of Ethical Principles;

    (iv)    The conviction of the **Independent Contractor** for a crime punishable as a felony;

    (v)    The participation of the **Independent Contractor** in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant to this Agreement;

    (vi)    The use by the **Independent Contractor**, in the sole determination of **AERAS**, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of **AERAS**, use by the **Independent Contractor** of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

    (vii)    The failure of the **Independent Contractor** to provide or perform services as required hereunder;

    (viii)    The request for termination of this Agreement by the administration or the medical staff of any of the hospitals, or of any other facility where the **Independent Contractor** has been performing services;

    (ix)    The institution, against the **Independent Contractor**, of bankruptcy proceedings or assignments for the benefit of creditors;

    (x)    The loss, by the **Independent Contractor**, of any license required to practice medicine in the State of Alabama;

    (xi)    The performance of services, for two (2) consecutive months, of less than  120  hours per month by the **Independent Contractor**.  **AERAS** shall otherwise rely upon the **Independent Contractor** to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

    (xii)    The death of the **Independent Contractor**; and

    (xiii)    The failure of the **Independent Contractor** to obtain or continuously provide the basic medical malpractice insurance coverage as required by Paragraph 9 of this Agreement.

AERAS 0194

b.      Notwithstanding any such termination of this Agreement, the **Independent Contractor** shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the **Independent Contractor** which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

## 9.      Malpractice Insurance.

The **Independent Contractor** shall obtain and continually maintain professional liability insurance, from carriers acceptable to **AERAS**, in the amount of at least One Million Dollars ($1,000,000.) single limit, each incident and Three Million Dollars ($3,000,000.) annual aggregate insuring itself for liability in performance of **Independent Contractor's** duties under this Agreement.    Such insurance shall be on a "*claims made*" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the **Independent Contractor**.    At request of **AERAS** or the hospital, **Independent Contractor** shall present evidence that the premiums are paid and that the policies are in full force and effect.    Upon termination of **Independent Contractor's** obligations under this agreement, **Independent Contractor** agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to **AERAS**). After the first two years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by **AERAS** of any sums owed to Independent Contractor upon termination of this agreement.    Should **Independent Contractor** fail to obtain such coverage effective upon the termination of this agreement, **AERAS** may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this agreement against the premium for such policy.    In such event, **Independent Contractor's** shall remain liable to **AERAS** for the difference between the amount of **Independent Contractor's** fees which have been applied by **AERAS** against the premium and the actual cost of the insurance premium.

## 10.      Indemnification.

Anything contained in this entire Agreement to the contrary notwithstanding, the **Independent Contractor** agrees to indemnify and save **AERAS**, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the **Independent Contractor** while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the **Independent Contractor's** duties hereunder.    This indemnification of **AERAS**, its officers, directors, shareholders, employees, agents and representatives, by the **Independent Contractor**, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the **Independent Contractor** occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

AERAS 0195

11.    Independent Contractor Relationship.

Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. **AERAS** shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the **Independent Contractor** shall perform the services required under this Agreement. The **Independent Contractor** shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from **AERAS**.    Neither **AERAS**, nor the **Independent Contractor**, shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the **Independent Contractor** shall not be deemed to be an employee of **AERAS**, but shall only be deemed a non-exclusive independent contractor of **AERAS**, and that this Agreement calls for the performance of services by the **Independent Contractor** as an independent contractor, and that at no time shall the **Independent Contractor** be considered as an employee, partner, joint venturer or business associate of **AERAS** for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the **Independent Contractor** and **AERAS**.    None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. **AERAS** is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the **Independent Contractor** arising here from will lie solely with the **Independent Contractor**.    It is further understood that the **Independent Contractor** and **AERAS** are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever.    Furthermore, neither the **Independent Contractor**, nor any individual whose compensation for services is paid by the **Independent Contractor**, is, in any way, directly or indirectly, expressly, or by implication, employed by **AERAS**, nor shall any such individual, including the **Independent Contractor**, be deemed to be employed by **AERAS** for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Social Security Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the **Independent Contractor** accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the **Independent Contractor** but also with respect to any and all such individuals whose compensation for services is paid by the **Independent Contractor**, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding **AERAS** harmless therefrom.

6

AERAS 0196

12.    **Independent Contractor's Warranties.**

The **Independent Contractor** hereby represents and warrants that the **Independent Contractor** has met all requirements prescribed by the Alabama Medical Association and, at the **Independent Contractor's** sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

13.    **Maintain Certifications.**

The **Independent Contractor** agrees that the **Independent Contractor** shall maintain and provide **AERAS**, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;

(b)    Medical License;

(c)    Advance Cardiac Life Support Provider Level Card or obtain one within one (1) year of Agreement;

(d)    Advance Trauma Life Support Provider Level Card or obtain one within one (1) year of Agreement; and

(e)    Medical Control Director's Course

(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

14.    **Outside Professional Activities.**

It is specifically acknowledged that at times when the **Independent Contractor** is not required to be on duty at the hospitals, the **Independent Contractor** may render medical and surgical services to others at locations other than the hospitals, and the **Independent Contractor** shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the **Independent Contractor's** duties under this Agreement. If **AERAS** determines that the rendering of such services by the **Independent Contractor** hinders or interferes with the **Independent Contractor's** duties hereunder, **AERAS** shall direct the **Independent Contractor**, and the **Independent Contractor** hereby agrees during the term of this Agreement, to cease rendering such services. However, it is understood that, except as is otherwise specifically provided herein, the **Independent Contractor** shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The **Independent Contractor** otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold **AERAS** harmless in all matters, of whatsoever kind and nature, arising with respect to the other businesses and/or professional practices the **Independent Contractor** may conduct, and the **Independent Contractor** shall also be solely responsible for any and all expenses incurred by the **Independent Contractor** in any of his such other businesses and/or professional practices, responsibilities or activities.

AERAS 0197

### 15.    Confidential, Trade Secret Information.

The **Independent Contractor** acknowledges that he will acquire or have access to billing and other related administrative information of **AERAS**, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the **Independent Contractor** shall keep and maintain such information confidential and secret.

### 16.    Agency.

**AERAS**, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the **Independent Contractor**, or to create any obligations on the part of the **Independent Contractor**. Likewise, the **Independent Contractor** shall have no authority to enter into any Contracts or other Agreements on behalf of **AERAS**, or to create any obligations on the part of **AERAS**. None of the Parties hereto shall have any authority to enter into any contract, obligation or liability binding upon the other Party, nor to create any liability or obligation on the part of any other Party. No Party hereto shall have any authority to make any agreements, debts, liabilities or obligations for any other Party nor to bind any other Party in any way whatsoever. Nothing in this Agreement shall authorize or empower any Party hereto to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner, or make any representation, warranty or commitment on behalf of any other Party, and any such Party hereto who violates the provisions hereof shall save, fully indemnify (including attorney's fees and expenses) and hold harmless the other Party on account thereof.

### 17.    Restrictive Covenant.

(a)    **AERAS** must necessarily undertake hereto to impart to the **Independent Contractor** confidential information and knowledge about billing and other related administrative information of **AERAS**. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the **Independent Contractor** will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of **AERAS** during the term of this Agreement. Additionally, **AERAS** has made a substantial investment in time and money in developing and maintaining contracts and business relationships with hospitals and physicians. In consideration of this Agreement, and the disclosure and referral by **AERAS** to the **Independent Contractor** of such knowledge and information described above, the **Independent Contractor** makes the covenants hereinafter set forth. The **Independent Contractor** understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of **AERAS** and that without the limited restriction on the **Independent Contractor's** activities imposed by these covenants, **AERAS** would suffer irreparable and immeasurable damage. The covenants herein given on the part of the **Independent Contractor** shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by **AERAS** of said covenants. Therefore, the **Independent Contractor** hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the **Independent Contractor** will not, within the territory hereinafter defined, directly or indirectly, for

AERAS 0198

himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

    (i)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of **AERAS**, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

    (ii)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any hospitals of **AERAS**, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such hospitals;

    (iii)    Deprecate, disparage or cast aspersions upon **AERAS** or any of **AERAS'** respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

    (iv)    Keep and maintain all such billing and other related administrative information confidential and secret in every way.

    (b)    The territory referred to in this section shall be designated as the State of Alabama.

    (c)    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of **AERAS** and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

## 18.    <u>Injunctive Relief.</u>

    (a)    Irreparable harm shall be presumed if the **Independent Contractor** breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to **AERAS** entering into this Agreement with the **Independent Contractor**. **AERAS** depends upon the **Independent Contractor's** absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the **Independent Contractor** breaches any covenants of this Agreement.

9

AERAS 0199

(b)    In light of same, the **Independent Contractor** hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery County, Alabama may immediately enjoin any breach of this Agreement, upon the request of **AERAS**, and the **Independent Contractor** also hereby specifically releases **AERAS** from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by **AERAS**, and the **Independent Contractor** further specifically waives all such defenses in any such action.

(c)    In the event of a breach or threatened breach by the **Independent Contractor** of any of the covenants of this Agreement, **AERAS** shall hereby be deemed so entitled to an injunction restraining the **Independent Contractor**, or any person or entity acting in concert with the **Independent Contractor**, from violating any of the provisions hereof.

(d)    Nothing herein contained shall be construed as prohibiting **AERAS** from simultaneously pursuing, in the same Court, any other remedies available to **AERAS** for such breach or threatened breach, including the recovery of compensatory and punitive damages from the **Independent Contractor**, or anyone acting in concert with the **Independent Contractor**, in regard to any breach of any of the provisions hereof.

19.    **Notices.**

All notices, requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

| | |
|---|---|
| **Independent Contractor:** | Wallace G. Falero, M.D. |
| | 2231 Old Pike Road |
| | Pike Road, AL 36064 |
| | |
| **AERAS:** | AERAS, P.C. |
| | John D. Moorehouse, M.D. |
| | Its President |
| | 4160 Carmichael Road, Suite 200 |
| | Montgomery, Alabama  36106 |

20.    **Waiver of Breach.**

No waiver of a breach by either Party hereunder shall be valid unless such wavier shall be in writing and signed by the Party against whom enforcement of any waiver is sought. No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party. No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or

AERAS 0200

remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

21.    <u>Completion and Execution of Additional Documents</u> - Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the hospitals being served by the **Independent Contractor** as may be required in order for Independent Contractor and **AERAS** to carry out their respective obligations under this agreement;  provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

22.    <u>Captions.</u>

The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

23.    <u>Reconciliation Clause.</u>

To the extent required by law, **AERAS** and the **Independent Contractor** hereby agree that for a period of four years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

24.    <u>Patient Medical and Surgical Records.</u>

Medical and surgical records of and for patients treated by the **Independent Contractor** shall be maintained and shall be the property of the individual facility at which the **Independent Contractor** is providing services; provided, however, the **Independent Contractor**, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the **Independent Contractor** shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

11

AERAS 0201

25.    **Assignment; Binding Agreement.**

This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. **AERAS** depends upon the personal services of the **Independent Contractor**, and the **Independent Contractor** shall not assign this Agreement without the prior, express, written consent of **AERAS**, nor shall the **Independent Contractor** delegate any of the **Independent Contractor's** obligations hereunder to any other person or corporation without the prior, express, written consent of **AERAS**. Any such attempted assignment or delegation by the **Independent Contractor**, without the prior, express, written consent of **AERAS**, shall be deemed null, void and of no effect.

26.    **Entire Agreement.**

This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all Parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

27.    **Severability of Provisions.**

The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

28.    **Prior Agreements.**

This Agreement supersedes any prior Agreement of the Parties.

29.    **Governing Law.**

This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

30.    **Construction.**

Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

AERAS 0202

31.    **Time is of the Essence.**

Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

32.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be construed as an original.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                              **ALABAMA EMERGENCY ROOM**
                                         **ADMINISTRATIVE SERVICES, P.C.**

_____        By: _____
Secretary                          John D. Moorehouse, M.D.
                                   Its President
                                   "AERAS"

(CORPORATE SEAL)

**Witness:**

_____        _____
                                   "Independent Contractor"

AERAS 0203

MEDICAL AND SURGICAL SERVICES
INDEPENDENT CONTRACTOR AGREEMENT

Addendum I

6.    **Compensation.**

(a)    During the term of this Agreement, AERAS shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **81%** of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$80** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, AERAS shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **81%** of the **55%** of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$80** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)    During the term of this Agreement, AERAS shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after the calendar month for which such payment is due **$75** per hour at **Autauga Medical Center**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

ATTEST:

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

_____
Secretary

By: _____
John D. Moorehouse, M.D.
Its President
"AERAS"

(CORPORATE SEAL)

Witness:

_____
Jeanie M. Shaw

_____
Wallace G. Falron
"Independent Contractor"

14

AERAS 0204

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the **1st** day of **July, 2002**, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Carlos Gutierrez, MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company there under to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

a.    **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

b.    **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

    i.      The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

    ii.     All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The

1

**AERAS 0205**

Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

   iii. The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

   iv. The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

  **c.** **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

   i. Maintenance of business records, to include the filing and indexing of all correspondence and communications;

   ii. Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

   (a) All typing and other clerical duties;

   (b) Scheduling appointments;

   (c) Answering telephones;

   (d) Facilities and equipment maintenance and cleaning  services; and

   (e) Financial management, bookkeeping and related services.

  **d.** **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

  **e.** **Billing Services**. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services. Company shall indemnify Independent Contractor for liability for billing errors made in Independent Contractor's name.

2

AERAS 0206

   f.    <u>**Contract Amount**</u>.  During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

   g.    <u>**Cost of Administration and of Services**</u>.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless there from.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless there from.

   h.    <u>**Term**</u>.
      i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period.  **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

      (i)  The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

      (ii)  The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

      (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

      (iv) The conviction of the Independent Contractor for a crime punishable as a felony;
      (v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

      (vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar

3

AERAS 0207

controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

      ii.     Notwithstanding any such termination of this agreement, the Independent Contractor does not waive any rights of due process.

      iii.     Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

    **i.**    **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the

4

AERAS 0208

policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

     **j.**    **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

     **k.**    **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever.

AERAS 0209

Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

      **l.**    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

      **m.**    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

      (a)    BNDD Registration;
      (b)    Medical License;
      (c)    Advance Cardiac Life Support Provider Level Card;
      (d)    Advance Trauma Life Support Provider Level Card;
      (e)    Medical Control Director's Course; and
      (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 0210

**n.** **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.** **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.** **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.** **Restrictive Covenant**.
　　　i.　　Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities

7

AERAS 0211

imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

AERAS 0212

**r.    Injunctive Relief**.

i.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.    In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

**s.    Notices**.  Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**        **Carlos Gutierrez, MD**
1126 Webster Street
Apt. A
New Orleans, LA  70118

**Company:**        **Alabama Emergency Room Administrative Services, P.C.**
John D. Moorehouse, M.D.
President
4160 Carmichael Road,
Suite 104
Montgomery, AL 36106

9

AERAS 0213

**With a copy to:**                    Gerald W. Hartley, Esq.
                                       Hill, Hill, Carter, Franco,
                                                Cole & Black, P.C.
                                       425 South Perry Street
                                       Montgomery, AL 36104

    **t.**      **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

    **u.**      **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

    **v.**      **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

    **w.**      **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

    **x.**      **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

AERAS 0214

    **y.**    <u>**Assignment; Binding Agreement**</u>. This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company. Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

    **z.**    <u>**Entire Agreement**</u>. This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all Parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

    **aa.**    <u>**Severability of Provisions**</u>. The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

    **bb.**    <u>**Prior Agreements**</u>. This Agreement supersedes any prior Agreement of the Parties.

    **cc.**    <u>**Governing Law**</u>. This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

    **dd.**    <u>**Construction**</u>. Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

    **ee.**    <u>**Time is of the Essence**</u>. Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

    **ff.**    <u>**Counterparts**</u>. This Agreement may be executed in several counterparts, each of which shall be construed as an original.

11

**AERAS 0215**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                                    **ALABAMA EMERGENCY ROOM**
                                               **ADMINISTRATIVE SERVICES, P.C.**

_____              By: _____
Secretary                                     John D. Moorehouse, M.D.
                                               Its President
                                               "Company"

(Corporate Seal)

Witness:

_____              _____
                                               "Independent Contractor"

12

**AERAS 0216**

## EXHIBIT 1
## CONTRACT AMOUNT/AERAS

(a)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.**   The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Prattville Hospital** and **Baptist Medical Center East**. The **Independent Contractor** will be guaranteed a minimum of **$93** per hour.

(c)     During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **North East Alabama Regional Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**

_____
Secretary

(Corporate Seal)

Witness:

_____

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: _____
John D. Moorehouse, M.D.
Its President

_____ M.D.
"Independent Contractor"

13

AERAS 0217

## MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT is effective as of this the _16_ day of _July_____, 2003, between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Julian Maha, MD** ("Independent Contractor").

### RECITALS:

WHEREAS, Company is a Professional Corporation organized under the laws of the State of Alabama;

WHEREAS, the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

WHEREAS, Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments and medical facilities of such Providers;

WHEREAS, the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

WHEREAS, Company desires to engage the Independent Contractor to perform medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

a.    **Recitals Approved**. The above Recitals are true and correct and are incorporated herein by this reference.

b.    **Duties of the Independent Contractor**. Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, medical and surgical services for and on behalf of Company subject to the following:

i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**AERAS 0218**

     **c.**     <u>Administrative Services</u>. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

          i.     Maintenance of business records, to include the filing and indexing of all correspondence and communications;

          ii.     Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

          (a)     All typing and other clerical duties;
          (b)     Scheduling appointments;
          (c)     Answering telephones;
          (d)     Facilities and equipment maintenance and cleaning services; and
          (e)     Financial management, bookkeeping and related services.

     **d.**     <u>Facilities and Equipment</u>. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the parties hereto.

     **e.**     <u>Billing Services</u>. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

     **f.**     <u>Contract Amount</u>.

     **g.**     <u>Cost of Administration and of Services</u>. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also fully indemnify, save and hold harmless, forever, the Company therefrom.

     **h.**     <u>Term</u>.

          i.     Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either party upon ninety (90) days prior written notice, and furthermore, this Agreement may be

AERAS 0219

immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph i, titled "Malpractice Insurance," of this Agreement.

ii.     Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

3

AERAS 0220

i.    **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the Providers, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

j.    **Indemnification.** Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify, defend and hold harmless, forever, Company and its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the parties, and shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

k.    **Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other party to this Agreement or due and owing by either party' employees. The parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent

4

AERAS 0221

Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;
(b)    Medical License; Controlled Substance
(c)    Advance Cardiac Life Support Provider Level Card;
(d)    Advance Trauma Life Support Provider Level Card;
(e)    Medical Control Director's Course; and
(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

n.    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor also agrees to fully indemnify (including attorney's fees and expenses), save and hold harmless forever Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

5

AERAS 0222

o.    **Confidential, Trade Secret Information**.  The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, indefinitely, the Independent Contractor shall keep and maintain such information confidential and secret.

p.    **Agency**.    Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing.  Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

q.    **Restrictive Covenants**.

i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians.  In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth.  The Independent Contractor understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage.  The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants.  Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor shall not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, entity, firm or business, do as follows:

(i) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, employ or attempt to take away any employees, staff, contractors, agents, vendors, customers, representatives or medical directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or medical directors to alter, amend, modify or terminate their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, contractors, agents, vendors, customers, representatives or medical directors;

(ii) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such Providers to alter, amend, modify or terminate its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, staff, agents, representatives, contractors, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

6

AERAS 0223

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

    ii.    The territory referred to in this section shall be designated as the State of Alabama.

    iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

    **r.**    <u>**Injunctive Relief**</u>.

    i.    Irreparable harm shall be presumed if the Independent Contractor breaches any provision or covenant of this Agreement. The faithful performance of all provisions and covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions and covenants hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any provision or covenant of this Agreement.

    ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

    iii.    In the event of a breach or threatened breach by the Independent Contractor of any such provision or covenant of this Agreement, Company shall hereby be deemed entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions or covenants hereof.

    iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in any court, any and all other remedies available to Company for any breach or threatened breach of this Agreement, including, without limitation, the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach of this Agreement.

    **s.**    <u>**Notices**</u>. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective party as follows:

    **Independent Contractor:**    **Julian Maha, MD**
    1607 Woodmere Loop
    Montgomery, AL 36117

7

**AERAS 0224**

Company:

**Alabama Emergency Room
Administrative Services, P.C.**
John D. Moorehouse, M.D.
President
4160 Carmichael Road, Ste 104
Montgomery, AL 36106

With a copy to:

Gerald W. Hartley, Esq.
Hill, Hill, Carter, Franco,
     Cole & Black, P.C.
425 South Perry Street
Montgomery, AL 36104

t.     **Waiver of Breach**. No waiver of a breach by either party hereunder shall be valid unless such waiver shall be in writing and signed by the party against whom enforcement of any waiver is sought. No waiver by a party of a breach of any provision of this Agreement by the other party shall be construed as a waiver of any subsequent breach by such party. No delay or omission on the part of either party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a party of any right or remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

u.     **Completion and Execution of Additional Documents**. Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph q, titled "Restrictive Covenants," hereof.

v.     **Captions**. The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience of reference only, and shall not affect in any way the interpretation or meaning of this Agreement.

w.     **Reconciliation Clause**. To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

x.     **Patient Medical and Surgical Records**. Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

y.     **Assignment; Binding Agreement**. This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company. Any such

8

AERAS 0225

attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

    **z.**    **Entire Agreement**.  This Agreement contains the entire Agreement between the parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

    **aa.**    **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If any term or provision hereof is deemed invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

    **bb.**    **Governing Law**. This Agreement shall be governed, by and interpreted in accordance with the laws of the State of Alabama.

    **cc.**    **Construction**. Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

    **dd.**    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

    **ee.**    **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be construed as an original.

    **ff.**    **Sponsor**. Company hereby agrees that during the term of this Agreement, it shall serve as the Sponsor of the Independent Contractor for immigration and naturalization purposes.  Such sponsorship shall not exist for any other purpose and the parties expressly agree that nothing contained in this paragraph shall be construed or deemed to create any employment relationship between the parties. Further, the Independent Contractor agrees to indemnify, defend and hold harmless, forever, Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from or in any way related to the Company's sponsorship of Independent Contractor for immigration and naturalization purposes pursuant to this paragraph.

9

**AERAS 0226**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                          **ALABAMA EMERGENCY ROOM**
                                                 **ADMINISTRATIVE SERVICES, P.C.**

By: _____                    _____
Secretary                                        John D. Moorehouse, M.D.
                                                     Its President    "Company"

(Corporate Seal)


Witness:                                         _5/28/03_____
                                                                          Date
_____                _____
                                                   "Independent Contractor"

10

**AERAS 0227**

EXHIBIT 1
**CONTRACT AMOUNT/AERAS**

During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor,** beginning in September for services provided in July for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Medical Center East and Baptist Prattville Hospital**. Payment for services will be delayed a graduated additional five days each month for one year or until payment for medical services are paid out 60 days in arrears. The **Independent Contractor** will be guaranteed a minimum base of **$85** per hour with an incentive compensation based proportionally on the amount of charges generated to the amount of charges collected. The incentive portion of the **Independent Contractor's** compensation is calculated on the work performance 1 ½ month in arrears.

**ATTEST:**

Secretary

(Corporate Seal)

Witness:

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: _____
    John D. Moorehouse, M.D.
       Its President

"Independent Contractor"

11

**AERAS 0228**

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the 1ˢᵗ day of **November, 1998**, even though executed on a later subsequent day by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **John D. Moorehouse, MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

    **a.**    **Recitals Approved**. The above Recitals are true and correct and are incorporated herein by this reference.

    **b.**    **Duties of the Independent Contractor**. Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

        i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

        ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and

1

**AERAS 0229**

regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

        iii.     The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

        iv.     The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

       **c.**     **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

        i.     Maintenance of business records, to include the filing and indexing of all correspondence and communications;

        ii.     Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

        (a)     All typing and other clerical duties;

        (b)     Scheduling appointments;

        (c)     Answering telephones;

        (d)     Facilities and equipment maintenance and cleaning      services; and

        (e)     Financial management, bookkeeping and related services.

       **d.**     **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

       **e.**     **Billing Services**.     Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

**AERAS 0230**

    **f.**    <u>Contract Amount</u>.  During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

    **g.**    <u>Cost of Administration and of Services</u>.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

    **h.**    <u>Term</u>.

    i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period.  **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

    (i)  The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

    (ii)  The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

    (iii)  The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

    (iv)  The conviction of the Independent Contractor for a crime punishable as a felony;

    (v)  The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

    (vi)  The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar

3

**AERAS 0231**

controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.    **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations

4

AERAS 0232

under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

**j.**     **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

**k.**     **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal

5

**AERAS 0233**

relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;

(b)    Medical License; Controlled Substance

(c)    Advance Cardiac Life Support Provider Level Card;

(d)    Advance Trauma Life Support Provider Level Card;

(e)    Medical Control Director's Course; and

(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 0234

n.    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

o.    **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

p.    **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

q.    **Restrictive Covenant**.
    i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities

7

AERAS 0235

imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

AERAS 0236

r.    **Injunctive Relief**.

i.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.    In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

s.    **Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

|  |  |
|---|---|
| **Independent Contractor:** | **John D. Moorehouse, MD** |
| | **2231 Old Pike Road** |
| | **Pike Road, AL 36064** |
| | |
| **Company:** | **Alabama Emergency Room** |
| | **Administrative Services, P.C.** |
| | John D. Moorehouse, M.D. |
| | President |
| | 4160 Carmichael Road, |
| | Suite 200 |
| | Montgomery, AL 36106 |

9

**AERAS 0237**

**With a copy to:**             Gerald W. Hartley, Esq.
Hill, Hill, Carter, Franco,
       Cole & Black, P.C.
425 South Perry Street
Montgomery, AL 36104

     **t.**    **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

     **u.**    **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

     **v.**    **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

     **w.**    **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

     **x.**    **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

**AERAS 0238**

**y.    Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

**z.    Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.    Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

**bb.    Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

**cc.    Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

**dd.    Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**ee.    Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

**AERAS 0239**

ff.   __Counterparts__.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:

Secretary

(Corporate Seal)

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: _____
John D. Moorehouse, M.D.
Its President
"Company"

Witness:

_____

2-18-99
Date

_____
"Independent Contractor"

12

**AERAS 0240**

## EXHIBIT 1
## CONTRACT AMOUNT/AERAS

(a)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due **81%** of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **81%** of the **55%** of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Hospital Downtown** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$110** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(d)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Prattville Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$110** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

ATTEST:                                          **ALABAMA EMERGENCY ROOM**
                                                 **ADMINISTRATIVE SERVICES, P.C.**

(Corporate Seal)

_____            By: _____
Secretary                               John D. Moorehouse, M.D.
                                         Its President

Witness:                                 2-18-99
                                         Date

_____            _____
                                         "Independent Contractor"

13

AERAS 0241

## MEDICAL AND SURGICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the **1st** Day of **May, 1998**, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C. ("AERAS")** and **Julio Enrico Rios, M.D.** **("Independent Contractor").**

### RECITALS:

**WHEREAS,** AERAS is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the **Independent Contractor** is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** AERAS is obligated under Agreements with various hospitals ("hospitals") to coordinate physician services in the emergency departments of such hospitals;

**WHEREAS,** the Agreements between **AERAS** and such hospitals permit **AERAS** to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of **AERAS** thereunder to the hospitals; and

**WHEREAS, AERAS** desires to engage the **Independent Contractor** to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the **Independent Contractor** desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

1.     **Recitals Approved.**

    The above Recitals are true and correct and are incorporated herein by this reference.

2.     **Duties of the Independent Contractor.**

    **AERAS** hereby engages the **Independent Contractor**, and the **Independent Contractor** hereby agrees to perform, hospital emergency room medical and surgical services for and on behalf of **AERAS** subject to the following:

    (a)    The **Independent Contractor** shall render medical and surgical services to all members of the general public presenting at such hospitals, and at all other places designated by **AERAS** and approved by such hospitals;

    (b)    All services required of, and rendered by, the **Independent Contractor** shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such hospitals. The **Independent Contractor** hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and

**AERAS 0242**

as applicable to the professional obligations of the **Independent Contractor**. The **Independent Contractor** further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the **Independent Contractor's** professional practice, whether pursuant to this Agreement or otherwise;

(c)    The **Independent Contractor** shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by **AERAS** or such hospitals; and

(d)    The **Independent Contractor** shall perform all things reasonably desirable to maintain and improve the **Independent Contractor's** professional skills. This shall be done solely at the expense of the **Independent Contractor**, and also done when, where and how the **Independent Contractor** determines it best to do so.

3.    **Administrative Services.**

**AERAS** shall provide the **Independent Contractor** all of the day-to-day clerical, billing and administrative assistance required by the **Independent Contractor** in connection with the **Independent Contractor's** provision of services under this Agreement, including, without being limited to, the following:

(a)    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

(b)    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(c)    All typing and other clerical duties;

(d)    Scheduling appointments;

(e)    Answering telephones;

(f)    Facilities and equipment maintenance and cleaning services; and

(g)    Financial management, bookkeeping and related services.

4.    **Facilities and Equipment.**

Through the hospitals, **AERAS** shall provide to the **Independent Contractor** the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the **Independent Contractor's** rendition of services to patients at the hospitals, as determined by mutual agreement of the Parties.

**AERAS 0243**

5.     **Billing Services.**

(a)     **AERAS** will provide to the **Independent Contractor** a central fee billing and disbursement system to provide for the orderly and timely billing and collection of the fees billed by the **Independent Contractor** for professional services rendered at the hospitals. **AERAS** shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the **Independent Contractor** at least as often as annually. **AERAS** agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the **Independent Contractor** for professional services.

(b)     (This section applies only if Independent Contractor works for a fee-for-service hospital where AERAS bills and collects for Independent Contractor services.) **Independent Contractor** hereby assigns to Corporation, its affiliates or assigns, the authority to bill any and all third party payors on his behalf (including the right to sign claims forms on **Independent Contractor's** behalf) and to receive and retain the proceeds therefrom. **Independent Contractor** hereby grants a limited power of attorney to **AERAS** to carry out the intent of this section. **Independent Contractor** grants to **AERAS** the right to edit and correct CPT coding based on **Independent Contractor's** documentation in order to comply with CPT coding guidelines.

6.     **Compensation.**

Refer to Addendum I for compensation at the individual hospitals.

7.     **Cost of Administration and of Services.**

All expenses incurred by **AERAS** in connection with **AERAS'** administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of **AERAS**. Likewise, the **Independent Contractor** shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the **Independent Contractor** shall save, fully indemnify (including attorney's fees and expenses) and hold **AERAS** harmless therefrom. The **Independent Contractor** shall not incur, on behalf of **AERAS**, any debts, liabilities or obligations, in any way whatsoever, or in any form whatsoever, and the **Independent Contractor** shall also save, fully indemnify and hold **AERAS** harmless therefrom.

8.     **Term.**

a.     Except as otherwise provided herein, this Agreement shall be effective for a period of one year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by **AERAS** at any time, without notice, upon the occurrence of any one of the following events, to-wit:

3

AERAS 0244

(i)     The expulsion, suspension or disciplining of the **Independent Contractor** as the final action of any professional or scientific organization;

(ii)     The resignation of the **Independent Contractor** from any professional or scientific organization while under threat of disciplinary action;

(iii)     The breach by the **Independent Contractor** of the American College of Emergency Physicians Rules of Ethical Principles;

(iv)     The conviction of the **Independent Contractor** for a crime punishable as a felony;

(v)     The participation of the **Independent Contractor** in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant to this Agreement;

(vi)     The use by the **Independent Contractor**, in the sole determination of **AERAS**, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of **AERAS**, use by the **Independent Contractor** of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii)     The failure of the **Independent Contractor** to provide or perform services as required hereunder;

(viii)     The request for termination of this Agreement by the administration or the medical staff of any of the hospitals, or of any other facility where the **Independent Contractor** has been performing services;

(ix)     The institution, against the **Independent Contractor**, of bankruptcy proceedings or assignments for the benefit of creditors;

(x)     The loss, by the **Independent Contractor**, of any license required to practice medicine in the State of Alabama;

(xi)     The performance of services, for two (2) consecutive months, of less than  120  hours per month by the **Independent Contractor**.   **AERAS** shall otherwise rely upon the **Independent Contractor** to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii)     The death of the **Independent Contractor**; and

(xiii)     The failure of the **Independent Contractor** to obtain or continuously provide the basic medical malpractice insurance coverage as required by Paragraph 9 of this Agreement.

b.     Notwithstanding any such termination of this Agreement, the **Independent Contractor** shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the **Independent Contractor** which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

4

AERAS 0245

9.    **Malpractice Insurance.**

The **Independent Contractor** shall obtain and continually maintain professional liability insurance, from carriers acceptable to **AERAS**, in the amount of at least One Million Dollars ($1,000,000.) single limit, each incident and Three Million Dollars ($3,000,000.) annual aggregate insuring itself for liability in performance of **Independent Contractor's** duties under this Agreement.  Such insurance shall be on a *"claims made"* basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the **Independent Contractor**.  At request of **AERAS** or the hospital, **Independent Contractor** shall present evidence that the premiums are paid and that the policies are in full force and effect.  Upon termination of **Independent Contractor's** obligations under this agreement, **Independent Contractor** agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to **AERAS**).  After the first two years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by **AERAS** of any sums owed to Independent Contractor upon termination of this agreement.  Should **Independent Contractor** fail to obtain such coverage effective upon the termination of this agreement, **AERAS** may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this agreement against the premium for such policy.  In such event, **Independent Contractor's** shall remain liable to **AERAS** for the difference between the amount of **Independent Contractor's** fees which have been applied by **AERAS** against the premium and the actual cost of the insurance premium.

10.    **Indemnification.**

Anything contained in this entire Agreement to the contrary notwithstanding, the **Independent Contractor** agrees to indemnify and save **AERAS**, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the **Independent Contractor** while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the **Independent Contractor's** duties hereunder.  This indemnification of **AERAS**, its officers, directors, shareholders, employees, agents and representatives, by the **Independent Contractor**, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the **Independent Contractor** occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

5

AERAS 0246

11.    **Independent Contractor Relationship.**

Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. **AERAS** shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the **Independent Contractor** shall perform the services required under this Agreement. The **Independent Contractor** shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from **AERAS**. Neither **AERAS**, nor the **Independent Contractor**, shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the **Independent Contractor** shall not be deemed to be an employee of **AERAS**, but shall only be deemed a non-exclusive independent contractor of **AERAS**, and that this Agreement calls for the performance of services by the **Independent Contractor** as an independent contractor, and that at no time shall the **Independent Contractor** be considered as an employee, partner, joint ventures or business associate of **AERAS** for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the **Independent Contractor** and **AERAS**. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. **AERAS** is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the **Independent Contractor** arising here from will lie solely with the **Independent Contractor**. It is further understood that the **Independent Contractor** and **AERAS** are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Furthermore, neither the **Independent Contractor**, nor any individual whose compensation for services is paid by the **Independent Contractor**, is, in any way, directly or indirectly, expressly, or by implication, employed by **AERAS**, nor shall any such individual, including the **Independent Contractor**, be deemed to be employed by **AERAS** for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Social Security Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the **Independent Contractor** accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the **Independent Contractor** but also with respect to any and all such individuals whose compensation for services is paid by the **Independent Contractor**, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding **AERAS** harmless therefrom.

6

AERAS 0247

12.    **Independent Contractor's Warranties.**

The **Independent Contractor** hereby represents and warrants that the **Independent Contractor** has met all requirements prescribed by the Alabama Medical Association and, at the **Independent Contractor's** sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

13.    **Maintain Certifications.**

The **Independent Contractor** agrees that the **Independent Contractor** shall maintain and provide **AERAS**, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;

(b)    Medical License;

(c)    Advance Cardiac Life Support Provider Level Card or obtain one within one (1) year of Agreement;

(d)    Advance Trauma Life Support Provider Level Card or obtain one within (1) year of Agreement; and

(e)    Medical Control Director's Course

(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

14.    **Outside Professional Activities.**

It is specifically acknowledged that at times when the **Independent Contractor** is not required to be on duty at the hospitals, the **Independent Contractor** may render medical and surgical services to others at locations other than the hospitals, and the **Independent Contractor** shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the **Independent Contractor's** duties under this Agreement. If **AERAS** determines that the rendering of such services by the **Independent Contractor** hinders or interferes with the **Independent Contractor's** duties hereunder, **AERAS** shall direct the **Independent Contractor**, and the **Independent Contractor** hereby agrees during the term of this Agreement, to cease rendering such services. However, it is understood that, except as is otherwise specifically provided herein, the **Independent Contractor** shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The **Independent Contractor** otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold **AERAS** harmless in all matters, of whatsoever kind and nature, arising with respect to the other businesses and/or professional practices the **Independent Contractor** may conduct, and the **Independent Contractor** shall also be solely responsible for any and all expenses incurred by the **Independent Contractor** in any of his such other businesses and/or professional practices, responsibilities or activities.

7

AERAS 0248

15.    **Confidential, Trade Secret Information.**

The **Independent Contractor** acknowledges that he will acquire or have access to billing and other related administrative information of **AERAS**, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the **Independent Contractor** shall keep and maintain such information confidential and secret.

16.    **Agency.**

**AERAS**, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the **Independent Contractor**, or to create any obligations on the part of the **Independent Contractor**.  Likewise, the **Independent Contractor** shall have no authority to enter into any Contracts or other Agreements on behalf of **AERAS**, or to create any obligations on the part of **AERAS**.  None of the Parties hereto shall have any authority to enter into any contract, obligation or liability binding upon the other Party, nor to create any liability or obligation on the part of any other Party.  No Party hereto shall have any authority to make any agreements, debts, liabilities or obligations for any other Party nor to bind any other Party in any way whatsoever.  Nothing in this Agreement shall authorize or empower any Party hereto to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner, or make any representation, warranty or commitment on behalf of any other Party, and any such Party hereto who violates the provisions hereof shall save, fully indemnify (including attorney's fees and expenses) and hold harmless the other Party on account thereof.

17.    **Restrictive Covenant.**

(a)    **AERAS** must necessarily undertake hereto to impart to the **Independent Contractor** confidential information and knowledge about billing and other related administrative information of **AERAS**.  The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the **Independent Contractor** will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of **AERAS** during the term of this Agreement.  Additionally, **AERAS** has made a substantial investment in time and money in developing and maintaining contracts and business relationships with hospitals and physicians.  In consideration of this Agreement, and the disclosure and referral by **AERAS** to the **Independent Contractor** of such knowledge and information described above, the **Independent Contractor** makes the covenants hereinafter set forth.  The **Independent Contractor** understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of **AERAS** and that without the limited restriction on the **Independent Contractor's** activities imposed by these covenants, **AERAS** would suffer irreparable and immeasurable damage.  The covenants herein given on the part of the **Independent Contractor** shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by **AERAS** of said covenants.  Therefore, the **Independent Contractor** hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the **Independent Contractor** will not, within the territory hereinafter defined, directly or indirectly, for himself, or on

8

AERAS 0249

behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i)     On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of **AERAS**, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any hospitals of **AERAS**, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such hospitals;

(iii)   Deprecate, disparage or cast aspersions upon **AERAS** or any of **AERAS'** respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv)    Keep and maintain all such billing and other related administrative information confidential and secret in every way.

(b)     The territory referred to in this section shall be designated as the State of Alabama.

(c)     Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of **AERAS** and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

18.     **Injunctive Relief.**

(a)     Irreparable harm shall be presumed if the **Independent Contractor** breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to **AERAS** entering into this Agreement with the **Independent Contractor**. **AERAS** depends upon the **Independent Contractor's** absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the **Independent Contractor** breaches any covenants of this Agreement.

9

**AERAS 0250**

(b)    In light of same, the **Independent Contractor** hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery County, Alabama may immediately enjoin any breach of this Agreement, upon the request of **AERAS**, and the **Independent Contractor** also hereby specifically releases **AERAS** from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by **AERAS**, and the **Independent Contractor** further specifically waives all such defenses in any such action.

(c)    In the event of a breach or threatened breach by the **Independent Contractor** of any of the covenants of this Agreement, **AERAS** shall hereby be deemed so entitled to an injunction restraining the **Independent Contractor**, or any person or entity acting in concert with the **Independent Contractor**, from violating any of the provisions hereof.

(d)    Nothing herein contained shall be construed as prohibiting **AERAS** from simultaneously pursuing, in the same Court, any other remedies available to **AERAS** for such breach or threatened breach, including the recovery of compensatory and punitive damages from the **Independent Contractor**, or anyone acting in concert with the **Independent Contractor**, in regard to any breach of any of the provisions hereof.

**19.    Notices.**

All notices, requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

|                          |                          |
|--------------------------|--------------------------|
| **Independent Contractor:** | Julio Rios, M.D.         |
|                          | 61 Uno Lago Drive        |
|                          | North Palm Beach, FL 33408 |
|                          |                          |
| **AERAS:**               | AERAS, P.C.              |
|                          | John D. Moorehouse, M.D. |
|                          | Its President            |
|                          | 4160 Carmichael Road, Suite 200 |
|                          | Montgomery, Alabama  36106 |

**20.    Waiver of Breach.**

No waiver of a breach by either Party hereunder shall be valid unless such wavier shall be in writing and signed by the Party against whom enforcement of any waiver is sought. No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party. No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy

10

AERAS 0251

shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

**21.    Completion and Execution of Additional Documents** - Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the hospitals being served by the **Independent Contractor** as may be required in order for Independent Contractor and **AERAS** to carry out their respective obligations under this agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

**22.    Captions.**

The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

**23.    Reconciliation Clause.**

To the extent required by law, **AERAS** and the **Independent Contractor** hereby agree that for a period of four years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

**24.    Patient Medical and Surgical Records.**

Medical and surgical records of and for patients treated by the **Independent Contractor** shall be maintained and shall be the property of the individual facility at which the **Independent Contractor** is providing services; provided, however, the **Independent Contractor**, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the **Independent Contractor** shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

AERAS 0252

25. **Assignment; Binding Agreement.**

This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. **AERAS** depends upon the personal services of the **Independent Contractor**, and the **Independent Contractor** shall not assign this Agreement without the prior, express, written consent of **AERAS**, nor shall the **Independent Contractor** delegate any of the **Independent Contractor's** obligations hereunder to any other person or corporation without the prior, express, written consent of **AERAS**. Any such attempted assignment or delegation by the **Independent Contractor**, without the prior, express, written consent of **AERAS**, shall be deemed null, void and of no effect.

26. **Entire Agreement.**

This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all Parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

27. **Severability of Provisions.**

The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

28. **Prior Agreements.**

This Agreement supersedes any prior Agreement of the Parties.

29. **Governing Law.**

This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

30. **Construction.**

Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

12

AERAS 0253

31.  **Time is of the Essence.**

Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

32.  **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be construed as an original.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

_____
Secretary

By: _____
    John D. Moorehouse, M.D.
    Its President
    "AERAS"

(CORPORATE SEAL)

**Witness:**

_____

_____
"Independent Contractor"

13

AERAS 0254

MEDICAL AND SURGICAL SERVICES
INDEPENDENT CONTRACTOR AGREEMENT

Addendum I

6.    **Compensation.**

(a)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** of the **55%** of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**

**ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.**

_____
Secretary

By: _____
John D. Moorehouse, M.D.
Its President
"AERAS"

(CORPORATE SEAL)

**Witness:**

_____

_____
"Independent Contractor"

14

AERAS 0255

Addendum A

## CONTRACT AMOUNT/AERAS

In accordance with the progressive percentage plan already in effect at Baptist South, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, the payment percentage as indicated by this Agreement until reaching 81% of the <u>**55%**</u> of gross professional charges paid by **North East Alabama Regional Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**

(Corporate Seal)

Secretary

Witness:

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: 

John D. Moorehouse, M.D.
Its President

3 / 29 / 2001
Date

Julio E. Ries, MD
"Independent Contractor"

14

**AERAS 0256**

## MEDICAL AND SURGICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the 1st_ Day of June, 1996, by and between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** (**"AERAS"**) and Ronald A. Shaw, M.D. (**"Independent Contractor"**).

### RECITALS:

**WHEREAS,** AERAS is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the **Independent Contractor** is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** AERAS is obligated under Agreements with various hospitals ("hospitals") to coordinate physician services in the emergency departments of such hospitals;

**WHEREAS,** the Agreements between **AERAS** and such hospitals permit **AERAS** to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of **AERAS** thereunder to the hospitals; and

**WHEREAS,** AERAS desires to engage the **Independent Contractor** to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the **Independent Contractor** desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

1.    **Recitals Approved.**

The above Recitals are true and correct and are incorporated herein by this reference.

2.    **Duties of the Independent Contractor.**

**AERAS** hereby engages the **Independent Contractor,** and the **Independent Contractor** hereby agrees to perform, hospital emergency room medical and surgical services for and on behalf of **AERAS** subject to the following:

(a)    The **Independent Contractor** shall render medical and surgical services to all members of the general public presenting at such hospitals, and at all other places designated by **AERAS** and approved by such hospitals;

(b)    All services required of, and rendered by, the **Independent Contractor** shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such hospitals. The **Independent Contractor** hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the

AERAS 0257

term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the **Independent Contractor**. The **Independent Contractor** further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the **Independent Contractor's** professional practice, whether pursuant to this Agreement or otherwise;

   (c) The **Independent Contractor** shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by **AERAS** or such hospitals; and

   (d) The **Independent Contractor** shall perform all things reasonably desirable to maintain and improve the **Independent Contractor's** professional skills. This shall be done solely at the expense of the **Independent Contractor**, and also done when, where and how the **Independent Contractor** determines it best to do so.

3. **Administrative Services.**

   **AERAS** shall provide the **Independent Contractor** all of the day-to-day clerical, billing and administrative assistance required by the **Independent Contractor** in connection with the **Independent Contractor's** provision of services under this Agreement, including, without being limited to, the following:

   (a) Maintenance of business records, to include the filing and indexing of all correspondence and communications;

   (b) Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

   (c) All typing and other clerical duties;

   (d) Scheduling appointments;

   (e) Answering telephones;

   (f) Facilities and equipment maintenance and cleaning services; and

   (g) Financial management, bookkeeping and related services.

4. **Facilities and Equipment.**

   Through the hospitals, **AERAS** shall provide to the **Independent Contractor** the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the **Independent Contractor's** rendition of services to patients at the hospitals, as determined by mutual agreement of the Parties.

**AERAS 0258**

5. **Billing Services.**

(a)    **AERAS** will provide to the **Independent Contractor** a central fee billing and disbursement system to provide for the orderly and timely billing and collection of the fees billed by the **Independent Contractor** for professional services rendered at the hospitals. **AERAS** shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the **Independent Contractor** at least as often as annually. **AERAS** agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the **Independent Contractor** for professional services.

(b)    (This section applies only if Independent Contractor works for a fee-for-service hospital where AERAS bills and collects for Independent Contractor services.) **Independent Contractor** hereby assigns to Corporation, its affiliates or assigns, the authority to bill any and all third party payors on his behalf (including the right to sign claims forms on **Independent Contractor's** behalf) and to receive and retain the proceeds therefrom. **Independent Contractor** hereby grants a limited power of attorney to **AERAS** to carry out the intent of this section. **Independent Contractor** grants to **AERAS** the right to edit and correct CPT coding based on **Independent Contractor's** documentation in order to comply with CPT coding guidelines.

6. **Compensation.**

Refer to Addendum I for compensation at the individual hospitals.

7. **Cost of Administration and of Services.**

All expenses incurred by **AERAS** in connection with **AERAS'** administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of **AERAS**. Likewise, the **Independent Contractor** shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the **Independent Contractor** shall save, fully indemnify (including attorney's fees and expenses) and hold **AERAS** harmless therefrom. The **Independent Contractor** shall not incur, on behalf of **AERAS**, any debts, liabilities or obligations, in any way whatsoever, or in any form whatsoever, and the **Independent Contractor** shall also save, fully indemnify and hold **AERAS** harmless therefrom.

8. **Term.**

a.    Except as otherwise provided herein, this Agreement shall be effective for a period of two years, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately

AERAS 0259

terminated by **AERAS** at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i)    The expulsion, suspension or disciplining of the **Independent Contractor** as the final action of any professional or scientific organization;

(ii)    The resignation of the **Independent Contractor** from any professional or scientific organization while under threat of disciplinary action;

(iii)    The breach by the **Independent Contractor** of the American College of Emergency Physicians Rules of Ethical Principles;

(iv)    The conviction of the **Independent Contractor** for a crime punishable as a felony;

(v)    The participation of the **Independent Contractor** in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant to this Agreement;

(vi)    The use by the **Independent Contractor**, in the sole determination of **AERAS**, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of **AERAS**, use by the **Independent Contractor** of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii)    The failure of the **Independent Contractor** to provide or perform services as required hereunder;

(viii)    The request for termination of this Agreement by the administration or the medical staff of any of the hospitals, or of any other facility where the **Independent Contractor** has been performing services;

(ix)    The institution, against the **Independent Contractor**, of bankruptcy proceedings or assignments for the benefit of creditors;

(x)    The loss, by the **Independent Contractor**, of any license required to practice medicine in the State of Alabama;

(xi)    The performance of services, for two (2) consecutive months, of less than  120  hours per month by the **Independent Contractor**.  **AERAS** shall otherwise rely upon the **Independent Contractor** to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii)    The death of the **Independent Contractor**; and

(xiii)    The failure of the **Independent Contractor** to obtain or continuously provide the basic medical malpractice insurance coverage as required by Paragraph 9 of this Agreement.

4

b.    Notwithstanding any such termination of this Agreement, the **Independent Contractor** shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the **Independent Contractor** which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

### 9.    Malpractice Insurance.

The **Independent Contractor** shall obtain and continually maintain professional liability insurance, from carriers acceptable to **AERAS**, in the amount of at least One Million Dollars ($1,000,000.) single limit, each incident and Three Million Dollars ($3,000,000.) annual aggregate insuring itself for liability in performance of **Independent Contractor's** duties under this Agreement.   Such insurance shall be on a *"claims made"* basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the **Independent Contractor**.  At request of **AERAS** or the hospital, **Independent Contractor** shall present evidence that the premiums are paid and that the policies are in full force and effect.   Upon termination of **Independent Contractor's** obligations under this agreement, **Independent Contractor** agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to **AERAS**). After the first two years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by **AERAS** of any sums owed to Independent Contractor upon termination of this agreement.   Should **Independent Contractor** fail to obtain such coverage effective upon the termination of this agreement, **AERAS** may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this agreement against the premium for such policy.   In such event, **Independent Contractor's** shall remain liable to **AERAS** for the difference between the amount of **Independent Contractor's** fees which have been applied by **AERAS** against the premium and the actual cost of the insurance premium.

### 10.    Indemnification.

Anything contained in this entire Agreement to the contrary notwithstanding, the **Independent Contractor** agrees to indemnify and save **AERAS**, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the **Independent Contractor** while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the **Independent Contractor's** duties hereunder.  This indemnification of **AERAS**, its officers, directors, shareholders, employees, agents and representatives, by the **Independent Contractor**, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the **Independent Contractor** occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

AERAS 0261

11.    <u>Independent Contractor Relationship.</u>

Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. **AERAS** shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the **Independent Contractor** shall perform the services required under this Agreement. The **Independent Contractor** shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from **AERAS**. Neither **AERAS**, nor the **Independent Contractor**, shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the **Independent Contractor** shall not be deemed to be an employee of **AERAS**, but shall only be deemed a non-exclusive independent contractor of **AERAS**, and that this Agreement calls for the performance of services by the **Independent Contractor** as an independent contractor, and that at no time shall the **Independent Contractor** be considered as an employee, partner, joint venturer or business associate of **AERAS** for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the **Independent Contractor** and **AERAS**. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. **AERAS** is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the **Independent Contractor** arising here from will lie solely with the **Independent Contractor**. It is further understood that the **Independent Contractor** and **AERAS** are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Furthermore, neither the **Independent Contractor**, nor any individual whose compensation for services is paid by the **Independent Contractor**, is, in any way, directly or indirectly, expressly, or by implication, employed by **AERAS**, nor shall any such individual, including the **Independent Contractor**, be deemed to be employed by **AERAS** for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Social Security Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the **Independent Contractor** accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the **Independent Contractor** but also with respect to any and all such individuals whose compensation for services is paid by the **Independent Contractor**, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding **AERAS** harmless therefrom.

AERAS 0262

12.    **Independent Contractor's Warranties.**

The **Independent Contractor** hereby represents and warrants that the **Independent Contractor** has met all requirements prescribed by the Alabama Medical Association and, at the **Independent Contractor's** sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

13.    **Maintain Certifications.**

The **Independent Contractor** agrees that the **Independent Contractor** shall maintain and provide **AERAS** not later than January 15th of each year during the term hereof with copies of the following:

      (a)    BNDD Registration;

      (b)    Medical License;

      (c)    Advance Cardiac Life Support Provider Level Card or obtain one within one (1) year of Agreement;

      (d)    Advance Trauma Life Support Provider Level Card or obtain one within (1) year of Agreement; and

      (e)    Medical Control Director's Course

      (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

14.    **Outside Professional Activities.**

It is specifically acknowledged that at times when the **Independent Contractor** is not required to be on duty at the hospitals, the **Independent Contractor** may render medical and surgical services to others at locations other than the hospitals, and the **Independent Contractor** shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the **Independent Contractor's** duties under this Agreement. If **AERAS** determines that the rendering of such services by the **Independent Contractor** hinders or interferes with the **Independent Contractor's** duties hereunder, **AERAS** shall direct the **Independent Contractor**, and the **Independent Contractor** hereby agrees during the term of this Agreement, to cease rendering such services. However, it is understood that, except as is otherwise specifically provided herein, the **Independent Contractor** shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The **Independent Contractor** otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold **AERAS** harmless in all matters, of whatsoever kind and nature, arising with respect to the other businesses and/or professional practices the **Independent Contractor** may conduct, and the **Independent Contractor** shall also be solely responsible for any and all expenses incurred by the **Independent Contractor** in any of his such other businesses and/or professional practices, responsibilities or activities.

**AERAS 0263**

15.    **Confidential, Trade Secret Information.**

The **Independent Contractor** acknowledges that he will acquire or have access to billing and other related administrative information of **AERAS**, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the **Independent Contractor** shall keep and maintain such information confidential and secret.

16.    **Agency.**

**AERAS**, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the **Independent Contractor**, or to create any obligations on the part of the **Independent Contractor**. Likewise, the **Independent Contractor** shall have no authority to enter into any Contracts or other Agreements on behalf of **AERAS**, or to create any obligations on the part of **AERAS**. None of the Parties hereto shall have any authority to enter into any contract, obligation or liability binding upon the other Party, nor to create any liability or obligation on the part of any other Party. No Party hereto shall have any authority to make any agreements, debts, liabilities or obligations for any other Party nor to bind any other Party in any way whatsoever. Nothing in this Agreement shall authorize or empower any Party hereto to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner, or make any representation, warranty or commitment on behalf of any other Party, and any such Party hereto who violates the provisions hereof shall save, fully indemnify (including attorney's fees and expenses) and hold harmless the other Party on account thereof.

17.    **Restrictive Covenant.**

(a)    **AERAS** must necessarily undertake hereto to impart to the **Independent Contractor** confidential information and knowledge about billing and other related administrative information of **AERAS**. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the **Independent Contractor** will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of **AERAS** during the term of this Agreement. Additionally, **AERAS** has made a substantial investment in time and money in developing and maintaining contracts and business relationships with hospitals and physicians. In consideration of this Agreement, and the disclosure and referral by **AERAS** to the **Independent Contractor** of such knowledge and information described above, the **Independent Contractor** makes the covenants hereinafter set forth. The **Independent Contractor** understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of **AERAS** and that without the limited restriction on the **Independent Contractor's** activities imposed by these covenants, **AERAS** would suffer irreparable and immeasurable damage. The covenants herein given on the part of the **Independent Contractor** shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by **AERAS** of said covenants. Therefore, the **Independent Contractor** hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the **Independent Contractor** will not, within the territory hereinafter defined, directly or indirectly, for

8

AERAS 0264

himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i)      On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of **AERAS**, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii)      On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any hospitals of **AERAS**, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such hospitals;

(iii)      Deprecate, disparage or cast aspersions upon **AERAS** or any of **AERAS'** respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv)      Keep and maintain all such billing and other related administrative information confidential and secret in every way.

(b)      The territory referred to in this section shall be designated as the State of Alabama.

(c)      Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of **AERAS** and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

### 18.      Injunctive Relief.

(a)      Irreparable harm shall be presumed if the **Independent Contractor** breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to **AERAS** entering into this Agreement with the **Independent Contractor**. **AERAS** depends upon the **Independent Contractor's** absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the **Independent Contractor** breaches any covenants of this Agreement.

9

AERAS 0265

(b)    In light of same, the **Independent Contractor** hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery County, Alabama may immediately enjoin any breach of this Agreement, upon the request of **AERAS**, and the **Independent Contractor** also hereby specifically releases **AERAS** from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by **AERAS**, and the **Independent Contractor** further specifically waives all such defenses in any such action.

(c)    In the event of a breach or threatened breach by the **Independent Contractor** of any of the covenants of this Agreement, **AERAS** shall hereby be deemed so entitled to an injunction restraining the **Independent Contractor**, or any person or entity acting in concert with the **Independent Contractor**, from violating any of the provisions hereof.

(d)    Nothing herein contained shall be construed as prohibiting **AERAS** from simultaneously pursuing, in the same Court, any other remedies available to **AERAS** for such breach or threatened breach, including the recovery of compensatory and punitive damages from the **Independent Contractor**, or anyone acting in concert with the **Independent Contractor**, in regard to any breach of any of the provisions hereof.

19.    **Notices.**

All notices, requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

> **Independent Contractor:**    Ronald A. Shaw, M.D.
> 5 Lee Ann Drive
> Barrington, RI  02806
>
>
> **AERAS:**    AERAS, P.C.
> John D. Moorehouse, M.D.
> Its President
> 4160 Carmichael Road, Suite 200
> Montgomery, Alabama  36106

20.    **Waiver of Breach.**

No waiver of a breach by either Party hereunder shall be valid unless such wavier shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or

AERAS 0266

remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

**21.    Completion and Execution of Additional Documents** - Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the hospitals being served by the **Independent Contractor** as may be required in order for Independent Contractor and **AERAS** to carry out their respective obligations under this agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

**22.    Captions.**

The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

**23.    Reconciliation Clause.**

To the extent required by law, **AERAS** and the **Independent Contractor** hereby agree that for a period of four years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

**24.    Patient Medical and Surgical Records.**

Medical and surgical records of and for patients treated by the **Independent Contractor** shall be maintained and shall be the property of the individual facility at which the **Independent Contractor** is providing services; provided, however, the **Independent Contractor**, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the **Independent Contractor** shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

**11**

AERAS 0267

25.    **Assignment; Binding Agreement.**

This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. **AERAS** depends upon the personal services of the **Independent Contractor**, and the **Independent Contractor** shall not assign this Agreement without the prior, express, written consent of **AERAS**, nor shall the **Independent Contractor** delegate any of the **Independent Contractor's** obligations hereunder to any other person or corporation without the prior, express, written consent of **AERAS**. Any such attempted assignment or delegation by the **Independent Contractor**, without the prior, express, written consent of **AERAS**, shall be deemed null, void and of no effect.

26.    **Entire Agreement.**

This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all Parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

27.    **Severability of Provisions.**

The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

28.    **Prior Agreements.**

This Agreement supersedes any prior Agreement of the Parties.

29.    **Governing Law.**

This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

30.    **Construction.**

Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

AERAS 0268

31.    **Time is of the Essence.**

Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

32.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be construed as an original.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.


**ATTEST:**                                    **ALABAMA EMERGENCY ROOM**
                                               **ADMINISTRATIVE SERVICES, P.C.**


_____                          By: _____
Secretary                                      John D. Moorehouse, M.D.
                                               Its President
                                               "AERAS"


(CORPORATE SEAL)


Witness:

_Carol A. Shaw_                                x _Ronald Shaw_
                                               "Independent Contractor"

AERAS 0269

MEDICAL AND SURGICAL SERVICES
INDEPENDENT CONTRACTOR AGREEMENT

Addendum I

6.    **Compensation.**

(a)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **59%** of gross professional charges paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$80** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The **Independent Contractor** will be guaranteed a minimum of **$80** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

ATTEST:

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By: _____

Secretary

John D. Moorehouse, M.D.
Its President
"AERAS"

(CORPORATE SEAL)

Witness:

_Carol A. Shaw_

_Ronald A Shaw_

"Independent Contractor"

AERAS 0270

During the term of this agreement, AERAS shall schedule the Independent Contractor to furnish services at the above hospitals, 180 (one hundred eighty) hours monthly. This number may be reduced by mutual agreement of the parties on a monthly basis for conditions such as, vacation, meetings, illness, etc.

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the **10th** day of **January, 2001**, between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **George C. Smith, Jr., MD**, ("Independent Contractor").

### RECITALS:

**WHEREAS**, Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS**, the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS**, Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS**, the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS**, Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

    a.    **Recitals Approved**. The above Recitals are true and correct and are incorporated herein by this reference.

    b.    **Duties of the Independent Contractor**. Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

        i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

        ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent

1

AERAS 0271

Contractor's professional practice, whether pursuant to this Agreement or otherwise;

   iii. The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

   iv. The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

  c. **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

   i. Maintenance of business records, to include the filing and indexing of all correspondence and communications;

   ii. Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

   (a) All typing and other clerical duties;
   (b) Scheduling appointments;
   (c) Answering telephones;
   (d) Facilities and equipment maintenance and cleaning services; and
   (e) Financial management, bookkeeping and related services.

  d. **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

  e. **Billing Services**. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

**AERAS 0272**

**f.    Contract Amount.**    During the term of this Agreement, **AERAS** shall pay to the Independent Contractor monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **North East Alabama Regional Medical Center** to **AERAS** for professional services provided hereunder by the **Independent Contractor**. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**g.    Cost of Administration and of Services.**    All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

**h.    Term.**
i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

3

**AERAS 0273**

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) ~~The performance of services, for two (2) consecutive months, of less than one hundred twenty (80) hours per month by the Independent Contractor.~~ Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.    **Malpractice Insurance.**  The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement.  Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor.  At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the

4

**AERAS 0274**

policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

j.    **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

k.    **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing

5

AERAS 0275

herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.    **Independent Contractor's Warranties**.  The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.    **Maintain Certifications**.  The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;
(b)    Medical License; Controlled Substance
(c)    Advance Cardiac Life Support Provider Level Card;
(d)    Advance Trauma Life Support Provider Level Card;
(e)    Medical Control Director's Course; and
(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 0276

n.    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

o.    **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

p.    **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

q.    **Restrictive Covenant**.

i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The

7

AERAS 0277

covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.   The territory referred to in this section shall be designated as the State of Alabama.

iii.   Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

8

AERAS 0278

r.   **Injunctive Relief**.

i.   Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

ii.   In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.   In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

iv.   Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

s.   **Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**      **George C. Smith, Jr., MD**
49 Jackson Springs Rd.
Lineville, AL 36266

**Company:**      **Alabama Emergency Room**
**Administrative Services, P.C.**
John D. Moorehouse, M.D.
President
4160 Carmichael Road, Ste 104
Montgomery, AL 36106

9

AERAS 0279

With a copy to:

> Gerald W. Hartley, Esq.
> Hill, Hill, Carter, Franco,
>   Cole & Black, P.C.
> 425 South Perry Street
> Montgomery, AL 36104

t.    **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

u.    **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

v.    **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

w.    **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

x.    **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

10

AERAS 0280

y.  **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

z.  **Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

aa.  **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

bb.  **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

cc.  **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

dd.  **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

ee.  **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

ff.  **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

11

**AERAS 0281**

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:

**ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.**

_____
Secretary

By: _____
        John D. Moorehouse, M.D.
        Its President
        "Company"

(Corporate Seal)

Witness:

_____

_____
        Date

_____
"Independent Contractor"

12

**AERAS 0282**

## MEDICAL AND SURGICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT is made, entered into and effective as of this the 21st day of January, 1992, by and between ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C. ("AERAS") and Joel C. Sullivan, M.D., ("Subcontractor").

### RECITALS:

WHEREAS, AERAS is a Professional Corporation licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

WHEREAS, the Subcontractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

WHEREAS, AERAS is obligated under Agreements with various hospitals ("hospitals") to provide physician services in the emergency departments of such hospitals;

WHEREAS, the Agreements between AERAS and such hospitals permit AERAS to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of AERAS thereunder to the hospitals; and

WHEREAS, AERAS desires to engage the Subcontractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Subcontractor desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

1. **Recitals Approved.**

   The above Recitals are true and correct and are incorporated herein by this reference.

2. **Duties of the Subcontractor.**

   AERAS hereby engages the Subcontractor, and the Subcontractor hereby agrees to perform, hospital emergency room medical and surgical services for and on behalf of AERAS subject to the following:

   (a)     The Subcontractor shall render medical and surgical services to all members of the general public presenting at such hospitals, and at all other places designated by AERAS and approved by such hospitals;

   (b)     All services required of, and rendered by, the Subcontractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such hospitals. The Subcontractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Subcontractor. The Subcontractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Subcontractor's professional practice, whether

AERAS 0283

pursuant to this Agreement or otherwise;

(c)    The **Subcontractor** shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by **AERAS** or such hospitals; and

(d)    The **Subcontractor** shall perform all things reasonably desirable to maintain and improve the **Subcontractor's** professional skills. This shall be done solely at the expense of the **Subcontractor**, and also done when, where and how the **Subcontractor** determines it best to do so.

## 3.    Administrative Services.

**AERAS** shall provide the **Subcontractor** all of the day-to-day clerical, billing and administrative assistance required by the **Subcontractor** in connection with the **Subcontractor's** provision of services under this Agreement, including, without being limited to, the following:

(a)    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

(b)    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(c)    All typing and other clerical duties;

(d)    Scheduling appointments;

(e)    Answering telephones;

(f)    Facilities and equipment maintenance and cleaning services; and

(g)    Financial management, bookkeeping and related services.

## 4.    Facilities and Equipment.

Through the hospitals, **AERAS** shall provide to the **Subcontractor** the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the **Subcontractor's** rendition of services to patients at the hospitals, as determined by mutual agreement of the Parties.

## 5.    Billing Services.

**AERAS** will provide to the **Subcontractor** a central fee billing and disbursement system to provide for the orderly and timely billing and collection of the fees billed by the **Subcontractor** for professional services rendered at the hospitals. **AERAS** shall keep full and accurate records of the sums collected and disbursed and shall render accountings to the **Subcontractor** at least as often as annually. **AERAS** agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the **Subcontractor** for professional services.

2

AERAS 0284

6.    <u>Compensation.</u>

Refer to **Addendum I** regarding compensation at the individual hospitals.

7.    <u>Cost of Administration and of Services.</u>

All expenses incurred by **AERAS** in connection with **AERAS'** administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of **AERAS**. Likewise, the **Subcontractor** shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the **Subcontractor** shall save, fully indemnify (including attorney's fees and expenses) and hold **AERAS** harmless therefrom. The **Subcontractor** shall not incur, on behalf of **AERAS**, any debts, liabilities or obligations, in any way whatsoever, or in any form whatsoever, and the **Subcontractor** shall also save, fully indemnify and hold **AERAS** harmless therefrom.

8.    <u>Term.</u>

a.    Except as otherwise provided herein, this Agreement shall be effective for a period of two years, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by **AERAS** at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i)    The expulsion, suspension or disciplining of the **Subcontractor** as the final action of any professional or scientific organization;

(ii)    The resignation of the **Subcontractor** from any professional or scientific organization while under threat of disciplinary action;

(iii)    The breach by the **Subcontractor** of the American College of Emergency Physicians Rules of Ethical Principles;

(iv)    The conviction of the **Subcontractor** for a crime punishable as a felony;

(v)    The participation of the **Subcontractor** in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant to this Agreement;

(vi)    The use by the **Subcontractor**, in the sole determination of **AERAS**, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of **AERAS**, use by the **Subcontractor** of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

3

**AERAS 0285**

(vii)    The failure of the **Subcontractor** to provide or perform services as required hereunder;

(viii)    The request for termination of this Agreement by the administration or the medical staff of any of the hospitals, or of any other facility where the **Subcontractor** has been performing services;

(ix)    The institution, against the **Subcontractor**, of bankruptcy proceedings or assignments for the benefit of creditors;

(x)    The loss, by the **Subcontractor**, of any license required to practice medicine in the State of Alabama;

(xi)    The performance of services, for two (2) consecutive months, of less than _80_ hours per month by the **Subcontractor**. **AERAS** shall otherwise rely upon the **Subcontractor** to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii)    The death of the **Subcontractor**; and

(xiii)    The failure of the **Subcontractor** to obtain or continuously provide the basic medical malpractice insurance coverage as required by Paragraph 9 of this Agreement.

b.    Notwithstanding any such termination of this Agreement, the **Subcontractor** shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the **Subcontractor** which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

## 9.    Malpractice Insurance.

The **Subcontractor** shall obtain and continuously provide for himself basic medical malpractice insurance coverage in the minimum amount of 1 million/3 million. This coverage must be from insurance carriers acceptable to **AERAS**. **AERAS** must also be named therein as an "Endorsed and/or Additional Insured" so as to thereby also provide **AERAS** with coverage thereunder but still at the sole expense of the **Subcontractor**. At any time upon written request by **AERAS**, the **Subcontractor** shall deliver to **AERAS** written evidence confirming such coverage.

## 10.    Indemnification.

Anything contained in this entire Agreement to the contrary notwithstanding, the **Subcontractor** agrees to indemnify and save **AERAS**, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the **Subcontractor** while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the **Subcontractor's** duties hereunder. This indemnification of **AERAS**, its officers, directors, shareholders, employees, agents and representatives, by the **Subcontractor**, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such

4

AERAS 0286

acts or omissions of the **Subcontractor** occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

11.    **Independent Contractor Relationship.**

Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. **AERAS** shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the **Subcontractor** shall perform the services required under this Agreement. The **Subcontractor** shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from **AERAS**. Neither **AERAS**, nor the **Subcontractor**, shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the **Subcontractor** shall not be deemed to be an employee of **AERAS**, but shall only be deemed a non-exclusive independent contractor of **AERAS**, and that this Agreement calls for the performance of services by the **Subcontractor** as an independent contractor, and that at no time shall the **Subcontractor** be considered as an employee, partner, joint venturer or business associate of **AERAS** for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the **Subcontractor** and **AERAS**. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. **AERAS** is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the **Subcontractor** arising herefrom will lie solely with the **Subcontractor**. It is further understood that the **Subcontractor** and **AERAS** are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Furthermore, neither the **Subcontractor**, nor any individual whose compensation for services is paid by the **Subcontractor**, is, in any way, directly or indirectly, expressly, or by implication, employed by **AERAS**, nor shall any such individual, including the **Subcontractor**, be deemed to be employed by **AERAS** for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Social Security Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the **Subcontractor** accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the **Subcontractor** but also with respect to any and all such individuals whose compensation for services is paid by the **Subcontractor**, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding **AERAS** harmless therefrom.

12.    **Subcontractor's Warranties.**

The **Subcontractor** hereby represents and warrants that the **Subcontractor** has met all requirements prescribed by the Alabama Medical Association and, at the **Subcontractor's** sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

5

13.    <u>American College of Emergency Physicians Membership.</u>

The **Subcontractor** agrees that the **Subcontractor** shall maintain membership in the American College of Emergency Physicians, or shall obtain such membership not later than the first anniversary date of this Agreement, and, not later than January 15th of each year during the term hereof, shall also provide **AERAS** with copies of the following:

(a)    BNDD Registration;

(b)    Medical License;

(c)    Advance Cardiac Life Support Provider Level Card or obtain one within one (1) year of Agreement;

(d)    Advance Trauma Life Support Provider Level Card or obtain one within (1) year of Agreement; and

(e)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

14.    <u>Outside Professional Activities.</u>

It is specifically acknowledged that at times when the **Subcontractor** is not required to be on duty at the hospitals, the **Subcontractor** may render medical and surgical services to others at locations other than the hospitals, and the **Subcontractor** shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the **Subcontractor's** duties under this Agreement.    If **AERAS** determines that the rendering of such services by the **Subcontractor** hinders or interferes with the **Subcontractor's** duties hereunder, **AERAS** shall direct the **Subcontractor**, and the **Subcontractor** hereby agrees during the term of this Agreement, to cease rendering such services. However, it is understood that, except as is otherwise specifically provided herein, the **Subcontractor** shall have the sole and exclusive right of management over his professional duties and obligations hereunder.    The **Subcontractor** otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold **AERAS** harmless in all matters, of whatsoever kind and nature, arising with respect to the other businesses and/or professional practices the **Subcontractor** may conduct, and the **Subcontractor** shall also be solely responsible for any and all expenses incurred by the **Subcontractor** in any of his such other businesses and/or professional practices, responsibilities or activities.

15.    <u>Confidential, Trade Secret Information.</u>

The **Subcontractor** acknowledges that he will acquire or have access to billing and other related administrative information of **AERAS**, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the **Subcontractor** shall keep and maintain such information confidential and secret.

6

AERAS 0288

16.    **Agency.**

AERAS, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the **Subcontractor**, or to create any obligations on the part of the **Subcontractor**. Likewise, the **Subcontractor** shall have no authority to enter into any Contracts or other Agreements on behalf of **AERAS**, or to create any obligations on the part of **AERAS**. None of the Parties hereto shall have any authority to enter into any contract, obligation or liability binding upon the other Party, nor to create any liability or obligation on the part of any other Party. No Party hereto shall have any authority to make any agreements, debts, liabilities or obligations for any other Party nor to bind any other Party in any way whatsoever. Nothing in this Agreement shall authorize or empower any Party hereto to assume or create any obligation or responsibility whatsoever, expressed or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner, or make any representation, warranty or commitment on behalf of any other Party, and any such Party hereto who violates the provisions hereof shall save, fully indemnify (including attorney's fees and expenses) and hold harmless the other Party on account thereof.

17.    **Restrictive Covenant.**

(a)    **AERAS** must necessarily undertake hereto to impart to the **Subcontractor** confidential information and knowledge about billing and other related administrative information of **AERAS**. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the **Subcontractor** will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of **AERAS** during the term of this Agreement. In consideration of this Agreement, and the disclosure and referral by **AERAS** to the **Subcontractor** of such knowledge and information described above, the **Subcontractor** makes the covenants hereinafter set forth. The **Subcontractor** understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of **AERAS** and that without the limited restriction on the **Subcontractor's** activities imposed by these covenants, **AERAS** would suffer irreparable and immeasurable damage. The covenants herein given on the part of the **Subcontractor** shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by **AERAS** of said covenants. Therefore, the **Subcontractor** hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the **Subcontractor** will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of **AERAS**, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

7

AERAS 0289

(ii)     On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any hospitals of **AERAS**, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with **AERAS**, or interfere with or disrupt, in any way, **AERAS'** relationship, contractual or otherwise, with any such hospitals;

(iii)    Deprecate, disparage or cast aspersions upon **AERAS** or any of **AERAS'** respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv)    Keep and maintain all such billing and other related administrative information confidential and secret in every way.

(b)     The territory referred to in this section shall be designated as the State of Alabama.

(c)     Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of **AERAS** and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

**18.    Injunctive Relief.**

(a)     Irreparable harm shall be presumed if the **Subcontractor** breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to **AERAS** entering into this Agreement with the **Subcontractor**. **AERAS** depends upon the **Subcontractor's** absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the **Subcontractor** breaches any covenants of this Agreement.

(b)     In light of same, the **Subcontractor** hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery County, Alabama may immediately enjoin any breach of this Agreement, upon the request of **AERAS**, and the **Subcontractor** also hereby specifically releases **AERAS** from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by **AERAS**, and the **Subcontractor** further specifically waives all such defenses in any such action.

(c)     In the event of a breach or threatened breach by the **Subcontractor** of any of the covenants of this Agreement, **AERAS** shall hereby be deemed so entitled to an injunction restraining the **Subcontractor,** or any person or entity acting in concert with the **Subcontractor,** from violating any of the provisions hereof.

8

(d)    Nothing herein contained shall be construed as prohibiting **AERAS** from simultaneously pursuing, in the same Court, any other remedies available to **AERAS** for such breach or threatened breach, including the recovery of compensatory and punitive damages from the **Subcontractor**, or anyone acting in concert with the **Subcontractor**, in regard to any breach of any of the provisions hereof.

19.    **Notices.**

All notices, requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

    Subcontractor: Joel C. Sullivan, M.D.
                   5689 Carriage Brook Rd.
                   Montgomery, AL 36116


    AERAS:    AERAS, P.C.
              % John D. Moorehouse, M.D.
              Its President
              4160 Carmichael Road, Suite 101
              Montgomery, Alabama  36106

20.    **Waiver of Breach.**

No waiver of a breach by either Party hereunder shall be valid unless such wavier shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

21.    **Captions.**

The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

22.    **Reconciliation Clause.**

To the extent required by law, **AERAS** and the **Subcontractor** hereby agree that for a period of four years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

9

AERAS 0291

**23.    Patient Medical and Surgical Records.**

Medical and surgical records of and for patients treated by the **Subcontractor** shall be maintained and shall be the property of the individual facility at which the **Subcontractor** is providing services; provided, however, the **Subcontractor**, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the **Subcontractor** shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

**24.    Assignment; Binding Agreement.**

This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. **AERAS** depends upon the personal services of the **Subcontractor**, and the **Subcontractor** shall not assign this Agreement without the prior, express, written consent of **AERAS**, nor shall the **Subcontractor** delegate any of the **Subcontractor's** obligations hereunder to any other person or corporation without the prior, express, written consent of **AERAS**. Any such attempted assignment or delegation by the **Subcontractor**, without the prior, express, written consent of **AERAS**, shall be deemed null, void and of no effect.

**25.    Entire Agreement.**

This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all Parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**26.    Severability of Provisions.**

The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

**27.    Prior Agreements.**

This Agreement supersedes any prior Agreement of the Parties.

**28.    Governing Law.**

This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

**29.    Construction.**

Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

10

AERAS 0292

30.     **Time is of the Essence.**

Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

31.     **Counterparts.**

This Agreement may be executed in several counterparts, each of which shall be construed as an original.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                ALABAMA EMERGENCY ROOM
                                       ADMINISTRATIVE SERVICES, P.C.

_____              By: _____

Secretary                              John D. Moorehouse, M.D.
                                       Its President
                                       "AERAS"

        (CORPORATE SEAL)

Witness:

_____

_____

                                       "Subcontractor"

**11**

**AERAS 0293**

## MEDICAL AND SURGICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**Addendum I**

### 6. Compensation.

**(a)**    During the term of this Agreement, **AERAS** shall pay to the **subcontractor** monthly, no later than the fifteenth day after the calendar month for which such payment is due, <u>81%</u> of the fees actually paid by **Baptist Medical Center** to **AERAS** for professional services provided hereunder by the **subcontractor**.  The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**(b)**    During the term of this Agreement, **AERAS** shall pay to the **subcontractor** monthly, no later than the fifteenth day after the calendar month for which such payment is due, <u>81%</u> of the <u>55%</u> of gross professional charges paid by **Jackson Hospital** to **AERAS** for professional services provided hereunder by the **subcontractor**.  The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**(c)**    During the term of this Agreement, **AERAS** shall pay to the **subcontractor** monthly,  no later than the fifteenth day after the calendar month for which such payment is due, <u>81%</u> of the <u>53%</u> of gross professional charges paid by **Humana Hospital Montgomery** to **AERAS** for professional services provided hereunder by the **subcontractor**.  The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**

**By:**

Secretary

**ALABAMA EMERGENCY ROOM**
**ADMINISTRATIVE SERVICES, P.C.**

John D. Moorehouse, M.D.
**Its President**
**"AERAS"**

**(CORPORATE SEAL)**

**Witness:**

**"Subcontractor"**

12

AERAS 0294

## MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the <u>6th</u> day of <u>September,   2005</u> , between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Joseph A. Foster, MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments and medical facilities of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

a.    <u>Recitals Approved</u>.  The above Recitals are true and correct and are incorporated herein by this reference.

b.    <u>Duties of the Independent Contractor</u>.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, medical and surgical services for and on behalf of Company subject to the following:

i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor.  The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills.  This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**AERAS 0295**

c.    **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(a)    All typing and other clerical duties;
(b)    Scheduling appointments;
(c)    Answering telephones;
(d)    Facilities and equipment maintenance and cleaning services; and
(e)    Financial management, bookkeeping and related services.

d.    **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the parties hereto.

e.    **Billing Services**. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

f.    **Contract Amount**.

g.    **Cost of Administration and of Services**. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also fully indemnify, save and hold harmless, forever, the Company therefrom.

h.    **Term**.

i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either party upon ninety (90) days prior written notice, and furthermore, this Agreement may be

2

**AERAS 0296**

immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph i, titled "Malpractice Insurance," of this Agreement.

ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

3

AERAS 0297

i.    **Malpractice Insurance.** The Independent Contractor shall be provided coverage for 1 year and endorsement tail coverage for the first year of professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. Evidence that the premiums are paid and that the policies are in full force and effect shall be provided to the Independent Contractor. After the first (1) year of signed contract the payment for Malpractice Insurance coverage becomes the obligation of the Independent Contractor. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company) unless the termination is within the first (1) year of signed contract and Company is responsible for endorsement coverage. After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

j.    **Indemnification.** Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify, defend and hold harmless, forever, Company and its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the parties, and shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

k.    **Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other party to this Agreement or due and owing by either party' employees. The parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an

4

**AERAS 0298**

employee of the other, and/or of the principals thereof, for any purpose whatsoever. The parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a)    BNDD Registration;
(b)    Medical License; Controlled Substance
(c)    Advance Cardiac Life Support Provider Level Card;
(d)    Advance Trauma Life Support Provider Level Card;
(e)    Medical Control Director's Course; and
(f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

n.    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor also agrees to fully indemnify (including attorney's fees and expenses), save and hold harmless forever Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent

5

AERAS 0299

Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.**    **Confidential, Trade Secret Information**.  The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, indefinitely, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.**    **Agency**.    Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing.  Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.**    **Restrictive Covenants**.

i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians.  In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth.  The Independent Contractor understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage.  The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants.  Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor shall not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, entity, firm or business, do as follows:

(i) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, employ or attempt to take away any employees, staff, contractors, agents, vendors, customers, representatives or medical directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or medical directors to alter, amend, modify or terminate their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, contractors, agents, vendors, customers, representatives or medical directors;

(ii) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such Providers to alter, amend, modify or terminate its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

6

**AERAS 0300**

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, staff, agents, representatives, contractors, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

    ii.    The territory referred to in this section shall be designated as the State of Alabama.

    iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

    r.    **Injunctive Relief.**

    i.    Irreparable harm shall be presumed if the Independent Contractor breaches any provision or covenant of this Agreement. The faithful performance of all provisions and covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions and covenants hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any provision or covenant of this Agreement.

    ii.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

    iii.    In the event of a breach or threatened breach by the Independent Contractor of any such provision or covenant of this Agreement, Company shall hereby be deemed entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions or covenants hereof.

    iv.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in any court, any and all other remedies available to Company for any breach or threatened breach of this Agreement, including, without limitation, the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach of this Agreement.

    s.    **Notices.** Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective party as follows:

**Independent Contractor:**    **Joseph A. Foster, MD**
**2079 Waterfront Drive**
**Southside, AL 35907**

7

AERAS 0301

Company:                          **Alabama Emergency Room**
                                  **Administrative Services, P.C.**
                                  John D. Moorehouse, M.D.
                                  President
                                  4160 Carmichael Road, Ste 104
                                  Montgomery, AL 36106

With a copy to:                   Gerald W. Hartley, Esq.
                                  Hill, Hill, Carter, Franco,
                                  Cole & Black, P.C.
                                  425 South Perry Street
                                  Montgomery, AL 36104

    t.      **Waiver of Breach**. No waiver of a breach by either party hereunder shall be valid unless such waiver shall be in writing and signed by the party against whom enforcement of any waiver is sought. No waiver by a party of a breach of any provision of this Agreement by the other party shall be construed as a waiver of any subsequent breach by such party. No delay or omission on the part of either party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a party of any right or remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

    u.      **Completion and Execution of Additional Documents**. Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph q, titled "Restrictive Covenants," hereof.

    v.      **Captions**. The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience of reference only, and shall not affect in any way the interpretation or meaning of this Agreement.

    w.      **Reconciliation Clause**. To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

    x.      **Patient Medical and Surgical Records**. Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

    y.      **Assignment; Binding Agreement**. This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company. Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of

8

**AERAS 0302**

Company, shall be deemed null, void and of no effect.

**z.      Entire Agreement.**  This Agreement contains the entire Agreement between the parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.      Severability.**  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If any term or provision hereof is deemed invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

**bb.      Governing Law.**  This Agreement shall be governed, by and interpreted in accordance with the laws of the State of Alabama.

**cc.      Construction.**  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**dd.      Time is of the Essence.**  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

**ee.      Counterparts.**  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

9

**AERAS 0303**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: _Mark Platt 10/19/05_
Secretary

John D. Moorehouse, M.D.
Its President   "Company"

(Corporate Seal)

Witness:

_9/21/05_
Date

"Independent Contractor"

10

AERAS 0304

EXHIBIT 1
## CONTRACT AMOUNT/AERAS

During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor**, on the 30th day of the following month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Medical Center South, Baptist Medical Center East and Baptist Prattville Hospital. The Independent Contractor** will be paid the higher of either a minimum base of $145 per hour or an incentive compensation based proportionally on the amount of charges generated and the number of patients seen. The incentive portion of the **Independent Contractor's** compensation is calculated on the work performance 2 months in arrears.


ATTEST:

_____ 10/19/05
Secretary


(Corporate Seal)


Witness:
_____

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

By: _____
John D. Moorehouse, M.D.
Its President


"Independent Contractor"


11


**AERAS 0305**

## MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

THIS AGREEMENT is effective as of this the ___*13*___ day of *March* , __2006__ , between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **DAVID A. HINES, MD** ("Independent Contractor").

### RECITALS:

WHEREAS, Company is a Professional Corporation organized under the laws of the State of Alabama;

WHEREAS, the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

WHEREAS, Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments and medical facilities of such Providers;

WHEREAS, the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

WHEREAS, Company desires to engage the Independent Contractor to perform medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

a.      **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

b.      **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, medical and surgical services for and on behalf of Company subject to the following:

i.      The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.      All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor.  The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

iii.      The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.      The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills.  This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**AERAS 0306**

c.    <u>Administrative Services</u>. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

      i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

      ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

      (a)    All typing and other clerical duties;
      (b)    Scheduling appointments;
      (c)    Answering telephones;
      (d)    Facilities and equipment maintenance and cleaning services; and
      (e)    Financial management, bookkeeping and related services.

d.    <u>Facilities and Equipment</u>. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the parties hereto.

e.    <u>Billing Services</u>. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

f.    <u>Contract Amount</u>.    See Exhibit 1.

g.    <u>Cost of Administration and of Services</u>. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also fully indemnify, save and hold harmless, forever, the Company therefrom.

h.    <u>Term</u>.

      i.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either party upon ninety (90) days prior written notice, and furthermore, this Agreement may be

AERAS 0307

immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph i, titled "Malpractice Insurance," of this Agreement.

ii.        Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

AERAS 0308

i.  **Malpractice Insurance.** The Independent Contractor is responsible for providing coverage for 1 year and endorsement tail coverage for the first year of professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. Evidence that the premiums are paid and that the policies are in full force and effect shall be provided to the Independent Contractor. After the first (1) year of signed contract the payment for Malpractice Insurance coverage becomes the obligation of the Independent Contractor. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company) unless the termination is within the first (1) year of signed contract and Company is responsible for endorsement coverage. After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

j.  **Indemnification.** Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify, defend and hold harmless, forever, Company and its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the parties, and shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

k.  **Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other party to this Agreement or due and owing by either party' employees. The parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an

Page 4 of 11

AERAS 0309

employee of the other, and/or of the principals thereof, for any purpose whatsoever. The parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.      **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.      **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

      (a)      BNDD Registration;
      (b)      Medical License; Controlled Substance
      (c)      Advance Cardiac Life Support Provider Level Card;
      (d)      Advance Trauma Life Support Provider Level Card;
      (e)      Medical Control Director's Course; and
      (f)      A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

n.      **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor also agrees to fully indemnify (including attorney's fees and expenses), save and hold harmless forever Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent

AERAS 0310

Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.** **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, indefinitely, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.** **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.** **Restrictive Covenants**.

i. Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor shall not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, entity, firm or business, do as follows:

(i) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, employ or attempt to take away any employees, staff, contractors, agents, vendors, customers, representatives or medical directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or medical directors to alter, amend, modify or terminate their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, contractors, agents, vendors, customers, representatives or medical directors;

(ii) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such Providers to alter, amend, modify or terminate its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

AERAS 0311

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, staff, agents, representatives, contractors, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

   ii.  The territory referred to in this section shall be designated as the State of Alabama.

   iii.  Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

  **r.**  <u>Injunctive Relief</u>.

   i.  Irreparable harm shall be presumed if the Independent Contractor breaches any provision or covenant of this Agreement. The faithful performance of all provisions and covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions and covenants hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any provision or covenant of this Agreement.

   ii.  In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

   iii.  In the event of a breach or threatened breach by the Independent Contractor of any such provision or covenant of this Agreement, Company shall hereby be deemed entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions or covenants hereof.

   iv.  Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in any court, any and all other remedies available to Company for any breach or threatened breach of this Agreement, including, without limitation, the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach of this Agreement.

  **s.**  <u>Notices</u>. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective party as follows:

**AERAS 0312**

| Independent Contractor: | David A. Hines, MD |
|---|---|
| | 994 Lee Road 380 |
| | Valley, AL 36854 |
| | |
| Company: | Alabama Emergency Room |
| | Administrative Services, P.C. |
| | John D. Moorehouse, M.D. |
| | President |
| | 4160 Carmichael Road, Ste 104 |
| | Montgomery, AL 36106 |
| | |
| With a copy to: | Gerald W. Hartley, Esq. |
| | Hill, Hill, Carter, Franco, |
| | Cole & Black, P.C. |
| | 425 South Perry Street |
| | Montgomery, AL 36104 |

t.    **Waiver of Breach**. No waiver of a breach by either party hereunder shall be valid unless such waiver shall be in writing and signed by the party against whom enforcement of any waiver is sought. No waiver by a party of a breach of any provision of this Agreement by the other party shall be construed as a waiver of any subsequent breach by such party. No delay or omission on the part of either party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a party of any right or remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

u.    **Completion and Execution of Additional Documents**. Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph q, titled "Restrictive Covenants," hereof.

v.    **Captions**. The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience of reference only, and shall not affect in any way the interpretation or meaning of this Agreement.

w.    **Reconciliation Clause**. To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

x.    **Patient Medical and Surgical Records**. Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

y.    **Assignment; Binding Agreement**. This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. Company depends upon the personal services of the Independent

Page 8 of 11

**AERAS 0313**

Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company. Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

z.    **Entire Agreement**. This Agreement contains the entire Agreement between the parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

aa.    **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If any term or provision hereof is deemed invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

bb.    **Governing Law**. This Agreement shall be governed, by and interpreted in accordance with the laws of the State of Alabama.

cc.    **Construction**. Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

dd.    **Time is of the Essence**. Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

ee.    **Counterparts**. This Agreement may be executed in several counterparts, each of which shall be construed as an original.

AERAS 0314

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.


ATTEST:                                          ALABAMA EMERGENCY ROOM
                                                 ADMINISTRATIVE SERVICES, P.C.


By: _____                    _____
Secretary                                        John D. Moorehouse, M.D.
                                                 Its President   "Company"

(Corporate Seal)


Witness:


_____                        _____
                                                 "Independent Contractor"
3/13/06
Date

**AERAS 0315**

# EXHIBIT 1
## CONTRACT AMOUNT/AERAS

During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor**, on the 30th day of the following month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Medical Center South, Baptist Medical Center East and Prattville Baptist Hospital**.

At Baptist Medical Center South, **the Independent Contractor** will be paid the higher of either a minimum base of **$ 140** per hour or an incentive compensation based proportionally on the amount of charges generated and the number of patients seen.

At Baptist Medical Center East and Prattville Baptist Hospital, **the Independent Contractor** will be paid the higher of either a minimum base of **$ 120** per hour or an incentive compensation based proportionally on the amount of charges generated and the number of patients seen.

The incentive portion of the **Independent Contractor's** compensation is calculated on the work performance 2 months in arrears.


ATTEST:

_____
Secretary

(Corporate Seal)


Witness:

_____

3/13/06
Date


ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By:_____
John D. Moorehouse, M.D.
Its President


_____
"Independent Contractor"


Page 11 of 11

**AERAS 0316**

**EXHIBIT 1**
**CONTRACT AMOUNT/AERAS**

     **THIS REVISED COMPENSATION AGREEMENT** is effective as of this the **FIRST DAY OF NOVEMBER 2006**, between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **DAVID A. HINES, MD** ("Independent Contractor").

     During the term of this Agreement, the **Company** shall pay to the **Independent Contractor**, on the 30th day of the following month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Medical Center South, Baptist Medical Center East and Baptist Prattville Hospital**. **The Independent Contractor** will be paid the higher of either a minimum base of **$ 140** per hour or an incentive compensation based proportionally on the amount of charges generated and the number of patients seen less mid-level provider deductions.

ATTEST:

**ALABAMA EMERGENCY ROOM**
**ADMINISTRATIVE SERVICES, P.C.**

Secretary

by: _____
John D. Moorehouse, M.D.
Its President

(Corporate Seal)

Witness:

_____
"Independent Contractor"

_____
Date

AERAS 0317

## MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the 1<u>st</u> day of **DECEMBER,  2005 **, between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **JOSHUA KOTOUC, MD** ("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments and medical facilities of such Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to perform medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein and other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

a.    **Recitals Approved**.  The above Recitals are true and correct and are incorporated herein by this reference.

b.    **Duties of the Independent Contractor**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, medical and surgical services for and on behalf of Company subject to the following:

i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor.  The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills.  This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**AERAS 0318**

  c.  <u>Administrative Services</u>. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

    i.  Maintenance of business records, to include the filing and indexing of all correspondence and communications;

    ii.  Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

    (a)  All typing and other clerical duties;
    (b)  Scheduling appointments;
    (c)  Answering telephones;
    (d)  Facilities and equipment maintenance and cleaning services; and
    (e)  Financial management, bookkeeping and related services.

  d.  <u>Facilities and Equipment</u>. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the parties hereto.

  e.  <u>Billing Services</u>. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

  f.  <u>Contract Amount</u>.

  g.  <u>Cost of Administration and of Services</u>. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also fully indemnify, save and hold harmless, forever, the Company therefrom.

  h.  <u>Term</u>.

    i.  Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either party upon ninety (90) days prior written notice, and furthermore, this Agreement may be

**AERAS 0319**

immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

(iv) The conviction of the Independent Contractor for a crime punishable as a felony;

(v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph i, titled "Malpractice Insurance," of this Agreement.

ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

3

**AERAS 0320**

i.    **Malpractice Insurance.** The Independent Contractor shall be provided coverage for 1 year and endorsement tail coverage for the first year of professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. Evidence that the premiums are paid and that the policies are in full force and effect shall be provided to the Independent Contractor. After the first (1) year of signed contract the payment for Malpractice Insurance coverage becomes the obligation of the Independent Contractor. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company) unless the termination is within the first (1) year of signed contract and Company is responsible for endorsement coverage. After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

j.    **Indemnification.** Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify, defend and hold harmless, forever, Company and its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the parties, and shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

k.    **Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other party to this Agreement or due and owing by either party' employees. The parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an

4

**AERAS 0321**

employee of the other, and/or of the principals thereof, for any purpose whatsoever. The parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.      **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.      **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

(a)     BNDD Registration;
(b)     Medical License; Controlled Substance
(c)     Advance Cardiac Life Support Provider Level Card;
(d)     Advance Trauma Life Support Provider Level Card;
(e)     Medical Control Director's Course; and
(f)     A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

n.      **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor also agrees to fully indemnify (including attorney's fees and expenses), save and hold harmless forever Company, its agents, assigns, contractors, employees, attorneys, accountants, officers, directors, shareholders, principals, and other representatives, from any claim, demand, fine, fee, expense (including reasonable attorney fees and court costs), judgment, lien, award, settlement, loss, liability, diminution in value, assessment, obligation, payment or other cost of any nature or kind (whether known or unknown, fixed or unfixed, conditional or unconditional, choate or inchoate, liquidated or unliquidated, secured or unsecured, accrued, absolute, contingent or otherwise) arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent

5

**AERAS 0322**

Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

o.    **Confidential, Trade Secret Information**.  The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, indefinitely, the Independent Contractor shall keep and maintain such information confidential and secret.

p.    **Agency**.  Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing.  Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

q.    **Restrictive Covenants**.

i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians.  In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth.  The Independent Contractor understands and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage.  The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants.  Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor shall not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, entity, firm or business, do as follows:

(i) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, employ or attempt to take away any employees, staff, contractors, agents, vendors, customers, representatives or medical directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or medical directors to alter, amend, modify or terminate their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, contractors, agents, vendors, customers, representatives or medical directors;

(ii) On behalf of himself, or on behalf of any other person, entity, firm or business, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such Providers to alter, amend, modify or terminate its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

6

AERAS 0323

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, staff, agents, representatives, contractors, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.     The territory referred to in this section shall be designated as the State of Alabama.

iii.     Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

r.     **Injunctive Relief**.

i.     Irreparable harm shall be presumed if the Independent Contractor breaches any provision or covenant of this Agreement. The faithful performance of all provisions and covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions and covenants hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any provision or covenant of this Agreement.

ii.     In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

iii.     In the event of a breach or threatened breach by the Independent Contractor of any such provision or covenant of this Agreement, Company shall hereby be deemed entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions or covenants hereof.

iv.     Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in any court, any and all other remedies available to Company for any breach or threatened breach of this Agreement, including, without limitation, the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach of this Agreement.

s.     **Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective party as follows:

**Independent Contractor:**     **Joshua Kotouc, MD**
**1372 Anderson Ave.**
**Morgantown, WV 26505**

**AERAS 0324**

Company:                              Alabama Emergency Room
                                      Administrative Services, P.C.
                                      John D. Moorehouse, M.D.
                                      President
                                      4160 Carmichael Road, Ste 104
                                      Montgomery, AL 36106

With a copy to:                       Gerald W. Hartley, Esq.
                                      Hill, Hill, Carter, Franco,
                                      Cole & Black, P.C.
                                      425 South Perry Street
                                      Montgomery, AL 36104

    t.    **Waiver of Breach**. No waiver of a breach by either party hereunder shall be valid unless such waiver shall be in writing and signed by the party against whom enforcement of any waiver is sought. No waiver by a party of a breach of any provision of this Agreement by the other party shall be construed as a waiver of any subsequent breach by such party. No delay or omission on the part of either party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a party of any right or remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

    u.    **Completion and Execution of Additional Documents**. Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph q, titled "Restrictive Covenants," hereof.

    v.    **Captions**. The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience of reference only, and shall not affect in any way the interpretation or meaning of this Agreement.

    w.    **Reconciliation Clause**. To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

    x.    **Patient Medical and Surgical Records**. Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

    y.    **Assignment; Binding Agreement**. This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest. Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company. Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of

8

**AERAS 0325**

Company, shall be deemed null, void and of no effect.

**z.    Entire Agreement.** This Agreement contains the entire Agreement between the parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the parties, either oral or otherwise. It may be amended at any time only by a written instrument executed by all parties hereto. Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.    Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If any term or provision hereof is deemed invalid or unenforceable by a court of competent jurisdiction, the parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

**bb.    Governing Law.** This Agreement shall be governed, by and interpreted in accordance with the laws of the State of Alabama.

**cc.    Construction.** Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**dd.    Time is of the Essence.** Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

**ee.    Counterparts.** This Agreement may be executed in several counterparts, each of which shall be construed as an original.

9

**AERAS 0326**

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the day and year first above written.


ATTEST:

By: _~~signature~~_
Secretary

(Corporate Seal)


Witness:

_~~signature~~_


ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

_~~signature~~_
John D. Moorehouse, M.D.
Its President   "Company"


12|01|2005
Date

_~~signature~~_

"Independent Contractor"


10

**AERAS 0327**

EXHIBIT 1
## CONTRACT AMOUNT/AERAS

During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor**, on the 30th day of the following month for which such payment is due, for professional services provided hereunder by the **Independent Contractor at Baptist Medical Center South, Baptist Medical Center East and Baptist Prattville Hospital. The Independent Contractor** will be paid the higher of either a minimum base of **$140** per hour or an incentive compensation based proportionally on the amount of charges generated and the number of patients seen. The incentive portion of the **Independent Contractor's** compensation is calculated on the work performance 2 months in arrears.

ATTEST:

_____
Secretary

(Corporate Seal)

Witness:

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By: _____
    John D. Moorehouse, M.D.
    Its President

12/01/2005
Date

_____
"Independent Contractor"

11

**AERAS 0328**



— A ProAssurance Company

## Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
       Credentialing
       4160 Carmichael Road, Suite 104
       Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:    David Gregory Alexander, D.O.

Policy Number:    MP44122
Policy Period:    2/20/2006 to 2/20/2007

Professional Liability Limits:    $1,000,000 per incident
                                  $3,000,000 aggregate

Retroactive Date:    4/1/2000

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:

PRA-COI 08 05

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0329**



# Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:    Jesse W. Austin, Jr., M.D.

Policy Number:     MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:     $1,000,000 per incident
                                   $3,000,000 aggregate

Retroactive Date:   4/1/1986

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY: *[signature]*

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

AERAS 0330



**Medical Assurance**
A ProAssurance Company

# Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:     Victoria Lynn Beckman, M.D.

Policy Number:     MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:     $1,000,000 per incident
                                   $3,000,000 aggregate

Retroactive Date:   6/1/2001

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:   *[signature]*

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

AERAS 0331



A ProAssurance Company

# Certificate of Insurance

TO:     Alabama Emergency Room Administrative Services, P.
        Credentialing
        4160 Carmichael Road, Suite 104
        Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in
existence with The Medical Assurance Company, Inc.. It is the INSURED'S
responsibility to advise third parties, including the holder of this certificate, of any
changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:     James M. Bradwell, M.D.

Policy Number:     MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:     $1,000,000 per incident
                                   $3,000,000 aggregate

Retroactive Date:   7/1/2001

This Certificate of Insurance does not amend, extend or alter the coverage provided by
the above-described POLICY.

Certified today, February 16, 2006:

BY:     *[signature]*

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0332**



A ProAssurance Company

# Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
       Credentialing
       4160 Carmichael Road, Suite 104
       Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:     Dante V. De Jesus, M.D.

Policy Number:     MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:     $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:    7/15/2005

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0333**



A ProAssurance Company

# Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc..  It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      Wallace G. Falero, M.D.

Policy Number:      MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:   4/22/1986

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0334**



A ProAssurance Company

# Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      Joseph A. Foster, M.D.

Policy Number:      MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:   9/21/2005

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:   _Karen Gabriel_



Medical
Assurance
—— A ProAssurance Company

## Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
       Credentialing
       4160 Carmichael Road, Suite 104
       Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      Carlos M. Gutierrez, M.D.

Policy Number:      MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:    8/1/2002

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:    *[signature]*

| PRODUCER: | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. |
|---|---|

| INSURED: DAVID HINES MD<br>2105 E SOUTH BLVD<br>MONTGOMERY, AL - 36116 | INSURERS AFFORDING COVERAGE |
|---|---|
| | **INSURER A: The Medical Protective Company**<br>5814 Reed Road, Fort Wayne, IN 46835<br>NAIC number - 11843; www.medpro.com |

### COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANYREQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN.

THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | GENERAL LIABILITY<br>☒ COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE  ☒ OCCUR<br>☐ _____<br>☐ _____<br>GENL AGGREGATE LIMIT APPLIES PER:<br>☒ POLICY ☐ PROJECT ☐ LOC | 646311 | 02/25/2007 | 02/25/2008 | EACH OCCURRENCE<br>PER CLAIM<br>FIRE DAMAGE (Any one fire)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS-COMP/OP AGG | $ n,ull,000<br>$<br>$ 0,000<br>$ 0,000<br>$ 0,000<br>$ n,ull,000<br>$ |
| | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS<br>☐ _____ | | | | COMBINED SINGLE LIMIT<br>(Each accident)<br>BODILY INJURY<br>(Per person)<br>BODILY INJURY<br>(Per accident)<br>PROPERTY DAMAGE<br>(Per accident) | $<br>$<br>$<br>$ |
| | PROFESSIONAL LIABILITY<br>☐ OCCURRENCE<br>☒ CLAIMS MADE<br>RETRO DATE: 02/01/2000 | 646311 | 02/25/2007 | 02/25/2008 | PER OCCURRENCE<br>PER CLAIM<br>ANNUAL AGGREGATE | $<br>$ 1,000,000<br>$ 3,000,000 |
| | EXCESS LIABILITY<br>☐ OCCURRENCE ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION  $ | | | | EACH OCCURRENCE<br>AGGREGATE | $<br>$<br>$<br>$ |
| | WORKERS COMPENSATION AND EMPLOYER'S LIABILITY | | | | ☐ WC STATUTORY LIMITS      ☐ OTHER<br>E.L. EA ACCIDENT<br>E.L. DISEASE-EA EMPLOYEE<br>E.L. DISEASE-POLICY LIMIT | $<br>$<br>$ |
| | OTHER:<br>EMPLOYMENT PRACTICES LIABILITY<br>DEFENSE COVERAGE<br>RETRO DATE: | | | | PER OCCURRENCE LIMIT OF DEFENCE<br>AGGREGATE LIMIT OF DEFENCE | $<br>$ |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SEE POLICY FOR SPECIFIC COVERAGE INFORMATION/SPECIAL PROVISIONS

SC DAVID A HINES MD PC

| CERTIFICATE HOLDER: | CANCELLATION |
|---|---|
| Baptist Health Hospitals ATTN: Credentialing<br>2105 E South Blvd,<br>Montgomery, AL - 36116 | THE MEDICAL PROTECTIVE COMPANY WILL NOT BE RESPONSIBLE FOR INFORMING THE CERTIFICATE HOLDER OF ANY CHANGES IN COVERAGE OR IN THE LIMITS OF LIABILITY OR IN THE EVENT OF THE TERMINATION OR CANCELLATION OF THE POLICY.<br><br>The Medical Protective Company Representative<br><br>*Md T. White* |

**AERAS 0337**

# CERTIFICATE OF LIABILITY INSURANCE

PRODUCER:

DATE: 02/13/2007

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

INSURED: DAVID HINES MD
2105 E SOUTH BLVD
MONTGOMERY, AL - 36116

INSURERS AFFORDING COVERAGE

**INSURER A: The Medical Protective Company**
5814 Reed Road, Fort Wayne, IN 46835
NAIC number - 11843; www.medpro.com

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN. THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|
| | GENERAL LIABILITY<br>☒ COMMERCIAL GENERAL LIABILITY<br>☐ CLAIMS MADE ☒ OCCUR<br>☐<br>☐<br>GENL AGGREGATE LIMIT APPLIES PER:<br>☒ POLICY ☐ PROJECT ☐ LOC | 646311 | 02/25/2007 | 02/25/2008 | EACH OCCURRENCE<br>PER CLAIM<br>FIRE DAMAGE (Any one fire)<br>MED EXP (Any one person)<br>PERSONAL & ADV INJURY<br>GENERAL AGGREGATE<br>PRODUCTS-COMP/OP AGG | $ n,ull,000<br>$<br>$ 0,000<br>$ 0,000<br>$ 0,000<br>$ n,ull,000<br>$ |
| | AUTOMOBILE LIABILITY<br>☐ ANY AUTO<br>☐ ALL OWNED AUTOS<br>☐ SCHEDULED AUTOS<br>☐ HIRED AUTOS<br>☐ NON-OWNED AUTOS<br>☐ | | | | COMBINED SINGLE LIMIT<br>(Each accident)<br>BODILY INJURY<br>(Per person)<br>BODILY INJURY<br>(Per accident)<br>PROPERTY DAMAGE<br>(Per accident) | $<br>$<br>$<br>$ |
| | PROFESSIONAL LIABILITY<br>☐ OCCURRENCE<br>☒ CLAIMS MADE<br>RETRO DATE: 02/01/2000 | 646311 | 02/25/2007 | 02/25/2008 | PER OCCURRENCE<br>PER CLAIM<br>ANNUAL AGGREGATE | $<br>$ 1,000,000<br>$ 3,000,000 |
| | EXCESS LIABILITY<br>☐ OCCURRENCE ☐ CLAIMS MADE<br>☐ DEDUCTIBLE<br>☐ RETENTION $ | | | | EACH OCCURRENCE<br>AGGREGATE | S<br>S<br>$<br>$ |
| | WORKERS COMPENSATION AND EMPLOYER'S LIABILITY | | | | ☐ WC STATUTORY LIMITS ☐ OTHER<br>E.L. EA ACCIDENT<br>E.L. DISEASE-EA EMPLOYEE<br>E.L. DISEASE-POLICY LIMIT | $<br>$<br>$ |
| | OTHER:<br>EMPLOYMENT PRACTICES LIABILITY<br>DEFENSE COVERAGE<br>RETRO DATE: | | | | PER OCCURRENCE LIMIT<br>OF DEFENCE<br>AGGREGATE LIMIT OF<br>DEFENCE | $<br>$ |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/SEE POLICY FOR SPECIFIC COVERAGE INFORMATION/SPECIAL PROVISIONS

SC DAVID A HINES MD PC

| CERTIFICATE HOLDER: | CANCELLATION |
|---|---|
| AERAS, PC ATTN Kathryn Kitchens<br>4160 Carmichael Rd,<br>Montgomery, AL - 36106 | THE MEDICAL PROTECTIVE COMPANY WILL NOT BE RESPONSIBLE FOR INFORMING THE CERTIFICATE HOLDER OF ANY CHANGES IN COVERAGE OR IN THE LIMITS OF LIABILITY OR IN THE EVENT OF THE TERMINATION OR CANCELLATION OF THE POLICY.<br><br>The Medical Protective Company Representative<br><br>*Med T. Villa* |

**AERAS 0338**



A ProAssurance Company

# Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
       Credentialing
       4160 Carmichael Road, Suite 104
       Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in
existence with The Medical Assurance Company, Inc.. It is the INSURED'S
responsibility to advise third parties, including the holder of this certificate, of any
changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:    Joshua T. Kotouc, M.D.

Policy Number:    MP44122
Policy Period:    2/20/2006 to 2/20/2007

Professional Liability Limits:    $1,000,000 per incident
                                  $3,000,000 aggregate

Retroactive Date:    1/10/2006

This Certificate of Insurance does not amend, extend or alter the coverage provided by
the above-described POLICY.

Certified today, February 16, 2006:

BY:

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0339**



A ProAssurance Company

# Certificate of Insurance

TO:  Alabama Emergency Room Administrative Services, P.
Credentialing
4160 Carmichael Road, Suite 104
Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:    Julian Mahaganasan, M.D.

Policy Number:    MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:    $1,000,000 per incident
$3,000,000 aggregate

Retroactive Date:    4/4/2002

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:  *[signature]*



## Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      John D. Moorehouse, M.D.

Policy Number:      MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:   4/1/1986

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:   *[signature]*

PRA-COI 08 05                    CERTIFICATE OF INSURANCE
                                © 2005 ProAssurance Corporation                    **AERAS 0341**



**A ProAssurance Company**

# Certificate of Insurance

TO:   Alabama Emergency Room Administrative Services, P.
      Credentialing
      4160 Carmichael Road, Suite 104
      Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in
existence with The Medical Assurance Company, Inc.. It is the INSURED'S
responsibility to advise third parties, including the holder of this certificate, of any
changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:     Julio E. Rios, M.D.

Policy Number:     MP44122
Policy Period:     2/20/2006 to 2/20/2007

Professional Liability Limits:     $1,000,000 per incident
                                   $3,000,000 aggregate

Retroactive Date:   5/27/1998

This Certificate of Insurance does not amend, extend or alter the coverage provided by
the above-described POLICY.

Certified today, February 16, 2006:

BY:   *Karen Cardüe*


A ProAssurance Company

# Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
       Credentialing
       4160 Carmichael Road, Suite 104
       Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc.. It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      Ronald A. Shaw, M.D.

Policy Number:      MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
                                    $3,000,000 aggregate

Retroactive Date:    6/1/1996

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:    *[signature]*

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

**AERAS 0343**


Medical Assurance
A ProAssurance Company

## Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
Credentialing
4160 Carmichael Road, Suite 104
Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in
existence with The Medical Assurance Company, Inc.. It is the INSURED'S
responsibility to advise third parties, including the holder of this certificate, of any
changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:    George Cicero Smith, Jr MD

Policy Number:    MP44122
Policy Period:    2/20/2006 to 2/20/2007

Professional Liability Limits:    $1,000,000 per incident
$3,000,000 aggregate

Retroactive Date:    1/7/2005

This Certificate of Insurance does not amend, extend or alter the coverage provided by
the above-described POLICY.

Certified today, February 16, 2006:

BY:    *Karen Carlisle*

PRA-COI 08 05                    CERTIFICATE OF INSURANCE                    **AERAS 0344**
© 2005 ProAssurance Corporation



# Certificate of Insurance

TO:    Alabama Emergency Room Administrative Services, P.
Credentialing
4160 Carmichael Road, Suite 104
Montgomery, AL 36106

THIS IS TO CERTIFY THAT as of this date, the following described insurance is in existence with The Medical Assurance Company, Inc..  It is the INSURED'S responsibility to advise third parties, including the holder of this certificate, of any changes in this insurance POLICY or the expiration or cancellation of this POLICY.

Insured:      Joel C. Sullivan, M.D.

Policy Number:     MP44122
Policy Period:      2/20/2006 to 2/20/2007

Professional Liability Limits:      $1,000,000 per incident
$3,000,000 aggregate

Retroactive Date:    2/1/1986

This Certificate of Insurance does not amend, extend or alter the coverage provided by the above-described POLICY.

Certified today, February 16, 2006:

BY:

CERTIFICATE OF INSURANCE
© 2005 ProAssurance Corporation

AERAS 0345

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Greg Alexander

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 37,999.44 | (1,893.00) | (668.00) | (93.49) | | (27.30) | | | 35,317.65 |
| 2/28/2006 | 40,341.27 | (1,893.00) | (668.00) | (93.49) | | (4.45) | | (100.00) | 37,582.33 |
| 3/31/2006 | 40,700.92 | (3,365.00) | (768.00) | (93.49) | | (25.39) | | (100.00) | 36,349.04 |
| 4/28/2006 | 37,893.14 | (3,365.00) | (768.00) | (93.49) | | (27.05) | | (100.00) | 33,539.60 |
| 5/31/2006 | 38,679.32 | (3,365.00) | (768.00) | (93.49) | | | | (200.00) | 34,252.83 |
| 6/30/2006 | 46,664.21 | (3,365.00) | (768.00) | (93.49) | | (38.57) | | (100.00) | 42,299.15 |
| 7/31/2006 | 40,884.84 | (3,365.00) | (768.00) | (93.49) | | | | (100.00) | 36,558.35 |
| 8/31/2006 | 47,275.79 | (3,365.00) | (768.00) | (93.49) | | | | (100.00) | 42,949.30 |
| 9/29/2006 | 40,426.11 | (3,365.00) | (768.00) | (93.49) | | (39.20) | | (100.00) | 36,060.42 |
| 10/31/2006 | 37,303.22 | (3,365.00) | (768.00) | (93.49) | | | | (100.00) | 32,976.73 |
| 12/1/2006 | 39,979.13 | (3,365.00) | (768.00) | (93.49) | | (13.51) | | (100.00) | 35,639.13 |
| 12/29/2006 | 34,010.56 | (3,365.00) | (768.00) | (93.49) | | (31.83) | | (100.00) | 29,652.24 |
| | - | | | | | | | | - |
| Totals | $ 482,157.95 | $ (37,436.00) | $ (9,016.00) | $ (1,121.88) | $ - | $ (207.30) | $ - | $ (1,200.00) | 433,176.77 |

YTD Physician Earnings-2006

**AERAS 0826**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Jesse Austin

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/25/2006 | 500.00 | | | | | | | | 500.00 |
| 1/31/2006 | 28,369.44 | (1,966.00) | | | | | | (100.00) | 26,303.44 |
| 2/24/2006 | 500.00 | | | | | | | | 500.00 |
| 2/28/2006 | 26,619.66 | (1,966.00) | | | | | | (100.00) | 24,553.66 |
| 3/24/2006 | 500.00 | | | | | | | | 500.00 |
| 3/31/2006 | 25,760.48 | (2,130.00) | | | | | | (100.00) | 23,530.48 |
| 4/25/2006 | 500.00 | | | | | | | | 500.00 |
| 4/28/2006 | 23,714.48 | (2,130.00) | | | | | | (200.00) | 21,384.48 |
| 5/25/2006 | 500.00 | | | | | | | | 500.00 |
| 5/31/2006 | 25,970.93 | (2,130.00) | | | | | | (200.00) | 23,640.93 |
| 6/23/2006 | 500.00 | | | | | | | | 500.00 |
| 6/30/2006 | 29,785.95 | (2,130.00) | | | | | | (100.00) | 27,555.95 |
| 7/25/2006 | 500.00 | | | | | | | | 500.00 |
| 7/31/2006 | 30,583.02 | (2,130.00) | | | | | | (100.00) | 28,353.02 |
| 8/25/2006 | 500.00 | | | | | | | | 500.00 |
| 8/31/2006 | 25,718.23 | (2,130.00) | | | | | | (100.00) | 23,488.23 |
| 9/25/2006 | 500.00 | | | | | | | | 500.00 |
| 9/29/2006 | 32,680.30 | (2,130.00) | | | | | | (100.00) | 30,450.30 |
| 10/25/2006 | 500.00 | | | | | | | | 500.00 |
| 10/31/2006 | 28,943.61 | (2,130.00) | | | | | | (100.00) | 26,713.61 |
| 11/24/2006 | 500.00 | | | | | | | | 500.00 |
| 12/1/2006 | 30,353.06 | (2,130.00) | | | | | | (100.00) | 28,123.06 |
| 12/22/2006 | 500.00 | | | | | | | | 500.00 |
| 12/29/2006 | 30,479.44 | (2,130.00) | | | | | | (100.00) | 28,249.44 |
| Totals | $ 344,978.60 | $ (25,232.00) | $ - | $ - | $ - | $ - | $ - | $ (1,400.00) | 318,346.60 |

YTD Physician Earnings-2006

AERAS 0827

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Victoria Beckman

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| BALANCE | | | | | | | 1,500.00 | | |
| 1/27/2006 | | | | | | | | | 1,500.00 |
| 1/31/2006 | 20,980.00 | (2,250.00) | (250.00) | (34.59) | | (6.00) | 1,500.00 | | 18,439.41 |
| 2/28/2006 | 22,291.71 | (2,250.00) | (250.00) | (34.59) | | (17.10) | (1,500.00) | | 18,140.02 |
| 3/31/2006 | 21,282.05 | (2,250.00) | (288.00) | (34.59) | | (21.00) | (1,500.00) | (100.00) | 17,188.46 |
| 4/28/2006 | 19,901.50 | (2,250.00) | (288.00) | (34.59) | | (6.00) | | | 17,322.91 |
| 5/31/2006 | 22,065.62 | (2,250.00) | (288.00) | (34.59) | | | | | 19,493.03 |
| 6/30/2006 | 20,090.02 | (2,250.00) | (288.00) | (34.59) | | (40.69) | | | 17,476.74 |
| 7/31/2006 | 20,054.32 | (2,250.00) | (288.00) | (34.59) | | (12.00) | | | 17,469.73 |
| 8/17/2006 | - | | | | | | 5,000.00 | | 5,000.00 |
| 8/31/2006 | 24,417.51 | (2,250.00) | (288.00) | (34.59) | | (39.00) | | | 21,805.92 |
| 9/29/2006 | 25,861.73 | (2,250.00) | (288.00) | (34.59) | | (53.47) | (5,000.00) | | 18,235.67 |
| 10/31/2006 | 25,706.34 | (2,250.00) | (288.00) | (34.59) | | (37.49) | | | 23,096.26 |
| 12/1/2006 | 24,267.32 | (2,250.00) | (288.00) | (34.59) | | (45.51) | | | 21,649.22 |
| 12/29/2006 | 28,618.30 | (2,250.00) | (288.00) | (34.59) | | (17.55) | | | 26,028.16 |
| | - | | | | | | | | - |
| | - | | | | | | | | - |
| TOTAL | $ 275,536.42 | $ (27,000.00) | $ (3,380.00) | $ (415.08) | $ - | $ (295.81) | $ - | $ (100.00) | $ 242,845.53 |

Advances: Tr $   3,000.00
            $  (1,500.00)
            $   1,500.00
            $  (1,500.00)
            $  (1,500.00)
            $       -

YTD Physician Earnings-2006

**AERAS 0828**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. James Bradwell

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 1/31/2006 | 42,357.94 | (1,670.00) | (668.00) | (93.49) | | (29.27) | | | 39,897.18 |
| 2/24/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 2/28/2006 | 32,219.19 | (1,670.00) | (668.00) | (93.49) | | | | | 29,787.70 |
| 3/24/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 3/31/2006 | 29,793.01 | (2,130.00) | (768.00) | (93.49) | | (5.78) | | (100.00) | 26,695.74 |
| 4/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 4/28/2006 | 30,807.88 | (2,130.00) | (768.00) | (93.49) | | (8.44) | | (100.00) | 27,707.95 |
| 5/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 5/31/2006 | 31,370.05 | (2,130.00) | (768.00) | (93.49) | | | | | 28,378.56 |
| 6/23/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 6/30/2006 | 31,954.61 | (2,130.00) | (768.00) | (93.49) | | (13.23) | | | 28,949.89 |
| 7/11/2006 | 2,983.71 | | | | | | | | 2,983.71 |
| 7/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 7/31/2006 | 39,409.42 | (2,130.00) | (768.00) | (93.49) | | (11.35) | | | 36,406.58 |
| 8/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 8/31/2006 | 39,145.28 | (2,130.00) | (768.00) | (93.49) | | | | | 36,153.79 |
| 9/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 9/29/2006 | 43,283.06 | (2,130.00) | (768.00) | (93.49) | | (38.76) | | | 40,252.81 |
| 10/25/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 10/31/2006 | 35,200.11 | (2,130.00) | (768.00) | (93.49) | | (23.18) | | | 32,185.44 |
| 11/24/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 12/1/2006 | 38,979.90 | (2,130.00) | (768.00) | (93.49) | | (12.93) | | | 35,975.48 |
| 12/22/2006 | 3,000.00 | | | | | | | | 3,000.00 |
| 12/29/2006 | 31,210.79 | (2,130.00) | (768.00) | (93.49) | | (10.41) | | | 28,208.89 |
| | $ 464,714.95 | $ (24,640.00) | $ (9,016.00) | $ (1,121.88) | $    - | $ (153.35) | $    - | $ (200.00) | $ 429,583.72 |

YTD Physician Earnings-2006

**AERAS 0829**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL  36106

YTD Earnings for Year Ending 2006
Dr. Wallace Falero

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 27,567.96 | (1,966.00) | (668.00) | (93.49) | (283.32) | (9.18) | | (100.00) | 24,447.97 |
| 2/28/2006 | 22,629.85 | (1,966.00) | (668.00) | (93.49) | (283.32) | (13.05) | | (600.06) | 19,005.93 |
| 3/31/2006 | 22,425.28 | (2,067.00) | (768.00) | (93.49) | (283.32) | (11.46) | | (401.58) | 18,800.43 |
| 4/28/2006 | 23,402.27 | (2,067.00) | (768.00) | (93.49) | (283.32) | (25.51) | | (300.08) | 19,864.87 |
| 5/31/2006 | 21,030.78 | (2,067.00) | (768.00) | (93.49) | (283.32) | | | (300.08) | 17,518.89 |
| 6/30/2006 | 24,759.79 | (2,067.00) | (768.00) | (93.49) | (283.32) | (64.69) | | (408.44) | 21,074.85 |
| 7/31/2006 | 17,530.21 | (2,067.00) | (768.00) | (93.49) | (283.32) | (6.00) | | (298.44) | 14,013.96 |
| 8/31/2006 | 17,191.27 | (2,067.00) | (768.00) | (93.49) | (283.32) | (9.00) | | (898.44) | 13,072.02 |
| 9/29/2006 | 22,062.85 | (2,067.00) | (768.00) | (93.49) | (283.32) | (59.44) | | (898.44) | 17,893.16 |
| 10/31/2006 | 19,335.25 | (2,067.00) | (768.00) | (93.49) | (283.32) | (23.57) | | (954.23) | 15,145.64 |
| 12/1/2006 | 24,751.22 | (2,067.00) | (768.00) | (93.49) | (283.32) | (70.61) | | (354.23) | 21,114.57 |
| 12/29/2006 | 29,188.54 | (2,067.00) | (768.00) | (93.49) | (283.32) | (37.94) | | (354.23) | 25,584.56 |
| Totals | $ 271,875.27 | $ (24,602.00) | $ (9,016.00) | $ (1,121.88) | $ (3,399.84) | $ (330.45) | $ - | $ (5,868.25) | $ 227,536.85 |

YTD Physician Earnings-2006

**AERAS 0830**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Joseph Foster

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 15,623.75 | | | | | | | | 15,623.75 |
| 2/28/2006 | 15,841.25 | | | | | | | | 15,841.25 |
| 3/31/2006 | 3,770.00 | | | | | | | | 3,770.00 |
| 4/28/2006 | 3,552.50 | | | | | | | | 3,552.50 |
| 7/31/2006 | 3,480.00 | | | | | | | (100.00) | 3,380.00 |
| | - | | | | | | | | - |
| | - | | | | | | | | - |
| | - | | | | | | | | - |
| Totals | $ 42,267.50 | $ - | $ - | $ - | $ - | $ - | $ - | $ (100.00) | $ 42,167.50 |

YTD Physician Earnings-2006

**AERAS 0831**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Carlos Gutierrez

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 32,310.56 | (1,965.00) | (250.00) | | | (25.58) | | | 30,069.98 |
| 2/28/2006 | 31,677.05 | (1,965.00) | (250.00) | | | (69.79) | | | 29,392.26 |
| 3/31/2006 | 32,481.51 | (1,965.00) | (288.00) | | | (53.67) | | | 30,174.84 |
| 4/28/2006 | 26,616.64 | (1,965.00) | (288.00) | | | (30.97) | | | 24,332.67 |
| 5/31/2006 | 26,935.42 | (1,965.00) | (288.00) | | | | | (41.52) | 24,640.90 |
| 6/30/2006 | 32,495.80 | (1,965.00) | (288.00) | | | (74.66) | | | 30,168.14 |
| 7/31/2006 | 28,399.24 | (1,965.00) | (288.00) | | | (17.70) | | | 26,128.54 |
| 8/31/2006 | 33,648.20 | (1,965.00) | (288.00) | | | | | | 31,395.20 |
| 9/29/2006 | 32,645.24 | (1,965.00) | (288.00) | | | (69.42) | | (19.40) | 30,303.42 |
| 10/31/2006 | 28,780.10 | (1,965.00) | (288.00) | | | (5.83) | | (24.92) | 26,496.35 |
| 12/1/2006 | 25,280.14 | (1,965.00) | (288.00) | | | (40.39) | | | 22,986.75 |
| 12/29/2006 | 28,191.18 | (1,965.00) | (288.00) | | | (18.86) | | | 25,919.32 |
| Totals | $ 359,461.08 | $ (23,580.00) | $ (3,380.00) | $ - | $ - | $ (406.87) | $ - | $ (85.84) | $ 332,008.37 |

YTD Physician Earnings-2006

**AERAS 0832**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL  36106

YTD Earnings for Year Ending 2006
Dr. David A. Hines

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 2/1/2006 | - | | | | | | 5,000.00 | | 5,000.00 |
| 3/15/2006 | - | | | | | | 5,000.00 | | 5,000.00 |
| 4/6/2006 | 2,400.00 | | | | | | | | 2,400.00 |
| 4/28/2006 | 14,800.00 | | | | | | | (175.00) | 14,625.00 |
| 5/31/2006 | 29,040.00 | | | | | | | | 29,040.00 |
| 6/30/2006 | 39,143.77 | | | | | | (2,000.00) | | 37,143.77 |
| 7/31/2006 | 44,333.09 | | | | | | (2,000.00) | | 42,333.09 |
| 8/31/2006 | 42,079.31 | | | | | | (2,000.00) | | 40,079.31 |
| 9/29/2006 | 37,395.29 | | | | | | (2,000.00) | | 35,395.29 |
| 10/31/2006 | 30,392.42 | | | | | (5.48) | (2,000.00) | | 28,386.94 |
| 12/1/2006 | 31,820.57 | | | | | | | | 31,820.57 |
| 12/29/2006 | 27,598.43 | | | | | | | | 27,598.43 |
| Totals | $ 299,002.88 | $ - | $ - | $ - | $ - | $ (5.48) | $ - | $ (175.00) | $ 298,822.40 |

YTD Physician Earnings-2006

**AERAS 0833**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL  36106

YTD Earnings for Year Ending 2006
Dr. Joshua Kotouc

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 2/14/2006 | - | | | | | | 4,000.00 | | 4,000.00 |
| 2/28/2006 | 9,800.00 | | | | | | (4,000.00) | | 5,800.00 |
| | - | | | | | | | | - |
| Totals | $ 9,800.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 9,800.00 |

YTD Physician Earnings-2006

**AERAS 0834**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Julian Maha

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 25,372.52 | (1,650.00) | | | | | | | 23,722.52 |
| 2/28/2006 | 20,085.64 | (1,650.00) | | | | | | | 18,435.64 |
| 3/31/2006 | 17,514.97 | (2,300.00) | | | | | | | 15,214.97 |
| 4/28/2006 | 25,079.37 | (2,300.00) | | | | | | | 22,673.95 |
| 5/31/2006 | 17,865.02 | (2,300.00) | | | | (5.42) | | (100.00) | 15,565.02 |
| 6/30/2006 | 24,505.92 | (2,300.00) | | | | | | | 22,205.92 |
| 7/31/2006 | 19,442.95 | (2,300.00) | | | | | | | 17,142.95 |
| 8/31/2006 | 18,322.19 | (2,300.00) | | | | | | | 16,022.19 |
| 9/29/2006 | 23,997.56 | (2,300.00) | | | | | | | 21,697.56 |
| 10/31/2006 | 21,527.98 | (2,300.00) | | | | | | | 19,227.98 |
| 12/1/2006 | 21,342.18 | (2,300.00) | | | | | | | 19,042.18 |
| 12/29/2006 | 19,511.12 | (2,300.00) | | | | | | | 17,211.12 |
| Totals | $ 254,567.42 | $ (26,300.00) | $ - | $ - | $ - | $ (5.42) | $ - | $ (100.00) | 228,162.00 |

YTD Physician Earnings-2006

AERAS 0835

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. James Matic

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 500.00 | | | | | | | | 500.00 |
| 2/28/2006 | 500.00 | | | | | | | | 500.00 |
| | - | | | | | | | | - |
| Totals | $ 1,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,000.00 |

YTD Physician Earnings-2006

AERAS 0836

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. John Moorehouse

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 26,386.13 | (1,664.00) | (668.00) | (112.12) | | (56.46) | | (100.00) | 23,785.55 |
| 2/28/2006 | 24,003.12 | (1,664.00) | (668.00) | (112.12) | | (26.51) | | (100.00) | 21,432.49 |
| 3/31/2006 | 23,865.00 | (1,920.00) | (768.00) | (112.12) | | | | (100.00) | 20,964.88 |
| 4/28/2006 | 26,883.18 | (1,920.00) | (768.00) | (112.12) | | (32.08) | | (100.00) | 23,950.98 |
| 5/31/2006 | 25,788.30 | (1,920.00) | (768.00) | (112.12) | | | | (100.00) | 22,888.18 |
| 6/30/2006 | 23,190.00 | (1,920.00) | (768.00) | (146.71) | | (78.38) | | (100.00) | 20,176.91 |
| 7/31/2006 | 20,385.00 | (1,920.00) | (768.00) | (146.71) | | (49.57) | | (100.00) | 17,400.72 |
| 8/31/2006 | 23,017.22 | (1,920.00) | (768.00) | (146.71) | | (17.58) | | (100.00) | 20,064.93 |
| 9/29/2006 | 17,980.64 | (1,920.00) | (768.00) | (146.71) | | (221.51) | | (100.00) | 14,824.42 |
| 10/31/2006 | 20,185.53 | (1,920.00) | (768.00) | (146.71) | | (19.95) | | (100.00) | 17,230.87 |
| 12/1/2006 | 21,510.00 | (1,920.00) | (768.00) | (146.71) | | (80.17) | | (100.00) | 18,495.12 |
| 12/29/2006 | 24,660.00 | (1,920.00) | (768.00) | (146.71) | | (81.68) | | (100.00) | 21,643.61 |
| | - | | | | | | | | - |
| Totals | $ 277,854.12 | $ (22,528.00) | $ (9,016.00) | $ (1,587.57) | $ - | $ (663.89) | $ - | $ (1,200.00) | 242,858.66 |

YTD Physician Earnings-2006

**AERAS 0837**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Julio Rios

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/25/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 1/31/2006 | 42,833.22 | (2,068.00) | (668.00) | (93.49) | | (55.54) | | | 39,948.19 |
| 2/24/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 2/28/2006 | 48,011.90 | (2,068.00) | (668.00) | (93.49) | | (73.80) | | | 45,108.61 |
| 3/24/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 3/31/2006 | 35,519.81 | (2,240.00) | (768.00) | (93.49) | | (57.72) | | | 32,360.60 |
| 4/25/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 4/28/2006 | 45,960.89 | (2,240.00) | (768.00) | (93.49) | | (46.40) | | (460.93) | 42,352.07 |
| 5/25/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 5/31/2006 | 38,185.06 | (2,240.00) | (768.00) | (93.49) | | | | | 35,083.57 |
| 6/23/2006 | 7,000.00 | | | | | | | | 7,000.00 |
| 6/30/2006 | 40,251.05 | (2,240.00) | (768.00) | (93.49) | | (236.11) | | | 36,913.45 |
| 7/25/2006 | 22,000.00 | | | | | | | | 22,000.00 |
| 7/31/2006 | 44,472.13 | (2,240.00) | (768.00) | (93.49) | | (88.87) | | | 41,281.77 |
| 8/25/2006 | 10,000.00 | | | | | | | | 10,000.00 |
| 8/31/2006 | 61,246.64 | (2,240.00) | (768.00) | (93.49) | | | | | 58,145.15 |
| 9/25/2006 | 10,000.00 | | | | | | | | 10,000.00 |
| 9/29/2006 | 53,344.03 | (2,240.00) | (768.00) | (93.49) | | (222.09) | | | 50,020.45 |
| 10/25/2006 | 10,000.00 | | | | | | | | 10,000.00 |
| 10/31/2006 | 37,531.15 | (2,240.00) | (768.00) | (93.49) | | (20.80) | | | 34,408.86 |
| 11/24/2006 | 10,000.00 | | | | | | | | 10,000.00 |
| 12/1/2006 | 39,694.06 | (2,240.00) | (768.00) | (93.49) | | (78.07) | | (292.50) | 36,222.00 |
| 12/22/2006 | 10,000.00 | | | | | | | | 10,000.00 |
| 12/29/2006 | 43,312.62 | (2,240.00) | (768.00) | (93.49) | | (153.43) | | | 40,057.70 |
| | - | | | | | | | | - |
| Totals | $ 644,362.56 | $ (26,536.00) | $ (9,016.00) | $ (1,121.88) | - | $ (1,032.83) | - | $ (753.43) | 605,902.42 |

YTD Physician Earnings-2006

AERAS 0838

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Ronald Shaw

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 1/31/2006 | 30,153.09 | (1,825.00) | (668.00) | (93.49) | | (39.38) | | (100.00) | 27,427.22 |
| 2/24/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 2/28/2006 | 28,157.14 | (1,825.00) | (668.00) | (93.49) | | (94.71) | | (490.00) | 24,985.94 |
| 3/24/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 3/31/2006 | 30,639.72 | (2,130.00) | (768.00) | (93.49) | | (73.09) | | (119.35) | 27,455.79 |
| 4/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 4/28/2006 | 35,127.19 | (2,130.00) | (768.00) | (93.49) | | (90.22) | | (100.00) | 31,945.48 |
| 5/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 5/31/2006 | 38,827.05 | (2,130.00) | (768.00) | (93.49) | | | | (118.90) | 35,716.66 |
| 6/23/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 6/30/2006 | 35,400.90 | (2,130.00) | (768.00) | (93.49) | | (135.68) | | (100.00) | 32,173.73 |
| 7/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 7/31/2006 | 30,292.94 | (2,130.00) | (768.00) | (93.49) | | (37.07) | | (162.06) | 27,102.32 |
| 8/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 8/31/2006 | 27,020.72 | (2,130.00) | (768.00) | (93.49) | | | | (132.13) | 23,897.10 |
| 9/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 9/29/2006 | 34,241.89 | (2,130.00) | (768.00) | (93.49) | | (92.27) | | (162.08) | 30,996.05 |
| 10/25/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 10/31/2006 | 27,930.37 | (2,130.00) | (768.00) | (93.49) | | (26.88) | | (700.00) | 24,212.00 |
| 11/24/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| 12/1/2006 | 33,559.90 | (2,130.00) | (768.00) | (93.49) | | (52.11) | | (122.95) | 30,393.35 |
| 12/22/2006 | 1,000.00 | | | | | | | | 1,000.00 |
| | - | | | | | | | | - |
| | - | | | | | | | | - |
| Totals | $ 363,350.91 | $ (22,820.00) | $ (8,248.00) | $ (1,028.39) | $ - | $ (641.41) | $ - | $ (2,307.47) | $ 328,305.64 |

YTD Physician Earnings-2006

AERAS 0839

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. George "Buddy" Smith

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/23/2006 | 12,970.00 | | | | | (3.04) | | | 12,966.96 |
| 4/19/2006 | 13,440.00 | | | | | | | | 13,440.00 |
| 6/30/2006 | 8,760.00 | | | | | (17.58) | | | 8,742.42 |
| 7/31/2006 | 16,070.00 | | | | | (8.96) | | | 16,061.04 |
| 8/31/2006 | 14,880.00 | | | | | | | | 14,880.00 |
| 9/29/2006 | 8,760.00 | | | | | (14.68) | | | 8,745.32 |
| 10/31/2006 | 8,590.00 | | | | | (9.28) | | | 8,580.72 |
| 12/1/2006 | 10,800.00 | | | | | (14.53) | | | 10,785.47 |
| 12/29/2006 | 13,140.00 | | | | | (4.66) | | 136.13 | 13,271.47 |
| | - | | | | | | | | - |
| Totals | $ 107,410.00 | $    - | $    - | $    - | $    - | $ (72.73) | $    - | $ 136.13 | $ 107,473.40 |

YTD Physician Earnings-2006

**AERAS 0840**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2006
Dr. Joel Sullivan

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2006 | 29,168.65 | (1,682.00) | | | | | | (100.00) | 27,386.65 |
| 2/28/2006 | 20,545.71 | (1,682.00) | | | | | | (100.00) | 18,763.71 |
| 3/31/2006 | 23,243.94 | (2,058.00) | | | | | | (100.00) | 21,085.94 |
| 4/28/2006 | 26,887.88 | (2,058.00) | | | | | | (100.00) | 24,729.88 |
| 5/31/2006 | 24,886.35 | (2,058.00) | | | | | | (100.00) | 22,728.35 |
| 6/30/2006 | 24,091.21 | (2,058.00) | | | | | | (100.00) | 21,933.21 |
| 7/31/2006 | 24,978.57 | (2,058.00) | | | | | | (100.00) | 22,820.57 |
| 8/31/2006 | 27,789.50 | (2,058.00) | | | | | | (100.00) | 25,631.50 |
| 9/29/2006 | 32,252.17 | (2,058.00) | | | | | | (100.00) | 30,094.17 |
| 10/31/2006 | 25,877.09 | (2,058.00) | | | | | | (100.00) | 23,719.09 |
| 12/1/2006 | 25,632.01 | (2,058.00) | | | | | | (100.00) | 23,474.01 |
| 12/29/2006 | 26,450.00 | (2,058.00) | | | | | | (100.00) | 24,292.00 |
| Totals | $ 311,803.08 | $ (23,944.00) | $ - | $ - | $ - | $ - | $ - | $ (1,200.00) | 286,659.08 |

YTD Physician Earnings-2006

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Greg Alexander

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/31/2005 | 35,045.44 | (2,640.00) | (596.00) | (93.49) | | (43.86) | | (100.00) | 31,572.09 |
| 3/1/2005 | 43,067.18 | (1,966.00) | (596.00) | (93.49) | | (53.45) | | (300.00) | 40,058.24 |
| 3/31/2005 | 30,981.26 | (1,893.00) | (668.00) | (93.49) | | (43.59) | | (200.00) | 28,083.18 |
| 5/2/2005 | 34,568.60 | (1,893.00) | (668.00) | (93.49) | | (15.99) | | - | 31,898.12 |
| 5/4/2005 | 1,140.02 | | | | | | | | 1,140.02 |
| 5/31/2005 | 38,335.75 | (1,893.00) | (668.00) | (93.49) | | (18.01) | | (100.00) | 35,563.25 |
| 6/30/2005 | 40,928.32 | (1,893.00) | (668.00) | (93.49) | | (20.31) | | (100.00) | 38,153.52 |
| 7/29/2005 | 36,600.50 | (1,893.00) | (668.00) | (93.49) | | (17.15) | | (100.00) | 33,828.86 |
| 8/31/2005 | 34,295.87 | (1,893.00) | (668.00) | (93.49) | | (15.36) | | (100.00) | 31,526.02 |
| 9/30/2005 | 33,429.56 | (1,893.00) | (668.00) | (93.49) | | | | (300.00) | 30,475.07 |
| 10/31/2005 | 41,379.38 | (1,893.00) | (668.00) | (93.49) | | (65.79) | | (100.00) | 38,559.10 |
| 11/30/2005 | 33,984.48 | (1,893.00) | (668.00) | (93.49) | | (18.11) | | 100.00 | 31,411.88 |
| 12/30/2005 | 35,000.32 | (1,893.00) | (668.00) | (93.49) | | (8.94) | | (410.00) | 31,926.89 |
| Totals | $ 439,256.68 | $ (23,536.00) | $ (7,872.00) | $ (1,121.88) | $ - | $ (320.56) | $ - | $ (1,710.00) | $ 404,696.24 |

YTD Physician Earnings-2005

AERAS 0842

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Jesse Austin

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/25/2005 | 500.00 | | | | | | | | 500.00 |
| 1/31/2005 | 24,223.83 | (2,738.00) | | | | | | (100.00) | 21,385.83 |
| 2/25/2005 | 500.00 | | | | | | | | 500.00 |
| 3/1/2005 | 25,982.12 | (2,130.00) | | | | | | (100.00) | 23,752.12 |
| 3/25/2005 | 500.00 | | | | | | | | 500.00 |
| 3/31/2005 | 28,538.62 | (1,966.00) | | | | | | (100.00) | 26,472.62 |
| 4/25/2005 | 500.00 | | | | | | | | 500.00 |
| 5/2/2005 | 26,556.17 | (1,966.00) | | | | | | (100.00) | 24,490.17 |
| 5/25/2005 | 500.00 | | | | | | | | 500.00 |
| 5/31/2005 | 27,520.58 | (1,966.00) | | | | | | (100.00) | 25,454.58 |
| 6/24/2005 | 500.00 | | | | | | | | 500.00 |
| 6/30/2005 | 30,378.41 | (1,966.00) | | | | | | (200.00) | 28,212.41 |
| 7/25/2005 | 500.00 | | | | | | | | 500.00 |
| 7/29/2005 | 30,194.34 | (1,966.00) | | | | | | (100.00) | 28,128.34 |
| 8/25/2005 | 500.00 | | | | | | | | 500.00 |
| 8/31/2005 | 29,530.11 | (1,966.00) | | | | | | (100.00) | 27,464.11 |
| 9/23/2005 | 500.00 | | | | | | | | 500.00 |
| 9/30/2005 | 29,176.44 | (1,966.00) | | | | | | (100.00) | 27,110.44 |
| 10/25/2005 | 500.00 | | | | | | | | 500.00 |
| 10/31/2005 | 29,340.76 | (1,966.00) | | | | | | (100.00) | 27,274.76 |
| 11/25/2005 | 500.00 | | | | | | | | 500.00 |
| 11/30/2005 | 28,319.47 | (1,966.00) | | | | | | (100.00) | 26,253.47 |
| 12/23/2005 | 500.00 | | | | | | | | 500.00 |
| 12/30/2005 | 28,715.95 | (1,966.00) | | | | | | (410.00) | 26,339.95 |
| Totals | $ 344,976.80 | $ (24,528.00) | $ - | $ - | $ - | $ - | $ - | $ (1,610.00) | $ 318,838.80 |

YTD Physician Earnings-2005

AERAS 0843

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Victoria Beckman

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/31/2005 | 18,194.72 | | (450.00) | (69.18) | | (5.17) | | | 17,670.37 |
| 2/10/2005 | - | | | | | | 2,000.00 | | 2,000.00 |
| 3/1/2005 | 16,874.33 | | (450.00) | (69.18) | | (3.93) | (2,000.00) | | 14,351.22 |
| 3/31/2005 | 14,923.88 | | (250.00) | (34.59) | | (3.00) | | | 14,636.29 |
| 5/2/2005 | 16,329.17 | | (250.00) | (34.59) | | (10.44) | | | 16,034.14 |
| 5/31/2005 | 15,275.72 | | (250.00) | (34.59) | | (9.77) | | | 14,981.36 |
| 6/30/2005 | 4,762.53 | | (250.00) | (34.59) | | | | (390.00) | 4,087.94 |
| 6/30/2005 | - | | | | | | 3,000.00 | | 3,000.00 |
| 7/29/2005 | 5,445.00 | | (250.00) | (34.59) | | (3.65) | 2,000.00 | | 7,156.76 |
| 8/31/2005 | 20,687.25 | | (250.00) | (34.59) | | (3.00) | (2,500.00) | | 17,899.66 |
| 9/30/2005 | 18,677.79 | | (250.00) | (34.59) | | (4.07) | (2,500.00) | (16.15) | 15,872.98 |
| 10/31/2005 | 17,583.46 | | (250.00) | (34.59) | | (3.67) | | | 17,295.20 |
| 11/30/2005 | 9,032.50 | (2,250.00) | | | | | | (165.00) | 6,332.91 |
| 11/30/2005 | - | | | | | | 3,000.00 | | 3,000.00 |
| 12/30/2005 | 16,087.50 | (2,250.00) | (250.00) | (34.59) | | (23.18) | (1,500.00) | (310.00) | 11,719.73 |
| TOTAL | $ 174,373.85 | $ (4,500.00) | $ (3,400.00) | $ (484.26) | $ - | $ (69.88) | $ 1,500.00 | $ (881.15) | $ 166,538.56 |

YTD Physician Earnings-2005

**AERAS 0844**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. James Bradwell

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 1/31/2005 | 39,512.55 | (1,903.00) | (596.00) | (93.49) | | | | | 36,920.06 |
| 2/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 3/1/2005 | 37,586.79 | (1,822.00) | (596.00) | (93.49) | | (26.74) | | | 35,048.56 |
| 3/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 3/31/2005 | 37,218.00 | (1,670.00) | (668.00) | (93.49) | | (3.40) | | | 34,783.11 |
| 4/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 5/2/2005 | 36,604.36 | (1,670.00) | (668.00) | (93.49) | | (28.96) | | | 34,143.91 |
| 5/4/2005 | 1,497.35 | | | | | | | | 1,497.35 |
| 5/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 5/31/2005 | 38,508.58 | (1,670.00) | (668.00) | (93.49) | | (26.84) | | (100.00) | 35,950.25 |
| 6/24/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 6/30/2005 | 36,628.77 | (1,670.00) | (668.00) | (93.49) | | (5.39) | | (390.00) | 33,801.89 |
| 7/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 7/29/2005 | 37,849.49 | (1,670.00) | (668.00) | (93.49) | | (7.60) | | | 35,410.40 |
| 8/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 8/31/2005 | 40,461.23 | (1,670.00) | (668.00) | (93.49) | | | | | 38,029.74 |
| 9/23/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 9/30/2005 | 37,126.62 | (1,670.00) | (668.00) | (93.49) | | | | (200.00) | 34,495.13 |
| 10/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 10/31/2005 | 40,870.57 | (1,670.00) | (668.00) | (93.49) | | (7.41) | | | 38,431.67 |
| 11/25/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 11/30/2005 | 35,523.61 | (1,670.00) | (668.00) | (93.49) | | (4.32) | | (600.00) | 32,487.80 |
| 12/23/2005 | 3,000.00 | | | | | | | | 3,000.00 |
| 12/30/2005 | 33,881.62 | (1,670.00) | (668.00) | (93.49) | | (20.82) | | (310.00) | 31,119.31 |
| | $ 489,769.54 | $ (20,425.00) | $ (7,872.00) | $ (1,121.88) | $    - | $ (131.48) | $    - | $ (1,600.00) | 458,619.18 |

YTD Physician Earnings-2005

**AERAS 0845**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Wallace Falero

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2005 | 27,525.00 | (2,592.00) | (596.00) | (93.49) | (283.32) | (12.00) | | (261.00) | 23,687.19 |
| 3/1/2005 | 26,775.00 | (2,130.00) | (596.00) | (93.49) | (283.32) | (12.00) | | (261.00) | 23,399.19 |
| 3/31/2005 | 18,780.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (7.53) | | (408.50) | 15,353.16 |
| 5/2/2005 | 27,085.74 | (1,966.00) | (668.00) | (93.49) | (283.32) | (12.00) | | (261.00) | 23,801.93 |
| 5/4/2005 | 19.16 | | | | | | | | 19.16 |
| 5/31/2005 | 28,837.50 | (1,966.00) | (668.00) | (93.49) | (283.32) | (18.00) | | (261.00) | 25,547.69 |
| 6/30/2005 | 26,550.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (3.00) | | (322.67) | 23,212.52 |
| 7/29/2005 | 24,900.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (12.73) | | (583.48) | 21,292.98 |
| 8/31/2005 | 24,330.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | | | (379.88) | 20,939.31 |
| 9/30/2005 | 26,842.50 | (1,966.00) | (668.00) | (93.49) | (283.32) | (38.39) | | (868.49) | 22,924.81 |
| 10/31/2005 | 19,305.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (6.00) | | (315.93) | 15,972.26 |
| 11/30/2005 | 24,705.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (12.00) | | (901.62) | 20,780.57 |
| 12/30/2005 | 11,700.00 | (1,966.00) | (668.00) | (93.49) | (283.32) | (1.77) | | (610.03) | 8,077.39 |
| Totals | $ 287,354.90 | $ (24,382.00) | $ (7,872.00) | $ (1,121.88) | $ (3,399.84) | $ (135.42) | $     - | $ (5,435.60) | 245,008.16 |

YTD Physician Earnings-2005

AERAS 0846

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Joseph Foster

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 10/31/2005 | 8,990.00 | | | | | | | (175.00) | 8,809.68 |
| 11/30/2005 | 23,490.00 | | | | | (5.32) | | (800.00) | 22,690.00 |
| 12/30/2005 | 19,212.50 | | | | | | | | 19,212.50 |
| Totals | $ 51,692.50 | $ - | $ - | $ - | $ - | $ (5.32) | $ - | $ (975.00) | 50,712.18 |

YTD Physician Earnings-2005

**AERAS 0847**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Carlos Gutierrez

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2005 | 32,783.16 | (2,245.30) | (223.00) | | | (43.21) | | (13.79) | 30,257.86 |
| 3/1/2005 | 34,961.22 | (1,965.00) | (223.00) | | | (51.78) | | | 32,721.44 |
| 3/31/2005 | 38,164.91 | (1,965.00) | (250.00) | | | (54.10) | | (5.26) | 35,890.55 |
| 5/2/2005 | 34,473.91 | (1,965.00) | (250.00) | | | (37.05) | | (108.32) | 32,113.54 |
| 5/4/2005 | 1,619.02 | | | | | | | | 1,619.02 |
| 5/31/2005 | 30,211.52 | (1,965.00) | (250.00) | | | (58.78) | | | 27,937.74 |
| 6/30/2005 | 37,278.67 | (1,965.00) | (250.00) | | | (46.69) | | | 35,016.98 |
| 7/29/2005 | 30,671.14 | (1,965.00) | (250.00) | | | (27.36) | | (26.61) | 28,402.17 |
| 8/31/2005 | 30,317.33 | (1,965.00) | (250.00) | | | (19.09) | | | 28,083.24 |
| 9/30/2005 | 33,298.45 | (1,965.00) | (250.00) | | | | | (200.00) | 30,883.45 |
| 10/31/2005 | 39,875.05 | (1,965.00) | (250.00) | | | (33.01) | | (490.00) | 37,137.04 |
| 11/30/2005 | 37,349.80 | (1,965.00) | (250.00) | | | (19.14) | | (600.00) | 34,515.66 |
| 12/30/2005 | 39,784.62 | (1,965.00) | (250.00) | | | (56.46) | | (310.00) | 37,203.16 |
| Totals | $ 420,788.80 | $ (23,860.30) | $ (2,946.00) | $  - | $  - | $ (446.67) | $  - | $ (1,753.98) | $ 391,781.85 |

YTD Physician Earnings-2005

AERAS 0848

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Julian Maha

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2005 | 21,474.03 | (1,240.00) | (223.00) | (34.59) | | | | 35.00 | 20,011.44 |
| 3/1/2005 | 24,341.30 | (1,650.00) | (223.00) | (34.59) | | | | | 22,433.71 |
| 3/31/2005 | 15,704.19 | (1,650.00) | (250.00) | (34.59) | | | | | 13,769.60 |
| 5/2/2005 | 19,855.37 | (1,650.00) | (250.00) | (34.59) | | | | | 17,920.78 |
| 5/31/2005 | 23,419.28 | (1,650.00) | (250.00) | (34.59) | | | | | 21,484.69 |
| 6/30/2005 | 21,554.27 | (1,650.00) | (250.00) | (34.59) | | | | | 19,619.68 |
| 7/29/2005 | 24,931.11 | (1,650.00) | (250.00) | (34.59) | | (21.14) | | (341.64) | 22,633.74 |
| 8/31/2005 | 23,117.19 | (1,650.00) | (250.00) | (34.59) | | | | | 21,182.60 |
| 9/30/2005 | 24,377.22 | (1,650.00) | | | | | | (200.00) | 22,527.22 |
| 10/31/2005 | 23,498.00 | (1,650.00) | | 15.62 | | | | 200.00 | 22,063.62 |
| 11/30/2005 | 24,030.62 | (1,650.00) | | | | | | | 22,380.62 |
| 12/30/2005 | 25,471.61 | (1,650.00) | | | | | | | 23,821.61 |
| Totals | $ 271,774.19 | $ (19,390.00) | $ (1,946.00) | $ (261.10) | $ - | $ (21.14) | $ - | $ (306.64) | $ 249,849.31 |

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. John Moorehouse

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/31/2005 | 24,732.23 | (2,450.00) | (596.00) | (112.12) | | (30.90) | | (109.56) | 21,433.65 |
| 3/1/2005 | 26,584.25 | (1,792.00) | (596.00) | (112.12) | | (42.65) | | (100.00) | 23,941.48 |
| 3/31/2005 | 31,039.15 | (1,664.00) | (668.00) | (112.12) | | (17.68) | | (100.00) | 28,477.35 |
| 5/2/2005 | 29,215.27 | (1,664.00) | (668.00) | (112.12) | | (32.78) | | (100.00) | 26,638.37 |
| 5/4/2005 | 1,130.44 | | | | | | | | 1,130.44 |
| 5/31/2005 | 29,726.38 | (1,664.00) | (668.00) | (112.12) | | (42.13) | | (100.00) | 27,140.13 |
| 6/30/2005 | 34,401.63 | (1,664.00) | (668.00) | (112.12) | | (35.04) | | (162.67) | 31,759.80 |
| 7/29/2005 | 28,172.60 | (1,664.00) | (668.00) | (112.12) | | (50.65) | | (100.00) | 25,577.83 |
| 8/31/2005 | 23,685.26 | (1,664.00) | (668.00) | (112.12) | | (36.08) | | (100.00) | 21,105.06 |
| 9/30/2005 | 31,544.20 | (1,664.00) | (668.00) | (112.12) | | | | (155.00) | 28,945.08 |
| 10/31/2005 | 21,223.37 | (1,664.00) | (668.00) | (112.12) | | (91.86) | | (100.00) | 18,587.39 |
| 11/30/2005 | 20,549.57 | (1,664.00) | (668.00) | (112.12) | | (35.20) | | (100.00) | 17,970.25 |
| 12/30/2005 | 20,364.76 | (1,664.00) | (668.00) | (112.12) | | (25.14) | | (510.00) | 17,385.50 |
| Totals | $ 322,869.11 | $ (20,882.00) | $ (7,872.00) | $ (1,345.44) | $ - | $ (440.11) | $ - | $ (1,737.23) | 290,592.33 |

YTD Physician Earnings-2005

**AERAS 0850**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL  36106

YTD Earnings for Year Ending 2005
Dr. Julio Rios

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 500.00 | | | | | | | | 500.00 |
| 1/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 1/31/2005 | 44,715.16 | (2,738.00) | (596.00) | (93.49) | | (75.62) | | (100.00) | 41,112.05 |
| 2/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 3/1/2005 | 39,442.40 | (2,240.00) | (596.00) | (93.49) | | (81.81) | | (100.00) | 36,331.10 |
| 3/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 3/31/2005 | 48,423.71 | (2,068.00) | (668.00) | (93.49) | | (58.37) | | (407.00) | 45,128.85 |
| 4/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 5/2/2005 | 40,026.13 | (2,068.00) | (668.00) | (93.49) | | (84.65) | | (604.50) | 36,507.49 |
| 5/4/2005 | 1,820.20 | | | | | | | | 1,820.20 |
| 5/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 5/31/2005 | 42,205.94 | (2,068.00) | (668.00) | (93.49) | | (65.63) | | (100.00) | 39,210.82 |
| 6/24/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 6/30/2005 | 44,227.79 | (2,068.00) | (668.00) | (93.49) | | (63.60) | | (440.00) | 40,894.70 |
| 7/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 7/29/2005 | 46,311.79 | (2,068.00) | (668.00) | (93.49) | | (49.95) | | (100.00) | 43,332.35 |
| 8/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 8/31/2005 | 54,783.26 | (2,068.00) | (668.00) | (93.49) | | (108.34) | | | 51,845.43 |
| 9/23/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 9/30/2005 | 43,312.06 | (2,068.00) | (668.00) | (93.49) | | | | (255.00) | 40,227.57 |
| 10/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 10/31/2005 | 43,636.96 | (2,068.00) | (668.00) | (93.49) | | (141.85) | | | 40,665.62 |
| 11/25/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 11/30/2005 | 44,478.41 | (2,068.00) | (668.00) | (93.49) | | (62.06) | | (600.00) | 40,986.86 |
| 12/23/2005 | 7,000.00 | | | | | | | | 7,000.00 |
| 12/30/2005 | 58,458.41 | (2,068.00) | (668.00) | (93.49) | | (56.35) | | (410.00) | 55,162.57 |
| Totals | $ 636,342.22 | $ (25,658.00) | $ (7,872.00) | $ (1,121.88) | $    - | $ (848.23) | $    - | $ (3,116.50) | 597,725.61 |

YTD Physician Earnings-2005

AERAS 0851

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL  36106

YTD Earnings for Year Ending 2005
Dr. Ronald Shaw

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/3/2005 | 30,712.55 | (2,738.00) | (823.00) | (93.49) | | (42.07) | | (100.00) | 26,915.99 |
| 1/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 1/31/2005 | 32,396.76 | (2,738.00) | (596.00) | (93.49) | | (17.63) | | (1,282.30) | 27,669.34 |
| 2/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 3/1/2005 | 33,955.23 | (1,966.00) | (596.00) | (93.49) | | (71.98) | | (166.43) | 31,061.33 |
| 3/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 3/31/2005 | 28,925.21 | (1,825.00) | (668.00) | (93.49) | | (35.22) | | (119.98) | 26,183.52 |
| 4/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 5/2/2005 | 29,996.28 | (1,825.00) | (668.00) | (93.49) | | (29.89) | | (100.00) | 27,279.90 |
| 5/4/2005 | 1,235.82 | | | | | | | | 1,235.82 |
| 5/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 5/31/2005 | 28,175.06 | (1,825.00) | (668.00) | (93.49) | | (45.18) | | (200.00) | 25,343.39 |
| 6/24/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 6/30/2005 | 32,541.85 | (1,825.00) | (668.00) | (93.49) | | (57.89) | | (163.20) | 29,734.27 |
| 7/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 7/29/2005 | 32,870.14 | (1,825.00) | (668.00) | (93.49) | | (39.51) | | (144.58) | 30,099.56 |
| 8/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 8/31/2005 | 38,014.92 | (1,825.00) | (668.00) | (93.49) | | (54.52) | | (156.40) | 35,217.51 |
| 9/23/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 9/30/2005 | 30,746.81 | (1,825.00) | (668.00) | (93.49) | | (6.76) | | (300.00) | 27,853.56 |
| 10/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 10/31/2005 | 30,079.57 | (1,825.00) | (668.00) | (93.49) | | (65.94) | | (727.00) | 26,700.14 |
| 11/25/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| 11/30/2005 | 26,183.12 | (1,825.00) | (668.00) | (93.49) | | (56.11) | | (700.00) | 22,840.52 |
| 12/23/2005 | 1,000.00 | | | | | | | | 1,000.00 |
| Totals | $ 387,833.32 | $ (23,867.00) | $ (8,027.00) | $ (1,121.88) | $  - | $ (522.70) | $  - | $ (4,159.89) | $ 350,134.85 |

YTD Physician Earnings-2005

**AERAS 0852**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. George "Buddy" Smith

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/ Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 2/28/2005 | 600.00 | | | | | | | | 600.00 |
| 3/1/2005 | 12,710.00 | | | | | | | | 12,710.00 |
| 3/31/2005 | 6,505.00 | | | | | | | | 6,505.00 |
| 5/2/2005 | 10,800.00 | | | | | | | | 10,800.00 |
| 5/31/2005 | 8,845.00 | | | | | | | | 8,845.00 |
| 7/25/2005 | 13,140.00 | | | | | | | | 13,140.00 |
| 8/31/2005 | 20,275.00 | | | | | | | | 20,275.00 |
| 9/30/2005 | 4,465.00 | | | | | | | (200.00) | 4,265.00 |
| 10/31/2005 | 15,135.00 | | | | | | | | 15,135.00 |
| 11/30/2005 | 10,800.00 | | | | | | | (600.00) | 10,200.00 |
| 12/30/2005 | 16,160.00 | | | | | (2.28) | | | 16,157.72 |
| Totals | $ 119,435.00 | $    - | $    - | $    - | $    - | $ (2.28) | $    - | $ (800.00) | $ 118,632.72 |

YTD Physician Earnings-2005

**AERAS 0853**

**AERAS, P.C.**
4160 Carmichael Road
Montgomery, AL 36106

YTD Earnings for Year Ending 2005
Dr. Joel Sullivan

| Check Date | Form 1099 Amount | Malpractice Insurance | Health Insurance | Dental Insurance | Disability Insurance | Cafeteria Charges | Advance | App. Fees/Other | Net Check |
|---|---|---|---|---|---|---|---|---|---|
| 1/31/2005 | 21,274.65 | (2,475.00) | | | | | | (100.00) | 18,699.65 |
| 3/1/2005 | 22,549.34 | (1,811.00) | | | | | | (100.00) | 20,638.34 |
| 3/31/2005 | 22,957.26 | (1,682.00) | | | | | | (100.00) | 21,175.26 |
| 5/2/2005 | 25,985.67 | (1,682.00) | | | | | | (100.00) | 24,203.67 |
| 5/31/2005 | 21,693.21 | (1,682.00) | | | | | | (100.00) | 19,911.21 |
| 6/30/2005 | 27,856.77 | (1,682.00) | | | | | | (100.00) | 26,074.77 |
| 7/29/2005 | 23,041.20 | (1,682.00) | | | | | | (100.00) | 21,259.20 |
| 8/31/2005 | 27,493.94 | (1,682.00) | | | | | | (100.00) | 25,711.94 |
| 9/30/2005 | 23,062.90 | (1,682.00) | | | | | | (100.00) | 21,280.90 |
| 10/31/2005 | 26,270.08 | (1,682.00) | | | | | | (100.00) | 24,488.08 |
| 11/30/2005 | 26,773.20 | (1,682.00) | | | | | | (100.00) | 24,991.20 |
| 12/30/2005 | 26,945.35 | (1,682.00) | | | | | | (200.00) | 25,063.35 |
| Totals | $ 295,903.57 | $ (21,106.00) | $ - | $ - | $ - | $ - | $ - | $ (1,300.00) | $ 273,497.57 |

YTD Physician Earnings-2005

AERAS 0854

2nd Qtr 2005
Mailed 7/14/05

# Form **941 for 2005:** Employer's Quarterly Federal Tax Return

(Rev. January 2005)    Department of the Treasury — Internal Revenue Service

9601

OMB No. 1545-0029

```
IO  63-0957661

***********AUTO** 3-DIGIT 361
JUN2005    S29    C
ALABAMA EMERGENCY ROOM
  ADMINISTRATIVE SERVICES PC          0049
4160 CARMICHAEL RD
MONTGOMERY AL  36106-3638
```

**Report for this Quarter ...**
(Check one.)

- [ ] 1: January, February, March
- [X] 2: April, May, June
- [ ] 3: July, August, September
- [ ] 4: October, November, December

Read the separate instructions before you fill out this form. Please type or print within the boxes.

## Part 1: Answer these questions for this quarter.

**1** Number of employees who received wages, tips, or other compensation for the pay period including: *Mar. 12* (Quarter 1), *June 12* (Quarter 2), *Sept. 12* (Quarter 3), *Dec. 12* (Quarter 4) — **1** | 20

**2** Wages, tips, and other compensation — **2** | 340,194 . 79

**3** Total income tax withheld from wages, tips, and other compensation — **3** | 62,490 . 20

**4** If no wages, tips, and other compensation are subject to social security or Medicare tax — [ ] Check and go to line 6.

**5** Taxable social security and Medicare wages and tips:

|  | Column 1 | | Column 2 |
|---|---|---|---|
| 5a Taxable social security wages | 340,194.79 | ×.124 = | 42,184.15 |
| 5b Taxable social security tips | 0 .00 | ×.124 = | 0 .00 |
| 5c Taxable Medicare wages & tips | 340,194.79 | ×.029 = | 9,865.65 |

**5d** Total social security and Medicare taxes (*Column 2*, lines 5a + 5b + 5c = line 5d) — **5d** | 44,609.80

**6** Total taxes before adjustments (lines 3 + 5d = line 6) — **6** | 107,100 .00

**7** Tax adjustments (If your answer is a negative number, write it in brackets.):

**7a** Current quarter's fractions of cents | 0 .18

**7b** Current quarter's sick pay | 0 .00

**7c** Current quarter's adjustments for tips and group-term life insurance | 0 .00

**7d** Current year's income tax withholding (Attach Form 941c) | 0 .00

**7e** Prior quarters' social security and Medicare taxes (Attach Form 941c) | 0 .00

**7f** Special additions to federal income tax (reserved use) | 0 .00

**7g** Special additions to social security and Medicare (reserved use) | 0 .00

**AERAS 0346**

**7h** Total adjustments (Combine all amounts: lines 7a through 7g.) — **7h** | 0 .18

**8** Total taxes after adjustments (Combine lines 6 and 7h.) — **8** | 107,100 .18

**9** Advance earned income credit (EIC) payments made to employees — **9** | 0 .00

**10** Total taxes after adjustment for advance EIC (lines 8 – 9 = line 10) — **10** | 107,100 .18

**11** Total deposits for this quarter, including overpayment applied from a prior quarter — **11** | 107,100 .18

**12** Balance due (lines 10 – 11 = line 12) Make checks payable to the *United States Treasury*. — **12** | 0 .00

**13** Overpayment (if line 11 is more than line 10, write the difference here.) | 0 .00 — [ ] Apply to next return. [ ] Send a refund.

Next →

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    Cat. No. 17001Z    **Form 941** (Rev. 1-2005)

P1-2005-070809-110

9602

| Name *(not your trade name)* | Employer identification number |
|---|---|
| | |

## Part 2: Tell us about your deposit schedule for this quarter.

If you are unsure about whether you are a monthly schedule depositor or a semiweekly schedule depositor, see *Pub. 15 (Circular E), section 11.*

14 `A` `L`   Write the state abbreviation for the state where you made your deposits OR write "MU" if you made your deposits in *multiple* states.

15 Check one: ☐ Line 10 is less than $2,500. Go to Part 3.

☐ You were a monthly schedule depositor for the entire quarter. Fill out your tax liability for each month. Then go to Part 3.

Tax liability: Month 1 [_____]

Month 2 [_____]

Month 3 [_____]

Total [_____]   Total must equal line 10.

☒ You were a semiweekly schedule depositor for any part of this quarter. Fill out Schedule B (Form 941), *Report of Tax Liability for Semiweekly Schedule Depositors, and attach it to this form.*

## Part 3: Tell us about your business. If a question does NOT apply to your business, leave it blank.

16 If your business has closed and you do not have to file returns in the future . . . . . . . . . ☐ Check here, and

enter the final date you paid wages [____/____/____]

17 If you are a seasonal employer and you do not have to file a return for every quarter of the year . . ☐ Check here.

## Part 4: May we contact your third-party designee?

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

☐ Yes. Designee's name [_____]

Phone ( ) – 

Personal Identification Number (PIN) ☐ ☐ ☐ ☐ ☐

☐ No.

## Part 5: Sign here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

**X**

Sign your name here *Ashley B Rogers*

Print name and title *Ashley B. Rogers*

Date 7/14/05   Phone (334) 272-1050

## Part 6: For paid preparers only *(optional)*

Preparer's signature [_____]

Firm's name [_____]

Address [_____]   EIN [_____]

   ZIP code [_____]

Date [____/____]   Phone ( ) –    SSN/PTIN [_____]

☐ Check if you are self-employed.

Page 2

Form **941** (Rev. 1-2005)

AERAS 0347

# Schedule B (Form 941):
**Report of Tax Liability for Semiweekly Schedule Depositors**
(Rev. January 2005)

9603

Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

Employer identification number  6 3 – 0 9 5 7 6 6 1

Name *(not your trade name)* Alabama Emergency Room Admin. Services

**Report for this Quarter ...**
(Check one.)

☐ 1: January, February, March
☒ 2: April, May, June
☐ 3: July, August, September
☐ 4: October, November, December

Use this schedule to show your tax liability for the quarter; DO NOT use it to show your deposits. You must fill out this form and attach it to Form 941 (or Form 941-SS) if you are a semiweekly schedule depositor or became one because your accumulated tax liability on any day was $100,000 or more. Write your daily tax liability on the numbered space that corresponds to the date wages were paid. See Section 11 in *Pub. 15 (Circular E), Employer's Tax Guide,* for details.

**Month 1**

| | | | | | | | | Tax liability for Month 1 |
|---|---|---|---|---|---|---|---|---|
| 1 | | 9 | | 17 | | 25 | | |
| 2 | | 10 | | 18 | | 26 | | $ 34,751 .06 |
| 3 | | 11 | | 19 | | 27 | | |
| 4 | | 12 | | 20 | | 28 | | |
| 5 | | 13 | | 21 | | 29 | 10,912 .36 | |
| 6 | | 14 | | 22 | 23,838 .70 | 30 | | |
| 7 | | 15 | | 23 | | 31 | | |
| 8 | | 16 | | 24 | | | | |

**Month 2**

| | | | | | | | | Tax liability for Month 2 |
|---|---|---|---|---|---|---|---|---|
| 1 | | 9 | | 17 | | 25 | | |
| 2 | | 10 | | 18 | | 26 | | $ 35,679 .21 |
| 3 | | 11 | | 19 | | 27 | | |
| 4 | | 12 | | 20 | | 28 | | |
| 5 | | 13 | 24,810 .92 | 21 | | 29 | | |
| 6 | | 14 | | 22 | | 30 | | |
| 7 | | 15 | | 23 | | 31 | 10,868 .29 | |
| 8 | | 16 | | 24 | | | | |

**Month 3**

| | | | | | | | | Tax liability for Month 3 |
|---|---|---|---|---|---|---|---|---|
| 1 | | 9 | | 17 | | 25 | | |
| 2 | | 10 | | 18 | | 26 | | $ 36,669 .91 |
| 3 | | 11 | | 19 | | 27 | | |
| 4 | | 12 | | 20 | | 28 | | |
| 5 | | 13 | | 21 | | 29 | | |
| 6 | | 14 | | 22 | | 30 | 11,496 .75 | |
| 7 | | 15 | 25,173 .16 | 23 | | 31 | | **AERAS 0348** |
| 8 | | 16 | | 24 | | | | |

Fill in your total liability for the quarter (Month 1 + Month 2 + Month 3) = Total tax liability for the quarter ▶
**Total must equal line 10 on Form 941** (or line 8 on Form 941-SS).

**Total liability for the quarter**
$ 107,100 .18

For Paperwork Reduction Act Notice, see separate instructions.

Cat. No. 11967Q

Schedule B (Form 941) Rev. 1-2005

AERAS, P.C. 2ND QTR 2005
Quarterly 941 Worksheet

Employer Identification Number: 63-0957661        Quarter: 2 Ended 06/30/05

Name:           AERAS, P.C. 2ND QTR 2005

Trade Name:

Address:        4160 CARMICHAEL ROAD

                MONTGOMERY, ALABAMA  36106

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

---

Part 1:

1.  Number of employees who received wages, tips, or other compensation for the pay period

    including: Mar 12 (Quarter 1), June 12 (Quarter 2), Sept 12 (Quarter 3), Dec 12 (Quarter 4). . . . . . . . . . . . . .[      ]

2.  Wages, tips, and other compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    340,194.79

3.  Total income tax withheld from wages, tips, and other compensation . . . . . . . . . . . . . .     62,490.20

4.  Check box if no wages, tips, and other compensation are subject to social security or Medicare tax . . [ ]

5.  Taxable social security and Medicare wages and tips:

    5a. Taxable social security wages . . . . . . . . . . . . . . . .    280,194.79  X   .124  =    34,744.15

    5b. Taxable social security tips. . . . . . . . . . . . . . . . .           .00  X   .124  =          .00

    5c. Taxable Medicare wages and tips . . . . . . . . . . . . . . .    340,194.79  X   .029  =     9,865.65

    5d. Total social security and Medicare taxes. . . . . . . . . . . . . . . . . . . . . . . . .     44,609.80

6.  Total taxes before adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    107,100.00

7.  Tax adjustments

    7a. Current quarter's fractions of cents. . . . . . . . . . . . . . . . . . . . . . . . .            .18

    7b. Current quarter's sick pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          .00

    7c. Current quarter's adjustments for tips and group-term life insurance. . . . . . . . . . .       .00

    7d. Current year's income tax withholding . . . . . . . . . . . . . . . . . . . . . . . . . .       .00

    7e. Prior quarters' social security and Medicare taxes. . . . . . . . . . . . . . . . . . . .       .00

    7f. Special additions to federal income tax . . . . . . . . . . . . . . . . . . . . . . . . .       .00

    7g. Special additions to social security and Medicare . . . . . . . . . . . . . . . . . . . .       .00

    7h. Total adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

8.  Total taxes after adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    107,100.18

9.  Advance earned income credit (EIC) payments made to employees . . . . . . . . . . . . . . . . . . . .    .00

10. Total taxes after adjustment for advance EIC. . . . . . . . . . . . . . . . . . . . . . . . .    107,100.18

11. Total deposits for this quarter, including overpayment applied from a prior quarter. . . . . . . . . . .    107,100.18

12. Balance due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    .00

13. Overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    .00

                                        Check one [ ] Apply to next return

                                                  [ ] Send a refund

    Part 2:

14. The state where you made your deposits (or MU for deposits in multiple states). . . . . . . . . . . . . . . . . . . . .

15. Deposit schedule

    15a. Check here if Line 10 is less than $2500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

    15b. Check here if Monthly Depositor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

                    Tax Liability: Month 1

                                   Month 2

                                   Month 3

                                   Total

    15c. Check here if semiweekly depositor for any part of this quarter. . . . . . . . . . . . . . . . . . . . . . [ ]

        (See Schedule B for Detail)

**AERAS 0349**

Schedule B Data (Quarterly 941 Worksheet)

• Employer Identification Number: 63-0957661                           Quarter: 2 Ended 06/30/05

Name:        AERAS, P.C. 2ND QTR 2005

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

This schedule is used to show your tax liability for the quarter.  The amounts below are in numbered spaces that
correspond to the date the wages were paid.

**MONTH 1**                                                                Tax liability for Month 1

| 1. | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
| 2. | .00 | 10. | .00 | 18. | .00 | 26. | .00 | 34,751.06 |
| 3. | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| 4. | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| 5. | .00 | 13. | .00 | 21. | .00 | 29. | 10,912.36 | |
| 6. | .00 | 14. | .00 | 22. | .00 | 30. | .00 | |
| 7. | .00 | 15. | 23,838.70 | 23. | .00 | 31. | .00 | |
| 8. | .00 | 16. | .00 | 24. | .00 | | | |

**MONTH 2**                                                                Tax liability for Month 2

| 1. | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
| 2. | .00 | 10. | .00 | 18. | .00 | 26. | .00 | 35,679.21 |
| 3. | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| 4. | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| 5. | .00 | 13. | 24,810.92 | 21. | .00 | 29. | .00 | |
| 6. | .00 | 14. | .00 | 22. | .00 | 30. | .00 | |
| 7. | .00 | 15. | .00 | 23. | .00 | 31. | 10,868.29 | |
| 8. | .00 | 16. | .00 | 24. | .00 | | | |

**MONTH 3**                                                                Tax liability for Month 3

| 1. | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
| 2. | .00 | 10. | .00 | 18. | .00 | 26. | .00 | 36,669.91 |
| 3. | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| 4. | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| 5. | .00 | 13. | .00 | 21. | .00 | 29. | .00 | |
| 6. | .00 | 14. | .00 | 22. | .00 | 30. | 11,496.75 | |
| 7. | .00 | 15. | 25,173.16 | 23. | .00 | 31. | .00 | |
| 8. | .00 | 16. | .00 | 24. | .00 | | | |

Total Tax liability for the quarter
107,100.18

**AERAS 0350**

Mailed 10/18/05

9601

Form **941 for 2005:** **Employer's Quarterly Federal Tax Return**

(Rev. January 2005)
Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

IO 63-0957661

8383 ****AUTO**5-DIGIT 36106
SEP2005    29    C
ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES PC
4160 CARMICHAEL RD
MONTGOMERY AL 36106-3638

**Report for this Quarter ...**
(Check one.)

- [ ] **1:** January, February, March
- [ ] **2:** April, May, June
- [x] **3:** July, August, September
- [ ] **4:** October, November, December

Read the separate instructions before you fill out this form. Please type or print within the boxes.

**Part 1: Answer these questions for this quarter.**

| | | |
|---|---|---|
| 1 **Number of employees who received wages, tips, or other compensation for the pay period including: Mar. 12 (Quarter 1), June 12 (Quarter 2), Sept. 12 (Quarter 3), Dec. 12 (Quarter 4)** | 1 | 24 |
| 2 **Wages, tips, and other compensation** . . . . . . . . . | 2 | $ 362,034.67 |
| 3 **Total income tax withheld from wages, tips, and other compensation** . . . . . . | 3 | $ 65,621.63 |

4 If no wages, tips, and other compensation are subject to social security or Medicare tax . . [ ] Check and go to line 6.

5 Taxable social security and Medicare wages and tips:

| | Column 1 | | | Column 2 |
|---|---|---|---|---|
| 5a Taxable social security wages | $ 262,034.67 | ×.124 = | | $ 32,492.30 |
| 5b Taxable social security tips | 0.00 | ×.124 = | | 0.00 |
| 5c Taxable Medicare wages & tips | $ 362,034.67 | ×.029 = | | $ 4,999.01 |

| | | |
|---|---|---|
| 5d Total social security and Medicare taxes (Column 2, lines 5a + 5b + 5c = line 5d) | 5d | $ 42,991.31 |
| 6 Total taxes before adjustments (lines 3 + 5d = line 6) | 6 | $ 108,612.94 |

7 Tax adjustments (If your answer is a negative number, write it in brackets.):

| | | |
|---|---|---|
| 7a Current quarter's fractions of cents | | $ .15 |
| 7b Current quarter's sick pay | | 0.00 |
| 7c Current quarter's adjustments for tips and group-term life insurance | | 0.00 |
| 7d Current year's income tax withholding (Attach Form 941c) | | 0.00 |
| 7e Prior quarters' social security and Medicare taxes (Attach Form 941c) | | 0.00 |
| 7f Special additions to federal income tax (reserved use) . . . . | | 0.00 |
| 7g Special additions to social security and Medicare (reserved use) | | 0.00 |

AERAS 0351

| | | |
|---|---|---|
| 7h **Total adjustments** (Combine all amounts: lines 7a through 7g.) . . . . | 7h | 0.15 |
| 8 **Total taxes after adjustments** (Combine lines 6 and 7h.) . . . . | 8 | $ 108,613.09 |
| 9 **Advance earned income credit (EIC) payments made to employees** . . . . | 9 | 0.00 |
| 10 **Total taxes after adjustment for advance EIC** (lines 8 – 9 = line 10) . . . | 10 | $ 108,613.09 |
| 11 **Total deposits for this quarter, including overpayment applied from a prior quarter** . . | 11 | $ 108,613.09 |
| 12 **Balance due** (lines 10 – 11 = line 12) Make checks payable to the *United States Treasury* . | 12 | 0.00 |
| 13 **Overpayment** (If line 11 is more than line 10, write the difference here.) | | |

Check one [ ] Apply to next return.
[ ] Send a refund.

Next ➡

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.

Cat. No. 17001Z    Form **941** (Rev. 1-2005)

9602

Employer identification number

## Part 2: Tell us about your deposit schedule for this quarter.

If you are unsure about whether you are a monthly schedule depositor or a semiweekly schedule depositor, see *Pub. 15 (Circular E)*, section 11.

14  | A | L |  Write the state abbreviation for the state where you made your deposits OR write "MU" if you made your deposits in **multiple** states.

15  Check one: ☐  Line 10 is less than $2,500. Go to Part 3.

☐  You were a monthly schedule depositor for the entire quarter. Fill out your tax liability for each month. Then go to Part 3.

Tax liability:  Month 1  |_____.____|

Month 2  |_____.____|

Month 3  |_____.____|

Total  |_____.____|  Total must equal line 10.

☒  You were a semiweekly schedule depositor for any part of this quarter. Fill out *Schedule B (Form 941), Report of Tax Liability for Semiweekly Schedule Depositors*, and attach it to this form.

## Part 3: Tell us about your business. If a question does NOT apply to your business, leave it blank.

16  If your business has closed and you do not have to file returns in the future . . . . . . . . . ☐ Check here, and

enter the final date you paid wages  |____/____/____|

17  If you are a seasonal employer and you do not have to file a return for every quarter of the year  . ☐ Check here.

## Part 4: May we contact your third-party designee?

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

☐ Yes.  Designee's name  |_____|

Phone  (      )      —   Personal Identification Number (PIN) |__|__|__|__|__|

☐ No.

## Part 5: Sign here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

**X**  Sign your name here  *Ashley P. Rogers*

Print name and title  Ashley P. Rogers,  Controller

Date  10 / 18 / 05   Phone  ( 334 ) 272 - 1050

## Part 6: For paid preparers only (optional)

Preparer's signature  |_____|

Firm's name  |_____|

Address  |_____|   EIN |_____|

|_____|   ZIP code |_____|

Date  |____/____/____|  Phone  (      )      —   SSN/PTIN |_____|

☐ Check if you are self-employed.

AERAS 0352

Form **941** (Rev. 1-2005)

# Schedule B (Form 941):

**Report of Tax Liability for Semiweekly Schedule Depositors**

(Rev. January 2005)    Department of the Treasury — Internal Revenue Service

9603

OMB No. 1545-0029

Employer identification number  6 3 – 0 9 5 7 6 6 1

Name (not your trade name)  Alabama Emergency Room Administratives Services, PC.

**Report for this Quarter ...**
(Check one.)

- [ ] 1: January, February, March
- [ ] 2: April, May, June
- [x] 3: July, August, September
- [ ] 4: October, November, December

Use this schedule to show your tax liability for the quarter; DO NOT use it to show your deposits. You must fill out this form and attach it to Form 941 (or Form 941-SS) if you are a semiweekly schedule depositor or became one because your accumulated tax liability on any day was $100,000 or more. Write your daily tax liability on the numbered space that corresponds to the date wages were paid. See Section 11 in *Pub. 15 (Circular E), Employer's Tax Guide,* for details.



**Month 1**

| | | | Tax liability for Month 1 |
|---|---|---|---|
| 15: $24,657.64 | 22: $329.80 | 29: $10,656.17 | $35,643.61 |

**Month 2**

| | | | Tax liability for Month 2 |
|---|---|---|---|
| 15: $24,454.53 | 31: $12,461.68 | | $36,916.21 |

**Month 3**

| | | | Tax liability for Month 3 |
|---|---|---|---|
| 15: $24,922.04 | 22: $639.85 | 30: $10,491.38 | $36,053.27 |

**AERAS 0353**

Fill in your total liability for the quarter (Month 1 + Month 2 + Month 3) = Total tax liability for the quarter
Total must equal line 10 on Form 941 (or line 8 on Form 941-SS). ▶

**Total liability for the quarter**

$108,613.09

For Paperwork Reduction Act Notice, see separate instructions.    Cat. No. 11967Q    Schedule B (Form 941) Rev. 1-2005

AERAS, P.C. Case 2:07-cv-00221
•Quarterly 941 Worksheet

Employer Identification Number: 63-0957661              Quarter: 3 Ended 09/30/05

Name:         AERAS, P.C. THIRD QUARTER 2005

Trade Name:

Address:      4160 CARMICHAEL ROAD
              SUITE 104
              MONTGOMERY, AL  36106


Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

Part 1:

1.  Number of employees who received wages, tips, or other compensation for the pay period
    including: Mar 12 (Quarter 1), June 12 (Quarter 2), Sept 12 (Quarter 3), Dec 12 (Quarter 4) . . . . . . . . . . . . . . . [    ]

2.  Wages, tips, and other compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      362,034.67

3.  Total income tax withheld from wages, tips, and other compensation . . . . . . . . .       65,621.63

4.  Check box if no wages, tips, and other compensation are subject to social security or Medicare tax . . [ ]

5.  Taxable social security and Medicare wages and tips:

    5a. Taxable social security wages . . . . . . . . . . . . . . . .    262,034.67 X  .124 =        32,492.30

    5b. Taxable social security tips . . . . . . . . . . . . . . . . .          .00 X  .124 =             .00

    5c. Taxable Medicare wages and tips . . . . . . . . . . . . . .    362,034.67 X  .029 =        10,499.01

    5d. Total social security and Medicare taxes . . . . . . . . . . . . . . . . . . . . . . . . .       42,991.31

6.  Total taxes before adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      108,612.94

7.  Tax adjustments

    7a. Current quarter's fractions of cents . . . . . . . . . . . . . . . . . . . . . . . . . . .             .15

    7b. Current quarter's sick pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .             .00

    7c. Current quarter's adjustments for tips and group-term life insurance . . . . . . . . . . .             .00

    7d. Current year's income tax withholding . . . . . . . . . . . . . . . . . . . . . . . . . .             .00

    7e. Prior quarters' social security and Medicare taxes . . . . . . . . . . . . . . . . . . . .             .00

    7f. Special additions to federal income tax . . . . . . . . . . . . . . . . . . . . . . . . .             .00

    7g. Special additions to social security and Medicare . . . . . . . . . . . . . . . . . . . .             .00

    7h. Total adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .             .15

8.  Total taxes after adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      108,613.09

9.  Advance earned income credit (EIC) payments made to employees . . . . . . . . . . . . . .             .00

10. Total taxes after adjustment for advance EIC . . . . . . . . . . . . . . . . . . . . . . . .      108,613.09

11. Total deposits for this quarter, including overpayment applied from a prior quarter . . . . . . . . . . . . . .      108,613.09

12. Balance due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .             .00

13. Overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     .00

                                                      Check one [ ] Apply to next return

                                                                [ ] Send a refund

Part 2:

14. The state where you made your deposits (or MU for deposits in multiple states) . . . . . . . . . . . . . . . . . .

15. Deposit schedule

    15a. Check here if Line 10 is less than $2500 . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

    15b. Check here if Monthly Depositor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

                                       Tax Liability: Month 1

                                                      Month 2

                                                      Month 3

                                                      Total

    15c. Check here if semiweekly depositor for any part of this quarter . . . . . . . . . . . . . . . . . . . . . [ ]

         (See Schedule B for Detail)


**AERAS 0354**

Schedule B (Form 941): Report of Tax Liability for Semiweekly Schedule Depositors

Employer Identification Number: 63-0957661                                    Quarter: 3 Ended 09/30/05

Name:        AERAS, P.C. THIRD QUARTER 2005

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

This schedule is used to show your tax liability for the quarter.  The amounts below are in numbered spaces that correspond to the date the wages were paid.

MONTH 1                                                                       Tax liability for Month 1

| 1. | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
|----|-----|----|-----|-----|-----|-----|-----|--|
| | | | | | | | | 35,643.61 |
| 2. | .00 | 10. | .00 | 18. | .00 | 26. | .00 | |
| 3. | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| 4. | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| 5. | .00 | 13. | .00 | 21. | .00 | 29. | 10,656.17 | |
| 6. | .00 | 14. | .00 | 22. | 329.80 | 30. | .00 | |
| 7. | .00 | 15. | 24,657.64 | 23. | .00 | 31. | .00 | |
| 8. | .00 | 16. | .00 | 24. | .00 | | | |

MONTH 2                                                                       Tax liability for Month 2

| . | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
|----|-----|----|-----|-----|-----|-----|-----|--|
| | | | | | | | | 36,916.21 |
| . | .00 | 10. | .00 | 18. | .00 | 26. | .00 | |
| . | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| . | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| . | .00 | 13. | .00 | 21. | .00 | 29. | .00 | |
| . | .00 | 14. | .00 | 22. | .00 | 30. | .00 | |
| . | .00 | 15. | 24,454.53 | 23. | .00 | 31. | 12,461.68 | |
| . | .00 | 16. | .00 | 24. | .00 | | | |

MONTH 3                                                                       Tax liability for Month 3

| . | .00 | 9. | .00 | 17. | .00 | 25. | .00 | |
|----|-----|----|-----|-----|-----|-----|-----|--|
| | | | | | | | | 36,053.27 |
| . | .00 | 10. | .00 | 18. | .00 | 26. | .00 | |
| . | .00 | 11. | .00 | 19. | .00 | 27. | .00 | |
| . | .00 | 12. | .00 | 20. | .00 | 28. | .00 | |
| . | .00 | 13. | .00 | 21. | .00 | 29. | .00 | |
| . | .00 | 14. | .00 | 22. | .00 | 30. | 10,491.38 | |
| . | .00 | 15. | 24,922.04 | 23. | 639.85 | 31. | .00 | |
| . | .00 | 16. | .00 | 24. | .00 | | | |

Total Tax liability for the quarter

108,613.09

AERAS 0355

Form **941 for 2005:** Employer's Quarterly Federal Tax Return

9601

(Rev. January 2005)

Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

IO 63-0957661

26653******AUTO**5-DIGIT 36106
DEC2005      S29      C
ALABAMA EMERGENCY ROOM
   ADMINISTRATIVE SERVICES PC
4160 CARMICHAEL RD
MONTGOMERY, AL 36106-3638                 26653

**Report for this Quarter ...**
(Check one.)

☐ 1: January, February, March

☐ 2: April, May, June

☐ 3: July, August, September

☒ 4: October, November, December

Read the separate instructions before you fill out this form. Please type or print within the boxes.

**Part 1: Answer these questions for this quarter.**

1 Number of employees who received wages, tips, or other compensation for the pay period
  including: *Mar. 12* (Quarter 1), *June 12* (Quarter 2), *Sept. 12* (Quarter 3), *Dec. 12* (Quarter 4)    1    21

2 Wages, tips, and other compensation . . . . . . . . . .    2    802751.47

3 Total income tax withheld from wages, tips, and other compensation . . . . . . .    3    308060.54

4 If no wages, tips, and other compensation are subject to social security or Medicare tax . . ☐ Check and go to line 6.

5 Taxable social security and Medicare wages and tips:

| | Column 1 | | Column 2 |
|---|---|---|---|
| 5a Taxable social security wages | 238838 . 97 | × .124 = | 29616 . 03 |
| 5b Taxable social security tips | . | × .124 = | |
| 5c Taxable Medicare wages & tips | 802751 . 47 | × .029 = | 23279 . 79 |

5d Total social security and Medicare taxes (*Column 2, lines 5a + 5b + 5c = line 5d*)    5d    52895 . 82

6 Total taxes before adjustments (lines 3 + 5d = line 6) . . . . . . .    6    360956 . 36

7 Tax adjustments (If your answer is a negative number, write it in brackets.):

7a Current quarter's fractions of cents . . . . . . . . .    . 25

7b Current quarter's sick pay . . . . . . . . .    .

7c Current quarter's adjustments for tips and group-term life insurance    .

7d Current year's income tax withholding (Attach Form 941c) . . .    .

7e Prior quarters' social security and Medicare taxes (Attach Form 941c)    .

7f Special additions to federal income tax (reserved use) . . . .    .

7g Special additions to social security and Medicare (reserved use)    .

**AERAS 0356**

7h Total adjustments (Combine all amounts: lines 7a through 7g.) . . .    7h    . 25

8 Total taxes after adjustments (Combine lines 6 and 7h.) . . . . .    8    360956.61

9 Advance earned income credit (EIC) payments made to employees . . . . . .    9    

10 Total taxes after adjustment for advance EIC (lines 8 – 9 = line 10) . . . . .    10    360956 . 61

11 Total deposits for this quarter, including overpayment applied from a prior quarter . .    11    360956 . 61

12 Balance due (lines 10 – 11 = line 12) Make checks payable to the *United States Treasury* .    12    .

13 Overpayment (If line 11 is more than line 10, write the difference here.)    .    Check one ☐ Apply to next return.
                                                                                          ☐ Send a refund.

**Next ➡**

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    Cat. No. 17001Z    Form **941** (Rev. 1-2005)

9602

| Name (not your trade name) | Employer identification number |
|---|---|

## Part 2: Tell us about your deposit schedule for this quarter.

If you are unsure about whether you are a monthly schedule depositor or a semiweekly schedule depositor, see *Pub. 15 (Circular E)*, section 11.

14  | A | L |  Write the state abbreviation for the state where you made your deposits OR write "MU" if you made your deposits in *multiple* states.

15  Check one:  ☐  Line 10 is less than $2,500. Go to Part 3.

☐  You were a monthly schedule depositor for the entire quarter. Fill out your tax liability for each month. Then go to Part 3.

Tax liability:  Month 1  [                    .        ]

Month 2  [                    .        ]

Month 3  [                    .        ]

Total  [                              ]  Total must equal line 10.

☒  You were a semiweekly schedule depositor for any part of this quarter. Fill out *Schedule B (Form 941): Report of Tax Liability for Semiweekly Schedule Depositors,* and attach it to this form.

## Part 3: Tell us about your business. If a question does NOT apply to your business, leave it blank.

16  If your business has closed and you do not have to file returns in the future . . . . . . . . . ☐ Check here, and

enter the final date you paid wages  [      /      /      ]

17  If you are a seasonal employer and you do not have to file a return for every quarter of the year  . . ☐ Check here.

## Part 4: May we contact your third-party designee?

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

☐ Yes.  Designee's name  [                                                        ]

Phone  ( )       –       Personal Identification Number (PIN)  [  ][  ][  ][  ][  ]

☐ No.

## Part 5: Sign here

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

X  Sign your name here  *Mark Platt*

Print name and title  *Mark Platt, CEO*

Date  *01 / 23 2006*  Phone  *(334) 272 - 1050*

## Part 6: For paid preparers only *(optional)*

Preparer's signature  [                                                        ]

Firm's name  [                                                        ]

Address  [                                                        ]   EIN  [                    ]

[                                                        ]   ZIP code  [                    ]

Date  [      /      /      ]  Phone  ( )       –       SSN/PTIN  [                    ]

☐ Check if you are self-employed.

**AERAS 0357**    Form **941** (Rev. 1-2005)

# Schedule B (Form 941):

## Report of Tax Liability for Semiweekly Schedule Depositors

(Rev. January 2005)

Department of the Treasury — Internal Revenue Service

9603

OMB No. 1545-0029

Employer identification number  6 3 – 0 9 5 7 6 6 1

Name *(not your trade name)* Alabama Emergency Room Admin Services

**Report for this Quarter ...**
(Check one.)

- [ ] 1: January, February, March
- [ ] 2: April, May, June
- [ ] 3: July, August, September
- [X] 4: October, November, December

Use this schedule to show your tax liability for the quarter; DO NOT use it to show your deposits. You must fill out this form and attach it to Form 941 (or Form 941-SS) if you are a semiweekly schedule depositor or became one because your accumulated tax liability on any day was $100,000 or more. Write your daily tax liability on the numbered space that corresponds to the date wages were paid. See Section 11 in *Pub. 15 (Circular E), Employer's Tax Guide*, for details.



**Month 1**

| | | | |
|---|---|---|---|
| 6: 23617.10 | | | |
| | | | 30: 10435.00 |

**Tax liability for Month 1**  34052.10

**Month 2**

| | | | |
|---|---|---|---|
| 7: 24454.20 | | | 25: 11398.87 |

**Tax liability for Month 2**  35853.07

**Month 3**

| | | | |
|---|---|---|---|
| 1: 11422.76 | | | |
| 7: 23959.32 | | | 30: 255669.36 |

**Tax liability for Month 3**  291051.44

**AERAS 0358**

Fill in your total liability for the quarter (Month 1 + Month 2 + Month 3) = Total tax liability for the quarter ►
Total must equal line 10 on Form 941 (or line 8 on Form 941-SS).

**Total liability for the quarter**  360956.61

For Paperwork Reduction Act Notice, see separate instructions.

Cat. No. 11967Q

Schedule B (Form 941) Rev. 1-2005

AERAS, P.C.
Quarterly 941 Worksheet

Employer Identification Number: 63-0957661          Quarter: 4 Ended 12/31/05

Name:          AERAS, P.C.

Trade Name:

Address:       4160 CARMICHAEL ROAD
               SUITE 200
               MONTGOMERY, AL 36106

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

Part 1:

. Number of employees who received wages, tips, or other compensation for the pay period

  including: Mar 12 (Quarter 1), June 12 (Quarter 2), Sept 12 (Quarter 3), Dec 12 (Quarter 4). . . . . . . . . . . . .[    ]

. Wages, tips, and other compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    802,751.47

. Total income tax withheld from wages, tips, and other compensation. . . . . . . . . . . . . . . . . . . .    308,060.54

. Check box if no wages, tips, and other compensation are subject to social security or Medicare tax . . [ ]

. Taxable social security and Medicare wages and tips:

   5a. Taxable social security wages . . . . . . . . . . . . . . .     238,838.97  X   .124  =       29,616.03

   5b. Taxable social security tips . . . . . . . . . . . . . . .            .00  X   .124  =             .00

   5c. Taxable Medicare wages and tips . . . . . . . . . . . . .     802,751.47  X   .029  =       23,279.79

   5d. Total social security and Medicare taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . . .       52,895.82

. Total taxes before adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      360,956.36

. Tax adjustments

   7a. Current quarter's fractions of cents. . . . . . . . . . . . . . . . . . . . . . . . . . .              .25

   7b. Current quarter's sick pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .              .00

   7c. Current quarter's adjustments for tips and group-term life insurance. . . . . . . . . . .              .00

   7d. Current year's income tax withholding . . . . . . . . . . . . . . . . . . . . . . . . . .              .00

   7e. Prior quarters' social security and Medicare taxes. . . . . . . . . . . . . . . . . . . .              .00

   7f. Special additions to federal income tax . . . . . . . . . . . . . . . . . . . . . . . . .              .00

   7g. Special additions to social security and Medicare . . . . . . . . . . . . . . . . . . . .              .00

   7h. Total adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          .25

. Total taxes after adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .      360,956.61

. Advance earned income credit (EIC) payments made to employees . . . . . . . . . . . . . . . . . . . . .          .00

0. Total taxes after adjustment for advance EIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . .      360,956.61

1. Total deposits for this quarter, including overpayment applied from a prior quarter. . . . . . . . . . . . .      360,956.61

2. Balance due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          .00

3. Overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                                                        Check one [ ] Apply to next return

                                                                 [ ] Send a refund

Part 2:

4. The state where you made your deposits (or MU for deposits in multiple states). . . . . . . . . . . . . . . . . . . . . . .    AL

5. Deposit schedule

   15a. Check here if Line 10 is less than $2500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

   15b. Check here if Monthly Depositor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

                           Tax Liability: Month 1

                                          Month 2

                                          Month 3

                                          Total

   15c. Check here if semiweekly depositor for any part of this quarter. . . . . . . . . . . . . . . . . . . . . . . [ ]

        (See Schedule B for Detail)

**AERAS 0359**

Employer Identification Number: 63-0957661                                    Quarter: 4 Ended 12/31/05

Name:        AERAS, P.C.

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

This schedule is used to show your tax liability for the quarter.  The amounts below are in numbered spaces that
correspond to the date the wages were paid.

### MONTH 1

|     |          |     |           |     |      |     |           | Tax liability for Month 1 |
|-----|----------|-----|-----------|-----|------|-----|-----------|---------------------------|
| 1.  | .00      | 9.  | .00       | 17. | .00  | 25. | .00       |                           |
|     |          |     |           |     |      |     |           | 34,052.10                 |
| 2.  | .00      | 10. | .00       | 18. | .00  | 26. | .00       |                           |
| 3.  | .00      | 11. | .00       | 19. | .00  | 27. | .00       |                           |
| 4.  | .00      | 12. | .00       | 20. | .00  | 28. | .00       |                           |
| 5.  | .00      | 13. | .00       | 21. | .00  | 29. | .00       |                           |
| 6.  | .00      | 14. | 23,617.10 | 22. | .00  | 30. | .00       |                           |
| 7.  | .00      | 15. | .00       | 23. | .00  | 31. | 10,435.00 |                           |
| 8.  | .00      | 16. | .00       | 24. | .00  |     |           |                           |

### MONTH 2

|     |          |     |           |     |      |     |           | Tax liability for Month 2 |
|-----|----------|-----|-----------|-----|------|-----|-----------|---------------------------|
| 1.  | .00      | 9.  | .00       | 17. | .00  | 25. | .00       |                           |
|     |          |     |           |     |      |     |           | 35,853.07                 |
| 2.  | .00      | 10. | .00       | 18. | .00  | 26. | .00       |                           |
| 3.  | .00      | 11. | .00       | 19. | .00  | 27. | .00       |                           |
| 4.  | .00      | 12. | .00       | 20. | .00  | 28. | .00       |                           |
| 5.  | .00      | 13. | .00       | 21. | .00  | 29. | .00       |                           |
| 6.  | .00      | 14. | .00       | 22. | .00  | 30. | 11,398.87 |                           |
| 7.  | .00      | 15. | 24,454.20 | 23. | .00  | 31. | .00       |                           |
| 8.  | .00      | 16. | .00       | 24. | .00  |     |           |                           |

### MONTH 3

|     |           |     |           |     |      |     |            | Tax liability for Month 3 |
|-----|-----------|-----|-----------|-----|------|-----|------------|---------------------------|
| 1.  | 11,422.76 | 9.  | .00       | 17. | .00  | 25. | .00        |                           |
|     |           |     |           |     |      |     |            | 291,051.44                |
| 2.  | .00       | 10. | .00       | 18. | .00  | 26. | .00        |                           |
| 3.  | .00       | 11. | .00       | 19. | .00  | 27. | .00        |                           |
| 4.  | .00       | 12. | .00       | 20. | .00  | 28. | .00        |                           |
| 5.  | .00       | 13. | .00       | 21. | .00  | 29. | .00        |                           |
| 6.  | .00       | 14. | .00       | 22. | .00  | 30. | 255,669.36 |                           |
| 7.  | .00       | 15. | 23,959.32 | 23. | .00  | 31. | .00        |                           |
| 8.  | .00       | 16. | .00       | 24. | .00  |     |            |                           |

Total Tax liability for the quarter

360,956.61

**AERAS 0360**

Form **941 for 2006:** Employer's QUARTERLY Federal Tax Return

(Rev. January 2006)                    Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

IO 63-0957661

26060******AUTO**5-DIGIT 36106
MAR2006    S29         C
ALABAMA EMERGENCY ROOM
  ADMINISTRATIVE SERVICES PC
4160 CARMICHAEL RD
MONTGOMERY, AL 36106-3638                    26060

**Report for this Quarter ...**
(Check one.)

[X] 1: January, February, March
[ ] 2: April, May, June
[ ] 3: July, August, September
[ ] 4: October, November, December

Read the separate instructions before you fill out this form. Please type or print within the boxes.

**Part 1: Answer these questions for this quarter.**

1 Number of employees who received wages, tips, or other compensation for the pay period including: *Mar. 12* (Quarter 1), *June 12* (Quarter 2), *Sept. 12* (Quarter 3), *Dec. 12* (Quarter 4)   **1**   22

2 Wages, tips, and other compensation . . . . . . . .   **2**   390,350.11

3 Total income tax withheld from wages, tips, and other compensation . . . . . . .   **3**   71,070.95

4 If no wages, tips, and other compensation are subject to social security or Medicare tax . .   [ ] Check and go to line 6.

5 Taxable social security and Medicare wages and tips:

|  | Column 1 |  | Column 2 |
|---|---|---|---|
| 5a Taxable social security wages | 390,350.11 | × .124 = | 48,403.41 |
| 5b Taxable social security tips | 0.00 | × .124 = | 0.00 |
| 5c Taxable Medicare wages & tips | 390,350.11 | × .029 = | 11,320.15 |

5d Total social security and Medicare taxes (*Column 2*, lines 5a + 5b + 5c = line 5d)   **5d**   59,723.56

6 Total taxes before adjustments (lines 3 + 5d = line 6) . . . . . . .   **6**   130,794.51

7 TAX ADJUSTMENTS (Read the instructions for line 7 before completing lines 7a through 7h.):

7a Current quarter's fractions of cents . . . . . . .   0.18

7b Current quarter's sick pay . . . . . . .   0.00

7c Current quarter's adjustments for tips and group-term life insurance   0.00

7d Current year's income tax withholding (attach Form 941c)   0.00

7e Prior quarters' social security and Medicare taxes (attach Form 941c)   0.00

7f Special additions to federal income tax (attach Form 941c)   0.00

7g Special additions to social security and Medicare (attach Form 941c)   0.00

**AERAS 0361**

7h TOTAL ADJUSTMENTS (Combine all amounts: lines 7a through 7g.) . . . . . .   **7h**   0.18

8 Total taxes after adjustments (Combine lines 6 and 7h.) . . . .   **8**   130,794.69

9 Advance earned income credit (EIC) payments made to employees . . . . . . .   **9**   0.00

10 Total taxes after adjustment for advance EIC (line 8 – line 9 = line 10) . . . .   **10**   0.00

11 Total deposits for this quarter, including overpayment applied from a prior quarter . .   **11**   138,654.92

12 Balance due (If line 10 is more than line 11, write the difference here.) . . . . . .   **12**   0.00
Make checks payable to *United States Treasury.*

13 Overpayment (If line 11 is more than line 10, write the difference here.)   7,860.23   Check one [ ] Apply to next return.
                                                                                         [X] Send a refund.

▶ You MUST fill out both pages of this form and SIGN it.                    Next ➡

For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.    Cat. No. 17001Z    Form **941** (Rev. 1-2006)

# Schedule B (Form 941).
**Report of Tax Liability for Semiweekly Schedule Depositors**
(Rev. January 2006)     Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

**(EIN)**
Employer identification number   6 3 – 0 9 5 7 6 6 1

Name *(not your trade name)*   Alabama Emergency Room Administrative Service, PC

Calendar year   2 0 0 6     *(Also check quarter)*

**Report for this Quarter ...**
(Check one.)

[X] 1: January, February, March
[ ] 2: April, May, June
[ ] 3: July, August, September
[ ] 4: October, November, December

Use this schedule to show your **TAX LIABILITY** for the quarter; **DO NOT** use it to show your deposits. You must fill out this form and attach it to Form 941 (or Form 941-SS) if you are a semiweekly schedule depositor or became one because your accumulated tax liability on any day was $100,000 or more. Write your daily tax liability on the numbered space that corresponds to the date wages were paid. See Section 11 in *Pub. 15 (Circular E), Employer's Tax Guide*, for details.

**Month 1**

13  $34,560.85
31  $13,261.96

**Tax liability for Month 1**
$ 47,822.81

**Month 2**

15  $30,401.99
27  $34.72
28  $13,346.72

**Tax liability for Month 2**
$ 42,783.13

**Month 3**

15  $28,293.54
31  $11,895.21

**Tax liability for Month 3**
$ 40,188.75

**AERAS 0362**

Fill in your total liability for the quarter (Month 1 + Month 2 + Month 3) = Total tax liability for the quarter ▶
**Total must equal line 10 on Form 941** (or line 8 on Form 941-SS).

**Total liability for the quarter**
$130,794.69

For Paperwork Reduction Act Notice, see separate instructions.     Cat. No. 11967Q     Schedule B (Form 941) Rev. 1-2006

Employer Identification Number: 63-0957661                                    Quarter: 1 Ended 03/31/06
Name:        AERAS, P.C.

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

This schedule is used to show your tax liability for the quarter.  The amounts below are in numbered spaces that
correspond to the date the wages were paid.

MONTH 1                                                                        Tax liability for Month 1
1.        .00      9.          .00      17.       .00      25.         .00
                                                                                        47,822.81
2.        .00      10.         .00      18.       .00      26.         .00

3.        .00      11.         .00      19.       .00      27.         .00

4.        .00      12.         .00      20.       .00      28.         .00

5.        .00      13.    34,560.85     21.       .00      29.         .00

6.        .00      14.         .00      22.       .00      30.         .00

7.        .00      15.         .00      23.       .00      31.    13,261.96

8.        .00      16.         .00      24.       .00

MONTH 2                                                                        Tax liability for Month 2
1.        .00      9.          .00      17.       .00      25.         .00
                                                                                        42,783.13
2.        .00      10.         .00      18.       .00      26.         .00

3.        .00      11.         .00      19.       .00      27.       34.42

4.        .00      12.         .00      20.       .00      28.    12,346.72

5.        .00      13.         .00      21.       .00      29.         .00

6.        .00      14.         .00      22.       .00      30.         .00

7.        .00      15.    30,401.99     23.       .00      31.         .00

8.        .00      16.         .00      24.       .00

MONTH 3                                                                        Tax liability for Month 3
1.        .00      9.          .00      17.       .00      25.         .00
                                                                                        40,188.75
2.        .00      10.         .00      18.       .00      26.         .00

3.        .00      11.         .00      19.       .00      27.         .00

4.        .00      12.         .00      20.       .00      28.         .00

5.        .00      13.         .00      21.       .00      29.         .00

6.        .00      14.         .00      22.       .00      30.         .00

7.        .00      15.    28,293.54     23.       .00      31.    11,895.21

3.        .00      16.         .00      24.       .00

                                                          Total Tax liability for the quarter
                                                                        130,794.69

**AERAS 0363**

Employer Identification Number: 63-0957661                Quarter: 1 Ended 03/31/06

Name:        AERAS, P.C.

Trade Name:

Address:     4160 CARMICHAEL ROAD
             SUITE 200
             MONTGOMERY, AL 36106

Worksheet Only - Use this data to complete IRS Form 941 - DO NOT FILE THIS REPORT

Part 1:

1.  Number of employees who received wages, tips, or other compensation for the pay period
    including: Mar 12 (Quarter 1), June 12 (Quarter 2), Sept 12 (Quarter 3), Dec 12 (Quarter 4). . . . . . . . . . . . . . .[    ]

2.  Wages, tips, and other compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . .        390,350.11

3.  Total income tax withheld from wages, tips, and other compensation . . . . . . . . . . . . . . . . . . . . .        71,070.95

4.  Check box if no wages, tips, and other compensation are subject to social security or Medicare tax . . [ ]

5.  Taxable social security and Medicare wages and tips:

    5a. Taxable social security wages . . . . . . . . . . . . . . . .    390,350.11  X   .124  =      48,403.41

    5b. Taxable social security tips . . . . . . . . . . . . . . . . .          .00  X   .124  =            .00

    5c. Taxable Medicare wages and tips . . . . . . . . . . . . . . .    390,350.11  X   .029  =      11,320.15

    5d. Total social security and Medicare taxes. . . . . . . . . . . . . . . . . . . . . . . . . . . .        59,723.56

6.  Total taxes before adjustments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       130,794.51

7.  Tax adjustments

    7a. Current quarter's fractions of cents. . . . . . . . . . . . . . . . . . . . . . . . . .            .18

    7b. Current quarter's sick pay. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            .00

    7c. Current quarter's adjustments for tips and group-term life insurance. . . . . . . . . . . .            .00

    7d. Current year's income tax withholding . . . . . . . . . . . . . . . . . . . . . . . . .            .00

    7e. Prior quarters' social security and Medicare taxes. . . . . . . . . . . . . . . . . . .            .00

    7f. Special additions to federal income tax . . . . . . . . . . . . . . . . . . . . . . . .            .00

    7g. Special additions to social security and Medicare . . . . . . . . . . . . . . . . . . .            .00

    7h. Total adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            .18

8.  Total taxes after adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .       130,794.69

9.  Advance earned income credit (EIC) payments made to employees . . . . . . . . . . . . . . . . . . . .            .00

10. Total taxes after adjustment for advance EIC. . . . . . . . . . . . . . . . . . . . . . . . . . .       130,794.69

11. Total deposits for this quarter, including overpayment applied from a prior quarter. . . . . . . . . . . . . .       138,654.92

12. Balance due . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .            .00

13. Overpayment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .          7,860.23

                                                        Check one [ ] Apply to next return
                                                          X Send a refund

Part 2:

14. The state where you made your deposits (or MU for deposits in multiple states). . . . . . . . . . . . . . . . . . . . . . .

15. Deposit schedule

    15a. Check here if Line 10 is less than $2500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

    15b. Check here if Monthly Depositor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . [ ]

                                        Tax Liability: Month 1

                                                       Month 2

                                                       Month 3

                                                       Total

    15c. Check here if semiweekly depositor for any part of this quarter. . . . . . . . . . . . . . . . . . . . . . . [ ]

         (See Schedule B for Detail)

**AERAS 0364**

COPY
990106

Form **941 for 2006:** **Employer's QUARTERLY Federal Tax Return**

(Rev. January 2006)    Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

**(EIN)**
Employer identification number    `6` `3` — `0` `9` `5` `7` `6` `6` `1`

Name (not your trade name)    ALABAMA EMERGENCY ROOM ADMINISTRATIVE SVCS

Trade name (if any)

Address    4160 CARMICHAEL ROAD
    Number    Street    Suite or room number

MONTGOMERY    AL    36106
City    State    ZIP code

**Report for this Quarter.**
(Check one.)

- [ ] **1:** January, February, March
- [✓] **2:** April, May, June
- [ ] **3:** July, August, September
- [ ] **4:** October, November, December

Read the separate instructions before you fill out this form. Please type or print within the boxes.

**Part 1: Answer these questions for this quarter.**

1   Number of employees who received wages, tips, or other compensation for the pay period
    including: *Mar. 12* (Quarter 1), *June 12* (Quarter 2), *Sept. 12* (Quarter 3), *Dec. 12* (Quarter 4)    **1**    | 24 |

2   Wages, tips, and other compensation    **2**    | 400593 . 33 |

3   Total income tax withheld from wages, tips, and other compensation    **3**    | 73291 . 55 |

4   If no wages, tips, and other compensation are subject to social security or Medicare tax    [ ] Check and go to line 6.

5   Taxable social security and Medicare wages and tips:

|  | Column 1 |  | Column 2 |
|---|---|---|---|
| 5a  Taxable social security wages | 344793 . 33 | × .124 = | 42754 . 37 |
| 5b  Taxable social security tips |  . | × .124 = |  . |
| 5c  Taxable Medicare wages & tips | 400593 . 33 | × .029 = | 11617 . 21 |

5d  Total social security and Medicare taxes (Column 2, lines 5a + 5b + 5c = line 5d)    **5d**    | 54371 . 58 |

6   Total taxes before adjustments (lines 3 + 5d = line 6)    **6**    | 127663 . 13 |

7   **TAX ADJUSTMENTS** (Read the instructions for line 7 before completing lines 7a through 7h.):

7a  Current quarter's fractions of cents    |  . 30 |

7b  Current quarter's sick pay    |  . |

7c  Current quarter's adjustments for tips and group-term life insurance    |  . |

7d  Current year's income tax withholding (attach Form 941c)    |  . |

7e  Prior quarters' social security and Medicare taxes (attach Form 941c)    |  . |

7f  Special additions to federal income tax (attach Form 941c)    |  . |

7g  Special additions to social security and Medicare (attach Form 941c)    |  . |

7h  **TOTAL ADJUSTMENTS** (Combine all amounts: lines 7a through 7g.)    **7h**    |  . 30 |

8   Total taxes after adjustments (Combine lines 6 and 7h.)    **8**    | 127663 . 43 |

9   Advance earned income credit (EIC) payments made to employees    **9**    |  . |

10  Total taxes after adjustment for advance EIC (line 8 – line 9 = line 10)    **10**    | 127663 . 43 |

11  Total deposits for this quarter, including overpayment applied from a prior quarter    **11**    | 127663 . 43 |

12  **Balance due** (If line 10 is more than line 11, write the difference here.)    **12**    |  . |
    Make checks payable to *United States Treasury.*

13  **Overpayment** (If line 11 is more than line 10, write the difference here.)    |  . |    Check one [ ] Apply to next return.
                                                                                                [ ] Send a refund.

► You **MUST** fill out both pages of this form and SIGN it.

Next ➡

**For Privacy Act and Paperwork Reduction Act Notice, see the back of the Payment Voucher.**    Cat. No. 17001Z    Form **941** (Rev. 1-2006)

**AERAS 0365**

990206

| Name (not your trade name) | Employer identification number (EIN) |
|---|---|
| ALABAMA EMERGENCY ROOM ADMINISTRATIVE SVCS | 63-0957661 |

**Part 2: Tell us about your deposit schedule and tax liability for this quarter.**

If you are unsure about whether you are a monthly schedule depositor or a semiweekly schedule depositor, see *Pub. 15 (Circular E)*, section 11.

14 [ A ] [ L ]   Write the state abbreviation for the state where you made your deposits OR write "MU" if you made your deposits in multiple states.

15  Check one: [ ] Line 10 is less than $2,500. Go to Part 3.

[ ] You were a monthly schedule depositor for the entire quarter. Fill out your tax liability for each month. Then go to Part 3.

Tax liability:   Month 1  [_____]

Month 2  [_____]

Month 3  [_____]

Total liability for quarter  [_____]  Total must equal line 10.

[✓] You were a semiweekly schedule depositor for any part of this quarter. Fill out *Schedule B (Form 941): Report of Tax Liability for Semiweekly Schedule Depositors*, and attach it to this form.

**Part 3: Tell us about your business. If a question does NOT apply to your business, leave it blank.**

16  If your business has closed or you stopped paying wages  [ ] Check here, and

enter the final date you paid wages  [____ / ____ / ____]

17  If you are a seasonal employer and you do not have to file a return for every quarter of the year  [ ] Check here.

**Part 4: May we speak with your third-party designee?**

Do you want to allow an employee, a paid tax preparer, or another person to discuss this return with the IRS? See the instructions for details.

[✓] Yes.  Designee's name  AUDRA L EDWARDS

Phone  ( 334 )  261 – 2116   Personal Identification Number (PIN)  [5][5][5][5][5]

[ ] No.

**Part 5: Sign here. You MUST fill out both sides of this form and SIGN it.**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

X   Sign your name here   *Mark Platt*

Print name and title   *Mark Platt, COO*

Date   7/28/00   Phone  ( 334 )  272 – 1050

**Part 6: For PAID preparers only (optional)**

Paid Preparer's Signature  [_____]

Firm's name  [_____]

Address  [_____]   EIN  [_____]

[_____]   ZIP code  [_____]

Date  [____ / ____]  Phone ( )  –   SSN/PTIN  [_____]

[ ] Check if you are self-employed.

Form **941** (Rev. 1-2006)

AERAS 0366

# Schedule B (Form 941):

990306

**Report of Tax Liability for Semiweekly Schedule Depositors**

(Rev. January 2006)     Department of the Treasury — Internal Revenue Service

OMB No. 1545-0029

**(EIN)**
**Employer identification number**   6 3 – 0 9 5 7 6 6 1

**Name** (not your trade name)   ALABAMA EMERGENCY ROOM ADMIN SERVICES

**Calendar year**   2 0 0 6   (Also check quarter)

**Report for this Quarter ...**
(Check one.)

☐ 1: January, February, March
☑ 2: April, May, June
☐ 3: July, August, September
☐ 4: October, November, December

Use this schedule to show your **TAX LIABILITY** for the quarter; **DO NOT** use it to show your deposits. You must fill out this form and attach it to Form 941 (or Form 941-SS) if you are a semiweekly schedule depositor or became one because your accumulated tax liability on any day was $100,000 or more. Write your daily tax liability on the numbered space that corresponds to the date wages were paid. See Section 11 in *Pub. 15 (Circular E), Employer's Tax Guide*, for details.

**Month 1**

| | | | | Tax liability for Month 1 |
|---|---|---|---|---|
| 1 | 9 | 17 | 25 | |
| 2 | 10 | 18 | 26 | |
| 3 | 11 | 19 | 27 | **40709 . 11** |
| 4 | 12 | 20 | 28 | |
| 5 | 13 | 21 | 29 | |
| 6 | 14 | 22 | 30  11191 . 68 | |
| 7  29517 . 43 | 15 | 23 | 31 | |
| 8 | 16 | 24 | | |

**Month 2**

| | | | | Tax liability for Month 2 |
|---|---|---|---|---|
| 1 | 9 | 17 | 25 | |
| 2 | 10 | 18 | 26 | |
| 3 | 11 | 19 | 27 | **40477 . 00** |
| 4 | 12 | 20 | 28 | |
| 5 | 13 | 21 | 29 | |
| 6 | 14 | 22 | 30 | |
| 7  26027 . 20 | 15 | 23 | 31  14449 . 80 | |
| 8 | 16 | 24 | | |

**Month 3**

| | | | | Tax liability for Month 3 |
|---|---|---|---|---|
| 1 | 9 | 17 | 25 | |
| 2 | 10 | 18 | 26 | |
| 3 | 11 | 19  6545 . 14 | 27 | **46477 . 32** |
| 4 | 12 | 20 | 28 | |
| 5 | 13 | 21 | 29 | |
| 6 | 14 | 22 | 30  12273 . 38 | |
| 7  27658 . 80 | 15 | 23 | 31 | |
| 8 | 16 | 24 | | |

Fill in your total liability for the quarter (Month 1 + Month 2 + Month 3) = Total tax liability for the quarter ▶

**Total must equal line 10 on Form 941** (or line 8 on Form 941-SS).

**Total liability for the quarter**

127663 . 43

For Paperwork Reduction Act Notice, see separate instructions.     Cat. No. 11967Q     Schedule B (Form 941) Rev. 1-2006

AERAS 0367

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents $ | OMB No. 1545-0115 2005 Form 1099-MISC | Miscellaneous Income |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 2 Royalties $ | | |
| | 3 Other income $ | 4 Federal income tax withheld $ | Copy A For Internal Revenue Service Center File with Form 1096. |
| PAYER'S Federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ |
| RECIPIENT'S name DAVID GREGORY ALEXANDER | 7 Nonemployee compensation $ 439256.68 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.) 7524 MOSSY OAK DRIVE | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code MONTGOMERY AL 36117 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form 1099-MISC                    41-1628061          Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page    —    Do Not Cut or Separate Forms on This Page

**AERAS 0438**

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents $ | OMB No. 1545-0115 2005 Form 1099-MISC | Miscellaneous Income |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 2 Royalties $ | | |
| | 3 Other income $ | 4 Federal income tax withheld $ | Copy A For Internal Revenue Service Center File with Form 1096. |
| PAYER'S Federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ |
| RECIPIENT'S name JAMES BRADWELL | 7 Nonemployee compensation $ 489769.54 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.) 124 PAYNE ROAD | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code MONTGOMERY AL 36116 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form 1099-MISC                    41-1628061          Department of the Treasury - Internal Revenue Service

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | $ | **2005** | Miscellaneous Income |
| | 2 Royalties | Form **1099-MISC** | |
| | $ | | |
| | 3 Other income | 4 Federal income tax withheld | **Copy A** |
| | $ | $ | **For Internal Revenue Service Center** |
| PAYER'S Federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name  WALLACE G FALERO MD | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | $  287354.90 | | |
| Street address (including apt. no.)  331 GREENCHASE CIRCLE | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code  MONTGOMERY AL  36117 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| | | $ | $ | |
| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
| $ | $ | $ | | $ |
| | | $ | | $ |

Form **1099-MISC**                41-1628061                Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page  —  Do Not Cut or Separate Forms on This Page

**AERAS 0439**

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | $ | **2005** | Miscellaneous Income |
| | 2 Royalties | Form **1099-MISC** | |
| | $ | | |
| | 3 Other income | 4 Federal income tax withheld | **Copy A** |
| | $ | $ | **For Internal Revenue Service Center** |
| PAYER'S Federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name  JOSEPH A FOSTER | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | $  51692.50 | | |
| Street address (including apt. no.)  2079 WATERFRONT DRIVE | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code  GADSDEN AL  35907 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| | | $ | $ | |
| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
| $ | $ | $ | | $ |
| | | $ | | $ |

Form **1099-MISC**                41-1628061                Department of the Treasury - Internal Revenue Service

9595   ☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | | $ | **2005** | |
| | | 2 Royalties | | |
| | | $ | Form 1099-MISC | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For Internal Revenue Service Center |
| PAYER'S Federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name<br>CARLOS GUTIERREZ | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | | $    420788.80 | $ | |
| Street address (including apt. no.)<br>3507 HARDING CLOSE CIRCLE | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City, state, and ZIP code<br>MONTGOMERY AL  36106 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**      41-1628061      Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page  —  Do Not Cut or Separate Forms on This Page

**AERAS 0440**

9595   ☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | | $ | **2005** | |
| | | 2 Royalties | | |
| | | $ | Form 1099-MISC | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For Internal Revenue Service Center |
| PAYER'S Federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name<br>HENRY KURUSZ III MD | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | | $    28880.94 | $ | |
| Street address (including apt. no.)<br>5801 EAST SHIRLEY LANE<br>AZALEA HILL SUITES, APT. 822 | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code<br>MONTGOMERY AL  36117 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**      41-1628061      Department of the Treasury - Internal Revenue Service

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | $<br>2 Royalties<br>$ | 2005<br>Form 1099-MISC | Miscellaneous Income |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Copy A |
| PAYER'S Federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | For Internal Revenue Service Center<br>File with Form 1096. |
| RECIPIENT'S name  JULIAN MAHAGANASAN MD | 7 Nonemployee compensation<br>$  271774.18 | 8 Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.)  1263 EAGLE PARK RD | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code  BIRMINGHAM AL  35242 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC                      41-1628061                      Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page  —  Do Not Cut or Separate Forms on This Page

**AERAS 0441**

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | $<br>2 Royalties<br>$ | 2005<br>Form 1099-MISC | Miscellaneous Income |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | Copy A |
| PAYER'S Federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ | For Internal Revenue Service Center<br>File with Form 1096. |
| RECIPIENT'S name  JULIO RIOS MD | 7 Nonemployee compensation<br>$  636342.22 | 8 Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.)  3101 MARLER ROAD | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| City, state, and ZIP code  PIKE ROAD AL  36064 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$ | 17 State/Payer's state no. | 18 State income<br>$ |

Form 1099-MISC                      41-1628061                      Department of the Treasury - Internal Revenue Service

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | | $ | **2005** | Miscellaneous Income |
| | | 2 Royalties | | |
| | | $ | Form **1099-MISC** | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For<br>Internal Revenue<br>Service Center |
| PAYER'S Federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name<br>RONALD A SHAW MD | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act<br>and Paperwork<br>Reduction Act |
| | | $  387833.32 | $ | Notice, see the<br>**2005 General** |
| Street address (including apt. no.)<br>8112 WESTLAKES PLACE | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | **Instructions for<br>Forms 1099,** |
| City, state, and ZIP code<br>MONTGOMERY AL  36117 | | 11 | 12 | **1098, 5498,<br>and W-2G.** |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| | | $ | $ | |
| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
| $ | $ | $<br>$ | | $<br>$ |

Form **1099-MISC**                41-1628061            Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page    —    Do Not Cut or Separate Forms on This Page

**AERAS 0442**

9595    ☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106 | | $ | **2005** | Miscellaneous Income |
| | | 2 Royalties | | |
| | | $ | Form **1099-MISC** | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For<br>Internal Revenue<br>Service Center |
| PAYER'S Federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name<br>GEORGE C SMITH JR | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act<br>and Paperwork<br>Reduction Act |
| | | $  119435.00 | $ | Notice, see the<br>**2005 General** |
| Street address (including apt. no.)<br>49 JACKSON SPRINGS ROAD | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | **Instructions for<br>Forms 1099,** |
| City, state, and ZIP code<br>LINEVILLE AL  36266 | | 11 | 12 | **1098, 5498,<br>and W-2G.** |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| | | $ | $ | |
| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
| $ | $ | $<br>$ | | $<br>$ |

Form **1099-MISC**                41-1628061            Department of the Treasury - Internal Revenue Service

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | $ | **2005** | |
| | 2 Royalties $ | Form 1099-MISC | |
| | 3 Other income $ | 4 Federal income tax withheld $ | Copy A |
| PAYER'S Federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | For Internal Revenue Service Center File with Form 1096. |
| RECIPIENT'S name JOEL C SULLIVAN MD | 7 Nonemployee compensation $ 295903.57 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| Street address (including apt. no.) 265 GLADYS DRIVE | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City, state, and ZIP code TITUS AL  36080 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**                    41-1628061                    Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page   —   Do Not Cut or Separate Forms on This Page

**AERAS 0443**

9595 ☐ VOID ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | $ | **2005** | |
| | 2 Royalties $ | Form 1099-MISC | |
| | 3 Other income $ | 4 Federal income tax withheld $ | Copy A |
| PAYER'S Federal identification number 63-0957661 | RECIPIENT'S identification number 63-0980970 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | For Internal Revenue Service Center File with Form 1096. |
| RECIPIENT'S name HILL HILL CARTER FRANCO COLE | 7 Nonemployee compensation $ 7224.98 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2005 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| Street address (including apt. no.) P O BOX 116 | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| City, state, and ZIP code MONTGOMERY AL  36101 | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**                    41-1628061                    Department of the Treasury - Internal Revenue Service

9595    ☒ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| ALABAMA ER ADMIN SERVICES PC 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | | $ | 2005 | |
| | | 2 Royalties | | |
| | | $ | Form 1099-MISC | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For Internal Revenue Service Center |
| PAYER'S Federal identification number 63-0957661 | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name | | 7 Nonemployee compensation $ 3436256.63 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.) COMPANY TOTAL | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code COMPANY TOTAL | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form 1099-MISC    41-1628061    Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page

**AERAS 0444**

9595    ☒ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|---|
| | | $ | 2005 | |
| | | 2 Royalties | | |
| | | $ | Form 1099-MISC | |
| | | 3 Other income | 4 Federal income tax withheld | Copy A |
| | | $ | $ | For Internal Revenue Service Center |
| PAYER'S Federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | File with Form 1096. |
| | | $ | $ | |
| RECIPIENT'S name | | 7 Nonemployee compensation $ | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the 2005 General Instructions for Forms 1099, 1098, 5498, and W-2G. |
| Street address (including apt. no.) | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| City, state, and ZIP code | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form 1099-MISC    41-1628061    Department of the Treasury - Internal Revenue Service

| a Control number | | | For Official Use Only ▷ | | |
|---|---|---|---|---|---|
| 10-CARTER | 22222 | Void □ | OMB No. 1545-0008 | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 43918.00 | 5266.16 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 43918.00 | 2722.94 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 43918.00 | 636.83 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| MELONI | CARTER | | |
| | | 13 Statutory employee □  Retirement plan □  Third-party sick pay □ | 12b |
| 1203 BRADBURY LANE | | 14 Other | 12c |
| PRATTVILLE   AL 36067 | | | 12d |

| f Employee's address and ZIP code | | | | | | |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| AL | 233891 | 43918.00 | 1660.28 | | | |

Form **W-2** **Wage and Tax Statement**     **2005**     Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0445**

| a Control number | | | For Official Use Only ▷ | | |
|---|---|---|---|---|---|
| 10-CLEVELA | 22222 | Void □ | OMB No. 1545-0008 | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 74500.00 | 9101.80 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 74500.00 | 4619.00 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 74500.00 | 1080.25 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| JIMMY | CLEVELAND | | |
| | | 13 Statutory employee □  Retirement plan □  Third-party sick pay □ | 12b |
| 2942 BALDWIN BROOK DRIVE | | 14 Other | 12c |
| MONTGOMERY   AL 36116 | | | 12d |

| f Employee's address and ZIP code | | | | | | |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| AL | 233891 | 74500.00 | 3151.33 | | | |

Form **W-2** **Wage and Tax Statement**     **2005**     Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.



## Form W-2 Wage and Tax Statement 2005 (1)

| Field | Value |
|---|---|
| a Control number | 10-COOPER   22222   Void ☐ |
| For Official Use Only ▷ OMB No. 1545-0008 | |
| b Employer identification number (EIN) | 63-0957661 |
| c Employer's name, address, and ZIP code | ALABAMA ER ADMIN SERVICES, PC<br>4160 CARMICHAEL ROAD SUITE 10<br>MONTGOMERY AL  36106 |
| 1 Wages, tips, other compensation | 18595.00 |
| 2 Federal income tax withheld | 2117.63 |
| 3 Social security wages | 18595.00 |
| 4 Social security tax withheld | 1152.91 |
| 5 Medicare wages and tips | 18595.00 |
| 6 Medicare tax withheld | 269.63 |
| 7 Social security tips | |
| 8 Allocated tips | |
| d Employee's social security number | 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 |
| 9 Advance EIC payment | |
| 10 Dependent care benefits | |
| e Employee's first name and initial | JUDY |
| Last name | COOPER |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | |
| 2665 CAPSTONE DRIVE<br>MONTGOMERY   AL 36106 | |
| 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | |
| 14 Other | |
| 12b | |
| 12c | |
| 12d | |
| f Employee's address and ZIP code | |
| 15 State AL  Employer's state ID number 233891 | |
| 16 State wages, tips, etc. | 18595.00 |
| 17 State income tax | 712.53 |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Form W-2 Wage and Tax Statement   2005

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

---

**AERAS 0446**

## Form W-2 Wage and Tax Statement 2005 (2)

| Field | Value |
|---|---|
| a Control number | 10-CRYSEL   22222   Void ☐ |
| For Official Use Only ▷ OMB No. 1545-0008 | |
| b Employer identification number (EIN) | 63-0957661 |
| c Employer's name, address, and ZIP code | ALABAMA ER ADMIN SERVICES, PC<br>4160 CARMICHAEL ROAD SUITE 10<br>MONTGOMERY AL  36106 |
| 1 Wages, tips, other compensation | 13890.00 |
| 2 Federal income tax withheld | 1677.49 |
| 3 Social security wages | 13890.00 |
| 4 Social security tax withheld | 861.18 |
| 5 Medicare wages and tips | 13890.00 |
| 6 Medicare tax withheld | 201.42 |
| 7 Social security tips | |
| 8 Allocated tips | |
| d Employee's social security number | 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 |
| 9 Advance EIC payment | |
| 10 Dependent care benefits | |
| e Employee's first name and initial | KIMBERLY |
| Last name | CRYSEL |
| 11 Nonqualified plans | |
| 12a See instructions for box 12 | |
| 1806 EDINBURGH STREET<br>PRATTVILLE   AL 36066 | |
| 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | |
| 14 Other | |
| 12b | |
| 12c | |
| 12d | |
| f Employee's address and ZIP code | |
| 15 State AL  Employer's state ID number 233891 | |
| 16 State wages, tips, etc. | 13890.00 |
| 17 State income tax | 483.77 |
| 18 Local wages, tips, etc. | |
| 19 Local income tax | |
| 20 Locality name | |

Form W-2 Wage and Tax Statement  2005

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number 10-FALERO | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 210000.00 | 2 Federal income tax withheld 55576.22 |
|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| | 5 Medicare wages and tips 210000.00 | 6 Medicare tax withheld 3045.00 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial WALLACE    Last name FALERO | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 331 GREEN CHASE CIRCLE MONTGOMERY    AL 36117 | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 210000.00 | 17 State income tax 7569.51 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement  **2005**  Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0447**

| a Control number 10-GAY | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 119375.00 | 2 Federal income tax withheld 27381.66 |
|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| | 5 Medicare wages and tips 119375.00 | 6 Medicare tax withheld 1730.95 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependant care benefits |
| e Employee's first name and initial MICKEY    Last name GAY | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 32 DOGWOOD DRIVE CALERA    AL 35040 | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 119375.00 | 17 State income tax 4654.59 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement  **2005**  Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ | | |
|---|---|---|---|---|---|
| 10-GUY | | | OMB No. 1545-0008 | | |

| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|
| 63-0957661 | | 23345.00 | 4371.86 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 23345.00 | 1447.39 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 23345.00 | 338.51 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| ALLISON | GUY | | |

| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
|---|---|---|
| 497 MCRAE ROAD | 14 Other | 12c |
| DEATSVILLE  AL 36022 | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 23345.00 | 899.29 | | | |

Form **W-2** **Wage and Tax Statement** **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

41-1628061

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0448**

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ | | |
|---|---|---|---|---|---|
| 10-LAUDERD | | | OMB No. 1545-0008 | | |

| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|
| 63-0957661 | | 69518.75 | 11103.24 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 69518.75 | 4310.20 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 69518.75 | 1008.03 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| RICK | LAUDERDALE | | |

| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
|---|---|---|
| 261 ELBERT DRIVE | 14 Other | 12c |
| ALEXANDER CITAL 35010 | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 69518.75 | 2570.02 | | | |

Form **W-2** **Wage and Tax Statement**  **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

## Form W-2 (top)

| a Control number 10-MCINTOS | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 67829.50 | 2 Federal income tax withheld 8316.13 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL  36106 | | 3 Social security wages 67829.50 | 4 Social security tax withheld 4205.45 |
| | | 5 Medicare wages and tips 67829.50 | 6 Medicare tax withheld 983.53 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial ELIZABETH | Last name MCINTOSH | 11 Nonqualified plans | 12a See instructions for box 12 |
| 400 MERRY PLACE PIKE ROAD    AL 36064 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| i Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 67829.50 | 17 State income tax 3128.96 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement  **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0449**

## Form W-2 (bottom)

| a Control number 10-MOOREHO | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 650000.00 | 2 Federal income tax withheld 302190.80 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL  36106 | | 3 Social security wages 90000.00 | 4 Social security tax withheld 5580.00 |
| | | 5 Medicare wages and tips 650000.00 | 6 Medicare tax withheld 9425.00 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial JOHN | Last name MOOREHOUSE | 11 Nonqualified plans | 12a See instructions for box 12 |
| 2231 OLD PIKE ROAD PIKE ROAD    AL 36064 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| i Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 650000.00 | 17 State income tax 38772.46 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement   **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

**a** Control number
10-NORRIS    22222    Void ☐    For Official Use Only ▷
OMB No. 1545-0008

**b** Employer identification number (EIN)
63-0957661

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 62038.00 | 7533.50 |

**c** Employer's name, address, and ZIP code
ALABAMA ER ADMIN SERVICES, PC
4160 CARMICHAEL ROAD SUITE 10
MONTGOMERY AL  36106

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 62038.00 | 3846.40 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 62038.00 | 899.61 |
| 7 Social security tips | 8 Allocated tips |

**d** Employee's social security number
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

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

**e** Employee's first name and initial   Last name
BEATRICE BEAR                NORRIS

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|

13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐   12b

2019 COMMODORE DRIVE
MONTGOMERY    AL 36106

14 Other     12c
            12d

**f** Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 62038.00 | 2448.46 | | | |

Form **W-2** **Wage and Tax Statement**    **2005**    Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this
entire page with Form W-3 to the Social Security
Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

41-1628061

*Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page*

**AERAS 0450**

**a** Control number
10-TREADWE    22222    Void ☐    For Official Use Only ▷
OMB No. 1545-0008

**b** Employer identification number (EIN)
63-0957661

| 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|
| 4800.00 | 642.91 |

**c** Employer's name, address, and ZIP code
ALABAMA ER ADMIN SERVICES, PC
4160 CARMICHAEL ROAD SUITE 10
MONTGOMERY AL  36106

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 4800.00 | 297.60 |
| 5 Medicare wages and tips | 6 Medicare tax withheld |
| 4800.00 | 69.60 |
| 7 Social security tips | 8 Allocated tips |

**d** Employee's social security number
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

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|

**e** Employee's first name and initial   Last name
DENISE                TREADWELL

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|

13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐   12b

419 OLD SPRINGVILLE ROAD
ODENVILLE    AL 35120

14 Other     12c
            12d

**f** Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 4800.00 | 184.52 | | | |

Form **W-2** **Wage and Tax Statement**    **2005**    Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this
entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 10-WILKERS | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 104537.50 | 15741.80 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 90000.00 | 5580.00 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL 36106 | 104537.50 | 1515.80 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| BENNY | WILKERSON | | |

| | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
|---|---|---|
| 813 NORTH CLAXTON AVE. | 14 Other | 12c |
| ELBA AL 36323 | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 104537.50 | 4493.53 | | | |

Form **W-2** Wage and Tax Statement **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0451**

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 20-DESTIN | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 30631.15 | 2271.37 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 30631.15 | 1899.18 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL 36106 | 30631.15 | 444.13 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| KELLI H. | DESTIN | | |

| | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
|---|---|---|
| 118 MOUNTAIN LAUREL ROAD | 14 Other | 12c |
| PRATTVILLE AL 36067 | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 30631.15 | 1133.04 | | | |

Form **W-2** Wage and Tax Statement **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 20-FRAWLEY | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 41965.93 | 4339.46 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 41965.93 | 2601.83 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL 36106 | 41965.93 | 608.54 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| KATHY A. | FRAWLEY | | |

| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
|---|---|---|
| 1203 YORKSHIRE DRIVE | | |
| PRATTVILLE AL 36067 | 14 Other | 12c |
| | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 41965.93 | 1765.44 | | | |

Form **W-2** Wage and Tax Statement **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0452**

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 20-KITCHEN | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 40750.97 | 5191.61 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 40750.97 | 2526.53 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL 36106 | 40750.97 | 590.87 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| KATHRYN B. | KITCHENS | | |

| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
|---|---|---|
| 2401 NOBLE WOOD COURT | | |
| MONTGOMERY AL 36117 | 14 Other | 12c |
| | | 12d |

f Employee's address and ZIP code

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 40750.97 | 1620.07 | | | |

Form **W-2** Wage and Tax Statement **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

**First W-2 Form (2005)**

| a Control number 20-PLATT | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 25500.00 | 2 Federal income tax withheld 2687.52 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | | 3 Social security wages 25500.00 | 4 Social security tax withheld 1581.00 |
| | | 5 Medicare wages and tips 25500.00 | 6 Medicare tax withheld 369.79 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial MARK | Last name PLATT | 11 Nonqualified plans | 12a See instructions for box 12 |
| 8636 HEARTHSTONE DRIVE MONTGOMERY AL 36117 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 25500.00 | 17 State income tax 934.63 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement **2005**
Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0453**

**Second W-2 Form (2005)**

| a Control number 20-ROGERS | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 48461.73 | 2 Federal income tax withheld 5281.85 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | | 3 Social security wages 48461.73 | 4 Social security tax withheld 3004.58 |
| | | 5 Medicare wages and tips 48461.73 | 6 Medicare tax withheld 702.79 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial ASHLEY | Last name ROGERS | 11 Nonqualified plans | 12a See instructions for box 12 |
| 612 INGLESIDE WAY PIKE ROAD AL 36064 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 48461.73 | 17 State income tax 1706.22 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form  **W-2** Wage and Tax Statement **2005**
Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number 20-SHAW | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 53847.54 | 2 Federal income tax withheld 5706.77 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL  36106 | | 3 Social security wages 53847.54 | 4 Social security tax withheld 3338.64 |
| | | 5 Medicare wages and tips 53847.54 | 6 Medicare tax withheld 780.83 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial JEANIE M. | Last name SHAW | 11 Nonqualified plans | 12a See instructions for box 12 |
| 3620 MARLER ROAD PIKE ROAD    AL 36064 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 53847.54 | 17 State income tax 2115.46 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**    **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are not acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

---

**AERAS 0454**

| a Control number 20-STANLEY | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 20400.00 | 2 Federal income tax withheld 4840.08 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL  36106 | | 3 Social security wages 20400.00 | 4 Social security tax withheld 1264.80 |
| | | 5 Medicare wages and tips 20400.00 | 6 Medicare tax withheld 295.92 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial REX | Last name STANLEY | 11 Nonqualified plans | 12a See instructions for box 12 |
| 3111 FERNWAY COURT MONTGOMERY AL 36111 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 20400.00 | 17 State income tax 1218.00 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**    **2005**



Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 30-TROTTER | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 7543.06 | 611.23 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 7543.06 | 467.67 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 7543.06 | 109.37 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| MARSHA | TROTTER | | |
| | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 692 LARKIN LANE | | 14 Other | 12c |
| MONTGOMERY   AL 36109 | | | 12d |

| f Employee's address and ZIP code | | | | | | |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| AL | 233891 | 7543.06 | 284.80 | | | |

Form **W-2** Wage and Tax Statement    **2005**    Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

---

**AERAS 0455**

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 40-FRAWLEG | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 25927.57 | 2258.76 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| ALABAMA ER ADMIN SERVICES, PC | 25927.57 | 1607.50 |
| 4160 CARMICHAEL ROAD SUITE 10 | 5 Medicare wages and tips | 6 Medicare tax withheld |
| MONTGOMERY AL  36106 | 25927.57 | 375.86 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's first name and initial | Last name | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| GINGER | FRAWLEY | | |
| | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 1203 YORKSHIRE DR. | | 14 Other | 12c |
| PRATTVILLE   AL 36067 | | | 12d |

| f Employee's address and ZIP code | | | | | | |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
| AL | 233891 | 25927.57 | 1053.44 | | | |

Form **W-2** Wage and Tax Statement        Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 40-RUSSELL | | | | | |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 34588.60 | 2 Federal income tax withheld 4478.74 |
|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | 3 Social security wages 34588.60 | 4 Social security tax withheld 2144.42 |
| | 5 Medicare wages and tips 34588.60 | 6 Medicare tax withheld 501.55 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial MELANIE    Last name RUSSELL | 11 Nonqualified plans | 12a See instructions for box 12 |
| 510 BOXWOOD RD. PRATTVILLE    AL 36067 | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 34588.60 | 1363.87 | | | |

Form **W-2** Wage and Tax Statement **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0456**

| a Control number | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 40-SMILEY | | | | | |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 25811.05 | 2 Federal income tax withheld 3202.95 |
|---|---|---|
| c Employer's name, address, and ZIP code ALABAMA ER ADMIN SERVICES, PC 4160 CARMICHAEL ROAD SUITE 10 MONTGOMERY AL 36106 | 3 Social security wages 25811.05 | 4 Social security tax withheld 1600.31 |
| | 5 Medicare wages and tips 25811.05 | 6 Medicare tax withheld 374.19 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial KATRINA    Last name SMILEY | 11 Nonqualified plans | 12a See instructions for box 12 |
| 3020 SOUTHMALL CIRCLE APARTMENT F MONTGOMERY    AL 36116 | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 25811.05 | 994.64 | | | |

Form **W-2** Wage and Tax Statement  **2005**

Department of the Treasury—Internal Revenue Service

Copy A For Social Security Administration — Send this entire page with Form W-3 to the Social Security

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

| a Control number 10-DEJESUS | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| b Employer identification number (EIN) 20-2610756 | | | 1 Wages, tips, other compensation 80998.98 | | 2 Federal income tax withheld 20384.18 |
| c Employer's name, address, and ZIP code ER MED LLC 4160 CARMICHAEL ROAD MONTGOMERY, AL 36106 | | | 3 Social security wages 80998.98 | | 4 Social security tax withheld 5021.94 |
| | | | 5 Medicare wages and tips 80998.98 | | 6 Medicare tax withheld 1174.49 |
| | | | 7 Social security tips | | 8 Allocated tips |
| d Employee's social security number 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 | | | 9 Advance EIC payment | | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code DANTE          DE JESUS 9220 SILVERBERRY COURT MONTGOMERY          AL 36117 | | | 11 Nonqualified plans | | 12a See instructions for box 12 |
| | | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | | 12b |
| | | | 14 Other | | 12c |
| | | | | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 0000440558 | 80998.98 | 2877.41 | | | |

Form **W-2** Wage and Tax Statement                    **2005**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

**AERAS 0457**

—

| a Control number | 22222 | Void ☒ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| b Employer identification number (EIN) 20-2610756 | | | 1 Wages, tips, other compensation 80998.98 | | 2 Federal income tax withheld 20384.18 |
| c Employer's name, address, and ZIP code ER MED LLC 4160 CARMICHAEL ROAD MONTGOMERY, AL 36106 | | | 3 Social security wages 80998.98 | | 4 Social security tax withheld 5021.94 |
| | | | 5 Medicare wages and tips 80998.98 | | 6 Medicare tax withheld 1174.49 |
| | | | 7 Social security tips | | 8 Allocated tips |
| d Employee's social security number | | | 9 Advance EIC payment | | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code | | | 11 Nonqualified plans | | 12a See instructions for box 12 |
| | | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | | 12b |
| | | | 14 Other | | 12c |
| | | | | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | | 80998.98 | 2877.41 | | | |

Form **W-2** Wage and Tax Statement                     **2005**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

| a Control number | | |
|---|---|---|
| 10-BRANNON | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 4500.00 | 373.45 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 4500.00 | 278.99 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 4500.00 | 65.25 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code              Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| WILLIAM          BRANNON | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 2057 COMODORE STREET | | 12c |
| MONTGOMERY  AL 36106 | 14 Other | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 4500.00 | 153.69 | | | |

Form **W-2** Wage and Tax Statement     **2006**     Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number | | |
|---|---|---|
| 10-CARTER | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 16533.43 | 1884.27 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 16533.43 | 1025.07 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 16533.43 | 239.75 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code              Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| MELONI          CARTER | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 1203 BRADBURY LANE | | 12c |
| PRATTVILLE  AL 36067 | 14 Other | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 16533.43 | 554.41 | | | |

Form **W-2** Wage and Tax Statement     **2006**     Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0458

FORM LW2D1

| a Control number | | | |
|---|---|---|---|
| 10-CLEVELA | 22222 | Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 78410.00 | 9989.11 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 78410.00 | 4861.42 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 78410.00 | 1136.95 |
| MONTGOMERY AL 36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code    Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| JIMMY         CLEVELAND | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 2942 BALDWIN BROOK DRIVE | 14 Other | 12c |
| MONTGOMERY  AL 36116 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 78410.00 | 3136.80 | | | |

Form **W-2** Wage and Tax Statement    **2006**

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number | | | |
|---|---|---|---|
| 10-COOPER | 22222 | Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 42724.38 | 5971.23 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 42724.38 | 2648.95 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 42724.38 | 619.54 |
| MONTGOMERY AL 36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code    Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| JUDY          COOPER | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 2665 CAPSTONE DRIVE | 14 Other | 12c |
| MONTGOMERY  AL 36106 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 42724.38 | 1650.34 | | | |

Form **W-2** Wage and Tax Statement    **2006**

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0459

FORM LW2D1

| a Control number | | | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 10-CRYSEL | 22222 | Void ☐ | | | |

| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|
| 63-0957661 | | 69287.00 | 9039.49 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 69287.00 | 4295.79 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 69287.00 | 1004.68 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code | Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| KIMBERLY        CRYSEL | | | |
| 1806 EDINBURGH STREET | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| PRATTVILLE    AL 36066 | | 14 Other | 12c |
| | | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 69287.00 | 2597.94 | | | |

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number | | | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 10-FALERO | 22222 | Void ☐ | | | |

| b Employer identification number (EIN) | | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|---|
| 63-0957661 | | 240000.00 | 60592.98 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 94200.00 | 5840.40 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 240000.00 | 3480.00 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code | Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|---|
| WALLACE        FALERO | | | |
| 331 GREEN CHASE CIRCLE | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| MONTGOMERY    AL 36117 | | 14 Other | 12c |
| | | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 240000.00 | 9580.38 | | | |

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0460

FORM LW2D1

| a Control number | | | OMB No. 1545-0008 | |
|---|---|---|---|---|
| 10-FALLSNI | 22222 | Void ☐ | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 2401.00 | 232.41 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL   36106 | 2401.00 | 148.86 |
| | 5 Medicare wages and tips<br>2401.00 | 6 Medicare tax withheld<br>34.82 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code            Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| NICOLE                    FALLS | | |
| 251 BEACHWOOD DRIVE<br>WETUMPKA        AL 36092 | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 2401.00 | 84.69 | | | |

Form **W-2** **Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    **For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy D—For Employer.

---

| a Control number | | | OMB No. 1545-0008 | |
|---|---|---|---|---|
| 10-GAY | 22222 | Void ☐ | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 128137.50 | 29705.68 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL   36106 | 94200.00 | 5840.40 |
| | 5 Medicare wages and tips<br>128137.50 | 6 Medicare tax withheld<br>1857.99 |
| | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code            Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| MICKEY                    GAY | | |
| 32 DOGWOOD DRIVE<br>CALERA          AL 35040 | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 128137.50 | 4837.88 | | | |

Form **W-2** **Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    **For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy D—For Employer.

AERAS 0461    FORM LW2D1

| a Control number 10-GUY | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| b Employer identification number (EIN) 63-0957661 | | | | 1 Wages, tips, other compensation 40875.00 | 2 Federal income tax withheld 7149.70 |
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | | | | 3 Social security wages 40875.00 | 4 Social security tax withheld 2534.27 |
| | | | | 5 Medicare wages and tips 40875.00 | 6 Medicare tax withheld 592.72 |
| | | | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code    Suff. ALLISON          GUY 497 MCRAE ROAD DEATSVILLE   AL 36022 | | | | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | | | 14 Other | 12c |
| | | | | | 12d |
| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 40875.00 | 17 State income tax 1542.56 | 18 Local wages, tips, etc. | 19 Local income tax    20 Locality name |

Form **W-2** **Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    For Privacy Act and Paperwork Reduction
Copy D—For Employer.    Act Notice, see back of Copy D.

| a Control number 10-LAUDERD | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| b Employer identification number (EIN) 63-0957661 | | | | 1 Wages, tips, other compensation 94879.69 | 2 Federal income tax withheld 16795.31 |
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | | | | 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 |
| | | | | 5 Medicare wages and tips 94879.69 | 6 Medicare tax withheld 1375.78 |
| | | | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code    Suff. RICK          LAUDERDALE 261 ELBERT DRIVE ALEXANDER CITAL 35010 | | | | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | | | 14 Other | 12c |
| | | | | | 12d |
| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 94879.69 | 17 State income tax 3530.13 | 18 Local wages, tips, etc. | 19 Local income tax    20 Locality name |

Form **W-2** **Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    For Privacy Act and Paperwork Reduction
Copy D—For Employer.    Act Notice, see back of Copy D.

AERAS 0462    FORM LW2D1

| a Control number | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 10-MATTHEW | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 1775.50 | 132.27 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 1775.50 | 110.09 |
| 4160 CARMICHAEL ROAD | **5** Medicare wages and tips | **6** Medicare tax withheld |
| SUITE 200 | 1775.50 | 25.75 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code        Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| KIMBERLY        MATTHEWS | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 314 SHADY NOOK DRIVE | | |
| DEATSVILLE   AL 36022 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 1775.50 | 58.47 | | | |

**Form W-2  Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

---

| a Control number | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 10-MCINTOS | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 63053.00 | 7460.92 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 63053.00 | 3909.31 |
| 4160 CARMICHAEL ROAD | **5** Medicare wages and tips | **6** Medicare tax withheld |
| SUITE 200 | 63053.00 | 914.27 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code        Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| ELIZABETH        MCINTOSH | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 400 MERRY PLACE | | |
| PIKE ROAD    AL 36064 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 63053.00 | 2856.12 | | | |

**Form W-2  Wage and Tax Statement**    **2006**    Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

**AERAS 0463**

FORM LW2D1

**a** Control number
10-MOOREHO          22222          Void ☐          OMB No. 1545-0008

**b** Employer identification number (EIN)
63-0957661

**1** Wages, tips, other compensation        300000.00
**2** Federal income tax withheld        85192.98

**c** Employer's name, address, and ZIP code
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL  36106

**3** Social security wages        94200.00
**4** Social security tax withheld        5840.40
**5** Medicare wages and tips        300000.00
**6** Medicare tax withheld        4350.00
**7** Social security tips
**8** Allocated tips

**d** Employee's social security number
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

**9** Advance EIC payment
**10** Dependent care benefits

**e** Employee's name, address, and ZIP code        Suff.
JOHN               MOOREHOUSE

3349 ALLENDALE PLACE
MONTGOMERY   AL 36111

**11** Nonqualified plans
**12a** See instructions for box 12
**13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐
**12b**
**14** Other
**12c**
**12d**

**15** State AL  Employer's state ID number 233891
**16** State wages, tips, etc.        300000.00
**17** State income tax        10600.38
**18** Local wages, tips, etc.
**19** Local income tax
**20** Locality name

Form **W-2**  **Wage and Tax Statement**        **2006**        Department of the Treasury—Internal Revenue Service
**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

**a** Control number
10-NORRIS          22222          Void ☐          OMB No. 1545-0008

**b** Employer identification number (EIN)
63-0957661

**1** Wages, tips, other compensation        75604.35
**2** Federal income tax withheld        9534.75

**c** Employer's name, address, and ZIP code
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL  36106

**3** Social security wages        75604.35
**4** Social security tax withheld        4687.51
**5** Medicare wages and tips        75604.35
**6** Medicare tax withheld        1096.34
**7** Social security tips
**8** Allocated tips

**d** Employee's social security number
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

**9** Advance EIC payment
**10** Dependent care benefits

**e** Employee's name, address, and ZIP code        Suff.
BEATRICE BEAR        NORRIS

2019 MYRTLEWOOD DRIVE
MONTGOMERY   AL 36111

**11** Nonqualified plans
**12a** See instructions for box 12
**13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐
**12b**
**14** Other
**12c**
**12d**

**15** State AL  Employer's state ID number 233891
**16** State wages, tips, etc.        75604.35
**17** State income tax        2888.06
**18** Local wages, tips, etc.
**19** Local income tax
**20** Locality name

Form **W-2**  **Wage and Tax Statement**        **2006**        Department of the Treasury—Internal Revenue Service
**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0464

FORM LW2D1

| a Control number | | |
|---|---|---|
| 10-PLATTL | 22222  Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 5062.50 | 183.51 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 5062.50 | 313.88 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 5062.50 | 73.41 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code    Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| LAUREN          PLATT | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 8636 HEARTHSTONE DRIVE | 14 Other | 12c |
| MONTGOMERY   AL 36117 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 5062.50 | 165.97 | | | |

Form **W-2** Wage and Tax Statement    2006    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    **For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy D—For Employer.

---

| a Control number | | |
|---|---|---|
| 10-PRITCH | 22222  Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 18695.00 | 1711.64 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 18695.00 | 1159.09 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 18695.00 | 271.09 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code    Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| CHRISTOPHER     PRITCHETT | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 504 LARKIN LANE | 14 Other | 12c |
| MONTGOMERY   AL 36109 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 18695.00 | 716.94 | | | |

Form **W-2** Wage and Tax Statement    2006    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    **For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy D—For Employer.

AERAS 0465

FORM LW2D1

| a Control number | | | |
|---|---|---|---|
| 10-SMITHST | 22222 | Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 5684.43 | 222.60 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 5684.43 | 352.44 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 5684.43 | 82.43 |
| MONTGOMERY AL   36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code          Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| STEVEN          SMITH | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 500 PINETREE LANE | | |
| MONTGOMERY   AL 36109 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 5684.43 | 224.98 | | | |

Form **W-2** Wage and Tax Statement          **2006**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

---

| a Control number | | | |
|---|---|---|---|
| 10-TRAUT | 22222 | Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 8094.43 | 750.44 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 8094.43 | 501.86 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 8094.43 | 117.37 |
| MONTGOMERY AL   36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code          Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| JENNIFER          TRAUTMANN | | |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 359 NEW HAVEN BLVD. | | |
| MONTGOMERY   AL 36117 | 14 Other | 12c |
| | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 8094.43 | 250.19 | | | |

Form **W-2** Wage and Tax Statement          **2006**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

AERAS 0466

FORM LW2D1

| a Control number 10-TREADWE | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 7726.93 | 2 Federal income tax withheld 1066.12 |
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | | 3 Social security wages 7726.93 | 4 Social security tax withheld 479.07 |
| | | 5 Medicare wages and tips 7726.93 | 6 Medicare tax withheld 112.05 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code DENISE          TREADWELL          Suff. | | 11 Nonqualified plans | 12a See instructions for box 12 |
| 419 OLD SPRINGVILLE ROAD ODENVILLE      AL 35120 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 7726.93 | 17 State income tax 302.24 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**      **2006**      Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department      For Privacy Act and Paperwork Reduction
Copy D—For Employer.      Act Notice, see back of Copy D.

| a Control number 10-WILKERS | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| b Employer identification number (EIN) 63-0957661 | | 1 Wages, tips, other compensation 105054.00 | 2 Federal income tax withheld 15911.87 |
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | | 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 |
| | | 5 Medicare wages and tips 105054.00 | 6 Medicare tax withheld 1523.31 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code BENNY          WILKERSON          Suff. | | 11 Nonqualified plans | 12a See instructions for box 12 |
| 813 NORTH CLAXTON AVE. ELBA        AL 36323 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 105054.00 | 17 State income tax 4383.44 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**      **2006**      Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department      For Privacy Act and Paperwork Reduction
Copy D—For Employer.      Act Notice, see back of Copy D.

**AERAS 0467**

FORM LW2D1

| a Control number | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 20-DESTIN | | | | | |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 31700.15 | 2 Federal income tax withheld 2689.55 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 31700.15 | 4 Social security tax withheld 1965.42 |
| | 5 Medicare wages and tips 31700.15 | 6 Medicare tax withheld 459.66 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code     Suff. KELLI D.          DESTIN 118 MOUNTAIN LAUREL ROAD PRATTVILLE  AL 36067 | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 31700.15 | 17 State income tax 1127.40 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement     **2006**     Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|
| 20-GREEN | | | | | |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 10860.86 | 2 Federal income tax withheld 647.49 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 10860.86 | 4 Social security tax withheld 673.40 |
| | 5 Medicare wages and tips 10860.86 | 6 Medicare tax withheld 157.51 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code     Suff. BARBARA          GREEN 902 GIVENS DRIVE MONTGOMERY  AL 36117 | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 10860.86 | 17 State income tax 348.11 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement     **2006**     Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0468                                   FORM LW2D1

| a Control number | | |
|---|---|---|
| 20-KITCHEN | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 50609.11 | 7290.97 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 50609.11 | 3137.68 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 50609.11 | 733.94 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code                Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| KATHRYN B.        KITCHENS | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 2401 NOBLE WOOD COURT | 14 Other | 12c |
| MONTGOMERY  AL 36117 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 50609.11 | 1960.96 | | | |

Form **W-2** Wage and Tax Statement    **2006**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

---

| a Control number | | |
|---|---|---|
| 20-PARKERE | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 63-0957661 | 15551.94 | 529.92 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| AERAS, P. C. | 15551.94 | 964.23 |
| 4160 CARMICHAEL ROAD | 5 Medicare wages and tips | 6 Medicare tax withheld |
| SUITE 200 | 15551.94 | 225.51 |
| MONTGOMERY AL  36106 | 7 Social security tips | 8 Allocated tips |

| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|---|
| 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 | | |

| e Employee's name, address, and ZIP code                Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| ERNEST        PARKER, JR. | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 7224 OLD BARN ROAD | 14 Other | 12c |
| MONTGOMERY  AL 36117 | | 12d |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| AL | 233891 | 15551.94 | 617.80 | | | |

Form **W-2** Wage and Tax Statement    **2006**

Department of the Treasury—Internal Revenue Service

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

**AERAS 0469**

FORM LW2D1

| a Control number | | |
|---|---|---|
| 20-PLATT | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 118019.24 | 2 Federal income tax withheld 17592.91 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 |
| | 5 Medicare wages and tips 118019.24 | 6 Medicare tax withheld 1711.40 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code MARK PLATT Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
| 8636 HEARTHSTONE DRIVE MONTGOMERY AL 36117 | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 118019.24 | 17 State income tax 4911.58 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**  2006  Department of the Treasury—Internal Revenue Service
**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number | | |
|---|---|---|
| 20-ROGERS | 22222 Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 23576.12 | 2 Federal income tax withheld 3171.43 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 23576.12 | 4 Social security tax withheld 1461.72 |
| | 5 Medicare wages and tips 23576.12 | 6 Medicare tax withheld 341.83 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code ASHLEY ROGERS Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
| 612 INGLESIDE WAY PIKE ROAD AL 36064 | 13 Statutory employee ☐ Retirement plan ☐ Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 23576.12 | 17 State income tax 880.26 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**  2006  Department of the Treasury—Internal Revenue Service
**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**
Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**AERAS 0470**

FORM LW2D1

| a Control number 20-SHAW | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 57125.82 | 2 Federal income tax withheld 6122.40 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 57125.82 | 4 Social security tax withheld 3541.79 |
| | 5 Medicare wages and tips 57125.82 | 6 Medicare tax withheld 828.40 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code JEANIE M.        SHAW            Suff. 3620 MARLER ROAD PIKE ROAD    AL 36064 | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 57125.82 | 17 State income tax 2184.15 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

| a Control number 20-STANLEY | 22222 | Void ☐ | OMB No. 1545-0008 | | |
|---|---|---|---|---|---|

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 850.00 | 2 Federal income tax withheld 201.67 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL 36106 | 3 Social security wages 850.00 | 4 Social security tax withheld 52.70 |
| | 5 Medicare wages and tips 850.00 | 6 Medicare tax withheld 12.33 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code REX          STANLEY            Suff. 3111 FERNWAY COURT MONTGOMERY   AL 36111 | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 850.00 | 17 State income tax 50.75 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service

**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0471

FORM LW2D1

**a Control number** 40-FRAWLEG    22222    Void ☐    OMB No. 1545-0008

**b Employer identification number (EIN)** 63-0957661

| 1 Wages, tips, other compensation 5646.97 | 2 Federal income tax withheld 456.01 |

**c Employer's name, address, and ZIP code**
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL  36106

| 3 Social security wages 5646.97 | 4 Social security tax withheld 350.10 |
| 5 Medicare wages and tips 5646.97 | 6 Medicare tax withheld 81.89 |
| 7 Social security tips | 8 Allocated tips |

**d Employee's social security number** 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

| 9 Advance EIC payment | 10 Dependent care benefits |

**e Employee's name, address, and ZIP code**    Suff.
GINGER                FRAWLEY

1203 YORKSHIRE DR.
PRATTVILLE   AL 36067

| 11 Nonqualified plans | 12a See instructions for box 12 |
| 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 14 Other | 12c |
| | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 5646.97 | 17 State income tax 226.46 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.
Copy D—For Employer.

---

**a Control number** 40-JONES    22222    Void ☐    OMB No. 1545-0008

**b Employer identification number (EIN)** 63-0957661

| 1 Wages, tips, other compensation 9116.25 | 2 Federal income tax withheld 1128.92 |

**c Employer's name, address, and ZIP code**
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL  36106

| 3 Social security wages 9116.25 | 4 Social security tax withheld 565.21 |
| 5 Medicare wages and tips 9116.25 | 6 Medicare tax withheld 132.18 |
| 7 Social security tips | 8 Allocated tips |

**d Employee's social security number** 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

| 9 Advance EIC payment | 10 Dependent care benefits |

**e Employee's name, address, and ZIP code**    Suff.
KRISTI                JONES

720 S. MARQUETTE DRIVE
MONTGOMERY   AL 36104

| 11 Nonqualified plans | 12a See instructions for box 12 |
| 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| 14 Other | 12c |
| | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 9116.25 | 17 State income tax 319.81 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form **W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service
Copy 1—For State, City, or Local Tax Department    For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.
Copy D—For Employer.

AERAS 0472

FORM LW2D1

**a Control number** 40-MAYS

22222  Void ☐  OMB No. 1545-0008

**b Employer identification number (EIN)** 63-0957661

**1 Wages, tips, other compensation** 16367.96

**2 Federal income tax withheld** 1595.65

**c Employer's name, address, and ZIP code**
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL 36106

**3 Social security wages** 16367.96

**4 Social security tax withheld** 1014.76

**5 Medicare wages and tips** 16367.96

**6 Medicare tax withheld** 237.35

**7 Social security tips**

**8 Allocated tips**

**d Employee's social security number** 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

**9 Advance EIC payment**

**10 Dependent care benefits**

**e Employee's name, address, and ZIP code**
QUATISHA          MAYS          Suff.

466 EASTDALE ROAD SOUTH
MONTGOMERY AL 36117

**11 Nonqualified plans**

**12a See instructions for box 12**

**13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐

**12b**

**14 Other**

**12c**

**12d**

**15 State** AL  **Employer's state ID number** 233891

**16 State wages, tips, etc.** 16367.96

**17 State income tax** 576.10

**18 Local wages, tips, etc.**

**19 Local income tax**

**20 Locality name**

**Form W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

---

**a Control number** 40-RUSSELL

22222  Void ☐  OMB No. 1545-0008

**b Employer identification number (EIN)** 63-0957661

**1 Wages, tips, other compensation** 36903.75

**2 Federal income tax withheld** 5112.74

**c Employer's name, address, and ZIP code**
AERAS, P. C.
4160 CARMICHAEL ROAD
SUITE 200
MONTGOMERY AL 36106

**3 Social security wages** 36903.75

**4 Social security tax withheld** 2287.98

**5 Medicare wages and tips** 36903.75

**6 Medicare tax withheld** 535.01

**7 Social security tips**

**8 Allocated tips**

**d Employee's social security number** 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

**9 Advance EIC payment**

**10 Dependent care benefits**

**e Employee's name, address, and ZIP code**
MELANIE          RUSSELL          Suff.

510 BOXWOOD RD.
PRATTVILLE AL 36067

**11 Nonqualified plans**

**12a See instructions for box 12**

**13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐

**12b**

**14 Other**

**12c**

**12d**

**15 State** AL  **Employer's state ID number** 233891

**16 State wages, tips, etc.** 36903.75

**17 State income tax** 1419.32

**18 Local wages, tips, etc.**

**19 Local income tax**

**20 Locality name**

**Form W-2** Wage and Tax Statement    **2006**    Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

AERAS 0473

FORM LW2D1

**First W-2 form:**

| | | |
|---|---|---|
| a Control number: 40-SMILEY | 22222  Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 29572.50 | 2 Federal income tax withheld 3847.06 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | 3 Social security wages 29572.50 | 4 Social security tax withheld 1833.53 |
| | 5 Medicare wages and tips 29572.50 | 6 Medicare tax withheld 428.84 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code        Suff. KATRINA          SMILEY 3020 SOUTHMALL CIRCLE APARTMENT F MONTGOMERY   AL 36116 | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number 233891 | 16 State wages, tips, etc. 29572.50 | 17 State income tax 1116.12 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement        **2006**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.

**Second W-2 form:**

| | | |
|---|---|---|
| a Control number | 22222  Void ☐ | OMB No. 1545-0008 |

| b Employer identification number (EIN) 63-0957661 | 1 Wages, tips, other compensation 1714398.81 | 2 Federal income tax withheld 314287.45 |
|---|---|---|
| c Employer's name, address, and ZIP code AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 | 3 Social security wages 1293508.38 | 4 Social security tax withheld 80197.52 |
| | 5 Medicare wages and tips 1714398.81 | 6 Medicare tax withheld 24859.35 |
| | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's name, address, and ZIP code        Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
| | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | 14 Other | 12c |
| | | 12d |

| 15 State AL | Employer's state ID number | 16 State wages, tips, etc. 1714398.81 | 17 State income tax 65854.43 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|

Form **W-2** Wage and Tax Statement        **2006**

Copy 1—For State, City, or Local Tax Department
Copy D—For Employer.

**AERAS 0474**

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see back of Copy D.
FORM LW2D1

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $ | **2006** | **Miscellaneous Income** |
| | | 2 Royalties | Form **1099-MISC** | |
| | | $ | | |
| | | 3 Other income | 4 Federal income tax withheld | **Copy C For Payer or State Copy** |
| | | $ | $ | |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | |
| | | $ | $ | |
| RECIPIENT'S name, address, and ZIP code | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | **For Privacy Act and Paperwork Reduction Act Notice, see the 2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| DAVID GREGORY ALEXANDER | | $  482157.95 | $ | |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| 7524 MOSSY OAK DRIVE | | | $ | |
| MONTGOMERY AL  36117 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not.<br>☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                                                                   Department of the Treasury - Internal Revenue Service

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $ | **2006** | **Miscellaneous Income** |
| | | 2 Royalties | Form **1099-MISC** | |
| | | $ | | |
| | | 3 Other income | 4 Federal income tax withheld | **Copy C For Payer or State Copy** |
| | | $ | $ | |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds | 6 Medical and health care payments | |
| | | $ | $ | |
| RECIPIENT'S name, address, and ZIP code | | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | **For Privacy Act and Paperwork Reduction Act Notice, see the 2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| JAMES BRADWELL | | $  464714.95 | $ | |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds | |
| 124 PAYNE ROAD | | | $ | |
| MONTGOMERY AL  36116 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not.<br>☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                                                                   Department of the Treasury - Internal Revenue Service

**AERAS 0475**

2006 FORM LMC

☐ VOID  ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$ | 2006<br>Form **1099-MISC** | |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | **Copy C**<br>**For Payer**<br>**or State Copy** |
| PAYER'S federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ |
| RECIPIENT'S name, address, and ZIP code<br>WALLACE G FALERO | 7 Nonemployee compensation<br>$  271875.27 | 8 Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 331 GREENCHASE CIRCLE<br>MONTGOMERY AL  36117 | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐<br>11 | 10 Crop insurance proceeds<br>$<br>12 | |
| Account number (see instructions)                          2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals  $ | 15b Section 409A income  $ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

---

☐ VOID  ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | Miscellaneous Income |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$ | 2006<br>Form **1099-MISC** | |
| | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | **Copy C**<br>**For Payer**<br>**or State Copy** |
| PAYER'S federal identification number  63-0957661 | RECIPIENT'S identification number  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 | 5 Fishing boat proceeds<br>$ | 6 Medical and health care payments<br>$ |
| RECIPIENT'S name, address, and ZIP code<br>JOSEPH A FOSTER | 7 Nonemployee compensation<br>$  42267.50 | 8 Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 2079 WATERFRONT DRIVE<br>GADSDEN AL  35907 | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐<br>11 | 10 Crop insurance proceeds<br>$<br>12 | |
| Account number (see instructions)                          2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals  $ | 15b Section 409A income  $ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

**AERAS 0476**

2006 FORM LMC

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$<br>3 Other income<br>$ | 2006<br>Form **1099-MISC**<br>4 Federal income tax withheld<br>$ | **Miscellaneous Income**<br><br>**Copy C**<br>**For Payer**<br>**or State Copy** |

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | |
|---|---|---|---|---|
| 63-0957661 | 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 | $ | $ | |

| RECIPIENT'S name, address, and ZIP code | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
|---|---|---|---|
| CARLOS GUTIERREZ<br><br>3507 HARDING CLOSE CIRCLE<br><br>MONTGOMERY AL  36106 | $   359461.08<br>9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐<br>11 | $<br>10 Crop insurance proceeds<br>$<br>12 | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
|---|---|---|---|---|

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $ | | $ |

Form **1099-MISC**                                                  Department of the Treasury - Internal Revenue Service

---

☐ VOID   ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$<br>3 Other income<br>$ | 2006<br>Form **1099-MISC**<br>4 Federal income tax withheld<br>$ | **Miscellaneous Income**<br><br>**Copy C**<br>**For Payer**<br>**or State Copy** |

| PAYER'S federal identification number | RECIPIENT'S identification number | 5 Fishing boat proceeds | 6 Medical and health care payments | |
|---|---|---|---|---|
| 63-0957661 | 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 | $ | $ | |

| RECIPIENT'S name, address, and ZIP code | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
|---|---|---|---|
| JOSHUA KOTOUC<br><br>1372 ANDERSON AVENUE<br><br>MORGANTOWN WV  26505 | $   9800.00<br>9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐<br>11 | $<br>10 Crop insurance proceeds<br>$<br>12 | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
|---|---|---|---|---|

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $ | | $ |

Form **1099-MISC**                                                  Department of the Treasury - Internal Revenue Service

**AERAS 0477**

2006 FORM LMC

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 334 272 1050 | | $ | **2006** Form **1099-MISC** | **Miscellaneous Income** |
| | | 2 Royalties $ | | |
| | | 3 Other income $ | 4 Federal income tax withheld $ | **Copy C For Payer or State Copy** |
| PAYER'S federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |
| RECIPIENT'S name, address, and ZIP code JULIAN MAHAGANASAN | | 7 Nonemployee compensation $ 254567.42 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 1263 EAGLE PARK ROAD | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| BIRMINGHAM AL  35242 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 334 272 1050 | | $ | **2006** Form **1099-MISC** | **Miscellaneous Income** |
| | | 2 Royalties $ | | |
| | | 3 Other income $ | 4 Federal income tax withheld $ | **Copy C For Payer or State Copy** |
| PAYER'S federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |
| RECIPIENT'S name, address, and ZIP code JAMES MATIC | | 7 Nonemployee compensation $ 1000.00 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 900 DEER TRACE ROAD | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| PELL CITY AL  35125 | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney | |
| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ | 17 State/Payer's state no. | 18 State income $ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

**AERAS 0478**

2006 FORM LMC

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1  Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $<br>2  Royalties<br>$ | **2006**<br>Form **1099-MISC** | **Miscellaneous Income** |
| | | 3  Other income<br>$ | 4  Federal income tax withheld<br>$ | **Copy C For Payer or State Copy** |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5  Fishing boat proceeds<br>$ | 6  Medical and health care payments<br>$ | |
| RECIPIENT'S name, address, and ZIP code<br>JULIO RIOS | | 7  Nonemployee compensation<br>$  644362.56 | 8  Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 3101 MARLER ROAD<br>PIKE ROAD AL  36064 | | 9  Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10  Crop insurance proceeds<br>$ | |
| | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not.<br>☐ | 13  Excess golden parachute payments<br>$ | 14  Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16  State tax withheld<br>$<br>$ | 17  State/Payer's state no. | 18  State income<br>$<br>$ |

Form **1099-MISC**                                            Department of the Treasury – Internal Revenue Service

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1  Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $<br>2  Royalties<br>$ | **2006**<br>Form **1099-MISC** | **Miscellaneous Income** |
| | | 3  Other income<br>$ | 4  Federal income tax withheld<br>$ | **Copy C For Payer or State Copy** |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5  Fishing boat proceeds<br>$ | 6  Medical and health care payments<br>$ | |
| RECIPIENT'S name, address, and ZIP code<br>RONALD A SHAW | | 7  Nonemployee compensation<br>$  363350.91 | 8  Substitute payments in lieu of dividends or interest<br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| 8112 WESTLAKES PLACE<br>MONTGOMERY AL  36117 | | 9  Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10  Crop insurance proceeds<br>$ | |
| | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not.<br>☐ | 13  Excess golden parachute payments<br>$ | 14  Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16  State tax withheld<br>$<br>$ | 17  State/Payer's state no. | 18  State income<br>$<br>$ |

Form **1099-MISC**                                            Department of the Treasury – Internal Revenue Service

**AERAS 0479**

2006 FORM LMC

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$ | **2006**<br>Form **1099-MISC** | **Miscellaneous Income** |

| | 3 Other income | 4 Federal income tax withheld | |
|---|---|---|---|
| PAYER'S federal identification number | $ | $ | **Copy C** |
| 63-0957661 | 5 Fishing boat proceeds | 6 Medical and health care payments | **For Payer** |
| RECIPIENT'S identification number | | | **or State Copy** |
| 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 | $ | $ | |

| RECIPIENT'S name, address, and ZIP code | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act |
|---|---|---|---|
| GEORGE C SMITH JR | $ 107410.00 | $ | and Paperwork Reduction Act |
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | Notice, see the **2006 General Instructions for** |
| 49 JACKSON SPRINGS ROAD | 11 | 12 | **Forms 1099, 1098, 5498,** |
| LINEVILLE AL  36266 | | | **and W-2G.** |

| Account number (see instructions) | | 2nd TIN not.<br>☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney |
|---|---|---|---|---|

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $<br>$ | | $<br>$ |

Form **1099-MISC**    Department of the Treasury - Internal Revenue Service

---

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | $<br>2 Royalties<br>$ | **2006**<br>Form **1099-MISC** | **Miscellaneous Income** |

| | 3 Other income | 4 Federal income tax withheld | |
|---|---|---|---|
| PAYER'S federal identification number | $ | $ | **Copy C** |
| 63-0957661 | 5 Fishing boat proceeds | 6 Medical and health care payments | **For Payer** |
| RECIPIENT'S identification number | | | **or State Copy** |
| 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 | $ | $ | |

| RECIPIENT'S name, address, and ZIP code | 7 Nonemployee compensation | 8 Substitute payments in lieu of dividends or interest | For Privacy Act |
|---|---|---|---|
| JOEL C SULLIVAN | $ 311803.08 | $ | and Paperwork Reduction Act |
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | Notice, see the **2006 General Instructions for** |
| 265 GLADYS DRIVE | 11 | 12 | **Forms 1099, 1098, 5498,** |
| TITUS AL  36080 | | | **and W-2G.** |

| Account number (see instructions) | | 2nd TIN not.<br>☐ | 13 Excess golden parachute payments | 14 Gross proceeds paid to an attorney |
|---|---|---|---|---|

| 15a Section 409A deferrals | 15b Section 409A income | 16 State tax withheld | 17 State/Payer's state no. | 18 State income |
|---|---|---|---|---|
| $ | $ | $<br>$ | | $<br>$ |

Form **1099-MISC**    Department of the Treasury - Internal Revenue Service

**AERAS 0480**

2006 FORM LMC

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 334 272 1050 | $ | **2006** | Miscellaneous Income |
| | 2 Royalties | Form **1099-MISC** | |
| | $ | | |
| | 3 Other income | 4 Federal income tax withheld | |
| | $ | $ | Copy C For Payer or State Copy |

| PAYER'S federal identification number 63-0957661 | RECIPIENT'S identification number 63-0980970 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |

| RECIPIENT'S name, address, and ZIP code HILL HILL CARTER FRANCO COLE & BLACK  P O BOX 116  MONTGOMERY AL  36101 | 7 Nonemployee compensation $   12697.50 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
|---|---|---|---|
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| | 11 | 12 | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form **1099-MISC**                      Department of the Treasury - Internal Revenue Service

---

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|
| AERAS, P. C. 4160 CARMICHAEL ROAD SUITE 200 MONTGOMERY AL  36106 334 272 1050 | $ | **2006** | Miscellaneous Income |
| | 2 Royalties | Form **1099-MISC** | |
| | $ | | |
| | 3 Other income | 4 Federal income tax withheld | |
| | $ | $ | Copy C For Payer or State Copy |

| PAYER'S federal identification number 63-0957661 | RECIPIENT'S identification number 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 | 5 Fishing boat proceeds $ | 6 Medical and health care payments $ | |

| RECIPIENT'S name, address, and ZIP code  ERNEST PARKER  7224 OLD BARN ROAD  MONTGOMERY AL  36117 | 7 Nonemployee compensation $   6189.48 | 8 Substitute payments in lieu of dividends or interest $ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
|---|---|---|---|
| | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds $ | |
| | 11 | 12 | |

| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments $ | 14 Gross proceeds paid to an attorney $ | |

| 15a Section 409A deferrals $ | 15b Section 409A income $ | 16 State tax withheld $ $ | 17 State/Payer's state no. | 18 State income $ $ |

Form **1099-MISC**                      Department of the Treasury - Internal Revenue Service

**AERAS 0481**

2006 FORM LMC

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $ | **2006** | **Miscellaneous Income** |
| | | 2 Royalties<br>$ | Form **1099-MISC** | |
| | | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | **Copy C** |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number<br>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 | 5 Fishing boat proceeds<br><br>$ | 6 Medical and health care payments<br><br>$ | **For Payer or State Copy** |
| RECIPIENT'S name, address, and ZIP code<br>LAUREN PLATT<br><br>8636 HEARTHSTONE DRIVE<br>MONTGOMERY AL 36117 | | 7 Nonemployee compensation<br><br>$       696.85 | 8 Substitute payments in lieu of dividends or interest<br><br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

---

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1 Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| AERAS, P. C.<br>4160 CARMICHAEL ROAD<br>SUITE 200<br>MONTGOMERY AL  36106<br>334 272 1050 | | $ | **2006** | **Miscellaneous Income** |
| | | 2 Royalties<br>$ | Form **1099-MISC** | |
| | | 3 Other income<br>$ | 4 Federal income tax withheld<br>$ | **Copy C** |
| PAYER'S federal identification number<br>63-0957661 | RECIPIENT'S identification number | 5 Fishing boat proceeds<br><br>$ | 6 Medical and health care payments<br><br>$ | **For Payer or State Copy** |
| RECIPIENT'S name, address, and ZIP code<br>COMPANY TOTAL<br><br>COMPANY TOTAL<br><br>COMPANY TOTAL | | 7 Nonemployee compensation<br><br>$  3332354.55 | 8 Substitute payments in lieu of dividends or interest<br><br>$ | For Privacy Act and Paperwork Reduction Act Notice, see the **2006 General Instructions for Forms 1099, 1098, 5498, and W-2G.** |
| | | 9 Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10 Crop insurance proceeds<br>$ | |
| | | 11 | 12 | |
| Account number (see instructions) | 2nd TIN not. ☐ | 13 Excess golden parachute payments<br>$ | 14 Gross proceeds paid to an attorney<br>$ | |
| 15a Section 409A deferrals<br>$ | 15b Section 409A income<br>$ | 16 State tax withheld<br>$<br>$ | 17 State/Payer's state no. | 18 State income<br>$<br>$ |

Form **1099-MISC**                                    Department of the Treasury - Internal Revenue Service

**AERAS 0482**

| Control number 10-DEJESUS | 22222 | Void ☐ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 20-2610756 | | 1 Wages, tips, other compensation 307781.06 | 2 Federal income tax withheld 82323.03 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ER MED LLC 4160 CARMICHAEL ROAD MONTGOMERY AL 36104 | | 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 |
| | | 5 Medicare wages and tips 307781.06 | 6 Medicare tax withheld 4462.82 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number 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 | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial DANTE   Last name DE JESUS   Suff. | | 11 Nonqualified plans | 12a See instructions for box 12 |
| 6212 MONTICELLO DRIVE MONTGOMERY    AL 36117 | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State Employer's state ID number AL 0000440558 | 16 State wages, tips, etc. 307781.06 | 17 State income tax 10812.92 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**   **2006**

Department of the Treasury—Internal Revenue Service

**Copy A For Social Security Administration** — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

Do Not Cut, Fold, or Staple Forms on This Page — Do Not Cut, Fold, or Staple Forms on This Page

**AERAS 0483**

| a Control number | 22222 | Void ☒ | For Official Use Only ▷ OMB No. 1545-0008 | |
|---|---|---|---|---|

| b Employer identification number (EIN) 20-2610756 | | 1 Wages, tips, other compensation 307781.06 | 2 Federal income tax withheld 82323.03 |
|---|---|---|---|
| c Employer's name, address, and ZIP code ER MED LLC 4160 CARMICHAEL ROAD MONTGOMERY AL 36104 | | 3 Social security wages 94200.00 | 4 Social security tax withheld 5840.40 |
| | | 5 Medicare wages and tips 307781.06 | 6 Medicare tax withheld 4462.82 |
| | | 7 Social security tips | 8 Allocated tips |
| d Employee's social security number | | 9 Advance EIC payment | 10 Dependent care benefits |
| e Employee's first name and initial   Last name   Suff. | | 11 Nonqualified plans | 12a See instructions for box 12 |
| | | 13 Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☐ | 12b |
| | | 14 Other | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State Employer's state ID number AL | 16 State wages, tips, etc. 307781.06 | 17 State income tax 10812.92 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|

Form **W-2** **Wage and Tax Statement**   **2006**

Department of the Treasury—Internal Revenue Service

**Copy A For Social Security Administration** — Send this entire page with Form W-3 to the Social Security Administration; photocopies are **not** acceptable.

For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.

41-1628061

FORM LW2A

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 05/01/05 THRU 05/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER  CARTER, MELONI | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03017 | D | 38.25 | 0.00 | 1,338.75 | 120.40 | 83.00 | 19.41 | 43.00 | 0.00 | 238.45 | 834.49 |
| 05/31/05 | D03032 | D | 57.50 | 0.00 | 2,012.50 | 221.46 | 124.78 | 29.18 | 71.64 | 0.00 | 240.64 | 1,324.80 |
| CARTER  TOTAL: | | | 95.75 | 0.00 | 3,351.25 | 341.86 | 207.78 | 48.59 | 114.64 | 0.00 | 479.09 | 2,159.29 |
| 10-CLEVELA  CLEVELAND, JIMMY | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03018 | D | 84.00 | 0.00 | 4,200.00 | 627.08 | 260.40 | 60.90 | 165.73 | 0.00 | 0.00 | 3,085.89 |
| 05/31/05 | D03033 | D | 84.00 | 0.00 | 4,200.00 | 627.08 | 260.40 | 60.90 | 165.73 | 0.00 | 0.00 | 3,085.89 |
| CLEVELA TOTAL: | | | 168.00 | 0.00 | 8,400.00 | 1,254.16 | 520.80 | 121.80 | 331.46 | 0.00 | 0.00 | 6,171.78 |
| 10-COOPER  COOPER, JUDY | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | 028493 | | 26.00 | 0.00 | 520.00 | 18.15 | 32.24 | 7.54 | 16.25 | 0.00 | 0.00 | 445.82 |
| 05/31/05 | 028540 | | 40.50 | 0.00 | 1,541.25 | 174.74 | 95.56 | 22.35 | 59.48 | 0.00 | 0.00 | 1,189.12 |
| COOPER  TOTAL: | | | 66.50 | 0.00 | 2,061.25 | 192.89 | 127.80 | 29.89 | 75.73 | 0.00 | 0.00 | 1,634.94 |
| 10-FALERO  FALERO, WALLACE | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03007 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO  TOTAL: | | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY  GAY, MICKEY | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | 028494 | | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| 05/31/05 | 028541 | | 84.00 | 0.00 | 4,200.00 | 926.10 | 260.40 | 60.90 | 157.86 | 0.00 | 0.00 | 2,794.74 |
| GAY  TOTAL: | | | 180.00 | 0.00 | 9,000.00 | 2,020.20 | 558.00 | 130.50 | 337.32 | 0.00 | 0.00 | 5,953.98 |
| 10-LAUDERD  LAUDERDALE, RICK | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03019 | D | 74.50 | 0.00 | 3,352.50 | 542.08 | 207.86 | 48.61 | 123.65 | 0.00 | 0.00 | 2,430.30 |
| 05/31/05 | D03034 | D | 69.00 | 0.00 | 3,105.00 | 480.21 | 192.51 | 45.02 | 114.36 | 0.00 | 0.00 | 2,272.90 |
| LAUDERD TOTAL: | | | 143.50 | 0.00 | 6,457.50 | 1,022.29 | 400.37 | 93.63 | 238.01 | 0.00 | 0.00 | 4,703.20 |
| 10-MCINTOS  MCINTOSH, ELIZABETH | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03020 | D | 102.00 | 0.00 | 3,570.00 | 489.58 | 221.34 | 51.77 | 156.10 | 0.00 | 0.00 | 2,651.21 |
| 05/31/05 | D03035 | D | 94.00 | 0.00 | 3,290.00 | 419.58 | 203.98 | 47.71 | 145.60 | 0.00 | 0.00 | 2,473.13 |
| MCINTOS TOTAL: | | | 196.00 | 0.00 | 6,860.00 | 909.16 | 425.32 | 99.48 | 301.70 | 0.00 | 0.00 | 5,124.34 |
| 10-MOOREHO  MOOREHOUSE, JOHN | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03008 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO TOTAL: | | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS  NORRIS, BEATRICE BEAR | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03021 | D | 47.00 | 0.00 | 2,350.00 | 228.62 | 144.27 | 33.74 | 86.37 | 0.00 | 56.10 | 1,800.90 |
| 05/31/05 | D03036 | D | 36.00 | 0.00 | 1,800.00 | 146.12 | 110.17 | 25.77 | 63.00 | 0.00 | 115.19 | 1,339.75 |
| NORRIS  TOTAL: | | | 83.00 | 0.00 | 4,150.00 | 374.74 | 254.44 | 59.51 | 149.37 | 0.00 | 171.29 | 3,140.65 |
| 10-TREADWE  TREADWELL, DENISE | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03022 | D | 24.00 | 0.00 | 1,200.00 | 148.54 | 74.40 | 17.40 | 46.74 | 0.00 | 0.00 | 912.92 |
| TREADWE TOTAL: | | | 24.00 | 0.00 | 1,200.00 | 148.54 | 74.40 | 17.40 | 46.74 | 0.00 | 0.00 | 912.92 |
| 10-WILKERS  WILKERSON, BENNY | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03023 | D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 127.06 | 0.00 | 45.60 | 2,268.26 |
| 05/31/05 | D03037 | D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 45.60 | 3,046.50 |
| WILKERS TOTAL: | | | 144.00 | 0.00 | 7,200.00 | 943.33 | 446.40 | 104.40 | 299.91 | 0.00 | 91.20 | 5,314.76 |
| DEPT 10 TOTAL: | | | 1100.75 | 0.00 | 88,680.00 | 18,141.33 | 3,945.31 | 1,285.20 | 3,324.84 | 0.00 | 741.58 | 61,241.74 |

**AERAS 0547**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 05/01/05 THRU 05/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03009 | D | 86.67 | 0.00 | 1,312.50 | 90.87 | 79.07 | 18.49 | 46.93 | 0.00 | 119.56 | 957.58 |
| 05/31/05 | D03024 | D | 81.22 | 0.00 | 1,305.72 | 89.85 | 78.65 | 18.39 | 46.64 | 0.00 | 119.56 | 952.63 |
| DESTIN TOTAL: | | | 167.89 | 0.00 | 2,618.22 | 180.72 | 157.72 | 36.88 | 93.57 | 0.00 | 239.12 | 1,910.21 |
| 20-FRAWLEY | FRAWLEY, KATHY A. | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03010 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| 05/31/05 | D03025 | D | 72.73 | 0.00 | 2,249.52 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.94 |
| FRAWLEY TOTAL: | | | 159.40 | 0.00 | 4,499.02 | 469.68 | 277.14 | 64.82 | 188.36 | 0.00 | 257.16 | 3,241.86 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03011 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| 05/31/05 | D03026 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| KITCHEN TOTAL: | | | 173.34 | 0.00 | 3,118.50 | 381.06 | 191.74 | 44.84 | 122.66 | 0.00 | 51.90 | 2,326.30 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03012 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| 05/31/05 | D03027 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| ROGERS TOTAL: | | | 173.34 | 0.00 | 3,833.34 | 407.82 | 235.04 | 54.98 | 133.32 | 0.00 | 112.30 | 2,889.88 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03013 | D | 86.67 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 29.88 | 1,676.86 |
| 05/31/05 | D03028 | D | 86.67 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.74 |
| SHAW TOTAL: | | | 173.34 | 0.00 | 4,375.00 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 29.88 | 3,383.60 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03014 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 05/31/05 | D03029 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1020.65 | 0.00 | 20,144.08 | 2,298.04 | 1,238.30 | 289.62 | 810.81 | 0.00 | 690.36 | 14,816.95 |

*AERAS 0548*

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 05/01/05 THRU 05/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG FRAWLEY, GINGER | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | 028491 | | 86.67 | 0.00 | 1,041.71 | 84.80 | 64.59 | 15.10 | 42.01 | 0.00 | 25.00 | 810.21 |
| 05/31/05 | 028539 | | 71.67 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| FRAWLEG TOTAL: | | | 158.34 | 0.00 | 2,083.40 | 169.60 | 129.17 | 30.20 | 84.02 | 0.00 | 50.00 | 1,620.41 |
| 40-RUSSELL RUSSELL, MELANIE | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03015 | D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| 05/31/05 | D03030 | D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| RUSSELL TOTAL: | | | 173.34 | 0.00 | 2,583.34 | 324.58 | 160.16 | 37.46 | 101.28 | 0.00 | 48.00 | 1,911.86 |
| 40-SMILEY SMILEY, KATRINA | | | | SSN: 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 | | | | | | | | |
| 05/13/05 | D03016 | D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 05/31/05 | D03031 | D | 46.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY TOTAL: | | | 133.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| DEPT 40 TOTAL: | | | 465.02 | 0.00 | 6,573.48 | 717.28 | 407.55 | 95.30 | 257.82 | 0.00 | 98.00 | 4,997.53 |
| REPORT TOTAL: | | | 2586.42 | 0.00 | 115,397.56 | 21,156.65 | 5,591.16 | 1,670.12 | 4,393.47 | 0.00 | 1,529.94 | 81,056.22 |

**AERAS 0549**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 06/01/05 THRU 06/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03040 | D | 20.00 | 0.00 | 700.00 | 36.67 | 43.40 | 10.15 | 16.58 | 0.00 | 238.45 | 354.75 |
| 06/30/05 | D03062 | D | 8.00 | 0.00 | 280.00 | 0.00 | 17.36 | 4.06 | 3.13 | 0.00 | 139.46 | 115.99 |
| CARTER TOTAL: | | | 28.00 | 0.00 | 980.00 | 36.67 | 60.76 | 14.21 | 19.71 | 0.00 | 377.91 | 470.74 |
| 10-CLEVELA | CLEVELAND, JIMMY | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03041 | D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| 06/30/05 | D03063 | D | 72.00 | 0.00 | 3,600.00 | 477.08 | 223.20 | 52.20 | 143.23 | 0.00 | 0.00 | 2,704.29 |
| CLEVELA TOTAL: | | | 120.00 | 0.00 | 6,000.00 | 716.66 | 372.00 | 87.00 | 238.33 | 0.00 | 0.00 | 4,586.01 |
| 10-COOPER | COOPER, JUDY | | | | SSN: 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 | | | | | | | |
| 06/15/05 | 028571 | | 30.50 | 0.00 | 1,296.25 | 129.63 | 80.37 | 18.80 | 49.48 | 0.00 | 0.00 | 1,017.97 |
| 06/30/05 | 028610 | | 36.50 | 0.00 | 1,551.25 | 177.24 | 96.18 | 22.49 | 59.85 | 0.00 | 0.00 | 1,195.49 |
| COOPER TOTAL: | | | 67.00 | 0.00 | 2,847.50 | 306.87 | 176.55 | 41.29 | 109.33 | 0.00 | 0.00 | 2,213.46 |
| 10-FALERO | FALERO, WALLACE | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03038 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO TOTAL: | | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY | GAY, MICKEY | | | | SSN: 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 | | | | | | | |
| 06/15/05 | 028572 | | 108.00 | 0.00 | 5,400.00 | 1,262.10 | 334.80 | 78.30 | 201.06 | 0.00 | 0.00 | 3,523.74 |
| 06/30/05 | 028611 | | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| GAY TOTAL: | | | 204.00 | 0.00 | 10,200.00 | 2,356.20 | 632.40 | 147.90 | 380.52 | 0.00 | 0.00 | 6,682.98 |
| 10-LAUDERD | LAUDERDALE, RICK | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03042 | D | 81.00 | 0.00 | 3,645.00 | 621.37 | 225.99 | 52.85 | 134.31 | 0.00 | 0.00 | 2,610.48 |
| 06/30/05 | D03064 | D | 117.50 | 0.00 | 5,287.50 | 1,081.27 | 327.83 | 76.67 | 193.44 | 0.00 | 0.00 | 3,608.29 |
| LAUDERD TOTAL: | | | 198.50 | 0.00 | 8,932.50 | 1,702.64 | 553.82 | 129.52 | 327.75 | 0.00 | 0.00 | 6,218.77 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03043 | D | 88.00 | 0.00 | 3,080.00 | 367.08 | 190.96 | 44.66 | 137.73 | 0.00 | 0.00 | 2,339.57 |
| 06/30/05 | D03065 | D | 70.25 | 0.00 | 2,458.75 | 268.40 | 152.44 | 35.65 | 111.60 | 0.00 | 0.00 | 1,890.66 |
| MCINTOS TOTAL: | | | 158.25 | 0.00 | 5,538.75 | 635.48 | 343.40 | 80.31 | 249.33 | 0.00 | 0.00 | 4,230.23 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03039 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO TOTAL: | | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03044 | D | 84.00 | 0.00 | 4,200.00 | 621.31 | 258.97 | 60.57 | 159.24 | 0.00 | 56.10 | 3,043.81 |
| 06/30/05 | D03066 | D | 79.50 | 0.00 | 3,975.00 | 565.06 | 245.02 | 57.30 | 150.80 | 0.00 | 108.49 | 2,848.33 |
| NORRIS TOTAL: | | | 163.50 | 0.00 | 8,175.00 | 1,186.37 | 503.99 | 117.87 | 310.04 | 0.00 | 164.59 | 5,892.14 |
| 10-TREADWE | TREADWELL, DENISE | | | | SSN: 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 | | | | | | | |
| 06/30/05 | D03067 | D | 12.00 | 0.00 | 600.00 | 58.54 | 37.20 | 8.70 | 21.24 | 0.00 | 0.00 | 474.32 |
| TREADWE TOTAL: | | | 12.00 | 0.00 | 600.00 | 58.54 | 37.20 | 8.70 | 21.24 | 0.00 | 0.00 | 474.32 |
| 10-WILKERS | WILKERSON, BENNY | | | | SSN: 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 | | | | | | | |
| 06/15/05 | D03045 | D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 45.60 | 3,046.50 |
| 06/30/05 | D03068 | D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 127.06 | 0.00 | 45.60 | 2,268.26 |
| WILKERS TOTAL: | | | 144.00 | 0.00 | 7,200.00 | 943.33 | 446.40 | 104.40 | 299.91 | 0.00 | 91.20 | 5,314.76 |
| DEPT 10 TOTAL: | | | 1095.25 | 0.00 | 90,473.75 | 18,876.92 | 4,056.52 | 1,311.20 | 3,386.12 | 0.00 | 633.70 | 62,209.29 |

**AERAS 0550**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 06/01/05 THRU 06/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03046 | D | 69.76 | 0.00 | 1,241.81 | 80.27 | 74.68 | 17.47 | 43.92 | 0.00 | 169.56 | 855.91 |
| 06/30/05 | D03050 | D | 81.67 | 0.00 | 1,312.53 | 90.88 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.60 |
| DESTIN TOTAL: | | | 151.43 | 0.00 | 2,554.34 | 171.15 | 153.75 | 35.96 | 90.85 | 0.00 | 339.12 | 1,763.51 |
| | | | | | | | | | | | | |
| 20-FRAWLEY | FRAWLEY, KATHY A. | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03047 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| 06/30/05 | D03055 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| FRAWLEY TOTAL: | | | 173.34 | 0.00 | 4,499.00 | 469.68 | 277.14 | 64.82 | 188.36 | 0.00 | 257.16 | 3,241.84 |
| | | | | | | | | | | | | |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03048 | D | 81.35 | 0.00 | 1,559.28 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.17 |
| 06/30/05 | D03056 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| KITCHEN TOTAL: | | | 168.02 | 0.00 | 3,118.53 | 381.07 | 191.74 | 44.84 | 122.66 | 0.00 | 51.90 | 2,326.32 |
| | | | | | | | | | | | | |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03049 | D | 82.43 | 0.00 | 1,916.71 | 203.92 | 117.52 | 27.49 | 66.67 | 0.00 | 56.15 | 1,444.96 |
| 06/30/05 | D03057 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| ROGERS TOTAL: | | | 169.10 | 0.00 | 3,833.38 | 407.83 | 235.04 | 54.98 | 133.33 | 0.00 | 112.30 | 2,889.90 |
| | | | | | | | | | | | | |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03051 | D | 79.80 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.75 |
| 06/30/05 | D03058 | D | 62.67 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 9.43 | 1,697.32 |
| SHAW TOTAL: | | | 142.47 | 0.00 | 4,375.02 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 9.43 | 3,404.07 |
| | | | | | | | | | | | | |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03051 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 06/30/05 | D03059 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| | | | | | | | | | | | | |
| DEPT 20 TOTAL: | | | 977.70 | 0.00 | 20,080.27 | 2,288.49 | 1,234.33 | 288.70 | 808.10 | 0.00 | 769.91 | 14,690.74 |

**AERAS 0551**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

DETAIL FOR 06/01/05 THRU 06/30/05
SORTED BY EMPLOYEE NUMBER

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG FRAWLEY, GINGER | | | SSN: 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 | | | | | | | | |
| 06/15/05 | 028574 | 86.67 | 0.00 | 1,041.71 | 84.80 | 64.59 | 15.10 | 42.01 | 0.00 | 25.00 | 810.21 |
| 06/30/05 | 028608 | 37.17 | 0.00 | 1,041.71 | 84.80 | 64.59 | 15.10 | 42.01 | 0.00 | 25.00 | 810.21 |
| FRAWLEG TOTAL: | | 123.84 | 0.00 | 2,083.42 | 169.60 | 129.18 | 30.20 | 84.02 | 0.00 | 50.00 | 1,620.42 |
| | | | | | | | | | | | |
| 40-RUSSELL RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03052 D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| 06/30/05 | D03060 D | 62.67 | 0.00 | 1,291.65 | 162.29 | 80.08 | 18.73 | 50.63 | 0.00 | 24.00 | 955.92 |
| RUSSELL TOTAL: | | 149.34 | 0.00 | 2,583.32 | 324.58 | 160.16 | 37.46 | 101.27 | 0.00 | 48.00 | 1,911.85 |
| | | | | | | | | | | | |
| 40-SMILEY SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 06/15/05 | D03053 D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 06/30/05 | D03061 D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY TOTAL: | | 173.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| | | | | | | | | | | | |
| DEPT 40 TOTAL: | | 446.52 | 0.00 | 6,573.48 | 717.28 | 407.56 | 95.30 | 257.81 | 0.00 | 98.00 | 4,997.53 |
| | | | | | | | | | | | |
| REPORT TOTAL: | | 2519.47 | 0.00 | 117,127.50 | 21,882.69 | 5,698.41 | 1,695.20 | 4,452.03 | 0.00 | 1,501.61 | 81,897.56 |

**AERAS 0552**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 07/01/05 THRU 07/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER  CARTER, MELONI | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03079  D | 49.50 | 0.00 | 1,732.50 | 179.46 | 107.42 | 25.12 | 59.74 | 0.00 | 238.45 | 1,122.31 |
| 07/29/05 | D03093  D | 47.00 | 0.00 | 1,645.00 | 166.33 | 101.99 | 23.85 | 56.02 | 0.00 | 238.45 | 1,058.36 |
| CARTER  TOTAL: | | 96.50 | 0.00 | 3,377.50 | 345.79 | 209.41 | 48.97 | 115.76 | 0.00 | 476.90 | 2,180.67 |
| 10-CLEVELA  CLEVELAND, JIMMY | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03080  D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 120.60 | 0.00 | 0.00 | 2,320.32 |
| 07/29/05 | D03094  D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 120.60 | 0.00 | 0.00 | 2,320.32 |
| CLEVELA  TOTAL: | | 120.00 | 0.00 | 6,000.00 | 659.16 | 372.00 | 87.00 | 241.20 | 0.00 | 0.00 | 4,640.64 |
| 10-COOPER  COOPER, JUDY | | | | SSN: 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 | | | | | | | |
| 07/15/05 | 028648 | 24.00 | 0.00 | 1,020.00 | 88.19 | 63.24 | 14.79 | 37.74 | 0.00 | 0.00 | 816.04 |
| 07/29/05 | 028698 | 49.50 | 0.00 | 2,103.75 | 315.36 | 130.43 | 30.50 | 80.57 | 0.00 | 0.00 | 1,546.89 |
| COOPER  TOTAL: | | 73.50 | 0.00 | 3,123.75 | 403.55 | 193.67 | 45.29 | 118.31 | 0.00 | 0.00 | 2,362.93 |
| 10-CRYSEL  CRYSEL, KIMBERLY | | | | SSN: 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 | | | | | | | |
| 07/29/05 | D03095  D | 18.00 | 0.00 | 360.00 | 2.67 | 22.32 | 5.22 | 5.58 | 0.00 | 0.00 | 324.21 |
| CRYSEL  TOTAL: | | 18.00 | 0.00 | 360.00 | 2.67 | 22.32 | 5.22 | 5.58 | 0.00 | 0.00 | 324.21 |
| 10-FALERO  FALERO, WALLACE | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03069  D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO  TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY  GAY, MICKEY | | | | SSN: 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 | | | | | | | |
| 07/15/05 | 028649 | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| 07/29/05 | 028700 | 92.50 | 0.00 | 4,625.00 | 1,045.10 | 286.75 | 67.06 | 173.16 | 0.00 | 2.64 | 3,050.29 |
| GAY  TOTAL: | | 188.50 | 0.00 | 9,425.00 | 2,139.20 | 584.35 | 136.66 | 352.62 | 0.00 | 2.64 | 6,209.53 |
| 10-LAUDER  LAUDERDALE, RICK | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03081  D | 63.00 | 0.00 | 2,835.00 | 412.71 | 175.77 | 41.11 | 104.24 | 0.00 | 0.00 | 2,101.17 |
| 07/29/05 | D03096  D | 69.50 | 0.00 | 3,127.50 | 485.83 | 193.91 | 45.35 | 115.21 | 0.00 | 0.00 | 2,287.20 |
| LAUDERD  TOTAL: | | 132.50 | 0.00 | 5,962.50 | 898.54 | 369.68 | 86.46 | 219.45 | 0.00 | 0.00 | 4,388.37 |
| 10-MCINTOS  MCINTOSH, ELIZABETH | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03082  D | 76.50 | 0.00 | 2,677.50 | 301.21 | 166.01 | 38.82 | 120.90 | 0.00 | 0.00 | 2,050.56 |
| 07/29/05 | D03097  D | 70.00 | 0.00 | 2,450.00 | 267.08 | 151.90 | 35.53 | 111.23 | 0.00 | 0.00 | 1,884.26 |
| MCINTOS  TOTAL: | | 146.50 | 0.00 | 5,127.50 | 568.29 | 317.91 | 74.35 | 232.13 | 0.00 | 0.00 | 3,934.82 |
| 10-MOOREHO  MOOREHOUSE, JOHN | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03070  D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO  TOTAL: | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS  NORRIS, BEATRICE BEAR | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03083  D | 36.00 | 0.00 | 1,800.00 | 146.12 | 110.17 | 25.77 | 63.00 | 0.00 | 56.10 | 1,398.84 |
| 07/29/05 | D03098  D | 48.00 | 0.00 | 2,400.00 | 236.12 | 147.37 | 34.47 | 88.50 | 0.00 | 167.45 | 1,726.09 |
| NORRIS  TOTAL: | | 84.00 | 0.00 | 4,200.00 | 382.24 | 257.54 | 60.24 | 151.50 | 0.00 | 223.55 | 3,124.93 |
| 10-WILKERS  WILKERSON, BENNY | | | | SSN: 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 | | | | | | | |
| 07/15/05 | D03084  D | 96.00 | 0.00 | 4,800.00 | 763.75 | 297.60 | 69.60 | 195.35 | 0.00 | 45.60 | 3,428.10 |
| 07/29/05 | D03099  D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 100.60 | 2,991.50 |
| WILKERS  TOTAL: | | 180.00 | 0.00 | 9,000.00 | 1,377.50 | 558.00 | 130.50 | 368.20 | 0.00 | 146.20 | 6,419.60 |
| DEPT 10 TOTAL: | | 1039.50 | 0.00 | 86,576.25 | 17,711.10 | 3,814.88 | 1,254.69 | 3,234.71 | 0.00 | 849.29 | 59,711.58 |

**AERAS 0553**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 07/01/05 THRU 07/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 07/15/05 | D03071 | D | 80.67 | 0.00 | 1,312.52 | 90.87 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.60 |
| 07/29/05 | D03085 | D | 86.67 | 0.00 | 1,312.50 | 90.87 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.58 |
| DESTIN TOTAL: | | | 167.34 | 0.00 | 2,625.02 | 181.74 | 158.14 | 36.98 | 93.86 | 0.00 | 339.12 | 1,815.18 |
| 20-FRAWLEY | FRAWLEY, KATHY A. | | | SSN: 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 | | | | | | | | |
| 07/15/05 | D03072 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| 07/29/05 | D03086 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| FRAWLEY TOTAL: | | | 173.34 | 0.00 | 4,499.00 | 469.68 | 277.14 | 64.82 | 188.36 | 0.00 | 257.16 | 3,241.84 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 07/15/05 | 028650 | | 80.00 | 0.00 | 1,439.28 | 164.43 | 89.24 | 20.87 | 57.28 | 0.00 | 0.00 | 1,107.46 |
| 07/15/05 | D03073 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| 07/29/05 | D03087 | D | 81.47 | 0.00 | 1,559.28 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.17 |
| KITCHEN TOTAL: | | | 248.14 | 0.00 | 4,557.81 | 545.50 | 280.98 | 65.71 | 179.94 | 0.00 | 51.90 | 3,433.78 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 07/15/05 | D03074 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| 07/29/05 | D03088 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| ROGERS TOTAL: | | | 173.34 | 0.00 | 3,833.34 | 407.82 | 235.04 | 54.98 | 133.32 | 0.00 | 112.30 | 2,889.88 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 07/15/05 | D03075 | D | 46.67 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.75 |
| 07/29/05 | D03089 | D | 86.67 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.74 |
| SHAW TOTAL: | | | 133.34 | 0.00 | 4,375.01 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 0.00 | 3,413.49 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 07/15/05 | D03076 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 07/29/05 | D03090 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1068.84 | 0.00 | 21,590.18 | 2,463.50 | 1,327.96 | 310.59 | 868.38 | 0.00 | 760.48 | 15,859.27 |

**AERAS 0554**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 07/01/05 THRU 07/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/<br>CHK DATE | CHK NO | REG<br>HOURS | O/T<br>HOURS | GROSS<br>WAGES | FEDERAL<br>W/H | FICA<br>W/H | MEDICARE<br>W/H | STATE<br>W/H | OTHER<br>TAXES | OTHER<br>DEDUCTIONS | CHECK<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG  FRAWLEY, GINGER | | SSN: 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 | | | | | | | | | |
| 07/15/05 | 028647 | 50.42 | 0.00 | 1,041.70 | 84.80 | 64.59 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| 07/29/05 | 028697 | 80.78 | 0.00 | 1,041.68 | 84.79 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| FRAWLEG TOTAL: | | 131.20 | 0.00 | 2,083.38 | 169.59 | 129.17 | 30.20 | 84.02 | 0.00 | 50.00 | 1,620.40 |
| | | | | | | | | | | | |
| 40-RUSSELL  RUSSELL, MELANIE | | SSN: 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 | | | | | | | | | |
| 07/15/05 | D03077  D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| 07/22/05 | 028671 | 80.00 | 0.00 | 1,192.24 | 147.38 | 73.92 | 17.29 | 46.41 | 0.00 | 0.00 | 907.24 |
| 07/29/05 | D03091  D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| RUSSELL TOTAL: | | 253.34 | 0.00 | 3,775.58 | 471.96 | 234.08 | 54.75 | 147.69 | 0.00 | 48.00 | 2,819.10 |
| | | | | | | | | | | | |
| 40-SMILEY  SMILEY, KATRINA | | SSN: 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 | | | | | | | | | |
| 07/15/05 | D03078  D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 07/29/05 | D03092  D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY  TOTAL: | | 173.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| DEPT 40 TOTAL: | | 557.88 | 0.00 | 7,765.70 | 864.65 | 481.47 | 112.59 | 304.23 | 0.00 | 98.00 | 5,904.76 |
| REPORT TOTAL: | | 2666.22 | 0.00 | 115,932.13 | 21,039.25 | 5,624.31 | 1,677.87 | 4,407.32 | 0.00 | 1,707.77 | 81,475.61 |

**AERAS 0555**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 08/01/05 THRU 08/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **10-CARTER  CARTER, MELONI** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00011 D | 46.00 | 0.00 | 1,610.00 | 161.08 | 99.82 | 23.35 | 54.53 | 0.00 | 238.45 | 1,032.77 |
| 08/31/00 | D00027 D | 62.50 | 0.00 | 2,187.50 | 247.71 | 135.63 | 31.72 | 79.07 | 0.00 | 295.66 | 1,397.71 |
| CARTER TOTAL: | | 108.50 | 0.00 | 3,797.50 | 408.79 | 235.45 | 55.07 | 133.60 | 0.00 | 534.11 | 2,430.48 |
| **10-CLEVELA  CLEVELAND, JIMMY** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00012 D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| 08/31/05 | D00028 D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| CLEVELA TOTAL: | | 96.00 | 0.00 | 4,800.00 | 479.16 | 297.60 | 69.60 | 190.20 | 0.00 | 0.00 | 3,763.44 |
| **10-COOPER  COOPER, JUDY** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | 028721 | 34.00 | 0.00 | 1,445.00 | 151.94 | 89.59 | 20.95 | 55.81 | 0.00 | 0.00 | 1,126.71 |
| 08/31/01 | 028742 | 26.50 | 0.00 | 1,126.25 | 104.13 | 69.83 | 16.33 | 42.26 | 0.00 | 0.00 | 893.70 |
| COOPER TOTAL: | | 60.50 | 0.00 | 2,571.25 | 256.07 | 159.42 | 37.28 | 98.07 | 0.00 | 0.00 | 2,020.41 |
| **10-CRYSEL  CRYSEL, KIMBERLY** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00013 D | 10.00 | 0.00 | 200.00 | 0.00 | 12.40 | 2.90 | 0.70 | 0.00 | 0.00 | 184.00 |
| 08/31/05 | D00029 D | 16.00 | 0.00 | 320.00 | 0.00 | 19.84 | 4.64 | 4.41 | 0.00 | 5.43 | 285.68 |
| CRYSEL TOTAL: | | 26.00 | 0.00 | 520.00 | 0.00 | 32.24 | 7.54 | 5.11 | 0.00 | 5.43 | 469.68 |
| **10-FALERO  FALERO, WALLACE** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00001 D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 310.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,107.94 |
| FALERO TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 310.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,107.94 |
| **10-GAY  GAY, MICKEY** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | 028722 | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| 08/31/05 | 028743 | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 359.60 | 84.10 | 215.46 | 0.00 | 0.00 | 3,766.74 |
| GAY  TOTAL: | | 192.00 | 0.00 | 10,600.00 | 2,468.20 | 657.20 | 153.70 | 394.92 | 0.00 | 0.00 | 6,925.98 |
| **10-GUY  GUY, ALLISON** | | | | SSN: 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 | | | | | | | |
| 08/31/05 | D00030 D | 75.50 | 0.00 | 2,265.00 | 403.54 | 140.43 | 32.84 | 84.11 | 0.00 | 0.00 | 1,604.08 |
| GUY  TOTAL: | | 75.50 | 0.00 | 2,265.00 | 403.54 | 140.43 | 32.84 | 84.11 | 0.00 | 0.00 | 1,604.08 |
| **10-LAUDERD  LAUDERDALE, RICK** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00014 D | 93.75 | 0.00 | 4,218.75 | 782.02 | 261.56 | 61.17 | 154.96 | 0.00 | 0.00 | 2,959.04 |
| 08/31/05 | D00031 D | 79.50 | 0.00 | 3,577.50 | 602.47 | 221.81 | 51.87 | 131.88 | 0.00 | 0.00 | 2,569.47 |
| LAUDERD TOTAL: | | 173.25 | 0.00 | 7,796.25 | 1,384.49 | 483.37 | 113.04 | 286.84 | 0.00 | 0.00 | 5,528.51 |
| **10-MCINTOS  MCINTOSH, ELIZABETH** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00015 D | 94.25 | 0.00 | 3,298.75 | 421.77 | 204.52 | 47.83 | 145.93 | 0.00 | 0.00 | 2,478.70 |
| 08/31/05 | D00032 D | 76.50 | 0.00 | 2,677.50 | 301.21 | 166.01 | 38.82 | 120.90 | 0.00 | 0.00 | 2,050.56 |
| MCINTOS TOTAL: | | 170.75 | 0.00 | 5,976.25 | 722.98 | 370.53 | 86.65 | 266.83 | 0.00 | 0.00 | 4,529.26 |
| **10-MOOREHO  MOOREHOUSE, JOHN** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00002 D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO TOTAL: | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| **10-NORRIS  NORRIS, BEATRICE BEAR** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00016 D | 60.00 | 0.00 | 3,000.00 | 326.12 | 184.57 | 43.17 | 114.00 | 0.00 | 56.10 | 2,276.04 |
| 08/31/05 | D00033 D | 48.00 | 0.00 | 2,400.00 | 236.12 | 147.37 | 34.47 | 88.50 | 0.00 | 56.10 | 1,837.44 |
| NORRIS TOTAL: | | 108.00 | 0.00 | 5,400.00 | 562.24 | 331.94 | 77.64 | 202.50 | 0.00 | 112.20 | 4,113.48 |
| **10-TREADWE  TREADWELL, DENISE** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00017 D | 36.00 | 0.00 | 1,800.00 | 287.29 | 111.60 | 26.10 | 69.80 | 0.00 | 0.00 | 1,305.21 |
| TREADWE TOTAL: | | 36.00 | 0.00 | 1,800.00 | 287.29 | 111.60 | 26.10 | 69.80 | 0.00 | 0.00 | 1,305.21 |
| **10-WILKERS  WILKERSON, BENNY** | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00018 D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 29.40 | 3,062.70 |
| 08/31/05 | D00034 D | 108.00 | 0.00 | 5,400.00 | 913.75 | 334.80 | 78.30 | 217.85 | 0.00 | 0.00 | 3,855.30 |
| WILKERS TOTAL: | | 192.00 | 0.00 | 9,600.00 | 1,527.50 | 595.20 | 139.20 | 390.70 | 0.00 | 29.40 | 6,918.00 |

**AERAS 0556**

ALABAMA ER ADMIN SERVICES, PC

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 08/01/05 THRU 08/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DEPT 10 TOTAL: | | 1238.50 | 0.00 | 95,126.25 | 19,434.42 | 3,724.98 | 1,378.66 | 3,552.64 | 0.00 | 681.14 | 66,354.41 |

**AERAS 0557**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 08/01/05 THRU 08/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00003 | D | 58.67 | 0.00 | 1,312.52 | 90.87 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.60 |
| 08/31/05 | D00019 | D | 74.43 | 0.00 | 1,200.61 | 74.09 | 72.13 | 16.87 | 42.17 | 0.00 | 169.56 | 825.79 |
| DESTIN TOTAL: | | | 133.10 | 0.00 | 2,513.13 | 164.96 | 151.20 | 35.36 | 89.10 | 0.00 | 339.12 | 1,733.39 |
| 20-FRAWLEY | FRAWLEY, KATHY A. | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00004 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| 08/31/05 | D00020 | D | 86.67 | 0.00 | 2,249.50 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.92 |
| FRAWLEY TOTAL: | | | 173.34 | 0.00 | 4,499.00 | 469.68 | 277.14 | 64.82 | 188.36 | 0.00 | 257.16 | 3,241.84 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00005 | D | 48.67 | 0.00 | 1,559.26 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| 08/31/05 | D00021 | D | 46.13 | 0.00 | 1,559.26 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| KITCHEN TOTAL: | | | 94.80 | 0.00 | 3,118.52 | 381.08 | 191.74 | 44.84 | 122.66 | 0.00 | 51.90 | 2,326.30 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 08/31/05 | D00035 | D | 173.33 | 0.00 | 1,500.00 | 0.00 | 93.00 | 21.75 | 38.33 | 0.00 | 0.00 | 1,346.92 |
| PLATT TOTAL: | | | 173.33 | 0.00 | 1,500.00 | 0.00 | 93.00 | 21.75 | 38.33 | 0.00 | 0.00 | 1,346.92 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00006 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| 08/31/05 | D00022 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| ROGERS TOTAL: | | | 173.34 | 0.00 | 3,833.34 | 407.82 | 235.04 | 54.98 | 133.32 | 0.00 | 112.30 | 2,889.88 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00007 | D | 67.24 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.75 |
| 08/31/05 | D00023 | D | 65.21 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 40.00 | 1,666.75 |
| SHAW TOTAL: | | | 132.45 | 0.00 | 4,375.02 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 40.00 | 3,373.50 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 08/15/05 | D00008 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 08/31/05 | D00024 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1053.70 | 0.00 | 21,539.01 | 2,282.30 | 1,324.78 | 309.85 | 844.67 | 0.00 | 800.48 | 15,976.93 |

**AERAS 0558**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 08/01/05 THRU 08/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG FRAWLEY, GINGER | | | | | SSN: 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 | | | | | | | |
| 08/15/05 | 028720 | | 80.25 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| 08/31/05 | 028741 | | 81.83 | 0.00 | 1,041.68 | 84.79 | 64.58 | 15.10 | 42.01 | 0.00 | 45.00 | 790.20 |
| FRAWLEG TOTAL: | | | 162.08 | 0.00 | 2,083.37 | 169.59 | 129.16 | 30.20 | 84.02 | 0.00 | 70.00 | 1,600.40 |
| | | | | | | | | | | | | |
| 40-RUSSELL RUSSELL, MELANIE | | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00009 | D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| 08/31/05 | D00025 | D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| RUSSELL TOTAL: | | | 173.34 | 0.00 | 2,583.34 | 324.58 | 160.16 | 37.46 | 101.28 | 0.00 | 48.00 | 1,911.86 |
| | | | | | | | | | | | | |
| 40-SMILEY SMILEY, KATRINA | | | | | SSN: 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 | | | | | | | |
| 08/15/05 | D00010 | D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 08/31/05 | D00026 | D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY TOTAL: | | | 173.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| | | | | | | | | | | | | |
| DEPT 40 TOTAL: | | | 508.76 | 0.00 | 6,573.45 | 717.27 | 407.54 | 95.30 | 257.82 | 0.00 | 118.00 | 4,977.52 |
| | | | | | | | | | | | | |
| REPORT TOTAL: | | | 2800.96 | 0.00 | 123,238.71 | 22,433.99 | 5,457.30 | 1,783.81 | 4,655.13 | 0.00 | 1,599.62 | 87,308.86 |

**AERAS 0559**

ALABAMA ER ADMIN SERVICES, PC

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 09/01/05 THRU 09/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER  CARTER, MELONI | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00047  D | 46.00 | 0.00 | 1,610.00 | 161.08 | 99.82 | 23.35 | 54.53 | 0.00 | 238.45 | 1,032.77 |
| 09/30/05 | D00064  D | 60.00 | 0.00 | 2,100.00 | 234.58 | 130.20 | 30.45 | 75.35 | 0.00 | 238.45 | 1,390.97 |
| CARTER  TOTAL: | | 106.00 | 0.00 | 3,710.00 | 395.66 | 230.02 | 53.80 | 129.88 | 0.00 | 476.90 | 2,423.74 |
| 10-CLEVELA  CLEVELAND, JIMMY | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00048  D | 72.00 | 0.00 | 3,600.00 | 477.08 | 223.20 | 52.20 | 143.23 | 0.00 | 0.00 | 2,704.29 |
| 09/30/05 | D00065  D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| CLEVELA  TOTAL: | | 120.00 | 0.00 | 6,000.00 | 716.66 | 372.00 | 87.00 | 238.33 | 0.00 | 0.00 | 4,586.01 |
| 10-COOPER  COOPER, JUDY | | | | SSN: 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 | | | | | | | |
| 09/15/05 | 028784 | 40.50 | 0.00 | 1,721.25 | 219.74 | 106.72 | 24.96 | 66.23 | 0.00 | 0.00 | 1,303.60 |
| 09/30/05 | 028823 | 24.50 | 0.00 | 1,041.25 | 91.38 | 64.56 | 15.10 | 38.65 | 0.00 | 0.00 | 831.56 |
| COOPER  TOTAL: | | 65.00 | 0.00 | 2,762.50 | 311.12 | 171.28 | 40.06 | 104.88 | 0.00 | 0.00 | 2,135.16 |
| 10-CRYSEL  CRYSEL, KIMBERLY | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00049  D | 16.00 | 0.00 | 320.00 | 0.00 | 19.84 | 4.64 | 4.41 | 0.00 | 0.00 | 291.11 |
| 09/30/05 | D00066  D | 12.50 | 0.00 | 250.00 | 0.00 | 15.50 | 3.63 | 2.17 | 0.00 | 0.00 | 228.70 |
| CRYSEL  TOTAL: | | 28.50 | 0.00 | 570.00 | 0.00 | 35.34 | 8.27 | 6.58 | 0.00 | 0.00 | 519.81 |
| 10-FALERO  FALERO, WALLACE | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00036  D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| FALERO  TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| 10-GAY  GAY, MICKEY | | | | SSN: 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 | | | | | | | |
| 09/15/05 | 028785 | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 359.60 | 84.10 | 215.46 | 0.00 | 0.00 | 3,766.74 |
| 09/30/05 | 028824 | 48.00 | 0.00 | 2,400.00 | 437.29 | 148.80 | 34.80 | 92.30 | 0.00 | 0.00 | 1,686.81 |
| GAY  TOTAL: | | 144.00 | 0.00 | 8,200.00 | 1,811.39 | 508.40 | 118.90 | 307.76 | 0.00 | 0.00 | 5,453.55 |
| 10-GUY  GUY, ALLISON | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00050  D | 96.00 | 0.00 | 2,880.00 | 557.29 | 178.56 | 41.76 | 107.18 | 0.00 | 0.00 | 1,995.21 |
| 09/30/05 | D00067  D | 80.00 | 0.00 | 2,400.00 | 437.29 | 148.80 | 34.80 | 89.18 | 0.00 | 5.49 | 1,684.44 |
| GUY  TOTAL: | | 176.00 | 0.00 | 5,280.00 | 994.58 | 327.36 | 76.56 | 196.36 | 0.00 | 5.49 | 3,679.65 |
| 10-LAUDERD  LAUDERDALE, RICK | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00051  D | 67.50 | 0.00 | 3,037.50 | 463.33 | 188.33 | 44.04 | 111.83 | 0.00 | 0.00 | 2,229.97 |
| 09/30/05 | D00068  D | 83.00 | 0.00 | 3,735.00 | 646.57 | 231.57 | 54.16 | 137.55 | 0.00 | 0.00 | 2,665.15 |
| LAUDERD  TOTAL: | | 150.50 | 0.00 | 6,772.50 | 1,109.90 | 419.90 | 98.20 | 249.38 | 0.00 | 0.00 | 4,895.12 |
| 10-MCINTOS  MCINTOSH, ELIZABETH | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00052  D | 84.00 | 0.00 | 2,940.00 | 340.58 | 182.28 | 42.63 | 132.05 | 0.00 | 0.00 | 2,242.46 |
| 09/30/05 | D00069  D | 51.00 | 0.00 | 1,785.00 | 167.33 | 110.67 | 25.88 | 82.97 | 0.00 | 0.00 | 1,398.15 |
| MCINTOS  TOTAL: | | 135.00 | 0.00 | 4,725.00 | 507.91 | 292.95 | 68.51 | 215.02 | 0.00 | 0.00 | 3,640.61 |
| 10-MOOREHO  MOOREHOUSE, JOHN | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00037  D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO  TOTAL: | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS  NORRIS, BEATRICE BEAR | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00053  D | 82.00 | 0.00 | 4,100.00 | 596.31 | 252.77 | 59.12 | 155.49 | 0.00 | 56.10 | 2,980.21 |
| 09/30/05 | D00070  D | 68.00 | 0.00 | 3,400.00 | 421.31 | 209.37 | 48.97 | 129.24 | 0.00 | 118.66 | 2,472.45 |
| NORRIS  TOTAL: | | 150.00 | 0.00 | 7,500.00 | 1,017.62 | 462.14 | 108.09 | 284.73 | 0.00 | 174.76 | 5,452.66 |
| 10-WILKERS  WILKERSON, BENNY | | | | SSN: 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 | | | | | | | |
| 09/15/05 | D00054  D | 72.00 | 0.00 | 3,600.00 | 463.75 | 223.20 | 52.20 | 150.35 | 0.00 | 238.45 | 2,472.05 |
| 09/30/05 | D00071  D | 96.00 | 0.00 | 4,800.00 | 763.75 | 297.60 | 69.60 | 195.35 | 0.00 | 238.45 | 3,235.25 |
| WILKERS  TOTAL: | | 168.00 | 0.00 | 8,400.00 | 1,227.50 | 520.80 | 121.80 | 345.70 | 0.00 | 476.90 | 5,707.30 |
| DEPT 10 TOTAL: | | 1243.00 | 0.00 | 93,920.00 | 19,026.50 | 3,340.19 | 1,361.19 | 3,508.58 | 0.00 | 1,134.05 | 65,549.49 |

**AERAS 0560**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 09/01/05 THRU 09/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/<br>CHK DATE | CHK NO | | REG<br>HOURS | O/T<br>HOURS | GROSS<br>WAGES | FEDERAL<br>W/H | FICA<br>W/H | MEDICARE<br>W/H | STATE<br>W/H | OTHER<br>TAXES | OTHER<br>DEDUCTIONS | CHECK<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00038 | D | 72.59 | 0.00 | 1,291.93 | 87.79 | 77.79 | 18.19 | 46.05 | 0.00 | 169.56 | 892.55 |
| 09/30/05 | D00056 | D | 78.67 | 0.00 | 1,312.53 | 90.88 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.60 |
| DESTIN TOTAL: | | | 151.26 | 0.00 | 2,604.46 | 178.67 | 156.86 | 36.68 | 92.98 | 0.00 | 339.12 | 1,800.15 |
| 20-FRAWLEY | FRAWLEY, KATHY A. | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00039 | D | 82.55 | 0.00 | 2,249.52 | 234.84 | 138.57 | 32.41 | 94.18 | 0.00 | 128.58 | 1,620.94 |
| 09/23/05 | 028817 | | 56.47 | 0.00 | 2,443.14 | 266.05 | 151.47 | 35.43 | 103.02 | 0.00 | 0.00 | 1,887.17 |
| 09/30/05 | D00057 | D | 35.08 | 0.00 | 1,199.73 | 77.38 | 73.49 | 17.19 | 49.56 | 0.00 | 128.58 | 853.53 |
| FRAWLEY TOTAL: | | | 174.10 | 0.00 | 5,892.39 | 578.27 | 363.53 | 85.03 | 246.76 | 0.00 | 257.16 | 4,361.64 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00057 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| 09/30/05 | D00058 | D | 76.37 | 0.00 | 1,559.27 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.16 |
| KITCHEN TOTAL: | | | 163.04 | 0.00 | 3,118.52 | 381.07 | 191.74 | 44.84 | 122.66 | 0.00 | 51.90 | 2,326.31 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00041 | D | 0.00 | 0.00 | 750.00 | 0.00 | 46.50 | 10.88 | 10.33 | 0.00 | 0.00 | 682.29 |
| 09/30/05 | D00055 | D | 173.33 | 0.00 | 750.00 | 0.00 | 46.50 | 10.88 | 10.33 | 0.00 | 0.00 | 682.29 |
| PLATT TOTAL: | | | 173.33 | 0.00 | 1,500.00 | 0.00 | 93.00 | 21.76 | 20.66 | 0.00 | 0.00 | 1,364.58 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00042 | D | 74.67 | 0.00 | 1,916.71 | 203.92 | 117.52 | 27.49 | 66.67 | 0.00 | 56.15 | 1,444.96 |
| 09/30/05 | D00059 | D | 68.17 | 0.00 | 1,916.70 | 203.92 | 117.52 | 27.49 | 66.67 | 0.00 | 56.15 | 1,444.95 |
| ROGERS TOTAL: | | | 142.84 | 0.00 | 3,833.41 | 407.84 | 235.04 | 54.98 | 133.34 | 0.00 | 112.30 | 2,889.91 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00043 | D | 81.58 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.75 |
| 09/30/05 | D00060 | D | 79.22 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.74 |
| SHAW TOTAL: | | | 160.80 | 0.00 | 4,375.01 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 0.00 | 3,413.49 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00044 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 09/30/05 | D00061 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1138.71 | 0.00 | 23,023.79 | 2,404.61 | 1,416.83 | 331.39 | 889.30 | 0.00 | 760.48 | 17,221.18 |

**AERAS 0561**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 09/01/05 THRU 09/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG FRAWLEY, GINGER | | | SSN: 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 | | | | | | | | |
| 09/15/05 | 028783 | 81.67 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| 09/30/05 | 028822 | 71.41 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| FRAWLEG TOTAL: | | 153.08 | 0.00 | 2,083.38 | 169.60 | 129.16 | 30.20 | 84.02 | 0.00 | 50.00 | 1,620.40 |
| | | | | | | | | | | | |
| 40-RUSSELL RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00045 D | 70.67 | 0.00 | 1,291.65 | 162.29 | 80.08 | 18.73 | 50.63 | 0.00 | 24.00 | 955.92 |
| 09/30/05 | D00062 D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| RUSSELL TOTAL: | | 157.34 | 0.00 | 2,583.32 | 324.58 | 160.16 | 37.46 | 101.27 | 0.00 | 48.00 | 1,911.85 |
| | | | | | | | | | | | |
| 40-SMILEY SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 09/15/05 | D00046 D | 70.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 09/30/05 | D00063 D | 79.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY TOTAL: | | 150.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| | | | | | | | | | | | |
| DEPT 40 TOTAL: | | 460.76 | 0.00 | 6,573.44 | 717.28 | 407.54 | 95.30 | 257.81 | 0.00 | 98.00 | 4,997.51 |
| | | | | | | | | | | | |
| REPORT TOTAL: | | 2842.47 | 0.00 | 123,517.23 | 22,148.39 | 5,164.56 | 1,787.88 | 4,655.69 | 0.00 | 1,992.53 | 87,768.18 |

**AERAS 0562**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 10/01/05 THRU 10/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/<br>CHK DATE | CHK NO | REG<br>HOURS | O/T<br>HOURS | GROSS<br>WAGES | FEDERAL<br>W/H | FICA<br>W/H | MEDICARE<br>W/H | STATE<br>W/H | OTHER<br>TAXES | OTHER<br>DEDUCTIONS | CHECK<br>AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CLEVELA CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00072 D | 72.00 | 0.00 | 3,600.00 | 477.08 | 223.20 | 52.20 | 143.23 | 0.00 | 0.00 | 2,704.29 |
| 10/31/05 | D00097 D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| CLEVELA TOTAL: | | 120.00 | 0.00 | 6,000.00 | 716.66 | 372.00 | 87.00 | 238.33 | 0.00 | 0.00 | 4,586.01 |
| 10-COOPER COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | 028859 | 15.00 | 0.00 | 637.50 | 30.82 | 39.53 | 9.24 | 21.49 | 0.00 | 0.00 | 536.42 |
| 10/31/05 | 028899 | 38.00 | 0.00 | 1,615.00 | 193.17 | 100.13 | 23.42 | 62.25 | 0.00 | 0.00 | 1,236.03 |
| COOPER TOTAL: | | 53.00 | 0.00 | 2,252.50 | 223.99 | 139.66 | 32.66 | 83.74 | 0.00 | 0.00 | 1,772.45 |
| 10-CRYSEL CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00073 D | 27.50 | 0.00 | 550.00 | 21.67 | 34.10 | 7.98 | 11.33 | 0.00 | 0.00 | 474.92 |
| 10/31/05 | D00098 D | 39.00 | 0.00 | 780.00 | 44.67 | 48.36 | 11.31 | 19.38 | 0.00 | 0.00 | 656.28 |
| CRYSEL TOTAL: | | 66.50 | 0.00 | 1,330.00 | 66.34 | 82.46 | 19.29 | 30.71 | 0.00 | 0.00 | 1,131.20 |
| 10-FALERO FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00087 D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| FALERO TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| 10-GAY GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | 028860 | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 230.95 | 84.10 | 215.46 | 0.00 | 0.00 | 3,895.39 |
| 10/31/05 | 028900 | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 0.00 | 69.60 | 179.46 | 0.00 | 0.00 | 3,456.84 |
| GAY TOTAL: | | 192.00 | 0.00 | 10,600.00 | 2,468.20 | 230.95 | 153.70 | 394.92 | 0.00 | 0.00 | 7,352.23 |
| 10-GUY GUY, ALLISON | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00074 D | 65.00 | 0.00 | 1,950.00 | 324.79 | 120.90 | 28.28 | 72.30 | 0.00 | 0.00 | 1,403.73 |
| 10/31/05 | D00099 D | 47.00 | 0.00 | 1,410.00 | 189.79 | 87.42 | 20.45 | 52.05 | 0.00 | 5.49 | 1,054.80 |
| GUY TOTAL: | | 112.00 | 0.00 | 3,360.00 | 514.58 | 208.32 | 48.73 | 124.35 | 0.00 | 5.49 | 2,458.53 |
| 10-LAUDERD LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00075 D | 71.50 | 0.00 | 3,217.50 | 508.33 | 199.49 | 46.65 | 118.58 | 0.00 | 0.00 | 2,344.45 |
| 10/31/05 | D00100 D | 70.00 | 0.00 | 3,150.00 | 491.46 | 195.30 | 45.68 | 116.05 | 0.00 | 0.00 | 2,301.51 |
| LAUDERD TOTAL: | | 141.50 | 0.00 | 6,367.50 | 999.79 | 394.79 | 92.33 | 234.63 | 0.00 | 0.00 | 4,645.96 |
| 10-MCINTOS MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00076 D | 69.50 | 0.00 | 2,432.50 | 264.46 | 150.82 | 35.27 | 110.49 | 0.00 | 0.00 | 1,871.46 |
| 10/31/05 | D00101 D | 79.75 | 0.00 | 2,791.25 | 318.27 | 173.06 | 40.47 | 125.73 | 0.00 | 0.00 | 2,133.72 |
| MCINTOS TOTAL: | | 149.25 | 0.00 | 5,223.75 | 582.73 | 323.88 | 75.74 | 236.22 | 0.00 | 0.00 | 4,005.18 |
| 10-MOOREHO MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00088 D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO TOTAL: | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00077 D | 60.00 | 0.00 | 3,000.00 | 326.12 | 184.57 | 43.17 | 114.00 | 0.00 | 56.10 | 2,276.04 |
| 10/31/05 | D00102 D | 72.00 | 0.00 | 3,600.00 | 471.31 | 221.77 | 51.87 | 136.74 | 0.00 | 118.66 | 2,599.65 |
| NORRIS TOTAL: | | 132.00 | 0.00 | 6,600.00 | 797.43 | 406.34 | 95.04 | 250.74 | 0.00 | 174.76 | 4,875.69 |
| 10-WILKERS WILKERSON, BENNY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00078 D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 238.45 | 2,853.65 |
| 10/31/05 | D00103 D | 64.50 | 0.00 | 3,225.00 | 370.00 | 199.95 | 46.76 | 136.29 | 0.00 | 238.45 | 2,233.55 |
| WILKERS TOTAL: | | 148.50 | 0.00 | 7,425.00 | 983.75 | 460.35 | 107.66 | 309.14 | 0.00 | 476.90 | 5,087.20 |
| DEPT 10 TOTAL: | | 1114.75 | 0.00 | 89,158.75 | 18,287.63 | 2,618.75 | 1,292.15 | 3,332.74 | 0.00 | 657.15 | 62,970.33 |

**AERAS 0563**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 10/01/05 THRU 10/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00079 | D | 75.88 | 0.00 | 1,226.66 | 78.00 | 73.74 | 17.25 | 43.28 | 0.00 | 169.56 | 844.83 |
| 10/31/05 | D00089 | D | 86.67 | 0.00 | 1,312.50 | 90.87 | 79.07 | 18.49 | 46.93 | 0.00 | 169.56 | 907.58 |
| DESTIN | TOTAL: | | 162.55 | 0.00 | 2,539.16 | 168.87 | 152.81 | 35.74 | 90.21 | 0.00 | 339.12 | 1,752.41 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00080 | D | 86.67 | 0.00 | 1,559.25 | 190.53 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.15 |
| 10/31/05 | D00090 | D | 79.80 | 0.00 | 1,559.28 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.17 |
| KITCHEN TOTAL: | | | 166.47 | 0.00 | 3,118.53 | 381.07 | 191.74 | 44.84 | 122.66 | 0.00 | 51.90 | 2,326.32 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00081 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 10/31/05 | D00091 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT | TOTAL: | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00082 | D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| 10/31/05 | D00092 | D | 83.67 | 0.00 | 1,916.70 | 203.92 | 117.52 | 27.49 | 66.67 | 0.00 | 56.15 | 1,444.95 |
| ROGERS | TOTAL: | | 170.34 | 0.00 | 3,833.37 | 407.83 | 235.04 | 54.98 | 133.33 | 0.00 | 112.30 | 2,889.89 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00083 | D | 86.67 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.74 |
| 10/31/05 | D00093 | D | 86.67 | 0.00 | 2,187.50 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 0.00 | 1,706.74 |
| SHAW | TOTAL: | | 173.34 | 0.00 | 4,375.00 | 455.42 | 271.26 | 63.44 | 171.40 | 0.00 | 0.00 | 3,413.48 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 10/14/05 | D00084 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 10/31/05 | D00094 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1019.38 | 0.00 | 23,066.06 | 2,712.37 | 1,421.25 | 332.42 | 910.98 | 0.00 | 503.32 | 17,185.72 |

**AERAS 0564**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 10/01/05 THRU 10/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG | FRAWLEY, GINGER | | | SSN: 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 | | | | | | | |
| 10/14/05 | 028861 | 74.77 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| 10/31/05 | 028898 | 70.35 | 0.00 | 1,041.69 | 84.80 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.20 |
| FRAWLEG TOTAL: | | 145.12 | 0.00 | 2,083.38 | 169.60 | 129.16 | 30.20 | 84.02 | 0.00 | 50.00 | 1,620.40 |
| | | | | | | | | | | | |
| 40-RUSSELL | RUSSELL, MELANIE | | | SSN: 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 | | | | | | | |
| 10/14/05 | D00085 D | 86.67 | 0.00 | 1,291.67 | 162.29 | 80.08 | 18.73 | 50.64 | 0.00 | 24.00 | 955.93 |
| 10/31/05 | D00095 D | 84.30 | 0.00 | 1,291.64 | 162.29 | 80.08 | 18.73 | 50.63 | 0.00 | 24.00 | 955.91 |
| RUSSELL TOTAL: | | 170.97 | 0.00 | 2,583.31 | 324.58 | 160.16 | 37.46 | 101.27 | 0.00 | 48.00 | 1,911.84 |
| | | | | | | | | | | | |
| 40-SMILEY | SMILEY, KATRINA | | | SSN: 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 | | | | | | | |
| 10/14/05 | D00086 D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| 10/31/05 | D00096 D | 86.67 | 0.00 | 953.37 | 111.55 | 59.11 | 13.82 | 36.26 | 0.00 | 0.00 | 732.63 |
| SMILEY TOTAL: | | 173.34 | 0.00 | 1,906.74 | 223.10 | 118.22 | 27.64 | 72.52 | 0.00 | 0.00 | 1,465.26 |
| | | | | | | | | | | | |
| DEPT 40 TOTAL: | | 489.43 | 0.00 | 6,573.43 | 717.28 | 407.54 | 95.30 | 257.81 | 0.00 | 98.00 | 4,997.50 |
| | | | | | | | | | | | |
| REPORT TOTAL: | | 2623.56 | 0.00 | 118,798.24 | 21,717.28 | 4,447.54 | 1,719.87 | 4,501.53 | 0.00 | 1,258.47 | 85,153.55 |

**AERAS 0565**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 11/01/05 THRU 11/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | SSN: 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 | | | | | | | | |
| 11/30/05 | D00121  D | 70.00 | 0.00 | 2,660.00 | 318.58 | 164.92 | 38.57 | 99.15 | 0.00 | 0.00 | 2,038.78 |
| CARTER | TOTAL: | 70.00 | 0.00 | 2,660.00 | 318.58 | 164.92 | 38.57 | 99.15 | 0.00 | 0.00 | 2,038.78 |
| 10-CLEVELA | CLEVELAND, JIMMY | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00114  D | 72.00 | 0.00 | 3,600.00 | 477.08 | 223.20 | 52.20 | 143.23 | 0.00 | 0.00 | 2,704.29 |
| 11/30/05 | D00122  D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| CLEVELA | TOTAL: | 120.00 | 0.00 | 6,000.00 | 716.66 | 372.00 | 87.00 | 238.33 | 0.00 | 0.00 | 4,586.01 |
| 10-COOPER | COOPER, JUDY | | SSN: 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 | | | | | | | | |
| 11/15/05 | 028926 | 34.50 | 0.00 | 1,466.25 | 155.99 | 90.91 | 21.26 | 56.67 | 0.00 | 0.00 | 1,141.42 |
| COOPER | TOTAL: | 34.50 | 0.00 | 1,466.25 | 155.99 | 90.91 | 21.26 | 56.67 | 0.00 | 0.00 | 1,141.42 |
| 10-CRYSEL | CRYSEL, KIMBERLY | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00115  D | 36.00 | 0.00 | 720.00 | 38.67 | 44.64 | 10.44 | 17.28 | 0.00 | 0.00 | 608.97 |
| 11/30/05 | D00123  D | 72.00 | 0.00 | 2,376.00 | 272.83 | 146.01 | 34.15 | 86.19 | 0.00 | 61.25 | 1,775.57 |
| CRYSEL | TOTAL: | 108.00 | 0.00 | 3,096.00 | 311.50 | 190.65 | 44.59 | 103.47 | 0.00 | 61.25 | 2,384.54 |
| 10-FALERO | FALERO, WALLACE | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00104  D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| FALERO | TOTAL: | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| 10-GAY | GAY, MICKEY | | SSN: 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 | | | | | | | | |
| 11/15/05 | 028927 | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 0.00 | 84.10 | 215.46 | 0.00 | 0.00 | 4,126.34 |
| 11/30/05 | 028995 | 84.00 | 0.00 | 4,200.00 | 926.10 | 0.00 | 60.90 | 157.86 | 0.00 | 0.00 | 3,055.14 |
| GAY | TOTAL: | 180.00 | 0.00 | 10,000.00 | 2,300.20 | 0.00 | 145.00 | 373.32 | 0.00 | 0.00 | 7,181.48 |
| 10-GUY | GUY, ALLISON | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00116  D | 84.00 | 0.00 | 2,520.00 | 467.29 | 156.24 | 36.54 | 93.68 | 0.00 | 0.00 | 1,766.25 |
| 11/30/05 | D00124  D | 80.00 | 0.00 | 2,800.00 | 537.29 | 173.60 | 40.60 | 104.18 | 0.00 | 0.00 | 1,944.33 |
| GUY | TOTAL: | 164.00 | 0.00 | 5,320.00 | 1,004.58 | 329.84 | 77.14 | 197.86 | 0.00 | 0.00 | 3,710.58 |
| 10-LAUDERD | LAUDERDALE, RICK | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00117  D | 88.50 | 0.00 | 3,982.50 | 715.87 | 246.92 | 57.75 | 146.46 | 0.00 | 0.00 | 2,815.50 |
| 11/30/05 | D00125  D | 73.50 | 0.00 | 3,307.50 | 530.83 | 205.07 | 47.96 | 121.96 | 0.00 | 0.00 | 2,401.68 |
| LAUDERD | TOTAL: | 162.00 | 0.00 | 7,290.00 | 1,246.70 | 451.99 | 105.71 | 268.42 | 0.00 | 0.00 | 5,217.18 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00118  D | 65.25 | 0.00 | 2,283.75 | 242.15 | 141.59 | 33.11 | 104.16 | 0.00 | 0.00 | 1,762.74 |
| 11/30/05 | D00126  D | 68.00 | 0.00 | 2,584.00 | 287.18 | 160.21 | 37.47 | 116.92 | 0.00 | 0.00 | 1,982.22 |
| MCINTOS | TOTAL: | 133.25 | 0.00 | 4,867.75 | 529.33 | 301.80 | 70.58 | 221.08 | 0.00 | 0.00 | 3,744.96 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00105  D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO | TOTAL: | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00119  D | 60.00 | 0.00 | 3,000.00 | 326.12 | 184.57 | 43.17 | 114.00 | 0.00 | 65.70 | 2,266.44 |
| 11/30/05 | D00127  D | 69.00 | 0.00 | 3,450.00 | 433.81 | 212.47 | 49.69 | 131.11 | 0.00 | 90.48 | 2,532.44 |
| NORRIS | TOTAL: | 129.00 | 0.00 | 6,450.00 | 759.93 | 397.04 | 92.86 | 245.11 | 0.00 | 156.18 | 4,798.88 |
| 10-WILKERS | WILKERSON, BENNY | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00120  D | 108.00 | 0.00 | 5,400.00 | 913.75 | 334.80 | 78.30 | 217.85 | 0.00 | 238.45 | 3,616.85 |
| 11/30/05 | D00128  D | 60.00 | 0.00 | 3,000.00 | 329.58 | 53.47 | 43.50 | 127.06 | 0.00 | 238.45 | 2,207.94 |
| WILKERS | TOTAL: | 168.00 | 0.00 | 8,400.00 | 1,243.33 | 388.27 | 121.80 | 344.91 | 0.00 | 476.90 | 5,824.79 |
| DEPT 10 TOTAL: | | 1268.75 | 0.00 | 95,550.00 | 19,520.96 | 2,687.42 | 1,384.51 | 3,578.28 | 0.00 | 694.33 | 67,684.50 |

**AERAS 0566**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 11/01/05 THRU 11/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **20-DESTIN  DESTIN, KELLI H.** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00106  D | 63.21 | 0.00 | 1,175.47 | 70.32 | 70.57 | 16.50 | 41.10 | 0.00 | 173.73 | 803.25 |
| 11/30/05 | D00129  D | 69.12 | 0.00 | 1,320.75 | 92.11 | 79.58 | 18.61 | 47.28 | 0.00 | 169.56 | 913.61 |
| DESTIN TOTAL: | | 132.33 | 0.00 | 2,496.22 | 162.43 | 150.15 | 35.11 | 88.38 | 0.00 | 343.29 | 1,716.86 |
| **20-KITCHEN  KITCHENS, KATHRYN B.** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00107  D | 74.67 | 0.00 | 1,559.28 | 190.54 | 95.87 | 22.42 | 61.33 | 0.00 | 25.95 | 1,163.17 |
| 11/30/05 | D00130  D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | 161.34 | 0.00 | 3,392.61 | 449.59 | 208.73 | 48.82 | 132.94 | 0.00 | 51.90 | 2,500.63 |
| **20-PLATT  PLATT, MARK** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00108  D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 11/30/05 | D00131  D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT  TOTAL: | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| **20-ROGERS  ROGERS, ASHLEY** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00109  D | 86.67 | 0.00 | 1,916.67 | 203.91 | 117.52 | 27.49 | 66.66 | 0.00 | 56.15 | 1,444.94 |
| 11/30/05 | D00132  D | 86.67 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| ROGERS  TOTAL: | | 173.34 | 0.00 | 3,916.67 | 420.32 | 240.21 | 56.18 | 136.87 | 0.00 | 112.30 | 2,950.79 |
| **20-SHAW  SHAW, JEANIE M.** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00110  D | 70.05 | 0.00 | 2,187.51 | 227.71 | 135.63 | 31.72 | 85.70 | 0.00 | 25.00 | 1,681.75 |
| 11/30/05 | D00133  D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| SHAW  TOTAL: | | 156.72 | 0.00 | 4,458.34 | 467.92 | 276.42 | 64.65 | 174.94 | 0.00 | 25.00 | 3,449.41 |
| **20-STANLEY  STANLEY, REX** | | | | SSN: 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 | | | | | | | |
| 11/15/05 | D00111  D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 11/30/05 | D00134  D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | 970.41 | 0.00 | 23,463.84 | 2,799.44 | 1,445.91 | 338.18 | 926.51 | 0.00 | 532.49 | 17,421.31 |

**AERAS 0567**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 11/01/05 THRU 11/30/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG  FRAWLEY, GINGER | | | SSN: 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 | | | | | | | | |
| 11/15/05 | 028925 | 86.67 | 0.00 | 1,041.67 | 84.79 | 64.58 | 15.10 | 42.01 | 0.00 | 25.00 | 810.19 |
| 11/30/05 | 028996 | 71.02 | 0.00 | 1,083.37 | 91.05 | 67.17 | 15.71 | 43.78 | 0.00 | 25.00 | 840.66 |
| FRAWLEG TOTAL: | | 157.69 | 0.00 | 2,125.04 | 175.84 | 131.75 | 30.81 | 85.79 | 0.00 | 50.00 | 1,650.85 |
| 40-RUSSELL  RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00112 D | 83.17 | 0.00 | 1,291.64 | 162.29 | 80.08 | 18.73 | 50.63 | 0.00 | 24.00 | 955.91 |
| 11/30/05 | D00135 D | 54.67 | 0.00 | 1,343.73 | 173.22 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.03 |
| RUSSELL TOTAL: | | 137.84 | 0.00 | 2,635.37 | 335.51 | 163.39 | 38.21 | 103.32 | 0.00 | 48.00 | 1,946.94 |
| 40-SMILEY  SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 11/15/05 | D00113 D | 72.67 | 0.00 | 1,041.68 | 124.79 | 64.58 | 15.10 | 40.01 | 0.00 | 0.00 | 797.20 |
| 11/30/05 | D00136 D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| SMILEY TOTAL: | | 159.34 | 0.00 | 2,125.01 | 255.83 | 131.75 | 30.81 | 81.79 | 0.00 | 0.00 | 1,624.83 |
| DEPT 40 TOTAL: | | 454.87 | 0.00 | 6,885.42 | 767.18 | 426.89 | 99.83 | 270.90 | 0.00 | 98.00 | 5,222.62 |
| REPORT TOTAL: | | 2694.03 | 0.00 | 125,899.26 | 23,087.58 | 4,560.22 | 1,822.52 | 4,775.69 | 0.00 | 1,324.82 | 90,328.43 |

**AERAS 0568**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 12/01/05 THRU 12/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029007 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00147 | D | 69.00 | 0.00 | 2,622.00 | 312.88 | 162.56 | 38.02 | 97.54 | 0.00 | 238.45 | 1,772.55 |
| 12/30/05 | D00163 | D | 34.50 | 0.00 | 1,311.00 | 116.23 | 81.28 | 19.01 | 41.82 | 0.00 | 238.45 | 814.21 |
| CARTER TOTAL: | | | 103.50 | 0.00 | 6,433.00 | 1,054.11 | 398.84 | 93.28 | 264.36 | 0.00 | 476.90 | 4,145.51 |
| 10-CLEVELA | CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029008 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00148 | D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 120.60 | 0.00 | 0.00 | 2,320.32 |
| 12/30/05 | D00164 | D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 120.60 | 0.00 | 0.00 | 2,320.32 |
| CLEVELA TOTAL: | | | 120.00 | 0.00 | 8,500.00 | 1,284.16 | 527.00 | 123.25 | 366.20 | 0.00 | 0.00 | 6,199.39 |
| 10-COOPER | COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029009 | | 0.00 | 0.00 | 1,000.00 | 250.00 | 62.00 | 14.50 | 50.00 | 0.00 | 0.00 | 623.50 |
| 12/30/05 | 029081 | | 12.00 | 0.00 | 510.00 | 17.15 | 31.62 | 7.40 | 15.80 | 0.00 | 0.00 | 438.03 |
| COOPER TOTAL: | | | 12.00 | 0.00 | 1,510.00 | 267.15 | 93.62 | 21.90 | 65.80 | 0.00 | 0.00 | 1,061.53 |
| 10-CRYSEL | CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029010 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00149 | D | 85.00 | 0.00 | 2,805.00 | 339.75 | 172.61 | 40.37 | 104.30 | 0.00 | 61.25 | 2,086.72 |
| 12/30/05 | D00165 | D | 84.00 | 0.00 | 2,772.00 | 332.23 | 170.56 | 39.89 | 103.02 | 0.00 | 61.25 | 2,065.05 |
| CRYSEL TOTAL: | | | 169.00 | 0.00 | 8,077.00 | 1,296.98 | 498.17 | 116.51 | 332.32 | 0.00 | 122.50 | 5,710.52 |
| 10-FALERO | FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 12/15/05 | D00137 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 0.00 | 217.50 | 547.48 | 0.00 | 0.00 | 10,417.94 |
| 12/30/05 | D00171 | D | 0.00 | 0.00 | 50,000.00 | 15,820.00 | 0.00 | 725.00 | 1,697.33 | 0.00 | 0.00 | 31,757.67 |
| FALERO TOTAL: | | | 0.00 | 0.00 | 65,000.00 | 19,637.08 | 0.00 | 942.50 | 2,244.81 | 0.00 | 0.00 | 42,175.61 |
| 10-GAY | GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029011 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | 029022 | | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 155.00- | 84.10 | 215.46 | 0.00 | 0.00 | 4,281.34 |
| 12/30/05 | 029082 | | 84.00 | 0.00 | 4,200.00 | 926.10 | 0.00 | 60.90 | 157.86 | 0.00 | 0.00 | 3,055.14 |
| GAY TOTAL: | | | 180.00 | 0.00 | 12,500.00 | 2,925.20 | 0.00 | 181.25 | 498.32 | 0.00 | 0.00 | 8,895.23 |
| 10-GUY | GUY, ALLISON | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029012 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00150 | D | 72.00 | 0.00 | 2,520.00 | 467.29 | 156.24 | 36.54 | 93.68 | 0.00 | 0.00 | 1,766.25 |
| 12/30/05 | D00166 | D | 60.00 | 0.00 | 2,100.00 | 362.29 | 130.20 | 30.45 | 77.93 | 0.00 | 0.00 | 1,499.13 |
| GUY TOTAL: | | | 132.00 | 0.00 | 7,120.00 | 1,454.58 | 441.44 | 103.24 | 296.61 | 0.00 | 0.00 | 4,824.13 |
| 10-LAUDERD | LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029013 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00151 | D | 60.00 | 0.00 | 2,700.00 | 378.96 | 167.40 | 39.15 | 99.18 | 0.00 | 0.00 | 2,015.31 |
| 12/30/05 | D00167 | D | 77.00 | 0.00 | 3,465.00 | 570.97 | 214.83 | 50.24 | 127.83 | 0.00 | 0.00 | 2,501.13 |
| LAUDERD TOTAL: | | | 137.00 | 0.00 | 8,665.00 | 1,574.93 | 537.23 | 125.64 | 352.01 | 0.00 | 0.00 | 6,075.19 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029014 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00152 | D | 74.00 | 0.00 | 2,812.00 | 321.38 | 174.34 | 40.77 | 126.61 | 0.00 | 0.00 | 2,148.90 |
| 12/30/05 | D00168 | D | 92.00 | 0.00 | 3,496.00 | 471.08 | 216.75 | 50.69 | 153.33 | 0.00 | 0.00 | 2,604.15 |
| MCINTOS TOTAL: | | | 166.00 | 0.00 | 8,808.00 | 1,417.46 | 546.09 | 127.71 | 404.94 | 0.00 | 0.00 | 6,311.80 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 12/15/05 | D00138 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 12/30/05 | 029087 | | 0.00 | 0.00 | 350,000.00 | 216,740.00 | 0.00 | 5,075.00 | 28,185.00 | 0.00 | 0.00 | 100,000.00 |
| MOOREHO TOTAL: | | | 0.00 | 0.00 | 375,000.00 | 223,857.08 | 0.00 | 5,437.50 | 29,067.48 | 0.00 | 0.00 | 116,637.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029015 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00153 | D | 63.00 | 0.00 | 3,150.00 | 358.81 | 193.87 | 45.34 | 119.86 | 0.00 | 98.66 | 2,333.46 |
| 12/30/05 | D00169 | D | 47.00 | 0.00 | 2,350.00 | 228.62 | 144.27 | 33.74 | 86.37 | 0.00 | 56.10 | 1,800.90 |
| NORRIS TOTAL: | | | 110.00 | 0.00 | 8,000.00 | 1,212.43 | 493.14 | 115.33 | 331.23 | 0.00 | 154.76 | 5,693.11 |

**AERAS 0569**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 12/01/05 THRU 12/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-WILKERS | WILKERSON, BENNY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029016 | | 0.00 | 0.00 | 2,500.00 | 625.00 | 155.00 | 36.25 | 125.00 | 0.00 | 0.00 | 1,558.75 |
| 12/15/05 | D00154 | D | 96.00 | 0.00 | 4,800.00 | 763.75 | 155.00- | 69.60 | 195.35 | 0.00 | 238.45 | 3,687.85 |
| 12/30/05 | D00170 | D | 102.00 | 0.00 | 5,100.00 | 838.75 | 0.00 | 73.95 | 206.60 | 0.00 | 238.45 | 3,742.25 |
| WILKERS TOTAL: | | | 198.00 | 0.00 | 12,400.00 | 2,227.50 | 0.00 | 179.80 | 526.95 | 0.00 | 476.90 | 8,988.85 |
| DEPT 10 TOTAL: | | | 1327.50 | 0.00 | 522,013.00 | 258,208.66 | 3,535.53 | 7,567.91 | 34,751.03 | 0.00 | 1,231.06 | 216,718.81 |

**AERAS 0570**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 12/01/05 THRU 12/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI H. | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029000 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00139 | D | 81.81 | 0.00 | 1,350.90 | 96.63 | 81.45 | 19.05 | 48.56 | 0.00 | 169.56 | 935.65 |
| 12/30/05 | D00155 | D | 86.67 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| DESTIN TOTAL: | | | 168.48 | 0.00 | 3,527.83 | 397.36 | 214.11 | 50.08 | 138.24 | 0.00 | 339.12 | 2,388.92 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029001 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00140 | D | 81.07 | 0.00 | 1,833.32 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.45 |
| 12/30/05 | D00156 | D | 72.67 | 0.00 | 1,833.34 | 259.06 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 153.74 | 0.00 | 4,468.59 | 718.59 | 275.44 | 64.43 | 183.32 | 0.00 | 51.90 | 3,174.91 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 12/15/05 | D00141 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 12/30/05 | D00157 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029002 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00142 | D | 86.67 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| 12/30/05 | 029090 | | 22.84 | 0.00 | 527.06 | 19.37 | 32.68 | 7.64 | 10.53 | 0.00 | 0.00 | 456.84 |
| 12/30/05 | D00158 | D | 57.91 | 0.00 | 1,375.01 | 122.66 | 83.94 | 19.63 | 43.64 | 0.00 | 56.15 | 1,048.99 |
| ROGERS TOTAL: | | | 167.42 | 0.00 | 4,704.00 | 558.92 | 289.03 | 67.59 | 164.48 | 0.00 | 112.30 | 3,511.68 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029003 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00143 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| 12/30/05 | D00159 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| SHAW TOTAL: | | | 173.34 | 0.00 | 5,343.59 | 680.90 | 331.30 | 77.49 | 218.58 | 0.00 | 0.00 | 4,035.32 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 12/15/05 | D00144 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| 12/30/05 | D00160 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 173.34 | 0.00 | 1,700.00 | 403.34 | 105.40 | 24.66 | 101.50 | 0.00 | 0.00 | 1,065.10 |
| DEPT 20 TOTAL: | | | 1009.66 | 0.00 | 27,244.01 | 3,654.95 | 1,680.28 | 393.01 | 1,098.00 | 0.00 | 503.32 | 19,914.45 |

**AERAS 0571**

**ALABAMA ER ADMIN SERVICES, PC**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 12/01/05 THRU 12/31/05*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG | FRAWLEY, GINGER | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029004 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | 029021 | | 86.67 | 0.00 | 1,083.33 | 91.04 | 67.17 | 15.71 | 43.78 | 0.00 | 25.00 | 840.63 |
| 12/30/05 | 029052 | | 86.67 | 0.00 | 1,083.33 | 91.04 | 67.17 | 15.71 | 43.78 | 0.00 | 25.00 | 840.63 |
| FRAWLEG TOTAL: | | | 173.34 | 0.00 | 2,968.59 | 382.56 | 184.06 | 43.05 | 127.66 | 0.00 | 50.00 | 2,181.26 |
| 40-RUSSELL | RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029005 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00145 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| 12/30/05 | D00161 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| RUSSELL TOTAL: | | | 173.34 | 0.00 | 3,489.43 | 546.94 | 216.34 | 50.59 | 145.48 | 0.00 | 48.00 | 2,482.08 |
| 40-SMILEY | SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 12/01/05 | 029006 | | 0.00 | 0.00 | 801.93 | 200.48 | 49.72 | 11.63 | 40.10 | 0.00 | 0.00 | 500.00 |
| 12/15/05 | D00146 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| 12/30/05 | D00162 | D | 81.67 | 0.00 | 1,083.38 | 131.05 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.67 |
| SMILEY TOTAL: | | | 168.34 | 0.00 | 2,968.64 | 462.57 | 184.06 | 43.05 | 123.66 | 0.00 | 0.00 | 2,155.30 |
| DEPT 40 TOTAL: | | | 515.02 | 0.00 | 9,426.66 | 1,392.07 | 584.46 | 136.69 | 396.80 | 0.00 | 98.00 | 6,818.64 |
| REPORT TOTAL: | | | 2852.18 | 0.00 | 558,683.67 | 263,255.68 | 5,800.27 | 8,097.61 | 36,245.83 | 0.00 | 1,832.38 | 243,451.90 |

**AERAS 0572**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 01/01/06 THRU 01/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER  CARTER, MELONI | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00182 | D | 96.00 | 0.00 | 3,876.00 | 612.75 | 240.31 | 56.20 | 145.25 | 0.00 | 238.45 | 2,583.04 |
| 01/31/06 | D00190 | D | 72.50 | 0.00 | 2,755.00 | 332.83 | 170.81 | 39.95 | 103.19 | 0.00 | 238.45 | 1,869.77 |
| CARTER TOTAL: | | | 168.50 | 0.00 | 6,631.00 | 945.58 | 411.12 | 96.15 | 248.44 | 0.00 | 476.90 | 4,452.81 |
| | | | | | | | | | | | | |
| 10-CLEVELA  CLEVELAND, JIMMY | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00183 | D | 60.00 | 0.00 | 3,300.00 | 402.08 | 204.60 | 47.85 | 131.98 | 0.00 | 0.00 | 2,513.49 |
| 01/31/06 | D00191 | D | 36.00 | 0.00 | 1,800.00 | 149.58 | 111.60 | 26.10 | 69.60 | 0.00 | 0.00 | 1,443.12 |
| CLEVELA TOTAL: | | | 96.00 | 0.00 | 5,100.00 | 551.66 | 316.20 | 73.95 | 201.58 | 0.00 | 0.00 | 3,956.61 |
| | | | | | | | | | | | | |
| 10-COOPER  COOPER, JUDY | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | 029098 | | 33.00 | 0.00 | 1,402.50 | 145.57 | 86.96 | 20.34 | 54.00 | 0.00 | 0.00 | 1,095.63 |
| 01/31/06 | 029126 | | 12.00 | 0.00 | 510.00 | 17.15 | 31.62 | 7.40 | 15.80 | 0.00 | 0.00 | 438.03 |
| COOPER TOTAL: | | | 45.00 | 0.00 | 1,912.50 | 162.72 | 118.58 | 27.74 | 69.80 | 0.00 | 0.00 | 1,533.66 |
| | | | | | | | | | | | | |
| 10-CRYSEL  CRYSEL, KIMBERLY | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00184 | D | 64.00 | 0.00 | 2,442.00 | 282.73 | 150.10 | 35.10 | 89.00 | 0.00 | 61.25 | 1,823.82 |
| 01/31/06 | D00192 | D | 88.50 | 0.00 | 2,920.50 | 368.63 | 179.77 | 42.04 | 108.63 | 0.00 | 61.25 | 2,160.18 |
| CRYSEL TOTAL: | | | 152.50 | 0.00 | 5,362.50 | 651.36 | 329.87 | 77.14 | 197.63 | 0.00 | 122.50 | 3,984.00 |
| | | | | | | | | | | | | |
| 10-FALERO  FALERO, WALLACE | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00180 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO TOTAL: | | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| | | | | | | | | | | | | |
| 10-GAY  GAY, MICKEY | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | 029099 | | 88.50 | 0.00 | 5,837.50 | 1,384.60 | 361.93 | 84.64 | 216.81 | 0.00 | 0.00 | 3,789.52 |
| 01/31/06 | 029127 | | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| GAY  TOTAL: | | | 184.50 | 0.00 | 10,637.50 | 2,478.70 | 659.53 | 154.24 | 396.27 | 0.00 | 0.00 | 6,948.76 |
| | | | | | | | | | | | | |
| 10-GUY  GUY, ALLISON | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00185 | D | 92.00 | 0.00 | 3,395.00 | 700.70 | 210.49 | 49.23 | 125.76 | 0.00 | 0.00 | 2,308.82 |
| 01/31/06 | D00193 | D | 84.00 | 0.00 | 2,940.00 | 573.30 | 182.28 | 42.63 | 109.38 | 0.00 | 0.00 | 2,032.41 |
| GUY  TOTAL: | | | 176.00 | 0.00 | 6,335.00 | 1,274.00 | 392.77 | 91.86 | 235.14 | 0.00 | 0.00 | 4,341.23 |
| | | | | | | | | | | | | |
| 10-LAUDERD  LAUDERDALE, RICK | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00186 | D | 82.50 | 0.00 | 3,993.75 | 719.02 | 247.61 | 57.91 | 146.86 | 0.00 | 0.00 | 2,822.35 |
| 01/31/06 | D00194 | D | 96.00 | 0.00 | 4,320.00 | 810.37 | 267.84 | 62.64 | 158.61 | 0.00 | 0.00 | 3,020.54 |
| LAUDERD TOTAL: | | | 178.50 | 0.00 | 8,313.75 | 1,529.39 | 515.45 | 120.55 | 305.47 | 0.00 | 0.00 | 5,842.89 |
| | | | | | | | | | | | | |
| 10-MCINTOS  MCINTOSH, ELIZABETH | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00187 | D | 78.00 | 0.00 | 3,287.00 | 418.83 | 203.79 | 47.66 | 145.49 | 0.00 | 0.00 | 2,471.23 |
| 01/31/06 | D00195 | D | 46.25 | 0.00 | 1,757.50 | 163.21 | 108.97 | 25.48 | 81.80 | 0.00 | 0.00 | 1,378.04 |
| MCINTOS TOTAL: | | | 124.25 | 0.00 | 5,044.50 | 582.04 | 312.76 | 73.14 | 227.29 | 0.00 | 0.00 | 3,849.27 |
| | | | | | | | | | | | | |
| 10-MOOREHO  MOOREHOUSE, JOHN | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00181 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| MOOREHO TOTAL: | | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| | | | | | | | | | | | | |
| 10-NORRIS  NORRIS, BEATRICE BEAR | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00188 | D | 69.00 | 0.00 | 3,687.50 | 493.18 | 227.19 | 53.13 | 140.02 | 0.00 | 56.10 | 2,717.88 |
| 01/31/06 | D00196 | D | 84.00 | 0.00 | 4,200.00 | 621.31 | 258.97 | 60.57 | 159.24 | 0.00 | 88.16 | 3,011.75 |
| NORRIS  TOTAL: | | | 153.00 | 0.00 | 7,887.50 | 1,114.49 | 486.16 | 113.70 | 299.26 | 0.00 | 144.26 | 5,729.63 |
| | | | | | | | | | | | | |
| 10-WILKERS  WILKERSON, BENNY | | | | | SSN: 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 | | | | | | | |
| 01/13/06 | D00189 | D | 60.00 | 0.00 | 3,600.00 | 463.75 | 223.20 | 52.20 | 150.35 | 0.00 | 238.45 | 2,472.05 |
| 01/31/06 | D00197 | D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 238.45 | 2,853.65 |
| WILKERS TOTAL: | | | 144.00 | 0.00 | 7,800.00 | 1,077.50 | 483.60 | 113.10 | 323.20 | 0.00 | 476.90 | 5,325.70 |
| | | | | | | | | | | | | |
| DEPT 10 TOTAL: | | | 1422.25 | 0.00 | 105,024.25 | 21,301.60 | 6,506.04 | 1,521.57 | 3,934.04 | 0.00 | 1,220.56 | 70,540.44 |

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 01/01/06 THRU 01/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI D. | | | SSN: 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 | | | | | | | | |
| 01/13/06 | D00172 | D | 86.67 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| 01/31/06 | D00198 | D | 86.67 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| DESTIN TOTAL: | | | 173.34 | 0.00 | 2,750.00 | 200.50 | 165.88 | 38.80 | 99.16 | 0.00 | 339.12 | 1,906.54 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 01/13/06 | 029093 | | 69.27 | 0.00 | 1,465.06 | 170.22 | 90.83 | 21.24 | 58.28 | 0.00 | 0.00 | 1,124.49 |
| 01/13/06 | D00173 | D | 74.20 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| 01/31/06 | D00199 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 230.14 | 0.00 | 5,131.72 | 688.32 | 316.55 | 74.04 | 201.50 | 0.00 | 51.90 | 3,799.41 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 01/13/06 | D00174 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 01/31/06 | D00200 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 01/13/06 | D00175 | D | 86.67 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| 01/31/06 | D00201 | D | 24.92 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| ROGERS TOTAL: | | | 111.59 | 0.00 | 4,000.00 | 432.82 | 245.38 | 57.38 | 140.42 | 0.00 | 112.30 | 3,011.70 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 01/13/06 | 029094 | | 78.23 | 0.00 | 1,824.32 | 173.23 | 113.11 | 26.45 | 70.26 | 0.00 | 0.00 | 1,441.27 |
| 01/13/06 | D00176 | D | 75.77 | 0.00 | 2,270.80 | 240.20 | 140.79 | 32.93 | 89.24 | 0.00 | 22.64 | 1,745.00 |
| 01/31/06 | D00202 | D | 72.85 | 0.00 | 2,270.81 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.64 |
| SHAW TOTAL: | | | 226.85 | 0.00 | 6,365.93 | 653.64 | 394.69 | 92.31 | 248.74 | 0.00 | 22.64 | 4,953.91 |
| 20-STANLEY | STANLEY, REX | | | SSN: 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 | | | | | | | | |
| 01/13/06 | D00177 | D | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| STANLEY TOTAL: | | | 86.67 | 0.00 | 850.00 | 201.67 | 52.70 | 12.33 | 50.75 | 0.00 | 0.00 | 532.55 |
| DEPT 20 TOTAL: | | | 1001.93 | 0.00 | 26,597.65 | 3,072.79 | 1,640.20 | 383.62 | 1,032.45 | 0.00 | 525.96 | 19,942.63 |

**AERAS 0574**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 01/01/06 THRU 01/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG | FRAWLEY, GINGER | | | SSN: 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 | | | | | | | | |
| 01/13/06 | 029092 | | 86.67 | 0.00 | 1,083.33 | 91.04 | 67.17 | 15.71 | 43.78 | 0.00 | 25.00 | 840.63 |
| 01/13/06 | 029095 | | 87.10 | 0.00 | 1,088.75 | 91.85 | 67.50 | 15.79 | 44.01 | 0.00 | 0.00 | 869.60 |
| 01/31/06 | 029128 | | 81.67 | 0.00 | 1,083.29 | 91.04 | 67.16 | 15.71 | 43.78 | 0.00 | 25.00 | 840.60 |
| FRAWLEG TOTAL: | | | 255.44 | 0.00 | 3,255.37 | 273.93 | 201.83 | 47.21 | 131.57 | 0.00 | 50.00 | 2,550.83 |
| 40-RUSSELL | RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 01/13/06 | 029096 | | 149.66 | 0.00 | 2,319.73 | 417.22 | 143.82 | 33.64 | 89.29 | 0.00 | 0.00 | 1,635.76 |
| 01/13/06 | D00178 | D | 70.67 | 0.00 | 1,343.74 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.03 |
| 01/31/06 | D00203 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| RUSSELL TOTAL: | | | 307.00 | 0.00 | 5,007.22 | 763.68 | 310.44 | 72.60 | 194.67 | 0.00 | 48.00 | 3,617.83 |
| 40-SMILEY | SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 01/13/06 | 029097 | | 121.67 | 0.00 | 1,520.88 | 217.51 | 94.29 | 22.05 | 59.34 | 0.00 | 0.00 | 1,127.69 |
| 01/13/06 | D00179 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| 01/31/06 | D00204 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| SMILEY TOTAL: | | | 295.01 | 0.00 | 3,687.54 | 479.59 | 228.63 | 53.47 | 142.90 | 0.00 | 0.00 | 2,782.95 |
| DEPT 40 TOTAL: | | | 857.45 | 0.00 | 11,950.13 | 1,517.20 | 740.90 | 173.28 | 469.14 | 0.00 | 98.00 | 8,951.61 |
| REPORT TOTAL: | | | 3281.63 | 0.00 | 143,572.03 | 25,891.59 | 8,887.14 | 2,078.47 | 5,435.63 | 0.00 | 1,844.52 | 99,434.68 |

**AERAS 0575**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 02/01/06 THRU 02/28/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER  CARTER, MELONI | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00214  D | 78.00 | 0.00 | 2,964.00 | 384.75 | 183.77 | 42.98 | 111.05 | 0.00 | 0.00 | 2,241.45 |
| CARTER  TOTAL: | | 78.00 | 0.00 | 2,964.00 | 384.75 | 183.77 | 42.98 | 111.05 | 0.00 | 0.00 | 2,241.45 |
| 10-CLEVELA  CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00215  D | 84.00 | 0.00 | 4,200.00 | 627.08 | 260.40 | 60.90 | 165.73 | 0.00 | 0.00 | 3,085.89 |
| 02/28/06 | D00229  D | 96.00 | 0.00 | 4,800.00 | 777.08 | 297.60 | 69.60 | 188.23 | 0.00 | 0.00 | 3,467.49 |
| CLEVELA  TOTAL: | | 180.00 | 0.00 | 9,000.00 | 1,404.16 | 558.00 | 130.50 | 353.96 | 0.00 | 0.00 | 6,553.38 |
| 10-COOPER  COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | 029162 | 24.00 | 0.00 | 1,020.00 | 88.19 | 63.24 | 14.79 | 37.74 | 0.00 | 0.00 | 816.04 |
| 02/28/06 | 029190 | 35.00 | 0.00 | 1,487.50 | 161.30 | 92.23 | 21.57 | 57.46 | 0.00 | 0.00 | 1,154.94 |
| COOPER  TOTAL: | | 59.00 | 0.00 | 2,507.50 | 249.49 | 155.47 | 36.36 | 95.20 | 0.00 | 0.00 | 1,970.98 |
| 10-CRYSEL  CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00216  D | 60.00 | 0.00 | 1,980.00 | 213.43 | 121.46 | 28.41 | 69.36 | 0.00 | 61.25 | 1,486.09 |
| 02/28/06 | D00230  D | 80.00 | 0.00 | 2,640.00 | 312.43 | 162.38 | 37.98 | 97.41 | 0.00 | 61.25 | 1,968.55 |
| CRYSEL  TOTAL: | | 140.00 | 0.00 | 4,620.00 | 525.86 | 283.84 | 66.39 | 166.77 | 0.00 | 122.50 | 3,454.64 |
| 10-FALERO  FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00205  D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO  TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY  GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | 029163 | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 359.60 | 84.10 | 215.46 | 0.00 | 0.00 | 3,766.74 |
| 02/28/06 | 029191 | 84.00 | 0.00 | 4,200.00 | 926.10 | 260.40 | 60.90 | 157.86 | 0.00 | 0.00 | 2,794.74 |
| GAY  TOTAL: | | 180.00 | 0.00 | 10,000.00 | 2,300.20 | 620.00 | 145.00 | 373.32 | 0.00 | 0.00 | 6,561.48 |
| 10-GUY  GUY, ALLISON | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00217  D | 57.00 | 0.00 | 1,995.00 | 336.04 | 123.69 | 28.93 | 73.99 | 0.00 | 0.00 | 1,432.35 |
| 02/28/06 | D00231  D | 51.00 | 0.00 | 1,785.00 | 283.54 | 110.67 | 25.88 | 66.11 | 0.00 | 0.00 | 1,298.80 |
| GUY  TOTAL: | | 108.00 | 0.00 | 3,780.00 | 619.58 | 234.36 | 54.81 | 140.10 | 0.00 | 0.00 | 2,731.15 |
| 10-LAUDERD  LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00218  D | 77.50 | 0.00 | 3,487.50 | 577.27 | 216.23 | 50.57 | 128.64 | 0.00 | 0.00 | 2,514.79 |
| 02/28/06 | D00232  D | 78.25 | 0.00 | 3,521.25 | 586.72 | 218.32 | 51.06 | 129.85 | 0.00 | 317.93 | 2,217.37 |
| LAUDERD TOTAL: | | 155.75 | 0.00 | 7,008.75 | 1,163.99 | 434.55 | 101.63 | 258.49 | 0.00 | 317.93 | 4,732.16 |
| 10-MCINTOS  MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00219  D | 84.50 | 0.00 | 3,211.00 | 399.83 | 199.08 | 46.56 | 142.64 | 0.00 | 0.00 | 2,422.89 |
| 02/28/06 | D00233  D | 71.50 | 0.00 | 2,717.00 | 307.13 | 168.45 | 39.40 | 122.58 | 0.00 | 0.00 | 2,079.44 |
| MCINTOS TOTAL: | | 156.00 | 0.00 | 5,928.00 | 706.96 | 367.53 | 85.96 | 265.22 | 0.00 | 0.00 | 4,502.33 |
| 10-MOOREHO  MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00206  D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| MOOREHO TOTAL: | | | | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| 10-NORRIS  NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00220  D | 36.00 | 0.00 | 1,800.00 | 146.12 | 110.17 | 25.77 | 63.00 | 0.00 | 112.55 | 1,342.39 |
| 02/28/06 | D00234  D | 48.00 | 0.00 | 2,400.00 | 236.12 | 147.37 | 34.47 | 88.50 | 0.00 | 56.10 | 1,837.44 |
| NORRIS  TOTAL: | | 84.00 | 0.00 | 4,200.00 | 382.24 | 257.54 | 60.24 | 151.50 | 0.00 | 168.65 | 3,179.83 |
| 10-WILKERS  WILKERSON, BENNY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00221  D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 238.45 | 2,853.65 |
| 02/28/06 | D00235  D | 84.00 | 0.00 | 4,200.00 | 613.75 | 260.40 | 60.90 | 172.85 | 0.00 | 238.45 | 2,853.65 |
| WILKERS TOTAL: | | 168.00 | 0.00 | 8,400.00 | 1,227.50 | 520.80 | 121.80 | 345.70 | 0.00 | 476.90 | 5,707.30 |
| DEPT 10 TOTAL: | | 1308.75 | 0.00 | 98,408.25 | 19,898.89 | 6,095.86 | 1,425.67 | 3,691.27 | 0.00 | 1,085.98 | 66,210.58 |

**AERAS 0576**

AERAS, P. C.

**PAYROLL CHECK HISTORY REPORT**

*DETAIL FOR 02/01/06 THRU 02/28/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI D. | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00207 | D | 77.52 | 0.00 | 1,375.01 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.28 |
| 02/28/06 | D00222 | D | 55.03 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| DESTIN TOTAL: | | | 132.55 | 0.00 | 2,750.01 | 200.50 | 165.88 | 38.80 | 99.16 | 0.00 | 339.12 | 1,906.55 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00208 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| 02/28/06 | D00223 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 173.34 | 0.00 | 3,666.66 | 518.10 | 225.72 | 52.80 | 143.22 | 0.00 | 51.90 | 2,674.92 |
| 20-PLATT | PLATT, MARK | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00209 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 02/28/06 | D00224 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| 20-ROGERS | ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00210 | D | 0.00 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| 02/28/06 | D00225 | D | 86.67 | 0.00 | 2,000.00 | 216.41 | 122.69 | 28.69 | 70.21 | 0.00 | 56.15 | 1,505.85 |
| ROGERS TOTAL: | | | 86.67 | 0.00 | 4,000.00 | 432.82 | 245.38 | 57.38 | 140.42 | 0.00 | 112.30 | 3,011.70 |
| 20-SHAW | SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | |
| 02/15/06 | D00211 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| 02/28/06 | D00226 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| SHAW TOTAL: | | | 173.34 | 0.00 | 4,541.66 | 480.42 | 281.58 | 65.86 | 178.48 | 0.00 | 0.00 | 3,535.32 |
| DEPT 20 TOTAL: | | | 739.24 | 0.00 | 22,458.33 | 2,527.68 | 1,383.56 | 323.60 | 853.16 | 0.00 | 503.32 | 16,867.01 |

**AERAS 0577**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 02/01/06 THRU 02/28/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-FRAWLEG  FRAWLEY, GINGER | | | | | SSN: 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 | | | | | | | |
| 02/15/06 | 029160 | | 79.05 | 0.00 | 1,083.30 | 91.04 | 67.16 | 15.71 | 43.78 | 0.00 | 25.00 | 840.61 |
| 02/27/06 | 029198 | | 18.00 | 0.00 | 225.00 | 0.00 | 13.95 | 3.26 | 7.33 | 0.00 | 0.00 | 200.46 |
| 02/28/06 | 029189 | | 77.67 | 0.00 | 1,083.30 | 91.04 | 67.16 | 15.71 | 43.78 | 0.00 | 25.00 | 840.61 |
| FRAWLEG TOTAL: | | | 174.72 | 0.00 | 2,391.60 | 182.08 | 148.27 | 34.68 | 94.89 | 0.00 | 50.00 | 1,881.68 |
| 40-RUSSELL  RUSSELL, MELANIE | | | | | SSN: 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 | | | | | | | |
| 02/15/06 | D00212 | D | 81.50 | 0.00 | 1,343.74 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.03 |
| 02/28/06 | D00227 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| RUSSELL TOTAL: | | | 168.17 | 0.00 | 2,687.49 | 346.46 | 166.62 | 38.96 | 105.38 | 0.00 | 48.00 | 1,982.07 |
| 40-SMILEY  SMILEY, KATRINA | | | | | SSN: 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 | | | | | | | |
| 02/15/06 | D00213 | D | 81.17 | 0.00 | 1,083.29 | 131.04 | 67.16 | 15.71 | 41.78 | 0.00 | 0.00 | 827.60 |
| 02/28/06 | D00228 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| SMILEY  TOTAL: | | | 167.84 | 0.00 | 2,166.62 | 262.08 | 134.33 | 31.42 | 83.56 | 0.00 | 0.00 | 1,655.23 |
| DEPT 40 TOTAL: | | | 510.73 | 0.00 | 7,245.71 | 790.62 | 449.22 | 105.06 | 283.83 | 0.00 | 98.00 | 5,518.98 |
| REPORT TOTAL: | | | 2558.72 | 0.00 | 128,112.29 | 23,217.19 | 7,928.64 | 1,854.33 | 4,828.26 | 0.00 | 1,687.30 | 88,596.57 |

**AERAS 0578**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 03/01/06 THRU 03/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00245 | D | 9.00 | 0.00 | 342.00 | 0.87 | 21.20 | 4.96 | 5.08 | 0.00 | 0.00 | 309.89 |
| CARTER  TOTAL: | | | 9.00 | 0.00 | 342.00 | 0.87 | 21.20 | 4.96 | 5.08 | 0.00 | 0.00 | 309.89 |
| 10-CLEVELA | CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00246 | D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| 03/31/06 | D00259 | D | 96.00 | 0.00 | 4,800.00 | 777.08 | 297.60 | 69.60 | 188.23 | 0.00 | 0.00 | 3,467.49 |
| CLEVELA  TOTAL: | | | 144.00 | 0.00 | 7,200.00 | 1,016.66 | 446.40 | 104.40 | 283.33 | 0.00 | 0.00 | 5,349.21 |
| 10-COOPER | COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 03/15/06 | 029230 | | 24.00 | 0.00 | 1,020.00 | 88.19 | 63.24 | 14.79 | 37.74 | 0.00 | 0.00 | 816.04 |
| 03/31/06 | 029295 | | 22.50 | 0.00 | 956.25 | 78.63 | 59.29 | 13.87 | 35.03 | 0.00 | 0.00 | 769.43 |
| COOPER  TOTAL: | | | 46.50 | 0.00 | 1,976.25 | 166.82 | 122.53 | 28.66 | 72.77 | 0.00 | 0.00 | 1,585.47 |
| 10-CRYSEL | CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00250 | D | 82.00 | 0.00 | 2,706.00 | 322.33 | 166.47 | 38.93 | 100.22 | 0.00 | 61.25 | 2,016.80 |
| 03/31/06 | D00260 | D | 71.00 | 0.00 | 2,343.00 | 267.88 | 143.96 | 33.67 | 84.79 | 0.00 | 61.25 | 1,751.45 |
| CRYSEL  TOTAL: | | | 153.00 | 0.00 | 5,049.00 | 590.21 | 310.43 | 72.60 | 185.01 | 0.00 | 122.50 | 3,768.25 |
| 10-FALERO | FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00236 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO  TOTAL: | | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY | GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 03/15/06 | 029231 | | 108.00 | 0.00 | 6,400.00 | 1,545.54 | 396.80 | 92.80 | 236.89 | 0.00 | 0.00 | 4,127.97 |
| 03/31/06 | 029296 | | 72.00 | 0.00 | 3,600.00 | 758.10 | 223.20 | 52.20 | 136.26 | 0.00 | 0.00 | 2,430.24 |
| GAY  TOTAL: | | | 180.00 | 0.00 | 10,000.00 | 2,303.64 | 620.00 | 145.00 | 373.15 | 0.00 | 0.00 | 6,558.21 |
| 10-LAUDERD | LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00248 | D | 72.00 | 0.00 | 3,240.00 | 513.96 | 200.88 | 46.98 | 119.43 | 0.00 | 317.93 | 2,040.82 |
| 03/31/06 | D00261 | D | 94.00 | 0.00 | 4,230.00 | 785.17 | 262.26 | 61.34 | 155.37 | 0.00 | 317.95 | 2,647.91 |
| LAUDERD  TOTAL: | | | 166.00 | 0.00 | 7,470.00 | 1,299.13 | 463.14 | 108.32 | 274.80 | 0.00 | 635.88 | 4,688.73 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00250 | D | 85.50 | 0.00 | 3,249.00 | 409.33 | 201.44 | 47.11 | 144.07 | 0.00 | 0.00 | 2,447.05 |
| 03/31/06 | D00262 | D | 92.00 | 0.00 | 3,496.00 | 471.08 | 216.75 | 50.69 | 153.33 | 0.00 | 0.00 | 2,604.15 |
| MCINTOS  TOTAL: | | | 177.50 | 0.00 | 6,745.00 | 880.41 | 418.19 | 97.80 | 297.40 | 0.00 | 0.00 | 5,051.20 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00237 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| MOOREHO  TOTAL: | | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 1,550.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,087.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00250 | D | 70.00 | 0.00 | 3,500.00 | 446.31 | 215.57 | 50.42 | 132.99 | 0.00 | 56.10 | 2,598.61 |
| 03/31/06 | D00263 | D | 76.00 | 0.00 | 3,800.00 | 521.31 | 234.17 | 54.77 | 144.24 | 0.00 | 91.73 | 2,753.78 |
| NORRIS  TOTAL: | | | 146.00 | 0.00 | 7,300.00 | 967.62 | 449.74 | 105.19 | 277.23 | 0.00 | 147.83 | 5,352.39 |
| 10-TREADWE | TREADWELL, DENISE | | | SSN: 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 | | | | | | | | |
| 03/31/06 | D00264 | D | 24.00 | 0.00 | 1,200.00 | 148.54 | 74.40 | 17.40 | 46.74 | 0.00 | 0.00 | 912.92 |
| TREADWE  TOTAL: | | | 24.00 | 0.00 | 1,200.00 | 148.54 | 74.40 | 17.40 | 46.74 | 0.00 | 0.00 | 912.92 |
| 10-WILKERS | WILKERSON, BENNY | | | SSN: 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 | | | | | | | | |
| 03/15/06 | D00251 | D | 61.00 | 0.00 | 3,050.00 | 337.08 | 189.10 | 44.23 | 129.19 | 0.00 | 238.45 | 2,111.95 |
| 03/31/06 | D00265 | D | 72.00 | 0.00 | 3,600.00 | 463.75 | 223.20 | 52.20 | 150.35 | 0.00 | 238.45 | 2,472.05 |
| WILKERS  TOTAL: | | | 133.00 | 0.00 | 6,650.00 | 800.83 | 412.30 | 96.43 | 279.54 | 0.00 | 476.90 | 4,584.00 |
| DEPT 10 TOTAL: | | | 1179.00 | 0.00 | 93,932.25 | 19,108.89 | 5,818.33 | 1,360.76 | 3,525.01 | 0.00 | 1,383.11 | 62,736.15 |

**AERAS 0579**

AERAS, P. C.

**PAYROLL CHECK HISTORY REPORT**

*DETAIL FOR 03/01/06 THRU 03/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN DESTIN, KELLI D. | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00238 | D | 86.67 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| 03/31/06 | D00252 | D | 80.00 | 0.00 | 1,375.02 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 192.96 | 929.89 |
| DESTIN TOTAL: | | | 166.67 | 0.00 | 2,750.02 | 200.50 | 165.88 | 38.80 | 99.16 | 0.00 | 362.52 | 1,883.16 |
| | | | | | | | | | | | | |
| 20-KITCHEN KITCHENS, KATHRYN B. | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00239 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| 03/31/06 | D00253 | D | 74.25 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 160.92 | 0.00 | 3,666.66 | 518.10 | 225.72 | 52.80 | 143.22 | 0.00 | 51.90 | 2,674.92 |
| | | | | | | | | | | | | |
| 20-PLATT PLATT, MARK | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00240 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 03/31/06 | D00254 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| | | | | | | | | | | | | |
| 20-ROGERS ROGERS, ASHLEY | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00241 | D | 0.00 | 0.00 | 1,117.34 | 84.01 | 67.96 | 15.89 | 32.69 | 0.00 | 56.15 | 860.64 |
| 03/31/06 | D00255 | D | 36.52 | 0.00 | 996.43 | 65.88 | 60.47 | 14.14 | 27.55 | 0.00 | 56.15 | 772.24 |
| ROGERS TOTAL: | | | 36.52 | 0.00 | 2,113.77 | 149.89 | 128.43 | 30.03 | 60.24 | 0.00 | 112.30 | 1,632.88 |
| | | | | | | | | | | | | |
| 20-SHAW SHAW, JEANIE M. | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00242 | D | 0.00 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| 03/31/06 | D00256 | D | 81.47 | 0.00 | 2,270.80 | 240.20 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.64 |
| SHAW TOTAL: | | | 81.47 | 0.00 | 4,541.63 | 480.41 | 281.58 | 65.86 | 178.48 | 0.00 | 0.00 | 3,535.30 |
| | | | | | | | | | | | | |
| DEPT 20 TOTAL: | | | 618.92 | 0.00 | 20,572.08 | 2,244.74 | 1,266.61 | 296.25 | 772.98 | 0.00 | 526.72 | 15,464.78 |

**AERAS 0580**

**AERAS, P. C.**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 03/01/06 THRU 03/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-RUSSELL  RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00243 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| 03/31/06 | D00257 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| RUSSELL TOTAL: | | | 173.34 | 0.00 | 2,687.50 | 346.46 | 166.62 | 38.96 | 105.38 | 0.00 | 48.00 | 1,982.08 |
| 40-SMILEY  SMILEY, KATRINA | | | SSN: 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 | | | | | | | | | |
| 03/15/06 | D00244 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| 03/31/06 | D00258 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| SMILEY TOTAL: | | | 173.34 | 0.00 | 2,166.66 | 262.08 | 134.34 | 31.42 | 83.56 | 0.00 | 0.00 | 1,655.26 |
| DEPT 40 TOTAL: | | | 346.68 | 0.00 | 4,854.16 | 608.54 | 300.96 | 70.38 | 188.94 | 0.00 | 48.00 | 3,637.34 |
| REPORT TOTAL: | | | 2144.60 | 0.00 | 119,358.49 | 21,962.17 | 7,385.90 | 1,727.39 | 4,486.93 | 0.00 | 1,957.83 | 81,838.27 |

**AERAS 0581**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 04/01/06 THRU 04/30/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00275 | D | 24.00 | 0.00 | 912.00 | 57.87 | 56.54 | 13.22 | 24.79 | 0.00 | 0.00 | 759.58 |
| 04/28/06 | D00291 | D | 9.00 | 0.00 | 405.00 | 7.17 | 25.11 | 5.87 | 6.84 | 0.00 | 0.00 | 360.01 |
| CARTER TOTAL: | | | 33.00 | 0.00 | 1,317.00 | 65.04 | 81.65 | 19.09 | 31.63 | 0.00 | 0.00 | 1,119.59 |
| 10-CLEVELA | CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00276 | D | 48.00 | 0.00 | 2,400.00 | 239.58 | 148.80 | 34.80 | 95.10 | 0.00 | 0.00 | 1,881.72 |
| 04/28/06 | D00292 | D | 84.00 | 0.00 | 4,200.00 | 627.08 | 260.40 | 60.90 | 165.73 | 0.00 | 0.00 | 3,085.89 |
| CLEVELA TOTAL: | | | 132.00 | 0.00 | 6,600.00 | 866.66 | 409.20 | 95.70 | 260.83 | 0.00 | 0.00 | 4,967.61 |
| 10-COOPER | COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 04/14/06 | 029328 | | 26.50 | 0.00 | 1,126.25 | 104.13 | 69.83 | 16.33 | 42.26 | 0.00 | 0.00 | 893.70 |
| 04/28/06 | 029361 | | 29.50 | 0.00 | 1,253.75 | 123.25 | 77.73 | 18.18 | 47.68 | 0.00 | 0.00 | 986.91 |
| COOPER TOTAL: | | | 56.00 | 0.00 | 2,380.00 | 227.38 | 147.56 | 34.51 | 89.94 | 0.00 | 0.00 | 1,880.61 |
| 10-CRYSEL | CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00277 | D | 105.50 | 0.00 | 3,481.50 | 508.88 | 214.55 | 50.18 | 129.66 | 0.00 | 61.25 | 2,516.98 |
| 04/28/06 | D00293 | D | 72.00 | 0.00 | 2,376.00 | 272.83 | 146.01 | 34.15 | 86.19 | 0.00 | 61.25 | 1,775.57 |
| CRYSEL TOTAL: | | | 177.50 | 0.00 | 5,857.50 | 781.71 | 360.56 | 84.33 | 215.85 | 0.00 | 122.50 | 4,292.55 |
| 10-FALERO | FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00266 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO TOTAL: | | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY | GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 04/14/06 | 029329 | | 120.00 | 0.00 | 7,000.00 | 1,743.54 | 434.00 | 101.50 | 256.99 | 0.00 | 0.00 | 4,463.97 |
| 04/28/06 | 029362 | | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| GAY TOTAL: | | | 216.00 | 0.00 | 11,800.00 | 2,837.64 | 731.60 | 171.10 | 436.45 | 0.00 | 0.00 | 7,623.21 |
| 10-LAUDERD | LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00278 | D | 85.00 | 0.00 | 3,825.00 | 671.77 | 237.15 | 55.46 | 140.79 | 0.00 | 238.45 | 2,481.38 |
| 04/28/06 | D00294 | D | 79.00 | 0.00 | 3,555.00 | 596.17 | 220.41 | 51.55 | 131.07 | 0.00 | 238.45 | 2,317.35 |
| LAUDERD TOTAL: | | | 164.00 | 0.00 | 7,380.00 | 1,267.94 | 457.56 | 107.01 | 271.86 | 0.00 | 476.90 | 4,798.73 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00279 | D | 61.00 | 0.00 | 2,318.00 | 247.28 | 143.72 | 33.61 | 105.62 | 0.00 | 0.00 | 1,787.77 |
| 04/28/06 | D00295 | D | 96.00 | 0.00 | 3,648.00 | 509.08 | 226.18 | 52.90 | 159.03 | 0.00 | 0.00 | 2,700.81 |
| MCINTOS TOTAL: | | | 157.00 | 0.00 | 5,966.00 | 756.36 | 369.90 | 86.51 | 264.65 | 0.00 | 0.00 | 4,488.58 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00267 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 930.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,707.94 |
| MOOREHO TOTAL: | | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 930.00 | 362.50 | 882.48 | 0.00 | 0.00 | 15,707.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00280 | D | 52.00 | 0.00 | 2,600.00 | 266.12 | 159.77 | 37.37 | 97.00 | 0.00 | 56.10 | 1,983.64 |
| 04/28/06 | D00296 | D | 12.00 | 0.00 | 600.00 | 0.00 | 35.77 | 8.37 | 12.87 | 0.00 | 113.67 | 429.32 |
| NORRIS TOTAL: | | | 64.00 | 0.00 | 3,200.00 | 266.12 | 195.54 | 45.74 | 109.87 | 0.00 | 169.77 | 2,412.96 |
| 10-TREADWE | TREADWELL, DENISE | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00281 | D | 36.00 | 0.00 | 1,800.00 | 287.29 | 111.60 | 26.10 | 69.80 | 0.00 | 0.00 | 1,305.21 |
| TREADWE TOTAL: | | | 36.00 | 0.00 | 1,800.00 | 287.29 | 111.60 | 26.10 | 69.80 | 0.00 | 0.00 | 1,305.21 |
| 10-WILKERS | WILKERSON, BENNY | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00282 | D | 96.00 | 0.00 | 4,800.00 | 763.75 | 297.60 | 69.60 | 195.35 | 0.00 | 238.45 | 3,235.25 |
| 04/28/06 | D00297 | D | 81.50 | 0.00 | 4,075.00 | 582.50 | 252.65 | 59.09 | 168.17 | 0.00 | 247.75 | 2,764.84 |
| WILKERS TOTAL: | | | 177.50 | 0.00 | 8,875.00 | 1,346.25 | 550.25 | 128.69 | 363.52 | 0.00 | 486.20 | 6,000.09 |
| DEPT 10 TOTAL: | | | 1213.00 | 0.00 | 95,175.50 | 19,636.55 | 5,275.42 | 1,378.78 | 3,544.36 | 0.00 | 1,255.37 | 64,085.02 |

**AERAS 0582**

AERAS, P. C.

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 04/01/06 THRU 04/30/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI D. | | SSN: 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 | | | | | | | | | |
| 04/14/06 | D00268 | D | 86.67 | 0.00 | 1,375.00 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.27 |
| 04/28/06 | D00283 | D | 83.34 | 0.00 | 1,375.01 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 169.56 | 953.28 |
| DESTIN TOTAL: | | | 170.01 | 0.00 | 2,750.01 | 200.50 | 165.88 | 38.80 | 99.16 | 0.00 | 339.12 | 1,906.55 |
| | | | | | | | | | | | | |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | SSN: 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 | | | | | | | | | |
| 04/14/06 | D00269 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| 04/28/06 | D00284 | D | 69.00 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 155.67 | 0.00 | 3,666.66 | 518.10 | 225.72 | 52.80 | 143.22 | 0.00 | 51.90 | 2,674.92 |
| | | | | | | | | | | | | |
| 20-PLATT | PLATT, MARK | | SSN: 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 | | | | | | | | | |
| 04/14/06 | D00270 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 04/28/06 | D00285 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| | | | | | | | | | | | | |
| 20-ROGERS | ROGERS, ASHLEY | | SSN: 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 | | | | | | | | | |
| 04/14/06 | D00271 | D | 53.63 | 0.00 | 1,237.57 | 102.05 | 75.42 | 17.64 | 37.80 | 0.00 | 56.15 | 948.51 |
| 04/28/06 | D00286 | D | 46.61 | 0.00 | 1,075.57 | 77.75 | 65.37 | 15.29 | 30.92 | 0.00 | 56.15 | 830.09 |
| ROGERS TOTAL: | | | 100.24 | 0.00 | 2,313.14 | 179.80 | 140.79 | 32.93 | 68.72 | 0.00 | 112.30 | 1,778.60 |
| | | | | | | | | | | | | |
| 20-SHAW | SHAW, JEANIE M. | | SSN: 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 | | | | | | | | | |
| 04/14/06 | D00272 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 16.50 | 1,751.16 |
| 04/28/06 | D00287 | D | 82.57 | 0.00 | 2,270.80 | 240.20 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.64 |
| SHAW TOTAL: | | | 169.24 | 0.00 | 4,541.63 | 480.41 | 281.58 | 65.86 | 178.48 | 0.00 | 16.50 | 3,518.80 |
| | | | | | | | | | | | | |
| DEPT 20 TOTAL: | | | 768.50 | 0.00 | 20,771.44 | 2,274.65 | 1,278.97 | 299.15 | 781.46 | 0.00 | 519.82 | 15,617.39 |

**AERAS 0583**

**AERAS, P. C.**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 04/01/06 THRU 04/30/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-MAYS | MAYS, QUATISHA | | | SSN: 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 | | | | | | | | |
| 04/14/06 | 029325 | | 101.42 | 0.00 | 1,023.92 | 99.35 | 62.34 | 14.58 | 35.72 | 0.00 | 48.75 | 763.18 |
| 04/28/06 | D00288 | D | 86.67 | 0.00 | 875.00 | 77.02 | 53.10 | 12.42 | 29.39 | 0.00 | 48.75 | 654.32 |
| MAYS TOTAL: | | | 188.09 | | 1,898.92 | 176.37 | 115.44 | 27.00 | 65.11 | 0.00 | 97.50 | 1,417.50 |
| 40-RUSSELL | RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00273 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| 04/28/06 | D00289 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| RUSSELL TOTAL: | | | 173.34 | 0.00 | 2,687.50 | 346.46 | 166.62 | 38.96 | 105.38 | 0.00 | 48.00 | 1,982.08 |
| 40-SMILEY | SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 04/14/06 | D00274 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| 04/28/06 | D00290 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| SMILEY TOTAL: | | | 173.34 | 0.00 | 2,166.66 | 262.08 | 134.34 | 31.42 | 83.56 | 0.00 | 0.00 | 1,655.26 |
| DEPT 40 TOTAL: | | | 534.77 | 0.00 | 6,753.08 | 784.91 | 416.40 | 97.38 | 254.05 | 0.00 | 145.50 | 5,054.84 |
| REPORT TOTAL: | | | 2516.27 | 0.00 | 122,700.02 | 22,696.11 | 6,970.79 | 1,775.31 | 4,579.87 | 0.00 | 1,920.69 | 84,757.25 |

*AERAS 0584*

AERAS, P. C.

**PAYROLL CHECK HISTORY REPORT**

*DETAIL FOR 05/01/06 THRU 05/31/06*
*SORTED BY EMPLOYEE NUMBER*

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-CARTER | CARTER, MELONI | | | SSN: 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 | | | | | | | | |
| 05/31/06 | D00322 | D | 27.00 | 0.00 | 1,215.00 | 101.83 | 75.33 | 17.62 | 37.74 | 0.00 | 2.97 | 979.51 |
| CARTER | TOTAL: | | 27.00 | 0.00 | 1,215.00 | 101.83 | 75.33 | 17.62 | 37.74 | 0.00 | 2.97 | 979.51 |
| 10-CLEVELA | CLEVELAND, JIMMY | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00308 | D | 60.00 | 0.00 | 3,000.00 | 329.58 | 186.00 | 43.50 | 120.60 | 0.00 | 0.00 | 2,320.32 |
| 05/31/06 | D00323 | D | 84.00 | 0.00 | 4,200.00 | 627.08 | 260.40 | 60.90 | 165.73 | 0.00 | 0.00 | 3,085.89 |
| CLEVELA | TOTAL: | | 144.00 | 0.00 | 7,200.00 | 956.66 | 446.40 | 104.40 | 286.33 | 0.00 | 0.00 | 5,406.21 |
| 10-COOPER | COOPER, JUDY | | | SSN: 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 | | | | | | | | |
| 05/15/06 | 029389 | | 24.50 | 0.00 | 1,041.25 | 91.38 | 64.56 | 15.10 | 38.65 | 0.00 | 0.00 | 831.56 |
| 05/31/06 | 029403 | | 48.50 | 0.00 | 2,061.25 | 304.74 | 127.80 | 29.89 | 78.98 | 0.00 | 0.00 | 1,519.84 |
| COOPER | TOTAL: | | 73.00 | 0.00 | 3,102.50 | 396.12 | 192.36 | 44.99 | 117.63 | 0.00 | 0.00 | 2,351.40 |
| 10-CRYSEL | CRYSEL, KIMBERLY | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00309 | D | 75.50 | 0.00 | 2,491.50 | 290.16 | 153.17 | 35.82 | 91.10 | 0.00 | 61.25 | 1,860.00 |
| 05/31/06 | D00324 | D | 84.50 | 0.00 | 2,788.50 | 335.63 | 171.59 | 40.13 | 103.68 | 0.00 | 61.25 | 2,076.22 |
| CRYSEL | TOTAL: | | 160.00 | 0.00 | 5,280.00 | 625.79 | 324.76 | 75.95 | 194.78 | 0.00 | 122.50 | 3,936.22 |
| 10-FALERO | FALERO, WALLACE | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00298 | D | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| FALERO | TOTAL: | | 0.00 | 0.00 | 15,000.00 | 3,817.08 | 930.00 | 217.50 | 547.48 | 0.00 | 0.00 | 9,487.94 |
| 10-GAY | GAY, MICKEY | | | SSN: 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 | | | | | | | | |
| 05/15/06 | 029390 | | 96.00 | 0.00 | 5,800.00 | 1,374.10 | 359.60 | 84.10 | 215.46 | 0.00 | 0.00 | 3,766.74 |
| 05/31/06 | 029404 | | 96.00 | 0.00 | 4,800.00 | 1,094.10 | 297.60 | 69.60 | 179.46 | 0.00 | 0.00 | 3,159.24 |
| GAY | TOTAL: | | 192.00 | 0.00 | 10,600.00 | 2,468.20 | 657.20 | 153.70 | 394.92 | 0.00 | 0.00 | 6,925.98 |
| 10-GUY | GUY, ALLISON | | | SSN: 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 | | | | | | | | |
| 05/31/06 | D00325 | D | 45.00 | 0.00 | 1,575.00 | 231.04 | 97.65 | 22.84 | 58.24 | 0.00 | 0.00 | 1,165.23 |
| GUY | TOTAL: | | 45.00 | 0.00 | 1,575.00 | 231.04 | 97.65 | 22.84 | 58.24 | 0.00 | 0.00 | 1,165.23 |
| 10-LAUDERD | LAUDERDALE, RICK | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00310 | D | 93.50 | 0.00 | 4,207.50 | 778.87 | 260.87 | 61.01 | 154.56 | 0.00 | 238.45 | 2,713.74 |
| 05/31/06 | D00326 | D | 74.00 | 0.00 | 3,480.00 | 575.17 | 215.76 | 50.46 | 128.37 | 0.00 | 238.45 | 2,271.79 |
| LAUDERD | TOTAL: | | 167.50 | 0.00 | 7,687.50 | 1,354.04 | 476.63 | 111.47 | 282.93 | 0.00 | 476.90 | 4,985.53 |
| 10-MCINTOS | MCINTOSH, ELIZABETH | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00311 | D | 73.75 | 0.00 | 2,802.50 | 319.96 | 173.76 | 40.64 | 126.21 | 0.00 | 0.00 | 2,141.93 |
| 05/31/06 | D00327 | D | 60.50 | 0.00 | 2,299.00 | 244.43 | 142.54 | 33.34 | 104.81 | 0.00 | 0.00 | 1,773.88 |
| MCINTOS | TOTAL: | | 134.25 | 0.00 | 5,101.50 | 564.39 | 316.30 | 73.98 | 231.02 | 0.00 | 0.00 | 3,915.81 |
| 10-MOOREHO | MOOREHOUSE, JOHN | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00299 | D | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| MOOREHO | TOTAL: | | 0.00 | 0.00 | 25,000.00 | 7,117.08 | 0.00 | 362.50 | 882.48 | 0.00 | 0.00 | 16,637.94 |
| 10-NORRIS | NORRIS, BEATRICE BEAR | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00312 | D | 24.00 | 0.00 | 1,200.00 | 57.69 | 72.97 | 17.07 | 37.42 | 0.00 | 56.10 | 958.75 |
| 05/31/06 | D00328 | D | 64.00 | 0.00 | 3,200.00 | 371.31 | 196.97 | 46.07 | 121.74 | 0.00 | 56.10 | 2,407.81 |
| NORRIS | TOTAL: | | 88.00 | 0.00 | 4,400.00 | 429.00 | 269.94 | 63.14 | 159.16 | 0.00 | 112.20 | 3,366.56 |
| 10-PRITCH | PRITCHETT, CHRISTOPHER | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00313 | D | 80.00 | 0.00 | 1,600.00 | 174.04 | 99.20 | 23.20 | 62.45 | 0.00 | 238.45 | 1,002.66 |
| 05/31/06 | D00329 | D | 63.50 | 0.00 | 2,540.00 | 409.04 | 157.48 | 36.83 | 97.70 | 0.00 | 238.45 | 1,600.50 |
| PRITCH | TOTAL: | | 143.50 | 0.00 | 4,140.00 | 583.08 | 256.68 | 60.03 | 160.15 | 0.00 | 476.90 | 2,603.16 |
| 10-SMITHST | SMITH, STEVEN | | | SSN: 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 | | | | | | | | |
| 05/31/06 | D00330 | D | 10.00 | 0.00 | 400.00 | 0.00 | 24.80 | 5.80 | 14.33 | 0.00 | 0.00 | 355.07 |
| SMITHST | TOTAL: | | 10.00 | 0.00 | 400.00 | 0.00 | 24.80 | 5.80 | 14.33 | 0.00 | 0.00 | 355.07 |

**AERAS 0585**

AERAS, P. C.

**PAYROLL CHECK HISTORY REPORT**

*DETAIL FOR 05/01/06 THRU 05/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 10 MEDICAL

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10-TREADWE TREADWELL, DENISE | | | | SSN: 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 | | | | | | | | |
| 05/31/06 | D00331 | D | 22.00 | 0.00 | 1,100.00 | 133.54 | 68.20 | 15.95 | 42.49 | 0.00 | 0.00 | 839.82 |
| TREADWE TOTAL: | | | 22.00 | 0.00 | 1,100.00 | 133.54 | 68.20 | 15.95 | 42.49 | 0.00 | 0.00 | 839.82 |
| 10-WILKERS WILKERSON, BENNY | | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00314 | D | 107.50 | 0.00 | 5,375.00 | 907.50 | 333.25 | 77.94 | 216.92 | 0.00 | 238.45 | 3,600.94 |
| 05/31/06 | D00332 | D | 72.00 | 0.00 | 3,750.00 | 501.25 | 232.50 | 54.38 | 155.98 | 0.00 | 238.45 | 2,567.44 |
| WILKERS TOTAL: | | | 179.50 | 0.00 | 9,125.00 | 1,408.75 | 565.75 | 132.32 | 372.90 | 0.00 | 476.90 | 6,168.38 |
| DEPT 10 TOTAL: | | | 1385.75 | 0.00 | 100,926.50 | 20,186.60 | 4,702.00 | 1,462.19 | 3,782.58 | 0.00 | 1,668.37 | 69,124.76 |

**AERAS 0586**

**AERAS, P. C.**

PAYROLL CHECK HISTORY REPORT

*DETAIL FOR 05/01/06 THRU 05/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 20 ADMINISTRATIVE

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20-DESTIN | DESTIN, KELLI D. | | | | SSN: 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 | | | | | | | |
| 05/15/06 | D00300 | D | 61.37 | 0.00 | 1,375.02 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 378.56 | 744.29 |
| DESTIN TOTAL: | | | 61.37 | 0.00 | 1,375.02 | 100.25 | 82.94 | 19.40 | 49.58 | 0.00 | 378.56 | 744.29 |
| 20-KITCHEN | KITCHENS, KATHRYN B. | | | | SSN: 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 | | | | | | | |
| 05/15/06 | D00301 | D | 86.67 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| 05/31/06 | D00315 | D | 61.98 | 0.00 | 1,833.33 | 259.05 | 112.86 | 26.40 | 71.61 | 0.00 | 25.95 | 1,337.46 |
| KITCHEN TOTAL: | | | 148.65 | 0.00 | 3,666.66 | 518.10 | 225.72 | 52.80 | 143.22 | 0.00 | 51.90 | 2,674.92 |
| 20-PLATT | PLATT, MARK | | | | SSN: 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 | | | | | | | |
| 05/15/06 | D00302 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| 05/31/06 | D00316 | D | 86.67 | 0.00 | 3,750.00 | 447.92 | 232.50 | 54.38 | 145.94 | 0.00 | 0.00 | 2,869.26 |
| PLATT TOTAL: | | | 173.34 | 0.00 | 7,500.00 | 895.84 | 465.00 | 108.76 | 291.88 | 0.00 | 0.00 | 5,738.52 |
| 20-ROGERS | ROGERS, ASHLEY | | | | SSN: 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 | | | | | | | |
| 05/15/06 | D00303 | D | 42.56 | 0.00 | 982.11 | 63.73 | 59.58 | 13.93 | 26.95 | 0.00 | 61.15 | 756.77 |
| 05/31/06 | D00317 | D | 53.46 | 0.00 | 1,233.64 | 101.46 | 75.17 | 17.58 | 37.64 | 0.00 | 56.15 | 945.64 |
| ROGERS TOTAL: | | | 96.02 | 0.00 | 2,215.75 | 165.19 | 134.75 | 31.51 | 64.59 | 0.00 | 117.30 | 1,702.41 |
| 20-SHAW | SHAW, JEANIE M. | | | | SSN: 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 | | | | | | | |
| 05/15/06 | D00304 | D | 80.98 | 0.00 | 2,270.80 | 240.20 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.64 |
| 05/31/06 | D00318 | D | 86.67 | 0.00 | 2,270.83 | 240.21 | 140.79 | 32.93 | 89.24 | 0.00 | 0.00 | 1,767.66 |
| SHAW TOTAL: | | | 167.65 | 0.00 | 4,541.63 | 480.41 | 281.58 | 65.86 | 178.48 | 0.00 | 0.00 | 3,535.30 |
| DEPT 20 TOTAL: | | | 647.03 | 0.00 | 19,299.06 | 2,159.79 | 1,189.99 | 278.33 | 727.75 | 0.00 | 547.76 | 14,395.44 |

**AERAS 0587**

AERAS, P. C.

**PAYROLL CHECK HISTORY REPORT**

*DETAIL FOR 05/01/06 THRU 05/31/06*
*SORTED BY EMPLOYEE NUMBER*

DEPARTMENT NO: 40 BILLING

| EMPLOYEE/ CHK DATE | CHK NO | | REG HOURS | O/T HOURS | GROSS WAGES | FEDERAL W/H | FICA W/H | MEDICARE W/H | STATE W/H | OTHER TAXES | OTHER DEDUCTIONS | CHECK AMOUNT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 40-MAYS | MAYS, QUATISHA | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00305 | D | 86.67 | 0.00 | 875.00 | 77.02 | 53.10 | 12.42 | 29.39 | 0.00 | 48.75 | 654.32 |
| 05/31/06 | D00319 | D | 86.67 | 0.00 | 875.00 | 77.02 | 53.10 | 12.42 | 29.39 | 0.00 | 48.75 | 654.32 |
| MAYS | TOTAL: | | 173.34 | 0.00 | 1,750.00 | 154.04 | 106.20 | 24.84 | 58.78 | 0.00 | 97.50 | 1,308.64 |
| 40-RUSSELL | RUSSELL, MELANIE | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00306 | D | 86.67 | 0.00 | 1,343.75 | 173.23 | 83.31 | 19.48 | 52.69 | 0.00 | 24.00 | 991.04 |
| 05/31/06 | D00320 | D | 178.98 | 0.00 | 2,875.89 | 556.26 | 178.31 | 41.70 | 110.15 | 0.00 | 24.00 | 1,965.47 |
| RUSSELL TOTAL: | | | 265.65 | 0.00 | 4,219.64 | 729.49 | 261.62 | 61.18 | 162.84 | 0.00 | 48.00 | 2,956.51 |
| 40-SMILEY | SMILEY, KATRINA | | | SSN: 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 | | | | | | | | |
| 05/15/06 | D00307 | D | 86.67 | 0.00 | 1,083.33 | 131.04 | 67.17 | 15.71 | 41.78 | 0.00 | 0.00 | 827.63 |
| 05/31/06 | D00321 | D | 186.67 | 0.00 | 2,333.23 | 420.60 | 144.66 | 33.83 | 89.80 | 0.00 | 0.00 | 1,644.34 |
| SMILEY | TOTAL: | | 273.34 | 0.00 | 3,416.56 | 551.64 | 211.83 | 49.54 | 131.58 | 0.00 | 0.00 | 2,471.97 |
| DEPT 40 TOTAL: | | | 712.33 | 0.00 | 9,386.20 | 1,435.17 | 579.65 | 135.56 | 353.20 | 0.00 | 145.50 | 6,737.12 |
| REPORT TOTAL: | | | 2745.11 | 0.00 | 129,611.76 | 23,781.56 | 6,471.64 | 1,876.08 | 4,863.53 | 0.00 | 2,361.63 | 90,257.32 |

*AERAS 0588*

**Extender Payroll**
**Period Ending 5/1/05 - 5/15/05**
**Paid 5/31/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 47.25 | 47.25 | $35.00 | $1,653.75 | -$209.00 | -$29.45 | | | -$2.19 | | -$240.64 | $1,413.11 |
| Cleveland, Jimmy | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Cooper, Judy | CK | 8.00 | 8.00 | $20.00 | $160.00 | | | | | | | $0.00 | $160.00 |
| Gay, Mickey | CK | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Lauderdale, Rick | DD | 69.00 | 69.00 | $45.00 | $3,105.00 | | | | | | | $0.00 | $3,105.00 |
| McIntosh, Elizabeth | DD | 67.50 | 67.50 | $35.00 | $2,362.50 | | | | | | | $0.00 | $2,362.50 |
| Norris, Bea Bear | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | -$33.00 | -$23.10 | -$59.09 | | -$115.19 | $1,684.81 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$45.60 | | | | -$45.60 | $4,154.40 |
| Totals | | 479.75 | 479.75 | | $21,681.25 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | -$61.28 | $0.00 | -$401.43 | $21,279.82 |
| | | | | | | | | | | | | | |
| Lauderdale, Rick (East) | DD | 0.00 | 0.00 | $45.00 | $ - | | | | | | | | |
| Carter, Meloni (East) | DD | 10.25 | 10.25 | $35.00 | $358.75 | | | | | | | $0.00 | $358.75 |
| McIntosh, Elizabeth (East) | DD | 26.50 | 26.50 | $35.00 | $927.50 | | | | | | | $0.00 | $927.50 |
| Cooper, Judy (East) | CK | 32.50 | 32.50 | $42.50 | $1,381.25 | | | | | | | $0.00 | $1,381.25 |
| Totals | | 69.25 | 69.25 | | $2,667.50 | | | | | | | | $2,667.50 |
| | | | | | | | | | | | | | |
| Total Extender Hours | | 549.00 | 549.00 | | $24,348.75 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | -$61.28 | $0.00 | -$401.43 | $23,947.32 |

AERAS 0589

**Extender Payroll**
**Period Ending 5/15/05 - 5/31/05**
**Paid 6/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 20.00 | 20.00 | $35.00 | $700.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $461.55 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 4.00 | 4.00 | $42.50 | $170.00 | | | | | | | $0.00 | $170.00 |
| Gay, Mickey | CK | 108.00 | 108.00 | $50.00 | $5,400.00 | | | | | | | $0.00 | $5,400.00 |
| Lauderdale, Rick | DD | 81.00 | 81.00 | $45.00 | $3,645.00 | | | | | | | $0.00 | $3,645.00 |
| McIntosh, Elizabeth | DD | 72.00 | 72.00 | $35.00 | $2,520.00 | | | | | | | $0.00 | $2,520.00 |
| Norris, Bea Bear | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $4,143.90 |
| Treadwell, Denise | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$45.60 | | | | -$45.60 | $4,154.40 |
| **Totals** | | 501.00 | 501.00 | | $23,235.00 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | | $0.00 | -$340.15 | $22,894.85 |
| | | | | | | | | | | | | | |
| Lauderdale, Rick (East) | DD | | 0.00 | $45.00 | $ - | | | | | | | | |
| Carter, Meloni (East) | DD | | | $35.00 | $0.00 | | | | | | | | $0.00 |
| McIntosh, Elizabeth (East) | DD | 16.00 | 16.00 | $35.00 | $560.00 | | | | | | | | $560.00 |
| Cooper, Judy (East) | CK | 26.50 | 26.50 | $42.50 | $1,126.25 | | | | | | | | $1,126.25 |
| **Totals** | | 42.50 | 42.50 | | $1,686.25 | | | | | | | | $1,686.25 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 543.50 | 543.50 | | $24,921.25 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | $0.00 | $0.00 | -$340.15 | $24,581.10 |

AERAS 0590

**Extender Payroll**
**Period Ending 6/01/05 - 6/30/05**
**Paid 6/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 8.00 | 8.00 | $35.00 | $280.00 | -$104.50 | -$29.45 | | | -$5.51 | | -$139.46 | $140.34 |
| Cleveland, Jimmy | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Lauderdale, Rick | DD | 117.50 | 117.50 | $45.00 | $5,287.50 | | | | | | | $0.00 | $5,287.50 |
| McIntosh, Elizabeth | DD | 48.50 | 48.50 | $35.00 | $1,697.50 | | | | | | | $0.00 | $1,697.50 |
| Norris, Bea Bear | DD | 79.50 | 79.50 | $50.00 | $3,975.00 | | | -$33.00 | -$23.10 | -$52.39 | | -$108.49 | $3,866.51 |
| Treadwell, Denise | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Wilkerson, Benny | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$45.60 | | | | -$45.60 | $2,954.40 |
| **Totals** | | 493.50 | 493.50 | | $23,240.00 | -$104.50 | -$29.45 | -$78.60 | -$23.10 | -$57.90 | $0.00 | -$293.55 | $22,946.45 |
| | | | | | | | | | | | | | |
| Lauderdale, Rick (East) | DD | - | 0.00 | $45.00 | - | | | | | | | | |
| Carter, Meloni (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | |
| McIntosh, Elizabeth (East) | DD | 21.75 | 21.75 | $35.00 | $761.25 | | | | | | | $0.00 | $761.25 |
| Cooper, Judy (East) | CK | 36.50 | 36.50 | $42.50 | $1,551.25 | | | | | | | $0.00 | $1,551.25 |
| **Totals** | | 58.25 | 58.25 | | $2,312.50 | | | | | | | $0.00 | $2,312.50 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 551.75 | 551.75 | | $25,552.50 | -$104.50 | -$29.45 | -$78.60 | -$23.10 | -$57.90 | $0.00 | -$293.55 | $25,258.95 |

**AERAS 0591**

**Extender Payroll**
**Period Ending 6/15/05 - 6/30/05**
**Paid 7/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 17.00 | 17.00 | $35.00 | $595.00 | -$209.00 | -$29.45 | | | | | $238.45 | $356.55 |
| Cleveland, Jimmy | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | | | | | $0.00 | $3,000.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Lauderdale, Rick | DD | 63.00 | 63.00 | $45.00 | $2,835.00 | | | | | | | $0.00 | $2,835.00 |
| McIntosh, Elizabeth | DD | 76.50 | 76.50 | $35.00 | $2,677.50 | | | | | | | $0.00 | $2,677.50 |
| Norris, Bea Bear | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $1,743.90 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 96.00 | 96.00 | $50.00 | $4,800.00 | | | -$45.60 | | | | -$45.60 | $4,754.40 |
| Totals | | 444.50 | 444.50 | | $20,507.50 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | | $0.00 | -$340.15 | $20,167.35 |
| | | | | | | | | | | | | | |
| Lauderdale, Rick (East) | DD | 0.00 | 0.00 | $45.00 | $ - | | | | | | | | |
| Carter, Meloni (East) | DD | 32.50 | 32.50 | $35.00 | $1,137.50 | | | | | | | $0.00 | $1,137.50 |
| McIntosh, Elizabeth (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | 24.00 | 24.00 | $42.50 | $1,020.00 | | | | | | | $0.00 | $1,020.00 |
| Totals | | 56.50 | 56.50 | | $2,157.50 | | | | | | | $0.00 | $2,157.50 |
| | | | | | | | | | | | | | |
| Total Extender Hours | | 501.00 | 501.00 | | $22,665.00 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | $0.00 | $0.00 | -$340.15 | $22,324.85 |

AERAS 0592

**Extender Payroll**
**Period Ending 7/15/05**
**Paid 7/29/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 24.00 | 24.00 | $35.00 | $840.00 | -$209.00 | -$29.45 | | | | | $238.45 | $601.55 |
| Cleveland, Jimmy | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | | | | | $0.00 | $3,000.00 |
| Cooper, Judy | CK | 8.00 | 8.00 | $42.50 | $340.00 | | | | | | | $0.00 | $340.00 |
| Gay, Mickey | CK | 92.50 | 92.50 | $50.00 | $4,625.00 | | | | $2.64 | | | -$2.64 | $4,622.36 |
| Lauderdale, Rick | DD | 69.50 | 69.50 | $45.00 | $3,127.50 | | | | | | | $0.00 | $3,127.50 |
| McIntosh, Elizabeth | DD | 51.00 | 51.00 | $35.00 | $1,785.00 | | | | | | | $0.00 | $1,785.00 |
| Norris, Bea Bear | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | -$33.00 | -$23.10 | -$56.35 | -$55.00 | -$167.45 | $2,232.55 |
| Treadwell, Denise | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$45.60 | | | -$55.00 | -$100.60 | $4,099.40 |
| **Totals** | | 437.00 | 437.00 | | $20,317.50 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | -$58.99 | -$110.00 | -$509.14 | $19,808.36 |
| | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Carter, Meloni (Prattville) | DD | 23.00 | 23.00 | $35.00 | $805.00 | | | | | | | $0.00 | $805.00 |
| McIntosh, Elizabeth (East) | DD | 19.00 | 19.00 | $35.00 | $665.00 | | | | | | | $0.00 | $665.00 |
| Crysel, Kimberly (East) | DD | 18.00 | 18.00 | $20.00 | $360.00 | | | | | | | $0.00 | $360.00 |
| Cooper, Judy (East) | CK | 41.50 | 41.50 | $42.50 | $1,763.75 | | | | | | | $0.00 | $1,763.75 |
| **Totals** | | 101.50 | 101.50 | | $3,593.75 | | | | | | | | $3,593.75 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 538.50 | 538.50 | | $23,911.25 | -$209.00 | -$29.45 | -$78.60 | -$23.10 | -$58.99 | -$110.00 | -$509.14 | $23,402.11 |

**AERAS 0593**

**Extender Payroll**
**Period Ending 7/16/05 - 7/31/05**
**Paid 8/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | 8.00 | 8.00 | $35.00 | $280.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $41.55 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | - | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | 10.00 | 10.00 | $20.00 | $200.00 | | | | | | | $0.00 | $200.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Lauderdale, Rick | DD | 93.75 | 93.75 | $45.00 | $4,218.75 | | | | | | | $0.00 | $4,218.75 |
| McIntosh, Elizabeth | DD | 76.25 | 76.25 | $35.00 | $2,668.75 | | | | | | | $0.00 | $2,668.75 |
| Norris, Bea Bear | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $2,943.90 |
| Treadwell, Denise | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | | | | | $0.00 | $1,800.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$29.40 | | | | -$29.40 | $4,170.60 |
| **Totals** | | **512.00** | **512.00** | | **$23,567.50** | **-$209.00** | **-$29.45** | **-$62.40** | **-$23.10** | | | **-$323.95** | **$23,243.55** |
| | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 6.00 | 6.00 | $35.00 | $210.00 | | | | | | | $0.00 | $210.00 |
| Carter, Meloni (Prattville) | DD | 32.00 | 32.00 | $35.00 | $1,120.00 | | | | | | | $0.00 | $1,120.00 |
| McIntosh, Elizabeth (East) | DD | 18.00 | 18.00 | $35.00 | $630.00 | | | | | | | $0.00 | $630.00 |
| Crysel, Kimberly (East) | DD | - | - | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | 34.00 | 34.00 | $42.50 | $1,445.00 | | | | | | | $0.00 | $1,445.00 |
| **Totals** | | **90.00** | **90.00** | | **$3,405.00** | | | | | | | | **$3,405.00** |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | **602.00** | **602.00** | | **$26,972.50** | **-$209.00** | **-$29.45** | **-$62.40** | **-$23.10** | **$0.00** | **$0.00** | **-$323.95** | **$26,648.55** |

AERAS 0594

**Extender Payroll**
**Period Ending 8/1/05 - 8/15/05**
**Paid 8/31/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | | - | $35.00 | $0.00 | -$209.00 | -$29.45 | | | -$57.21 | | -$295.66 | -$295.66 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | | | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | -$5.43 | | -$5.43 | -$5.43 |
| Guy, Allison (orient) | DD | | | $30.00 | $0.00 | | | | | | | $0.00 | $4,800.00 |
| Lauderdale, Rick | DD | 79.50 | 79.50 | $45.00 | $3,577.50 | | | | | | | $0.00 | $3,577.50 |
| McIntosh, Elizabeth | DD | 60.00 | 60.00 | $35.00 | $2,100.00 | | | | | | | $0.00 | $2,100.00 |
| Norris, Bea Bear | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $2,343.90 |
| Treadwell, Denise | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 104.00 | 104.00 | $50.00 | $5,200.00 | | | | | | | $0.00 | $5,200.00 |
| **Totals** | | 435.50 | 435.50 | | $20,477.50 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$62.64 | | -$357.19 | $20,120.31 |
| | | | | | | | | | | | $0.00 | | |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 24.50 | 24.50 | $35.00 | $857.50 | | | | | | | $0.00 | $857.50 |
| Carter, Meloni (Prattville) | DD | 37.00 | 37.00 | $35.00 | $1,295.00 | | | | | | | $0.00 | $1,295.00 |
| McIntosh, Elizabeth (East) | DD | 16.50 | 16.50 | $35.00 | $577.50 | | | | | | | $0.00 | $577.50 |
| Guy, Allison | DD | | - | $30.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (East) | DD | | | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (Prattville) | DD | 8.00 | 8.00 | $42.50 | $340.00 | | | | | | | $0.00 | $340.00 |
| Cooper, Judy (East) | CK | 18.50 | 18.50 | $42.50 | $786.25 | | | | | | | $0.00 | $786.25 |
| **Totals** | | 104.50 | 104.50 | | $3,856.25 | | | | | | | $0.00 | $3,858.25 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Carter, Meloni | DD | 1.00 | 1.00 | $35.00 | $35.00 | | | | | | | $0.00 | $35.00 |
| Crysel, Kimberly | DD | 16.00 | 16.00 | $20.00 | $320.00 | | | | | | | $0.00 | $320.00 |
| Guy, Allison | DD | 75.50 | 75.50 | $30.00 | $2,265.00 | | | | | | | $0.00 | $2,265.00 |
| Wilkerson, Benny | DD | 4.00 | 4.00 | $50.00 | $200.00 | | | | | | | $0.00 | $200.00 |
| **Totals** | | 96.50 | 96.50 | | $2,820.00 | | | | | | | $0.00 | $2,820.00 |
| **Total Extender Hours** | | 636.50 | 636.50 | | $27,153.75 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$62.64 | $0.00 | -$357.19 | $26,796.56 |

**Pay Meloni Carter 1 hour extra - AERAS
**Pay Benny Wilkerson for a 12 hour shift on the 14th but only charge physician 8 hours and AERAS 4 hours

AERAS 0595

**Extender Payroll**
**Period Ending 8/16/05 - 8/31/05**
**Paid 9/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $35.00 | $0.00 | -$209.00 | -$29.45 | | | | | -$238.45 | -$238.45 |
| Cleveland, Jimmy | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Cooper, Judy | CK | 0.00 | 0.00 | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | 0.00 | - | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Guy, Allison (orient) | DD | 0.00 | - | $30.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 67.50 | 67.50 | $45.00 | $3,037.50 | | | | | | | $0.00 | $3,037.50 |
| McIntosh, Elizabeth | DD | 84.00 | 84.00 | $35.00 | $2,940.00 | | | | | | | $0.00 | $2,940.00 |
| Norris, Bea Bear | DD | 82.00 | 82.00 | $50.00 | $4,100.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $4,043.90 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $3,361.55 |
| Totals | | 473.50 | 473.50 | | $22,077.50 | -$418.00 | -$58.90 | -$33.00 | -$23.10 | | $0.00 | -$533.00 | $21,544.50 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 14.00 | 14.00 | $35.00 | $490.00 | | | | | | | $0.00 | $490.00 |
| Carter, Meloni (Prattville) | DD | 32.00 | 32.00 | $35.00 | $1,120.00 | | | | | | | $0.00 | $1,120.00 |
| McIntosh, Elizabeth (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison | DD | - | - | $30.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (East) | DD | - | - | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (Prattville) | DD | 5.50 | 5.50 | $42.50 | $233.75 | | | | | | | $0.00 | $233.75 |
| Cooper, Judy (East) | CK | 35.00 | 35.00 | $42.50 | $1,487.50 | | | | | | | $0.00 | $1,487.50 |
| Totals | | 86.50 | 86.50 | | $3,331.25 | | | | | | | $0.00 | $3,331.25 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Crysel, Kimberly | DD | 16.00 | 16.00 | $20.00 | $320.00 | | | | | | | $0.00 | $320.00 |
| Guy, Allison | DD | 96.00 | 96.00 | $30.00 | $2,880.00 | | | | | | | $0.00 | $2,880.00 |
| Totals | | 112.00 | 112.00 | | $3,200.00 | | | | | | | $0.00 | $3,200.00 |
| Total Extender Hours | | 672.00 | 672.00 | | $28,608.75 | -$418.00 | -$58.90 | -$33.00 | -$23.10 | $0.00 | $0.00 | -$533.00 | $28,075.75 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0596

**Extender Payroll**
**Period Ending 9/1/05 - 9/15/05**
**Paid 9/30/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | 12.00 | 12.00 | $35.00 | $420.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $181.55 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | 0.00 | - | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Guy, Allison | DD | 64.00 | 64.00 | $30.00 | $1,920.00 | | | | | -$5.49 | | -$5.49 | $1,914.51 |
| Lauderdale, Rick | DD | 81.00 | 81.00 | $45.00 | $3,645.00 | | | | | | | $0.00 | $3,645.00 |
| McIntosh, Elizabeth | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Norris, Bea Bear | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | -$62.56 | | -$118.66 | $2,881.34 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 96.00 | 96.00 | $50.00 | $4,800.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $4,561.55 |
| Totals | | 445.00 | 445.00 | | $19,845.00 | -$418.00 | -$58.90 | -$33.00 | -$23.10 | -$68.05 | $0.00 | -$601.05 | $19,243.95 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 8.00 | 8.00 | $35.00 | $280.00 | | | | | | | $0.00 | $280.00 |
| Carter, Meloni (Prattville) | DD | 40.00 | 40.00 | $35.00 | $1,400.00 | | | | | | | $0.00 | $1,400.00 |
| McIntosh, Elizabeth (East) | DD | 15.00 | 15.00 | $35.00 | $525.00 | | | | | | | $0.00 | $525.00 |
| Guy, Allison (East) | DD | 16.00 | 16.00 | $30.00 | $480.00 | | | | | | | $0.00 | $480.00 |
| Norris, Bea Bear (East) | DD | 8.00 | 8.00 | $50.00 | $400.00 | | | | | | | $0.00 | $400.00 |
| Cooper, Judy (Prattville) | DD | 8.00 | 8.00 | $42.50 | $340.00 | | | | | | | $0.00 | $340.00 |
| Cooper, Judy (East) | CK | 16.50 | 16.50 | $42.50 | $701.25 | | | | | | | $0.00 | $701.25 |
| Totals | | 111.50 | 111.50 | | $4,126.25 | | | | | | | | $4,126.25 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Crysel, Kimberly | DD | 12.50 | 12.50 | $20.00 | $250.00 | | | | | | | $0.00 | $250.00 |
| Guy, Allison | DD | - | - | $30.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Rick Lauderdale (gas) | DD | 2.00 | 2.00 | $45.00 | $90.00 | | | | | | | $0.00 | $90.00 |
| Totals | | 14.50 | 14.50 | | $340.00 | | | | | | | | $340.00 |
| Total Extender Hours | | 571.00 | 571.00 | | $24,311.25 | -$418.00 | -$58.90 | -$33.00 | -$23.10 | -$68.05 | $0.00 | -$601.05 | $23,710.20 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AFRAS 0597

**Extender Payroll**
Period Ending 9/16/05 - 9/30/05
Paid 10/14/05

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $35.00 | $0.00 | $0.00 | $0.00 | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | 0.00 | 0.00 | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Guy, Allison | DD | 33.00 | 33.00 | $30.00 | $990.00 | | | | | | | $0.00 | $990.00 |
| Lauderdale, Rick | DD | 63.50 | 63.50 | $45.00 | $2,857.50 | | | | | | | $0.00 | $2,857.50 |
| McIntosh, Elizabeth | DD | 37.00 | 37.00 | $35.00 | $1,295.00 | | | | | | | $0.00 | $1,295.00 |
| Norris, Bea Bear | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $2,943.90 |
| Treetwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $3,961.55 |
| Totals | | 445.50 | 445.50 | | $20,742.50 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | $0.00 | $0.00 | -$294.55 | $20,447.95 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| McIntosh, Elizabeth (Prattville) | DD | 8.00 | 8.00 | $35.00 | $280.00 | | | | | | | $0.00 | $280.00 |
| McIntosh, Elizabeth (East) | DD | 24.50 | 24.50 | $35.00 | $857.50 | | | | | | | $0.00 | $857.50 |
| Guy, Allison (East) | DD | 24.00 | 24.00 | $30.00 | $720.00 | | | | | | | $0.00 | $720.00 |
| Guy, Allison (Prattville) | DD | 8.00 | 8.00 | $30.00 | $240.00 | | | | | | | $0.00 | $240.00 |
| Cooper, Judy (Prattville) | CK | 15.00 | 15.00 | $42.50 | $637.50 | | | | | | | $0.00 | $637.50 |
| Lauderdale, Rick (East) | DD | 8.00 | 8.00 | $45.00 | $360.00 | | | | | | | $0.00 | $360.00 |
| Totals | | 87.50 | 87.50 | | $3,095.00 | | | | | | | | $3,095.00 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Crysel, Kimberly | DD | 27.50 | 27.50 | $20.00 | $550.00 | | | | | | | $0.00 | $550.00 |
| Totals | | 27.50 | 27.50 | | $550.00 | | | | | | | $0.00 | $550.00 |
| | | | | | | | | | | | | | |
| Total Extender Hours | | 560.50 | 560.50 | | $24,387.50 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | $0.00 | $0.00 | -$294.55 | $24,092.95 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0598

**Extender Payroll**
**Period Ending 10/01/05 - 10/15/05**
**Paid 10/31/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $35.00 | $0.00 | $0.00 | $0.00 | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (Orient) | DD | 0.00 | - | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Guy, Allison | DD | 40.00 | 40.00 | $30.00 | $1,200.00 | | | | | $5.49 | | -$5.49 | $1,194.51 |
| Lauderdale, Rick | DD | 53.00 | 53.00 | $45.00 | $2,385.00 | | | | | | | $0.00 | $2,385.00 |
| McIntosh, Elizabeth | DD | 35.50 | 35.50 | $35.00 | $1,242.50 | | | | | | | $0.00 | $1,242.50 |
| Norris, Bea Bear | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | | | -$33.00 | -$23.10 | -$62.56 | | -$118.66 | $3,481.34 |
| Treadwell, Denise | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 56.00 | 56.00 | $50.00 | $2,800.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $2,561.55 |
| **Totals** | | 400.50 | 400.50 | | $18,427.50 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$68.05 | $0.00 | -$362.60 | $18,064.90 |
| | | | | | | | | | | | | | |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny (East) | DD | 8.50 | 8.50 | $50.00 | $425.00 | | | | | | | $0.00 | $425.00 |
| McIntosh, Elizabeth (East) | DD | 44.25 | 44.25 | $35.00 | $1,548.75 | | | | | | | $0.00 | $1,548.75 |
| Lauderday, Rick (East) | DD | 17.00 | 17.00 | $45.00 | $765.00 | | | | | | | $0.00 | $765.00 |
| Guy, Allison (Prattville) | DD | 7.00 | 7.00 | $30.00 | $210.00 | | | | | | | $0.00 | $210.00 |
| Cooper, Judy (Prattville) | CK | 26.00 | 26.00 | $42.50 | $1,105.00 | | | | | | | $0.00 | $1,105.00 |
| Cooper, Judy (East) | CK | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick (East) | DD | | | $45.00 | | | | | | | | | |
| **Totals** | | 114.75 | 114.75 | | $4,563.75 | | | | | | | $0.00 | $4,053.75 |
| | | | | | | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Crysel, Kimberly | DD | 39.00 | 39.00 | $20.00 | $780.00 | | | | | | | $0.00 | $780.00 |
| **Totals** | | 39.00 | 39.00 | | $780.00 | | | | | | | $0.00 | $780.00 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 554.25 | 554.25 | | $23,771.25 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$68.05 | $0.00 | -$362.60 | $22,898.65 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0599

**Extender Payroll**
**Period Ending 10/16/05 - 10/31/05**
**Paid 11/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | | - | $35.00 | $0.00 | $0.00 | $0.00 | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (orient) | DD | 0.00 | | $20.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Guy, Allison | DD | 48.00 | 48.00 | $30.00 | $1,440.00 | | | | | | | $0.00 | $1,440.00 |
| Lauderdale, Rick | DD | 68.00 | 68.00 | $45.00 | $3,060.00 | | | | | | | $0.00 | $3,060.00 |
| McIntosh, Elizabeth | DD | 24.00 | 24.00 | $35.00 | $840.00 | | | | | | | $0.00 | $840.00 |
| Norris, Bea Bear | DD | | | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | -$9.60 | | -$65.70 | $2,934.30 |
| Treadwell, Denise | DD | | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 108.00 | 108.00 | $50.00 | $5,400.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $5,161.55 |
| **Totals** | | 476.00 | 476.00 | | $22,140.00 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$9.60 | $0.00 | -$304.15 | $21,835.85 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny (East) | DD | | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| McIntosh, Elizabeth (East) | DD | 31.25 | 31.25 | $35.00 | $1,093.75 | | | | | | | $0.00 | $1,093.75 |
| McIntosh, Elizabeth (Prattville) | DD | 10.00 | 10.00 | $35.00 | $350.00 | | | | | | | $0.00 | $350.00 |
| Lauderdale, Rick (Prattville) | DD | 8.50 | 8.50 | $45.00 | $382.50 | | | | | | | $0.00 | $382.50 |
| Guy, Allison (Prattville) | DD | 12.00 | 12.00 | $30.00 | $360.00 | | | | | | | $0.00 | $360.00 |
| Guy, Allison (East) | DD | 24.00 | 24.00 | $30.00 | $720.00 | | | | | | | $0.00 | $720.00 |
| Cooper, Judy (Prattville) | CK | 22.50 | 22.50 | $42.50 | $956.25 | | | | | | | $0.00 | $955.25 |
| Cooper, Judy (East) | CK | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | |
| Lauderdale, Rick (East) | DD | 12.00 | 12.00 | $45.00 | $540.00 | | | | | | | $0.00 | $540.00 |
| **Totals** | | 132.25 | 132.25 | | $4,912.50 | | | | | | | $0.00 | $4,402.50 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Crysel, Kimberly | DD | 36.00 | 36.00 | $20.00 | $720.00 | | | | | | | $0.00 | $720.00 |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | $0.00 | $1,000.00 |
| **Totals** | | 36.00 | 36.00 | | $1,720.00 | | | | | | | $0.00 | $1,720.00 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 644.25 | 644.25 | | $28,772.50 | -$209.00 | -$29.45 | -$33.00 | -$23.10 | -$9.60 | $0.00 | -$304.15 | $27,958.35 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0600

**Extender Payroll**
Period Ending 11/1/05 - 11/15/05
Paid 11/30/05

| Name | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $38.00 | $0.00 | $0.00 | $0.00 | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | CK | 0.00 | - | $33.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 84.00 | 84.00 | $50.00 | $4,200.00 | | | $40.25 | $21.00 | | | -$61.25 | $4,138.75 |
| Gay, Allison | DD | 60.00 | 60.00 | $35.00 | $2,100.00 | | | | | | | $0.00 | $2,100.00 |
| Lauderdale, Rick | DD | 60.00 | 60.00 | $45.00 | $2,700.00 | | | | | | | $0.00 | $2,700.00 |
| McIntosh, Elizabeth | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| Norris, Bea Bear | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | -$34.38 | | -$90.48 | $2,909.52 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $2,761.55 |
| **Totals** | | 420.00 | 420.00 | | $19,224.00 | -$209.00 | -$29.45 | -$73.25 | -$44.10 | -$34.38 | $0.00 | -$390.18 | $18,833.82 |
| | | | | | | | | | | | | | |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 26.00 | 26.00 | $38.00 | $988.00 | | | | | | | $0.00 | $988.00 |
| Carter, Meloni (Prattville) | DD | 44.00 | 44.00 | $38.00 | $1,672.00 | | | | | | | $0.00 | $1,672.00 |
| McIntosh, Elizabeth (East) | DD | 20.00 | 20.00 | $38.00 | $760.00 | | | | | | | $0.00 | $760.00 |
| Norris, Bea Bear (Prattville) | DD | 9.00 | 9.00 | $50.00 | $450.00 | | | | | | | $0.00 | $450.00 |
| Lauderdale, Rick (Prattville) | DD | - | - | $45.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Allison (Prattville) | DD | 9.00 | 9.00 | $35.00 | $315.00 | | | | | | | $0.00 | $315.00 |
| Guy, Allison (East) | DD | 11.00 | 11.00 | $35.00 | $385.00 | | | | | | | $0.00 | $385.00 |
| Cooper, Judy (Prattville) | CK | - | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | - | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick (East) | DD | 13.50 | 13.50 | $45.00 | $607.50 | | | | | | | $0.00 | $607.50 |
| Crysel, Kimberely (East) | DD | 62.00 | 62.00 | $33.00 | $2,046.00 | | | | | | | | |
| Crysel, Kimberely (Prattville) | DD | 10.00 | 10.00 | $33.00 | $330.00 | | | | | | | | |
| **Totals** | | 204.50 | 204.50 | | $7,553.50 | | | | | | | $0.00 | $5,177.50 |
| | | | | | | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $0.00 | | | | | | | #REF! | $0.00 |
| **Totals** | | | | | $0.00 | | | | | | | #REF! | $0.00 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 624.50 | 624.50 | | $26,777.50 | -$209.00 | -$29.45 | $73.25 | $44.10 | -$34.38 | $0.00 | #REF! | $24,011.32 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0601

**Extender Payroll**
**Period Ending 11/16/05 - 11/30/05**
**Paid 12/15/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $38.00 | $0.00 | -$209.00 | -$29.45 | | | | | -$238.45 | -$238.45 |
| Cleveland, Jimmy | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | | | | | $0.00 | $3,000.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 0.00 | - | $33.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | $40.25 | $21.00 | | | -$61.25 | $4,738.75 |
| Guy, Allison | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Lauderdale, Rick | DD | 36.00 | 36.00 | $45.00 | $1,620.00 | | | | | | | $0.00 | $1,620.00 |
| McIntosh, Elizabeth | DD | 67.00 | 67.00 | $38.00 | $2,546.00 | | | | | | | $0.00 | $2,546.00 |
| Norris, Bea Bear | DD | 44.00 | 44.00 | $50.00 | $2,200.00 | | | | | | | $0.00 | $2,200.00 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | -$29.45 | -$33.00 | -$23.10 | -$42.56 | | -$98.66 | -$98.66 |
| Wilkerson, Benny | DD | 96.00 | 96.00 | $50.00 | $4,800.00 | -$209.00 | | | | | | -$238.45 | $4,561.55 |
| **Totals** | | 435.00 | 435.00 | | $20,226.00 | -$418.00 | -$58.90 | -$73.25 | -$44.10 | -$42.56 | $0.00 | -$636.81 | $19,589.19 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 34.00 | 34.00 | $38.00 | $1,292.00 | | | | | | | $0.00 | $1,292.00 |
| Carter, Meloni (Prattville) | DD | 35.00 | 35.00 | $38.00 | $1,330.00 | | | | | | | $0.00 | $1,330.00 |
| McIntosh, Elizabeth (East) | DD | 7.00 | 7.00 | $38.00 | $266.00 | | | | | | | $0.00 | $266.00 |
| Norris, Bea Bear (Prattville) | DD | 8.00 | 8.00 | $50.00 | $400.00 | | | | | | | $0.00 | $400.00 |
| Norris, Bea Bear (East) | DD | 11.00 | 11.00 | $50.00 | $550.00 | | | | | | | $0.00 | $550.00 |
| Guy, Allison (Prattville) | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (East) | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Cooper, Judy (Prattville) | CK | | | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | | | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick (East) | DD | 24.00 | 24.00 | $45.00 | $1,080.00 | | | | | | | $0.00 | $1,080.00 |
| Crysel, Kimberely (East) | DD | 29.00 | 29.00 | $33.00 | $957.00 | | | | | | | $0.00 | $957.00 |
| Crysel, Kimberely (Prattville) | DD | 56.00 | 56.00 | $33.00 | $1,848.00 | | | | | | | $0.00 | $1,848.00 |
| **Totals** | | 240.00 | 240.00 | | $8,983.00 | | | | | | | $0.00 | $8,983.00 |
| **Total Extender Hours** | | 675.00 | 675.00 | | $30,209.00 | -$418.00 | -$58.90 | -$73.25 | -$44.10 | -$42.56 | $0.00 | -$636.81 | $29,572.19 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Totals** | | | | | $1,000.00 | | | | | | | | $1,000.00 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0602

**Extender Payroll**
**Period Ending 12/17/05 - 12/15/05**
**Paid 12/30/05**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | 12.00 | 12.00 | $38.00 | $456.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $217.55 |
| Cleveland, Jimmy | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | | | | | $0.00 | $3,000.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 0.00 | | $33.00 | $0.00 | | | | | | | -$61.25 | -$61.25 |
| Gay, Mickey | CK | 84.00 | 84.00 | $50.00 | $4,200.00 | | | -$40.25 | -$21.00 | | | $0.00 | $4,200.00 |
| Guy, Allison | DD | 12.00 | 12.00 | $35.00 | $420.00 | | | | | | | $0.00 | $420.00 |
| Lauderdale, Rick | DD | 29.00 | 29.00 | $45.00 | $1,305.00 | | | | | | | $0.00 | $1,305.00 |
| McIntosh, Elizabeth | DD | 58.00 | 58.00 | $38.00 | $2,204.00 | | | -$33.00 | -$23.10 | | | $0.00 | $2,204.00 |
| Norris, Bea Bear | DD | 24.00 | 24.00 | $50.00 | $1,200.00 | | | | | | | -$56.10 | $1,143.90 |
| Treadwell, Denise | DD | 0.00 | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 102.00 | 102.00 | $50.00 | $5,100.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $4,861.55 |
| Totals | | 381.00 | 381.00 | | $17,685.00 | -$418.00 | -$58.90 | -$73.25 | -$44.10 | $0.00 | | -$594.25 | $17,290.75 |
| | | | | | | | | | | | | | |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 10.50 | 10.50 | $38.00 | $399.00 | | | | | | | $0.00 | $399.00 |
| Carter, Meloni (Prattville) | DD | 12.00 | 12.00 | $38.00 | $456.00 | | | | | | | $0.00 | $456.00 |
| McIntosh, Elizabeth (East) | DD | 24.00 | 24.00 | $38.00 | $912.00 | | | | | | | $0.00 | $912.00 |
| McIntosh, Elizabeth (Prattville) | DD | 10.00 | 10.00 | $38.00 | $380.00 | | | | | | | $0.00 | $380.00 |
| Norris, Bea Bear (East) | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Norris, Bea Bear (Prattville) | DD | 11.00 | 11.00 | $50.00 | $550.00 | | | | | | | $0.00 | $550.00 |
| Guy, Allison (Prattville) | DD | 12.00 | 12.00 | $35.00 | $420.00 | | | | | | | $0.00 | $420.00 |
| Guy, Allison (East) | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Cooper, Judy (Prattville) | CK | | - | $42.50 | $0.00 | | | | | | | | |
| Cooper, Judy (East) | CK | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $510.00 |
| Lauderdale, Rick (East) | DD | 48.00 | 48.00 | $45.00 | $2,160.00 | | | | | | | $0.00 | $2,160.00 |
| Crysel, Kimberley (East) | DD | 24.00 | 24.00 | $33.00 | $792.00 | | | | | | | | |
| Crysel, Kimberely (Prattville) | DD | 60.00 | 60.00 | $33.00 | $1,980.00 | | | | | | | | |
| Totals | | 271.50 | 271.50 | | $10,419.00 | | | | | | | $0.00 | $10,419.00 |
| | | | | | | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $0.00 | | | | | | | | $0.00 |
| Totals | | | | | $0.00 | | | | | | | | $0.00 |
| | | | | | | | | | | | | | |
| Total Extender Hours | | 652.50 | 652.50 | | $28,304.00 | $418.00 | $58.90 | $73.25 | $44.10 | $0.00 | $0.00 | $594.25 | $27,709.75 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0603

**Extender Payroll**
**Period Ending 12/16/05 - 12/31/05**
**Paid 1/13/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | 12.00 | 12.00 | $38.00 | $456.00 | -$209.00 | -$29.45 | | | | | $238.45 | $217.55 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 0.00 | 0.00 | $42.50 | $0.00 | | | | | | | | $0.00 |
| Crysel, Kimberly | DD | 0.00 | 0.00 | $33.00 | $0.00 | | | | | | | | $0.00 |
| Gay, Mickey | CK | 72.00 | 72.00 | $50.00 | $3,600.00 | | | -$40.25 | -$21.00 | | | $61.25 | $3,538.75 |
| Guy, Allison | DD | 73.00 | 73.00 | $35.00 | $2,555.00 | | | | | | | $0.00 | $2,555.00 |
| Lauderdale, Rick | DD | 46.00 | 46.00 | $45.00 | $2,070.00 | | | | | | | $0.00 | $2,070.00 |
| McIntosh, Elizabeth | DD | 49.00 | 49.00 | $38.00 | $1,862.00 | | | | | | | $0.00 | $1,862.00 |
| Norris, Bea Bear | DD | 38.00 | 38.00 | $50.00 | $1,900.00 | | | -$33.00 | -$23.10 | | | $56.10 | $1,743.90 |
| Treadwell, Denise | DD | 0.00 | 0.00 | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $238.45 | $381.55 |
| **Totals** | | 348.00 | 348.00 | | $15,343.00 | -$209.00 | -$29.45 | -$73.25 | -$44.10 | $0.00 | $0.00 | $584.25 | $14,748.75 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 24.00 | 24.00 | $38.00 | $912.00 | | | | | | | | $912.00 |
| Carter, Meloni (Prattville) | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | | $1,824.00 |
| McIntosh, Elizabeth (East) | DD | 12.00 | 12.00 | $38.00 | $456.00 | | | | | | | | $456.00 |
| McIntosh, Elizabeth (Prattville) | DD | - | - | $38.00 | $0.00 | | | | | | | | $0.00 |
| Norris, Bea Bear (East) | DD | 23.50 | 23.50 | $50.00 | $1,175.00 | | | | | | | | $1,175.00 |
| Norris, Bea Bear (Prattville) | DD | - | - | $50.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Allison (Prattville) | DD | - | - | $35.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Allison (East) | DD | 9.00 | 9.00 | $35.00 | $315.00 | | | | | | | | $315.00 |
| Cooper, Judy (Prattville) | CK | 8.00 | 8.00 | $42.50 | $340.00 | | | | | | | | $340.00 |
| Cooper, Judy (East) | CK | 25.00 | 25.00 | $42.50 | $1,062.50 | | | | | | | | $1,062.50 |
| Lauderdale, Rick (East) | DD | 24.00 | 24.00 | $45.00 | $1,080.00 | | | | | | | | $1,080.00 |
| Crysel, Kimberly (East) | DD | 12.00 | 12.00 | $33.00 | $396.00 | | | | | | | | $396.00 |
| Crysel, Kimberly (Prattville) | DD | 32.00 | 32.00 | $33.00 | $1,056.00 | | | | | | | | $1,056.00 |
| Wilkerson, Benny (East) | DD | 24.00 | 24.00 | $50.00 | $1,200.00 | | | | | | | | $1,056.00 |
| **Totals** | | 241.50 | 241.50 | | $9,816.50 | | | | | | | | $9,616.50 |
| **Overtime Hours for Midwives** | | | | | | | | | | | | | |
| Carter, Meloni (Prattville) | DD | 12.00 | 12.00 | $57.00 | $684.00 | | | | | | | | |
| Cleveland, Jimmy (South) | DD | 12.00 | 12.00 | $75.00 | $900.00 | | | | | | | | |
| Crysel, Kimberly (South) | DD | 20.00 | 20.00 | $49.50 | $990.00 | | | | | | | | |
| Gay, Mickey (South) | CK | 16.50 | 16.50 | $75.00 | $1,237.50 | | | | | | | | |
| Guy, Allison (East) | DD | 10.00 | 10.00 | $52.50 | $525.00 | | | | | | | | |
| Lauderdale (East) | DD | 12.50 | 12.50 | $67.50 | $843.75 | | | | | | | | |
| McIntosh (Prattville) | DD | 7.00 | 7.00 | $57.00 | $399.00 | | | | | | | | |
| McIntosh (East) | DD | 10.00 | 10.00 | $57.00 | $570.00 | | | | | | | | |
| Norris (South) | DD | 9.50 | 9.50 | $75.00 | $712.50 | | | | | | | | |
| Wilkerson (South) | DD | 24.00 | 24.00 | $75.00 | $1,800.00 | | | | | | | | |
| **TOTAL HOLIDAY HOURS** | | 133.50 | 133.50 | | $8,661.75 | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Totals** | | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Total Extender Hours** | | 723.00 | 723.00 | | $34,221.25 | -$418.00 | -$58.90 | -$73.25 | -$44.10 | $0.00 | $0.00 | $584.25 | $29,365.25 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0604

**Extender Payroll**
**Period Ending 1/01/06 - 1/15/06**
**Paid 1/31/06**

| SOUTH | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni | DD | - | - | $35.00 | $0.00 | | $29.45 | | | | | -$29.45 | -$29.45 |
| Cleveland, Jimmy | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | $209.00 | | | | | | -$209.00 | $1,591.00 |
| Cooper, Judy | CK | 0.00 | 0.00 | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 0.00 | 0.00 | $33.00 | $0.00 | | | $40.25 | | | | -$40.25 | -$40.25 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | $21.00 | | | -$21.00 | $4,779.00 |
| Guy, Allison | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Lauderdale, Rick | DD | 72.00 | 72.00 | $45.00 | $3,240.00 | | | | | | | $0.00 | $3,240.00 |
| McIntosh, Elizabeth | DD | - | - | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear | DD | 0.00 | 0.00 | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Treadwell, Denise | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | $33.00 | $23.10 | $32.06 | | -$88.16 | $4,111.84 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | $209.00 | $29.45 | | | | | -$238.45 | $3,961.55 |
| **Totals** | | 408.00 | 408.00 | | $19,500.00 | $418.00 | $58.90 | $73.25 | $44.10 | $32.06 | $0.00 | -$626.31 | $18,873.69 |

| EAST/PRATTVILLE | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Carter, Meloni (East) | DD | 12.00 | 12.00 | $38.00 | $456.00 | | | | | | | $0.00 | $456.00 |
| Carter, Meloni (Prattville) | DD | 60.50 | 60.50 | $38.00 | $2,299.00 | | | | | | | $0.00 | $2,299.00 |
| McIntosh, Elizabeth (East) | DD | 36.25 | 36.25 | $38.00 | $1,377.50 | | | | | | | $0.00 | $1,377.50 |
| McIntosh, Elizabeth (Prattville) | DD | 10.00 | 10.00 | $38.00 | $380.00 | | | | | | | $0.00 | $380.00 |
| Norris, Bea Bear (East) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (Prattville) | DD | 12.00 | 12.00 | $35.00 | $420.00 | | | | | | | $0.00 | $420.00 |
| Guy, Allison (East) | DD | 36.00 | 36.00 | $35.00 | $1,260.00 | | | | | | | $0.00 | $1,260.00 |
| Cooper, Judy (Prattville) | CK | | | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | DD | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $510.00 |
| Lauderdale, Rick (East) | DD | 24.00 | 24.00 | $45.00 | $1,080.00 | | | | | | | $0.00 | $1,080.00 |
| Crysel, Kimberly (East) | DD | 46.00 | 46.00 | $33.00 | $1,518.00 | | | | | | | $0.00 | $1,518.00 |
| Crysel, Kimberly (Prattville) | DD | 42.50 | 42.50 | $33.00 | $1,402.50 | | | | | | | $0.00 | $1,402.50 |
| **Totals** | | 291.25 | 291.25 | | $10,703.00 | | | | | | | $0.00 | $10,703.00 |

| REGULAR SALARY | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Gay, Mickey | DD | | | | $0.00 | | | | | | | $0.00 | $0.00 |
| **Totals** | | | | | $0.00 | | | | | | | $0.00 | $0.00 |

| Total Extender Hours | | 699.25 | 699.25 | | $30,203.00 | $418.00 | $58.90 | $73.25 | $44.10 | $32.06 | $0.00 | -$626.31 | $29,576.69 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0605

**Extender Payroll**
**Period Ending 1/16/06 – 1/31/06**
**Paid 2/15/06**

| Name | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | - | - | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 0.00 | - | $33.00 | $0.00 | | | $40.25 | $21.00 | | | $61.25 | -$61.25 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Guy, Allison | DD | 0.00 | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 53.50 | 53.50 | $45.00 | $2,407.50 | | | | | | | $0.00 | $2,407.50 |
| McAnnish, Elizabeth | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| Norris, Bea Bear | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | $33.00 | $23.10 | $56.45 | | $112.55 | $1,687.45 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | $209.00 | $29.45 | | | | | $238.45 | $3,961.55 |
| **Totals** | | 401.50 | 401.50 | | $19,231.50 | $209.00 | $29.45 | $73.25 | $44.10 | $56.45 | | $412.25 | $18,819.25 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Carter, Meloni (East) | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| Carter, Meloni (Prattville) | DD | 30.00 | 30.00 | $38.00 | $1,140.00 | | | | | | | $0.00 | $1,140.00 |
| McIntosh, Elizabeth (East) | DD | 36.50 | 36.50 | $38.00 | $1,387.00 | | | | | | | $0.00 | $1,387.00 |
| McIntosh, Elizabeth (Prattville) | DD | - | - | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (East) | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (Prattville) | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (Prattville) | DD | 57.00 | 57.00 | $35.00 | $1,995.00 | | | | | | | $0.00 | $1,995.00 |
| Cooper, Judy (East) | CK | - | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (Prattville) | CK | 24.00 | 24.00 | $42.50 | $1,020.00 | | | | | | | $0.00 | $1,020.00 |
| Lauderdale, Rick (East) | DD | 24.00 | 24.00 | $45.00 | $1,080.00 | | | | | | | $0.00 | $1,080.00 |
| Crysel, Kimberly (East) | DD | - | - | $33.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly (Prattville) | DD | 60.00 | 60.00 | $33.00 | $1,980.00 | | | | | | | $0.00 | $1,980.00 |
| **Totals** | | 279.50 | 279.50 | | $10,426.00 | | | | | | | $0.00 | $10,426.00 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Totals** | | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Total Extender Hours** | | 681.00 | 681.00 | | $30,657.50 | $209.00 | $29.45 | $73.25 | $44.10 | $56.45 | $0.00 | $412.25 | $30,245.25 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0606

**Extender Payroll**
**Period Ending 2/1/06 - 2/15/06**
**Paid 2/28/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Total Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Cleveland, Jimmy | DD | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 0.00 | - | $33.00 | $0.00 | | | | | | | -$61.25 | -$61.25 |
| Gay, Mickey | CK | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Guy, Allison | DD | 0.00 | 0.00 | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 52.25 | 52.25 | $45.00 | $2,351.25 | -$278.66 | -$39.27 | -$40.25 | -$21.00 | | | -$317.93 | $2,033.32 |
| McIntosh, Elizabeth | DD | 60.00 | 60.00 | $38.00 | $2,280.00 | | | | | | | $0.00 | $2,280.00 |
| Norris, Bea Bear | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $1,743.90 |
| Treadwell, Denise | DD | 0.00 | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $3,361.55 |
| Totals | | 400.25 | 400.25 | | $19,031.25 | -$487.66 | -$68.72 | -$73.25 | -$44.10 | $0.00 | $0.00 | -$673.73 | $18,357.52 |
| | | | | | | | | | | | | | |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 11.50 | 11.50 | $38.00 | $437.00 | | | | | | | $0.00 | $437.00 |
| McIntosh, Elizabeth (Prattville) | DD | - | - | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (East) | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Norris, Bea Bear (Prattville) | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (Prattville) | DD | 18.50 | 18.50 | $35.00 | $647.50 | | | | | | | $0.00 | $647.50 |
| Guy, Allison (East) | DD | 32.50 | 32.50 | $35.00 | $1,137.50 | | | | | | | $0.00 | $1,137.50 |
| Cooper, Judy (Prattville) | CK | 23.00 | 23.00 | $42.50 | $977.50 | | | | | | | $0.00 | $977.50 |
| Cooper, Judy (East) | CK | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $510.00 |
| Lauderdale, Rick (East) | DD | 26.00 | 26.00 | $45.00 | $1,170.00 | | | | | | | $0.00 | $1,170.00 |
| Wilkerson, Benny (East) | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Crysel, Kimberely (East) | DD | 75.00 | 75.00 | $33.00 | $2,475.00 | | | | | | | $0.00 | $2,475.00 |
| Crysel, Kimberely (Prattville) | DD | 5.00 | 5.00 | $33.00 | $165.00 | | | | | | | $0.00 | $165.00 |
| Totals | | 227.50 | 227.50 | | $8,719.50 | | | | | | | $0.00 | $8,719.50 |
| | | | | | | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | | | | | | | | | |
| Totals | | | - | - | | $0.00 | | | | | | | $0.00 | $0.00 |
| | | | | | | | | | | | | | |
| Total Extender Hours | | 627.75 | 627.75 | | $27,750.75 | #REF! | #REF! | -$73.25 | -$44.10 | $0.00 | $0.00 | $0.00 | $26,477.02 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0607

**Extender Payroll**
**Period Ending 2/16/06 - 2/28/06**
**Paid 3/15/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | - | - | $42.50 | $0.00 | | | | | | | | $0.00 |
| Crysel, Kimberly | DD | 7.00 | 7.00 | $33.00 | $231.00 | | | -$40.25 | -$21.00 | | | -$61.25 | $169.75 |
| Gay, Mickey | CK | 108.00 | 108.00 | $50.00 | $5,400.00 | | | | | | | $0.00 | $5,400.00 |
| Guy, Allison | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 36.00 | 36.00 | $45.00 | $1,620.00 | -$278.66 | -$39.27 | | | | | -$317.93 | $1,302.07 |
| McIntosh, Elizabeth | DD | 72.00 | 72.00 | $38.00 | $2,736.00 | | | | | | | $0.00 | $2,736.00 |
| Norris, Bea Bear | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $1,743.90 |
| Treadwell, Denise | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $2,161.55 |
| Totals | | 355.00 | 355.00 | | $16,587.00 | -$487.66 | -$68.72 | -$73.25 | -$44.10 | $0.00 | $0.00 | -$673.73 | $15,913.27 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 13.50 | 13.50 | $38.00 | $513.00 | | | | | | | $0.00 | $513.00 |
| McIntosh, Elizabeth (Prattville) | DD | - | - | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (East) | DD | 34.00 | 34.00 | $50.00 | $1,700.00 | | | | | | | $0.00 | $1,700.00 |
| Norris, Bea Bear (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (Prattville) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (East) | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (Prattville) | CK | - | | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | 24.00 | 24.00 | $42.50 | $1,020.00 | | | | | | | $0.00 | $1,020.00 |
| Lauderdale, Rick (East) | DD | 36.00 | 36.00 | $45.00 | $1,620.00 | | | | | | | $0.00 | $1,620.00 |
| Wilkerson, Benny (East) | DD | 13.00 | 13.00 | $50.00 | $650.00 | | | | | | | $0.00 | $650.00 |
| Carter, Marion (Prattville) | DD | 9.00 | 9.00 | $38.00 | $342.00 | | | | | | | $0.00 | $342.00 |
| Crysel, Kimberely (East) | DD | 41.00 | 41.00 | $33.00 | $1,353.00 | | | | | | | $0.00 | $1,353.00 |
| Crysel, Kimberely (Prattville) | DD | 34.00 | 34.00 | $33.00 | $1,122.00 | | | | | | | $0.00 | $1,122.00 |
| Totals | | 204.50 | 204.50 | | $8,320.00 | | | | | | | $0.00 | $8,320.00 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | - | - | | $1,000.00 | | | | | | | | $1,000.00 |
| Totals | | - | - | | $1,000.00 | | | | | | | | $1,000.00 |
| **Total Extender Hours** | | 559.50 | 559.50 | | $25,907.00 | -$487.66 | -$68.72 | -$73.25 | -$44.10 | $0.00 | $0.00 | -$673.73 | $25,233.27 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0608

**Extender Payroll**
**Period Ending 3/1/06 - 3/15/06**
**Paid 3/31/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Cleveland, Jimmy | DD | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 6.00 | 5.00 | $33.00 | $165.00 | | | $40.25 | $21.00 | | | -$61.25 | $103.75 |
| Gay, Mickey | CK | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Guy, Allison | DD | 0.00 | 0.00 | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 5.00 | 5.00 | $45.00 | $225.00 | -$278.67 | -$39.28 | | | | | -$317.95 | -$92.95 |
| Mcintosh, Elizabeth | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| Norris, Bea Bear | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | | | -$33.00 | -$23.10 | -$35.63 | | -$91.73 | $2,908.27 |
| Treadwell, Denise | DD | 24.00 | 24.00 | $50.00 | $1,200.00 | | | | | | | $0.00 | $1,200.00 |
| Wilkerson, Benny | DD | 60.00 | 60.00 | $50.00 | $3,000.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $2,761.55 |
| **Totals** | | 370.00 | 370.00 | | $17,814.00 | -$487.67 | -$68.73 | -$73.25 | -$44.10 | -$35.63 | $0.00 | -$709.38 | $17,104.62 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| Mcintosh, Elizabeth (East) | DD | 20.00 | 20.00 | $38.00 | $760.00 | | | | | | | $0.00 | $760.00 |
| Mcintosh, Elizabeth (Prattville) | DD | 24.00 | 24.00 | $38.00 | $912.00 | | | | | | | $0.00 | $912.00 |
| Norris, Bea Bear (East) | DD | 16.00 | 16.00 | $50.00 | $800.00 | | | | | | | $0.00 | $800.00 |
| Norris, Bea Bear (Prattville) | DD | - | - | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (Prattville) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Guy, Allison (East) | DD | - | - | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (Prattville) | CK | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $510.00 |
| Cooper, Judy (East) | DD | 10.50 | 10.50 | $42.50 | $446.25 | | | | | | | $0.00 | $446.25 |
| Lauderdale, Rick (East) | DD | 89.00 | 89.00 | $45.00 | $4,005.00 | | | | | | | $0.00 | $4,005.00 |
| Wilkerson, Benny (East) | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Carter, Marion (Prattville) | DD | - | - | $38.00 | $0.00 | | | | | | | | |
| Crysel, Kimberly (East) | DD | 35.00 | 35.00 | $33.00 | $1,155.00 | | | | | | | | $1,155.00 |
| Crysel, Kimberly (Prattville) | DD | 31.00 | 31.00 | $33.00 | $1,023.00 | | | | | | | | $1,023.00 |
| **Totals** | | 249.50 | 249.50 | | $10,211.25 | | | | | | $0.00 | $0.00 | $10,211.25 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | | | | | | | | | $0.00 |
| **Totals** | | - | - | | $0.00 | | | | | | | | $0.00 |
| **Total Extender Hours** | | 619.50 | 619.50 | | $28,025.25 | -$487.67 | -$68.73 | -$73.25 | -$44.10 | -$35.63 | $0.00 | -$709.38 | $27,315.87 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0609

**Extender Payroll**
**Period Ending 3/16/06 - 3/31/06**
**Paid 4/14/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | 24.00 | 24.00 | $38.00 | $912.00 | | | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Cooper, Judy | CK | 0.00 | - | $42.50 | $0.00 | | | | | | | | $0.00 |
| Crysel, Kimberly | DD | 0.00 | - | $33.00 | $0.00 | | | | | | | $61.25 | -$61.25 |
| Gay, Mickey | DD | 120.00 | 120.00 | $50.00 | $6,000.00 | | | $40.25 | $21.00 | | | $0.00 | $6,000.00 |
| Guy, Alison | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | 24.50 | 24.50 | $45.00 | $1,102.50 | | | | | | | $0.00 | $1,340.95 |
| McIntosh, Elizabeth | DD | 36.00 | 36.00 | $38.00 | $1,368.00 | $209.00 | $29.45 | | | | | $238.45 | $1,340.95 |
| Norris, Bea Bear | DD | 28.00 | 28.00 | $50.00 | $1,400.00 | | | $33.00 | | | | $0.00 | $1,368.00 |
| Treadwell, Denise | DD | 36.00 | 36.00 | $50.00 | $1,800.00 | | | | -$23.10 | | | -$56.10 | $1,343.90 |
| Wilkerson, Benny | SRW | 84.00 | 84.00 | $50.00 | $4,200.00 | -$209.00 | -$29.45 | -$73.25 | | | | -$238.45 | $1,800.00 |
| **Totals** | | 400.50 | 376.50 | | $19,182.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$117.35 | $3,961.55 |
| | | | | | | | | | | | | | $18,153.15 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 25.00 | 25.00 | $38.00 | $950.00 | | | | | | | $0.00 | $950.00 |
| McIntosh, Elizabeth (Prattville) | DD | | | $38.00 | | | | | | | | | $0.00 |
| Norris, Bea Bear (East) | DD | 24.00 | 24.00 | $50.00 | $1,200.00 | | | | | | | $0.00 | $1,200.00 |
| Norris, Bea Bear (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Alison (East) | DD | | | $35.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Alison (Prattville) | DD | | | $35.00 | $0.00 | | | | | | | | $0.00 |
| Cooper, Judy (Prattville) | CK | 26.50 | 26.50 | $42.50 | $1,126.25 | | | | | | | $0.00 | $1,126.25 |
| Cooper, Judy (East) | DD | 60.50 | 60.50 | $42.50 | $2,722.50 | | | | | | | $0.00 | $2,722.50 |
| Lauderdale, Rick (East) | DD | | | $45.00 | $0.00 | | | | | | | | $0.00 |
| Wilkerson, Benny (East) | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Carter, Meloni (Prattville) | DD | | | $38.00 | $0.00 | | | | | | | | $0.00 |
| Crysel, Kimberly (East) | DD | 68.50 | 68.50 | $33.00 | $2,260.50 | | | | | | | | $2,260.50 |
| Crysel, Kimberly (Prattville) | DD | 37.00 | 37.00 | $33.00 | $1,221.00 | | | | | | | | $1,221.00 |
| **Totals** | | 253.50 | 253.50 | | $10,080.25 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $10,080.25 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Totals** | | | | | $1,000.00 | | | | | | | | $1,000.00 |
| **Total Extender Hours** | | 654.00 | 630.00 | | $30,262.75 | $0.00 | $0.00 | $73.25 | $44.10 | $0.00 | $0.00 | -$117.35 | $29,233.40 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0610

**Extender Payroll**
**Period Ending 4/1/06 - 4/15/06**
**Paid 4/28/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Meloni | DD | | | $45.00 | $0.00 | | | | | | | | $0.00 |
| Cleveland, Jimmy | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Cooper, Judy | CK | 0.00 | 0.00 | $42.50 | $0.00 | | | | | | | | $0.00 |
| Crysel, Kimberly | DD | 0.00 | 0.00 | $33.00 | $0.00 | | | | | | | | $0.00 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | $40.25 | $21.00 | | | $81.25 | -$81.25 |
| Guy, Alison (East) | DD | 0.00 | 0.00 | $35.00 | $0.00 | | | | | | | | $0.00 |
| Lauderdale, Rick | DD | 48.00 | 48.00 | $45.00 | $2,160.00 | -$209.00 | -$29.45 | | | | | $238.45 | $1,921.55 |
| McIntosh, Elizabeth | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| Norris, Bea Bear | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| Treadwell, Denise | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | $33.00 | $23.10 | -$57.57 | | $113.67 | $486.33 |
| Wilkerson, Benny | DD | 68.00 | 68.00 | $50.00 | $3,400.00 | -$209.00 | -$29.45 | | | -$9.30 | | $247.75 | $3,152.25 |
| **Totals** | | 356.00 | 356.00 | | $16,984.00 | -$418.00 | -$58.90 | $73.25 | $44.10 | -$66.87 | $0.00 | $661.12 | $16,322.88 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 48.00 | 48.00 | $38.00 | $1,824.00 | | | | | | | $0.00 | $1,824.00 |
| McIntosh, Elizabeth (Prattville) | DD | | | $38.00 | $0.00 | | | | | | | | $0.00 |
| Norris, Bea Bear (East) | DD | | | $50.00 | $0.00 | | | | | | | | $0.00 |
| Norris, Bea Bear (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Alison (Prattville) | DD | | | $35.00 | $0.00 | | | | | | | | $0.00 |
| Guy, Alison (East) | CK | | | $35.00 | $0.00 | | | | | | | | $0.00 |
| Cooper, Judy (Prattville) | CK | | | $42.50 | $0.00 | | | | | | | | $0.00 |
| Cooper, Judy (East) | DD | 29.50 | 29.50 | $42.50 | $1,253.75 | | | | | | | | $1,253.75 |
| Lauderdale, Rick (East) | DD | 31.00 | 31.00 | $45.00 | $1,395.00 | | | | | | | | $1,395.00 |
| Wilkerson, Benny (East) | DD | 13.50 | 13.50 | $50.00 | $675.00 | | | | | | | | $675.00 |
| Carter, Meloni (Prattville) | DD | 9.00 | 9.00 | $45.00 | $405.00 | | | | | | | | $405.00 |
| Crysel, Kimberely (East) | DD | 60.00 | 60.00 | $33.00 | $1,980.00 | | | | | | | | $1,980.00 |
| Crysel, Kimberely (Prattville) | DD | 12.00 | 12.00 | $33.00 | $396.00 | | | | | | | | $396.00 |
| **Totals** | | 203.00 | 203.00 | | $7,928.75 | | | | | | | $0.00 | $7,928.75 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | | | | | | | | | $0.00 |
| **Totals** | | - | - | | $0.00 | | | | | | | | $0.00 |
| **Total Extender Hours** | | 559.00 | 559.00 | | $24,912.75 | -$418.00 | -$58.90 | $73.25 | -$44.10 | -$66.87 | $0.00 | $661.12 | $24,251.63 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0611

**Extender Payroll**
**Period Ending 4/16/06 - 4/30/06**
**Paid 5/15/06**

| Extender Payroll | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Total Extender | Net Extra Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | | |
| Carter, Meloni | DD | | | $45.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Cleveland, Jimmy | DD | 80.00 | 60.00 | $50.00 | $3,000.00 | | | | | | | $0.00 | | $3,000.00 |
| Cooper, Judy | CK | | | $42.50 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Crystel, Kimberly | DD | | | $33.00 | $33.00 | | | $40.25 | $21.00 | | | $51.25 | | $51.25 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | | $4,800.00 |
| Guy, Allison | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Lauderdale, Rick | DD | 69.50 | 69.50 | $45.00 | $3,127.50 | $209.00 | $29.45 | | | | | -$238.45 | | $2,889.05 |
| McIntosh, Elizabeth | DD | 36.75 | 36.75 | $38.00 | $1,396.50 | | | | | | | $0.00 | | $1,396.50 |
| Norris, Bea Bear | DD | 24.00 | 24.00 | $50.00 | $1,200.00 | | | $33.00 | $23.10 | | | -$56.10 | | $1,143.90 |
| Pritchet, Chris | DD | | | $20.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Touchwell, Dennis | DD | | | $50.00 | $0.00 | $209.00 | $29.45 | | | | | -$238.45 | | -$238.45 |
| Carter, Meloni (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Wilkerson, Benn | DD | 57.00 | 57.00 | $50.00 | $2,850.00 | $209.00 | $29.45 | | | | | -$238.45 | | $2,611.55 |
| **Totals** | | 343.25 | 343.25 | | $16,374.00 | $627.00 | $88.35 | $73.25 | $44.10 | | | -$832.70 | | $15,541.30 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 37.00 | 37.00 | $38.00 | $1,406.00 | | | | | | | $0.00 | | $1,406.00 |
| McIntosh, Elizabeth (Prattville) | DD | | | $38.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Norris, Bea Bear (East) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Norris, Bea Bear (Prattville) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Guy, Allison (Prattville) | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Guy, Allison (East) | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Cooper, Judy (Prattville) | CK | | | $42.50 | $0.00 | | | | | | | $0.00 | | $0.00 |
| Cooper, Judy (East) | CK | 24.50 | 24.50 | $42.50 | $1,041.25 | | | | | | | $0.00 | | $1,041.25 |
| Lauderdale, Rick (East) | CK | 24.00 | 24.00 | $45.00 | $1,080.00 | | | | | | | $0.00 | | $1,080.00 |
| Wilkerson, Benny (East) | DD | 50.50 | 50.50 | $50.00 | $2,525.00 | | | | | | | $0.00 | | $2,525.00 |
| Crystel, Kimberly (Prattville) | DD | 51.50 | 51.50 | $33.00 | $1,699.50 | | | | | | | $0.00 | | $1,699.50 |
| Crystel, Kimberly (East) | DD | 24.00 | 24.00 | $33.00 | $792.00 | | | | | | | $0.00 | | $792.00 |
| Pritchet, Chris (East) | DD | | | $20.00 | $0.00 | | | | | | | $0.00 | | $0.00 |
| **Totals** | | 211.50 | 211.50 | | $8,543.75 | | | | | | | $0.00 | | $8,543.75 |
| **REGULAR SALARY** | | | | | | | | | | | | | | |
| Gay, Mickey | DD | 80.00 | 80.00 | | $1,000.00 | | | | | | | $0.00 | | $1,000.00 |
| Pritchet, Chris | DD | 80.00 | 80.00 | $20.00 | $1,600.00 | | | | | | | $0.00 | | $1,600.00 |
| **Totals** | | 80.00 | 80.00 | | $2,600.00 | | | | | | | $0.00 | | $2,600.00 |
| **Total Extender Hours** | | 634.75 | 634.75 | | $27,517.75 | $627.00 | $88.35 | $73.25 | $44.10 | | | -$832.70 | | $26,685.05 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0612

**Extender Payroll**
**Period Ending 5/15/06**
**Paid 5/31/06**

| | Payment Method | Baptist Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Melon | DD | | | $45.00 | $0.00 | | | | | -$2.97 | | $0.00 | $2.97 |
| Cleveland, Jimmy | DD | 84.00 | 84.00 | $50.00 | $4,200.00 | | | | | | | $0.00 | $4,200.00 |
| Cooper, Judy | CK | | 12.00 | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Crysel, Kimberly | DD | 12.00 | 12.00 | $33.00 | $396.00 | | | $40.25 | $21.00 | | | -$61.25 | $334.75 |
| Gay, Mickey | CK | 96.00 | 96.00 | $50.00 | $4,800.00 | | | | | | | $0.00 | $4,800.00 |
| Gay, Allison | DD | 35.00 | 35.00 | $35.00 | $1,225.00 | | | | | | | $0.00 | $1,225.00 |
| Lauderdale, Rick | DD | 74.00 | 74.00 | $45.00 | $3,330.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $3,091.55 |
| McIntosh, Elizabeth | DD | 24.00 | 24.00 | $38.00 | $912.00 | | | | | | | $0.00 | $912.00 |
| Norris, Bea Bear | DD | 56.00 | 56.00 | $50.00 | $2,800.00 | | | -$33.00 | -$23.10 | | | -$56.10 | $2,743.90 |
| Pritchett, Chris | DD | 12.00 | 12.00 | $40.00 | $480.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $241.55 |
| Treadwell, Denise | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | 72.00 | 72.00 | $50.00 | $3,600.00 | -$209.00 | -$29.45 | | | | | -$238.45 | $3,361.55 |
| **Totals** | | 465.00 | 465.00 | | $21,743.00 | -$627.00 | -$88.35 | -$73.25 | -$44.10 | -$2.97 | $0.00 | -$832.70 | $20,910.30 |
| **EAST/PRATTVILLE** | | | | | | | | | | | | | |
| McIntosh, Elizabeth (East) | DD | 16.50 | 16.50 | $38.00 | $627.00 | | | | | | | $0.00 | $627.00 |
| McIntosh, Elizabeth (Prattville) | DD | 20.00 | 20.00 | $38.00 | $760.00 | | | | | | | $0.00 | $760.00 |
| Norris, Bea Bear (East) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Norris, Bea Bear (Prattville) | DD | 8.00 | 8.00 | $50.00 | $400.00 | | | | | | | $0.00 | $400.00 |
| Guy, Allison (Prattville) | DD | 10.00 | 10.00 | $35.00 | $350.00 | | | | | | | $0.00 | $350.00 |
| Guy, Allison (East) | DD | 10.00 | 10.00 | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cooper, Judy (East) | CK | 48.50 | 48.50 | $42.50 | $2,061.25 | | | | | | | $0.00 | $2,061.25 |
| Lauderdale, Rick (East) | DD | | | $45.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny (East) | DD | | | $50.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Carter, Melon (Prattville) | DD | 27.00 | 27.00 | $45.00 | $1,215.00 | | | | | | | $0.00 | $1,215.00 |
| Crysel, Kimberly (East) | DD | 72.50 | 72.50 | $33.00 | $2,392.50 | | | | | | | $0.00 | $2,392.50 |
| Pritchett, Chris (Prattville) | DD | 51.50 | 51.50 | $40.00 | $2,060.00 | | | | | | | $0.00 | $2,060.00 |
| Smith, Steven (East) | DD | 10.00 | 10.00 | $40.00 | $400.00 | | | | | | | $0.00 | $400.00 |
| Treadwell, Denise (East) | DD | 22.00 | 22.00 | $50.00 | $1,100.00 | | | | | | | $0.00 | $1,100.00 |
| **Totals** | | 286.00 | 286.00 | | $11,265.75 | | | | | | | $0.00 | $11,305.75 |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $0.00 | | | | | | | $0.00 | $0.00 |
| Lauderdale, Rick | DD | | | | $150.00 | | | | | | | $0.00 | $0.00 |
| Pritchett, Chris | DD | | | | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny | DD | | | | $150.00 | | | | | | | $0.00 | $0.00 |
| **Totals** | | | | | $300.00 | | | | | | | $0.00 | $0.00 |
| **Total Extender Hours** | | 751.00 | 751.00 | | $33,408.75 | -$627.00 | -$88.35 | -$73.25 | -$44.10 | $0.00 | $0.00 | -$832.70 | $28,716.05 |

**Start $1000 raise for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0613

**Extender Payroll**

**Period Ending 5/14/06 - 5/27/06**
**Paid 6/15/2006**

| | Payment Method | Basic Hours | Total Hours | Rate | Extender Subtotal | Health Insurance | Dental Insurance | AFLAC Short-Term Disability | AFLAC Sickness | Cafeteria Charges | Other Charges | Total Deductions | Extender Net before Taxes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SOUTH** | | | | | | | | | | | | | |
| Carter, Mason | DD | | | $45.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Cleveland, Jimmy | DD | 50.00 | 50.00 | $50.00 | $2,900.00 | | | | | | | $0.00 | $2,900.00 |
| Cooper, Judy (Partiville) | DD | | | $42.50 | $0.00 | | | | | | | $0.00 | $0.00 |
| Dyess, Kimberly | DD | | | $33.00 | $0.00 | | | | $51.00 | | | $51.00 | $0.00 |
| Gay, Mickey | CK | 72.00 | 72.00 | $50.00 | $3,600.00 | | | | | | | $0.00 | $3,600.00 |
| Gay, Allison (Partiville) | DD | 24.00 | 24.00 | $35.00 | $840.00 | | | $40.25 | | | | $40.25 | $840.00 |
| Lauderdale, Rick | DD | 85.00 | 85.00 | $45.00 | $3,825.00 | $200.00 | | | | | | $200.00 | $3,640.00 |
| Mannsen, Elizabeth | DD | 60.00 | 60.00 | $38.00 | $2,280.00 | | $29.45 | | | | | $29.45 | $2,280.00 |
| Pritchett, Chris | DD | 60.50 | 60.50 | $40.00 | $2,420.00 | $209.00 | | $33.00 | | $42.76 | | $98.86 | $2,321.14 |
| Thatcher, Denise | DD | | | $50.00 | $0.00 | $209.00 | $29.45 | | $23.10 | | | $238.45 | $2,111.55 |
| Wilkerson, Benny | DD | 66.00 | 66.00 | $50.00 | $3,300.00 | $209.00 | $29.45 | | | | | $238.45 | $3,061.55 |
| | | | | | | | | | | | | | |
| **SCORE HOURS** | | | | | | | | | | | | | |
| Brannon, William (East) | CK | 84.00 | 84.00 | $9.00 | $756.00 | | | | | | | | $756.00 |
| Plan, James | DD | | | $9.00 | $0.00 | | | | | | | | $0.00 |
| **TOTALS** | | 84.00 | 84.00 | | $756.00 | | | | | | | | |
| | | | | | | | | | | | | | |
| **Total** | | 567.50 | 567.50 | | $22,965.00 | $627.00 | $66.35 | $573.25 | $44.10 | $42.76 | $0.00 | $675.46 | $21,169.93 |
| | | | | | | | | | | | | | |
| **EAST/FAYETTEVILLE** | | | | | | | | | | | | | |
| Morrison, Elizabeth (East) | DD | | | $38.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Morrison, Elizabeth (Partiville) | DD | 10.00 | 10.00 | $38.00 | $380.00 | | | | | | | $0.00 | $380.00 |
| Norris, Bea Star (East) | DD | 10.00 | 10.00 | $50.00 | $500.00 | | | | | | | $0.00 | $500.00 |
| Gay, Allison (Partiville) | DD | | | $35.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Gay, Allison (East) | DD | 40.00 | 40.00 | $35.00 | $1,400.00 | | | | | | | $0.00 | $1,400.00 |
| Cooper, Judy (Partiville) | DD | 12.00 | 12.00 | $42.50 | $510.00 | | | | | | | $0.00 | $510.00 |
| Cooper, Judy (East) | DD | 36.50 | 36.50 | $42.50 | $1,551.25 | | | | | | | $0.00 | $1,551.25 |
| Lauderdale, Rick (East) | DD | | | $45.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Wilkerson, Benny (East) | DD | 48.00 | 48.00 | $50.00 | $2,400.00 | | | | | | | $0.00 | $2,400.00 |
| Carter, Mason (Partiville) | DD | | | $45.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Creel, Kimberly (East) | DD | 66.00 | 66.00 | $33.00 | $2,178.00 | | | | | | | $0.00 | $2,178.00 |
| Dyess, Kimberly (Partiville) | DD | | | $33.00 | $0.00 | | | | | | | $0.00 | $0.00 |
| Pritchett, Chris (East) | DD | 33.25 | 33.25 | $40.00 | $1,330.00 | | | | | | | $0.00 | $1,330.00 |
| Smith, Steven (East) | DD | 12.00 | 12.00 | $42.00 | $504.00 | | | | | | | $0.00 | $504.00 |
| Gay, Mickey | DD | 12.00 | 12.00 | $50.00 | $600.00 | | | | | | | $0.00 | $600.00 |
| **Totals** | | 255.75 | 255.75 | | $10,153.25 | | | | | | | $0.00 | $2,719.25 |
| | | | | | | | | | | | | | |
| **REGULAR SALARY** | | | | | | | | | | | | | |
| Gay, Mickey | DD | | | | $1,000.00 | | | | | | | | $1,000.00 |
| Lauderdale, Rick | DD | | | | $0.00 | | | | | | | | $0.00 |
| Pritchett, Chris | DD | | | | $0.00 | | | | | | | | $0.00 |
| Wilkerson, Benny | DD | | | | $0.00 | | | | | | | | $0.00 |
| **Totals** | | | | | $1,000.00 | | | | | | | | $1,000.00 |
| | | | | | | | | | | | | | |
| **Total Extender Hours** | | 823.25 | 823.25 | | $33,974.25 | $627.00 | $66.35 | $573.25 | $44.10 | $42.76 | $0.00 | $675.46 | $23,904.70 |
| **Adjustment 531100 Payroll:** | | | | | | | | | | | | | |
| Shain | DD | 10.00 | 10.00 | $2.00 | $20.00 | | | | | | | | $20.00 |
| | | | | | | | | | | | | | |
| **TOTAL:** | | | | | $33,994.25 | | | | | | | | $29,924.70 |

\*\*Start $1000 rate for Mickey Gay on the 15th checks.
Raise to title him as Director of Mid-Level Provider Documentation

AERAS 0614

AERAS

AERAS 0947

State of Alabama  )
       :
Montgomery County )

### AMENDMENT ONE

This *Amendment One* is made this 1ˢᵗ day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

### WITNESSETH

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter "*Agreement*" with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.  Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

    a)  Paragraph 3.2 is amended to read as follows:

        3.2  <u>Fee Schedule</u>. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A" shall serve as the basis for AERAS compensation under

Page 1 of 3

AERAS 0948

Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements, provided that AERAS has consented and agreed in writing to comply with and participate in such plans prior to the time that AERAS' participation is required.

b) Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a) BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b) Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information and a copy of the ER record on said patients along with all other information including diagnosis and other pertinent information necessary to enable AERAS to bill patients for services provided by Emergency Room Physicians. The information supplied to AERAS by BMCS may be released by AERAS for billing purposes.

c) Effective January 1, 2004, BMCS will pay AERAS an annual subsidy of Three Hundred Thousand and 00/100 Dollars ($300,000.00) payable in equal monthly installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00).

c) Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8    Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

AERAS 0949

2.      Paragraph 4.12(b) is amended to read as follows:

      4.12(b)      If to BMCS, to:      Robin Barca
                                                    Senior Vice President/COO
                                                  Baptist Health
                                                  Post Office Box 244001
                                                  Montgomery, Alabama 36124-4001

3.      The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

      4.18      HIPAA Compliance. AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto. As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.      This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.      The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.      Confidential Nature of Agreement. This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential. Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health
d/b/a Baptist Medical Center South**

_____
Randall L. Hoover
President/CEO

Date: 7/17/03

**Alabama Emergency Room Administrative
Services, P.C.**

_____
John D. Moorehouse, M.D.
President

Date: 7/9/03

**AERAS 0950**

STATE OF ALABAMA

MONTGOMERY COUNTY

## EMERGENCY ROOM SERVICES AGREEMENT

This Agreement is entered into by and between Baptist Medical Center, Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "BMC") and Alabama Emergency Room Administrative Services, P.C., an Alabama professional corporation (hereinafter referred to as "AERAS").

### WITNESSETH:

BMC operates an Emergency Department located in its facility in Montgomery, Alabama, (hereinafter referred to as "Emergency Department"), which requires the professional medical services of physicians. BMC has determined that in order to insure the proper and efficient operation of the Emergency Department that several objectives must be met, including but not limited to, 24 hour physician coverage, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in recordkeeping, and quality patient care; and,

WHEREAS, AERAS is capable and willing to provide physicians (hereinafter referred to as "Emergency Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the BMC Medical Staff, and receive privileges to practice in the Emergency Department; and, AERAS can assure that the Emergency Physicians they provide shall accept responsibility to provide emergency services in the Emergency Department; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of BMC, and the terms and conditions set forth in this Agreement;

THEREFORE, BMC and AERAS desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the Emergency Department, and agree as follows:

### AERAS' COMMITMENTS

1.1    Physician Staffing. AERAS shall provide physician staffing for the Emergency Department through duly licensed and qualified Emergency Physicians on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week for the duration of this Agreement. A second physician will be provided during peak patient flow periods on City ER days and at such other times as shall be mutually identified by BMC and AERAS.

AERAS will provide Emergency Physicians who, at a minimum, shall be Board Eligible in Emergency Medicine or Board Eligible/Certified in a primary specialty with experience in emergency medicine. All Emergency Physicians provided by AERAS shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Emergency Physicians and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Emergency Physicians furnished by AERAS will provide care to all individuals who present themselves to the Emergency Department in need of service.

1

AERAS 0951

AERAS shall maintain a daily log to be kept in the Emergency Department indicating the identity of the physician or physicians on duty and the times they were present. This log shall be open to inspection by BMC at any time.

Every Emergency Department Physician shall be certified in Advanced Cardiac Life Support and shall seek certification in Advanced Trauma Life Support. Emergency Physicians shall not begin rendering services in the Emergency Department until he or she has been fully credentialed by BMC as provided herein.

1.2    Medical Staff Privileges.

(a)    Procedure. Each Emergency Physician provided by AERAS shall apply for medical privileges in Emergency Medicine and must obtain approval for appropriate Medical Staff membership in accordance with BMC policies and procedures and the Medical Staff Bylaws, except in unusual or unforeseen circumstances, as described herein. Physician credentials shall be forwarded to BMC by AERAS in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at BMC. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Temporary Medical Staff Privileges. Notwithstanding any other provision in this agreement, it is understood that, on occasion, temporary Medical Staff Privileges may be requested by AERAS due to unusual or unforeseen circumstances. In such instances, temporary Medical Staff Privileges may be granted by BMC officials in accordance with Medical Staff Bylaws.

(c)    Responsibilities of Emergency Physician. Each Emergency Physician provided by AERAS shall have the same responsibilities as other members of the Medical Staff including attendance at medical staff and committee meetings in accordance with Medical Staff Bylaws.

1.3    Independent Contractors. In the performance of emergency medical services hereunto, AERAS and Emergency Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BMC. Neither AERAS nor Emergency Physicians performing services for AERAS under this Agreement, whether said Emergency Physicians be members, partners, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BMC for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group. AERAS shall maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis. Full time Emergency Physicians are expected to live in the area. For good cause, BMC shall have the right to refuse any physician which AERAS proposes to use in the Emergency Department and/or to request the removal of any AERAS Emergency Physician, provided, however, that AERAS has been given adequate notice and an opportunity to cure any problems concerning a particular physician.

1.5    Emergency Medical Director. AERAS shall designate an Emergency Medical Director. The Emergency Medical Director shall, at a minimum, be Board Certified in his/her area of practice and also be Board Eligible in Emergency Medicine. The Emergency Medical Director shall work full time in the Emergency Department and shall devote his/her best efforts to the proper management of Emergency Physicians and the Emergency Department staff as well as the professional and medical issues which involve the Emergency Department. BMC shall have the right to participate in the selection process and approve the individual selected by AERAS as the Medical Director.

2

AERAS 0952

The Emergency Medical Director shall be responsible for the following:

(a)     Clinical direction of the Emergency Department.

(b)     Act as a liaison between AERAS and BMC.

(c)     Act as a liaison between the Emergency Physicians and the BMC Medical Staff.

(d)     Attend all Emergency Department section meetings and any medical staff committee meetings to which he/she is assigned.

(e)     Represent the Emergency Department to the community.

(f)     Assist in the coordination of disaster planning.

(g)     Assist in the preparation of the Emergency Department for JCAHO and State Accreditation surveys.

(h)     Review and implement medical protocols for the Emergency Department.

(i)     Coordinate the Quality Assurance Program within the Emergency Department.

(j)     Monitor the quality of care delivered in the Emergency Department in accordance with the BMC Quality Assurance Plan.

(k)     Assist in the education and training on an initial and ongoing basis, of Emergency Department personnel.

(l)     Orient new Emergency Department physicians.

(m)     Coordinate the Emergency Department physicians schedule and publish same.

(n)     Assure continual Emergency Department coverage.

(o)     Work with Medical Staff of Hospital for scheduling an adequate call-in schedule for specialty and sub-specialty physicians.

(p)     Evaluate the performance of physicians working in the Emergency Department.

(q)     Deal with complaints, in conjunction with Nursing staff, ancillary personnel and BMC officials, regarding Emergency Department services and/or incidents of alleged suboptimal performance.

(r)     Coordinate the establishment of Emergency Services at BMC as a fully functional Emergency Department.

(s)     Advise and assist in coordination of public relations and marketing decisions regarding emergency services in the Emergency Department.

3

AERAS 0953

1.6  <u>Treatment and Patient Referral</u>. All patients presenting to the Emergency Department will be treated by the Emergency Physician on duty, unless the patient requests to see or has been sent to the Emergency Department by his/her private physician.

When a patient presents to the Emergency Department and requests his/her private physician, all reasonable efforts will be made to contact the private physician. Once contacted, the private physician shall be advised of the patients presentation to the Emergency Department and their condition/complaints. The private physician shall have the option of coming in to see the patient, or having the Emergency Physician on duty see the patient.

If the patient does not have a private physician, or if the private physician cannot be contacted within a reasonable period of time, or if for any reason the private physician does not assume responsibility for the said patient, then the Emergency Physician shall see the patient. If the patient's condition warrants hospitalization or definitive specialized care, the Emergency Department physician shall refer the patient to the appropriate staff physician on-call, or shall arrange a transfer or referral, as appropriate.

No patient will be triaged out of the Emergency Department without a medical screening examination by the Emergency Physician.

1.7  <u>Admission Privileges.</u>  Emergency Physicians will not have admission privileges.

1.8  <u>Non-Discrimination</u>. AERAS shall not discriminate against any Emergency Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.9  <u>Personal Expenses</u>. AERAS and Emergency Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.10  <u>No Authority to Commit BMC</u>. AERAS shall incur no financial obligation on behalf of BMC without prior written approval of BMC.

1.11  <u>Quality and Risk Management</u>. AERAS will provide a continuing review and an annual evaluation of the professional performance of each physician assigned to the BMC Emergency Department pursuant to this Agreement. BMC shall participate in such annual evaluation. Physician evaluations shall be shared with the appropriate BMC committee as part of their peer review process. AERAS will further implement BMC's current hospital quality improvement plan.

1.12  <u>Utilization Review</u>. AERAS will assist in the Utilization Review Program by monitoring admissions to BMC from the Emergency Department and by evaluating the appropriateness of such admissions according to established criteria.

1.13  <u>Staff Education</u>. Emergency Physicians will, without compensation, assist the hospital in providing educational programs for BMC's nursing, physician and ancillary staffs.

1.14  <u>EMS/ALS</u>. AERAS agrees to provide on-line medical direction for all calls made to the Emergency Department by an EMS/ALS unit. The Emergency Physician shall monitor patient data transmitted to the Emergency Department from the ambulance unit via telemetry or other means of communication and provide appropriate medical direction.

1.15  <u>Evaluation</u>. AERAS shall meet with BMC Administration on a quarterly basis to determine the level of attainment of stated goals and to discuss any problem areas, and for review of the operation of the Emergency Department.

4

AERAS 0954

1.16    Codes. Emergency Physicians shall be available for all emergencies or "codes" occurring in-house whenever their response will not endanger an Emergency Department patient.

1.17    AERAS and BMC agree to cooperate in resolving all claims and litigation which may arise out of the providing of Emergency Department services by AERAS. Emergency Physicians and/or the Medical Director will personally respond to patient complaints/ problems and as requested by the Emergency Department head nurse.

1.18    Guest Relations. AERAS agrees to work with BMC to stress guest relations techniques and patient satisfaction.

1.19    BMC Employee Injuries. AERAS agrees to treat BMC's employees with work related injuries (i.e., workman's compensation cases) at no cost to BMC and where appropriate, to refer employees to physician specialists designated by BMC.

1.20    Marketing. AERAS agrees to make reasonable efforts to support, participate in, and submit input into BMC's marketing program.

## BMC COMMITMENTS

2.1    Facilities and Supplies. BMC shall make available during the term of this Agreement the space designated for the Emergency Department and such equipment as is required for the proper operation and conduct of the Emergency Department. BMC shall provide said Emergency Department with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the department. The supplies necessary will be determined by the Medical Director and BMC Administration. AERAS shall inform BMC of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    Transcription of Records. BMC will provide a transcription of all dictated medical records of patients treated by AERAS on a timely basis.

2.3    X-Ray. BMC shall make a reasonable effort to provide a dedicated x-ray procedure room and to provide an x-ray technician for Emergency Department use.

2.4    Lab. BMC shall provide a phlebotomist for the Emergency Department, to work a schedule mutually agreed to by the Emergency Medical Director and BMC.

2.5    Telephone. BMC shall make a reasonable effort to install a remote phone system for On-Line Medical Control for pre-hospital care.

2.6    Patient Monitoring. BMC shall establish dedicated patient monitoring for blood pressure, pulse, EKG, and oxygen saturation.

2.7    Personnel.

(a)    All non-physician personnel required for the proper operation of the Emergency Department shall be employed or assigned by BMC. Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by BMC. All Emergency Department personnel shall be trained and qualified in emergency medicine services and shall be capable of performing their

5

AERAS 0955

assigned responsibilities. All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of BMC.

(b)   Nursing Staff. BMC will make a reasonable effort to have all full time Emergency Department registered nurses ACLS and TNCC (Trauma Nurse Care Curriculum) certified. BMC nursing shall work with Emergency Department physicians following established emergency care protocols.

2.8   Physician Room. BMC shall make available a room within the Emergency Department, containing a bed, lockers, desk, lamp, telephone, television, video machine, dictation equipment, and a personal computer terminal to access the Micromedex data base.

2.9   Assurance. During the term of this Agreement, BMC shall not contract with any other physicians or entities for the services performed by Emergency Physicians assigned to BMC through AERAS and this Agreement.

## FEES, BILLING, COLLECTION AND REMUNERATION

3.1   Definitions. For the purpose of this section, the following definitions shall apply:

(a)   Services to Patients: Those services of Emergency Physicians which:
    (i)   are personally furnished to a patient by Emergency Physicians.
    (ii)   contribute directly to the diagnosis or treatment of the patient; and
    (iii)   ordinarily require performance by a physician.

(b)   Services to Hospital: Those services of AERAS and/or Emergency Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in BMC; e.g., administrative and supervisory services shall be performed at no charge to BMC.

3.2   Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Unless changed by mutual written agreement of the parties, the fee schedule attached to this Agreement as Exhibit "A" shall serve as the basis for AERAS's compensation under Section 3.7 of this Agreement. AERAS agrees to participate in major third party payor plans and comply with participation agreements.

3.3   HMO's, PPO's, Workman's Comp., Etc. AERAS agrees to work with BMC in providing care through the Emergency Department for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with BMC to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups. Any participation by AERAS or its subcontractor physicians will be subject to AERAS' approval.

3.4   Cooperation with TEFRA Regulations. AERAS shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect BMC's reimbursement. AERAS shall do nothing, knowingly, which would adversely affect such reimbursement or BMC's Medicare/Medicaid provider status.

6

12-10-03   03:24pm   From-BAPTIST HEALTH   +334-273-4422   T-508   P.07/11   F-214

**AERAS 0956**

3.5    Changes in the Law or Regulations.   AERAS and BMC hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program. Should these limits or any other federal law or regulation affecting reimbursement for BMC or for AERAS under this Agreement be significantly changed during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

3.6    Final Payment.   In the event this Agreement is terminated as provided for herein, all rights of AERAS to compensation from BMC pursuant to Section 3.7 shall end as of the effective date of such termination, and BMC shall distribute to AERAS the sum, if any, due and owing for services rendered by AERAS as of the effective date of said termination and shall pay said sum within fifteen (15) days after the termination date.

3.7    Billing and Collection for Services to Patients.   BMC shall be responsible for the billing and collection of all professional fees for Services to Patients. AERAS shall provide sufficient information including diagnosis, professional service code and any other pertinent data to BMC to enable BMC to bill Patients for services provided by Emergency Physicians. The information supplied to BMC by AERAS may be released by BMC for billing purposes.

3.8    Remuneration.

(a)    City E.D. Days.   BMC will remit to AERAS 59% of the gross professional charges billed from the fee schedule attached as Exhibit A.

(b)    Non-City E.D. Days.   BMC will remit to AERAS 59% of the gross professional charges billed from the attached fee schedule, with a minimum guaranteed hourly rate of $85.00 per hour.

(c)    Accounting.   BMC shall render an accounting and make payment to AERAS for respective fees owed AERAS for services rendered to patients no longer than 10 days following the end of each month.

## GENERAL PROVISIONS

4.1    Access to Books and Records.   Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, AERAS shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If AERAS carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, AERAS agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) ( of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

4.2    Material Breach.   In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific

7

AERAS 0957

performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3     Regulatory Requirements. The Emergency Department shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over BMC. Emergency Department practices shall be in compliance with the policies and regulations of BMC, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Emergency Medicine.

4.4     Liability Insurance. During the term of this agreement, AERAS agrees that it and its Emergency Physicians who provide services in the Emergency Department will be covered by professional liability insurance in the amount of One Million Dollars ($1,000,000.) single limit each incident, and Three Million Dollars ($3,000,000.) annual aggregate. The liability insurance will be on a claims made basis. A certificate of insurance evidencing coverage will be submitted to BMC. AERAS shall furnish BMC with prompt written notice of cancellation or material change in its insurance coverage. Upon termination of this Agreement, AERAS shall purchase the Optional Extension Period Coverage, or similar *"tail"* policy, available to it under its professional liability insurance policy contemplated by this section. AERAS shall include in its agreement with its subcontracting physicians a requirement that such physicians purchase the Optional Extension Period Coverage upon termination of their services at BMC under this Agreement, however, AERAS shall not be liable to BMC or third parties for the failure of its subcontracting physicians to obtain such coverage. The aforesaid liability insurance shall be with a carrier or carriers acceptable to BMC.

4.5     Gender and Number. Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6     Captions. Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8     Waiver of Provisions. Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto. A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9     Acts of God. BMC is not obligated to compensate AERAS for services during periods in which AERAS is not performing its responsibilities under the Agreement because the Department is closed due to an Act of God.

4.10     Severability. The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11     Benefit of Successor. This Agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

8

AERAS 0958

4.12    Notices. All notices and other communications hereunder shall be in writing and shall be deemed sufficiently given if delivered personally, transmitted by facsimile which the sender's facsimile machine indicates has been sent (in the case of an addressee whose facsimile number is supplied), sent by Federal Express of similar courier, or mailed by registered or certified mail (return receipt requested), charges or postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

> (a)    if to AERAS, to:
>
> AERAS
> Attention: John D. Moorehouse, M.D.
> 4160 Carmichael Road, Suite 101
> Montgomery, Alabama 36106
> Fax: 205-272-1046
>
> (b)    if to BMC, to:
>
> William C. Bentley, Senior Vice President
> Baptist Medical Center
> 2105 East South Boulevard
> P. O. Box 11010
> Montgomery, Alabama  36111-0010

Unless otherwise provided, notices shall be effective on the earlier of (x) actual delivery, (y) the date of transmission, if by facsimile, or (z) as applicable, either (i) the first business day following the date of deposit with a qualified courier service or (ii) the third business day following the date of deposit with the United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail. Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13    Term. The term of this Agreement shall be one (1) year, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14    Termination. This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days written notice given by one party to the other.

4.15    Rights. No parties other than AERAS and BMC have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16    Entire Agreement. This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral. All amendments to the contract will be in writing and signed by authorized representatives of both parties.

4.17    Effective Date. This Agreement shall be in effect as of the date of execution of both parties.

9

AERAS 0959

BAPTIST MEDICAL CENTER

By: _William C Bentley_
William C. Bentley
Senior Vice President
Baptist Medical Center

Date: _9/8/92_

Witness: _Cathy G. Shriner_

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By: _John D Moorehouse_
John D. Moorehouse, M.D.
President
A.E.R.A.S.

Date: _8/28/92_

_Jeanie M. Shaw_

10

AERAS 0960

State of Alabama        )
                        :
Montgomery County  )

## *AMENDMENT ONE*

This ***Amendment One*** is made this 1st day of July, 2003, by and between ***Baptist Health***, an Alabama non-profit corporation, ***d/b/a Baptist Medical Center South*** (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and ***Alabama Emergency Room Administrative Services, P.C.***, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

### *W I T N E S S E T H*

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter "***Agreement***" with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

***Whereas***, AERAS has complied with and fulfilled the terms of its obligations under said ***Agreement*** through the date of its execution of this Amendment;

***Whereas***, BMCS has complied with and fulfilled the terms of its obligations under said ***Agreement*** through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said ***Agreement***.

***Therefore***, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1. Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

   a) Paragraph 3.2 is amended to read as follows:

      3.2    Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the ***Agreement*** as Exhibit "A" shall serve as the basis for AERAS compensation under

Page 1 of 3

**AERAS 0961**

Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements, provided that AERAS has consented and agreed in writing to comply with and participate in such plans prior to the time that AERAS' participation is required.

b)  Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)  BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b)  Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information and a copy of the ER record on said patients along with all other information including diagnosis and other pertinent information necessary to enable AERAS to bill patients for services provided by Emergency Room Physicians. The information supplied to AERAS by BMCS may be released by AERAS for billing purposes.

c)  Effective January 1, 2004, BMCS will pay AERAS an annual subsidy of Three Hundred Thousand and 00/100 Dollars ($300,000.00) payable in equal monthly installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00).

c)  Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8  Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

AERAS 0962

2.     Paragraph 4.12(b) is amended to read as follows:

4.12(b)         If to BMCS, to:     Robin Barca
                                    Senior Vice President/COO
                                    Baptist Health
                                    Post Office Box 244001
                                    Montgomery, Alabama 36124-4001

3.     The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

4.18    HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.     This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.     The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.     Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential. Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health**
**d/b/a Baptist Medical Center South**

_____
Randall L. Hoover
President/CEO

Date: 7/17/03

**Alabama Emergency Room Administrative**
**Services, P.C.**

_____
John D. Moorehouse, M.D.
President

Date: 7/18/03

Page 3 of 3

AERAS 0963

State of Alabama        )
                        :
Montgomery County  )

## *AMENDMENT ONE*

This *Amendment One* is made this 1st day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

### *WITNESSETH*

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter *"Agreement"* with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.    Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

    a)    Paragraph 3.2 is amended to read as follows:

        3.2    Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A" shall serve as the basis for AERAS compensation under

Page 1 of 3

**AERAS 0964**



Baptist Health

PO Box 244001
Montgomery, AL 36124-4001



JUN 2 6 2003



John Moorehouse, M.D.
*Alabama Emergency Room Administrative*
*Services, P.C.*
4160 Carmichael Road
Montgomery, Alabama  36106

AERAS 0965

B. Blaine Brown, III
General Counsel

 **Baptist**
HEALTH

Baptist Health

301 Brown Springs Road
PO Box 244001
Montgomery, AL 36124-4001
Tel  334-273-4410
Fax: 334-273-4422

June 25, 2003

John Moorehouse, M.D.
*Alabama Emergency Room Administrative Services, P.C.*
4160 Carmichael Road
Montgomery, Alabama  36106

Re:    Amendment to Emergency Room Services Agreement

Dear Dr. Moorehouse:

Pursuant to Mr. Hoover's request, I have enclosed an Amendment One to the existing "Emergency Room Services Agreement."  If you have no questions or problems with same, please execute both copies and return them to me for execution by Mr. Hoover.  Following execution, I will return a signed original for your records.  Should you have any questions, please contact Mr. Hoover at 273-4400.

Sincerely,

B. Blaine Brown, III
General Counsel

BBBIII/bh

Enclosures/as stated

**AERAS 0966**

State of Alabama    )

:

Montgomery County  )

## *AMENDMENT ONE*

This *Amendment One* is made this ____ day of June, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed to amend that Agreement as follows:

1.     Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

     a)    Paragraph 3.2 is amended to read as follows:

          3.2    Fee Schedule.  The parties shall maintain a mutually agreed upon schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. AERAS agrees to participate in major third party payor plans and comply with participation agreements.

     b)    Paragraph 3.6 is deleted in its entirety.

     c)    Paragraph 3.7 "Billing and Collection for Services to Patients" is amended to read as follows:

          3.7    Billing and Collection for Services to Patients.  AERAS shall be responsible for the billing and collection of all professionals fees for Services to Patients. BMCS shall make available to AERAS such information/documentation as shall be necessary to accomplish billing and collection services.

     d)    Paragraph 3.8 is deleted in its entirety and is replaced with the following:

          3.8    Subsidy to be Paid by BMCS. BMCS shall pay an annual subsidy of Three Hundred Thousand and 00/100 Dollars ($300,000.00), payable in equal monthly installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00) per month. Said subsidy is intended to cover the services at BMCS, Baptist Medical Center East and Prattville Baptist Hospital, and as such shall

Page 1 of 3

AERAS 0967

render null and void any subsidy language contained in those separate Agreements.

e.     To add numbered Paragraph 3.9 to read as follows:

3.9     Identification/Handling of Non-Emergent Patients Presenting to the ER's.     The parties hereto recognize the intent of Baptist Health hospital facilities to provide care to all patients presenting to their ER's with an emergent medical condition, notwithstanding their ability to pay for said care. At the same time, the parties hereto likewise recognize the inappropriate use of ER facilities for non-emergent medical conditions. Baptist Health has policies and procedures regarding the disposition/handling of patients presenting with non-emergent conditions. AERAS agrees to follow Baptist Health's policies and procedures and to assist Baptist Health in dealing with these patients.

Because of the impact of any failure to follow the aforementioned policies and procedures the parties agree as follows:

(1)     That in each month of this Agreement, Baptist Health shall randomly review cases from the ER's for the prior month.

(2)     Should there be a failure rate on following Baptist Health's procedures in excess of _____ percent of the cases reviewed for any month, then the subsidy payment as set forth in Paragraph 3.8 for the next month will be forfeited.

2.     Paragraph 4.12(b) is amended to read as follows:

4.12(b)          If to BMCS, to:          Robin Barca
                                          Senior Vice President/COO
                                          Baptist Health
                                          Post Office Box 244001
                                          Montgomery, Alabama 36124-4001

3.     This Amendment One shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

Page 2 of 3

AERAS 0968

4.    The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

5.    <u>Confidential Nature of Agreement</u>.    This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health**
**d/b/a Baptist Medical Center South**

**Alabama Emergency Room Administrative**
**Services, P.C.**

_____
Randall L. Hoover
President/CEO

Date:_____

_____
John D. Moorehouse, M.D.
President

Date:_____

Page 3 of 3

AERAS 0969

State of Alabama    )
                :
Montgomery County  )

## *AMENDMENT ONE*

This ***Amendment One*** is made this ___ day of June, 2003, by and between ***Baptist Health***, an Alabama non-profit corporation, ***d/b/a Baptist Medical Center South*** (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and ***Alabama Emergency Room Administrative Services, P.C.***, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed to amend that Agreement as follows:

1.     Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

    a)     Paragraph 3.2 is amended to read as follows:

        3.2     <u>Fee Schedule</u>. The parties shall maintain a mutually agreed upon schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. AERAS agrees to participate in major third party payor plans and comply with participation agreements.

    b)     Paragraph 3.6 is deleted in its entirety.

    c)     Paragraph 3.7 "Billing and Collection for Services to Patients" is amended to read as follows:

        3.7     <u>Billing and Collection for Services to Patients</u>. AERAS shall be responsible for the billing and collection of all professionals fees for Services to Patients. BMCS shall make available to AERAS such information/documentation as shall be necessary to accomplish billing and collection services.

    d)     Paragraph 3.8 is deleted in its entirety and is replaced with the following:

        3.8     <u>Subsidy to be Paid by BMCS</u>. BMCS shall pay an annual subsidy of Three Hundred Thousand and 00/100 Dollars ($300,000.00), payable in equal monthly installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00) per month. Said subsidy is intended to cover the services at BMCS, Baptist Medical Center East and Prattville Baptist Hospital, and as such shall

Page 1 of 3

**AERAS 0970**

render null and void any subsidy language contained in those separate Agreements.

e.    To add numbered Paragraph 3.9 to read as follows:

3.9    Identification/Handling of Non-Emergent Patients Presenting to the ER's.    The parties hereto recognize the intent of Baptist Health hospital facilities to provide care to all patients presenting to their ER's with an emergent medical condition, notwithstanding their ability to pay for said care.  At the same time, the parties hereto likewise recognize the inappropriate use of ER facilities for non-emergent medical conditions. Baptist Health has policies and procedures regarding the disposition/handling of patients presenting with non-emergent conditions. AERAS agrees to follow Baptist Health's policies and procedures and to assist Baptist Health in dealing with these patients.

Because of the impact of any failure to follow the aforementioned policies and procedures the parties agree as follows:

(1)    That in each month of this Agreement, Baptist Health shall randomly review cases from the ER's for the prior month.

(2)    Should there be a failure rate on following Baptist Health's procedures in excess of _____ percent of the cases reviewed for any month, then the subsidy payment as set forth in Paragraph 3.8 for the next month will be forfeited.

2.    Paragraph 4.12(b) is amended to read as follows:

4.12(b)        If to BMCS, to:        Robin Barca
                                        Senior Vice President/COO
                                        Baptist Health
                                        Post Office Box 244001
                                        Montgomery, Alabama 36124-4001

3.    This Amendment One shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

AERAS 0971

4.    The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

5.    <u>Confidential Nature of Agreement</u>.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health**
**d/b/a Baptist Medical Center South**

**Alabama Emergency Room Administrative**
**Services, P.C.**

_____
Randall L. Hoover
President/CEO

Date:_____

_____
John D. Moorehouse, M.D.
President

Date:_____

Page 3 of 3

**AERAS 0972**





**Baptist** HEALTH

Baptist Health

PO Box 244001
Montgomery, AL 36124-4001

RECEIVED
JUL - 3 2003

John Moorehouse, M.D.
Alabama Emergency Room Administrative
Services, P.C.
4160 Carmichael Road
Montgomery, Alabama 36106

36106+2066

AERAS 0973



**Baptist**
HEALTH

Randall L. Hoover
President and
Chief Executive Officer

Baptist Health

501 Brown Springs Road
PO Box 244001
Montgomery, AL 36124-4001
Tel.: 334-273-4400
Fax: 334-273-4407

July 1, 2003

John Moorehouse, M.D.
*Alabama Emergency Room Administrative Services, P.C.*
4160 Carmichael Road
Montgomery, Alabama 36106

Re:    Amendment to Emergency Room Services Agreement

Dear John:

I am in receipt of your letter of June 27, 2003, and the proposed Amendment to the Emergency Room Services Agreement. Your proposed changes have been reviewed and are basically acceptable. The only change that we will require will be in regards to the subsidy to be paid by BMCS. That subsidy will have to be paid on a monthly basis in installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00) per month. We are not agreeable to a one time payment as you proposed.

I have attached a revised draft Amendment for your review. It contains some housecleaning amendments as well to insure that we covered all appropriate areas in the original Agreement, including HIPAA.

If you have any questions after reviewing same, please call me.

Sincerely,

Randall L. Hoover
President/CEO

RLH/bh

Enclosures/as stated

AERAS 0974

State of Alabama       )
                       :
Montgomery County  )

## AMENDMENT ONE

This **Amendment One** is made this __/__ day of July, 2003, by and between **Baptist Health**, an Alabama non-profit corporation, **d/b/a Baptist Medical Center South** (hereinafter "BMCS"), formally d/b/a Baptist Medical Center, Montgomery, Alabama, and **Alabama Emergency Room Administrative Services, P.C.**, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

## WITNESSETH

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter "**Agreement**" with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

**Whereas**, AERAS has complied with and fulfilled the terms of its obligations under said **Agreement** through the date of its execution of this Amendment;

**Whereas**, BMCS has complied with and fulfilled the terms of its obligations under said **Agreement** through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said **Agreement**.

**Therefore**, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.    Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

a)    Paragraph 3.2 is amended to read as follows:

3.2    Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the **Agreement** as Exhibit "A" shall serve as the basis for AERAS compensation under

Page 1 of 3

AERAS 0975

Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements.

b)   Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)   BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b)   Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information and a copy of the ER record on said patients to enable AERAS to bill for services provided by Emergency Physicians. The information supplied to AERAS by BMCS may be released by AERAS for billing purposes.

c)   Effective January 1, 2004, BMCS will pay AERAS an annual subsidy of Three Hundred Thousand and 00/100 Dollars ($300,000.00) payable in equal monthly installments of Twenty Five Thousand and 00/100 Dollars ($25,000.00).

c)   Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8    Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

Page 2 of 3

**AERAS 0976**

2.    Paragraph 4.12(b) is amended to read as follows:

4.12(b)    If to BMCS, to:    Robin Barca
Senior Vice President/COO
Baptist Health
Post Office Box 244001
Montgomery, Alabama 36124-4001

3.    The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

4.18    HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.    This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.    The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.    Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential. Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health
d/b/a Baptist Medical Center South**

_____
Randall L. Hoover
President/CEO

Date: 7/1/03

**Alabama Emergency Room Administrative
Services, P.C.**

_____
John D. Moorehouse, M.D.
President

Date:_____

Page 3 of 3

**AERAS 0977**


**Baptist**
**HEALTH**

# MEMORANDUM

*Confidential – Attorney Work Product*

**TO:**       Jeannie Shaw
              AERAS

**FROM:**    Blaine Brown

**DATE:**     July 18, 2003

**SUBJECT:**  Amendment to ER Services Agreement

    I have enclosed two (2) copies of the Amendment modified to include your requested additions <u>and</u> the subsidy language. Upon reflection, I decided not to have the version your office sent over executed, less there be questions etc.

    Thank you for your help.

**AERAS 0978**



**AERAS**
**PrimeCare**

July 16, 2003

**HAND DELIVER**

Mr. Randall Hoover, CEO
Baptist Health
301 Brown Spring Road
Montgomery, AL 36117

Re:     **Amendment to Emergency Room Services, Agreement**

Dear Randy:

I am returning two signed originals of above referenced Amendment for execution with
your signature. You will also find enclosed a redlined copy highlighting the changes
made. Upon signing the agreement, please contact our office and we will be happy to
come by to pick up our copy.

I look forward to continuing a successful relationship with you and Baptist Health. As
always, please call if you have any questions.

Sincerely,

John D. Moorehouse, MD, FACEP
President


Enclosures



Cc:     Robin Barca
        Blaine Brown


**Emergency Medicine**     4160 Carmichael Road     (334) 272-1050     www.aeras.com *Website*
**& Urgent Care**          Suite 104                800-825-7421 *Toll-free*
                           Montgomery, AL  36106    (334) 271-7698 *Fax*

**AERAS 0979**



**AERAS**

**PrimeCare**

July 16, 2003

## HAND DELIVER

Mr. Randall Hoover, CEO
Baptist Health
301 Brown Spring Road
Montgomery, AL 36117

Re:    **Amendment to Emergency Room Services, Agreement**

Dear Randy:

I am returning two signed originals of above referenced Amendment for execution with
your signature. You will also find enclosed a redlined copy highlighting the changes
made. Upon signing the agreement, please contact our office and we will be happy to
come by to pick up our copy.

I look forward to continuing a successful relationship with you and Baptist Health. As
always, please call if you have any questions.

Sincerely,

John D. Moorehouse, MD, FACEP
President

Enclosures

Cc:    Robin Barca
       Blaine Brown

| | | | |
|---|---|---|---|
| **Emergency Medicine** | 4160 Carmichael Road | (334) 272-1050 | www.aeras.com *Website* |
| **& Urgent Care** | Suite 104 | 800-825-7421 *Toll-free* | |
| | Montgomery, AL  36106 | (334) 271-7698 *Fax* | |

**AERAS 0980**

redlined

State of Alabama                 )
                                 :
Montgomery County               )

### AMENDMENT ONE

This *Amendment One* is made this ____ day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formerly d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992.  The parties hereto have agreed as follows:

### *W I T N E S S E T H*

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter *"Agreement"* with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.    Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

    a)    Paragraph 3.2 is amended to read as follows:

        3.2    Fee Schedule.  The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department.  Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A"

Page 1 of 3

**AERAS 0981**

shall serve as the basis for AERAS compensation under
Section 3.7 (a) of this Amendment. Effective January 1,
2004, AERAS shall assume responsibility for billing for
their professional services and Exhibit "A" shall be null and
void. AERAS agrees to participate in major third party
payor plans and comply with participating agreements
~~provided that AERAS has consented and agreed in writing~~
~~to comply with and participate in such plans prior to the~~
~~time that AERAS participation is required.~~

b)    Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)    BMCS will, through December 31, 2003, be
responsible for the billing and collection of all professional fees for
services to patients. AERAS will provide sufficient information
including diagnosis, professional service code and any other
pertinent data to BMCS to enable BMCS to bill patients for
services provided by Emergency Physicians. The information
supplied to BMCS by AERAS may be released by BMCS for
billing purposes.

b)    Effective January 1, 2004, AERAS will be
responsible for the billing and collection of all professional fees for
services to patients. BMCS will provide available demographic
and insurance information, copies of the ER records ~~along with all~~
~~other information including diagnosis and other pertinent~~
~~information necessary~~ to enable AERAS to bill ~~patients~~ for
services rendered by Emergency ~~Room~~ Physicians. The
information supplied to AREAS by BMCS may be released by
AERAS for billing purposes.

c)    Paragraph 3.8 "Remuneration" is amended as to the
title as follows:

3.8    Remuneration Computation Through December 31,
2003.

The balance of Paragraph 3.8 remains unchanged.

2.    Paragraph 4.12(b) is amended to read as follows:

AERAS 0982

4.12(b)     If to BMCS, to:     Robin Barca
                                Senior Vice President/COO
                                Baptist Health
                                Post Office Box 244001
                                Montgomery, Alabama 36124-4001

3.     The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

4.18   HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.     This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.     The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.     Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

*Baptist Health*                      *Alabama Emergency Room Administrative*
*d/b/a Baptist Medical Center South*       *Services, P.C.*

_____        _____
Randall L. Hoover                   John D. Moorehouse, M.D.
President/CEO                        President

Date:_____             Date:_____

Page 3 of 3

**AERAS 0983**

4.12(b)        If to BMCS, to:        Robin Barca
                                      Senior Vice President/COO
                                      Baptist Health
                                      Post Office Box 244001
                                      Montgomery, Alabama 36124-4001

3.     The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

    4.18   HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.     This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.     The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.     Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health**
**d/b/a Baptist Medical Center South**

**Alabama Emergency Room Administrative**
**Services, P.C.**

_____
Randall L. Hoover
President/CEO

Date:_____

_____
John D. Moorehouse, M.D.
President

Date: 7/14/03

Page 3 of 3

**AERAS 0984**

State of Alabama            )
                            :
Montgomery County           )

### AMENDMENT ONE

This **Amendment One** is made this ____ day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formerly d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

### W I T N E S S E T H

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter *"Agreement"* with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.    Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

      a)    Paragraph 3.2 is amended to read as follows:

            3.2    Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A"

Page 1 of 3

AERAS 0985

shall serve as the basis for AERAS compensation under Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements provided that AERAS has consented and agreed in writing to comply with and participate in such plans prior to the time that AERAS' participation is required.

b)    Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)    BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b)    Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information, copies of the ER records along with all other information including diagnosis and other pertinent information necessary to enable AERAS to bill patients for services rendered by Emergency Room Physicians. The information supplied to AREAS by BMCS may be released by AERAS for billing purposes.

c)    Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8    Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

2.    Paragraph 4.12(b) is amended to read as follows:

Page 2 of 3

**AERAS 0986**

4.12(b)        If to BMCS, to:        Robin Barca
                                      Senior Vice President/COO
                                      Baptist Health
                                      Post Office Box 244001
                                      Montgomery, Alabama 36124-4001

3.      The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

4.18   HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.      This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.      The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.      Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

*Baptist Health*
*d/b/a Baptist Medical Center South*

_____
Randall L. Hoover
President/CEO

Date:_____

*Alabama Emergency Room Administrative Services, P.C.*

_____
John D. Moorehouse, M.D.
President

Date: 7/17/03

Page 3 of 3

**AERAS 0987**

| | |
|---|---|
| State of Alabama | ) |
| | : |
| Montgomery County | ) |

## AMENDMENT ONE

This *Amendment One* is made this ____ day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formerly d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

## *WITNESSETH*

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter *"Agreement"* with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

1.  Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

    a)  Paragraph 3.2 is amended to read as follows:

        3.2  Fee Schedule. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A"

Page 1 of 3

AERAS 0988

shall serve as the basis for AERAS compensation under Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements provided that AERAS has consented and agreed in writing to comply with and participate in such plans prior to the time that AERAS' participation is required.

b)    Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)    BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b)    Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information, copies of the ER records along with all other information including diagnosis and other pertinent information necessary to enable AERAS to bill patients for services rendered by Emergency Room Physicians. The information supplied to AREAS by BMCS may be released by AERAS for billing purposes.

c)    Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8    Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

2.    Paragraph 4.12(b) is amended to read as follows:

Page 2 of 3

4.12(b)      If to BMCS, to:     Robin Barca
Senior Vice President/COO
Baptist Health
Post Office Box 244001
Montgomery, Alabama 36124-4001

3.     The following new Paragraph 4.18 is added in compliance with Health Insurance Portability and Accountability Act of 1996 ("HIPAA") Regulations:

4.18   HIPAA Compliance.  AERAS agrees to adhere to all HIPAA Regulations including standards for privacy of individually identifiable health information, and to the modifications thereto.  As HIPAA continues to modify regulations, AERAS agrees to adhere to all required standards.

4.     This Amendment shall be effective July 1, 2003, notwithstanding the date of execution by the parties hereto.

5.     The balance of the Emergency Room Services Agreement dated September 8, 1992, except as amended/modified by this Amendment One shall remain in full force and effect.

6.     Confidential Nature of Agreement.  This Amendment One and the underlying Emergency Room Services Agreement contain information which has a competitive value and all such information is proprietary and confidential.  Both parties agree that without the written consent of the other party, they will not allow or cause disclosure to any third party except those persons (accountants, lawyers, etc.) who have a need to know, and such parties shall be bound by this confidentiality clause as well, or where disclosure is required by law.

**Baptist Health**
**d/b/a Baptist Medical Center South**

**Alabama Emergency Room Administrative**
**Services, P.C.**

_____

Randall L. Hoover
President/CEO

John D. Moorehouse, M.D.
President

Date:_____

Date: 7/19/03

Page 3 of 3

AERAS 0990

State of Alabama      )
                      :

Montgomery County   )

### *AMENDMENT ONE*

This *Amendment One* is made this ____ day of July, 2003, by and between *Baptist Health*, an Alabama non-profit corporation, *d/b/a Baptist Medical Center South* (hereinafter "BMCS"), formerly d/b/a Baptist Medical Center, Montgomery, Alabama, and *Alabama Emergency Room Administrative Services, P.C.*, an Alabama professional corporation (hereinafter referred to as "AERAS"), for the purpose of amending that "Emergency Room Services Agreement" dated September 8, 1992. The parties hereto have agreed as follows:

### *WITNESSETH*

On September 8, 1992, BMCS and AERAS entered into that certain Emergency Room Services Agreement (hereinafter *"Agreement"* with a copy of same being attached hereto and incorporated herein) wherein, AERAS agreed to provide staffing for the emergency department owned, operated and conducted by BMCS in Montgomery, Alabama.

*Whereas*, AERAS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment;

*Whereas*, BMCS has complied with and fulfilled the terms of its obligations under said *Agreement* through the date of its execution of this Amendment:

The Parties now wish to enter into this Amendment to provide for certain modifications to the said *Agreement*.

*Therefore*, BMCS and AERAS hereby enter into this Amendment effective as of the date set forth hereinabove, each acknowledging the consideration given to the other and each acknowledging and agreeing to the sufficiency thereof, agree to be bound as follows:

    1.    Section Three, "Fees, Billing, Collection and Remuneration" is amended as follows:

        a)    Paragraph 3.2 is amended to read as follows:

            3.2    <u>Fee Schedule</u>. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Through December 31, 2003, the Fee Schedule attached to the *Agreement* as Exhibit "A"

Page 1 of 3

AERAS 0991

shall serve as the basis for AERAS compensation under Section 3.7 (a) of this Amendment. Effective January 1, 2004, AERAS shall assume responsibility for billing for their professional services and Exhibit "A" shall be null and void. AERAS agrees to participate in major third party payor plans and comply with participating agreements provided that AERAS has consented and agreed in writing to comply with and participate in such plans prior to the time that AERAS' participation is required.

b)    Paragraph 3.7 is deleted in its entirety and replaced with the following:

Billing and Collection for Services to Patients.

a)    BMCS will, through December 31, 2003, be responsible for the billing and collection of all professional fees for services to patients. AERAS will provide sufficient information including diagnosis, professional service code and any other pertinent data to BMCS to enable BMCS to bill patients for services provided by Emergency Physicians. The information supplied to BMCS by AERAS may be released by BMCS for billing purposes.

b)    Effective January 1, 2004, AERAS will be responsible for the billing and collection of all professional fees for services to patients. BMCS will provide available demographic and insurance information, copies of the ER records along with all other information including diagnosis and other pertinent information necessary to enable AERAS to bill patients for services rendered by Emergency Room Physicians. The information supplied to AREAS by BMCS may be released by AERAS for billing purposes.

c)    Paragraph 3.8 "Remuneration" is amended as to the title as follows:

3.8    Remuneration Computation Through December 31, 2003.

The balance of Paragraph 3.8 remains unchanged.

2.    Paragraph 4.12(b) is amended to read as follows:

Page 2 of 3

AERAS 0992



SCHOOL OF
MEDICINE

*Montgomery Internal Medicine Residency Program*

*Returned to*
*Valerie*
*4803*
*(IW)*

## IMMEDIATE ATTENTION REQUESTED

March 25, 2003

### M E M O R A N D U M

COPY

TO:       All Clinical Faculty Physicians

FROM:   W. J. Many, Jr., M.D.        *Wick Many*
          Program Director

RE:       ACGME and HIPAA

The deadline for meeting the HIPAA privacy guidelines is on April 14, 2003. Recently the HHS made a ruling that the ACGME is a "covered entity" and as such must have Business Associate Agreements in place with all training facilities and physicians. Therefore each of our clinical faculty physicians is required to sign the enclosed agreement and return it as quickly as possible to meet the April 14th deadline. Also enclosed is the letter from the ACGME concerning the ruling from the HHS.

For those of you whose entire practice participates in our residency program, only one agreement is required between your practice and the ACGME. Please have one of your physicians sign the agreement on behalf of the entire practice.

Someone in our office will pick up the signed agreements in order to expedite this process. Please contact Valerie Jordan, Business Officer and HIPAA Compliance Officer, at 284-5211, ext. 259 to make these arrangements. Thank you for your immediate attention to this matter.

Enclosures:
    (1)    ACGME Letter
    (2)    ACGME Business Associate Agreement

4371 Narrow Lane Road, Ste 200
334.284.5211
Fax 334.284.9020
Toll Free 1.888.467.0765
www.uabmontgomery.org

The University of
Alabama at Birmingham
Mailing Address:
4371 NARROW LANE ROAD
MONTGOMERY AL 36116

AERAS 0993



SCHOOL OF
MEDICINE

*Montgomery Internal Medicine Residency Program*

## ACGME BUSINESS ASSOCIATE AGREEMENT

This Agreement governs the provision of Protected Health Information (PHI) (as defined in 45 C.F.R. §164.501) by **Alabama Emergency Room Physicians, PC** (Covered Entity) to Accreditation Council for Graduate Medical Education (Accrediting Entity or ACGME) for its use and disclosure in accrediting all graduate medical education programs conducted in whole or in part in Covered Entity facilities. The accreditation process for all graduate medical education programs is described in the "Manual of Policy and Procedures for ACGME Residency Review Committees" on the ACGME web site at www.acgme.org, and in documents referenced therein.

Whereas, Accrediting Entity provides certain accreditation-related services to the Covered Entity and, in connection with the provision of those services, the Covered Entity discloses to Accrediting Entity PHI that is subject to protection under the Health Insurance Portability and Accountability Act of 1996 (HIPAA);

Whereas, **Alabama Emergency Room Physicians, PC** is a "Covered Entity" as that term is defined in the HIPAA implementing regulations, 45 C.F.R. Part 160 and Part 164, Subparts A and E, the Standards for Privacy of Individually Identifiable Health Information ("Privacy Rule");

Whereas, the accrediting entity, as a recipient of PHI from Covered Entity, is a "Business Associate" of the Covered Entity as the term "Business Associate" is defined in the Privacy Rule;

Whereas, pursuant to the Privacy Rule, all Business Associates of Covered Entities must agree in writing to certain mandatory provisions regarding the use and disclosure of PHI; and

Whereas, the purpose of this Agreement is to comply with the requirements of the Privacy Rule, including, but not limited to, the Business Associate contract requirements at 45 C.F.R. §§164.502(e), 164.504(e), and as may be amended.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1. Definitions. Unless otherwise provided in this Agreement, capitalized terms have the same meanings as set forth in the Privacy Rule.

4371 Narrow Lane Road, Ste 200
334.284.5211
Fax 334.284.9020
Toll Free 1.888.467.0765
www.uabmontgomery.org

The University of
Alabama at Birmingham
Mailing Address:
4371 NARROW LANE ROAD
MONTGOMERY AL 36116

**AERAS 0994**

2. Scope of Use and Disclosure by Accrediting Entity of Protected Health Information

A.      Accrediting Entity shall be permitted to make Use and Disclosure of PHI that is disclosed to it by Covered Entity as necessary to perform its obligations under Accrediting Entity's established policies, procedures and requirements.

B.      Unless otherwise limited herein, in addition to any other Uses and/or Disclosures permitted or authorized by this Agreement or required by law, Accrediting Entity may:

        (1) use the PHI in its possession for its proper management and administration and to fulfill any legal responsibilities of Accrediting Entity;

        (2) disclose the PHI in its possession to a third party for the purpose of Accrediting Entity's proper management and administration or to fulfill any legal responsibilities of Accrediting Entity; provided, however, that the disclosures are Required By Law or Accrediting Entity has received from the third party written assurances that (a) the information will be held confidentially and used or further disclosed only as Required By Law or for the purposes for which it was disclosed to the third party; and (b) the third party will notify the Accrediting Entity of any instances of which it becomes aware in which the confidentiality of the information has been breached;

        (3) engage in Data Aggregation activities, consistent with the Privacy Rule; and

        (4) de-identify any and all PHI created or received by Accrediting Entity under this Agreement; provided, that the de-identification conforms to the requirements of the Privacy Rule.

3. Obligations of Accrediting Entity. In connection with its Use and Disclosure of PHI, Accrediting Entity agrees that it will:

A.      Use or further disclose PHI only as permitted or required by this Agreement or as required by law;

B.      Use reasonable and appropriate safeguards to prevent use or disclosure of PHI other than as provided for by this Agreement;

C.      To the extent practicable, mitigate any harmful effect that is known to Accrediting Entity of a use or disclosure of PHI by Accrediting Entity in violation of this Agreement;

AERAS 0995

D.    Promptly report to Covered Entity any Use or Disclosure of PHI not provided for by this Agreement of which Accrediting Entity becomes aware;

E.    Require contractors or agents to whom Accrediting Entity provides PHI to agree to the same restrictions and conditions that apply to Accrediting Entity pursuant to this Agreement;

F.    Make available to the Secretary of Health and Human Services Accrediting Entity's internal practices, books and records relating to the Use or Disclosure of PHI for purposes of determining Covered Entity's compliance with the Privacy Rule, subject to any applicable legal privileges;

G.    Within (15) days of receiving a request from Covered Entity, make available the information necessary for Covered Entity to make an accounting of Disclosures of PHI about an individual in a Designated Record Set;

H.    Within ten (10) days of receiving a written request from Covered Entity, make available PHI in a Designated Record Set necessary for Covered Entity to respond to individuals' requests for access to PHI about them that is not in the possession of Covered Entity;

I.    Within fifteen (15) days of receiving a written request from Covered Entity incorporate any amendments or corrections to the PHI in a Designated Record Set in accordance with the Privacy Rule;

J.    Not make any Disclosures of PHI that Covered Entity would be prohibited from making.

4. Obligations of Covered Entity. Covered Entity agrees that it:

    A.    Has included, and will include, in Covered Entity's Notice of Privacy Practices required by the Privacy Rule that Covered Entity may disclose PHI for health care operations purposes;

    B.    Has obtained, and will obtain, from Individuals any consents, authorizations and other permissions necessary or required by laws applicable to Covered Entity for Accrediting Entity and Covered Entity to fulfill their obligations under this Agreement;

    C.    Will promptly notify Accrediting Entity in writing of any restrictions on the Use and Disclosure of PHI about Individuals that Covered Entity has agreed

AERAS 0996

to that may affect Accrediting Entity's ability to perform its obligations under this Agreement;

D.    Will promptly notify Accrediting Entity in writing of any changes in, or revocation of, permission by an Individual to use or disclose PHI, if such changes or revocation may affect Accrediting Entity's ability to perform its obligations under this Agreement.

5. Termination.

A.    Termination for Cause. Upon Covered Entity's knowledge of a material breach by Accrediting Entity, Covered Entity shall either:

(1) provide an opportunity for Accrediting Entity to cure the breach or end the violation and terminate this Agreement if Accrediting Entity does not cure the breach or end the violation within the time specified by Covered Entity;
(2) immediately terminate this Agreement if Accrediting Entity has breached a material term of this Agreement and cure is not possible; or
(3) if neither termination nor cure are feasible, Covered Entity shall report the violation to the Secretary.

B.    Automatic Termination. This Agreement will automatically terminate upon the cessation of Covered Entity's conducting accredited activities in all Covered Entity facilities.

C.    Effect of Termination.

(1) Termination of this Agreement will result in cessation of Covered Entity's conducting accredited activities in all Covered Entity facilities.

(2) Upon termination of this Agreement, Accrediting Entity will return or destroy all PHI received from Covered Entity or created or received by Accrediting Entity on behalf of Covered Entity that Accrediting Entity still maintains and retain no copies of such PHI; provided that if such return or destruction is not feasible, Accrediting Entity will extend the protections of this Agreement to the PHI and limit further Use and Disclosure to those purposes that make the return or destruction of the information infeasible.

AERAS 0997

6. Amendment. Accrediting Entity and Covered Entity agree to take such action as is necessary to amend this Agreement for Covered Entity to comply with the requirements of the Privacy Rule or other applicable law.

7. Survival. The obligations of Accrediting Entity under section 5.C.(2) of this Agreement shall survive any termination of this Agreement.

8. No Third Party Beneficiaries. Nothing express or implied in this Agreement is intended to confer, nor shall anything herein confer, upon any person other than the parties and their respective successors or assigns, any rights, remedies, obligations or liabilities whatsoever.

9. Other Applicable Law. This Agreement does not, and is not intended to, abrogate any responsibilities of the parties under any other applicable law.

10. Effective Date. This Agreement shall be effective on the date of execution by Covered Entity.

**Alabama Emergency Room Physicians, PC**
**Name Of Covered Entity**

By: _____

Name: PAUL K. TANAKA, MD

Title: VICE PRESIDENT

Date: 4-7-03

**ACGME**

By: _____

Name: David C. Leach, M.D.

Title: Executive Director

Date: 02/17/2003

**ACGME 6 Digit Sponsoring**
**Institution Number**
**01-0498 – University of Alabama Hospital**

AERAS 0998



**ACGME**

Accreditation Council
for Graduate Medical
Education

515 N. State St., Suite 2000
Chicago, IL 60610
(312) 464-4920
FAX: (312) 464-4098

March 13, 2003 (Revised)

To: Designated Institutional Officials of ACGME Accredited Programs

From: David C. Leach, M.D., Executive Director, ACGME

Subject: HIPAA Compliance

As you may be aware, the Privacy Rule promulgated by the U.S. Department of Health and Human Services (HHS) under the Health Insurance Portability and Accountability Act (HIPAA) requires each covered health care provider to enter into a "business associate" agreement with an accrediting agency before the covered health care provider may provide the accrediting agency with access to the provider's "Protected Health Information" (PHI) during accreditation activities.

During the rule-making process, ACGME and other accrediting agencies urged HHS to place accreditation in a Privacy Rule category that does not require business associate agreements. ACGME argued (1) that it already maintains and enforces a confidentiality policy relating to information disclosed during the accreditation process, including PHI, and (2) that, as it is headquartered in Illinois, it is subject to the Illinois peer review statute, which makes it a misdemeanor to disclose, in violation of the statute, information obtained during the accreditation process. These arguments failed to persuade HHS, and accrediting agencies are business associates under the Privacy Rule.

As ACGME does require access to PHI on occasion during its accreditation activities, ACGME intends to enter into business associate agreements with each of its sponsoring institutions and clinical sites that is a "covered entity" under the Privacy Rule.

To accomplish this, ACGME has created one standard form business associate agreement for use with each sponsoring institution, participating institution, and clinical site (form business associate agreement available on ACGME website).

The form is the same as the single business associate agreement that ACGME is about to enter into with the Veterans Health Administration (VHA) for all VHA facilities, and which VHA intends to use with all of its educational and non-educational accrediting agencies. The form is patterned after the form business associate agreement used by the Joint Commission on Accreditation of Healthcare Organizations. Use of a form agreement is consistent with the December 3, 2002 Privacy Rule "guidance" issued by HHS. HHS/OCR has approved the concept of VHA's entering into one business associate agreement with ACGME, because, although VHA facilities at various locations are sponsors and/or clinical sites of ACGME accredited residency programs, VHA is one, unitary covered entity. It is ACGME's understanding that this concept applies, not just to VHA, but to any one, unitary covered entity with multiple facilities.

Member Organizations

American Board of Medical
Specialties
Suite 404
1007 Church Street
Evanston, IL 60201

American Hospital Association
One North Franklin
Chicago, IL 60606

American Medical Association
515 North State Street
Chicago, IL 60610

Association of American
Medical Colleges
2450 N Street N.W.
Washington, D.C. 20037

Council of Medical
Specialty Societies
Suite M
51 Sherwood Terrace
Lake Bluff, IL 60044-2252

**AERAS 0999**

Utilizing this standard form agreement ensures the following:

- A sponsoring institution of one or more programs will have only one business associate agreement with ACGME;
- A sponsoring institution of one or more programs that is also a participating institution or clinical site of one or more other programs will have only one business associate agreement with ACGME;
- A participating institution of one or more programs that is also a sponsoring institution or clinical site of one or more other programs will have only one business associate agreement with ACGME; and
- A clinical site of one or more programs that is also a sponsoring institution or participating institution of one or more other programs will have only one business associate agreement with ACGME.

In order for ACGME to enter into business associate agreements with all sponsoring institutions, participating institutions, and clinical sites that are "covered entities" under the Privacy Rule, the following needs to happen:

- The Designated Institutional Official for each sponsoring institution will be responsible for obtaining ACGME business associate agreements executed by the sponsoring institution, all co-sponsors, all participating institutions, and all clinical sites of all programs that the sponsoring institution sponsors (this is limited to "covered entities;" see paragraph immediately following these bullet points);
- The Designated Institutional Official will send ACGME the business associate agreement executed by the sponsoring institution to ACGME;
- The Designated Institutional Official will be responsible for executing and sending to ACGME a representation that all "covered entity" co-sponsors, participating institutions, and clinical sites of all programs that the institution sponsors have executed ACGME business associate agreements, and that each new "covered entity" co-sponsor, participating institution and clinical site will execute an ACGME business associate agreement (only one representation form needs to be submitted to ACGME, but the representation states that, as new "covered entity" co-sponsors, participating institutions, and clinical sites are added, they will execute ACGME business associate agreements); and
- ACGME business associate agreements with co-sponsors, participating institutions and clinical sites will be maintained by each sponsoring institution, with ACGME access on site visits or otherwise.

A sponsoring institution, participating institution or clinical site may determine (1) that, in such role, it is not a covered entity under the Privacy Rule, and (2) that it is unnecessary for it to enter into a business associate agreement with ACGME in order for it to give ACGME accreditation access to any PHI in its control subject to the confidentiality and other provisions of ACGME policies and procedures. In this case,

**AERAS 1000**

a business associate agreement between ACGME and a sponsoring institution, participating institution or clinical site is unnecessary.

ACGME requires that the Designated Institutional Official send two documents. (1) an executed ACGME business associate agreement from the sponsoring institution and (2) a signed representation form, to ACGME on or before April 14, 2003. Both of these forms are available on the ACGME website. These should be addressed to HIPAA Compliance office, Accreditation Council for Graduate Medical Education, 515 N. State Street, Suite 2000, Chicago, Illinois, 60610. Upon ACGME receipt of both the executed business associate agreement and the executed representation form, an email confirming receipt of same will be sent to the Designated Institutional Official of the sponsoring institution. PLEASE ONLY RETURN THE TWO DOCUMENTS REQUESTED.

The ACGME focus in this endeavor is its ability to perform its accreditation function. If, after April 14, 2003, the lack of a business associate agreement from a sponsoring institution, participating institution or clinical site impedes this ability, relating to a site visit, the resident Case logs, or otherwise, this will be brought to the attention of the RRC or IRC, as appropriate. The RRC or IRC will then determine the course of action to take, up to and including adverse accreditation action.

Questions can be sent to hipaa@acgme.org, or visit the ACGME website, under HIPAA AGREEMENTS for frequently asked questions.

ACGME thanks you all for your assistance in this important compliance endeavor.


Sincerely,

David C. Leach, M.D.
ACGME
Executive Director

STATE OF ALABAMA

MONTGOMERY COUNTY

## EMERGENCY ROOM SERVICES AGREEMENT

    This Agreement is entered into by and between Baptist Medical Center, Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "BMC") and Alabama Emergency Room Administrative Services, P.C., an Alabama professional corporation (hereinafter referred to as "AERAS").

### WITNESSETH:

    BMC operates an Emergency Department located in its facility in Montgomery, Alabama, (hereinafter referred to as "Emergency Department"), which requires the professional medical services of physicians. BMC has determined that in order to insure the proper and efficient operation of the Emergency Department that several objectives must be met, including but not limited to, 24 hour physician coverage, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in recordkeeping, and quality patient care; and,

    WHEREAS, AERAS is capable and willing to provide physicians (hereinafter referred to as "Emergency Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the BMC Medical Staff, and receive privileges to practice in the Emergency Department; and, AERAS can assure that the Emergency Physicians they provide shall accept responsibility to provide emergency services in the Emergency Department; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of BMC, and the terms and conditions set forth in this Agreement;

    THEREFORE, BMC and AERAS desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the Emergency Department, and agree as follows:

### AERAS' COMMITMENTS

    1.1    <u>Physician Staffing</u>. AERAS shall provide physician staffing for the Emergency Department through duly licensed and qualified Emergency Physicians on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week for the duration of this Agreement. A second physician will be provided during peak patient flow periods on City ER days and at such other times as shall be mutually identified by BMC and AERAS.

    AERAS will provide Emergency Physicians who, at a minimum, shall be Board Eligible in Emergency Medicine or Board Eligible/Certified in a primary specialty with experience in emergency medicine. All Emergency Physicians provided by AERAS shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Emergency Physicians and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Emergency Physicians furnished by AERAS will provide care to all individuals who present themselves to the Emergency Department in need of service.

1

AERAS 1002

AERAS shall maintain a daily log to be kept in the Emergency Department indicating the identity of the physician or physicians on duty and the times they were present. This log shall be open to inspection by BMC at any time.

Every Emergency Department Physician shall be certified in Advanced Cardiac Life Support and shall seek certification in Advanced Trauma Life Support. Emergency Physicians shall not begin rendering services in the Emergency Department until he or she has been fully credentialed by BMC as provided herein.

1.2    Medical Staff Privileges.

(a)    Procedure. Each Emergency Physician provided by AERAS shall apply for medical privileges in Emergency Medicine and must obtain approval for appropriate Medical Staff membership in accordance with BMC policies and procedures and the Medical Staff Bylaws, except in unusual or unforeseen circumstances, as described herein. Physician credentials shall be forwarded to BMC by AERAS in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at BMC. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Temporary Medical Staff Privileges. Notwithstanding any other provision in this agreement, it is understood that, on occasion, temporary Medical Staff Privileges may be requested by AERAS due to unusual or unforeseen circumstances. In such instances, temporary Medical Staff Privileges may be granted by BMC officials in accordance with Medical Staff Bylaws.

(c)    Responsibilities of Emergency Physician. Each Emergency Physician provided by AERAS shall have the same responsibilities as other members of the Medical Staff including attendance at medical staff and committee meetings in accordance with Medical Staff Bylaws.

1.3    Independent Contractors. In the performance of emergency medical services hereunto, AERAS and Emergency Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BMC. Neither AERAS nor Emergency Physicians performing services for AERAS under this Agreement, whether said Emergency Physicians be members, partners, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BMC for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group. AERAS shall maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis. Full time Emergency Physicians are expected to live in the area. For good cause, BMC shall have the right to refuse any physician which AERAS proposes to use in the Emergency Department and/or to request the removal of any AERAS Emergency Physician, provided, however, that AERAS has been given adequate notice and an opportunity to cure any problems concerning a particular physician.

1.5    Emergency Medical Director. AERAS shall designate an Emergency Medical Director. The Emergency Medical Director shall, at a minimum, be Board Certified in his/her area of practice and also be Board Eligible in Emergency Medicine. The Emergency Medical Director shall work full time in the Emergency Department and shall devote his/her best efforts to the proper management of Emergency Physicians and the Emergency Department staff as well as the professional and medical issues which involve the Emergency Department. BMC shall have the right to participate in the selection process and approve the individual selected by AERAS as the Medical Director.

2

AERAS 1003

The Emergency Medical Director shall be responsible for the following:

(a)     Clinical direction of the ~~Emergency Department~~. *Hospital ER*

(b)     Act as a liaison between AERAS and BMC.

(c)     Act as a liaison between the ~~Emergency Physicians~~ *Hospital* and the BMC Medical Staff. *or patients*

(d)     Attend all ~~Emergency Department~~ *Critical Care* section meetings and any medical staff committee meetings to which he/she is assigned.

(e)     Represent the ~~Emergency Department~~ *Hosp. to* to the community.

(f)     Assist in the coordination of disaster planning.

(g)     Assist in the preparation of the ~~Emergency Department~~ *Hos JAH* for JCAHO and State Accreditation surveys.

(h)     Review and implement medical protocols for the Emergency Department. *Hospi Prog*

(i)     Coordinate the Quality Assurance Program within the Emergency Department. *Hosp*

(j)     Monitor the quality of care delivered in the Emergency Department in accordance with the BMC Quality Assurance Plan.

(k)     Assist in the education and training on an initial and ongoing basis, of Emergency Department personnel.

(l)     Orient new Emergency Department physicians.

(m)     Coordinate the Emergency Department physicians schedule and publish same.

(n)     Assure continual Emergency Department coverage.

(o)     Work with Medical Staff of Hospital for scheduling an adequate call-in schedule for specialty and sub-specialty physicians.

(p)     Evaluate the performance of physicians working in the Emergency Department.

(q)     Deal with complaints, in conjunction with Nursing staff, ancillary personnel and BMC officials, regarding Emergency Department services and/or incidents of alleged suboptimal performance.

(r)     Coordinate the establishment of Emergency Services at BMC as a fully functional Emergency Department.

(s)     Advise and assist in coordination of public relations and marketing decisions regarding emergency services in the Emergency Department.

3

AERAS 1004

1.6    <u>Treatment and Patient Referral</u>. All patients presenting to the Emergency Department will be treated by the Emergency Physician on duty, unless the patient requests to see or has been sent to the Emergency Department by his/her private physician.

When a patient presents to the Emergency Department and requests his/her private physician, all reasonable efforts will be made to contact the private physician. Once contacted, the private physician shall be advised of the patients presentation to the Emergency Department and their condition/complaints. The private physician shall have the option of coming in to see the patient, or having the Emergency Physician on duty see the patient.

If the patient does not have a private physician, or if the private physician cannot be contacted within a reasonable period of time, or if for any reason the private physician does not assume responsibility for the said patient, then the Emergency Physician shall see the patient. If the patient's condition warrants hospitalization or definitive specialized care, the Emergency Department physician shall refer the patient to the appropriate staff physician on-call, or shall arrange a transfer or referral, as appropriate.

No patient will be triaged out of the Emergency Department without a medical screening examination by the Emergency Physician.

1.7    <u>Admission Privileges.</u>  Emergency Physicians will not have admission privileges.

1.8    <u>Non Discrimination</u>. AERAS shall not discriminate against any Emergency Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.9    <u>Personal Expenses</u>. AERAS and Emergency Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.10    <u>No Authority to Commit BMC</u>. AERAS shall incur no financial obligation on behalf of BMC without prior written approval of BMC.

1.11    <u>Quality and Risk Management</u>. AERAS will provide a continuing review and an annual evaluation of the professional performance of each physician assigned to the BMC Emergency Department pursuant to this Agreement. BMC shall participate in such annual evaluation. Physician evaluations shall be shared with the appropriate BMC committee as part of their peer review process. AERAS will further implement BMC's current hospital quality improvement plan.

1.12    <u>Utilization Review</u>. AERAS will assist in the Utilization Review Program by monitoring admissions to BMC from the Emergency Department and by evaluating the appropriateness of such admissions according to established criteria.

1.13    <u>Staff Education</u>. Emergency Physicians will, without compensation, assist the hospital in providing educational programs for BMC's nursing, physician and ancillary staffs.

1.14    <u>EMS/ALS</u>. AERAS agrees to provide on-line medical direction for all calls made to the Emergency Department by an EMS/ALS unit. The Emergency Physician shall monitor patient data transmitted to the Emergency Department from the ambulance unit via telemetry or other means of communication and provide appropriate medical direction.

1.15    <u>Evaluation</u>. AERAS shall meet with BMC Administration on a quarterly basis to determine the level of attainment of stated goals and to discuss any problem areas, and for review of the operation of the Emergency Department.

**AERAS 1005**

1.16    Codes. Emergency Physicians shall be available for all emergencies or "codes" occurring in-house whenever their response will not endanger an Emergency Department patient.

1.17    AERAS and BMC agree to cooperate in resolving all claims and litigation which may arise out of the providing of Emergency Department services by AERAS. Emergency Physicians and/or the Medical Director will personally respond to patient complaints/ problems and as requested by the Emergency Department head nurse.

1.18    Guest Relations. AERAS agrees to work with BMC to stress guest relations techniques and patient satisfaction.

1.19    BMC Employee Injuries. AERAS agrees to treat BMC's employees with work related injuries (i.e., workman's compensation cases) at no cost to BMC and where appropriate, to refer employees to physician specialists designated by BMC.

1.20    Marketing. AERAS agrees to make reasonable efforts to support, participate in, and submit input into BMC's marketing program.

## BMC COMMITMENTS

2.1    Facilities and Supplies. BMC shall make available during the term of this Agreement the space designated for the Emergency Department and such equipment as is required for the proper operation and conduct of the Emergency Department. BMC shall provide said Emergency Department with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the department. The supplies necessary will be determined by the Medical Director and BMC Administration. AERAS shall inform BMC of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    Transcription of Records. BMC will provide a transcription of all dictated medical records of patients treated by AERAS on a timely basis.

2.3    X-Ray. BMC shall make a reasonable effort to provide a dedicated x-ray procedure room and to provide an x-ray technician for Emergency Department use.

2.4    Lab. BMC shall provide a phlebotomist for the Emergency Department, to work a schedule mutually agreed to by the Emergency Medical Director and BMC.

2.5    Telephone. BMC shall make a reasonable effort to install a remote phone system for On-Line Medical Control for pre-hospital care.

2.6    Patient Monitoring.    BMC shall establish dedicated patient monitoring for blood pressure, pulse, EKG, and oxygen saturation.

2.7    Personnel.

    (a)    All non-physician personnel required for the proper operation of the Emergency Department shall be employed or assigned by BMC. Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by BMC. All Emergency Department personnel shall be trained and qualified in emergency medicine services and shall be capable of performing their

AERAS 1006

assigned responsibilities. All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of BMC.

(b) <u>Nursing Staff</u>. BMC will make a reasonable effort to have all full time Emergency Department registered nurses ACLS and TNCC (Trauma Nurse Care Curriculum) certified. BMC nursing shall work with Emergency Department physicians following established emergency care protocols.

2.8 <u>Physician Room</u>. BMC shall make available a room within the Emergency Department, containing a bed, lockers, desk, lamp, telephone, television, video machine, dictation equipment, and a personal computer terminal to access the Micromedex data base.

2.9 <u>Assurance</u>. During the term of this Agreement, BMC shall not contract with any other physicians or entities for the services performed by Emergency Physicians assigned to BMC through AERAS and this Agreement.

## FEES, BILLING, COLLECTION AND REMUNERATION

3.1 <u>Definitions</u>. For the purpose of this section, the following definitions shall apply:

(a) Services to Patients: Those services of Emergency Physicians which:
   (i)    are personally furnished to a patient by Emergency Physicians.
   (ii)   contribute directly to the diagnosis or treatment of the patient; and
   (iii)  ordinarily require performance by a physician.

(b) Services to Hospital: Those services of AERAS and/or Emergency Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in BMC; e.g., administrative and supervisory services shall be performed at no charge to BMC.

3.2 <u>Fee Schedule</u>. The parties shall maintain a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department. Unless changed by mutual written agreement of the parties, the fee schedule attached to this Agreement as Exhibit "A" shall serve as the basis for AERAS's compensation under Section 3.7 of this Agreement. AERAS agrees to participate in major third party payor plans and comply with participation agreements.

3.3 <u>HMO's, PPO's, Workman's Comp., Etc</u>. AERAS agrees to work with BMC in providing care through the Emergency Department for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with BMC to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups. Any participation by AERAS or its subcontractor physicians will be subject to AERAS' approval.

3.4 <u>Cooperation with TEFRA Regulations</u>. AERAS shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect BMC's reimbursement. AERAS shall do nothing, knowingly, which would adversely affect such reimbursement or BMC's Medicare/Medicaid provider status.

6

AERAS 1007

      3.5      <u>Changes in the Law or Regulations.</u>  AERAS and BMC hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program. Should these limits or any other federal law or regulation affecting reimbursement for BMC or for AERAS under this Agreement be significantly changed during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

      3.6      <u>Final Payment.</u>  In the event this Agreement is terminated as provided for herein, all rights of AERAS to compensation from BMC pursuant to Section 3.7 shall end as of the effective date of such termination, and BMC shall distribute to AERAS the sum, if any, due and owing for services rendered by AERAS as of the effective date of said termination and shall pay said sum within fifteen (15) days after the termination date.

      3.7      <u>Billing and Collection for Services to Patients.</u>  BMC shall be responsible for the billing and collection of all professional fees for Services to Patients. BMC shall provide sufficient information including diagnosis, professional service code and any other pertinent data to BMC to enable BMC to bill Patients for services provided by Emergency Physicians. The information supplied to BMC by AERAS may be released by BMC for billing purposes.

      3.8      <u>Remuneration.</u>

      (a)      <u>City E.D. Days.</u>  BMC will remit to AERAS 59% of the gross professional charges billed from the fee schedule attached as Exhibit A.

      (b)      <u>Non-City E.D. Days.</u>  BMC will remit to AERAS 59% of the gross professional charges billed from the attached fee schedule, with a minimum guaranteed hourly rate of $85.00 per hour.

      (c)      <u>Accounting.</u>  BMC shall render an accounting and make payment to AERAS for respective fees owed AERAS for services rendered to patients no longer than <u>10</u> days following the end of each month.

## GENERAL PROVISIONS

      4.1      <u>Access to Books and Records.</u>  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, AERAS shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If AERAS carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, AERAS agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) ( of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

      4.2      <u>Material Breach.</u>  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific

7

AERAS 1008

performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    Regulatory Requirements. The Emergency Department shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over BMC. Emergency Department practices shall be in compliance with the policies and regulations of BMC, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Emergency Medicine.

4.4    Liability Insurance. During the term of this agreement, AERAS agrees that it and its Emergency Physicians who provide services in the Emergency Department will be covered by professional liability insurance in the amount of One Million Dollars ($1,000,000.) single limit each incident, and Three Million Dollars ($3,000,000.) annual aggregate. The liability insurance will be on a claims made basis. A certificate of insurance evidencing coverage will be submitted to BMC. AERAS shall furnish BMC with prompt written notice of cancellation or material change in its insurance coverage. Upon termination of this Agreement, AERAS shall purchase the Optional Extension Period Coverage, or similar "tail" policy, available to it under its professional liability insurance policy contemplated by this section. AERAS shall include in its agreement with its subcontracting physicians a requirement that such physicians purchase the Optional Extension Period Coverage upon termination of their services at BMC under this Agreement, however, AERAS shall not be liable to BMC or third parties for the failure of its subcontracting physicians to obtain such coverage. The aforesaid liability insurance shall be with a carrier or carriers acceptable to BMC.

4.5    Gender and Number. Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6    Captions. Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8    Waiver of Provisions. Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto. A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9    Acts of God. BMC is not obligated to compensate AERAS for services during periods in which AERAS is not performing its responsibilities under the Agreement because the Department is closed due to an Act of God.

4.10    Severability. The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor. This Agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

AERAS 1009

4.12  Notices. All notices and other communications hereunder shall be in writing and shall be deemed sufficiently given if delivered personally, transmitted by facsimile which the sender's facsimile machine indicates has been sent (in the case of an addressee whose facsimile number is supplied), sent by Federal Express of similar courier, or mailed by registered or certified mail (return receipt requested), charges or postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(a)    if to AERAS, to:

AERAS
Attention: John D. Moorehouse, M.D.
4160 Carmichael Road, Suite 101
Montgomery, Alabama 36106
Fax: 205-272-1046

(b)    if to BMC, to:

William C. Bentley, Senior Vice President
Baptist Medical Center
2105 East South Boulevard
P. O. Box 11010
Montgomery, Alabama  36111-0010

Unless otherwise provided, notices shall be effective on the earlier of (x) actual delivery, (y) the date of transmission, if by facsimile, or (z) as applicable, either (i) the first business day following the date of deposit with a qualified courier service or (ii) the third business day following the date of deposit with the United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail. Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13  Term. The term of this Agreement shall be one (1) year, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14  Termination. This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days written notice given by one party to the other.

4.15  Rights. No parties other than AERAS and BMC have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16  Entire Agreement. This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral. All amendments to the contract will be in writing and signed by authorized representatives of both parties.

4.17  Effective Date. This Agreement shall be in effect as of the date of execution of both parties.

9

AERAS 1010

BAPTIST MEDICAL CENTER

By: _William C. Bentley_
    William C. Bentley
    Senior Vice President
    Baptist Medical Center

Date: _9/8/92_

Witness: _Cathy G. Garner_

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By: _John D. Moorehouse_
    John D. Moorehouse, M.D.
    President
    A.E.R.A.S.

Date: _8/28/92_

_Jeanie M. Shaw_

10

AERAS 1011

STATE OF ALABAMA

MONTGOMERY COUNTY

## EMERGENCY DEPARTMENT SERVICES AGREEMENT

This Agreement is entered into by and between Baptist Medical Center d/b/a Baptist Medical Center Downtown, Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "BMCD") and Alabama Emergency Room Administrative Services, P.C., an Alabama professional corporation (hereinafter referred to as "AERAS").

### WITNESSETH:

BMCD operates an Emergency Department located in its acute care hospital facility in Montgomery, Alabama, (hereinafter referred to as "Emergency Department"), which requires the professional medical services of physicians. BMCD has determined that in order to ensure the proper and efficient operation of the Emergency Department that several objectives must be met, including but not limited to, 24 hour physician coverage, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in record keeping, and quality patient care; and,

WHEREAS, AERAS is capable and willing to provide physicians (hereinafter referred to as "Emergency Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the BMCD Medical Staff, and receive privileges to practice in the Emergency Department; and, AERAS can assure that the Emergency Physicians they provide shall accept responsibility to provide professional medical services in the Emergency Department; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of BMCD, and the terms and conditions set forth in this Agreement;

THEREFORE, BMCD and AERAS desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the Emergency Department, and agree as follows:

### AERAS' COMMITMENTS

1.1    Physician Staffing. AERAS shall provide physician staffing for the Emergency Department through duly licensed and qualified Emergency Physicians on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week for the duration of this Agreement.

AERAS will provide Emergency Physicians who shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical

1

**AERAS 1012**

standards and in accordance with the rules and regulations of the American College of Emergency Physicians and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Emergency Physicians furnished by AERAS will provide care to all individuals who present themselves to the Emergency Department in need of service.

AERAS shall maintain a daily log to be kept in the Emergency Department indicating the identity of the physician or physicians on duty and the times they were present. This log shall be open to inspection by BMCD at any time.

Every Emergency Room Physician shall be certified in Advanced Cardiac Life Support and shall seek certification in Advanced Trauma Life Support. Emergency Physicians shall not begin rendering services in the Emergency Department until he or she has been fully credentialed by BMCD.

1.2    Medical Staff Privileges

(a)    Procedure. Each Emergency Physician provided by AERAS shall apply for medical privileges in Emergency Medicine and must obtain approval for appropriate Medical Staff membership in accordance with BMCD polices and procedures and the Medical Staff Bylaws, except in unusual or unforeseen circumstances, as described herein. Physician credentials shall be forwarded to BMCD by AERAS in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at BMCD. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Responsibilities of Emergency Physicians. Each Emergency Physician provided by AERAS shall have the same responsibilities as other members of the Medical Staff including attendance at Medical Staff and Committee meetings in accordance with the Medical Staff Bylaws.

1.3    Independent Contractors. In the performance of emergency medical services hereunto, AERAS and Emergency Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BMCD. Neither AERAS nor Emergency Physicians performing services for AERAS under this Agreement, whether said Emergency Physicians be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BMCD for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group. AERAS shall maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis. Full-time Emergency Physicians are expected to live in the area. For good cause, BMCD shall have the right to refuse any physician which AERAS proposes to use in the Emergency Department and/or to request the

2

AERAS 1013

removal of any AERAS Emergency Physician, provided, however, that AERAS has been given at least thirty (30) days notice and an opportunity to cure any problems concerning a particular Physician.

     1.5    Emergency Medical Director.  AERAS shall designate an Emergency Medical Director. The Emergency Medical Director shall, at a minimum, be Board Certified in his/her area of practice and also be Board Eligible in Emergency Medicine.  The Emergency Medical Director shall work full time in the Emergency Department and shall devote his/her best efforts to the proper management of Emergency Physicians and the professional and medical issues which involve the Emergency Department. BMCD shall have the right to participate in the selection process and approve the individual selected by AERAS as the Medical Director.

The Emergency Medical Director shall be responsible for the following:

(a)    Clinical direction of the Emergency Department.

(b)    Act as a liaison between AERAS and BMCD.

(c)    Act as a liaison between the Emergency Physicians and the BMCD Medical Staff.

(d)    Attend all Emergency Department section meetings and any medical staff committee meetings to which he/she is assigned.

(e)    Represent the Emergency Department to the community.

(f)    Assist in the coordination of disaster planning.

(g)    Assist in the preparation of the Emergency Department for JCAHO and State Accreditation surveys.

(h)    Review and implement medical protocols for the Emergency Department.

(i)    Coordinate the Quality Assurance Program within the Emergency Department.

(j)    Monitor the quality of care delivered in the Emergency Department in accordance with the BMCD Quality Assurance Plan.

(k)    Assist in the education and training on an initial and ongoing basis, of Emergency Department personnel.

(l)    Orient new Emergency Department physicians.

(m)    Coordinate the Emergency Department schedule and publish same.

(n)    Assure continual Emergency Department coverage.

(o)    Work with the BMCD Medical Staff to formulate an adequate call-in schedule for speciality and sub-speciality physicians.

(p)    Evaluate the performance of physicians working in the Emergency Department.

(q)    Deal with complaints, in conjunction with Nursing Staff, and ancillary personnel and BMCD officials, regarding Emergency Department services and/or incidents of alleged suboptimal performance.

(r)    Coordinate the establishment of Emergency Services at BMCD as a fully functional department.

(s)    Advise and assist in the coordination of public relations and marketing decisions, regarding services in the Emergency Department.

AERAS 1014

1.6    Treatment and Patient Referral. All patients presenting to the Emergency Department will be treated by the Emergency Physician on duty unless the patient requests to see or has been sent to the Emergency Department by his/her private physician.

When a patient presents to the Emergency Department and requests his/her private physician, all reasonable efforts will be made to contact the private physician. Once contacted, the private physician shall be advised of the patients presentation to the Emergency Department and their condition/complaints. The private physician shall have the option of coming in to see the patient, or having the Emergency Physician on duty see the patient.

If the patient does not have a private physician, or if the private physician cannot be contacted within a reasonable period of time, or if for any reason the private physician does not assume responsibility for the said patient, then the Emergency Physician shall see the patient. If the patient's condition warrants hospitalization or definitive specialized care, the Emergency Department physician shall refer the patient to the appropriate staff physician on-call, or shall arrange an appropriate transfer or referral, as appropriate.

No patient will be triaged out of the Emergency Department without a medical screening examination by the Emergency Physician.

1.7    Admission Privileges.    Emergency Physicians will not have admission privileges.

1.8    Non Discrimination.    AERAS shall not discriminate against any Emergency Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.9    Personal Expenses. AERAS and Emergency Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.10    No Authority to Commit BMCD. AERAS shall incur no financial obligation on behalf of BMCD without prior written approval of BMCD.

1.11    Quality and Risk Management. AERAS will provide a continuing review and an annual evaluation of the professional performance of each physician assigned to the  BMCD Emergency Department pursuant to this Agreement. BMCD shall participate in such annual evaluation. Physician evaluations shall be shared with the appropriate BMCD committee as part of their peer review process. AERAS will further implement the Hospital's Quality and Risk Management Plan.

1.12    Utilization Review. AERAS will assist in the Utilization Review Program by monitoring admissions to BMCD from the Emergency Department and by evaluating the

4

AERAS 1015

appropriateness of such admissions according to established criteria.

1.13    Staff Education.  Emergency Physicians will, without compensation, assist the hospital in providing educational programs for BMCD's nursing, physician and ancillary staffs.

1.14    Evaluation.  AERAS shall meet with BMCD Administration on a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the Emergency Department.

1.15    Codes.  Emergency Physicians shall respond to all emergencies or "codes" occurring in-house whenever their response will not endanger an Emergency Room patient.

1.16    Claims/Litigation.  AERAS agrees to cooperate with BMCD in resolving all claims and litigation which may arise out of the providing of Emergency Department services by AERAS. Emergency Physicians will personally respond to patient complaints/problems and as requested by the Emergency Department head nurse, and/or Administration.

1.17    Guest Relations.  AERAS agrees to stress guest relations techniques and patient satisfaction and to cooperate with surveys conducted by BMCD to measure patient and family satisfaction with ER services.

1.18    BMCD Employee Injuries.  AERAS agrees to treat BMCD's employees with work related injuries (i.e., workman's compensation cases) and where appropriate, to refer employees to physician specialists designated by BMCD.

1.19    Marketing.  AERAS agrees, to the extent possible, to support, participate in, and submit input into BMCD's marketing program.

## BMCD COMMITMENTS

2.1    Facilities and Supplies.  BMCD shall make available during the term of this Agreement the space designated for the Emergency Department and such equipment as is required for the proper operation and conduct of the Emergency Department. BMCD shall provide said Emergency Department with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the department. The supplies necessary will be determined by the Medical Director and BMCD Administration. AERAS shall inform BMCD of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    Transcription of Records.    BMCD will provide, through its' transcription system, transcription of all dictated medical records information on patients treated by AERAS on a timely basis.

2.3    Patient Monitoring.    BMCD shall establish dedicated patient monitoring for blood

5

**AERAS 1016**

pressure, pulse, EKG and oxygen saturation.

2.4     Personnel.

(a)   Non-Physician Staff. All non-physician personnel required for the operation of the Emergency Department shall be employed or assigned by BMCD. Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by BMCD. All Emergency Department personnel shall be trained and qualified in emergency medicine services and shall be capable of performing their assigned responsibilities. All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of BMCD.

(b)   Nursing Staff.  BMCD will make a reasonable effort to have all full-time Emergency Department registered nurses, ACLS and TNCC (Trauma Nurse Care Curriculum) certified. BMCD Nursing Staff shall work with Emergency Department Physicians and shall follow established emergency care protocol.

2.5     Physician Room. BMCD shall make available a room within the Emergency Department, containing a bed, lockers, desk, lamp, and telephone, television, video machine, dictation equipment and a personal computer terminal, if possible, access the World Wide Web and the Micromedex data base.

2.6     Assurance. During the term of this Agreement, BMCD shall not contract with any other physicians or entities for the services performed by Emergency Physicians assigned to BMCD through AERAS and this Agreement. In the event this Agreement expires or is terminated by either party subject to the notice provisions contained herein, it is hereby agreed that BMCD may offer employment to any Emergency Physician, including the Medical Director, who is providing service in the Emergency Department at the time of such contract termination or expiration.

## FEES, BILLING, COLLECTION AND RENUMERATION

3.1     Definitions. For the purpose of this section, the following definitions shall apply:

(a)     Services to Patients: Those services of Emergency Physicians which:
(i)      are personally furnished to a patient by Emergency Physicians.
(ii)     contribute directly to the diagnosis or treatment of the patient; and
(iii)    ordinarily require performance by a physician.
(iv)     involve services performed by CRNP's and PA's, employed by AERAS.

(b)     Services to Hospital:  Those services of AERAS and/or Emergency Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in BMCD; e.g.,

6

**AERAS 1017**

administrative and supervisory services shall be performed at no charge to BMCD.

3.2    Fee Schedule.  The parties shall establish a schedule of fees to be charged to patients for Services to Patients by Emergency Physicians in the Emergency Department.  Fees shall be at levels which are reasonable, not in excess of the usual and customary fees for such services, and commensurate with the services rendered.  AERAS shall participate in major third party payor plans and comply with participation agreements.

3.3    HMO's, PPO's, Workman's Comp., Etc.  AERAS agrees to participate with BMCD in providing care through the Emergency Department for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with BMCD to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups.

3.4    Cooperation with TEFRA Regulations.  AERAS shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect BMCD's reimbursement.  AERAS shall do nothing, knowingly, which would adversely affect such reimbursement or BMCD's Medicare/Medicaid provider status.

3.5    Changes in the Law or Regulations.  AERAS and BMCD hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program.  Should these limits or any other law or regulation affecting reimbursement for BMCD or for AERAS under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

3.6    Final Payment.  In the event this Agreement is terminated as provided for herein, all rights of AERAS to compensation from BMCD pursuant to Section 3.7 shall end as of the effective date of such termination, and BMCD shall distribute to AERAS the sum, if any, due and owing for services rendered by AERAS as of the effective date of said termination and shall pay said sum within fifteen (15) days after the termination date.

3.7    Renumeration.
    (a)    AERAS shall bill, collect, and retain fees for all services rendered by it, its' physicians and other AERAS employees providing services on its behalf hereunder.
    (b)    AERAS and BMCD have agreed upon a subsidy arrangement such that



for the total (non-overlapping) hours covered by a physician in that month.
    (c)    In each month of this Agreement, BMCD shall make any subsidy payment

7

AERAS 1018

owed to AERAS within ten (10) days of receipt of the prior month's documentation and proof of net collections.

(d)    AERAS will make every effort to provide BMCD with documentation and proof of net collections, for the previous month, by the 5th of the month.

## GENERAL PROVISIONS

4.1    <u>Access to Books and Records</u>.  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, AERAS shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service.  Such inspections shall be available up to four (4) years after the rendering of such services.  If AERAS carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, AERAS agrees to include this requirement in any such subcontract.  This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) ( of the Social Security Act) and regulations promulgated thereunder.  The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

4.2    <u>Material Breach</u>.  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination.  If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies.  However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    <u>Regulatory Requirements</u>.  The Emergency Department shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over BMCD.  Emergency Department practices shall be in compliance with the policies and regulations of BMCD, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Emergency Medicine.

4.4    <u>Liability Insurance</u>.  AERAS agrees that its Emergency Physicians will be covered by professional liability insurance in the amount of at least $1 million/$3 million for each Emergency Physician who provides services in the Emergency Department.  The liability insurance will be on a claims made basis.  A certificate of insurance evidencing coverage will be submitted to BMCD.  AERAS shall furnish BMCD with prompt written notice of cancellation or material change in its insurance coverage.  The aforesaid liability insurance shall be with a carrier or carriers

8

**AERAS 1019**

acceptable to BMCD.

4.5    Gender and Number.  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6    Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8    Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9    Force Majeure.  BMCD is not obligated to compensate AERAS for services during periods in which AERAS is not performing its responsibilities under this Agreement because of:

    (a)    strike, lockout, walkout or labor dispute affecting the hospital or any portion thereof; or

    (b)    Acts of God; governmental restrictions, regulations or controls; enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party

4.10    Severability.  The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor.  This Agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12    Notices.  Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing.  If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

9

**AERAS 1020**

If to BMCD:

Al Hargrave, Vice President/Administrator
Baptist Medical Center Downtown
310 South Ripley Street
Montgomery, Alabama 36104
(334) 269-8650

If to AERAS:

John D. Moorehouse, M.D., FACEP
Alabama Emergency Room Administrative Services, P.C.
4160 Carmichael Road, Suite 104
Montgomery, Alabama 36116
(334) 272-1050

Unless otherwise provided, notices shall be effective on the earlier of (i) actual delivery, (ii) the date of transmission, if by facsimile, or (iii) as applicable, either the first business day following the date of deposit with a qualified courier service or the third business day following the date of deposit with the United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail. Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13    <u>Term</u>. The term of this Agreement shall be two (2) years, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14    <u>Termination</u>. This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty days (180) days written notice given by one party to the other.

4.15    <u>Rights</u>. No parties other than AERAS and BMCD have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16    <u>Entire Agreement</u>. This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral. All amendments to the contract will be in writing and signed by authorized representatives of both parties.

10

**AERAS 1021**

4.17    Effective Date. This Agreement shall be in effect as of the date of execution of both parties or such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the _____ day of _____, 1998.

BAPTIST MEDICAL CENTER d/b/a
BAPTIST MEDICAL CENTER DOWNTOWN

By: _____
      C. Bruce Lawrence
      Senior Vice President/COO
      Baptist Medical Center

Date: _____10-28-98_____

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.

By: _____

Its: _____President_____

Date: _____10/29/98_____

**AERAS 1022**

STATE OF ALABAMA

MONTGOMERY COUNTY

## EMERGENCY DEPARTMENT SERVICES AGREEMENT

This Agreement is entered into by and between Baptist Medical Center d/b/a Prattville Baptist Hospital, Prattville, Alabama, an Alabama non-profit corporation (hereinafter referred to as "PBH") and Alabama Emergency Room Administrative Services, P.C., an Alabama professional corporation (hereinafter referred to as "AERAS").

### WITNESSETH:

PBH operates an Emergency Department located in its acute care hospital facility in Prattville, Alabama, (hereinafter referred to as "Emergency Department"), which requires the professional medical services of physicians. PBH has determined that in order to ensure the proper and efficient operation of the Emergency Department that several objectives must be met, including but not limited to, 24 hour physician coverage, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in record keeping, and quality patient care; and,

WHEREAS, AERAS is capable and willing to provide physicians (hereinafter referred to as "Emergency Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the PBH Medical Staff, and receive privileges to practice in the Emergency Department; and, AERAS can assure that the Emergency Physicians they provide shall accept responsibility to provide professional medical services in the Emergency Department; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of PBH, and the terms and conditions set forth in this Agreement;

THEREFORE, PBH and AERAS desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the Emergency Department, and agree as follows:

### AERAS' COMMITMENTS

1.1     Physician Staffing. AERAS shall provide physician staffing for the Emergency Department through duly licensed and qualified Emergency Physicians on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week for the duration of this Agreement.

AERAS will provide Emergency Physicians who shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Emergency

1

**AERAS 1023**

Physicians and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Emergency Physicians furnished by AERAS will provide care to all individuals who present themselves to the Emergency Department in need of service.

AERAS shall maintain a daily log to be kept in the Emergency Department indicating the identity of the physician or physicians on duty and the times they were present. This log shall be open to inspection by PBH at any time.

Every Emergency Room Physician shall be certified in Advanced Cardiac Life Support and shall seek certification in Advanced Trauma Life Support. Emergency Physicians shall not begin rendering services in the Emergency Department until he or she has been fully credentialed by PBH.

1.2    Medical Staff Privileges

(a)    Procedure. Each Emergency Physician provided by AERAS shall apply for medical privileges in Emergency Medicine and must obtain approval for appropriate Medical Staff membership in accordance with PBH polices and procedures and the Medical Staff Bylaws, except in unusual or unforeseen circumstances, as described herein. Physician credentials shall be forwarded to PBH by AERAS in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at PBH. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Responsibilities of Emergency Physicians. Each Emergency Physician provided by AERAS shall have the same responsibilities as other members of the Medical Staff including attendance at Medical Staff and Committee meetings in accordance with the Medical Staff Bylaws.

1.3    Independent Contractors. In the performance of emergency medical services hereunto, AERAS and Emergency Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of PBH. Neither AERAS nor Emergency Physicians performing services for AERAS under this Agreement, whether said Emergency Physicians be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against PBH for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group. AERAS shall maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis. Full-time Emergency Physicians are expected to live in the area. For good cause, PBH shall have the right to refuse any physician which AERAS proposes to use in the Emergency Department and/or to request the removal of any AERAS Emergency Physician, provided, however, that AERAS has been given at

2

AERAS 1024

least thirty (30) days notice and an opportunity to cure any problems concerning a particular Physician.

    1.5    <u>Emergency Medical Director</u>.  AERAS shall designate an Emergency Medical Director.  The Emergency Medical Director shall, at a minimum, be Board Certified in his/her area of practice and also be Board Eligible in Emergency Medicine.  The Emergency Medical Director shall work full time in the Emergency Department and shall devote his/her best efforts to the proper management of Emergency Physicians and the professional and medical issues which involve the Emergency Department.  PBH shall have the right to participate in the selection process and approve the individual selected by AERAS as the Medical Director.

The Emergency Medical Director shall be responsible for the following:

| | |
|---|---|
| (a) | Clinical direction of the Emergency Department. |
| (b) | Act as a liaison between AERAS and PBH. |
| (c) | Act as a liaison between the Emergency Physicians and the PBH Medical Staff. |
| (d) | Attend all Emergency Department section meetings and any medical staff committee meetings to which he/she is assigned. |
| (e) | Represent the Emergency Department to the community. |
| (f) | Assist in the coordination of disaster planning. |
| (g) | Assist in the preparation of the Emergency Department for JCAHO and State Accreditation surveys. |
| (h) | Review and implement medical protocols for the Emergency Department. |
| (i) | Coordinate the Quality Assurance Program within the Emergency Department. |
| (j) | Monitor the quality of care delivered in the Emergency Department in accordance with the PBH Quality Assurance Plan. |
| (k) | Assist in the education and training on an initial and ongoing basis, of Emergency Department personnel. |
| (l) | Orient new Emergency Department physicians. |
| (m) | Coordinate the Emergency Department schedule and publish same. |
| (n) | Assure continual Emergency Department coverage. |
| (o) | Work with the PBH Medical Staff to formulate an adequate call-in schedule for speciality and sub-speciality physicians. |
| (p) | Evaluate the performance of physicians working in the Emergency Department. |
| (q) | Deal with complaints, in conjunction with Nursing Staff, and ancillary personnel and PBH officials, regarding Emergency Department services and/or incidents of alleged suboptimal performance. |
| (r) | Coordinate the establishment of Emergency Services at PBH as a fully functional department. |
| (s) | Advise and assist in the coordination of public relations and marketing decisions. regarding services in the Emergency Department. |

    1.6    <u>Treatment and Patient Referral</u>.  All patients presenting to the Emergency Department

3

**AERAS 1025**

will be treated by the Emergency Physician on duty unless the patient requests to see or has been sent to the Emergency Department by his/her private physician.

When a patient presents to the Emergency Department and requests his/her private physician, all reasonable efforts will be made to contact the private physician. Once contacted, the private physician shall be advised of the patients presentation to the Emergency Department and their condition/complaints. The private physician shall have the option of coming in to see the patient, or having the Emergency Physician on duty see the patient.

If the patient does not have a private physician, or if the private physician cannot be contacted within a reasonable period of time, or if for any reason the private physician does not assume responsibility for the said patient, then the Emergency Physician shall see the patient. If the patient's condition warrants hospitalization or definitive specialized care, the Emergency Department physician shall refer the patient to the appropriate staff physician on-call, or shall arrange an appropriate transfer or referral, as appropriate.

No patient will be triaged out of the Emergency Department without a medical screening examination by the Emergency Physician.

1.7     <u>Admission Privileges</u>.   Emergency Physicians will not have admission privileges.

1.8     <u>Non Discrimination</u>.   AERAS shall not discriminate against any Emergency Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.9     <u>Personal Expenses</u>. AERAS and Emergency Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.10     <u>No Authority to Commit PBH</u>. AERAS shall incur no financial obligation on behalf of PBH without prior written approval of PBH.

1.11     <u>Quality and Risk Management</u>. AERAS will provide a continuing review and an annual evaluation of the professional performance of each physician assigned to the PBH Emergency Department pursuant to this Agreement. PBH shall participate in such annual evaluation. Physician evaluations shall be shared with the appropriate PBH committee as part of their peer review process. AERAS will further implement the Hospital's Quality and Risk Management Plan.

1.12     <u>Utilization Review</u>. AERAS will assist in the Utilization Review Program by monitoring admissions to PBH from the Emergency Department and by evaluating the appropriateness of such admissions according to established criteria.

**AERAS 1026**

1.13    Staff Education.  Emergency Physicians will, without compensation, assist the hospital in providing educational programs for PBH's nursing, physician and ancillary staffs.

1.14    Evaluation.  AERAS shall meet with PBH Administration on a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the Emergency Department.

1.15    Codes.  Emergency Physicians shall respond to all emergencies or "codes" occurring in-house whenever their response will not endanger an Emergency Room patient.

1.16    Claims/Litigation.  AERAS agrees to cooperate with  PBH in resolving all claims and litigation which may arise out of the providing of Emergency Department services by AERAS. Emergency Physicians will personally respond to patient complaints/problems and as requested by the Emergency Department head nurse, and/or Administration.

1.17    Guest Relations.  AERAS agrees to stress guest relations techniques and patient satisfaction and to cooperate with surveys conducted by PBH to measure patient and family satisfaction with ER services.

1.18    PBH Employee Injuries.  AERAS agrees to treat PBH's employees with work related injuries (i.e., workman's compensation cases) and where appropriate, to refer employees to physician specialists designated by PBH.

1.19    Marketing.  AERAS agrees, to the extent possible, to support, participate in, and submit input into PBH's marketing program.

## PBH COMMITMENTS

2.1    Facilities and Supplies.  PBH shall make available during the term of this Agreement the space designated for the Emergency Department and such equipment as is required for the proper operation and conduct of the Emergency Department. PBH shall provide said Emergency Department with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the department. The supplies necessary will be determined by the Medical Director and PBH Administration.  AERAS shall inform PBH of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    Transcription of Records.    PBH will provide, through its' transcription system, transcription of all dictated medical records information on patients treated by AERAS on a timely basis.

2.3    Patient Monitoring.   PBH shall establish dedicated patient monitoring for blood pressure, pulse, EKG and oxygen saturation.

5

AERAS 1027

2.4    Personnel.

(a)    Non-Physician Staff.  All non-physician personnel required for the operation of the Emergency Department shall be employed or assigned by PBH.  Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by PBH.  All Emergency Department personnel shall be trained and qualified in emergency medicine services and shall be capable of performing their assigned responsibilities.  All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of PBH.

(b)    Nursing Staff.    PBH will make a reasonable effort to have all full-time Emergency Department registered nurses, ACLS and TNCC (Trauma Nurse Care Curriculum) certified.  PBH Nursing Staff shall work with Emergency Department Physicians and shall follow established emergency care protocol.

2.5    Physician Room.  PBH shall make available a room within the Emergency Department, containing a bed, lockers, desk, lamp, and telephone, television, video machine, dictation equipment and a personal computer terminal, if possible, access the World Wide Web and the Micromedex data base.

2.6    Assurance.  During the term of this Agreement, PBH shall not contract with any other physicians or entities for the services performed by Emergency Physicians assigned to PBH through AERAS and this Agreement.  In the event this Agreement expires or is terminated by either party subject to the notice provisions contained herein, it is hereby agreed that PBH may offer employment to any Emergency Physician, including the Medical Director, who is providing service in the Emergency Department at the time of such contract termination or expiration.

## FEES, BILLING, COLLECTION AND RENUMERATION

3.1    Definitions.  For the purpose of this section, the following definitions shall apply:

(a)    Services to Patients:  Those services of Emergency Physicians which:
   (i)    are personally furnished to a patient by Emergency Physicians.
   (ii)    contribute directly to the diagnosis or treatment of the patient; and
   (iii)    ordinarily require performance by a physician.
   (iv)    involve services performed by CRNP's and PA's, employed by AERAS.

(b)    Services to Hospital:  Those services of AERAS and/or Emergency Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in PBH; e.g., administrative and supervisory services shall be performed at no charge to PBH.

3.2    Fee Schedule.  The parties shall establish a schedule of fees to be charged to patients

6

AERAS 1028

for Services to Patients by Emergency Physicians in the Emergency Department. Fees shall be at levels which are reasonable, not in excess of the usual and customary fees for such services, and commensurate with the services rendered. AERAS shall participate in major third party payor plans and comply with participation agreements.

    3.3    <u>HMO's, PPO's, Workman's Comp., Etc.</u> AERAS agrees to participate with PBH in providing care through the Emergency Department for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with PBH to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups.

    3.4    <u>Cooperation with TEFRA Regulations.</u> AERAS shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect PBH's reimbursement. AERAS shall do nothing, knowingly, which would adversely affect such reimbursement or PBH's Medicare/Medicaid provider status.

    3.5    <u>Changes in the Law or Regulations.</u> AERAS and PBH hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program. Should these limits or any other law or regulation affecting reimbursement for PBH or for AERAS under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

    3.6    <u>Final Payment.</u> In the event this Agreement is terminated as provided for herein, all rights of AERAS to compensation from PBH pursuant to Section 3.7 shall end as of the effective date of such termination, and PBH shall distribute to AERAS the sum, if any, due and owing for services rendered by AERAS as of the effective date of said termination and shall pay said sum within fifteen (15) days after the termination date.

    3.7    <u>Renumeration.</u>
        (a)    AERAS shall bill, collect, and retain fees for all services rendered by it, its' physicians and other AERAS employees providing services on its behalf hereunder.
        (b)    AERAS and PBH have agreed upon a subsidy arrangement such that PBH will provide a subsidy which shall make up any difference between AERAS net collections in a month and the sum of one hundred twenty-five dollars ($125.00) per hour for the total (non-overlapping) hours covered by a physician in that month.
        (c)    In each month of this Agreement, PBH shall make any subsidy payment owed to AERAS within ten (10) days of receipt of the prior month's documentation and proof of net collections.
        (d)    AERAS will make every effort to provide PBH with documentation and

7

**AERAS 1029**

proof of net collections, for the previous month, by the 5th of the month.

## GENERAL PROVISIONS

4.1    Access to Books and Records.  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, AERAS shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service.  Such inspections shall be available up to four (4) years after the rendering of such services.  If AERAS carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, AERAS agrees to include this requirement in any such subcontract.  This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) ( of the Social Security Act) and regulations promulgated thereunder.  The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

4.2    Material Breach.  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination.  If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies.  However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    Regulatory Requirements.  The Emergency Department shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over PBH.  Emergency Department practices shall be in compliance with the policies and regulations of PBH, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Emergency Medicine.

4.4    Liability Insurance.  AERAS agrees that its Emergency Physicians will be covered by professional liability insurance in the amount of at least $1 million/$3 million for each Emergency Physician who provides services in the Emergency Department.  The liability insurance will be on a claims made basis.  A certificate of insurance evidencing coverage will be submitted to PBH.  AERAS shall furnish PBH with prompt written notice of cancellation or material change in its insurance coverage.  The aforesaid liability insurance shall be with a carrier or carriers acceptable to PBH.

4.5    Gender and Number.  Whenever the context hereof requires, the gender of all words

8

**AERAS 1030**

shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6     Captions. Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8     Waiver of Provisions. Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto. A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9     Force Majeure. PBH is not obligated to compensate AERAS for services during periods in which AERAS is not performing its responsibilities under this Agreement because of:

(a)     strike, lockout, walkout or labor dispute affecting the hospital or any portion thereof; or

(b)     Acts of God; governmental restrictions, regulations or controls; enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party

4.10     Severability. The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11     Benefit of Successor. This Agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12     Notices. Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing. If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

**AERAS 1031**

If to PBH:

William E. Hines, Vice President/Administrator
Prattville Baptist Hospital
124 South Memorial Drive
Prattville, Alabama 36067
(334) 361-4306


If to AERAS:

John D. Moorehouse, M.D., FACEP
Alabama Emergency Room Administrative Services, P.C.
4160 Carmichael Road, Suite 104
Montgomery, Alabama 36116
(334) 272-1050

Unless otherwise provided, notices shall be effective on the earlier of (i) actual delivery, (ii) the date of transmission, if by facsimile, or (iii) as applicable, either the first business day following the date of deposit with a qualified courier service or the third business day following the date of deposit with the United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail.  Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13    Term.  The term of this Agreement shall be two (2) years, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14    Termination.  This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty days (180) days written notice given by one party to the other.

4.15    Rights.  No parties other than AERAS and PBH have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16    Entire Agreement.  This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral.  All amendments to the contract will be in writing and signed by authorized representatives of both parties.

10

**AERAS 1032**

4.17   Effective Date. This Agreement shall be in effect as of the date of execution of both parties or such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the _____ day of _____, 1998.


BAPTIST MEDICAL CENTER d/b/a
PRATTVILLE BAPTIST HOSPITAL


By: _William E. Hines_____
    William E. Hines
    Vice President/Administrator
    Prattville Baptist Hospital

Date: _10/30/98_____


ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, P.C.


By: _John D. Noonamy_____
Its: _President_____

Date: _10/29/98_____


**AERAS 1033**

STATE OF ALABAMA
MONTGOMERY COUNTY

## EMERGENCY ROOM SERVICES AGREEMENT

    This Agreement is entered into by and between **Baptist Medical Center d/b/a Baptist Medical Center East**, Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as **BMC-East**) and **Alabama Emergency Room Administrative Services, P.C.**, an Alabama professional corporation (hereinafter referred to as "**AERAS, P.C.**"). This contract is effective April 1, 1999.

WITNESSETH:

    **BMC-East** OPERATES AN Emergency Department located in its facility in Montgomery, Alabama, (hereinafter referred to as "Emergency Department"), which requires the professional medical services of physicians. **BMC - East** has determined that in order to insure the proper and efficient operation of the Emergency Department that several objectives must be met, including but not limited to, 24 hour physician coverage, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in recordkeeping, and quality patient care; and,

    WHEREAS, **AERAS, P.C.** is capable and willing to provide physicians (hereinafter referred to as "Emergency Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the **BMC – East** Medical Staff, and receive privileges to practice in the Emergency Department; and, **AERAS, P.C.** can assure that the Emergency Physicians they provide shall accept responsibility to provide emergency services in the Emergency Department; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of **BMC - East**, and the terms and conditions set forth in this Agreement;

    THEREFORE, **BMC – East** and **AERAS, P.C.** desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the Emergency Department, and agree as follows:

1

AERAS 1034

## AERAS, P.C. COMMITMENTS

1.1    <u>Physician Staffing.</u>  **AERAS, P.C.** shall provide physicians for the Emergency Department through duly licensed and qualified Emergency Physicians on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week for the duration of this Agreement.

All Emergency Physicians provided by **AERAS, P.C.** shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Emergency Physicians and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status.  The Emergency Physicians furnished by **AERAS, P.C.** will provide care to all individuals who present themselves to the Emergency Department in need of service.

**AERAS, PC**. Shall maintain a daily log to be kept in the Emergency Department indicating the identity of the physician or physicians on duty and the times they were present.  This log shall be open to inspection by **BMC – East** at any time.

Every Emergency Department Physician shall be certified in Advanced Cardiac Life Support and shall seek certification in Advanced Trauma Life Support.   Emergency Physicians shall not begin rendering services in the Emergency Department until he or she has been fully credentialed by **BMC – East** as provided herein.

1.2    PhysicianExtenders.   AERAS may employ and utilize licensed Physician Assistants (PA's) and Nurse Practitioners (NP's) to provide appropriate services in the Emergency Department.  All services provided by Physician Extenders must be noted to allow for proper billing for those services.   Physician Extenders who do not have Blue Cross or Medicare/Medicaid provider numbers cannot provide services for those patients, which are of a billable nature.

1.3    <u>Medical Staff Privileges.</u>

2

**AERAS 1035**

(a)   Procedure.   Each Emergency Physician provided by **AERAS, P.C.** shall apply for medical privileges in Emergency Medicine and must obtain approval for appropriate Medical Staff membership in accordance with **BMC - East** policies and procedures and the Medical Staff Bylaws, except in unusual or unforeseen circumstances, as described herein.  Physician credentials shall be forwarded to **BMC - East** by **AERAS, P.C.** in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at **BMC - East**. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)   Responsibilities of Emergency Physician.  Each Emergency Physician provided by **AERAS, P.C.** shall have the same responsibilities as other members of the Medical Staff including attendance at medical staff and committee meetings in accordance with Medical Staff Bylaws.

1.4   Independent Contractors.   In the performance of emergency medical services hereunto, **AERAS, P.C.** and Emergency Physicians/Physician Extenders  shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent (s) of **BMC - East**.  Neither **AERAS, P.C.** nor Emergency Physicians/Physician Extenders performing services for **AERAS, P.C.** under this Agreement, whether said Emergency Physicians/Physician Extenders be members, partners, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against **BMC - East** for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits or any kind.

1.5   Core Group.   **AERAS, P.C.** shall maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis.  For good cause, **BMC – East** shall have the right to refuse any physician which **AERAS, P.C.** proposes to use in the Emergency Department and/or to request the removal of any **AERAS, P.C.** Emergency Physician, provided, however, that **AERAS, P.C.** has been given at least thirty (30) days  notice and an opportunity to cure any problems concerning a particular physician.

1.5   EMERGENCY MEDICAL DIRECTOR.   **AERAS, P.C.** shall designate an Emergency Medical Director. The Emergency Medical Director shall work

3

**AERAS 1036**

full time in the Emergency Department and shall devote his/her best efforts to the proper management of Emergency Physicians and the Emergency Department staff as well as the professional and medical issues that involve the Emergency Department.

The Emergency Medical Director shall be responsible for the following:

(a)  Clinical direction of the Emergency Department
(b)  Act as a liaison between AERAS, PC and BMC- East
(c)  Act as a liaison between the Emergency Physicians and the BMC – East Medical Staff.
(d)  Attend all Emergency Department section meetings and any medical staff committee meetings to which he/she is assigned.
(e)  Represent the Emergency Department to the community.
(f)  Assist in the coordination of disaster planning.
(g)  Assist in the preparation of the Emergency Department for JCAHO and State Accreditation surveys.
(h)  Review and implement medical protocols for the Emergency Department
(i)  Coordinate the Quality Assurance Program within the Emergency Department.
(j)  Monitor the quality of care delivered in the Emergency Department in accordance with the BMC-East Quality Assurance Plan.
(k)  Assist in the education and training on an initial and ongoing basis, of Emergency Department personnel.
(l)  Orient new Emergency Department physicians.
(m)  Coordinate the Emergency Department schedule and publish same.
(n)  Assure continual Emergency Department coverage.
(o)  Work with BMC – East Medical Staff to formulate an adequate call-in schedule for specialty and sub specialty physicians.
(p)  Evaluate the performance of physicians working in the Emergency Department.
(q)  Deal with complaints, in conjunction with Nursing Staff, ancillary personnel and  BMC –East officials, regarding Emergency Department services and/or incidents of alleged suboptimal performance.
(r)  Coordinate the establishment of Emergency Services at BMC – East as a fully functional department.
(s)  Advise and assist in the coordination of public relations and marketing decisions regarding services in the Emergency Department.

4

AERAS 1037

1.7    <u>Treatment and Patient Referral</u>.  All patients presenting to the Emergency Department will be treated by the Emergency Physician on duty, unless the patient requests to see his/her private physician.

When a patient presents to the Emergency Department and requests his/her private physician, all reasonable efforts will be made to contract the private physician.    Once contacted, the private  physician shall be advised of the patients presentation to the Emergency Department and their condition/complaints.  The private physician shall have the option of coming in to see the patient, or having the Emergency Physician on duty see the patient.

If the patient does not have a private physician, or if the private physician cannot be contacted within a reasonable period of time, or if for any reason the private physician does not assume responsibility for the said patient, then the Emergency Physician shall see the patient.    If the patient's condition warrants hospitalization or definitive specialized care, the Emergency Department physician shall refer the patient to the appropriate staff physician on-call, or shall arrange a transfer or referral, as appropriate.

No patient will be triaged out of the Emergency Department without a medical screening examination by the Emergency Physician.

1.8    <u>Admission privileges</u>.    Emergency Physicians will not have admission privileges.

1.9    <u>Non Discrimination</u>. **AERAS, P.C.** shall not discriminate against any Emergency Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.10    <u>Personal Expenses.</u> **AERAS, PC.** and Emergency Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.11    <u>No Authority to commit to **BMC -East**</u>.    **AERAS, P.C.** shall incur no financial obligation on behalf of **BMC - East** without prior written approval of **BMC – East**.

1.12    <u>Quality and Risk Management</u>.  **AERAS, P.C.** will provide a continuing review and an annual evaluation of the professional performance of each

5

*AERAS* 1038

physician assigned to the **BMC - East** Emergency Department pursuant to this Agreement.

1.13  <u>Utilization Review</u>.    **AERAS, P.C.** will assist in the Utilization Review Program by monitoring admissions to **BMC - East** from the Emergency Department and b evaluating the appropriateness of such admissions according to established criteria.

1.14  <u>Staff Education</u>.  Emergency Physicians will, without compensation, assist the hospital in providing educational programs for BMC-East's nursing, physician and ancillary staffs.

1.15  <u>Evaluation</u>.  **AERAS, P.C.** shall meet with **BMC - East** Administration on a quarterly basis to determine the level of attainment of stated goals and to discuss any problem areas, and for review of the operation of the Emergency Department.

1.16  <u>Codes.</u> Emergency Physicians shall be available for all emergencies or "codes" occurring in-house whenever their response will not endanger an Emergency Department patient.

1.17  <u>Claims/Litigation.</u> **AERAS, P.C.** and **BMC – East** agree to cooperate in resolving all claims and litigation which may arise out of the providing of Emergency Department services by **AERAS, P.C.**. Emergency Physicians and/or the Medical Director will personally respond to patient complaints/problems and as requested by the Emergency Department head nurse.

1.18  <u>Guest Relations</u>.  **AERAS, P.C.** agrees to stress guest relations techniques and patient satisfaction and to cooperate with surveys conducted by BMC – East to measure patient and family satisfaction with ER services.

1.19  **<u>BMC - East</u>** <u>Employee Injuries</u>.  **AERAS, P.C.** agrees to treat employees with work related injuries (i.e. worker's compensation cases) in the Emergency Department, and refer to physician specialists designated by **BMC - East.**

1.20  <u>Marketing</u>. **AERAS, P.C.** agrees to make reasonable efforts to support, participate in, and submit input into **BMC - East** Marketing program.

6

**AERAS 1039**

## BMC - EAST COMMITMENTS

2.1    <u>Facilities and supplies</u>.  **BMC - East** shall make available during the term of this Agreement the space designated for the Emergency Department and such equipment as is required for the proper operation and conduct of the Emergency Department.  **BMC - East** shall provide said Emergency Department with utilities, housekeeping, laundry, and other supplies for the proper and efficient operation of the department.  The supplies necessary will be determined by the Medical Director and **BMC - East** Administration.  **AERAS, P.C.** shall inform **BMC-East** of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    <u>Transcription of records</u>. **BMC - East** will provide a transcription of all dictated medical records of patients treated by **AERAS, P.C.** on a timely basis.

2.3    <u>Patient Monitoring</u>. **BMC - East** shall establish dedicated patient monitoring for blood pressure, pulse, EKG, and oxygen saturation.

2.4    <u>Personnel</u>.

    (a)    All non-physician personnel required for the proper operation of the Emergency Department shall be employed or assigned by **BMC - East**.  Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by **BMC - East**.  All Emergency Department personnel shall be trained and qualified in emergency medical services and shall be capable of performing their assigned responsibilities. All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of **BMC - East**.

    (b)    <u>Nursing Staff</u>. **BMC - East** will make a reasonable effort to have all full time Emergency Department registered nurses ACLS and TNCC (Trauma Nursing Core Curriculum) certified. **BMC - East** nursing shall work with Emergency Department physicians following established emergency care protocols.

2.6    <u>Physician room</u>. **BMC - East** shall make available a room within the Emergency Department, contained a bed, lockers, desk, lamp, telephone, video machine, dictation equipment, and a personal computer terminal with access to the World Wide Web and Micromedex data base.

7

**AERAS 1040**

2.7    Assurance. During the term of this agreement, **BMC - East** shall not contract with any other physicians or entities for the services performed by Emergency Physicians assigned **BMC – East** through **AERAS, P.C.** and this agreement.

## FEES, BILLING, COLLECTION, and REMUNERATION

3.1    Definitions. For the purpose of this section, the following definitions shall apply:

    (a)    services to patients:  those services of Emergency Physicians which:
        (i)    are personally furnished to a patient by Emergency Physicians.
        (ii)    Contribute directly to the diagnosis or treatment of the patient; and
        (iii)    Ordinarily require performance by a physician.
        (iv)    To include CRNP and PA's
    (b)    Services to hospital:
        Those services of **AERAS, P.C.** and/or Emergency Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in **BMC - East**; e.g., administrative and supervisory service shall be performed at no charge to **BMC- East**.

3.2    Fee Schedule.  The parties shall establish a schedule of fees to be charged to patients  for Services to Patients by Emergency Physicians in the Emergency Department.  Fees shall be at levels which are reasonable, not in excess of the usual and customary fees for such services, and commensurate with the services.

3.3    HMO's, PPO's, Workman's compensation, etc. **AERAS, P.C.**  agrees to work with **BMC - East** in providing care through the Emergency Department for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with **BMC - East** to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups.  Any change in fees charged by **AERAS, P.C.** for services rendered by Emergency Physicians/Physician Extenders will require approval by **AERAS, P.C.**

8

**AERAS 1041**

3.4     Cooperation with TEFRA Regulations.   **AERAS, PC**  shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect BMC-East's reimbursement.  **AERAS, PC** shall do nothing, knowingly, which would adversely affect such reimbursement or BMC-East's  Medicare/Medicaid provider status.

3.5     Changes in the Law or Regulations.   **AERAS, PC** and **BMC − East** hereby recognize that the compensation arrangement herein described is basted, in part, on the limits of reimbursable compensation set by regulation under the Medicare program.  Should these limits or any other law or regulation affecting reimbursement for BMC-East or for **AERAS, PC** under this Agreement change during the term of hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiating by either party upon the giving of written request to the other party.

3.6     Final Payment.  In the event this Agreement is terminated as provided for herein, all rights of **AERAS, PC** to compensation from **BMC-East** pursuant to Section 3.7 shall end as of the effective date of such termination, and **BMC − East** shall distribute to **AERAS, PC** the sum, if any, due and owing for services rendered by **AERAS, PC** as of the effective date of said termination and shall pay said sum within Fifteen (15) days after the termination date.

3.7     Remuneration.

(a) **AERAS, P.C.** shall bill, collect, and retain fees for all services rendered by it and it's physicians and other AERAS, PC employees providing services on its behalf hereunder.

(b) **AERAS, P.C.** and **BMC - East** shall negotiate a hospital subsidy such that net collections, plus the hospital subsidy do not fall below the mathematical product of One Hundred Twenty Five Dollars ($125.00) per hour for the total (non-overlapping) hours covered by a physician in that month.  (or portion of a month).

(c) In Each month of this Agreement. **BMC - East** shall make payment any subsidy payment owed to **AERAS, P.C.** within ten (10) days of receipt of the prior month's documentation and proof of net collections.

(d) **AERAS, P.C.** will provide **BMC - East** documentation and proof of net collections (for the previous month) by the 5th of the month.

9

(e) **If AERAS, PC,** at the commencement of this Agreement shall not have Blue Cross and/or Medicare/Medicaid provider numbers for its Emergency Physicians, it shall make a log of all services provided but not billed in each month. At such time as said provider numbers are available and that prior work is billed, then there shall be an adjustment payment to **BMC- East** reflecting the amount collections for those months where no billing occurred.

## GENERAL PROVISIONS

4.1   Access to Books and Records. Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, **AERAS, P.C.** shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If **AERAS, P.C.** carries out any of the duties of this agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, **AERAS, P.C.** agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499-952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this agreement.

4.2   Material Breach. In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured with a reasonable time.

4.3   Regulatory Requirements. The Emergency Department shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over BMC – East. Emergency

10

**AERAS 1043**

Department practices shall be in compliance with the policies and regulations of BMC-East, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Emergency Medicine.

4.4   Liability Insurance.  During the term of this agreement, **AERAS, P.C.** agrees that it and its Emergency Physicians who provide services in the Emergency Department will be covered by professional liability insurance in the amount of One Million Dollars ($1,000,000.00) single limit each incident, and Three Million Dollars ($3,000,000.00) annual aggregate. The liability insurance will be on a claims made basis.  A certificate of insurance evidencing coverage will be submitted to **BMC - East.** **AERAS, P.C.** shall furnish **BMC - East** with prompt written notice of cancellation or material change in its insurance coverage.  Upon termination of this agreement, AERAS, P.C. shall purchase the Optional Extension Period Coverage, or similar "tail" policy, available to it under its professional liability insurance policy contemplated by this section. **AERAS, P.C.** shall include in its agreement with its subcontracting physicians a requirement that such physicians purchase the Optional Extension Period Coverage upon termination of their services at **BMC - East** under this agreement, however, **AERAS, P.C.** shall not be liable to **BMC - East** or third parties for the failure of its subcontracting physicians to obtain such coverage.  The aforesaid liability insurance shall be with a carrier or carriers acceptable to **BMC - East.**

4.5   Gender and Number.  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6   Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this agreement or any provisions thereof.

4.7   Counterparts.  This agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8   Waiver of Provisions. Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions here of shall not be construed as a waiver of any other terms and conditions hereof.

11

**AERAS 1044**

4.9 <u>Force Majeure.</u> . **BMC - East** is not obligated to **compensate AERAS, P.C.** for services during periods in which **AERAS, P.C.** is not performing its responsibilities under the Agreement because of:

(a) Strike, lockout, walkout or labor dispute affecting the hospital or any portion thereof: or

(b) Acts of God; governmental restrictions, regulations or controls, enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party.

4.10 <u>Severability.</u>  The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed servable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remained of this Agreement shall be effective and binding upon the parties.

4.11 <u>Benefit of Successor.</u>  This agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12 <u>Notices.</u>  All notices and other communications hereunder shall be in writing and shall be deemed sufficiently given if delivered personally, transmitted by facsimile which the sender's facsimile machine indicates has been sent (in the case of an addressee whose facsimile number is supplied), sent by charges or postage prepaid, to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

a) if to **AERAS, P.C.:**

**AERAS, P.C.**
ATTN:  Paul K. Tanaka, MD,
4160 Carmichael Road, Suite 104
Montgomery, AL  36106
334-272-1050        (telephone)
334-271-7698        (fax)

12

**AERAS 1045**

(f) if to **BMC - East**:

**Baptist Medical Center - East**
John Melton Vice-President, Administrator
Baptist Health – East
400 Taylor Road
Montgomery, AL 36117
334-244-8500        (telephone)

Unless otherwise provided, notices shall be effective on the earlier of (x) actual delivery, (y) the date of transmission, if by facsimile, or (z) as applicable, either (i) the first business day following the date of deposit with a qualified courier service or (ii) the third business day following the date of deposit of United States Mail.  Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13    Term.  The term of this agreement shall be two (2) years, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14    Termination.  This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days written notice given by one party to the other.

4.15    Rights.  No parties other than **AERAS, P.C.** and **BMC - East** have rights under this Agreement.  Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

13

**AERAS 1046**

4.16    Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes any prior agreement either written or oral. All amendments to the contract will be in writing and signed by authorized representatives of both parties.

4.17    Effective date. This agreement shall be in effect as of the date of execution of both parties and such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the _____1ˢᵗ_____ day of __April__ _____, 1999.

BAPTIST HEALTH d/b/a
BAPTIST MEDICAL CENTER EAST

By: _____
        C. Bruce Lawrence
        Senior Vice President/COO
        Baptist Health

ALABAMA EMERGENCY ROOM
ADMINISTRATIVE SERVICES, PC.

By: _____
        Paul K. Tanaka, MD
        Vice President

Date: ___2-25-99___

Date: ___2-26-99___

14

AERAS 1047



NORTHEAST ALABAMA
**Regional Medical Center**

May 2, 1988

John D. Moorehouse, M.D.
Alabama Emergency Room Services, P.C.
Route 1 Box 46
Pike Road, Alabama  36064

Re:  Emergency Care Agreement

Dear Dr. Moorehouse:

Enclosed is your copy of the executed Emergency Care Agreement along
with the fee schedule.

Please contact me, at (205) 235-5255, if you have any questions.

Thank you.

Sincerely,

John E. McEnroe, Jr.
Vice President – Finance

JEMcjr:dm
Enclosures

AERAS 1048

STATE OF ALABAMA

CALHOUN COUNTY

## EMERGENCY CARE AGREEMENT

AGREEMENT between REGIONAL MEDICAL CENTER BOARD (the "BOARD") and ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C., an Alabama Professional Corporation (the "CORPORATION").

### RECITALS:

BOARD owns and operates Northeast Alabama Regional Medical Center (the "HOSPITAL") in Anniston, Alabama and desires that the CORPORATION provide licensed, qualified physicians (the "PHYSICIANS") to staff Emergency Department (the "DEPARTMENT"). The CORPORATION believes that it will be able to provide the HOSPITAL with individuals who are qualified to practice medicine and the services referred to in this Agreement.

### NOW, THEREFORE, THIS AGREEMENT

### WITNESSETH:

That in consideration of the mutual agreements herein, the BOARD and CORPORATION agree as follows:

### BOARD:

2.01.  **SPACE.**  BOARD shall make available for use by CORPORATION office space and the space now or that may be hereinafter designated as DEPARTMENT.

2.02.  **EQUIPMENT AND SUPPLIES.**  BOARD shall provide necessary medical equipment, drugs, supplies, furniture and fixtures for DEPARTMENT. Requests will be processed in accordance with the policies and procedures of the BOARD. Equipment furnished by the BOARD shall remain the property of the BOARD. BOARD shall keep DEPARTMENT facilities and equipment in good repair.

2.03.  **PERSONNEL.**  BOARD shall employ, promote, terminate, supervise and reinstate DEPARTMENT personnel.

2.04.  **UTILITIES AND SUPPORT SERVICES.**  BOARD shall provide utilities and support services (laundry, maintenance, housekeeping) for DEPARTMENT. Telephone service is limited to local and to patient-related calls.

2.05.  **HOURS OF OPERATION.**  BOARD shall operate DEPARTMENT on a twenty-four (24) hour per day, seven (7) day per week basis.

AERAS 1049

2.06.   **PATIENT NOTIFICATION.**  BOARD agrees to provide patients at HOSPITAL notification that separate professional fees will be billed for physician services.

2.07.   **HOSPITAL CHARGES.**  HOSPITAL will bill for supplies and technical services and expenses incurred by HOSPITAL in rendering care to patients.  CORPORATION will be under no duty to assist in the collection of said charges.  HOSPITAL charges for said services shall be separate and distinct from the charges made by CORPORATION for medical services to patients.

2.08.   **AGENT.**  The HOSPITAL  shall act as the agent for the CORPORATION for billing and collection purposes and only for billing and collection purposes.  No other principal-agent relationship exists between the parties, and the parties agree not to represent themselves as agents to any third party, other than is stated above.

2.09.  **HOSPITALS LIABILITY.**  This Agreement is made upon the express condition that CORPORATION and its independent contractor physicians are free from all liability and claim for damages by reason of any person or persons arising out of acts performed by BOARD which are not performed pursuant to the terms of this Agreement:  BOARD hereby covenanting and agreeing to indemnify and save CORPORATION and its independent contractor physicians from all liability, loss, costs, and obligations on account of or arising out of any such injuries or losses.

## CORPORATION

3.01   **APPLICABLE STANDARDS.**  The CORPORATION and PHYSICIANS shall use their reasonable efforts to perform the services enumerated herein in such a manner as may further the goals and objectives of BOARD and as will insure that all duties are performed and services provided in the HOSPITAL as may be required by the policies, rules, and regulations of the HOSPITAL; the Medical Staff Bylaws, rules and regulations; any standard, ruling, regulation, or statute of the Joint Commission on Accreditation of Healthcare Organizations; the United States Department of Health and Human Services; the Alabama Department of Public Health; or any other federal, State, or local government agency, corporation entity, or individual exercising authority with respect to or affecting the HOSPITAL.

3.02   **GENERAL OBLIGATIONS OF CORPORATION AND PHYSICIANS.**

      A.   To render professional services in a manner which is safe, efficient, consistent, and satisfactory to the BOARD; and

      B.   To conduct services professionally, ethically and conscientiously to insure the quality of medical care; and

-2-

**AERAS 1050**

C.   To accept patients, irrespective of color, race, creed, religion, national origin, sex, age, or financial status; and

D.   To abide by the BOARD´s Medical Staff Bylaws, rules and regulations, and all applicable policies of BOARD in rendering medical care.

3.03   **HOURS OF COVERAGE AND PHYSICIAN STAFFING.**  CORPORATION shall cause a qualified individual, licensed to practice medicine in the State of Alabama, who is a member of the medical staff of HOSPITAL to be available on the premises of the DEPARTMENT twenty-four (24) hours each day, and CORPORATION shall provide either double coverage or an available back-up physician for peak patient flow periods.

CORPORATION shall not be required to have on call the number of physicians necessary to respond to disasters or other occurrences which are of unforeseeable size, scope or duration.

3.04   **PHYSICIAN SERVICES.**

A.   **Patient Protocol.** Treat patients assigned to the Emergency Department Physician as follows:

1.   Any patient presenting in acute distress or needing immediate physician attention at the discretion of the nurse.
2.   Any patient without a personal physician (including obvious fractures).
3.   Any patient requesting to see the Emergency Department Physician.
4.   Any patient at the request of their personal physician.
5.   Any patient requesting their personal physician but for some reason the physician or his/her coverage cannot be contacted after thirty (30) minutes or when too prolonged for the patients condition.

B.   **Admissions.**  No physician provided by CORPORATION shall admit patients in his own name except in an emergency situation where an admitting physician cannot be contacted immediately and only until such time as the case can be transferred to a physician with admitting privileges.  CORPORATION must refer repeat outpatients to members of HOSPITAL´s medical staff.

C.   **Consultation.**  Work closely with private physicians in obtaining consultants of their choice and assist in the immediate care of patients in the process of being hospitalized;

−3−

AERAS 1051

D. **Emergency Situations.** Respond to inpatient cardiac arrests and be familiar with cardiac resuscitation protocol. Respond to and assist HOSPITAL's staff in handling emergency patient situations and other reasonable requests of nursing or other hospital personnel when no other physician is available or until private physicians can be contacted;

E. **Complaint Resolution.** CORPORATION will assist BOARD in resolving complaints about DEPARTMENT OR CORPORATION.

F. **Employee Physical Examinations.** CORPORATION shall provide pre-employment and annual physical examinations for HOSPITAL employees without charge to HOSPITAL.

G. **Employee Accidents and Injuries.** CORPORATION shall provide emergency services for accidents and other on-premises injuries to HOSPITAL employees without charge other than for those cases for which a charge is collectible from sources other than HOSPITAL and its employees.

H. **Training and Clinical Direction.** CORPORATION shall provide, as appropriate, continuing education and clinical direction of DEPARTMENT personnel.

I. **EMS.** CORPORATION shall provide active input and participation in the East Alabama Emergency Medical Services.

J. **Technical Advice.** CORPORATION shall provide HOSPITAL such technical advice and assistance as may be requested to facilitate selection and/or installation of facilities and/or equipment and in the operation of DEPARTMENT.

K. **Committees.** CORPORATION shall serve and actively participate in HOSPITAL and/or Medical Staff committees.

L. **Medical Records.** PHYSICIAN shall promptly complete medical records and reports. Ownership and right of control of all reports, records, and supporting documents prepared in connection with the operation of the DEPARTMENT shall vest exclusively with the BOARD; provided, however, that PHYSICIAN shall have such right of access to such reports, records, and supporting documentation as shall be provided by State law and BOARD policies.

M. **Publications.** CORPORATION will cooperate with and assist members of the medical staff in preparation of clinical reports for publication.

AERAS 1052

N.  **Workman´s Compensation.**  The CORPORATION shall comply with the Alabama Workman´s Compensation Act.

3.05.  **DIRECTOR; OFFICE OF.**  CORPORATION shall designate a physician, subject to approval of the Administrator of HOSPITAL, to act as Director of Emergency Services (the "DIRECTOR").  The DIRECTOR shall be responsible for providing emergency medical services and for the day to day medical administration and operation of the DEPARTMENT.

3.06.  **RESIDENCE – PLACE OF.**  Physicians providing base coverage in DEPARTMENT shall be residents of the greater Anniston area within one (1) year from the date of their contract with CORPORATION.  "Base Coverage" is defined as coverage of the DEPARTMENT for at least sventy-five (75%) percent of the time computed on an annual basis. BOARD is not, nor will it accept responsibility for, payment of expenses incurred by CORPORATION or employees/subcontractors of CORPORATION under the requirement of this paragraph.

3.07.  **PHYSICIANS LIABILITY.**  This Agreement is made upon the express condition that BOARD is free from all liability and claim for damages by reason of any person or persons arising out of acts performed by CORPORATION and its independent contractor physicians which are not performed pursuant to the terms of this Agreement; CORPORATION hereby covenanting and agreeing to indemnify and save BOARD from all liability, loss, costs, and obligations on account of or arising out of any such injuries or losses.

3.08.  **MALPRACTICE INSURANCE.**  During the term of this Agreement, each of the independent contractor physicians of CORPORATION shall, at their own expense, provide and continuously maintain in full force and effect professional liability insurance coverage in the minimum amount required by the Medical Staff Bylaws of the BOARD insuring such individual independent contractor physicians and CORPORATION against liability in the performance of their duties pursuant to this Agreement, and shall also furnish a certified copy of said policies to the BOARD.  If the Medical Staff Bylaws of the BOARD are revised to increase the minimum amount of insurance to be maintained by the said individual independent contractor physicians, the CORPORATION may, without penalty terminate this agreement.  Upon the expiration or termination of this Agreement, each of the independent contractor physicians of CORPORATION shall obtain an endorsement to said policies maintaining and extending the coverage thereof with respect to any claims which may be asserted after such expiration or termination from or as the result of any acts or omissions or alleged acts or omissions which occur during the term of this Agreement or any extension or renewal thereof, and shall also furnish certified copies of saih endorsements to the BOARD.  Said policies shall be written by a responsible insurance company qualified in the State of Alabama to insure the risks undertaken, and shall contain a provision that the insurer consents to the indemnity herein contained in Section 3.07 above and that the insurer will give the BOARD thirty (30) days´ written notice prior to any cancellation or material alteration thereof.  Such insurance shall provide that it is primary coverage solely as to the named insureds with respect to the

-5-

AERAS 1053

liability of the independent contractor physicians of CORPORATION. The provisions of this section shall survive the expiration or termination of this Agreement.

3.09.  **MEDICAL STAFF MEMBERSHIP AND LICENSURE.**  The DEPARTMENT shall be staffed by physicians licensed to practice medicine in the State of Alabama subject to approval of BOARD in accordance with the Bylaws of the medical staff of BOARD prior to and while performing services pursuant to this Agreement.  Such approval shall not be unreasonably withheld.  Any such physicians so designated shall be compensated by CORPORATION for their time spent working in the DEPARTMENT.

3.10.  **USE OF PREMISES.**  CORPORATION covenants that no part of the premises shall be used by CORPORATION or its independent contractor physicians as an office for the general practice of medicine or for any purpose other than the performance of services hereunder.

4.01.  **INDEPENDENT CONTRACTOR.**

A.  CORPORATION is a professional corporation and as an independent contractor, has the exclusive right to hire and terminate its subcontractors.  Problems and conflicts may arise between subcontractors of CORPORATION and employees or medical staff of the BOARD.  BOARD AND CORPORATION agree to attempt to resolve any such problems promptly through Administrative channels.  However, if the BOARD provides CORPORATION with a written notice as to an irreconcilable problem or conflict concerning a subcontractor of CORPORATION, CORPORATION will assign another subcontractor to that position within thirty (30) days of receipt of the written notice.

The Administrator of HOSPITAL, after consulting with the Chief of Staff, shall, at his discretion and with due cause, prevent any individual physician contractor of CORPORATION from working within or entering into the DEPARTMENT.  This action shall become effective upon twenty-four (24) hour written notice to the DIRECTOR.

B.  Physicians of CORPORATION are at all times acting and performing as independent contractors practicing their profession of medicine and surgery, and specializing in emergency treatment.  HOSPITAL shall neither have nor exercise control or direction over the methods by which physicians perform their work and functions excepting that CORPORATION and its PHYSICIANS agree to perform the said work and functions at all times in strict accordance with currently approved methods and practice in their professional speciality and that the sole interest of HOSPITAL is to assure that said services shall be performed and rendered in a competent, efficient and satisfactory manner.  All applicable provisions of law relating to licensing and regulating of physicians and hospitals shall be fully complied with by all parties hereto.

-6-

AERAS 1054

## 5.01.  PROFESSIONAL FEES.

A.  Professional fees for services rendered by physicians employed by or working for CORPORATION shall be agreed upon in writing by the Administrator of HOSPITAL and by CORPORATION. Said fees shall be in accordance with the fee schedule attached hereto as Exhibit "A" and incorporated herein by this reference.

B.  Professional fees are agreed to be reasonable, competitive, and in general accordance with customary local fees for comparable services for all HOSPITAL patients referred to or desiring of professional services from CORPORATION by reason of its position with HOSPITAL.

## 6.01.  DAILY MEMORANDUM AND BILLING.

A.  PHYSICIANS shall file with HOSPITAL daily memoranda of the services performed and shall and do hereby assign the collection of said charges to HOSPITAL.

B.  Notification shall include, but not be limited to, designation of the Hospital Charge Code(s) and procedural/ diagnostic codes (CPT-4) on the Emergency Room Record. Notification shall be made by individual patient for whom services were rendered.

## 6.02.  COMPUTATION OF RESPECTIVE AMOUNTS DUE TO CORPORATION AND TO BOARD.

A.  During the term of this Agreement, BOARD shall pay CORPORATION as follows:

1.  HOSPITAL shall, daily, balance with CORPORATION records of charges.  Charges shall be defined as the PHYSICIAN charge for PHYSICIANS service as described by a CPT-4 procedure code.

2.  HOSPITAL shall prepare an accounting to CORPORATION at the end of each month.  Said accounting shall contain a reconciliation of charges and HOSPITAL computation of payment due CORPORATION by multiplying the volume of each physician charge for professional service provided by PHYSICIAN by the charge for each service.  The sum of charges as computed shall be defined as Professional Fees.

B.  The CORPORATION shall pay the BOARD an Administrative Fee equal to the sum of the following:

1.  Professional, courtesy or similar discount extended to patients by the CORPORATION.

-7-

AERAS 1055

2.  Bad Debts and uncollectibles, which such uncollectible fees shall include, without limitation, those which have been disallowed in whole or in part by third-party payors and which are not otherwise collectible from the patient whether such collection is barred by applicable law and regulation or is due to the insolvency of the said patient.

3.  The BOARD's carrying cost for Professional Fees paid to the CORPORATION in advance of receipt of the same by the BOARD and

4.  Actual clerical, computer and other like expenses of billing.

The initial Administrative Fee shall be deemed to be thirty-five percent (35%) of the Professional Fees, but the amount of the Administrative Fee shall be adjusted periodically in light of the actual amount of the foregoing costs.  The Administrative Fee shall be payable at the time that the Professional Fees are payable to the CORPORATION and may be held out of such Professional Fees by the BOARD.

C.  It is the intent of both parties that the financial positions under the predecessor agreement shall not be worsened relative to the terms of this Agreement and that neither party shall subsidize the other party.

D.  Should Agreement be terminated by either party, HOSPITAL shall:

a.  Render CORPORATION an accounting and payment of any monies due.
b.  Retain accounts receivable for professional services generated under this Agreement and shall collect and retain monies from said receivables.

6.03.  **PAYMENT.**  HOSPITAL shall render the accounting and make payment to CORPORATION on or before the 15th day of each month for services rendered to patients by CORPORATION the previous month. Payments shall be made as specified in Section 6.02.

6.04.  **RELEASE OF AGREEMENT/CHARGE INFORMATION.**  A copy of this agreement and charges may be provided to Blue Cross/Blue Shield; the financial intermediary for Medicare; and to the State of Alabama intermediary for Medicaid.

7.01.  **COMPLIANCE WITH THIRD PARTY PAYOR REQUIREMENTS.**  The CORPORATION recognizes that the BOARD is a participant in various third party payment programs, including, without limitation, Medicare and Medicaid programs, which participation is essential to the financial viabililty of the BOARD.  The CORPORATION shall use its reasonable efforts to fully cooperate with the BOARD and provide assistance to the BOARD to the end that the BOARD will be able to meet

–8–

**AERAS 1056**

all requirements for participation and payment associated with any such third pary payment program. Further, until the expiration of four years after the furnishing of services provided under the Agreement, the CORPORATION will make available to the Secretary, United States Department of Health and Human Services and the United States Comptroller General, and their representatives, the Agreement and all books, documents and records necessary to certify the nature and extent of the costs of those services. If the CORPORATION carries out the duties of this Agreement through a subcontract worth $10,000 or more over a 12-month period with an organization or individuals, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to its books and records.

8.01.  **ASSIGNMENT.** During the term of this Agreement, CORPORATION shall have no right to assign any part of CORPORATION's interest and responsibilities hereunder without first obtaining the written consent of BOARD.

8.02.  **TERM OF AGREEMENT.** The Agreement shall become effective on April 1, 1988 for an initial term of fifteen (15) months therefrom and shall be automatically renewed for successive periods of two (2) years thereafter subject, however, to Sections 8.03 and 8.04.

8.03.  **REVIEW.** Beginning with the 90th day prior to the end of the initial or any renewal terms thereof, any other provision of this Agreement shall be subject to review at the request of either party hereto. During this review period the parties agree to use their best efforts to meet together at mutually agreeable times for the review and, if necessary, renegotiation of the applicable provisions hereof. If the parties agree to modification of this Agreement, such modifications shall be incorporated herein by amendment as hereinafter provided, such amendments to become effective on the date stipulated therein. In the event the parties do not agree to modifications of this Agreement, this Agreement shall continue in effect without modifications until terminated in accordance with the provisions herein.

8.04.  **TERMINATION.** This Agreement may be sooner terminated on the first to occur of the following:

> a.  **Termination by Mutual Agreement.** In the event BOARD and Corporation mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.
> b.  **Termination by BOARD.** BOARD shall be entitled to terminate this Agreement if (i) CORPORATION defaults in the performance of any material term or terms of this Agreement and such default continues uncured thirty (30) days after written notice of such default is received by CORPORATION from BOARD, or (ii) CORPORATION shall apply for or consent to the appointment of a receiver, trustee or liquidator of CORPORATION or of all or a substantial part of CORPORATION's assets or admit in writing its inability to pay CORPORATION's debts as they become due or make a general assignment for the

-9-

AERAS 1057

benefit of creditors.

    c.  **Termination by CORPORATION.**  CORPORATION shall be entitled to terminate this Agreement if (i) BOARD defaults in the performance of any material term or terms of this Agreement and such default continues uncured thirty (30) days after written notice of such default is received by BOARD from CORPORATION, or (ii) the DEPARTMENT or any portion thereof shall be damaged or destroyed by fire or other casualty and if Board fails to commence repairing, restoring, rebuilding or replacing any such damage or destruction within thirty (30) days after such fire or other casualty, or shall fail to complete such work within a reasonable period of time.

    d.  **Optional Termination.**  If either party shall, with or without cause, give to the other at least one hundred twenty (120) days advance written notice, this Agreement shall terminate on the future date specified in such notice.

**8.05.**  **EFFECTS OF TERMINATION.**  Upon termination of this Agreement, neither party shall have any further obligation hereunder except for (a) obligations occuring prior to the date of termination and (b) obligations, promises or covenants contained herein that are expressly made to extend beyond the term of this Agreement.

**8.06**  **CONTENT AND AMENDMENT.**  This agreement contains all of the agreements and conditions made between the parties with reference to CORPORATIONS´ association with BOARD and may not be amended except in writing signed by all of the parties hereto.

**8.07.**  **NOTICES.**  Any notice, demand, or communication required, permitted, or desired to be given hereunder, shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed as follows:

      A.  TO CORPORATION:
         Alabama Emergency Room Administrative Services, P.C.
         c/o John D. Moorehouse, M.D.
         2231 Old Pike Road
         Pike Road, Alabama  36064

      B.  TO BOARD:
         Administrator
         Northeast Alabama Regional Medical Center
         Post Office Box 2208
         Anniston, Alabama  36202

**8.08.**  **SEVERABILITY.**  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

-10-

AERAS 1058

8.09.   **HEADINGS.**  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.10.   **GOVERNING LAW.**  The Agreement shall be governed by and construed in accordance with the laws of the State of Alabama.  All duties and obligations of the parties created hereunder are performable in Calhoun County, Alabama, and Calhoun County, Alabama shall be the sole and exclusive venue for any litigation, special proceedings, or other proceedings as between the parties that may be brought or arise out of or in connection with or by  reason of this Agreement.

8.11.   **WAIVER OR BREACH.**  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

8.12.   **ENFORCEMENT.**  In the event either party resorts to legal actions to enforce the terms and provisions of this Agreement, the prevailing party shall be entitled to recover the costs of such action so incurred, including, without limitation, reasonable attorneys' fees.

8.13.   **ADDITIONAL ASSURANCES.**  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as are necessary to effectuate this Agreement.

8.14.   **FORCE MAJEURE.**  Neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement, or other interruption of service or employment deemed resulting, directly or indirectly, from Acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either party's employees, or any similar or dissimilar cause beyond the reasonable control of either party.

8.15.   **AMENDMENTS AND AGREEMENT EXECUTION.**  This Agreement and amendments thereto shall be in writing and executed in multiple copies on behalf of CORPORATION by its President with respect to such execution and on behalf of BOARD by its Administrator.  Each multiple copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

8.16.   **ENTIRE AGREEMENT.**  This Agreement supersedes all previous contracts and constitutes the entire agreement between the parties. Neither party shall be entitled to benefits other than those specified herein.  No oral statement or prior written material not specifically incorporated herein shall be of any force and effect and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein, such amendment(s) to become

-11-

AERAS 1059

effective on the date stipulated in such amendments.  Both parties specifically acknowledge that in entering into and executing this Agreement, they rely soley upon the representations  and agreements contained in this Agreement and no others.

   **IN WITNESS WHEREOF,** the parties have executed this Emergency Care Agreement in multiple originals on this the ____/____ day of _April_____, 19 98.

REGIONAL MEDICAL CENTER BOARD:               ALABAMA EMERGENCY ROOM
                                             ADMINISTRATIVE SERVICES, P.C.

BY: _Allen Fletcher___                       BY: _John Moorehouse___
   ALLEN FLETCHER                               JOHN D. MOOREHOUSE, M.D.
   ADMINISTRATOR                                Medical Director and
                                                Chief Executive Officer

Attest:                                      Attest:

_____                      _____


                              -12-


                                             **AERAS 1060**

04/29/88  14:09:15                                      E.R. PHYSICIAN CHA

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 424 | 9994245 | *VOID CARD* | .00 | 5 | 00 | | |
| | 8223109 | $ERTEBRAL BODIES FX | 65.00 | X | 47 | 0000000 | 981 |
| | 8700841 | $EBD SKN PTL THICKNE | 35.00 | X | 47 | 0011046 | 981 |
| | 8131013 | $RNK LACERATE2.5-7.5 | 122.00 | X | 47 | 0013101 | 981 |
| | 8700601 | $INGER TIP GRAFT | 225.00 | X | 47 | 0015050 | 981 |
| | 8700817 | $ROCTOSCOPIC EXAM | 63.75 | X | 47 | 0045300 | 981 |
| | 8906000 | $MT CONSULTATION | 50.00 | X | 47 | 0090600 | 981 |
| | 8906059 | $NTERMEDIATE CONSULT | 60.00 | X | 47 | 0090605 | 981 |
| | 8906109 | $CNSULTATION EXTEND | 65.00 | X | 47 | 0090610 | 981 |
| | 8906208 | $OMPREHENSIVE CONSUL | 80.00 | X | 47 | 0090620 | 981 |
| | 8930422 | $EW PAT ECG INTERP | 15.00 | X | 47 | 0093042 | 981 |
| | 8932733 | $KG MONITOR | 40.00 | X | 47 | 0093273 | 981 |
| | 8990541 | $DD SUNDAY&HOLIDAY | 20.00 | X | 47 | 0099054 | 981 |
| | 8991556 | $EW PAT.MED MGT CNSL | 30.00 | X | 47 | 0099155 | 981 |
| | 8100000 | I&D SEBACEOUS CYST | 37.00 | X | 47 | 1000000 | 981 |
| | 8700882 | I&D SEBACEOUS CYST | 18.00 | X | 47 | 1000050 | 981 |
| | 8700064 | I&D SEBAC CYST-PREMT | 23.00 | X | 47 | 1000056 | 981 |
| | 8100018 | SEB CYST 2ND LESION | 25.00 | X | 47 | 1000100 | 981 |
| | 8100034 | I&D SEBACEOUS CYST | 47.00 | X | 47 | 1000300 | 981 |
| | 8700866 | I&D SEBACEOUS CYST | 23.00 | X | 47 | 1000350 | 981 |
| | 8100208 | I&D OF FURUNCLE | 46.00 | X | 47 | 1002000 | 981 |
| | 8700874 | I&D OF FURUNCLE | 20.00 | X | 47 | 1002050 | 981 |
| | 8700056 | I&D FURUNCLE-PREMGNT | 25.00 | X | 47 | 1002056 | 981 |
| | 8100604 | I&D ABSCESS SIMPLE | 40.00 | X | 47 | 1006000 | 981 |
| | 8700890 | I&D ABSCESS SIMPLE | 20.00 | X | 47 | 1006050 | 981 |
| | 8700510 | I&D ABSCESS-PREMGMT | 40.00 | X | 47 | 1006056 | 981 |
| | 8100612 | I&D ABSCESS CMPX&MEDVT | 78.00 | X | 47 | 1006100 | 981 |

**AERAS 1061**

04/19/88  14:09:15

E.R. PHYSICIAN CHA

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8700908 | I&D ABSCESS CMPXEMEDVT | 39.00 | X | 47 | 1006150 | 981 |
| | 8100802 | I&D PILONIDAL CYST | 62.00 | X | 47 | 1008000 | 981 |
| | 8700916 | I&D PILONIDAL CYST | 31.00 | X | 47 | 1008050 | 981 |
| | 8101308 | I&D PARONYCHIA | 45.00 | X | 47 | 1010000 | 981 |
| | 8700924 | I&D PARONYCHIA | 22.00 | X | 47 | 1010050 | 981 |
| | 8101206 | INC&REM FORGN BODY | 45.00 | X | 47 | 1012000 | 981 |
| | 8700932 | INC&REM FORGN BODY | 22.00 | X | 47 | 1012050 | 981 |
| | 8101214 | FORGN BODY REM COMP | 118.00 | X | 47 | 1012100 | 981 |
| | 8700940 | FORGN BODY REM COMP | 59.00 | X | 47 | 1012150 | 981 |
| | 8101404 | I&D HEMATOMA SIMPLE | 41.00 | X | 47 | 1014000 | 981 |
| | 8700957 | I&D HEMATOMA SIMPLE | 20.00 | X | 47 | 1014050 | 981 |
| | 8101602 | PUNCTURE ABSCESS | 37.00 | X | 47 | 1016000 | 981 |
| | 8700965 | PUNCTURE ABSCESS | 18.00 | X | 47 | 1016050 | 981 |
| | 8700049 | PUNCT ABSCESS PREMGT | 40.00 | X | 47 | 1016056 | 981 |
| | 8700973 | ABRASION DEBRIDEMENT | 40.00 | X | 47 | 1104000 | 981 |
| | 8700981 | ABRASION DEBRIDEMENT | 20.00 | X | 47 | 1104050 | 981 |
| | 8700858 | \$EBD SKN PTL THIC RE | 20.00 | X | 47 | 1104056 | 981 |
| | 8117301 | AVULSION NAIL PLATE | 54.00 | X | 47 | 1173000 | 981 |
| | 8700999 | AVULSION NAIL PLATE | 27.00 | X | 47 | 1173050 | 981 |
| | 8700700 | AVUL NAIL PLATE SING | 25.00 | X | 47 | 1173056 | 981 |
| | 8117319 | AVUL 2ND NAIL PLATE | 25.00 | X | 47 | 1173100 | 981 |
| | 8117327 | AVUL EA ADD NAIL PLT | 26.00 | X | 47 | 1173200 | 981 |
| | 8117400 | EVAC SUBUNGUAL HEMAT | 36.00 | X | 47 | 1174000 | 981 |
| | 8701005 | EVAC SUBUNGUAL HEMAT | 18.00 | X | 47 | 1174050 | 981 |
| | 8117608 | RECONSTRUCT NAIL BED | 52.00 | X | 47 | 1176000 | 981 |
| | 8701913 | RECONSTRUCT NAIL BED | 26.00 | X | 47 | 1176050 | 981 |
| | 8117624 | RECONST NAIL BED-CCM | 230.00 | X | 47 | 1176200 | 981 |

**AERAS 1062**

E.R. PHYSICIAN CHA...

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8731021 | RECONST NAIL BED-CGM | 115.00 | X | 47 | 1176250 | 981 |
| | 8120016 | LACERATION TO 2.5CM | 46.00 | X | 47 | 1200100 | 981 |
| | 8701039 | LACERATION TO 2.5CM | 23.00 | X | 47 | 1200150 | 981 |
| | 8700445 | TRUNK REPAIR TO 2.5 | 31.00 | X | 47 | 1200156 | 981 |
| | 8120024 | LACERATION 2.5-7.5CM | 59.00 | X | 47 | 1200200 | 981 |
| | 8701047 | LACERATION 2.5-7.5CM | 29.00 | X | 47 | 1200250 | 981 |
| | 8700437 | TRUNK REPAIR 2.5-7.5 | 37.00 | X | 47 | 1200256 | 981 |
| | 8120040 | LACERATION7.5-12.5CM | 79.00 | X | 47 | 1200400 | 981 |
| | 8701054 | LACERATION7.5-12.5CM | 39.00 | X | 47 | 1200450 | 981 |
| | 8700429 | TRUNK REPAIR 7.5-125 | 37.00 | X | 47 | 1200456 | 981 |
| | 8120057 | LACERATION-12.5-20CM | 102.00 | X | 47 | 1200500 | 981 |
| | 8701062 | LACERATION-12.5-20CM | 51.00 | X | 47 | 1200550 | 981 |
| | 8120065 | 20CM TO 30CM SI LAC | 210.00 | X | 47 | 1200600 | 981 |
| | 8701070 | 20 CM TO 30CM SI LAC | 105.00 | X | 47 | 1200650 | 981 |
| | 8120073 | LACERATION OVER 30CM | 254.00 | X | 47 | 1200700 | 981 |
| | 8701088 | LACERATION OVER 30CM | 127.00 | X | 47 | 1200750 | 981 |
| | 8120115 | FACE LACERATION2.5CM | 54.00 | X | 47 | 1201100 | 981 |
| | 8701096 | FACE LACERATION2.5CM | 27.00 | X | 47 | 1201150 | 981 |
| | 8700411 | FACE REPAIR TO 2.5CM | 30.00 | X | 47 | 1201156 | 981 |
| | 8120131 | FACE LACERATE2.5-5CM | 79.00 | X | 47 | 1201300 | 981 |
| | 8701104 | FACE LACERATE2.5-5CM | 39.00 | X | 47 | 1201350 | 981 |
| | 8700403 | FACE REPAIR 2.5-5.0 | 39.00 | X | 47 | 1201356 | 981 |
| | 8120149 | FACE LACERATE5-7.5CM | 101.00 | X | 47 | 1201400 | 981 |
| | 8701112 | FACE LACERATE5-7.5CM | 50.00 | X | 47 | 1201450 | 981 |
| | 8120156 | FACE LACER7.5-12.5CM | 114.00 | X | 47 | 1201500 | 981 |
| | 8701120 | FACE LACER7.5-12.5CM | 57.00 | X | 47 | 1201550 | 981 |
| | 8120164 | FACELACER 12.5-20 CM | 160.00 | X | 47 | 1201600 | 981 |

AERAS 1063

E.R. PHYSICIAN CHARGES

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|-------------|-------------|-------|-----|-----|-------------|-----------|
| | 8701138 | FACE LACER 12.5-20CM | 80.00 | X | 47 | 1201650 | 981 |
| | 8120172 | FACE LACERATE 20-30CM | 200.00 | X | 47 | 1201700 | 981 |
| | 8701146 | FACE LACERATE 20-30CM | 100.00 | X | 47 | 1201750 | 981 |
| | 8120180 | FACE LACERATION 30CM | 215.00 | X | 47 | 1201800 | 981 |
| | 8701153 | FACE LACERATION 30CM | 107.00 | X | 47 | 1201850 | 981 |
| | 8120313 | LACERATION REPAIR 2.5 | 69.00 | X | 47 | 1203100 | 981 |
| | 8701161 | LACERATION REPAIR 2.5 | 34.00 | X | 47 | 1203150 | 981 |
| | 8700395 | TRUNK WOUND TO 2.5CM | 35.00 | X | 47 | 1203156 | 981 |
| | 8120321 | LACERATE RPR 2.5-7.5 | 96.00 | X | 47 | 1203200 | 981 |
| | 8701179 | LACERATE RPR 2.5-7.5 | 48.00 | X | 47 | 1203250 | 981 |
| | 8120347 | LACERATION 7.5-12.5 | 132.00 | X | 47 | 1203400 | 981 |
| | 8701187 | LACERATION 7.5-12.5 | 66.00 | X | 47 | 1203450 | 981 |
| | 8120354 | LACERATION 12.5-20CM | 205.00 | X | 47 | 1203500 | 981 |
| | 8701195 | LACERATION 12.5-20CM | 102.00 | X | 47 | 1203550 | 981 |
| | 8120362 | LACERATION 20-30CM | 255.00 | X | 47 | 1203600 | 981 |
| | 8701203 | LACERATION 20-30CM | 127.00 | X | 47 | 1203650 | 981 |
| | 8120370 | LACERATION OVER 30CM | 275.00 | X | 47 | 1203700 | 981 |
| | 8701211 | LACERATION OVER 30CM | 137.00 | X | 47 | 1203750 | 981 |
| | 8120412 | LACERATION UP TO 2.5 | 63.00 | X | 47 | 1204100 | 981 |
| | 8701229 | LACERATION UP TO 2.5 | 31.00 | X | 47 | 1204150 | 981 |
| | 8700387 | NECK LACERATE TO 2.5 | 40.00 | X | 47 | 1204156 | 981 |
| | 8120420 | LACERATION 2.5-7.5CM | 94.00 | X | 47 | 1204200 | 981 |
| | 8701237 | LACERATION 2.5-7.5CM | 47.00 | X | 47 | 1204250 | 981 |
| | 8120446 | LACERATION 7.5-12.5C | 107.00 | X | 47 | 1204400 | 981 |
| | 8701245 | LACERATION 7.5-12.5C | 53.00 | X | 47 | 1204450 | 981 |
| | 8120453 | LACERATION 12.5-20.0 | 120.00 | X | 47 | 1204500 | 981 |
| | 8701252 | LACERATION 12.5-20.0 | 60.00 | X | 47 | 1204550 | 981 |

E.R. PHYSICIAN CHA

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|------|------|------|------|------|------|------|
| | 8120461 | LACERATION 20CM-30CM | 175.00 | X | 47 | 1204600 | 981 |
| | 8701260 | LACERATION 20CM-30CM | 87.00 | X | 47 | 1204650 | 981 |
| | 8120479 | LACERATION OVER 30CM | 200.00 | X | 47 | 1204700 | 981 |
| | 8701278 | LACERATION OVER 30CM | 100.00 | X | 47 | 1204750 | 981 |
| | 8120511 | FACE LACERATE 2.5CM | 104.00 | X | 47 | 1205100 | 981 |
| | 8701286 | FACE LACERATE 2.5CM | 52.00 | X | 47 | 1205150 | 981 |
| | 8700379 | FACE LACERATE TO 2.5 | 55.00 | X | 47 | 1205156 | 981 |
| | 8120529 | FACE LACER 2.5-5CM | 134.00 | X | 47 | 1205200 | 981 |
| | 8701294 | FACE LACER 2.5-5CM | 67.00 | X | 47 | 1205250 | 981 |
| | 8120537 | FACE LACERATE 5-7.5 | 160.00 | X | 47 | 1205300 | 981 |
| | 8701302 | FACE LACERATE 5-7.5 | 80.00 | X | 47 | 1205350 | 981 |
| | 8120545 | FACE LACER 7.5-12.5 | 185.00 | X | 47 | 1205400 | 981 |
| | 8701310 | FACE LACER 7.5-12.5 | 92.00 | X | 47 | 1205450 | 981 |
| | 8120552 | FACE LACERATE12.5-20 | 210.00 | X | 47 | 1205500 | 981 |
| | 8701328 | FACE LACERATE12.5-20 | 105.00 | X | 47 | 1205550 | 981 |
| | 8120560 | 20CM TO 30CM LY CLO | 305.00 | X | 47 | 1205600 | 981 |
| | 8701336 | 20CM TO 30CM LY CLO | 152.00 | X | 47 | 1205650 | 981 |
| | 8120578 | FACE LACERATE 30CM | 415.00 | X | 47 | 1205700 | 981 |
| | 8701344 | FACE LACERATE 30CM | 207.00 | X | 47 | 1205750 | 981 |
| | 8131005 | TRNK LACERATE 2.5CM | 121.00 | X | 47 | 1310000 | 981 |
| | 8701351 | TRNK LACERATE 2.5CM | 60.00 | X | 47 | 1310050 | 981 |
| | 8131203 | COMP SCLP 1.0-2.5CM | 146.00 | X | 47 | 1312000 | 981 |
| | 8701369 | COMP SCLP 1.0-2.5CM | 73.00 | X | 47 | 1312050 | 981 |
| | 8131211 | COMP SCLP 2.5-7.5CM | 244.00 | X | 47 | 1312100 | 981 |
| | 8701377 | COMP SCLP 2.5-7.5CM | 122.00 | X | 47 | 1312150 | 981 |
| | 8131310 | COMP LACERATE 2.5CM | 170.00 | X | 47 | 1313100 | 981 |
| | 8701385 | COMP LACERATE 2.5CM | 85.00 | X | 47 | 1313150 | 981 |

**AERAS 1065**

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8131328 | CXLACNKIDSFT2.5 7.5 | 335.00 | X | 47 | 1313200 | 981 |
| | 8701393 | CXLACNKIDSFT2.5 7.5 | 167.00 | X | 47 | 1313250 | 981 |
| | 8700585 | COMPLEX REPAIR-WOUND | 240.00 | X | 47 | 1313252 | 981 |
| | 8131500 | RPR LACERATE 1.0CM | 122.00 | X | 47 | 1315000 | 981 |
| | 8701401 | RPR LACERATE 1.0CM | 61.00 | X | 47 | 1315050 | 981 |
| | 8131518 | RPR LACERATE 1.0-2.5 | 210.00 | X | 47 | 1315100 | 981 |
| | 8701419 | RPR LACERATE 1.0-2.5 | 105.00 | X | 47 | 1315150 | 981 |
| | 8131526 | 25 TO 75 CX LAC FACE | 365.00 | X | 47 | 1315200 | 981 |
| | 8701427 | 25 TO 75 CX LAC FACE | 182.00 | X | 47 | 1315250 | 981 |
| | 8700593 | COMPLEX REPAIR-25-75 | 260.00 | X | 47 | 1315252 | 981 |
| | 8133001 | COMP UNUSUAL 7.5OVER | 445.00 | X | 47 | 1330000 | 981 |
| | 8701435 | COMP UNUSUAL 7.5OVER | 222.00 | X | 47 | 1330050 | 981 |
| | 8150500 | PINCH GRAFT | 155.00 | X | 47 | 1505000 | 981 |
| | 8701443 | PINCH GRAFT | 77.00 | X | 47 | 1505050 | 981 |
| | 8160004 | BURN 1ST DEGREE | 40.00 | X | 47 | 1600000 | 981 |
| | 8701450 | BURN 1ST DEGREE | 20.00 | X | 47 | 1600050 | 981 |
| | 8700031 | BURN-1ST DEGREE-MGMT | 16.00 | X | 47 | 1600056 | 981 |
| | 8160103 | BURN WITH ANESTHESIA | 44.00 | X | 47 | 1601000 | 981 |
| | 8701468 | BURN WITH ANESTHESIA | 22.00 | X | 47 | 1601050 | 981 |
| | 8160152 | BURN MED/LARGE ANEST | 146.00 | X | 47 | 1601500 | 981 |
| | 8701476 | BURN MED/LARGE ANEST | 73.00 | X | 47 | 1601550 | 981 |
| | 8160202 | BURN W/O ANESTHESIA | 38.00 | X | 47 | 1602000 | 981 |
| | 8701484 | BURN W/O ANESTHESIA | 19.00 | X | 47 | 1602050 | 981 |
| | 8700023 | BURN-PREOP MGMT | 16.00 | X | 47 | 1602056 | 981 |
| | 8160251 | BURN MED W/O ANESTH | 45.00 | X | 47 | 1602500 | 981 |
| | 8701492 | BURN MED W/O ANESTH | 21.00 | X | 47 | 1602550 | 981 |
| | 8160301 | BURN LG W/O ANESTH | 56.00 | X | 47 | 1603000 | 981 |

AERAS 1066

E.R. PHYSICIAN CHAR

| GL# | SERVICE CODE | DESCRIPTION | PRICE | N/C | INS | C.P.T. CODE | UB82 CODE |
|-----|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8701500 | BURN LG W/O ANESTH | 28.00 | X | 47 | 1603050 | 981 |
| | 8200008 | GEN INCISION ABSCESS | 52.00 | X | 47 | 2000000 | 981 |
| | 8701518 | GEN INCISION ABSCESS | 26.00 | X | 47 | 2000050 | 981 |
| | 8200057 | I&D SOFTTISSUEABSCES | 30.00 | X | 47 | 2000500 | 981 |
| | 8701526 | I&D SOFTTISSUEABSCES | 15.00 | X | 47 | 2000550 | 981 |
| | 8205205 | INCISE REM FB MUSCL | 56.00 | X | 47 | 2052000 | 981 |
| | 8701534 | INCISE REM FB MUSCL | 28.00 | X | 47 | 2052050 | 981 |
| | 8205502 | INJ TENDON-LIG-TRIGG | 30.00 | X | 47 | 2055000 | 981 |
| | 8701542 | INJ TENDON-LIG-TRIGG | 15.00 | X | 47 | 2055050 | 981 |
| | 8206005 | ARTHOCENTESIS SMALL | 36.00 | X | 47 | 2060000 | 981 |
| | 8701559 | ARTHOCENTESIS SMALL | 18.00 | X | 47 | 2060050 | 981 |
| | 8206054 | INTER JOINT OR BURSA | 31.00 | X | 47 | 2060500 | 981 |
| | 8701567 | INTER JOINT OR BURSA | 15.00 | X | 47 | 2060550 | 981 |
| | 8206104 | MAJOR JOINT OR BURSA | 32.00 | X | 47 | 2061000 | 981 |
| | 8701575 | MAJOR JOINT OR BURSA | 16.00 | X | 47 | 2061050 | 981 |
| | 8700791 | SKULL FRACTURES | 90.00 | X | 47 | 2130000 | 981 |
| | 8701583 | SKULL FRACTURES | 45.00 | X | 47 | 2130050 | 981 |
| | 8700759 | SKULL FRACTURE | 65.00 | X | 47 | 2130052 | 981 |
| | 8213100 | NASAL FRACTURE | 45.00 | X | 47 | 2131000 | 981 |
| | 8701591 | NASAL FRACTURE | 22.00 | X | 47 | 2131050 | 981 |
| | 8700833 | TMJ DISLOCATION UNC | 119.00 | X | 47 | 2148000 | 981 |
| | 8701609 | TMJ DISLOCATION UNC | 59.00 | X | 47 | 2148050 | 981 |
| | 8700775 | RIB FX CLO EACH | 124.00 | X | 47 | 2180000 | 981 |
| | 8701617 | RIB FX CLO EACH | 62.00 | X | 47 | 2180050 | 981 |
| | 8700783 | RIB FX CLOSED EACH | 40.00 | X | 47 | 2180052 | 981 |
| | 8700767 | STERNUM FX CLOSED | 65.00 | X | 47 | 2182000 | 981 |
| | 8235004 | CLOSED CLAVICULAR FX | 160.00 | X | 47 | 2350000 | 981 |

AERAS 1067

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB 82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8701625 | CLOSED CLAVICULAR FX | 80.00 | X | 47 | 2350050 | 981 |
| | 8235053 | CLAV FRACTRE MANIPUL | 220.00 | X | 47 | 2350500 | 981 |
| | 8701633 | CLAV FRACTRE MANIPUL | 110.00 | X | 47 | 2350550 | 981 |
| | 8235301 | STERNOCLAVICULAR | 60.00 | X | 47 | 2353000 | 981 |
| | 8235400 | CLS ACROMIOCLAVICULR | 60.00 | X | 47 | 2354000 | 981 |
| | 8235707 | CLOS SCAPULAR FRCTRE | 142.00 | X | 47 | 2357000 | 981 |
| | 8236002 | CLOSED HUMERAL FRCTR | 60.00 | X | 47 | 2360000 | 981 |
| | 8236200 | CLOS TUBEROS FRACTRE | 142.00 | X | 47 | 2362000 | 981 |
| | 8236507 | CLS SHOULDER DISLOC | 290.00 | X | 47 | 2365000 | 981 |
| | 8701641 | CLS SHOULDER DISLOC | 145.00 | X | 47 | 2365050 | 981 |
| | 8236556 | CLS SHLDR DISL ANES | 365.00 | X | 47 | 2365500 | 981 |
| | 8701658 | CLS SHLDR DISL ANES | 182.00 | X | 47 | 2365550 | 981 |
| | 8239311 | GEN I&D INFECT BURSA | 51.00 | X | 47 | 2393100 | 981 |
| | 8701666 | GEN I&D INFECT BURSA | 25.00 | X | 47 | 2393150 | 981 |
| | 8245003 | CLS HUMRL SHFT FRACT | 310.00 | X | 47 | 2450000 | 981 |
| | 8245300 | CLS SUPRACONDYLAR | 315.00 | X | 47 | 2453000 | 981 |
| | 8700726 | RX CLG SUPRACOND FX | 40.00 | X | 47 | 2453056 | 981 |
| | 8245607 | CLS EPICONDYLAR FRAC | 180.00 | X | 47 | 2456000 | 981 |
| | 8700361 | EPICONDYLAR FX-PREM | 40.00 | X | 47 | 2456056 | 981 |
| | 8246001 | CLS ELBOW DISLOCATE | 155.00 | X | 47 | 2460000 | 981 |
| | 8246050 | ELBOW DISLOC ANESTH | 310.00 | X | 47 | 2460500 | 981 |
| | 8246407 | RADIAL HEAD SUBLUXAT | 73.00 | X | 47 | 2464000 | 981 |
| | 8701674 | RADIAL HEAD SUBLUXAT | 36.00 | X | 47 | 2464050 | 981 |
| | 8700734 | RX RADIAL HD SUB MV | 40.00 | X | 47 | 2464056 | 981 |
| | 8246506 | RAD HEAD-NECK FRACT | 74.00 | X | 47 | 2465000 | 981 |
| | 8700353 | RADIAL HEAD/NECK-PRE | 40.00 | X | 47 | 2465056 | 981 |
| | 8246704 | CLS ULNAR FRACTURE | 130.00 | X | 47 | 2467000 | 981 |

AERAS 1068

PHYSICIAN CHAR

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|-----|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8700346 | ULNAR FX-PROX-PREMGT | 40.00 | X | 47 | 2467056 | 981 |
| | 8255002 | RX CLOSED RADIAL SH | 235.00 | X | 47 | 2550000 | 981 |
| | 8700742 | CLO RADIAL FX MV | 40.00 | X | 47 | 2550056 | 981 |
| | 8255309 | CLS ULNAR SHAFT FRAC | 190.00 | X | 47 | 2553000 | 981 |
| | 8700338 | ULNAR SHAFT FX-PREMT | 40.00 | X | 47 | 2553056 | 981 |
| | 8255606 | CLS RAD-ULNAR SHAFT | 265.00 | X | 47 | 2556000 | 981 |
| | 8700320 | RADIAL-ULNAR FX-PRE | 40.00 | X | 47 | 2556056 | 981 |
| | 8256000 | DISTAL RADIAL FRAC | 74.00 | X | 47 | 2560000 | 981 |
| | 8700312 | DISTAL RADIAL FX-PRE | 40.00 | X | 47 | 2560056 | 981 |
| | 8256307 | CLS CARPAL BONE FRAC | 70.00 | X | 47 | 2563000 | 981 |
| | 8700304 | CARPAL BONE FX-PREMT | 40.00 | X | 47 | 2563056 | 981 |
| | 8260101 | DRAIN FINGER ABSCESS | 52.00 | X | 47 | 2601000 | 981 |
| | 8701682 | DRAIN FINGER ABSCESS | 26.00 | X | 47 | 2601050 | 981 |
| | 8260119 | I&D FINGER ABSC COMP | 113.00 | X | 47 | 2601100 | 981 |
| | 8701690 | I&D FINGER ABSC COMP | 56.00 | X | 47 | 2601150 | 981 |
| | 8260606 | TENOTOMY PER DIGIT | 230.00 | X | 47 | 2606000 | 981 |
| | 8701708 | TENOTOMY PER DIGIT | 115.00 | X | 47 | 2606050 | 981 |
| | 8262404 | RADIAL HEAD SUBLV AT | 50.00 | X | 47 | 2624056 | 981 |
| | 8264103 | EXTENSOR REPAIR HAND | 260.00 | X | 47 | 2641000 | 981 |
| | 8701716 | EXTENSOR REPAIR HAND | 130.00 | X | 47 | 2641050 | 981 |
| | 8266009 | CLS METACARDAL FRACT | 165.00 | X | 47 | 2660000 | 981 |
| | 8700155 | METACARPAL FX-PREMGT | 40.00 | X | 47 | 2660056 | 981 |
| | 8266058 | METACARP MANIP/BONE | 270.00 | X | 47 | 2660500 | 981 |
| | 8266454 | CLS CARPOMET FX | 229.00 | X | 47 | 2664500 | 981 |
| | 8267007 | METACARPO DIS MANIP | 102.00 | X | 47 | 2670000 | 981 |
| | 8701724 | METACARPO DIS MANIP | 51.00 | X | 47 | 2670050 | 981 |
| | 8700163 | METACARPOPHAL-PREMGT | 40.00 | X | 47 | 2670056 | 981 |

AERAS 1069

E.R. PHYSICIAN CHAR

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8267205 | CLS PHALANGEAL SHAFT | 112.00 | X | 47 | 2672000 | 981 |
| | 8701732 | CLS PHALANGEAL SHAFT | 56.00 | X | 47 | 2672050 | 981 |
| | 8700171 | PHALANGEAL FX-PREMGT | 59.00 | X | 47 | 2672056 | 981 |
| | 8267254 | PHALANGEAL MANIP EA | 180.00 | X | 47 | 2672500 | 981 |
| | 8701740 | PHALANGEAL MANIP EA | 90.00 | X | 47 | 2672550 | 981 |
| | 8267502 | DISTAL PHAL MANIP EA | 89.00 | X | 47 | 2675000 | 981 |
| | 8701757 | DISTAL PHAL MANIP EA | 44.00 | X | 47 | 2675050 | 981 |
| | 8267551 | CLO DST PHA FX MANIP | 102.00 | X | 47 | 2675500 | 981 |
| | 8701765 | CLO DST PHA FX MANIP | 51.00 | X | 47 | 2675550 | 981 |
| | 8702623 | JOINT DISLOCATION | 160.00 | X | 47 | 2678000 | 981 |
| | 8270886 | FB REMOVALCOMPLICATE | 335.00 | X | 47 | 2708800 | 981 |
| | 8701773 | FB REMOVALCOMPLICATE | 167.00 | X | 47 | 2708850 | 981 |
| | 8272007 | COCCYX FRACTURE | 255.00 | X | 47 | 2720000 | 981 |
| | 8701781 | COCCYX FRACTURE | 127.00 | X | 47 | 2720050 | 981 |
| | 8272106 | PELVIC FRACTURE | 65.00 | X | 47 | 2721000 | 981 |
| | 8700809 | PELVIC FRACTURE | 40.00 | X | 47 | 2721052 | 981 |
| | 8272205 | HIP SOCKET FRACTURE | 65.00 | X | 47 | 2722000 | 981 |
| | 8700536 | HIP SOCKET FX-PREMGT | 40.00 | X | 47 | 2722056 | 981 |
| | 8272304 | FEMORAL FRACTURE | 65.00 | X | 47 | 2723000 | 981 |
| | 8700544 | FEMORAL FX-PREMGMT | 40.00 | X | 47 | 2723056 | 981 |
| | 8272387 | HIP FRACTURE, CLOSED | 65.00 | X | 47 | 2723800 | 981 |
| | 8700551 | PERTRO FEMORAL-PREMT | 40.00 | X | 47 | 2723856 | 981 |
| | 8275000 | FEMORAL SHAFT FX | 65.00 | X | 47 | 2750000 | 981 |
| | 8700569 | FEMORAL REF-PREMGMT | 40.00 | X | 47 | 2750056 | 981 |
| | 8275208 | CLS PATELLAR FRACTRE | 74.00 | X | 47 | 2752000 | 981 |
| | 8700189 | PATELLAR FX-PREMGMT | 40.00 | X | 47 | 2752056 | 981 |
| | 8275380 | INTERCONDYLAR SPINE | 74.00 | X | 47 | 2753800 | 981 |

AERAS 1070

F E R . PHYSICIAN CHA~

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|---|---|---|---|---|---|---|---|
| | 8750197 | NTERCONDILAR-PREMGT | 40.00 | X | 47 | 2753856 | 981 |
| | 8275505 | CLS KNEE DISLOCATION | 435.00 | X | 47 | 2755000 | 981 |
| | 8275604 | CLS PATELLAR DISLOC | 180.00 | X | 47 | 2756000 | 981 |
| | 8701799 | CLS PATELLAR DISLOC | 90.00 | X | 47 | 2756050 | 981 |
| | 8700205 | PATELLAR DISC PREMGT | 40.00 | X | 47 | 2756056 | 981 |
| | 8275620 | PATELLAR DIS ANESTH | 180.00 | X | 47 | 2756200 | 981 |
| | 8701807 | PATELLAR DIS ANESTH | 90.00 | X | 47 | 2756250 | 981 |
| | 8277501 | CLS TIBIAL SHAFT FX | 74.00 | X | 47 | 2775000 | 981 |
| | 8700692 | CLS TIB SH FX MANIP | 40.00 | X | 47 | 2775056 | 981 |
| | 8277600 | DISTAL TIBIAL FRACTR | 74.00 | X | 47 | 2776000 | 981 |
| | 8700221 | DISTAL TIBIAL FX-PRE | 40.00 | X | 47 | 2776056 | 981 |
| | 8277808 | CLS PROXIMAL FIBULAR | 74.00 | X | 47 | 2778000 | 981 |
| | 8700239 | PROXIMAL FIBULA-PREM | 40.00 | X | 47 | 2778056 | 981 |
| | 8277865 | CLS DISTAL FIBULA FX | 305.00 | X | 47 | 2778600 | 981 |
| | 8700247 | DISTAL FIBULAR-PREMT | 40.00 | X | 47 | 2778656 | 981 |
| | 8278004 | CLS TIBIA-FIBULA FX | 360.00 | X | 47 | 2780000 | 981 |
| | 8700254 | TIBIA-FIBIA FX-PREMT | 40.00 | X | 47 | 2780056 | 981 |
| | 8278087 | CLS BIMALELR ANKL FX | 74.00 | X | 47 | 2780800 | 981 |
| | 8700262 | BIMALLEOLAR ANKLE | 40.00 | X | 47 | 2780856 | 981 |
| | 8278160 | TRIMALLEOLAR ANKL FX | 74.00 | X | 47 | 2781600 | 981 |
| | 8700270 | TRIMALLEOLAR ANKLE | 40.00 | X | 47 | 2781656 | 981 |
| | 8278301 | PROX TIBIOFIB JT DIS | 74.00 | X | 47 | 2783000 | 981 |
| | 8700288 | PROX TIBIOFIBULAR | 40.00 | X | 47 | 2783056 | 981 |
| | 8278400 | ANKLE DISLOCATION | 255.00 | X | 47 | 2784000 | 981 |
| | 8700684 | ANKLE DISLO REFERRAL | 40.00 | X | 47 | 2784056 | 981 |
| | 8278426 | ANKLE DISLOC ANESTH | 305.00 | X | 47 | 2784200 | 981 |
| | 8284002 | CLS CALCANEAL FRACTR | 260.00 | X | 47 | 2840000 | 981 |

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8700072 | CALCANEAL FX-PREMGMT | 40.00 | X | 47 | 2840056 | 981 |
| | 8284309 | CLS TALUS FRACTURE | 265.00 | X | 47 | 2843000 | 981 |
| | 8700676 | RX CLO TALUS FX REF | 40.00 | X | 47 | 2843056 | 981 |
| | 8284507 | CLS TARSAL BONE FX | 200.00 | X | 47 | 2845000 | 981 |
| | 8700296 | TARSAL BONE FX-PREMT | 40.00 | X | 47 | 2845056 | 981 |
| | 8284705 | CLS METATARSAL FRACT | 265.00 | X | 47 | 2847000 | 981 |
| | 8700148 | METATARSAL FX-PREMGT | 40.00 | X | 47 | 2847056 | 981 |
| | 8284903 | CLS FRACT GREAT TOE | 83.00 | X | 47 | 2849000 | 981 |
| | 8700130 | FRACTURE TOE-PREMGMT | 40.00 | X | 47 | 2849056 | 981 |
| | 8285108 | FX PHALANX OTHER TOE | 126.00 | X | 47 | 2851000 | 981 |
| | 8285405 | TARSAL BONE DISLOC | 200.00 | X | 47 | 2854000 | 981 |
| | 8700122 | TARSAL BONE-PRE MGMT | 40.00 | X | 47 | 2854056 | 981 |
| | 8285702 | TALOTARSAL JT DISLOC | 335.00 | X | 47 | 2857000 | 981 |
| | 8700114 | TALOTARSAL JNT-PREMT | 40.00 | X | 47 | 2857056 | 981 |
| | 8286007 | TARSOMETATARSAL DIS | 85.00 | X | 47 | 2860000 | 981 |
| | 8700106 | TARSOMETA JNT-PREMGT | 40.00 | X | 47 | 2860056 | 981 |
| | 8286304 | METATARSOPHLANG DISLOC | 59.00 | X | 47 | 2863000 | 981 |
| | 8700098 | METATARSO JNT-PREMGT | 40.00 | X | 47 | 2863056 | 981 |
| | 8286601 | INTERPHLANGEAL DIS | 51.00 | X | 47 | 2866000 | 981 |
| | 8701815 | INTERPHLANGEAL DIS | 25.00 | X | 47 | 2866050 | 981 |
| | 8700080 | INTERPHAL JNT-PREMGT | 40.00 | X | 47 | 2866056 | 981 |
| | 8286700 | INTERPHA CLO JT ANES | 127.00 | X | 47 | 2867000 | 981 |
| | 8701823 | INTERPHA CLO JT ANES | 63.00 | X | 47 | 2867050 | 981 |
| | 8290553 | SHOULDER SPICA | 51.00 | X | 47 | 2905500 | 981 |
| | 8701831 | SHOULDER SPICA | 25.00 | X | 47 | 2905550 | 981 |
| | 8290652 | LONG ARM CAST/STRAP | 103.00 | X | 47 | 2906500 | 981 |
| | 8701849 | LONG ARM CAST/STRAP | 51.00 | X | 47 | 2906550 | 981 |

AERAS 1072

E.R. PHYSICIAN CHA

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8293751 | SHORT ARM CAST/STRAP | 79.00 | X | 47 | 2907500 | 981 |
| | 8701856 | SHORT ARM CAST/STRAP | 39.00 | X | 47 | 2907550 | 981 |
| | 8290850 | GAUNTLET CAST/STRAP | 72.00 | X | 47 | 2908500 | 981 |
| | 8701864 | GAUNTLET CAST/STRAP | 36.00 | X | 47 | 2908550 | 981 |
| | 8291056 | CAST LONG ARM SPLINT | 87.00 | X | 47 | 2910500 | 981 |
| | 8701872 | CAST LONG ARM SPLINT | 43.00 | X | 47 | 2910550 | 981 |
| | 8291254 | CAST SHORT ARM SPLIN | 29.00 | X | 47 | 2912500 | 981 |
| | 8701880 | CAST SHORT ARM SPLIN | 14.00 | X | 47 | 2912550 | 981 |
| | 8291304 | EXPLI/FINGER SPL IND | 27.00 | X | 47 | 2913000 | 981 |
| | 8701898 | EXPLI/FINGER SPL IND | 13.00 | X | 47 | 2913050 | 981 |
| | 8700650 | APPLI FINGER SPL STA | 21.00 | X | 47 | 2913056 | 981 |
| | 8292005 | STRAPPING LOW BACK | 33.00 | X | 47 | 2920000 | 981 |
| | 8701906 | STRAPPING LOW BACK | 16.00 | X | 47 | 2920050 | 981 |
| | 8292401 | STRAPPING SHOULDER | 31.00 | X | 47 | 2924000 | 981 |
| | 8701914 | STRAPPING SHOULDER | 15.00 | X | 47 | 2924050 | 981 |
| | 8293656 | CYLINDER CAST | 123.00 | X | 47 | 2936500 | 981 |
| | 8701922 | CYLINDER CAST | 61.00 | X | 47 | 2936550 | 981 |
| | 8294050 | SHORT LEG CAST | 97.00 | X | 47 | 2940500 | 981 |
| | 8701930 | SHORT LEG CAST | 48.00 | X | 47 | 2940550 | 981 |
| | 8294407 | ADDING WALKER T/CAST | 20.00 | X | 47 | 2944000 | 981 |
| | 8701948 | ADDING WALKER T/CAST | 10.00 | X | 47 | 2944050 | 981 |
| | 8295057 | LONG LEG SPLINT | 60.00 | X | 47 | 2950500 | 981 |
| | 8901951 | LONG LEG SPLINT | 30.00 | X | 47 | 2950550 | 981 |
| | 8295156 | SHORT LEG SPLINT | 45.00 | X | 47 | 2951500 | 981 |
| | 8701963 | SHORT LEG SPLINT | 22.00 | X | 47 | 2951550 | 981 |
| | 8295206 | STRAPPING HIP | 77.00 | X | 47 | 2952000 | 981 |
| | 8701971 | STRAPPING HIP | 38.00 | X | 47 | 2952050 | 981 |

AERAS 1073

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|---|---|---|---|---|---|---|---|
| | 8295305 | KNEE IMMOBILIZER | 39.00 | X | 47 | 2953000 | 981 |
| | 8701989 | KNEE IMMOBILIZER | 19.00 | X | 47 | 2953050 | 981 |
| | 8303000 | REMOVE FOREIGN BODY | 42.00 | X | 47 | 3030000 | 981 |
| | 8701997 | REMOVE FOREIGN BODY | 21.00 | X | 47 | 3030050 | 981 |
| | 8309031 | NASAL HEMORRHAGE CTL | 93.00 | X | 47 | 3090300 | 981 |
| | 8702003 | NASAL HEMORRHAGE CTL | 46.00 | X | 47 | 3090350 | 981 |
| | 8700528 | NASAL HEMORRHAGE | 20.00 | X | 47 | 3090356 | 981 |
| | 8309056 | NASAL HEMORHAGE POST | 185.00 | X | 47 | 3090500 | 981 |
| | 8702011 | NASAL HEMORHAGE POST | 92.00 | X | 47 | 3090550 | 981 |
| | 8310005 | SINUS LAVAGE CANNULA | 41.00 | X | 47 | 3100000 | 981 |
| | 8702029 | SINUS LAVAGE CANNULA | 20.00 | X | 47 | 3100050 | 981 |
| | 8310013 | SINUS BILAT LAVAGE | 67.00 | X | 47 | 3100100 | 981 |
| | 8702037 | SINUS BILAT LAVAGE | 33.00 | X | 47 | 3100150 | 981 |
| | 8315004 | INTUB ENDOT EMERGE | 155.00 | X | 47 | 3150000 | 981 |
| | 8702045 | INTUB ENDOT EMERGE | 77.00 | X | 47 | 3150050 | 981 |
| | 8700619 | INTUB W OTHER PROCED | 103.00 | X | 47 | 3150052 | 981 |
| | 8315053 | LARYNGOSCOPY INDIREC | 50.00 | X | 47 | 3150500 | 981 |
| | 8702052 | LARYNGOSCOPY INDIREC | 25.00 | X | 47 | 3150550 | 981 |
| | 8315111 | LARYNGOSCOPY-FOR BOD | 155.00 | X | 47 | 3151100 | 981 |
| | 8702060 | LARYNGOSCOPY-FOR BOD | 77.00 | X | 47 | 3151150 | 981 |
| | 8315301 | LARYNGOSCOPY OPERATE | 415.00 | X | 47 | 3153000 | 981 |
| | 8702078 | LARYNGOSCOPY OPERATE | 207.00 | X | 47 | 3153050 | 981 |
| | 8316010 | TRACHEOSTOMY 2 YEARS | 565.00 | X | 47 | 3160100 | 981 |
| | 8702086 | TRACHEOSTOMY 2 YEARS | 282.00 | X | 47 | 3160150 | 981 |
| | 8702631 | TRACHEOSTOMY PLAN ED | 246.00 | X | 47 | 3160300 | 981 |
| | 8702094 | TRACHEOSTOMY PLAN ED | 123.00 | X | 47 | 3160350 | 981 |
| | 8316051 | CRICOTHYROID MEMBRAN | 845.00 | X | 47 | 3160500 | 981 |

AERAS 1074

E.R. PHYSICIAN CHA

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|-----|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8702102 | CRICOTHYROID MEMBRAN | 422.00 | X | 47 | 3160550 | 981 |
| | 8320004 | THORACENTESIS PUNCTR | 103.00 | X | 47 | 3200000 | 981 |
| | 8702110 | THORACENTESIS PUNCTR | 51.00 | X | 47 | 3200050 | 981 |
| | 8320202 | TUBE THORACOSTOMY | 270.00 | X | 47 | 3202000 | 981 |
| | 8702128 | TUBE THORACOSTOMY | 135.00 | X | 47 | 3202050 | 981 |
| | 8321606 | OPEN CHEST CARDIAC | 1,180.00 | X | 47 | 3216000 | 981 |
| | 8702136 | OPEN CHEST CARDIAC | 590.00 | X | 47 | 3216050 | 981 |
| | 8330102 | PERICARDIOCENTESIS | 102.00 | X | 47 | 3301000 | 981 |
| | 8702144 | PERICARDIOCENTESIS | 51.00 | X | 47 | 3301050 | 981 |
| | 8332108 | PACEMAKER INSERTION | 385.00 | X | 47 | 3321000 | 981 |
| | 8702151 | PACEMAKER INSERTION | 192.00 | X | 47 | 3321050 | 981 |
| | 8339996 | CARDIAC SURGERY | 246.00 | X | 47 | 3399900 | 981 |
| | 8360100 | ADLT INTRACATH | 41.00 | X | 47 | 3600000 | 981 |
| | 8702169 | ADLT INTRACATH | 20.00 | X | 47 | 3600050 | 981 |
| | 8360109 | CATH SUP/INF VENACAV | 305.00 | X | 47 | 3601000 | 981 |
| | 8702177 | CATH SUP/INF VENACAV | 152.00 | X | 47 | 3601050 | 981 |
| | 8361032 | TRACHEOSTOMY PLANNED | 246.00 | X | 47 | 3610300 | 981 |
| | 8364051 | VENOUS SCALP VEIN | 53.00 | X | 47 | 3640500 | 981 |
| | 8702185 | VENOUS SCALP VEIN | 26.00 | X | 47 | 3640550 | 981 |
| | 8364101 | VENIPUNCTURE | 31.00 | X | 47 | 3641000 | 981 |
| | 8702193 | VENIPUNCTURE | 15.00 | X | 47 | 3641050 | 981 |
| | 8364200 | VENIPUNCTURE CUTDOWN | 85.00 | X | 47 | 3642000 | 981 |
| | 8702201 | VENIPUNCTURE CUTDOWN | 42.00 | X | 47 | 3642050 | 981 |
| | 8364309 | BLOOD TRANSFUSION | 25.00 | X | 47 | 3643000 | 981 |
| | 8702219 | BLOOD TRANSFUSION | 12.00 | X | 47 | 3643050 | 981 |
| | 8364804 | VENOUS CATH SUBCLAVE | 85.00 | X | 47 | 3648000 | 981 |
| | 8702227 | VENOUS CATH SUBCLAVE | 42.00 | X | 47 | 3648050 | 981 |

AERAS 1075

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|------|------|------|------|------|------|------|
| | 8364853 | CATHERIZATION CUTDWN | 100.00 | X | 47 | 3648500 | 981 |
| | 8702235 | CATHERIZATION CUTDWN | 50.00 | X | 47 | 3648550 | 981 |
| | 8366007 | ARTERIAL PUNCTURE | 50.00 | X | 47 | 3660000 | 981 |
| | 8702243 | ARTERIAL PUNCTURE | 25.00 | X | 47 | 3660050 | 981 |
| | 8366205 | ARTERIAL CATHERIZATN | 110.00 | X | 47 | 3662000 | 981 |
| | 8702250 | ARTERIAL CATHERIZATN | 55.00 | X | 47 | 3662050 | 981 |
| | 8383002 | DRAIN LYMPH ABSCESS | 81.00 | X | 47 | 3830000 | 981 |
| | 8702268 | DRAIN LYMPH ABSCESS | 40.00 | X | 47 | 3830050 | 981 |
| | 8406506 | LAC LIP MERMILION | 350.00 | X | 47 | 4065000 | 981 |
| | 8702276 | LAC LIP MERMILION | 175.00 | X | 47 | 4065050 | 981 |
| | 8406548 | LAC LIP COMPLEX | 445.00 | X | 47 | 4065400 | 981 |
| | 8702284 | LAC LIP COMPLEX | 222.00 | X | 47 | 4065450 | 981 |
| | 8408304 | LAC OF MOUTH UP TO2C | 102.00 | X | 47 | 4083000 | 981 |
| | 8702292 | LAC OF MOUTH UP TO2C | 51.00 | X | 47 | 4083050 | 981 |
| | 8408312 | LAC OF MOUTH COMPLEX | 165.00 | X | 47 | 4083100 | 981 |
| | 8702300 | LAC OF MOUTH COMPLEX | 82.00 | X | 47 | 4083150 | 981 |
| | 8412512 | TONGUE LAC 2CM | 50.00 | X | 47 | 4125100 | 981 |
| | 8702318 | TONGUE LAC 2CM | 25.00 | X | 47 | 4125150 | 981 |
| | 8412520 | TONGUE/FLOR MOU 2CM | 230.00 | X | 47 | 4125200 | 981 |
| | 8702326 | TONGUE/FLOR MOU 2CM | 115.00 | X | 47 | 4125250 | 981 |
| | 8702656 | FOREIGN BODY-PHARYNX | 315.00 | X | 47 | 4280900 | 981 |
| | 8702334 | FOREIGN BODY-PHARYNX | 157.00 | X | 47 | 4280950 | 981 |
| | 8460404 | I&D PERI RECTAL ABSS | 210.00 | X | 47 | 4604000 | 981 |
| | 8702342 | I&D PERI RECTAL ABSS | 105.00 | X | 47 | 4604050 | 981 |
| | 8463200 | EXC THROMBOTIC HEMRD | 94.00 | X | 47 | 4632000 | 981 |
| | 8702359 | EXC THROMBOTIC HEMRD | 47.00 | X | 47 | 4632050 | 981 |
| | 8700452 | EXCISE HEMORRHOID | 35.00 | X | 47 | 4632056 | 981 |

AERAS 1076

E.R. PHYSICIAN CHA

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB 82 CODE |
|-----|------|-------------|-------|-----|-----|-------|-------|
| | 8490807 | PERITINCOCENTESIS | 76.00 | X | 47 | 4908000 | 981 |
| | 8702367 | PERITINCOCENTESIS | 38.00 | X | 47 | 4908050 | 981 |
| | 8494205 | INSRT PERITONEAL CAT | 102.00 | X | 47 | 4942000 | 981 |
| | 8702375 | INSRT INTRAPERIT CAT | 51.00 | X | 47 | 4942050 | 981 |
| | 8516007 | INJECTION CYSTOGRAPH | 30.00 | X | 47 | 5160000 | 981 |
| | 8702383 | INJECTION CYSTOGRAPH | 15.00 | X | 47 | 5160050 | 981 |
| | 8536401 | BLADDER CATH W GUIDE | 58.00 | X | 47 | 5364000 | 981 |
| | 8702391 | BLADDER CATH W GUIDE | 29.00 | X | 47 | 5364050 | 981 |
| | 8536708 | SIMPLE BLADDER CATH | 15.00 | X | 47 | 5367000 | 981 |
| | 8702409 | SIMPLE BLADDER CATH | 7.00 | X | 47 | 5367050 | 981 |
| | 8702649 | MARSUP-BARTHOLINCYST | 315.00 | X | 47 | 5644000 | 981 |
| | 8702417 | MARSUP-BARTHOLINCYST | 157.00 | X | 47 | 5644050 | 981 |
| | 8567406 | BARTHOLIN GLAND EXCI | 360.00 | X | 47 | 5674000 | 981 |
| | 8702425 | BARTHOLIN GLAND EXCI | 180.00 | X | 47 | 5674050 | 981 |
| | 8570202 | COLPOCENTESIS | 51.00 | X | 47 | 5702000 | 981 |
| | 8702433 | COLPOCENTESIS | 25.00 | X | 47 | 5702050 | 981 |
| | 8594103 | VAG DELIVERY | 640.00 | X | 47 | 5941000 | 981 |
| | 8702441 | VAG DELIVERY | 320.00 | X | 47 | 5941050 | 981 |
| | 8598104 | ABORTION TREATMENT | 255.00 | X | 47 | 5981000 | 981 |
| | 8702458 | ABORTION TREATMENT | 127.00 | X | 47 | 5981050 | 981 |
| | 8622706 | SPINAL PUNCTURE | 75.00 | X | 47 | 6227000 | 981 |
| | 8702466 | SPINAL PUNCTURE | 37.00 | X | 47 | 6227050 | 981 |
| | 8700494 | SPINAL PUNCT-PREMGMT | 44.00 | X | 47 | 6227052 | 981 |
| | 8644502 | PERIPHERAL NERVE BLK | 60.00 | X | 47 | 6445000 | 981 |
| | 8702474 | PERIPHERAL NERVE BLK | 30.00 | X | 47 | 6445050 | 981 |
| | 8652059 | REM FB EXTERNAL EYE | 37.00 | X | 47 | 6520500 | 981 |
| | 8702482 | REM FB EXTERNAL EYE | 18.00 | X | 47 | 6520550 | 981 |

AERAS 1077

E.R. PHYSICIAN CHA

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|------|------|------|------|------|------|------|
| | 8700486 | REMOVE BODY-EYE-EXT | 16.00 | X | 47 | 6520556 | 981 |
| | 8652109 | CONJUNCTIVAL EMBEDED | 35.00 | X | 47 | 6521000 | 981 |
| | 8702490 | CONJUNCTIVAL EMBEDED | 17.00 | X | 47 | 6521050 | 981 |
| | 8700478 | CONJ EMBED BODY EYE | 27.00 | X | 47 | 6521056 | 981 |
| | 8652208 | REM OCULAR FORGN BOD | 42.00 | X | 47 | 6522000 | 981 |
| | 8702508 | REM OCULAR FORGN BOD | 21.00 | X | 47 | 6522050 | 981 |
| | 8700015 | REMOVE OCULAR BODY | 45.00 | X | 47 | 6522056 | 981 |
| | 8652224 | REM FB CORNEAL WSLIT | 45.00 | X | 47 | 6522200 | 981 |
| | 8677007 | BLEPHROTOMY ABSC DRN | 42.00 | X | 47 | 6770000 | 981 |
| | 8702516 | BLEPHROTOMY ABSC DRN | 21.00 | X | 47 | 6770050 | 981 |
| | 8677106 | SEVER TARSORRHAPHY | 51.00 | X | 47 | 6771000 | 981 |
| | 8702524 | SEVER TARSORRHAPHY | 25.00 | X | 47 | 6771050 | 981 |
| | 8679383 | REM FOR BODY EYELID | 41.00 | X | 47 | 6793800 | 981 |
| | 8702532 | REM FOR BODY EYELID | 20.00 | X | 47 | 6793850 | 981 |
| | 8700460 | REMOVE FOREIGN BODY | 21.00 | X | 47 | 6793856 | 981 |
| | 8690000 | I&D EXTERNAL EAR | 50.00 | X | 47 | 6900000 | 981 |
| | 8702540 | I&D EXTERNAL EAR | 25.00 | X | 47 | 6900050 | 981 |
| | 8700007 | I & D EAR-PREOP MGMT | 13.00 | X | 47 | 6900056 | 981 |
| | 8690059 | I&D EAR COMPLICATED | 76.00 | X | 47 | 6900500 | 981 |
| | 8702557 | I&D EAR COMPLICATED | 38.00 | X | 47 | 6900550 | 981 |
| | 8690208 | I&D AUDITORY CANAL | 51.00 | X | 47 | 6902000 | 981 |
| | 8702565 | I&D AUDITORY CANAL | 25.00 | X | 47 | 6902050 | 981 |
| | 8700718 | I&D CANAL ABSCESS MV | 15.00 | X | 47 | 6902056 | 981 |
| | 8692006 | REM FOR BOD AUDCANAL | 44.00 | X | 47 | 6920000 | 981 |
| | 8702573 | REM FOR BOD AUDCANAL | 22.00 | X | 47 | 6920050 | 981 |
| | 8692105 | REMOV IMPACT CERUMEN | 18.00 | X | 47 | 6921000 | 981 |
| | 8702581 | REMOV IMPACT CERUMEN | 9.00 | X | 47 | 6921050 | 981 |

E.R. PHYSICIAN CHAR

| GL # | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|------|------|------|------|------|------|------|------|
| | 8902405 | HOSP CARE BRIEF SER | 27.00 | X | 47 | 9024000 | 981 |
| | 8902504 | HOSP CARE LTD SER | 30.00 | X | 47 | 9025000 | 981 |
| | 8902603 | HOSP CARE INT SER | 34.00 | X | 47 | 9026000 | 981 |
| | 8905002 | NEW ER PAT MIN SVCS | 26.00 | X | 47 | 9050000 | 981 |
| | 8905051 | NEW ER PAT BRIEF SVC | 30.00 | X | 47 | 9050500 | 981 |
| | 8905101 | NEW ER PAT LMTD SER | 34.00 | X | 47 | 9051000 | 981 |
| | 8700627 | REDUCE CHG LMT SERV | 22.00 | X | 47 | 9051052 | 981 |
| | 8905150 | NEW ER INTRMED SER | 47.00 | X | 47 | 9051500 | 981 |
| | 8700635 | REDUCED CHG INTER SV | 25.00 | X | 47 | 9051552 | 981 |
| | 8905176 | NEW ER PAT EXTND SER | 65.00 | X | 47 | 9051700 | 981 |
| | 8700577 | EXTENDED SERVICES | 52.00 | X | 47 | 9051752 | 981 |
| | 8905309 | EST ER PAT MIN SER | 22.00 | X | 47 | 9053000 | 981 |
| | 8905408 | EST ER PAT BRIEF SER | 27.00 | X | 47 | 9054000 | 981 |
| | 8905507 | EST ER PAT LMTD SER | 35.00 | X | 47 | 9055000 | 981 |
| | 8905606 | EST ER INTRMED SER | 37.00 | X | 47 | 9056000 | 981 |
| | 8905705 | EST ER PAT EXTND SER | 45.00 | X | 47 | 9057000 | 981 |
| | 8907826 | SQ/IM INJECTION | 10.00 | X | 47 | 9078200 | 981 |
| | 8907842 | IV INJECTION | 24.00 | X | 47 | 9078400 | 981 |
| | 8929507 | CARDIOPULM RESUS-CPR | 124.00 | X | 47 | 9295000 | 981 |
| | 8700643 | CPR LIMITED | 62.00 | X | 47 | 9295050 | 981 |
| | 8929606 | CARDIOVERSION EXTERN | 155.00 | X | 47 | 9296000 | 981 |
| | 8702599 | CARDIOVERSION EXTERN | 77.00 | X | 47 | 9296050 | 981 |
| | 8991507 | PROLONG PHYSICIAN SV | 105.00 | X | 47 | 9915000 | 981 |
| | 8700825 | CRITICAL CARE | 103.00 | X | 47 | 9916000 | 981 |
| | 8702607 | CRITICAL CARE | 51.00 | X | 47 | 9916050 | 981 |
| | 8991622 | CRITICAL CARE EXTEND | .00 | X | 47 | 9916200 | 981 |
| | 8991705 | GASTRIC INTUBATION | 52.00 | X | 47 | 9917000 | 981 |

AERAS 1079

E.R. PHYSICIAN CHA

| GL# | SERVICE CODE | DESCRIPTION | PRICE | M/C | INS | C.P.T. CODE | UB82 CODE |
|-----|--------------|-------------|-------|-----|-----|-------------|-----------|
| | 8 70 26 15 | GASTRIC INTUBATION | 26.00 | X | 47 | 9917050 | 981 |
| | 8 99 17 54 | IPECAC EMESIS | 22.00 | X | 47 | 9917500 | 981 |

TOTAL NUMBER OF RECORDS PROCESSED 515

AERAS 1080

## Alabama Emergency Room Administrative Services, P. C.

4160 Carmichael Road • Suite 200
Montgomery, Alabama 36106
(334) 272-1050 • FAX (334) 271-7698

John D. Moorehouse, M.D., F.A.C.E.P.
President

Paul K. Tanaka, M.D.
Vice President

Rex A. Stanley
Chief Financial Officer

August 28, 1996

Mr. Allen P. Fletcher, President/CEO
Northeast Alabama Regional Medical Center
P.O. Box 2208
Anniston, AL 36202

Dear Allen:

Please find enclosed your copy of the signed amendment to the Emergency Care Agreement between Regional Medical Center Board (the "Board") and Alabama Emergency Room Administrative Services, P.C., (the "Corporation). I appreciate your working with us and look forward to a continued long term relationship.

Best regards,

John D. Moorehouse, M.D., FACEP
President

JDM/th

───────────── **Medical Directors** ─────────────

Howard E. McVeigh, M.D., F.A.C.E.P. • William O. Sargeant, D.O., F.A.A.F.P., F.A.A.O.E.P.
Joel C. Sullivan, M.D. • Thomas L. Arnold, M.D., F.A.C.E.P.

**AERAS 1081**



**REGIONAL**

**MEDICAL**

**CENTER**

Thursday, August 22, 1996

John D. Moorehouse, M.D.
ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.
4160 Carmichael Road, Suite 200
Montgomery, AL   36106

Dear Doctor Moorehouse:

This letter serves to amend the Emergency Care Agreement, dated April 1, 1988, between the Regional Medical Center Board (the "Board") and Alabama Emergency Room Administrative Services P.C., (the "Corporation").

The Agreement shall be amended, effective October 1, 1996, for a term of three (3) years. The Board will pay to the Corporation a fee which shall be fifty-five percent (55%) of billed professional fees (reference Section 6.02(B)4, the Administrative Fee shall be forty-five percent (45%). The current professional fee schedule will remain in place until such time as both parties mutually agree to change the professional fee schedule; and, there will be no change to the current staffing levels provided by the Corporation unless approved by both parties.

If this is your understanding of our previous verbal agareement, please sign below (both originals), retain one original for your file and return the other for my file.

I appreciate your sincere cooperation during these contract negotiations. The Board, Management and our community are very fortunate to have such an outstanding emergency physicians' group.

Sincerely,

REGIONAL MEDICAL CENTER BOARD

By: *Allen P. Fletcher*
ALLEN P. FLETCHER, President/CEO

APF/dk

APPROVED:   ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.

By: *John D. Moorehouse*
JOHN D. MOOREHOUSE, M.D.
Medical Director and CEO

NORTHEAST ALABAMA
REGIONAL MEDICAL CENTER
Post Office Box 2208
Anniston, Alabama 36202
(205) 235-5121

**AERAS 1082**

*2 yr. Contract automatically Renewable*
*120 Day out Clause*

STATE OF ALABAMA

CALHOUN COUNTY

## EMERGENCY CARE AGREEMENT

AGREEMENT between REGIONAL MEDICAL CENTER BOARD (the "BOARD") and ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C., an Alabama Professional Corporation (the "CORPORATION").

### RECITALS:

BOARD owns and operates Northeast Alabama Regional Medical Center (the "HOSPITAL") in Anniston, Alabama and desires that the CORPORATION provide licensed, qualified physicians (the "PHYSICIANS") to staff Emergency Department (the "DEPARTMENT"). The CORPORATION believes that it will be able to provide the HOSPITAL with individuals who are qualified to practice medicine and the services referred to in this Agreement.

### NOW, THEREFORE, THIS AGREEMENT

### WITNESSETH:

That in consideration of the mutual agreements herein, the BOARD and CORPORATION agree as follows:

### BOARD:

2.01. **SPACE.** BOARD shall make available for use by CORPORATION office space and the space now or that may be hereinafter designated as DEPARTMENT.

2.02. **EQUIPMENT AND SUPPLIES.** BOARD shall provide necessary medical equipment, drugs, supplies, furniture and fixtures for DEPARTMENT. Requests will be processed in accordance with the policies and procedures of the BOARD. Equipment furnished by the BOARD shall remain the property of the BOARD. BOARD shall keep DEPARTMENT facilities and equipment in good repair.

2.03. **PERSONNEL.** BOARD shall employ, promote, terminate, supervise and reinstate DEPARTMENT personnel.

2.04. **UTILITIES AND SUPPORT SERVICES.** BOARD shall provide utilities and support services (laundry, maintenance, housekeeping) for DEPARTMENT. Telephone service is limited to local and to patient-related calls.

2.05. **HOURS OF OPERATION.** BOARD shall operate DEPARTMENT on a twenty-four (24) hour per day, seven (7) day per week basis.

2.06.   **PATIENT NOTIFICATION.**  BOARD agrees to provide patients at HOSPITAL notification that separate professional fees will be billed for physician services.

2.07.   **HOSPITAL CHARGES.**  HOSPITAL will bill for supplies and technical services and expenses incurred by HOSPITAL in rendering care to patients.  CORPORATION will be under no duty to assist in the collection of said charges.  HOSPITAL charges for said services shall be separate and distinct from the charges made by CORPORATION for medical services to patients.

2.08.   **AGENT.**  The HOSPITAL  shall act as the agent for the CORPORATION for billing and collection purposes and only for billing and collection purposes.  No other principal-agent relationship exists between the parties, and the parties agree not to represent themselves as agents to any third party, other than is stated above.

2.09.  **HOSPITALS LIABILITY.**  This Agreement is made upon the express condition that CORPORATION and its independent contractor physicians are free from all liability and claim for damages by reason of any person or persons arising out of acts performed by BOARD which are not performed pursuant to the terms of this Agreement:  BOARD hereby covenanting and agreeing to indemnify and save CORPORATION and its independent contractor physicians from all liability, loss, costs, and obligations on account of or arising out of any such injuries or losses.

CORPORATION

3.01   **APPLICABLE STANDARDS.**  The CORPORATION and PHYSICIANS shall use their reasonable efforts to perform the services enumerated herein in such a manner as may further the goals and objectives of BOARD and as will insure that all duties are performed and services provided in the HOSPITAL as may be required by the policies, rules, and regulations of the HOSPITAL; the Medical Staff Bylaws, rules and regulations; any standard, ruling, regulation, or statute of the Joint Commission on Accreditation of Healthcare Organizations; the United States Department of Health and Human Services; the Alabama Department of Public Health; or any other federal, State, or local government agency, corporation entity, or individual exercising authority with respect to or affecting the HOSPITAL.

3.02   **GENERAL OBLIGATIONS OF CORPORATION AND PHYSICIANS.**

A.   To render professional services in a manner which is safe, efficient, consistent, and satisfactory to the BOARD; and

B.   To conduct services professionally, ethically and conscientiously to insure the quality of medical care; and

-2-

**AERAS 1084**

    C.   To accept patients, irrespective of color, race, creed, religion, national origin, sex, age, or financial status; and

    D.   To abide by the BOARD´s Medical Staff Bylaws, rules and regulations, and all applicable policies of BOARD in rendering medical care.

    3.03   **HOURS OF COVERAGE AND PHYSICIAN STAFFING.** CORPORATION shall cause a qualified individual, licensed to practice medicine in the State of Alabama, who is a member of the medical staff of HOSPITAL to be available on the premises of the DEPARTMENT twenty-four (24) hours each day, and CORPORATION shall provide either double coverage or an available back-up physician for peak patient flow periods.

    CORPORATION shall not be required to have on call the number of physicians necessary to respond to disasters or other occurrences which are of unforseeable size, scope or duration.

    3.04   **PHYSICIAN SERVICES.**

    A.   **Patient Protocol.** Treat patients assigned to the Emergency Department Physician as follows:

       1.   Any patient presenting in acute distress or needing immediate physician attention at the discretion of the nurse.
       2.   Any patient without a personal physician (including obvious fractures).
       3.   Any patient requesting to see the Emergency Department Physician.
       4.   Any patient at the request of their personal physician.
       5.   Any patient requesting their personal physician but for some reason the physician or his/her coverage cannot be contacted after thirty (30) minutes or when too prolonged for the patients condition.

    B.   **Admissions.** No physician provided by CORPORATION shall admit patients in his own name except in an emergency situation where an admitting physician cannot be contacted immediately and only until such time as the case can be transferred to a physician with admitting privileges. CORPORATION must refer repeat outpatients to members of HOSPITAL´s medical staff.

    C.   **Consultation.** Work closely with private physicians in obtaining consultants of their choice and assist in the immediate care of patients in the process of being hospitalized;

-3-

AERAS 1085

D.  **Emergency Situations.** Respond to inpatient cardiac arrests and be familiar with cardiac resuscitation protocol. Respond to and assist HOSPITAL's staff in handling emergency patient situations and other reasonable requests of nursing or other hospital personnel when no other physician is available or until private physicians can be contacted;

E.  **Complaint Resolution.** CORPORATION will assist BOARD in resolving complaints about DEPARTMENT OR CORPORATION.

F.  **Employee Physical Examinations.** CORPORATION shall provide pre-employment and annual physical examinations for HOSPITAL employees without charge to HOSPITAL.

G.  **Employee Accidents and Injuries.** CORPORATION shall provide emergency services for accidents and other on-premises injuries to HOSPITAL employees without charge other than for those cases for which a charge is collectible from sources other than HOSPITAL and its employees.

H.  **Training and Clinical Direction.** CORPORATION shall provide, as appropriate, continuing education and clinical direction of DEPARTMENT personnel.

I.  **EMS.** CORPORATION shall provide active input and participation in the East Alabama Emergency Medical Services.

J.  **Technical Advice.** CORPORATION shall provide HOSPITAL such technical advice and assistance as may be requested to facilitate selection and/or installation of facilities and/or equipment and in the operation of DEPARTMENT.

K.  **Committees.** CORPORATION shall serve and actively participate in HOSPITAL and/or Medical Staff committees.

L.  **Medical Records.** PHYSICIAN shall promptly complete medical records and reports. Ownership and right of control of all reports, records, and supporting documents prepared in connection with the operation of the DEPARTMENT shall vest exclusively with the BOARD; provided, however, that PHYSICIAN shall have such right of access to such reports, records, and supporting documentation as shall be provided by State law and BOARD policies.

M.  **Publications.** CORPORATION will cooperate with and assist members of the medical staff in preparation of clinical reports for publication.

-4-

AERAS 1086

N. **Workman´s Compensation.** The CORPORATION shall comply with the Alabama Workman´s Compensation Act.

3.05. **DIRECTOR; OFFICE OF.** CORPORATION shall designate a physician, subject to approval of the Administrator of HOSPITAL, to act as Director of Emergency Services (the "DIRECTOR"). The DIRECTOR shall be responsible for providing emergency medical services and for the day to day medical administration and operation of the DEPARTMENT.

3.06. **RESIDENCE - PLACE OF.** Physicians providing base coverage in DEPARTMENT shall be residents of the greater Anniston area within one (1) year from the date of their contract with CORPORATION. "Base Coverage" is defined as coverage of the DEPARTMENT for at least seventy-five (75%) percent of the time computed on an annual basis. BOARD is not, nor will it accept responsibility for, payment of expenses incurred by CORPORATION or employees/subcontractors of CORPORATION under the requirement of this paragraph.

3.07. **PHYSICIANS LIABILITY.** This Agreement is made upon the express condition that BOARD is free from all liability and claim for damages by reason of any person or persons arising out of acts performed by CORPORATION and its independent contractor physicians which are not performed pursuant to the terms of this Agreement; CORPORATION hereby covenanting and agreeing to indemnify and save BOARD from all liability, loss, costs, and obligations on account of or arising out of any such injuries or losses.

3.08. **MALPRACTICE INSURANCE.** During the term of this Agreement, each of the independent contractor physicians of CORPORATION shall, at their own expense, provide and continuously maintain in full force and effect professional liability insurance coverage in the minimum amount required by the Medical Staff Bylaws of the BOARD insuring such individual independent contractor physicians and CORPORATION against liability in the performance of their duties pursuant to this Agreement, and shall also furnish a certified copy of said policies to the BOARD. If the Medical Staff Bylaws of the BOARD are revised to increase the minimum amount of insurance to be maintained by the said individual independent contractor physicians, the CORPORATION may, without penalty terminate this agreement. Upon the expiration or termination of this Agreement, each of the independent contractor physicians of CORPORATION shall obtain an endorsement to said policies maintaining and extending the coverage thereof with respect to any claims which may be asserted after such expiration or termination from or as the result of any acts or omissions or alleged acts or omissions which occur during the term of this Agreement or any extension or renewal thereof, and shall also furnish certified copies of said endorsements to the BOARD. Said policies shall be written by a responsible insurance company qualified in the State of Alabama to insure the risks undertaken, and shall contain a provision that the insurer consents to the indemnity herein contained in Section 3.07 above and that the insurer will give the BOARD thirty (30) days´ written notice prior to any cancellation or material alteration thereof. Such insurance shall provide that it is primary coverage solely as to the named insureds with respect to the

-5-

AERAS 1087

liability of the independent contractor physicians of CORPORATION. The provisions of this section shall survive the expiration or termination of this Agreement.

3.09. **MEDICAL STAFF MEMBERSHIP AND LICENSURE.** The DEPARTMENT shall be staffed by physicians licensed to practice medicine in the State of Alabama subject to approval of BOARD in accordance with the Bylaws of the medical staff of BOARD prior to and while performing services pursuant to this Agreement. Such approval shall not be unreasonably withheld. Any such physicians so designated shall be compensated by CORPORATION for their time spent working in the DEPARTMENT.

3.10. **USE OF PREMISES.** CORPORATION covenants that no part of the premises shall be used by CORPORATION or its independent contractor physicians as an office for the general practice of medicine or for any purpose other than the performance of services hereunder.

4.01. **INDEPENDENT CONTRACTOR.**

A. CORPORATION is a professional corporation and as an independent contractor, has the exclusive right to hire and terminate its subcontractors. Problems and conflicts may arise between subcontractors of CORPORATION and employees or medical staff of the BOARD. BOARD AND CORPORATION agree to attempt to resolve any such problems promptly through Administrative channels. However, if the BOARD provides CORPORATION with a written notice as to an irreconcilable problem or conflict concerning a subcontractor of CORPORATION, CORPORATION will assign another subcontractor to that position within thirty (30) days of receipt of the written notice.

The Administrator of HOSPITAL, after consulting with the Chief of Staff, shall, at his discretion and with due cause, prevent any individual physician contractor of CORPORATION from working within or entering into the DEPARTMENT. This action shall become effective upon twenty-four (24) hour written notice to the DIRECTOR.

B. Physicians of CORPORATION are at all times acting and performing as independent contractors practicing their profession of medicine and surgery, and specializing in emergency treatment. HOSPITAL shall neither have nor exercise control or direction over the methods by which physicians perform their work and functions excepting that CORPORATION and its PHYSICIANS agree to perform the said work and functions at all times in strict accordance with currently approved methods and practice in their professional speciality and that the sole interest of HOSPITAL is to assure that said services shall be performed and rendered in a competent, efficient and satisfactory manner. All applicable provisions of law relating to licensing and regulating of physicians and hospitals shall be fully complied with by all parties hereto.

-6-

AERAS 1088

5.01. **PROFESSIONAL FEES.**

A. Professional fees for services rendered by physicians employed by or working for CORPORATION shall be agreed upon in writing by the Administrator of HOSPITAL and by CORPORATION. Said fees shall be in accordance with the fee schedule attached hereto as Exhibit "A" and incorporated herein by this reference.

B. Professional fees are agreed to be reasonable, competitive, and in general accordance with customary local fees for comparable services for all HOSPITAL patients referred to or desiring of professional services from CORPORATION by reason of its position with HOSPITAL.

6.01. **DAILY MEMORANDUM AND BILLING.**

A. PHYSICIANS shall file with HOSPITAL daily memoranda of the services performed and shall and do hereby assign the collection of said charges to HOSPITAL.

B. Notification shall include, but not be limited to, designation of the Hospital Charge Code(s) and procedural/diagnostic codes (CPT-4) on the Emergency Room Record. Notification shall be made by individual patient for whom services were rendered.

6.02. **COMPUTATION OF RESPECTIVE AMOUNTS DUE TO CORPORATION AND TO BOARD.**

A. During the term of this Agreement, BOARD shall pay CORPORATION as follows:

1. HOSPITAL shall, daily, balance with CORPORATION records of charges. Charges shall be defined as the PHYSICIAN charge for PHYSICIANS service as described by a CPT-4 procedure code.
2. HOSPITAL shall prepare an accounting to CORPORATION at the end of each month. Said accounting shall contain a reconciliation of charges and HOSPITAL computation of payment due CORPORATION by multiplying the volume of each physician charge for professional service provided by PHYSICIAN by the charge for each service. The sum of charges as computed shall be defined as Professional Fees.

B. The CORPORATION shall pay the BOARD an Administrative Fee equal to the sum of the following:

1. Professional, courtesy or similar discount extended to patients by the CORPORATION.

–7–

**AERAS 1089**

2.  Bad Debts and uncollectibles, which such uncollectible fees shall include, without limitation, those which have been disallowed in whole or in part by third-party payors and which are not otherwise collectible from the patient whether such collection is barred by applicable law and regulation or is due to the insolvency of the said patient.

3.  The BOARD's carrying cost for Professional Fees paid to the CORPORATION in advance of receipt of the same by the BOARD and

4.  Actual clerical, computer and other like expenses of billing.

The initial Administrative Fee shall be deemed to be thirty-five percent (35%) of the Professional Fees, but the amount of the Administrative Fee shall be adjusted periodically in light of the actual amount of the foregoing costs.  The Administrative Fee shall be payable at the time that the Professional Fees are payable to the CORPORATION and may be held out of such Professional Fees by the BOARD.

C.  It is the intent of both parties that the financial positions under the predecessor agreement shall not be worsened relative to the terms of this Agreement and that neither party shall subsidize the other party.

D.  Should Agreement be terminated by either party, HOSPITAL shall:

a.  Render CORPORATION an accounting and payment of any monies due.
b.  Retain accounts receivable for professional services generated under this Agreement and shall collect and retain monies from said receivables.

6.03.  **PAYMENT.**  HOSPITAL shall render the accounting and make payment to CORPORATION on or before the 15th day of each month for services rendered to patients by CORPORATION the previous month. Payments shall be made as specified in Section 6.02.

6.04.  **RELEASE OF AGREEMENT/CHARGE INFORMATION.**  A copy of this agreement and charges may be provided to Blue Cross/Blue Shield; the financial intermediary for Medicare; and to the State of Alabama intermediary for Medicaid.

7.01.  **COMPLIANCE WITH THIRD PARTY PAYOR REQUIREMENTS.**  The CORPORATION recognizes that the BOARD is a participant in various third party payment programs, including, without limitation, Medicare and Medicaid programs, which participation is essential to the financial viability of the BOARD.  The CORPORATION shall use its reasonable efforts to fully cooperate with the BOARD and provide assistance to the BOARD to the end that the BOARD will be able to meet

-8-

**AERAS 1090**

all requirements for participation and payment associated with any such third pary payment program. Further, until the expiration of four years after the furnishing of services provided under the Agreement, the CORPORATION will make available to the Secretary, United States Department of Health and Human Services and the United States Comptroller General, and their representatives, the Agreement and all books, documents and records necessary to certify the nature and extent of the costs of those services. If the CORPORATION carries out the duties of this Agreement through a subcontract worth $10,000 or more over a 12-month period with an organization or individuals, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General and their representatives to its books and records.

8.01. **ASSIGNMENT.** During the term of this Agreement, CORPORATION shall have no right to assign any part of CORPORATION's interest and responsibilities hereunder without first obtaining the written consent of BOARD.

8.02. **TERM OF AGREEMENT.** The Agreement shall become effective on April 1, 1988 for an initial term of fifteen (15) months therefrom and shall be automatically renewed for successive periods of two (2) years thereafter subject, however, to Sections 8.03 and 8.04.

8.03. **REVIEW.** Beginning with the 90th day prior to the end of the initial or any renewal terms thereof, any other provision of this Agreement shall be subject to review at the request of either party hereto. During this review period the parties agree to use their best efforts to meet together at mutually agreeable times for the review and, if necessary, renegotiation of the applicable provisions hereof. If the parties agree to modification of this Agreement, such modifications shall be incorporated herein by amendment as hereinafter provided, such amendments to become effective on the date stipulated therein. In the event the parties do not agree to modifications of this Agreement, this Agreement shall continue in effect without modifications until terminated in accordance with the provisions herein.

8.04. **TERMINATION.** This Agreement may be sooner terminated on the first to occur of the following:

a. **Termination by Mutual Agreement.** In the event BOARD and Corporation mutually agree in writing, this Agreement may be terminated on the terms and date stipulated therein.
b. **Termination by BOARD.** BOARD shall be entitled to terminate this Agreement if (i) CORPORATION defaults in the performance of any material term or terms of this Agreement and such default continues uncured thirty (30) days after written notice of such default is received by CORPORATION from BOARD, or (ii) CORPORATION shall apply for or consent to the appointment of a receiver, trustee or liquidator of CORPORATION or of all or a substantial part of CORPORATION's assets or admit in writing its inability to pay CORPORATION's debts as they become due or make a general assignment for the

–9–

AERAS 1091

benefit of creditors.

c.  **Termination by CORPORATION.**  CORPORATION shall be entitled to terminate this Agreement if (i) BOARD defaults in the performance of any material term or terms of this Agreement and such default continues uncured thirty (30) days after written notice of such default is received by BOARD from CORPORATION, or (ii) the DEPARTMENT or any portion thereof shall be damaged or destroyed by fire or other casualty and if Board fails to commence repairing, restoring, rebuilding or replacing any such damage or destruction within thirty (30) days after such fire or other casualty, or shall fail to complete such work within a reasonable period of time.

d.  **Optional Termination.**  If either party shall, with or without cause, give to the other at least one hundred twenty (120) days advance written notice, this Agreement shall terminate on the future date specified in such notice.

8.05.  **EFFECTS OF TERMINATION.**  Upon termination of this Agreement, neither party shall have any further obligation hereunder except for (a) obligations occuring prior to the date of termination and (b) obligations, promises or covenants contained herein that are expressly made to extend beyond the term of this Agreement.

8.06  **CONTENT AND AMENDMENT.**  This agreement contains all of the agreements and conditions made between the parties with reference to CORPORATIONS´ association with BOARD and may not be amended except in writing signed by all of the parties hereto.

8.07.  **NOTICES.**  Any notice, demand, or communication required, permitted, or desired to be given hereunder, shall be deemed effectively given when personally delivered or mailed by prepaid certified mail, return receipt requested, addressed as follows:

> A.  TO CORPORATION:
> Alabama Emergency Room Administrative Services, P.C.
> c/o John D. Moorehouse, M.D.
> 2231 Old Pike Road
> Pike Road, Alabama  36064
>
> B.  TO BOARD:
> Administrator
> Northeast Alabama Regional Medical Center
> Post Office Box 2208
> Anniston, Alabama  36202

8.08.  **SEVERABILITY.**  In the event any provision of this Agreement is held to be unenforceable for any reason, the unenforceability thereof shall not affect the remainder of the Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

-10-

**AERAS 1092**

8.09.   **HEADINGS.**  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

8.10.   **GOVERNING LAW.**  The Agreement shall be governed by and construed in accordance with the laws of the State of Alabama.  All duties and obligations of the parties created hereunder are performable in Calhoun County, Alabama, and Calhoun County, Alabama shall be the sole and exclusive venue for any litigation, special proceedings, or other proceedings as between the parties that may be brought or arise out of or in connection with or by reason of this Agreement.

8.11.   **WAIVER OR BREACH.**  The waiver by either party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the same or other provision hereof.

8.12.   **ENFORCEMENT.** In the event either party resorts to legal actions to enforce the terms and provisions of this Agreement, the prevailing party shall be entitled to recover the costs of such action so incurred, including, without limitation, reasonable attorneys' fees.

8.13.   **ADDITIONAL ASSURANCES.**  The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the request of either party, the other party shall execute such additional instruments and take such additional acts as are necessary to effectuate this Agreement.

8.14.   **FORCE MAJEURE.**  Neither party shall be liable nor deemed to be in default for any delay or failure in performance under this Agreement, or other interruption of service or employment deemed resulting, directly or indirectly, from Acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, failure of transportation, strikes or other work interruptions by either party's employees, or any similar or dissimilar cause beyond the reasonable control of either party.

8.15.   **AMENDMENTS AND AGREEMENT EXECUTION.**  This Agreement and amendments thereto shall be in writing and executed in multiple copies on behalf of CORPORATION by its President with respect to such execution and on behalf of BOARD by its Administrator.  Each multiple copy shall be deemed an original, but all multiple copies together shall constitute one and the same instrument.

8.16.   **ENTIRE AGREEMENT.**  This Agreement supersedes all previous contracts and constitutes the entire agreement between the parties. Neither party shall be entitled to benefits other than those specified herein.  No oral statement or prior written material not specifically incorporated herein shall be of any force and effect and no changes in or additions to this Agreement shall be recognized unless incorporated herein by amendment as provided herein, such amendment(s) to become

-11-

**AERAS 1093**

effective on the date stipulated in such amendments. Both parties
specifically acknowledge that in entering into and executing this
Agreement, they rely soley upon the representations and agreements
contained in this Agreement and no others.

IN WITNESS WHEREOF, the parties have executed this Emergency Care
Agreement in multiple originals on this the _____/_____ day of
_April_____, 19 8̸8̸.


REGIONAL MEDICAL CENTER BOARD:                    ALABAMA EMERGENCY ROOM
                                                  ADMINISTRATIVE SERVICES, P.C.

BY: _Allen Fletcher_____                        BY: _John D. Moorhouse M.D._____
    ALLEN FLETCHER                                     JOHN D. MOOREHOUSE, M.D.
    ADMINISTRATOR                                      Medical Director and
                                                      Chief Executive Officer

Attest:                                           Attest:
_____                           _____


-12-

AERAS 1094



R E G I O N A L

M E D I C A L

C E N T E R

August 4, 1999


John D. Moorehouse, MD
Alabama Emergency Room Administrative Services, PC
4160 Carmichael Rd, Ste 104
Montgomery, AL   36106


Dear Dr. Moorehouse:

This letter shall serve to amend the Emergency Care Agreement, dated
April 1, 1988,  between Regional Medical Center Board (the "Board") and
Alabama Emergency Room Administrative Services, PC (the
"Corporation") and replaces the first amendment to that agreement,
dated August 22, 1996.  The Agreement shall be amended as follows:

1.   The term of the Agreement shall be extended for another three (3)
     year period, beginning October 1, 1999 and ending September
     30, 2002.
2.   The Board shall pay to the Corporation a net fee, which shall be
     55% of the billed professional fees as stipulated in paragraph
     6.02(a) of the original agreement, less an additional amount of
     $13,750 per month.  The billed professional fees will be based
     upon the current professional fee schedule (Exhibit A).  The fee
     schedule will remain in place until such time as both parties might
     mutually agree to change the professional fee schedule.
3.   RMC will install and absorb initial and annual operating cost of the
     physician documentation system known as the "T-System".
4.   RMC will amend its current health care plan to allow RMC
     employees to use the Emergency Room Fast Track Clinic (with no
     monetary disincentive).
5.   There will be no change to the current staffing levels provided by
     the Corporation unless approved by both parties.

The Board and the Corporation also agree to add the following
paragraphs relative to Medicare and Medicaid Anti-Kick Back Statutes
and Fraud and Abuse Statues:

a.   The parties hereto shall comply with all applicable Federal, State
     and local laws, regulations and restrictions in carrying out their
     respective obligations under this Agreement.
b.   This Agreement is intended by the parties to comply fully with the
     exception under the illegal remuneration provisions, relating to
     independent contractors, set forth in 42 U.S.C. § 1320a-7b of the
     Social Security Act and as set forth in the "safe harbor"
     regulations at 42 C.F.R. §1001.952(i) and also under the limitation
     on physician referral provisions at 42 U.S. C.

NC.... rEAST ALABAMA
REGIONAL MEDICAL CENTER
Post Office Box 2208
Anniston, Alabama 36202
(256) 235-5121
WWW.RMCCARES.ORG

**AERAS 1095**

John D. Moorehouse, MD
August 4, 1999
Page Two

§ 1395nn. Notwithstanding any unanticipated effect of any of the provisions herein, neither party will intentionally conduct itself under the terms of this Agreement in a manner to constitute a violation of the Medicare and Medicaid fraud and abuse provisions. No payment, direct or indirect, overt or covert, in cash or in kind, made or received under this Agreement, is in return for the referral of patients or in return for the purchasing, leasing, ordering, or arranging for or recommending the purchasing, leasing or ordering of any good, service, item or product.

c.   In the event that (i) Medicare, Medicaid, any third party payer, or any federal, state or local legislative or regulatory authority adopts any law, rule, regulations, policy, procedure, or interpretation thereof which establishes a material change in the method or amount in the reimbursement or payment for services under this Agreement or (ii) any or all such payor/authorities impose requirements that require a material change in the manner of either party's operations under this Agreement and/or the costs related thereto, then, upon the request of either party materially effected by such change in circumstances, the parties shall enter into good faith negotiations for the purpose of establishing such amendments or modifications as may be appropriate in order to accommodate the new requirements and change of circumstances while preserving the original intent of this Agreement to the greatest extent possible.

d.   The parties hereto acknowledge that Board is a tax-exempt healthcare public corporation, the operations and activities of which are subject to specific statutory restrictions and requirements in order for it to maintain its status as such. It is the intent and agreement of the parties that neither this Agreement nor any provision hereof shall be construed or interpreted in any manner to require the Board to engage in any activity, perform any act, or refrain from performing any act, or activity, in violation of any requirements imposed on any of them by the State of Alabama, the Internal Revenue Services, or any other governmental agency, and each term of this Agreement must be construed and interpreted in a manner that is consistent with the status of the Board as a tax-exempt entity and as a healthcare public corporation under the laws of the State of Alabama.

**AERAS 1096**

John D. Moorehouse, MD
August 4, 1999
Page Three


If this is your understanding of our verbal agreement, please sign below (both originals), retain one original for your file and return the other for my file. We appreciate your sincere cooperation during these contract negotiations.


Approved:  **Regional Medical Center Board**



By: *Allen P. Fletcher*
　　ALLEN P. FLETCHER, President/CEO



Approved:  **Alabama Emergency Room Administrative Services, PC**



By: 
　　John D. Moorehouse, MD
　　Medical Director and CEO

**AERAS 1097**

# MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is effective as of this the 1ˢᵗ day of **December, 1999**, between **ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.** ("Company") and **Philip A. Zurowsky, MD** ("Independent Contractor") **/dba PJ Consulting Services, Incorporated**.

### RECITALS:

**WHEREAS**, Company is a Professional Corporation organized under the laws of the State of Alabama;

**WHEREAS**, the Independent Contractor is a physician licensed or otherwise legally qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS**, Company is obligated under Agreements with various Medical Service Providers ("Providers") to coordinate physician services in the emergency departments of such Providers;

**WHEREAS**, the Agreements between Company and such Providers permit Company to contract with duly licensed physicians and professional corporations providing physician services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS**, Company desires to engage the Independent Contractor to perform hospital emergency room medical and surgical services ("services"), upon the terms and conditions set forth herein, and the Independent Contractor desires to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the Parties hereto agree as follows:

    **a.**   **Recitals Approved**. The above Recitals are true and correct and are incorporated herein by this reference.

    **b.**   **Duties of the Independent Contractor**. Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company subject to the following:

        i.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers, and at all other places designated by Company and approved by such Providers;

        ii.   All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that

1

**AERAS 1098**

govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

        iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

        iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

        **c.**    **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

        i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

        ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

        (a)    All typing and other clerical duties;
        (b)    Scheduling appointments;
        (c)    Answering telephones;
        (d)    Facilities and equipment maintenance and cleaning services; and
        (e)    Financial management, bookkeeping and related services.

        **d.**    **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

        **e.**    **Billing Services**. Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

2

**AERAS** 1099

**f.**    <u>Contract Amount</u>. During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

**g.**    <u>Cost of Administration and of Services</u>. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

**h.**    <u>Term</u>.
     i.      Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:
     (i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

     (ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

     (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

     (iv) The conviction of the Independent Contractor for a crime punishable as a felony;

     (v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

     (vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled

3

**AERAS 1100**

substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

    ii.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

    i.    **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations

4

**AERAS 1101**

under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

      **j.**    **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

      **k.**    **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of

5

AERAS 1102

employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

l.    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

m.    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

      (a)    BNDD Registration;
      (b)    Medical License; Controlled Substance
      (c)    Advance Cardiac Life Support Provider Level Card;
      (d)    Advance Trauma Life Support Provider Level Card;
      (e)    Medical Control Director's Course; and
      (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

6

AERAS 1103

**n.    Outside Professional Activities.** It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

**o.    Confidential, Trade Secret Information.** The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

**p.    Agency.** Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

**q.    Restrictive Covenant.**
    i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The

7

AERAS 1104

covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

AERAS 1105

**r.**     <u>Injunctive Relief</u>.

        i.       Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

        ii.      In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

        iii.     In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

        iv.     Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

        **s.**     <u>Notices</u>. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

| | |
|---|---|
| **Independent Contractor:** | **PJ Consulting Services, Inc.** |
| | **Philip A. Zurowsky, MD** |
| | President |
| | 2207 Concord Pike, Ste. 503 |
| | Wilmington, DE 19803 |
| | |
| **Company:** | **Alabama Emergency Room** |
| | **Administrative Services, P.C.** |
| | John D. Moorehouse, M.D. |
| | President |
| | 4160 Carmichael Road, Ste 104 |
| | Montgomery, AL 36106 |

AERAS 1106

With a copy to:           Gerald W. Hartley, Esq.
Hill, Hill, Carter, Franco,
           Cole & Black, P.C.
425 South Perry Street
Montgomery, AL 36104

    **t.**    **Waiver of Breach**. No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought. No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party. No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy. Any waiver of a condition shall not constitute a permanent or continuing waiver.

    **u.**    **Completion and Execution of Additional Documents**. Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement. Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

    **v.**    **Captions**. The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

    **w.**    **Reconciliation Clause**. To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

    **x.**    **Patient Medical and Surgical Records**. Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records. Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

10

AERAS 1107

**y.**    **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

**z.**    **Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.**    **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

**bb.**    **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

**cc.**    **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

**dd.**    **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**ee.**    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

**ff.**    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

**AERAS 1108**

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**

**ALABAMA EMERGENCY ROOM ADMINISTRATIVE SERVICES, P.C.**

_____

By:_____

Secretary

John D. Moorehouse, M.D.
Its President
"Company"

(Corporate Seal)

Witness:

_____
Date

_____

_____
"Independent Contractor"

12

**AERAS 1109**

**EXHIBIT 1**
**CONTRACT AMOUNT/AERAS**

(a)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due **75%** (with yearly increments of 2% until reaching 81%) of the **59%** of gross professional charges paid by **Baptist Medical Center** to AERAS for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(b)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **Jackson Hospital** to AERAS for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(c)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, **75%** (with yearly increments of 2% until reaching 81%) of the **55%** of gross professional charges paid by **North East Alabama Regional Medical Center** to AERAS for professional services provided hereunder by the **Independent Contractor.** The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(d)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Prattville Hospital** to AERAS for professional services provided hereunder by the **Independent Contractor.** The **Independent Contractor** will be guaranteed a minimum of **$93** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

(e)    During the term of this Agreement, **AERAS** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such payment is due, charges paid by **Baptist Medical Center East** to AERAS for professional services provided hereunder by the **Independent Contractor.** The **Independent Contractor** will be guaranteed a minimum of **$95** per hour. The balance of such fees actually paid **AERAS** shall be retained by **AERAS** as compensation for its services hereunder.

**ATTEST:**

    (Corporate Seal)

**ALABAMA EMERGENCY ROOM**
**ADMINISTRATIVE SERVICES, P.C.**

_____
Secretary

By: _____          _____
     John D. Moorehouse, M.D.          (Date)
     Its President

Witness:

_____          _____
       "Independent Contractor"

13

**AERAS 1110**

Hospitalist

AERAS 1111

STATE OF ALABAMA

MONTGOMERY COUNTY

## HOSPITALIST SERVICES AGREEMENT

This Agreement is entered into by and between **Baptist Medical Center East,** Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "**BMC-EAST**") and **Hospitalist, PC**, an Alabama professional corporation (hereinafter referred to as "**HPC**").

WITNESSETH:

**BMC-EAST** OPERATES a general medical/surgical hospital facility in Montgomery, Alabama, (hereinafter referred to as "the Hospital"), which requires the professional medical services of physicians. **BMC-EAST** has recognized the need for hospital based physicians to provide important care services for unattached patients who present to the Hospital, for inpatient care, or to provide assistance to attending/referring physicians with their patients who are to be admitted to the Hospital; and

WHEREAS, **HPC** is able to provide qualified physicians (hereinafter referred to as "Hospitalists"), to provide the needed coverage and the inpatient care services identified by **BMC-EAST**; who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the **BMC-EAST** Medical Staff, and receive privileges to practice in Internal Medicine and Family Practice; and, **HPC** can assure that the Hospitalists' they provide shall accept responsibility to provide professional medical services in the Hospital; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of **BMC-EAST** , and the terms and conditions set forth in this Agreement;

THEREFORE, **BMC-EAST** and **HPC** desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the provision of Hospitalists to provide inpatient care services at **BMC-EAST**, and agree as follows:

### HPC's COMMITMENTS

1.1    Physician Staffing. **HPC** will provide appropriately licensed and qualified physicians who will provide inpatient care services as shall be mutually agreed upon by the parties hereto.

1

**AERAS 1112**

**HPC** provided Hospitalists' will, at a minimum be Board Eligible in Internal Medicine or Family Practice, be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Physicians, American Society of Internal Medicine, the American Academy of Family Physicians, and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Hospitalists will provide medical care to all "unattached" individuals who present themselves to the Hospital in need of inpatient medical services.

**HPC** shall maintain a schedule indicating the Hospitalists on duty each day, the service hours, and the times they were present in the Hospital.

Hospitalists shall not begin rendering services in the Hospital until he or she has been fully credentialed by **BMC-EAST**.

1.2    Medical Staff Privileges.

(a)    Procedure.    Each Hospitalist provided by **HPC** shall apply for medical privileges in Internal Medicine or Family Practice and must obtain approval for appropriate Medical Staff membership in accordance with **BMC-EAST** policies and procedures and the Medical Staff Bylaws. Physician credentials shall be forwarded to **BMC-EAST** by **HPC** in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at **BMC-EAST**. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Responsibilities of Hospitalists. Each Hospitalist provided by **HPC** shall have the same responsibilities as other members of the Medical Staff including attendance at medical staff and committee meetings in accordance with Medical Staff Bylaws.

1.3    Independent Contractors.    In the performance of inpatient medical services hereunto, **HPC** and Hospitalists shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of **BMC-EAST**. Neither **HPC** nor Hospitalists performing services for **HPC** under this Agreement, whether said Hospitalists be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against **BMC-EAST** for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social

2

AERAS 1113

Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4   Core Group.   **HPC** shall maintain a stable core group of full-time Hospitalists to work in the Hospital on a regular basis. Full-time Hospitalists are expected to live in the area. For good cause, **BMC-EAST** shall have the right to refuse any physician which **HPC** proposes to use in the Hospital and/or to request the removal of any **HPC** Hospitalist, provided, however, that **HPC** has been given a 30 day notice and an opportunity to cure any problems concerning a particular physician.

1.5   Treatment and Patient Referral.   All unattached patients presenting to the Hospital, and/or patients referred at the specific request of a referring physician, will be treated by the Hospitalist on duty, unless the patient/family requests otherwise.   At the end of the period of hospitalization, the Hospitalists shall discharge the patient and arrange follow-up through an appropriate physician or clinic or in the case of referred patients, shall refer the patient back to his/her referring physician for follow-up care. Hospitalists' will not schedule themselves for follow-up care of discharged patients.

1.6   No Private Practice. Full-time Hospitalists' shall not otherwise engage in the private practice of medicine within the Hospital's primary service area (Montgomery, Autauga, Elmore, Pike, Crenshaw, and Lowndes Counties) during the term of this agreement.

1.7   Non-Discrimination.   **HPC** shall not discriminate against any Hospitalist applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.8   Personal Expenses.   **HPC** and Hospitalists shall be responsible for all personal and professional expenses, including but not limit to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.9   No Authority to commit to **BMC-EAST**.   **HPC** shall incur no financial obligation on behalf of **BMC-EAST** without prior written approval of **BMC-EAST**.

1.10   Quality and Risk Management.   **HPC** will provide a continuing review and an annual evaluation of the professional performance of each Hospitalist pursuant to this Agreement. **BMC-EAST** shall participate in such annual evaluation.   Hospitalist evaluations shall be shared with the appropriate

AERAS 1114

**BMC-EAST** committee as part of their peer review process.  **HPC** will further implement the Quality and Risk Management Plan of the Hospital.

1.11   Utilization Review.  **HPC** will assist in the Utilization Review Program by monitoring admissions to **BMC-EAST** from the Hospital and evaluating the appropriateness of such admissions according to established criteria.

1.12   Staff Education.   Hospitalists will, without compensation, assist the Hospital in providing educational programs for **BMC-EAST's** nursing, physician, and ancillary staffs.

1.13   Evaluation.   **HPC** shall meet with **BMC-EAST** Administration on a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the Hospitalist program.

1.14   Codes.  Hospitalists shall respond to all emergencies or "codes" occurring in-house.

1.15   Claims/ Litigation.  **HPC** agrees to cooperate with **BMC-EAST** in resolving all claims and litigation, which may arise out of providing of Hospitalist services by **HPC**.   Hospitalists will personally respond to patient complaints/problems and as requested by a head nurse, and/or Administration.

1.16   Guest Relations.  **HPC** agrees to stress guest relation techniques and patient satisfaction and to cooperate with surveys conducted by **BMC-EAST** to measure patient and family satisfaction with Hospitalist services.

1.17   Marketing.  **HPC** agrees, to the extent possible, to support, participate in, and submit input into **BMC-EAST** 's marketing program.

**BMC-EAST COMMITMENTS**

2.1   Transcription of records.  **BMC-EAST** will provide, through its transcription systems, a transcription of all dictated medical records information on patients treated by **HPC** on a timely basis.

2.2   Assurance.  During the term of this agreement, **BMC-EAST** shall not contract with any other physicians or entities for the services performed by Hospitalists assigned to **BMC-EAST** through **HPC** and this agreement. In the event this Agreement expires, or is terminated by either party

4

**AERAS 1115**

subject to the notice provisions contained herein, it is hereby agreed that **BMC-EAST** may offer employment to any Hospitalist who is providing service in the Hospital at the time of such contract termination or expiration.


## FEES, BILLING, COLLECTION, and REMUNERATION

3.1     Definitions.  For the purpose of this section, the following definitions shall apply:

    (a)    Services to patients:  those services of inpatient care which:

        (i)    are personally furnished to a patient by Hospitalists.

        (ii)    Contribute directly to the diagnosis or treatment of the patient; and

        (iii)    Ordinarily require performance by a physician, physician assistant, or nurse practitioner working under the direct supervision of a physician.

    (b)    Services to Hospital: Those services of **HPC** and/or Hospitalists which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in **BMC-EAST**; e.g., administrative and supervisory services shall be performed at no charge to **BMC-EAST**.

3.2.     HMO's, PPO's, Workman's compensation, etc. **HPC** agrees to participate with **BMC-EAST** in providing care for any enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with **BMC-EAST** to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups. **HPC** shall reserve the right to negotiate terms for the professional Hospitalists' services with any such entity.

3.3     Cooperation with TEFRA Regulations. **HPC** shall comply with these provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect **BMC-EAST's** reimbursement. **HPC** shall do nothing, knowingly, which would adversely affect such reimbursement or **BMC-EAST's** Medicare/ Medicaid provider status.

3.4     Changes in the Law or Regulations. **HPC** and **BMC-EAST** hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation

5

AERAS 1116

under the Medicare program. Should these limits or any other law or regulation affecting reimbursement for **BMC-EAST** or for **HPC** under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

3.5    Final Payment.  In the event this Agreement is terminated as provided for herein, all rights of **HPC** to compensation from **BMC-EAST** pursuant to Section 3.6 shall end as of the effective date of such termination, and **BMC-EAST** shall distribute to **HPC** the sum, if any, due and owing for services rendered by **HPC** as of the effective date of said termination and shall pay said sum within fifteen days (15) after the termination date.

3.6    Renumeration

(a)    HPC shall bill, collect, and retain fees for all services rendered by it, its' physicians and other employees providing services on its behalf hereunder.

(b)    HPC and BMC-East have agreed upon subsidy agreement such that BMC-East will provide a subsidy which shall make up any difference between HPC's net collections in a month and the sum of one hundred ten and no/100 dollars ($110.00) per hour for the total (non-overlapping) hours covered by a physician in that month.

(c)    In each month of this Agreement, BMC-East shall make any subsidy payment owed to the HPC within ten (10) days of receipt of the prior month's documentation and proof of net collections.

(d)    HPC will make every effort to provide BMC-East with documentation and proof of net collections, for the previous month, by the 5th of the month.

## GENERAL PROVISIONS

4.1    Access to Books and Records. Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, **HPC** shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If **HPC** carries out any of the duties of this agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, **HPC** agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of

6

AERAS 1117

Public Law 46-499, 952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this agreement.

4.2    Material Breach. In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, and such reasonable steps being satisfactory to the non-breaching party, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    Regulatory Requirements. The Hospitalists shall at all times conduct themselves and their conduct in compliance with Hospital's policies and procedures, Medical Staff Bylaws and Rules and Regulations, and all applicable statues, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over **BMC-EAST**. Hospitalists' practice shall further be in compliance with the applicable standards of the Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Internal Medicine.

4.4    Liability Insurance. **HPC** agrees that it Hospitalists will be covered by professional liability insurance in the amount of One Million Dollars ($1,000,000.00) single limit each incident, and Three Million Dollars ($3,000,000.00) annual aggregate for each Hospitalist who provides services in the Hospital. The liability insurance will be on a claims made basis. A certificate of insurance evidencing coverage will be submitted to **BMC-EAST**. **HPC** shall furnish **BMC-EAST** with prompt written notice of cancellation or material change in its insurance coverage. The aforesaid liability insurance shall be with a carrier or carriers acceptable to **BMC-EAST**.

4.5    Gender and Number. Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

7

AERAS 1118

4.6    Captions. Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this agreement or any provisions thereof.

4.7    Counterparts. This agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8    Waiver of Provisions. Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto. A waiver of any of the terms and conditions here of shall not be construed as a waiver of any other terms and conditions hereof.

4.9    Force Majeure. **BMC-EAST** is not obligated to compensate **HPC** for services during periods in which **HPC** is not performing its responsibilities under this Agreement because of :

   (a)    Strike, lockout, walkout, or labor dispute affecting the Hospital or any portion thereof; or
   (b)    Acts of God; governmental restrictions, regulations or controls; enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party

4.10    Severability. The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed servable and if any portion shall be held invalid, illegal; or unenforceable for any reason, the remained of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor. This agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12    Notice. Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing. If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

8

**AERAS 1119**

    (a)    if to **Hospitalist, PC**:
            **(HPC)**
            ATTN: John D. Moorehouse, MD, FACEP
            4160 Carmichael Road, Suite 104
            Montgomery, AL  36116
            334-272-1050      (telephone)
            334-271-7698      (fax)

    (B)    if to **Baptist Medical Center East:**
            **(BMC-EAST)**
            John Melton, Administrator
            PO Box 241267
            Montgomery, AL  36116-1267
            334-244-8500      (telephone)

Unless otherwise provided, notices shall be effective on the earlier of (i) actual delivery, (ii) the date of transmission, if by facsimile, or (iii) as applicable, either the first business day following the date of deposit with a qualified courier service or the third business day following the date of deposit with United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail . Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13   Term.  The initial term of this Agreement shall be for a period of two (2) years, commencing April 1, 1999 unless it is terminated in the manner provided in paragraph 4.14.  The Agreement may thereafter automatically renew for one (1) year terms, unless a proper termination is effected or either party gives at least a one hundred twenty days (120) written notice of an intention not to renew the Contract for another term.

4.14   Termination.  This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred twenty (120) days written notice given by one party to the other.

4.15   Rights.  No parties other than **HPC** and **BMC-EAST** have rights under this Agreement.  Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16   Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes any prior agreement either written or oral.  All amendments to the contract will be in writing and signed by authorized representatives of both parties.

9

4.17   Effective date. This agreement shall be in effect as of the date of execution of both parties or such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the 1st day of April, 1999.

Baptist Medical Center East

By: _____

John Melton
Administrator

Date: 2/8/99

Hospitalist, PC

By: _____

Paul K. Tanaka, MD
Vice-President

Date: 2/8/99

10

AERAS 1121

STATE OF ALABAMA

MONTGOMERY COUNTY

## HOSPITALIST SERVICES AGREEMENT

This Agreement is entered into by and between Baptist Medical Center d/b/a Baptist Medical Center Downtown, Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "BMCD") and Hospitalist, P.C., an Alabama professional corporation (hereinafter referred to as "HPC").

### WITNESSETH:

BMCD operates a general medical/surgical hospital facility in Montgomery, Alabama (hereinafter referred to as "the Hospital"), which requires the professional medical services of physicians. BMCD has recognized the need for a hospital based physician to provide important care services for unattached patients who present to the hospital for inpatient care, and/or to provide assistance to attending/referring physicians with their patients who are to be admitted to the Hospital; and

WHEREAS, HPC is able to provide qualified physicians (hereinafter referred to as "Hospitalists'"), to provide the needed coverage and to provide the inpatient care services identified by BMCD; who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the BMCD Medical Staff, and receive privileges to practice in Internal Medicine; and, HPC can assure that the Hospitalists' they provide shall accept responsibility to provide professional medical services in the Hospital; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of BMCD, and the terms and conditions set forth in this Agreement;

THEREFORE, BMCD and HPC desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the provision of Hospitalists to provide inpatient care services at BMCD, and agree as follows:

### HPCS' COMMITMENTS

1.1    Physician Staffing. HPC will provide appropriately licensed and qualified physicians who will provide inpatient care services during such hours as shall be mutually agreed upon by the parties hereto.

1

AERAS 1122

HPC provided Hospitalist's will, at a minimum be Board Eligible in Internal Medicine, be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Physicians, American Society of Internal Medicine and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Hospitalists will provide medical care to all "unattached" individuals who present themselves to the Hospital in need of inpatient medical services.

HPC shall maintain a schedule indicating the Hospitalist on duty each day, the service hours, and the times they were present in the Hospital.

Hospitalists shall not begin rendering services in the Hospital until he or she has been fully credentialed by BMCD.

1.2    Medical Staff Privileges

(a)    Procedure. Each Hospitalist provided by HPC shall apply for medical privileges in Internal Medicine and must obtain approval for appropriate Medical Staff membership in accordance with BMCD polices and procedures and the Medical Staff Bylaws. Physician credentials shall be forwarded to BMCD by HPC in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at BMCD. Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

(b)    Responsibilities of Hospitalist. Each Hospitalist provided by HPC shall have the same responsibilities as other members of the Medical Staff including attendance at Medical Staff and Committee meetings in accordance with the Medical Staff Bylaws.

1.3    Independent Contractors. In the performance of emergency medical services hereunto, HPC and Hospitalists shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BMCD. Neither HPC nor Hospitalists performing services for HPC under this Agreement, whether said Hospitalists be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BMCD for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group. HPC shall maintain a stable group of full-time Hospitalists to work in the Hospital on a regular basis. Full-time Hospitalists are expected to live in the area. For good cause, BMCD shall have the right to refuse any physician which HPC proposes to use in the Hospital and/or to request the removal of any HPC Hospitalist, provided, however, that HPC has

AERAS 1123

been given at least thirty (30) days notice and an opportunity to cure any problems concerning a particular Physician.

1.5    Treatment and Patient Referral. All unattached patients presenting to the Hospital, and/or patients referred at the specific request of a referring physician, will be treated by the Hospitalist on duty, unless the patient/family requests otherwise. At the end of the period of hospitalization, the Hospitalists shall discharge the patient and arrange follow-up through an appropriate physician or clinic or in the case of referred patients, shall refer the patient back to his/her referring physician for follow-up care. Hospitalists' will not schedule themselves for follow-up care of discharged patients.

1.6    No Private Practice. Hospitalists' shall not otherwise engage in the private practice of medicine within the Hospital's primary service area (Montgomery, Autauga, Elmore, Pike, Crenshaw and Lowndes Counties) during the term of this Agreement.

1.7    Non Discrimination. HPC shall not discriminate against any Hospitalist applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.8    Personal Expenses. HPC and Hospitalists shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.9    No Authority to Commit BMCD. HPC shall incur no financial obligation on behalf of BMCD without prior written approval of BMCD.

1.10    Quality and Risk Management. HPC will provide a continuing review and an annual evaluation of the professional performance of each Hospitalist assigned to BMCD pursuant to this Agreement. BMCD shall participate in such annual evaluation. Hospitalist evaluations shall be shared with the appropriate BMCD committee as part of their peer review process. HPC will further implement the Quality and Risk Management Plan of the Hospital.

1.11    Utilization Review. HPC will assist in the Utilization Review Program by monitoring admissions to BMCD and by evaluating the appropriateness of such admissions according to established criteria.

1.12    Staff Education. Hospitalists will, without compensation, assist the Hospital in providing educational programs for BMCD's nursing, physician and ancillary staffs.

1.13    Evaluation. HPC shall meet with BMCD Administration on a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the Hospitalist program.

1.14    Codes. Hospitalists shall respond to all emergencies or "codes" occurring in-house.

3

AERAS 1124

1.15    Claims/Litigation.    HPC agrees to cooperate with BMCD in resolving all claims and litigation which may arise out of the providing of Hospitalist services by HPC. Hospitalists will personally respond to patient complaints/problems and as requested by a head nurse, and/or Administration.

1.16    Guest Relations.    HPC agrees to stress guest relations techniques and patient satisfaction and to cooperate with surveys conducted by BMCD to measure patient and family satisfaction with Hospitalist services.

1.17    Marketing.    HPC agrees, to the extent possible, to support, participate in, and submit input into BMCD's marketing program.

## BMCD COMMITMENTS

2.1    Facilities and Supplies.    BMCD shall make available, during the term of this Agreement, an appropriate office space and such equipment as the parties shall mutually agree upon as being required for the provision of services by the Hospitalists'.

2.2    Transcription of Records.    BMCD will provide, through its' transcription system, transcription of all dictated medical records information on patients treated by HPC on a timely basis.

2.6    Assurance.    During the term of this Agreement, BMCD shall not contract with any other physicians or entities for the services performed by Hospitalists assigned to BMCD through HPC and this Agreement. In the event this Agreement expires or is terminated by either party subject to the notice provisions contained herein, it is hereby agreed that BMCD may offer employment to any Hospitalist who is providing service in the Hospital at the time of such contract termination or expiration.

## FEES, BILLING, COLLECTION AND RENUMERATION

3.1    Definitions.    For the purpose of this section, the following definitions shall apply:

(a)    Services to Patients:   Those services of Hospitalists which:
    (i)    are personally furnished to a patient by Hospitalists.
    (ii)    contribute directly to the diagnosis or treatment of the patient; and
    (iii)    ordinarily require performance by a physician, physician assistant, or nurse practitioner working under the direct supervision of a physician.

4

**AERAS 1125**

    (b)    Services to Hospital:  Those services of HPC and/or Hospitalists which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in BMCD; e.g., administrative and supervisory services shall be performed at no charge to BMCD.

3.2    HMO's, PPO's, Workman's Comp., Etc. HPC agrees to participate with BMCD in providing care  for enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with BMCD to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups.

3.3    Cooperation with TEFRA Regulations. HPC shall comply with those provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect BMCD's reimbursement. HPC shall do nothing, knowingly, which would adversely affect such reimbursement or BMCD's Medicare/Medicaid provider status.

3.4    Changes in the Law or Regulations. HPC and BMCD hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program.  Should these limits or any other law or regulation affecting reimbursement for BMCD or for HPC under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

3.5    Final Payment. In the event this Agreement is terminated as provided for herein, all rights of HPC to compensation from BMCD pursuant to Section 3.7 shall end as of the effective date of such termination, and BMCD shall distribute to HPC the sum, if any, due and owing for services rendered by HPC as of the effective date of said termination and shall pay said sum within fifteen (15) days after the termination date.

3.7    Renumeration.
    (a)    HPC shall bill, collect, and retain fees for all services rendered by it, its' physicians and other employees providing services on its behalf hereunder.
    (b)    HPC and BMCD have agreed upon subsidy arrangement such that BMCD will provide a subsidy which shall make up any difference between HPC's ████████████████████ or the total (non-overlapping) hours covered by a physician in that month.
    (c)    In each month of this Agreement, BMCD shall make any subsidy payment owed to HPC within ten (10) days of receipt of the prior month's documentation and proof of net collections.
    (d)    HPC will make every effort to provide BMCD with documentation and proof of net collections, for the previous month, by the 5th of the month.

5

AERAS 1126

# GENERAL PROVISIONS

4.1    <u>Access to Books and Records</u>. Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, HPC shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If HPC carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, HPC agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) ( of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

4.2    <u>Material Breach</u>. In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    <u>Regulatory Requirements</u>. The Hospitalists shall at all times conduct themselves and their conduct in compliance with Hospital's policies and procedures, Medical Staff Bylaws and Rules and Regulations, and all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over BMCD. Hospitalists' practices shall further be in compliance with the applicable standards of the Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Internal Medicine.

4.4    <u>Liability Insurance</u>. HPC agrees that its Hospitalists will be covered by professional liability insurance in the amount of at least $1 million/$3 million for each Hospitalist who provides services in the Hospital. The liability insurance will be on a claims made basis. A certificate of insurance evidencing coverage will be submitted to BMCD. HPC shall furnish BMCD with prompt written notice of cancellation or material change in its insurance coverage. The aforesaid liability insurance shall be with a carrier or carriers acceptable to BMCD.

4.5    <u>Gender and Number</u>. Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

AERAS 1127

4.6    Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8    Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9    Force Majeure.  BMCD is not obligated to compensate HPC for services during periods in which HPC is not performing its responsibilities under this Agreement because of:

(a)    strike, lockout, walkout or labor dispute affecting the hospital or any portion thereof; or

(b)    Acts of God; governmental restrictions, regulations or controls; enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party

4.10    Severability.  The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor.  This Agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12    Notices.  Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing.  If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

7

AERAS 1128

If to BMCD:

Al Hargrave, Vice President/Administrator
Baptist Medical Center Downtown
310 South Ripley Street
Montgomery, Alabama 36104
(334) 269-8650


If to HPC:

John D. Moorehouse, M.D., FACEP
Hospitalist, P.C.
4160 Carmichael Road, Suite 104
Montgomery, Alabama 36116
(334) 272-1050

Unless otherwise provided, notices shall be effective on the earlier of (i) actual delivery, (ii) the date of transmission, if by facsimile, or (iii) as applicable, either the first business day following the date of deposit with a qualified courier service or the third business day following the date of deposit with the United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail. Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

    4.13    Term. The term of this Agreement shall be two (2) years, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

    4.14    Termination. This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty days (180) days written notice given by one party to the other.

    4.15    Rights. No parties other than HPC and BMCD have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

    4.16    Entire Agreement. This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral. All amendments to the contract will be in writing and signed by authorized representatives of both parties.

8

AERAS 1129

4.17    Effective Date. This Agreement shall be in effect as of the date of execution of both parties or such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the _____ day of _____, 1998.


BAPTIST MEDICAL CENTER d/b/a                    HOSPITALIST, P.C.
BAPTIST MEDICAL CENTER DOWNTOWN

By: _____              By: _____
    C. Bruce Lawrence                          Its: _____
    Senior Vice President/COO
    Baptist Medical Center

Date: ___10-28-98_____                     Date: ___10/29/98_____


9


AERAS 1130

STATE OF ALABAMA

MONTGOMERY COUNTY

<u>HOSPITALIST SERVICES AGREEMENT</u>

This Agreement is entered into by and between **Jackson Hospital & Clinic, Inc.,** Montgomery, Alabama, an Alabama non-profit corporation (hereinafter referred to as "**JHC**") and **Hospitalist, PC**, an Alabama professional corporation (hereinafter referred to as "**HPC**").

WITNESSETH:

**JHC** OPERATES a general medical/surgical hospital facility in Montgomery, Alabama, (hereinafter referred to as "the Hospital"), which requires the professional medical services of physicians.  **JHC** has recognized the need for hospital based physicians to provide important care services for unattached patients who present to the Hospital, for inpatient care, or to provide assistance to attending/referring physicians with their patients who are to be admitted to the Hospital; and

WHEREAS, **HPC** is able to provide qualified physicians (hereinafter referred to as "Hospitalists"), to provide the needed coverage and the inpatient care services identified by **JHC**; who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the **JHC** Medical Staff, and receive privileges to practice in Internal Medicine or Family Practice; and, **HPC** can assure that the Hospitalists' they provide shall accept responsibility to provide professional medical services in the Hospital; in accordance with accepted medical standards, the Bylaws of the Medical Staff, the policies and procedures of **JHC** , and the terms and conditions set forth in this Agreement;

THEREFORE, **JHC** and **HPC** desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the provision of Hospitalists to provide inpatient care services at **JHC**, and agree as follows:

**HPC's** COMMITMENTS

1.1   <u>Physician Staffing</u>.  **HPC** will provide appropriately licensed and qualified physicians who will provide inpatient care services as shall be mutually agreed upon by the parties hereto.

1

**AERAS 1131**

**HPC** provided Hospitalists' will, at a minimum be Board Eligible in Internal Medicine or Family Practice, be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and in accordance with the rules and regulations of the American College of Physicians, American Society of Internal Medicine, or American Academy of Family Physicians, and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Hospitalists will provide medical care to all "unattached" individuals who present themselves to the Hospital in need of inpatient medical services.

**HPC** shall maintain a schedule indicating the Hospitalists on duty each day, the service hours, and the times they will be present in the Hospital.

Hospitalists shall not begin rendering services in the Hospital until he or she has been fully credentialed by **JHC.**

1.2    Medical Staff Privileges.

    (a)    Procedure.    Each Hospitalist provided by **HPC** shall apply for medical privileges in Internal Medicine or Family Practice and must obtain approval for appropriate Medical Staff membership in accordance with **JHC** policies and procedures and the Medical Staff Bylaws. Physician credentials shall be forwarded to **JHC** by **HPC** in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at **JHC.** Medical Staff privileges shall be maintained according to the Medical Staff Bylaws.

    (b)    Temporary Medical Staff Privileges. Notwithstanding any other provision in this agreement, it is understood that, on occasion, temporary Medical Staff Privileges may be requested by **HPC** due to unusual or unforeseen circumstances. In such instances, temporary Medical Staff Privileges may be granted by **JHC** officials in accordance with Medical Staff Bylaws.

    (c)    Responsibilities of Hospitalists. Each Hospitalist provided by **HPC** shall have the same responsibilities as other members of the Medical Staff including attendance at medical staff and committee meetings in accordance with Medical Staff Bylaws.

1.3    Independent Contractors.    In the performance of inpatient medical services hereunto, **HPC** and Hospitalists shall at all times act as independent

2

AERAS 1132

contractors practicing their profession, and not as employee(s) or agent(s) of **JHC**. Neither **HPC** nor Hospitalists performing services for **HPC** under this Agreement, whether said Hospitalists be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against **JHC** for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

1.4    Core Group.    **HPC** shall maintain a stable core group of full-time Hospitalists to work in the Hospital on a regular basis. Full-time Hospitalists are expected to live in the area. For good cause, **JHC** shall have the right to refuse any physician which **HPC** proposes to use in the Hospital and/or to request the removal of any **HPC** Hospitalist, provided, however, that **HPC** has been given a 60 day notice and an opportunity to cure any problems concerning a particular physician.

1.5    Treatment and Patient Referral. All unattached patients presenting to the Hospital, and/or patients referred at the specific request of a referring physician, will be treated by the Hospitalist on duty, unless the patient/family requests otherwise. At the end of the period of hospitalization, the Hospitalists shall discharge the patient and arrange follow-up through an appropriate physician or clinic or in the case of referred patients, shall refer the patient back to his/her referring physician for follow-up care. Hospitalists' will not schedule themselves for follow-up care of discharged patients.

1.6    No Private Practice. Full-time Hospitalists' shall not otherwise engage in the private practice of medicine within the Hospital's primary service area (Montgomery, Autauga, Elmore, Pike, Crenshaw, and Lowndes Counties) during the term of this agreement.

1.7    Non-Discrimination. **HPC** shall not discriminate against any Hospitalist applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.8    Personal Expenses. **HPC** and Hospitalists shall be responsible for all personal and professional expenses, including but not limit to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.9    No Authority to commit to **JHC.** **HPC** shall incur no financial obligation on behalf of **JHC** without prior written approval of **JHC.**

3

AERAS 1133

1.10   Quality and Risk Management.  **HPC** will provide a continuing review and an annual evaluation of the professional performance of each Hospitalist pursuant to this Agreement.  **JHC** shall participate in such annual evaluation.  Hospitalist evaluations shall be shared with the appropriate **JHC** committee as part of their peer review process.  **HPC** will further implement the Quality and Risk Management Plan of the Hospital.

1.11   Utilization Review.  **HPC** will assist in the Utilization Review Program by monitoring admissions to **JHC** from the Hospitalist and evaluating the appropriateness of such admissions according to established criteria.

1.12   Staff Education.   Hospitalists will, without compensation, assist the Hospital in providing educational programs for **JHC's** nursing, physician, and ancillary staffs.

1.13   Evaluation.  **HPC** shall meet with **JHC** Administration on a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the Hospitalist program.

1.14   Codes.  Hospitalists shall respond to all emergencies or "codes" occurring in-house.

1.15   Claims/ Litigation.   **HPC** agrees to cooperate with **JHC** in resolving all claims and litigation, which may arise out of providing of Hospitalist services by **HPC**.   Hospitalists will personally respond to patient complaints/problems and as requested by a head nurse, and/or Administration.

1.16   Guest Relations.  **HPC** agrees to stress guest relation techniques and patient satisfaction and to cooperate with surveys conducted by **JHC** to measure patient and family satisfaction with Hospitalist services.

1.17   Marketing.  **HPC** agrees, to the extent possible, to support, participate in, and submit input into **JHC** 's marketing program.

## JHC COMMITMENTS

2.1   Transcription of records.  **JHC** will provide, through its transcription systems, a transcription of all dictated medical records information on patients treated by **HPC** on a timely basis.

4

AERAS 1134

2.2    <u>Assurance.</u>  During the term of this agreement, **JHC** shall not contract with any other physicians or entities for the services performed by Hospitalists assigned to **JHC** through **HPC** and this agreement. In the event this Agreement expires, or is terminated by either party subject to the notice provisions contained herein, it is hereby agreed that **JHC** may offer employment to any Hospitalist who is providing service in the Hospital at the time of such contract termination or expiration.

## FEES, BILLING, COLLECTION, and REMUNERATION

3.1    <u>Definitions</u>.  For the purpose of this section, the following definitions shall apply:

    (a)    Services to patients:  those services of inpatient care which:
        (i)    are personally furnished to a patient by Hospitalists.
        (ii)    Contribute directly to the diagnosis or treatment of the patient; and
        (iii)    Ordinarily require performance by a physician, physician assistant, or nurse practitioner working under the direct supervision of a physician.
    (b)    Services to Hospital: Those services of **HPC** and/or Hospitalists which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in **JHC**; e.g., administrative and supervisory services shall be performed at no charge to **JHC**.

3.2.    <u>HMO's, PPO's, Workman's compensation, etc.</u> **HPC** agrees to participate with **JHC** in providing care for any enrollees of any Health Maintenance Organization (HMO) or Preferred Provider Organization (PPO) or similar groups, and/or employees or employers who might contract with **JHC** to provide care for their enrollees/employees, and in the development of a special pricing structure for such groups.  **HPC** shall reserve the right to negotiate terms for the professional Hospitalists' services with any such entity.

3.3    <u>Cooperation with TEFRA Regulations.</u>  **HPC** shall comply with these provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) which affect **JHC's** reimbursement.  **HPC** shall do nothing, knowingly, which would adversely affect such reimbursement or **JHC's** Medicare/ Medicaid provider status.

5

**AERAS 1135**

3.4    <u>Changes in the Law or Regulations.</u>  **HPC** and **JHC** hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reimbursable compensation set by regulation under the Medicare program.  Should these limits or any other law or regulation affecting reimbursement for **JHC** or for **HPC** under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation by either party upon the giving of written request to the other party.

3.5    <u>Final Payment.</u>  In the event this Agreement is terminated as provided for herein, all rights of **HPC** to compensation from **JHC** pursuant to Section 3.6 shall end as of the effective date of such termination, and **JHC** shall distribute to **HPC** the sum, if any, due and owing for services rendered by **HPC** as of the effective date of said termination and shall pay said sum within fifteen days (15) after the termination date.

3.6    <u>Financial Terms.</u>  In consideration of **HPC** managing and providing treatment to all unattached medical inpatient or observation admissions through **JHC**'s Emergency Department and accepting all Medical inpatient and observation admissions from physicians not having hospital practices or physician with hospital practices who desire to refer patients, **JHC** shall assist **HPC** with its Net Operating Expenses up to $200,000.00 per year ($16,666.67) per month.  Net Operating Expenses shall be defined as **HPC**'s Yearly Operational Expenses including physician costs and the amortization (over 5 years) of its start-up expenses as outlined in the budget accompanying this agreement, less collections from all sources related to medical services provided to these patients.

At the conclusion of the first  (15) fifteen months of this Hospitalist Program Agreement, Net Operating Expenses related to this Agreement, shall be calculated for the previous twelve (12) months.  Based upon this calculation and analysis, the annual Net Operating Expense assistance amount from **JHC** shall be reduced by the amount that annual Net Operating Expenses are below $200,000.00 per year.  At the point in time when Net Operating Expenses reach "zero" or collections are equal to or exceed Operational Expenses, the financial assistance from **JHC** shall cease.  **JHC** shall have the right to inspect the books and records of **HPC** that support the calculations and analysis of Net Operating Expenses.

**GENERAL PROVISIONS**

4.1    <u>Access to Books and Records.</u> Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their

6

duly authorized representatives, **HPC** shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service. Such inspections shall be available up to four (4) years after the rendering of such services. If **HPC** carries out any of the duties of this agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, **HPC** agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this agreement.

4.2    Material Breach. In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this agreement by further written notice of immediate termination. If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, and such reasonable steps being satisfactory to the non-breaching party, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies. However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    Regulatory Requirements. The Hospitalists shall at all times conduct themselves and their conduct in compliance with Hospital's policies and procedures, Medical Staff Bylaws and Rules and Regulations, and all applicable statues, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over **JHC**. Hospitalists' practice shall further be in compliance with the applicable standards of the Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of Internal Medicine.

4.4    Liability Insurance. **HPC** agrees that it Hospitalists will be covered by professional liability insurance in the amount of One Million Dollars ($1,000,000.00) single limit each incident, and Three Million Dollars ($3,000,000.00) annual aggregate for each Hospitalist who provides services in the Hospital. The liability insurance will be on a claims made basis. A certificate of insurance evidencing coverage will be submitted to **JHC**. **HPC** shall furnish **JHC** with prompt written notice of cancellation or

AERAS 1137

material change in its insurance coverage.  The aforesaid liability insurance shall be with a carrier or carriers acceptable to **JHC.**

4.5     Gender and Number.  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6     Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this agreement or any provisions thereof.

4.7     Counterparts.  This agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8     Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions here of shall not be construed as a waiver of any other terms and conditions hereof.

4.9     Force Majeure.  **JHC** is not obligated to compensate **HPC** for services during periods in which **HPC** is not performing its responsibilities under this Agreement because of :

(a)     Strike, lockout, walkout, or labor dispute affecting the Hospital or any portion thereof; or
(b)     Acts of God; governmental restrictions, regulations or controls; enemy or hostile governmental action; civil commotion; insurrection or revolution; sabotage; fire or other casualty or other conditions beyond the control of either party

4.10    Severability.  The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed servable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remained of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor.  This agreement is binding upon and shall inure to the benefit of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

8

AERAS 1138

4.12    Notice.  Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing. If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

(a)    if to **Hospitalist, PC**:

   **(HPC)**
   ATTN:  John D. Moorehouse, MD, FACEP
   4160 Carmichael Road, Suite 104
   Montgomery, AL  36116
   334-272-1050        (telephone)
   334-271-7698        (fax)

(B)    if to **Jackson Hospital**:
   **(JHC)**
   Donald M. Ball, President
   1725 Pine Street
   Montgomery, AL  36106
   334-293-8000        (telephone)

Unless otherwise provided, notices shall be effective on the earlier of (i) actual delivery, (ii) the date of transmission, if by facsimile, or (iii) as applicable, either the first business day following the date of deposit with a qualified courier service or the third business day following the date of deposit with United States Post Office or in a regularly maintained receptacle for the deposit of United States Mail . Any refusal to accept delivery of any such communication shall be considered successful delivery thereof.

4.13    Term.  The initial term of this Agreement shall be for a period of two (2) years, commencing _1-20-99_ unless it is terminated in the manner provided in paragraph 4.14.  The Agreement may thereafter automatically renew for one (1) year terms, unless a proper termination is effected or either party gives at least a one hundred twenty days (120) written notice of an intention not to renew the Contract for another term.

4.14    Termination.  This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred twenty (120) days written notice given by one party to the other.

4.15    Rights.  No parties other than **HPC** and **JHC** have rights under this Agreement.  Both parties are prohibited from assigning their rights and

9

**AERAS 1139**

responsibilities to another party without the prior written consent of the other party.

4.16    Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes any prior agreement either written or oral.  All amendments to the contract will be in writing and signed by authorized representatives of both parties.

4.17    Effective date. This agreement shall be in effect as of the date of execution of both parties or such date as the parties shall mutually agree upon. The parties hereto agree that this Agreement shall commence on the 20 th day of _Feb_ , 1998. 1999

Jackson Hospital & Clinic, Inc.            Hospitalist, PC

By: _Donald M Ball_                        By: _John D Moorehouse_
    Donald M. Ball                             John D. Moorehouse, MD
    President                                  President

Date: _1-20-99_                            Date: _1-20-99_

10

AERAS 1140

## MEDICAL SERVICES
## INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made effective as of this the _____ day of
_____, 19__, even though executed on a later subsequent day by and
between **HOSPITALIST, P.C.** ("Company") and _____
("Independent Contractor").

### RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the
State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally
qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various hospitals
("Hospitals") to coordinate physician services for hospital based physicians who practice in
Internal Medicine to provide important care services for unattached patients who present to such
Hospitals for inpatient care, and/or to provide assistance to attending/referring physicians with
their patients who are to be admitted to such Hospitals;

**WHEREAS,** the Agreements between Company and such Providers permit Company to
contract with duly licensed physicians and professional corporations providing physician
services to fulfill the obligations of Company thereunder to the Providers; and

**WHEREAS,** Company desires to engage the Independent Contractor to provide the
needed coverage and to provide the inpatient care services ("services"), upon the terms and
conditions set forth herein, and the Independent Contractor desire to provide such services.

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the
Parties hereto agree as follows:

1.    **Recitals Approved.**  The above Recitals are true and correct and are incorporated herein
by this reference.

2.    **Duties of the Independent Contractor.**  Company hereby engages the Independent
Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and
surgical services for and on behalf of Company subject to the following:

A.    The Independent Contractor shall render medical and surgical services to all members of
the general public presenting at such Providers, and at all other places designated by Company
and approved by such Providers;

B.    All services required of, and rendered by, the Independent Contractor shall be consistent
with the facilities available and the standards established in the medical community, as well as
the rules and regulations of such Providers.  The Independent Contractor hereto shall perform the
services called for under the terms of this Agreement in accordance with the highest standards of
professional ethics and practice as may, from time to time, be applicable during the term of this
Agreement, as may otherwise be provided under the laws of the State of Alabama, and as
applicable to the professional obligations of the Independent Contractor.  The Independent
Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that

**AERAS 1141**

govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

C.      The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

D.      The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

3.      **Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

A.      Maintenance of business records, to include the filing and indexing of all correspondence and communications;

B.      Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;
> (a)      All typing and other clerical duties;
> (b)      Scheduling appointments;
> (c)      Answering telephones
> (d)      Facilities and equipment maintenance and cleaning services; and
> (e)      Financial management, bookkeeping and related services.

1.      **Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

2.      **Billing Services**.      Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

AERAS 1142

3.    **Contract Amount**.  During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

4.    **Cost of Administration and of Services**.  All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery, billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company.  Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom.  The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

5.    **Term**.
A.    Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) years, beginning on the date first above written, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

(i)    The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

(i)    The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

(i)    The breach by the Independent Contractor of the American Board of Interanal Medicine Rules of Ethical Principles;

(i)    The conviction of the Independent Contractor for a crime punishable as a felony;

(i)    The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

(i)    The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

AERAS 1143

(i)    The failure of the Independent Contractor to provide or perform services as required hereunder;

(i)    The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(i)    The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(i)    The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(i)    The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor. Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(i)    The death of the Independent Contractor; and

(i)    The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

A.    Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

2.    **Malpractice Insurance.** The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement. Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor. At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect. Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company). After the first two (2) years of signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such

**AERAS 1144**

coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

3.  **Indemnification**. Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

4.  **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others,

AERAS 1145

whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

5. **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

6. **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

    (a)                BNDD Registration;
    (b)                Medical License; Controlled Substance
    (c)                Advance Cardiac Life Support Provider Level Card;
    (d)                Evidence of certification by the American Board of Internal Medicine; and
    (e)                A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

1. **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

2.    **Confidential, Trade Secret Information**.  The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

3.    **Agency**.   Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing.  Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

4.    **Restrictive Covenant**.

A.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company.  The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement.  Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians.  In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth.  The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage.  The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants.  Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(i)    On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(i)    Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(i)    Keep and maintain all such billing and other related administrative information confidential and secret in every way.

A.    The territory referred to in this section shall be designated as the State of Alabama.

B.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

2.    **Injunctive Relief.**

A.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

B.    In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

C.    In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

D.    Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

3.    **Notices**.  Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

**Independent Contractor:**    _____
                               _____
                               _____

**Company:**    **Hospitalist, P.C.**
                John D. Moorehouse, M.D.
                President
                4160 Carmichael Road,
                Suite 200
                Montgomery, AL 36106

**With a copy to:**    Gerald W. Hartley, Esq.
                       Hill, Hill, Carter, Franco,
                              Cole & Black, P.C.
                       425 South Perry Street
                       Montgomery, AL 36104

1.    **Waiver of Breach**.  No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

2.    **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under

**AERAS 1149**

this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

3.    **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

4.    **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

5.    **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

6.    **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

7.    **Entire Agreement**.  This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein.  This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

8.    **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

9.    **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

AERAS 1150

10.    **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

11.    **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

12.    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

13.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

14.    **IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

ATTEST:                                              HOSPITALIST, P.C.


_____          By:_____
Secretary                                              John D. Moorehouse, M.D.
                                                       Its President
                                                       "Company"

        (Corporate Seal)


Witness:


_____          _____
                                                       "Independent Contractor"


AERAS 1151

**EXHIBIT 1**

**CONTRACT AMOUNT/HOSPITALIST**

ANNUAL CONTRACT AMOUNT = $       to be paid in 12 equal monthly amounts not later than the 15[th] day of each month.


_____       _____
     "Independent Contractor"              Date


_____       _____
John D. Moorehouse, MD, FACEP       Date
     "Hospitalist, PC"

Prime Care

AERAS 1153

STATE OF ALABAMA

MONTGOMERY COUNTY



## PHYSICIAN STAFFING AGREEMENT

This Agreement is entered into by and between Baptist Ventures, Inc., Montgomery, Alabama, an Alabama corporation (hereinafter referred to as "BVI") and Prime Care, P.C., an Alabama professional corporation (hereinafter referred to as "Prime Care").

### WITNESSETH:

WHEREAS, BVI operates PRI MED urgent care facilities in Montgomery and surrounding counties (hereinafter referred to as "PRI MEDS"), which require the professional medical services of physicians. BVI has determined that in order to insure the proper and efficient operation of the PRI MEDS that several objectives must be met, including but not limited to, appropriate physician coverage hours, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in record keeping, and above all quality patient care;

WHEREAS, Prime Care is capable and willing to provide physicians (hereinafter referred to as "Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the Baptist Ventures, Inc. ("BVI") Medical Staff, and receive privileges to practice in the PRI MEDS; and, Prime Care can assure that the Physicians they provide shall accept responsibility to provide services in the PRI MEDS in accordance with accepted medical standards, the policies and procedures of BVI, and the terms and conditions set forth in this Agreement.

THEREFORE, BVI and Prime Care desire to provide a full statement of their agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the PRI MEDS, and agree as follows:

### 1. PRIME CARE COMMITMENTS

#### 1.1    Physician Staffing.

(a)    Prime Care shall provide physician staffing for the PRI MEDS through duly licensed and qualified Physicians on a continuous, uninterrupted basis, each day, seven (7) days each week for the duration of this Agreement. The number of physicians and the hours to be worked shall be in the sole discretion of BVI.

(b)    Prime Care will provide Physicians who, at a minimum, shall be American Board Certified or Eligible in Family Medicine/Internal Medicine/Emergency Medicine or in a primary specialty with experience in emergency medicine. All Physicians provided by Prime Care shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of the qualifications, prerogatives, and

AERAS 1154

responsibilities of their Medical Staff status.  The Physicians furnished by Prime Care will provide care to all individuals who present themselves to the PRI MEDS for medical treatment.

**1.2    Medical Staff Privileges.**

(a)    Application Process.  Each Physician provided by Prime Care shall be interviewed and approved by BVI before applying for medical privileges in their speciality and must obtain approval for appropriate Medical Staff membership in accordance with BVI policies and procedures.  Physician credentials shall be forwarded to BVI or its designee by Prime Care in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at a PRI MED.  Medical Staff privileges shall be maintained according to the BVI policies and procedures.

(b)    Temporary Medical Staff Privileges.    Notwithstanding any other provisions in this Agreement, it is understood that, on occasion, temporary Privileges may be requested by Prime Care due to unusual or unforeseen circumstances.

(c)    Responsibilities of Physicians.  Each Physician provided by Prime Care shall have the responsibilities set forth hereinafter.

**1.3    Independent Contractors.**  In the performance of primary care services hereunto, Prime Care and its' Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BVI.  Neither Prime Care nor Physicians performing services for Prime Care under this Agreement, whether said Physicians be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BVI for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

**1.4    Core Group.**  Prime Care shall maintain a stable core group of full-time Physicians to work in the respective PRI MEDS on a regular basis.  Full time Physicians are expected to live in the area.  It is Prime Care's intent to keep physician turnover to a minimum. BVI shall have the right to refuse any physician which Prime Care proposes to use in a PRI MED and/or to request the removal of any Prime Care Physician who in BVI's sole judgment does not meet the standards and qualifications required by it for Physicians practicing in its facilities.

**1.5    Admission Privileges.**  PRI MED Physicians will not have admission privileges at any Baptist Health facility, unless such Physicians independently apply for such privileges.

**1.6    Non Discrimination.**  Prime Care shall not discriminate against any Physician applying for employment or sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

**1.7    Personal Expenses.**  Prime Care and Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

**1.8    No Authority to Commit BVI.**  Prime Care shall incur no financial obligation on behalf of BVI without prior written approval of BVI.

**1.9    Evaluation.**  Prime Care shall meet with BVI Administration on at least a quarterly basis to determine the level of attainment of stated goals, to discuss any problem areas, and for review of the operation of the PRI MEDS.

**1.10    Cooperation.**  Prime Care and BVI agree to cooperate in resolving all claims and litigation which may arise out of the providing of PRI MED medical services by Physicians.  PRI MED Physicians and/or the PRI MED Medical Director will personally respond to patient complaints/problems as requested.

**1.11    Payor Contracting.**  Prime Care and BVI agree to participate in all plans for which Baptist Medical Center is a hospital provider or which is approved by Central Alabama Management Service Organization (CAMSO) or any Physician Hospital Organization(PHO) developed by Baptist and its medical staff notwithstanding the above, Prime Care and BVI will participate jointly in all contract reviews and negotiations.

## 2. BVI COMMITMENTS

**2.1    Facilities and Supplies.**  BVI shall make available during the term of this Agreement such equipment as is required for the proper operation of the PRI MEDS.  BVI shall provide said PRI MEDS with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the same.  Prime Care and/or Physicians shall inform BVI of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

**2.2    X-Ray.**  BVI shall provide an x-ray procedure room and appropriately trained staff for each PRI MED.

**2.3    Lab.**  BVI shall provide an appropriate lab and availability of more advanced laboratory procedures through outside sources.

**2.4    Personnel.**  All non-physician personnel required for the proper operation of the PRI MEDS shall be employed or assigned by BVI.  Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by BVI.  All PRI MED personnel shall be trained and qualified in appropriate medicine services and shall be capable of performing their assigned responsibilities.  All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of BVI.

**2.5    Assurance.**  During the term of this Agreement, BVI shall not contract with any other physicians or entities for the services performed by Physicians assigned to BVI through Prime Care and this Agreement.

**AERAS 1156**

## 3. FEES, BILLING, COLLECTION AND REMUNERATION

**3.1    Fee Schedule.** BVI shall establish and maintain a schedule of fees to be charged for Physicians' professional services rendered to patients in the PRI MEDS.

**3.2    Changes in the Law or Regulations.** Prime Care and BVI hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reasonable compensation set by IRS and other regulations regarding compensation of physicians in similar circumstances. Should these limits or any other law or regulation affecting reimbursement for BVI or for Prime Care under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation.

**3.3    Billing and Collection for Services Rendered.** BVI shall be responsible for the billing and collection of all professional fees for services to patients. Prime Care shall provide sufficient information including diagnosis, professional service code and any other pertinent data to BVI to enable BVI to bill Patients for services provided by Physicians. The information supplied to BVI by Prime Care may be released by BVI for billing purposes.

**3.4    Remuneration.** Prime Care shall be compensated for services rendered by Physicians in accordance with the formula set forth in Exhibit A.

**3.5    Assignment.** Prime Care shall cause each Physician to assign to BVI all accounts receivable generated from the services rendered to patients at the PRI MEDS pursuant to this Agreement. To that end, each Physician shall be obligated to complete a written agreement with BVI which complies with the Medicare Reassignment Rules set forth in the Medicare Carriers' Manual, Section 3060. Each Physician shall also complete such other forms or documents necessary to assign his or her receivables to BVI. It is the intent of the parties hereto to comply with all laws, rules and regulations relating to third-party payor requirements.

## 4. GENERAL PROVISIONS

**4.1    Access to Books and Records.** Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, Prime Care shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing its service. Such inspections shall be available up to four (4) years after the rendering of such services. If Prime Care carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, Prime Care agrees to include this requirement in any such subcontract. This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder. The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Section. The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

**4.2    Material Breach.**  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach to the breaching party, terminate this Agreement by further written notice of immediate termination.  If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies.  However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

**4.3    Regulatory Requirements.**  The PRI MEDS shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction.  PRI MEDS practices shall be in compliance with the policies and regulations of BVI and its parent corporation Baptist Health, the applicable standards of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of practice of medicine.

**4.4    Liability Insurance.**  During the term of this Agreement, Prime Care agrees that its Physicians who provide services in the PRI MEDS will each be covered by professional liability insurance in the amount of at least one million dollars ($1,000,000) single limit each incident, and Three Million Dollars ($3,000,000) annual aggregate.  The liability insurance will be on a claims made basis.  A certificate of insurance evidencing coverage will be submitted to BVI.  Prime Care shall furnish BVI with prompt written notice of cancellation or material change in its insurance coverage.  Upon termination of this Agreement, Prime Care shall purchase the Optional Extension Period Coverage, or similar "tail" policy, available to it under its professional liability insurance policy contemplated by this section.  Prime Care shall include in its agreement with its subcontracting or employed physicians a requirement that such physicians purchase the Optional Extension Period Coverage upon termination of their services at BVI under this Agreement, however, Prime Care shall not be liable to BVI or third parties for the failure of its subcontracting or employed physicians to obtain such coverage.  The aforesaid liability insurance shall be with a carrier or carriers acceptable to BVI.

**4.5    Gender and Number.**  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

**4.6    Captions.**  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation or determination of validity of this Agreement or any provisions hereof.

**4.7    Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

**4.8     Waiver of Provisions.** Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto. A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

**4.9     Acts of God.** BVI is not obligated to compensate Prime Care for services during periods in which Prime Care is not performing its responsibilities under the Agreement because a PRI MED is closed due to an Act of God.

**4.10     Severability.** The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

**4.11     Benefit of Successor.** This Agreement is binding upon and shall inure to the benefit of the successors in interest or the permitted assignees of the parties hereto, except as otherwise provided herein.

**4.12     Notices.** Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing, if mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

If to BVI:

Robin Barca, Senior Vice President and COO
Baptist Ventures, Inc.
301 Brown Springs Road
Post Office Box 244001
Montgomery, Alabama 36124-4001

If to Prime Care:

Paul Tanaka, M.D.
Prime Care, P.C.
4160 Carmichael Road, Suite 101
Montgomery, Alabama 36104

or such other place or places as any of the parties each shall designate by written notice to the other.

**4.13     Term.** The term of this Agreement shall commence on the Effective Date (as defined in Section 4.17) and shall continue for one (1) year, unless sooner terminated as provided for herein. Thereafter, this Agreement shall automatically renew for successive one (1) year periods, subject to the termination provisions set forth herein.

**4.14     Termination.** This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days prior written notice given by one party to the other.

**4.15    Rights.**  No parties other than Prime Care and BVI have rights under this Agreement.  Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

**4.16    Entire Agreement.**  This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral.  All amendments to this Agreement shall be in writing and signed by authorized representatives of both parties.

**4.17    Effective Date.**  This Agreement shall be in effect as of the _____ day of _____, 2002.

**4.18    Effects of Termination.**  Upon termination of this Agreement, as herein provided, neither party shall have any further rights or obligations hereunder except: (a) for obligations accruing prior to the date of termination, including the obligation of BVI to compensate Prime Care for services provided by the Physicians through the date of termination, including, but not limited to, any Compensation (as defined in Exhibit A) based on Adjusted Professional Fees (as defined in Exhibit A) received by BVI within 120 days following the date of termination, (b) for obligations, promises or covenants contained herein which are expressly made to extend beyond the term of this Agreement, or (c) arising as a result of any breach of this Agreement.  Termination of this Agreement, regardless of the cause of such termination, shall not affect a Physician's Medical Staff status or clinical privileges at any other Baptist Health facility.  In the event this Agreement is terminated before the first annual anniversary of the Effective Date, the parties agree not to enter into a new agreement that covers services similar to those described in this Agreement until after the first annual anniversary of the Effective Date.  The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

**4.19    Construction of Agreement.**  This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Alabama, applied without giving effect to any conflicts-of-law principles.  Both parties have participated fully in the review and revision of this Agreement.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement.  The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

AERAS 1160

IN WITNESS WHEREOF, Prime Care and BVI, by and through their duly authorized officers, have caused this Agreement to be made effective as of the date set forth above.

BAPTIST VENTURES, INC.

By: _____

    Robin Barca
    Senior Vice President and COO
    Baptist Ventures, Inc.

Date: ___5/13/08___

PRIME CARE, P.C.

_____

Paul Tanaka, M.D.
President
Prime Care, P.C.

**AERAS 1161**

EXHIBIT A

COMPENSATION FOR SERVICES

A.   **Compensation.**   Prime Care will be compensated for services provided to BVI and PRIMED patients as follows: Prime Care shall be paid compensation of 59% of Adjusted Professional Fees, $10.00 per EKG and $8.00 per x-ray.   PRIMED locations open less than twenty-four (24) months shall be paid compensation equal to the greater of $85.00 per operating hour or 59% of Adjusted Professional Fees, $10.00 per EKG and $8.00 per x-ray.

B.   **Definitions.**     For purposes of calculating Prime Care's Compensation in Paragraph A above, the following definitions shall apply:

1.   *"Gross Professional Fees"* shall include gross revenue for all office visits, surgical procedures, and medical review services provided by Physicians and shall exclude all revenue from Ancillary Services, medical supplies and other services.

2.   *"Revenue Adjustment Factor"* shall be a percentage calculated by dividing Actual Total Adjustments to Revenue plus Net Provision for Bad Debt by Actual Total Annual Gross Revenue for all PRI MEDS combined for the immediately preceding fiscal year. For fiscal year 1998, the Revenue Adjustment Factor was 16.4%.

3.   *"Adjusted Professional Fees"* shall be calculated by subtracting the product of the Gross Professional Fees multiplied by the Revenue Adjustment Factor for the Gross Professional Fees.

4.   *"Fiscal Year"* shall mean the twelve (12) month period beginning July 1 and ending June 30.

5.   *"Ancillary Services"* shall mean those designated health services covered by Medicare's Limitation on Certain Physician Referrals, 42 U.S.C. 1395 nn (commonly referred to as the "Stark II" law), but excluding designated health services personally performed or provided by a referring Physicians.

C.   **Payment Schedule.**   Compensation shall be paid by BVI to Prime Care monthly by the tenth day of each month based on the Adjusted Professional Fees received by BVI in the prior month (e.g., amount earned in April will be paid by May 10th).

D.   **Miscellaneous.**

1.   Access to Records.     BVI shall make available for review by Prime Care such accounting and other records as are necessary to verify and substantiate the Compensation set for above.

2.   Fair Market Value.     BVI and Prime Care have entered into this Agreement with the intent of conducting their professional services relationship in full compliance with applicable state, local, and federal laws including, but not limited to, the Medicare/Medicaid Anti-Fraud and Abuse and Stark laws.   Accordingly, the compensation payable to Prime Care has been negotiated in good faith and in arm's-length negotiations and represents the fair market value of the services provided by Prime

A — 1

AERAS 1162

Care under this Agreement. The compensation paid by BVI to Prime Care is not directly or Indirectly based on the volume of value of any referrals or other business generated by Prime Care, or its Physicians, for BVI. This Agreement covers all of the services Prime Care shall provide to BVI for the term of this Agreement and the services are reasonably necessary to accomplish the commercially reasonable business purposes associated with the operation of the PRI MEDS.

3.     <u>Referrals.</u>     The parties acknowledge that none of the remuneration granted either party herein is conditioned on any requirement that either party hereto or any of its respective physicians make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the other party hereto, or any of their respective physicians.

912003.4

A — 2

**AERAS 1163**

STATE OF ALABAMA

MONTGOMERY COUNTY



## PRI MED MANAGEMENT AGREEMENT

This Agreement is entered into by and between Baptist Ventures, Inc., Montgomery, Alabama, an Alabama corporation (hereinafter referred to as "BVI") and Prime Care, P.C., an Alabama professional corporation (hereinafter referred to as "Prime Care").

### WITNESSETH:

WHEREAS, BVI operates PRI MED urgent care facilities in Montgomery and surrounding counties (hereinafter referred to as "PRI MEDS"), which require the management of certain professional medical services provided by physicians. BVI has determined that in order to insure the proper and efficient operation of the PRI MEDS that several objectives must be met, including but not limited to, appropriate physician coverage hours, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in record keeping, and above all quality patient care;

WHEREAS, the parties have entered into that certain Physician Staffing Agreement of even date hereof (the "Physician Staffing Agreement"), pursuant to which Prime Care will provide physicians to staff the PRI MEDS (collectively, the "Physicians"); and

WHEREAS, Prime Care is capable and willing to provide to the PRI MEDS the Management Services set forth below in accordance with the terms of this Agreement.

THEREFORE, BVI and Prime Care desire to provide a full statement of their agreement by setting forth the rights and duties of each party with respect to the Management Services, and agree as follows:

## 1. PRIME CARE COMMITMENTS

1.1     Services of Prime Care. During the term of this Agreement, BVI hereby engages Prime Care to provide on a full-time basis, directly or through its Designees, those management services set forth herein (the "Management Services"). The term "Designee" shall mean a person or entity, including employees and independent contractors, engaged, hired or retained by Prime Care to perform, on its behalf, the Management Services.

1.2     Time and Attention to Duties. Prime Care shall devote the time and attention of its personnel to the faithful performance of its duties under this Agreement. However, the manner and means by which Prime Care performs its duties hereunder, including the determination of the time, energy and skill devoted thereto, shall be under Prime Care's sole control. Prime Care may, at its expense and in its reasonable discretion, engage, hire or retain a Designee to perform, on its behalf, the Management Services set forth herein; provided,

Error! Unknown document property name.                    1

AERAS 1164

however, that Prime Care shall retain full responsibility for the faithful performance of the duties set forth herein, and such Designee shall act in accordance with the terms and conditions set forth in this Agreement.

1.3    PRI MED Medical Director.  Prime Care shall designate a PRI MED Medical Director (the "PRI MED Medical Director").  The PRI MED Medical Director shall, at a minimum, be Board Certified in his/her specialty, but may or may not be employed by Prime Care.  The PRI MED Medical Director may or may not work full-time in the PRI MEDS and shall devote his/her best efforts to the proper management of the Physicians as well as the professional and medical issues which involve the PRI MEDS.  BVI shall have the sole right to approve the Medical Director designated by Prime Care.  The PRI MED Medical Director shall be responsible for the following:

(a)    Clinical direction of the PRI MEDS.

(b)    Act as a liaison between Prime Care, the Physicians and BVI.

(c)    Act as a liaison between the Physicians and Baptist Health, Montgomery, Alabama ("BH") Medical Staffs.

(d)    Attend all PRI MED Physician meetings.

(e)    Represent the PRI MEDS to the community.

(f)    Assist in the preparation of the PRI MEDS for Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") and State Accreditation surveys.

(g)    Review and implement medical protocols for the PRI MEDS.

(h)    Coordinate the Quality Assurance Program within the PRI MEDS.

(i)    Monitor the quality of care delivered in the PRI MEDS in accordance with the Quality Assurance Program adopted by BVI.

(j)    Assist in the education and training on an initial and ongoing basis of PRI MEDS' personnel, as appropriate.

(k)    Orient new PRI MED Physicians.

(l)    Coordinate the Physicians' scheduling.

(m)    Work with the Medical Staffs of BH and/or other appropriate hospitals for patient referrals and adequate call-in schedule for specialty and sub-specialty physicians.

AERAS 1165

(n)    Deal with complaints in conjunction with the PRI MED staff, ancillary personnel and BVI officials, regarding PRI MED services and/or incidents of alleged suboptimal performance.

(o)    Advise and assist in coordination of public relations and marketing decisions regarding services in the PRI MEDS.

1.4    <u>No Authority to Commit BVI</u>.  Prime Care shall incur no financial obligation on behalf of BVI without prior written approval of BVI.

1.5    <u>Quality and Risk Management</u>.  Prime Care will provide a continuing review and an annual evaluation of the professional performance of each Physician assigned to the PRI MEDS pursuant to the Physician Staffing Agreement.  BVI shall participate in each annual evaluation.  Physician evaluations shall be shared with the appropriate BVI personnel as part of its peer review process and shall be maintained as confidential peer review information protected by Alabama law.

1.6    <u>Evaluation</u>.  Prime Care shall meet with BVI Administration on at least a quarterly basis to determine the level of attainment of stated goals, to discuss any problem areas, and for review of the operation of the PRI MEDS.

1.7    <u>Cooperation</u>.  Prime Care and BVI agree to cooperate in resolving all claims and litigation which may arise out of the providing of PRI MED medical services by Physicians pursuant to the Physician Staffing Agreement.  The Physicians and/or the PRI MED Medical Director will personally respond to patient complaints/problems as requested by BVI.

1.8    <u>Marketing</u>.  Prime Care agrees, to the extent possible, to support, participate in, and submit input into BVI's marketing program; provided, however, that Prime Care will not be required to directly market the services of the PRI MEDS.

## 2.  BVI COMMITMENTS

2.1    <u>Facilities and Supplies</u>.  BVI shall make available during the term of this Agreement such equipment as is required for the proper operation of the PRI MEDS.  BVI shall provide said PRI MEDS with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the same.  Prime Care and/or Physicians shall inform BVI of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

2.2    <u>Assurance</u>.  During the term of this Agreement, BVI shall not contract with or engage any other physician or entity to provide the services performed by Prime Care pursuant to this Agreement, and Prime Care shall serve as BVI's and PRI MEDS' exclusive provider of the administrative and management services set forth in this Agreement.

Error! Unknown document property name.                     3

**AERAS 1166**

2.3    <u>No Authority to Commit Prime Care</u>.  BVI shall incur no financial obligation on behalf of Prime Care without prior written approval of Prime Care.

2.4    <u>Remuneration</u>.    Prime Care shall be compensated for administrative and management services provided under this Agreement in accordance with the formula set forth in <u>Exhibit A</u>, attached hereto and incorporated herein.

## 3.  GENERAL PROVISIONS

3.1    <u>Access to Books and Records</u>.  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, Prime Care shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing its service.  Such inspections shall be available up to four (4) years after the rendering of such services. If Prime Care carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, Prime Care agrees to include this requirement in any such subcontract.  This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder.    The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Section.    The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

3.2    <u>Material Breach</u>.  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach to the breaching party, terminate this Agreement by further written notice of immediate termination.  If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies.  However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

3.3    <u>Regulatory Requirements</u>.  The PRI MEDS shall at all times be maintained and operated, and services therein shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction over the PRI MEDS.  PRI MEDS' practices shall be in compliance with the policies and regulations of BVI and its parent corporation Baptist Health, the applicable standards of JCAHO, and all currently accepted and approved methods and practices of the Physicians' professional specialty of practice of medicine.

AERAS 1167

3.4    Gender and Number.  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

3.5    Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, subparagraphs or exhibits of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation or determination of validity of this Agreement or any provisions hereof.

3.6    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

3.7    Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

3.8    Acts of God.  BVI is not obligated to pay the Fixed Compensation (as defined in Exhibit A) to Prime Care for a particular PRI MED location during such periods in which the location has been closed due to an Act of God.

3.9    Severability.  The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

3.10    Benefit of Successor.  This Agreement is binding upon and shall inure to the benefit of the successors in interest or the permitted assignees of the parties hereto, except as otherwise provided herein.

3.11    Notices.  Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing, if mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

If to BVI:

Robin Barca, Senior Vice President and COO
Baptist Ventures, Inc.
301 Brown Springs Road
P.O. Box 244001
Montgomery, Alabama  36124-4001

AERAS 1168

If to Prime Care:

Paul Tanaka, M.D.
Prime Care, P.C.
4160 Carmichael Road, Suite 101
Montgomery, Alabama 36104

or to such other place or places as any of the parties each shall designate by written notice to the other given in accordance with this Section.

3.12    Term. The term of this Agreement shall commence on the Effective Date (as defined in Section 3.16) and shall continue for one (1) year, unless sooner terminated as provided for herein. Thereafter, this Agreement shall automatically renew for successive one (1) year periods, subject to the termination provisions set forth herein.

3.13    Termination. This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days prior written notice given by one party to the other.

3.14    Rights. No parties other than Prime Care and BVI have rights under this Agreement. Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

3.15    Entire Agreement. This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral. All amendments to this Agreement shall be in writing and signed by authorized representatives of both parties.

3.16    Effective Date. This Agreement shall be in effect as of the _____ day of _____, 2002.

3.17    Effects of Termination. Upon termination of this Agreement, as herein provided, neither party shall have any further rights or obligations hereunder except: (a) for obligations accruing prior to the date of termination, including the obligation of BVI to compensate Prime Care for services provided by Prime Care through the date of termination, including, but not limited to, any Management Compensation (as defined in Exhibit A) based on Adjusted Professional Fees (as defined in Exhibit A) received by BVI within 120 days following the date of termination, (b) for obligations, promises or covenants contained herein which are expressly made to extend beyond the term of this Agreement, or (c) arising as a result of any breach of this Agreement. In the event this Agreement is terminated before the first annual anniversary of the Effective Date, the parties agree not to enter into a new agreement that covers services similar to those described in this Agreement until after the first annual anniversary of the Effective Date. The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

**AERAS 1169**

3.18    <u>Construction of Agreement</u>. This Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Alabama, applied without giving effect to any conflicts-of-law principles. Both parties have participated fully in the review and revision of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply to the interpretation of this Agreement. The provisions of this Section shall survive termination of this Agreement, regardless of the cause of such termination.

3.19    <u>Independent Contractors</u>. None of the provisions of this Agreement are intended to create, and none shall be deemed or construed to create, any relationship between Prime Care and BVI other than that of independent entities contracting with each other solely for the purpose of effecting the provisions of this Agreement.

IN WITNESS WHEREOF, Prime Care and BVI, by and through their duly authorized officers, have caused this Agreement to be made effective as of the date set forth above.

BAPTIST VENTURES, INC.

By:    _____
       Robin Barca
       Senior Vice President and COO
       Baptist Ventures, Inc.

Date:    __5/13/08_____

PRIME CARE, P.C.

_____
Paul Tanaka
President
Prime Care, P.C.

Date:    __5-14-02_____

AERAS 1170

# EXHIBIT A

## COMPENSATION FOR SERVICES

A.  **Management Compensation.**  Prime Care will be compensated for management services provided to BVI as follows:  In return for administrative and management services, BVI shall pay Prime Care Management Compensation equal to 6% of the Adjusted Professional Fees.

B.  **Definitions.**  For purposes of calculating Prime Care's Management Compensation in Paragraph A above, the following definitions shall apply:

1.  *"Gross Professional Fees"*  shall include:  gross revenue for all office visits, surgical procedures, and medical review services provided by Physicians and shall exclude all revenue from Ancillary Services, medical supplies and other services.

2.  *"Revenue Adjustment Factor"*  shall be a percentage calculated by dividing Actual Total Adjustments to Revenue plus Net Provision for Bad Debt by actual Total Annual Gross Revenue for all PRI MEDS combined for the immediately prededing fiscal year.  For fiscal year 1998, the Revenue Adjustment Factor was 16.4%.

3.  *"Adjusted Professional Fees"*  shall be calculated by subtracting the product of the Gross Professional Fees multiplied by the Revenue Adjustment Factor from the Gross Professional Fees.

4.  *"Fiscal Year"*  shall mean the twelve (12) month period beginning July 1 and ending June 30.

5.  *"Ancillary Services"*  shall mean those designated health services covered by Medicare's Limitation on Certain Physician Referrals, 42 U.S.C. § 1395nn (commonly referred to as the "Stark II" law), but excluding designated health services personally performed or provided by a Physician.

C.  **Payment Schedule.**  Management Compensation shall be paid by BVI to Prime Care monthly by the tenth day of each month for services provided the prior month (e.g., amount earned in April will be paid by May 10th).

A--1                                                          **AERAS 1171**

D. <u>Miscellaneous.</u>

1. <u>Access to Records.</u> BVI shall make available for review by Prime Care such accounting and other records as are necessary to verify and substantiate the Management Compensation set forth above.

2. <u>Fair Market Value.</u> BVI and Prime Care have entered into this Agreement with the intent of conducting their professional services relationship in full compliance with applicable state, local, and federal laws including, but not limited to, the Medicare/Medicaid Anti-Fraud and Abuse and Stark laws. Accordingly, the compensation payable to Prime Care has been negotiated in good faith and in arm's-length negotiations and represents the fair market value of the services provided by Prime Care under this Agreement. The compensation paid by BVI to Prime Care is not directly or indirectly based on the volume or value of any referrals or other business generated by Prime Care, or its Physicians, for BVI. This Agreement covers all of the services Prime Care shall provide to BVI for the term of this Agreement and the services are reasonably necessary to accomplish the commercially reasonable business purposes associated with the operation of the PRI MEDS.

3. <u>Referrals.</u> The parties acknowledge that none of the remuneration granted either party herein is conditioned on any requirement that either party hereto or any of its respective physicians make referrals to, be in a position to make or influence referrals to, or otherwise generate business for the other party hereto, or any of their respective physicians.

A--2

**AERAS 1172**

DIVISION NO:    10    MEDICAL

| VENDOR/ INVOICE NO. | DATES | | | INVOICE AMOUNT | DISCOUNT APPLIED | NET AMOUNT |
|---|---|---|---|---|---|---|
| | INVOICE | DUE | DISCOUNT | | | |

**MOOREHJ JOHN MOOREHOUSE, MD, PC**
CHECK ENTRY NO: 001

| OC-02-0303 | 04/25/03 | 04/25 | | 68,250.00 | .00 | 68,250.00 |
|---|---|---|---|---|---|---|
| | COMMENT: | On-Calls 2002-thru March 03 | | | | |
| | VENDOR MOOREHJ TOTALS: | | | 68,250.00 | .00 | 68,250.00 |

**TANAKAP PAUL K. TANAKA, M.D.**
CHECK ENTRY NO: 001

| OC-02-0303 | 04/25/03 | 04/25 | | 55,050.00 | .00 | 55,050.00 |
|---|---|---|---|---|---|---|
| | VENDOR TANAKAP TOTALS: | | | 55,050.00 | .00 | 55,050.00 |
| | DIVISION 10 TOTALS: | | | 123,300.00 | .00 | 123,300.00 |
| | REPORT TOTALS: | | | 123,300.00 | .00 | 123,300.00 |

**AERAS 1173**

STATE OF ALABAMA

MONTGOMERY COUNTY

## PRI MED PHYSICIAN SERVICES AGREEMENT

This Agreement is entered into by and between Baptist Ventures, Inc., Montgomery, Alabama, an Alabama corporation (hereinafter referred to as "BVI") and Prime Care, Inc., an Alabama corporation (hereinafter referred to as "PCI").

### WITNESSETH:

BVI operates PRI MED urgent care facilities in Montgomery and surrounding counties (hereinafter referred to as "PRI MEDS"), which require the professional medical services of physicians. BVI has determined that in order to insure the proper and efficient operation of the PRI MEDS that several objectives must be met, including but not limited to, appropriate physician coverage hours, coordination of physician schedules and assignments, administrative ease and efficiency, consistency and uniformity in recordkeeping, and above all quality patient care.

WHEREAS, PCI is capable and willing to provide physicians (hereinafter referred to as "Physicians"), who are duly licensed to practice medicine in the State of Alabama, and who can meet the requirements for appointment to the BMC Limited Courtesy Medical Staff, and receive privileges to practice in the PRI MEDS; and, PCI can assure that the Physicians they provide shall accept responsibility to provide services in the PRI MEDS; in accordance with accepted medical standards, the Bylaws of the BMC Medical Staff, the policies and procedures of BVI, and the terms and conditions set forth in this Agreement;

THEREFORE, BVI and PCI desire to provide a full statement of their Agreement by setting forth the rights and duties of each party with respect to the staffing and operation of the PRI MEDS, and agree as follows:

### PCI COMMITMENTS

1.1    Physician Staffing. PCI shall provide physician staffing for the PRI MEDS through duly licensed and qualified Physicians on a continuous, uninterrupted basis, each day, seven (7) days each week for the duration of this Agreement. The number of physicians and the hours to be worked shall be in the sole discretion of BVI.

PCI will provide Physicians who, at a minimum, shall be American Board Certified or Eligible in Family Medicine/Internal Medicine/Emergency Medicine or in a primary specialty with experience in emergency medicine. All Physicians provided by PCI shall be licensed to practice medicine in the State of Alabama, and shall act in accordance with accepted local and national medical standards and the Joint Commission on Accreditation of Healthcare Organizations, and in accordance with all of

1

AERAS 1174

the qualifications, prerogatives, and responsibilities of their Medical Staff status. The Physicians furnished by PCI will provide care to all individuals who present themselves to the PRI MEDS for medical treatment.

    1.2    <u>Medical Staff Privileges</u>.

    (a)    Each Physician provided by PCI shall be interviewed and approved by Baptist Ventures, Inc. before applying for medical privileges in their speciality and must obtain approval for appropriate Medical Staff membership in accordance with BMC policies and procedures and the Medical Staff Bylaws. Physician credentials shall be forwarded to BMC by PCI in a timely fashion to allow reasonable time for review and approval prior to the physician being scheduled to work at a PRI MED. Medical Staff privileges shall be maintained according to the BMC Medical Staff Bylaws.

    (b)    <u>Temporary Medical Staff Privileges</u>. Notwithstanding any other provisions in this agreement, it is understood that, on occasion, temporary Medical Staff Privileges may be requested by PCI due to unusual or unforeseen circumstances. In such instances, temporary Medical Staff Privileges may be granted in accordance with the BMC Medical Staff Bylaws.

    (c)    <u>Responsibilities of Physicians</u>. Each Physician provided by PCI shall have the responsibilities set forth hereinafter.

    (d)    PCI shall have until June, 1998, to fulfill the credentialing requirements for all physicians approved to work in Pri Med at October, 1997. After October 1, 1997, new physicians must meet the credentialing requirements of this contract.

    1.3    <u>Independent Contractors</u>. In the performance of primary care services hereunto, PCI and its' Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agent(s) of BVI. Neither PCI nor Physicians performing services for PCI under this Agreement, whether said Physicians are members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against BVI for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

    1.4    <u>Core Group</u>. PCI shall maintain a stable core group of full-time Physicians to work in the respective PRI MEDS on a regular basis. Full time Physicians are expected to live in the area. It is PCI's intent to keep physician turnover to a minimum. BVI shall have the right to refuse any physician which PCI proposes to use in a PRI MED and/or to request the removal of any PCI Physician who in BVI's sole judgment does not meet the standards and qualifications required by it for Physicians practicing in its facilities.

    1.5    <u>PRI MED Medical Director</u>. PCI designate a PRI MED Medical Director. The PRI MED Medical Director shall, at a minimum, be Board Certified in his/her specialty, but may or may

2

AERAS 1175

not be employed by PCI. The PRI MED Medical Director may or may not work full-time in the PRI MEDS and shall devote his/her best efforts to the proper management of Physicians as well as the professional and medical issues which involve the PRI MEDS. BVI shall have the sole right to approve the Medical Director designated by PCI.

The PRI MED Medical Director shall be responsible for the following:

(a)     Clinical direction of the PRI MEDS.

(b)     Act as a liaison between PCI, Physicians and BVI.

(c)     Act as a liaison between the Physicians and the BMC Medical Staff.

(d)     Attend all PRI MED Physician meetings.

(e)     Represent the PRI MEDS to the community.

(f)     Assist in the preparation of the PRI MEDS for JCAHO and State Accreditation surveys.

(g)     Review and implement medical protocols for the PRI MEDS.

(h)     Coordinate the Quality Assurance Program within the PRI MEDS.

(i)     Monitor the quality of care delivered in the PRI MED in accordance with the Quality Assurance Plan adopted by BVI.

(j)     Assist in the education and training on an initial and ongoing basis, of PRI MEDS personnel as appropriate.

(k)     Orient new PRI MEDS physicians.

(l)     Coordinate the Physicians scheduling.

(m)     Work with Medical Staff of BMC and/or other appropriate hospitals for patient referrals and adequate call-in schedule for specialty and sub-specialty physicians.

(n)     Deal with complaints in conjunction with the PRI MED staff, ancillary personnel and BVI officials, regarding PRI MED services and/or incidents of alleged suboptimal performance.

(o)     Advise and assist in coordination of public relations and marketing decisions regarding services in the PRI MEDS.

3

AERAS 1176

1.6    Admission Privileges.  PRI MED Physicians will not have admission privileges at BMC.

1.7    Non Discrimination.  PCI shall not discriminate against any Physician applying for sub-contractor status on the basis of race, color, religion, sex, age, national origin, or handicap.

1.8    Personal Expenses.  PCI and Physicians shall be responsible for all personal and professional expenses, including but not limited to, malpractice insurance, relocation expenses, membership fees and dues and expenses of attending conventions and educational meetings.

1.9    No Authority to Commit BVI.  PCI shall incur no financial obligation on behalf of BVI without prior written approval of BVI.

1.10    Quality and Risk Management.  PCI will provide a continuing review and an annual evaluation of the professional performance of each physician assigned to the PRI MEDS pursuant to this Agreement.  BVI shall participate in each annual evaluation.  Physician evaluations shall be shared with the appropriate BVI personnel as part of their peer review process.

1.11    Evaluation.  PCI shall meet with BVI Administration on at least a quarterly basis to determine the level of attainment of stated goals to discuss any problem areas, and for review of the operation of the PRI MEDS.

1.12    PCI and BVI agree to cooperate in resolving all claims and litigation which may arise out of the providing of PRI MED medical services by PCI.  PRI MED Physicians and/or the Medical Director  will personally respond to patient complaints/problems as requested.

1.13    Marketing.  PCI agrees, to the extent possible, to support, participate in, and submit input into BVI's marketing program.

1.14    Payor Contracting.  PCI and BVI agree to participate in all plans for which Baptist Medical Center is a hospital provider or which is approved by Central Alabama Management Service Organization (CAMSO) or any Physician Hospital Organization (PHO) developed by Baptist and its medical staff notwithstanding the above, PCI and BVI will participate jointly in all contract reviews and negotiations.

## BVI COMMITMENTS

2.1    Facilities and Supplies.  BVI shall make available during the term of this Agreement such equipment as is required for the proper operation of the PRI MEDS.  BVI shall provide said PRI MEDS with utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the same.  PCI and/or Physicians shall inform BVI of any defects in equipment or deficiencies in supplies when they are aware of such defects or deficiencies.

4

**AERAS 1177**

2.2    X-Ray.  BVI shall provide an x-ray procedure room and approximately appropriately trained staff for each PRI MED.

2.3    Lab.    BVI shall provide an appropriate lab and availability of more advanced laboratory procedures through outside sources.

2.4    Personnel.  All non-physician personnel required for the proper operation of the PRI MEDS shall be employed or assigned by BVI.  Salaries, benefits, hours of work, job descriptions and responsibilities, and personnel policies shall be established by BVI.  All PRI MED personnel shall be trained and qualified in appropriate medicine services and shall be capable of performing their assigned responsibilities.  All salaries, wages, taxes, insurance, worker's compensation insurance, and expenses of any kind or character shall be, and remain, the responsibility and obligation of BVI.

2.5    Assurance.  During the term of this Agreement, BVI shall not contract with any other physicians or entities for the services performed by Physicians assigned to BVI through PCI and this Agreement.

## FEES, BILLING, COLLECTION AND REMUNERATION

3.1    Definitions.  For the purpose of this section, the following definitions shall apply:

(a)    Services to Patients:  Those services of Physicians which:
   (i)    are personally furnished to a patient by Physicians.
   (ii)   contribute directly to the diagnosis or treatment of the patient; and
   (iii)  ordinarily require performance by or under the supervision of a physician.

(b)    Services to the PRI MEDS:  Those services of PCI and/or Physicians which do not qualify as Services to Patients as herein defined, but which are related to the provision of patient care in the PRI MEDS, e.g., administrative and supervisory services shall be performed as a part of this Agreement.

3.2    Fee Schedule.  BVI shall establish and maintain a schedule of fees to be charged for services to patients for Services to Physicians in the PRI MEDS.

3.3    Changes in the Law or Regulations.  PCI and BVI hereby recognize that the compensation arrangement herein described is based, in part, on the limits on reasonable compensation set by IRS and other regulations regarding compensation of physicians in similar circumstances. Should these limits or any other law or regulation affecting reimbursement for BVI or for PCI under this Agreement change during the term hereof such that reimbursement is altered materially, then the applicable terms of this Agreement shall be subject to renegotiation.

3.4    Final Payment.  In the event this Agreement is terminated as provided for herein, all rights of PCI to compensation from BVI pursuant to Section 3.5 shall end as of the effective date of

5

AERAS 1178

such termination, and BVI shall distribute to PCI the sum, if any, due and owing for services rendered by PCI as of the effective date of said termination and shall pay said sum within thirty (30) days after the termination date.

3.5    Billing and Collection for Services Rendered.  BVI shall be responsible for the billing and collection of all professional fees for services to patients.  PCI shall provide sufficient information including diagnosis, professional service code and any other pertinent data to BVI to enable BVI to bill Patients for services provided by Physicians.  The information supplied to BVI by PCI may be released by BVI for billing purposes.

3.6    Remuneration.  PCI shall be compensated for services rendered by Physicians in accordance with the formula set forth in Exhibit A.

3.7    Assignment.  PCI does hereby assign to BVI all accounts receivable generated from the services rendered to patients by PCI pursuant to this Agreement.

## GENERAL PROVISIONS

4.1    Access to Books and Records.  Upon written request of the Secretary of Health and Human Services or the Comptroller General or any of their duly authorized representatives, PCI shall make available to the Secretary those contracts, books, documents, and records necessary to verify the nature and extent of the costs of providing their service.  Such inspections shall be available up to four (4) years after the rendering of such services.  If PCI carries out any of the duties of this Agreement through a subcontract with a value of Ten Thousand ($10,000.00) Dollars or more over a 12 month period with a related individual or organization, PCI agrees to include this requirement in any such subcontract.  This section is included pursuant to and is governed by the requirements of Public Law 46-499, 952 (1861 v) (of the Social Security Act) and regulations promulgated thereunder.  The parties agree that any attorney-client, accountant-client, or other legal privilege shall not be deemed waived by virtue of this Agreement.

4.2    Material Breach.  In the event of a material breach by one party, the non-breaching party may, at any time following thirty (30) days written notice of the breach, terminate this Agreement by further written notice of immediate termination.  If the breaching party, prior to a receipt of notice of termination, has either cured the breach or taken all reasonable steps necessary to begin effecting a cure, this Agreement shall remain in effect, and the non-breaching party shall be limited to damages and specific performance as its exclusive remedies.  However, the continuation of this Agreement will be required only if the breach can be and actually is cured within a reasonable time.

4.3    Regulatory Requirements.  The PRI MEDS shall at all times be maintained and operated, and services shall at all times be rendered, in compliance with all applicable statutes, regulations, rules and directives of federal, state, and other governmental and regulatory bodies, including third party payors, having jurisdiction.  PRI MEDS practices shall be in compliance with the policies and regulations of BVI and its parent corporation Baptist Health, the applicable standards

6

AERAS 1179

of Joint Commission on the Accreditation of Healthcare Organizations, and all currently accepted and approved methods and practices of the professional specialty of practice of medicine.

4.4     Liability Insurance.  During the term of this Agreement, PCI agrees that its Physicians who provide services in the PRI MEDS will each be covered by professional liability insurance in the amount of at least one million dollars ($1,000,000) single limit each incident, and Three Million Dollars ($3,000,000) annual aggregate.  The liability insurance will be on a claims made basis.  A certificate of insurance evidencing coverage will be submitted to BVI.  PCI shall furnish BVI with prompt written notice of cancellation or material change in its insurance coverage.  Upon termination of this Agreement, PCI shall purchase the Optional Extension Period Coverage , or similar "tail" policy, available to it under its professional liability insurance policy contemplated by this section. PCI shall include in its agreement with its subcontracting physicians a requirement that such physicians purchase the Optional Extension Period Coverage upon termination of their services at BVI under this Agreement, however, PCI shall not be liable to BVI or third parties for the failure of its subcontracting physicians to obtain such coverage.  The aforesaid liability insurance shall be with a carrier or carriers acceptable to BVI.

4.5     Gender and Number.  Whenever the context hereof requires, the gender of all words shall include the masculine, feminine, neuter, and the number of all words shall include the singular and plural.

4.6     Captions.  Any captions to or headings of the articles, sections, subsections, paragraphs, or subparagraphs of this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of determination of validity of this Agreement or any provisions hereof.

4.7     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

4.8     Waiver of Provisions.  Any waiver of any terms and conditions hereof must be in writing, and signed by the parties hereto.  A waiver of any of the terms and conditions hereof shall not be construed as a waiver of any other terms and conditions hereof.

4.9     Acts of God.  BVI is not obligated to compensate PCI for services during periods in which PCI is not performing its responsibilities under the Agreement because a PRI MED is closed due to an Act of God.

4.10    Severability.  The provisions of this Agreement, except for the provisions of the Section on Fees, Billing, Collection and Remuneration, shall be deemed severable and if any portion shall be held invalid, illegal, or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

4.11    Benefit of Successor.  This Agreement is binding upon and shall inure to the benefit

AERAS 1180

4.17   Effective Date.  This Agreement shall be in effect as of the 1st day of October, 1997.


BAPTIST VENTURES, INC.                PRIME CARE, INC.

By: _____         By: _____

Steve Wilson                          Its: _____
Senior Vice President
Baptist Ventures, Inc.

Date: _____ 1/14/97 _____             Date: _____ 12/16/97 _____


**AERAS 1181**

of the successors in interest or the assignees of the parties hereto, except as otherwise provided herein.

4.12    Notices.  Any notice or report herein required or permitted to be given shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party or on the fifth day after mailing.  If mailed to the other party by certified mail, return receipt requested, postage prepaid and addressed to the parties as follows:

If to BVI:

Steve Wilson, Senior Vice President
Baptist Ventures, Inc.
2105 East South Boulevard
P. O. Box 11010
Montgomery, Alabama  36111-0010


If to PCI:

John D. Moorehouse, M.D.
Prime Care, Inc.
4160 Carmichael Road, Suite 101
Montgomery, Alabama 36104

or such other place or places as any of the parties each shall designate by written notice to the other.

4.13    Term.  The term of this Agreement shall be one year, automatically renewable for a like term at the end of each term unless sooner terminated by either party.

4.14    Termination.  This Agreement may be terminated at any time during the term of this Agreement by either party with or without cause, upon one hundred eighty (180) days written notice given by one party to the other.

4.15    Rights.  No parties other than PCI and BVI have rights under this Agreement.  Both parties are prohibited from assigning their rights and responsibilities to another party without the prior written consent of the other party.

4.16    Entire Agreement.    This Agreement and its attachments constitute the entire agreement between the parties and supersedes any prior agreement whether written or oral.  All amendments to the contract will be in writing and signed by authorized representatives of both parties.

8

**AERAS 1182**

# EXHIBIT A

## COMPENSATION FOR SERVICES

PCI will be compensated for services provided to BVI and PRIMED patients as follows:

A.    Base Compensation
PCI shall be paid base compensation of 45% of Adjusted Professional Fees. PRIMED locations open less than twenty-four (24) months shall be paid Base Compensation equal to the greater of $85.00 per operating hour or 45% of Adjusted Professional Fees.

B.    Patient Satisfaction Incentive
PCI shall earn five percent (5%) of Adjusted Professional Fees on a quarterly basis subject to the achievement of targeted patient satisfaction scores as reported on the Press, Ganey Patient Satisfaction Survey Results. This incentive shall be earned quarterly. Failure to meet targeted incentives in two consecutive quarters will result in forfeiture of the incentive for those two quarters. Targeted scores will be established prospectively for each eligible PRIMED location at the beginning of each fiscal year. A PRIMED location will become eligible in the first complete fiscal quarter after being open twelve months.

C.    Budget Performance Incentive
PCI shall be paid five percent (5%) of Adjusted Professional Fees on an annual basis if the Actual Annual Direct Expense Ratio is less than the Budgeted Annual Direct Expense Ratio for each eligible PRIMED. A PRIMED location will be eligible in the first full fiscal year beginning after the facility's first six (6) months of operation. Facilities eligible in FY 1998 are Vaughn Road, Atlanta Highway and Silver Hills.

D.    Production Incentive
PCI shall be paid a Production Incentive equal to a percentage of Total Cumulative Adjusted Professional Fees per facility, according to the following schedule:

| Total Cumulative Adjusted Professional Fees | Production Incentive Percentage | Maximum Incentive Amount |
|---|---|---|
| $      0 -   799,000 | 0% | $        0 |
| 800,000 -   899,999 | 1.0% | 9,000 |
| 900,000 -   999,999 | 2.0% | 20,000 |
| 1,000,000 - 1,099,999 | 3.0% | 33,000 |
| 1,100,000 - 1,199,999 | 4.0% | 48,000 |
| 1,200,000 - 1,299,999 | 5.0% | 65,000 |
| 1,300,000 - 1,399,999 | 6.0% | 84,000 |
| 1,400,000 - 1,499,999 | 7.0% | 105,000 |
| 1,500,000 - 1,599,999 | 8.0% | 128,000 |
| 1,600,000 - 1,699,999 | 9.0% | 153,000 |
| 1,700,000 + | 10.0% | |

1

AERAS 1183

The cumulative incentive payments of the prior month shall reduce the current month's incentive payment calculation.

E.    Medical Director Compensation
      PCI shall be paid six percent (6%) of Adjusted Professional Fees for the provision of Medical Director Services, to include, but not limited to, recruitment of physicians, corrective action/follow-up, clinical quality improvement and training/education.

F.    Nurse Practitioner Supervision Compensation
      PCI shall be paid five percent (5%) of Adjusted Professional Fees for services provided by a Nurse Practitioner under the supervision of a physician. Professional Fees generated for services of a nurse practitioner shall be excluded from the computation of A above.

G.    Definitions

      For purposes of calculating PCI's compensation in Paragraphs A and B, the following definitions and computations shall apply:

      1.    **Gross Professional Fees** shall include gross revenue for all office visits, surgical procedures and medical review services and shall exclude all revenue for ancillary services (lab tests, x-rays, EKGs, injections), medical supplies and other services.

      2.    **Revenue Adjustment Factor** shall be a percentage calculated by dividing Actual Total Adjustments to Revenue plus Net Provision for Bad Debt by Actual Total Annual Gross Revenue for all Pri Meds combined for the immediately preceding fiscal year. For FY 1998, the Revenue Adjustment Factor shall be 16.4%.

      3.    **Adjusted Professional Fees** shall be calculated by subtracting the product of the Gross Professional Fees multiplied by the Revenue Adjustment Factor from the Gross Professional Fees.

      4.    **Budgeted Annual Direct Expense Ratio** shall be calculated by dividing the sum of Budgeted Annual Salary, Pharmaceutical and Medical Supply Expenses by the Budgeted Net Patient Revenue as indicated in the Annual Budget approved by the Baptist Health Board of Directors.

      5.    **Actual Annual Direct Expense Ratio** shall be calculated by dividing the sum of Actual Annual Salary, Pharmaceutical and Medical Supply Expenses by the Actual Net Patient Revenue as determined by the audited financial statements of Baptist Health.

      6.    **Fiscal Year** shall mean the twelve (12) month period beginning July 1, and ending June 30.

2

**AERAS 1184**

H.    Payment Schedule

1.    Base Compensation, and Medical Director Compensation and Nurse Practitioner Supervision Compensation shall be paid monthly by the tenth of the month following the month compensation was earned (e.g., amount earned in April will be paid by May 10th).

2.    The Patient Satisfaction Incentive shall be paid within fifteen (15) days of the receipt of quarterly patient satisfaction survey results from Press Ganey. If targeted scores are not achieved in one quarter, payment shall be held until the next reported survey results. If targeted scores are not achieved for two consecutive quarters, incentive payments shall be deemed unearned and will not be paid.

3.    The Budget Performance Incentive shall be paid no later than one hundred twenty (120) days following the end of the BVI fiscal year.

4.    Productive Incentive shall be paid monthly by the tenth of the month following the month the incentive was earned.

I.    Access to Records

BVI shall make available for review by PCI such accounting and other records as are necessary to verify and substantiate the incentive payments made under this agreement.

exhafin

**AERAS 1185**

# MEDICAL SERVICES
# INDEPENDENT CONTRACTOR AGREEMENT

**THIS AGREEMENT** is made, entered into and effective as of this the __th day of
_____, 2000, by and between **PRIME CARE, P.C.** ("Company") and _____
MD ("Independent Contractor").

## RECITALS:

**WHEREAS,** Company is a Professional Corporation organized under the laws of the
State of Alabama;

**WHEREAS,** the Independent Contractor is a physician licensed or otherwise legally
qualified and authorized to practice medicine by and within the State of Alabama;

**WHEREAS,** Company is obligated under Agreements with various Medical Service
Providers ("Providers") to coordinate physician services in the Pri-Med Facilities of such
Providers;

**WHEREAS,** the Agreements between Company and such Providers permit Company to
contract with duly licensed physicians and professional corporations providing physician services
to fulfill the obligations of Company thereunder to the Providers; and

**NOW, THEREFORE,** in consideration of the mutual covenants contained herein, the
Parties hereto agree as follows:

    **a.**    **Recitals Approved**. The above Recitals are true and correct and are incorporated
herein by this reference.

    **b.**    **Duties of the Independent Contractor**. Company hereby engages the
Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital
medical and surgical services for and on behalf of Company subject to the following:

        i.     The Independent Contractor shall render medical and surgical services to
all members of the general public presenting at such Providers, and at all other places designated
by Company and approved by such Providers;

        ii.     All services required of, and rendered by, the Independent Contractor shall
be consistent with the facilities available and the standards established in the medical community,
as well as the rules and regulations of such Providers. The Independent Contractor hereto shall
perform the services called for under the terms of this Agreement in accordance with the highest
standards of professional ethics and practice as may, from time to time, be applicable during the
term of this Agreement, as may otherwise be provided under the laws of the State of Alabama,
and as applicable to the professional obligations of the Independent Contractor. The Independent
Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that
govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's
professional practice, whether pursuant to this Agreement or otherwise;

        iii.     The Independent Contractor shall maintain complete and accurate patient
medical and surgical records including the completion of written records on forms provided by
Company or such Providers; and

1

**AERAS 1186**

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

**c.    Administrative Services**. Company shall provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the Independent Contractor in connection with the Independent Contractor's provision of services under this Agreement, including, without being limited to, the following:

i.    Maintenance of business records, to include the filing and indexing of all correspondence and communications;

ii.    Maintenance of accounts pertaining to the rendering of professional medical and surgical services, invoicing fees and collecting accounts;

(a)    All typing and other clerical duties;
(b)    Scheduling appointments;
(c)    Answering telephones;
(d)    Facilities and equipment maintenance and cleaning services; and
(e)    Financial management, bookkeeping and related services.

**d.    Facilities and Equipment**. Through the Providers, Company shall provide to the Independent Contractor the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to the Independent Contractor's rendition of services to patients at the Providers, as determined by mutual agreement of the Parties.

**e.    Billing Services**.    Company will establish a central fee billing and disbursement system ("System") to accommodate the Company, Independent Contractor and Providers. Independent Contractor will cooperate with Company in the operation of the System and will execute all agreements, contracts, authorizations and consents needed to allow the System to operate efficiently. Company will provide to the Independent Contractor use of the System to provide for the orderly and timely billing and collection of the fees billed by the Independent Contractor for professional services rendered at the Providers. Company shall keep full and accurate records of the sums collected and disbursed and shall render accounting to the Independent Contractor at least as often as annually. Company agrees to comply with all applicable laws, rules and regulations of governmental authorities and medical associations pertaining to the billing and collection of the amounts owed the Independent Contractor for professional services.

**f.    Compensation**. During the term of this Agreement, Company shall pay the Independent Contractor for the services rendered hereunder in accordance with the Independent Contractor Fee Schedule attached hereto as Exhibit 1.

**g.    Cost of Administration and of Services**. All expenses incurred by Company in connection with Company's administration hereunder to include, without limitation, stationery,

2

AERAS 1187

billing forms, postage, office rent, office supplies, office equipment, furniture and fixtures and telephone expenses shall be the sole responsibility of Company. Likewise, the Independent Contractor shall be solely responsible for any and all of his out-of-pocket expenses, of whatsoever kind and nature, incurred in the performance of his duties and responsibilities hereunder, and the Independent Contractor shall save, fully indemnify (including attorney's fees and expenses) and hold Company harmless therefrom. The Independent Contractor shall not incur, on behalf of Company, any debts, liabilities or obligations, in any way whatsoever, of in any form whatsoever, and the Independent Contractor shall also save, fully indemnify and hold Company harmless therefrom.

     **h.**   **Term**.

        i.      Except as otherwise provided herein, this Agreement shall be effective for a period of one (1) year, beginning on the date first above written, or the first day of actual working on behalf of the company, and unless otherwise terminated as provided herein, shall be automatically renewed for each year subsequent to the initial period. **ANYTHING CONTAINED IN THIS ENTIRE AGREEMENT TO THE CONTRARY NOTWITHSTANDING**, this Agreement may be terminated at any time by either Party upon ninety (90) days prior written notice, and furthermore, this Agreement may be immediately terminated by Company at any time, without notice, upon the occurrence of any one of the following events, to-wit:

        (i) The expulsion, suspension or disciplining of the Independent Contractor as the final action of any professional or scientific organization;

        (ii) The resignation of the Independent Contractor from any professional or scientific organization while under threat of disciplinary action;

        (iii) The breach by the Independent Contractor of the American College of Emergency Physicians Rules of Ethical Principles;

        (iv) The conviction of the Independent Contractor for a crime punishable as a felony;

        (v) The participation of the Independent Contractor in conduct amounting to an act of fraud, dishonesty or other misconduct in the rendition of services pursuant in this Agreement;

        (vi) The use by the Independent Contractor, in the sole determination of Company, of narcotics, cocaine, marijuana, hashish, hallucinogens or any other similar controlled substances, or, in the opinion of Company use by the Independent Contractor of prescription drugs or alcohol in such manner as to be detrimental to his rendering of services hereunder;

3

**AERAS 1188**

(vii) The failure of the Independent Contractor to provide or perform services as required hereunder;

(viii) The request for termination of this Agreement by the administration or the medical staff of any of the Providers, or of any other facility where the Independent Contractor has been performing services;

(ix) The institution against the Independent Contractor, of bankruptcy proceedings or assignments for the benefit of creditors;

(x) The loss, by the Independent Contractor, of any license required to practice medicine in the State of Alabama;

(xi) The performance of services, for two (2) consecutive months, of less than one hundred twenty (120) hours per month by the Independent Contractor.  Company shall otherwise rely upon the Independent Contractor to perform such number of hours per month as are reasonable and necessary to fulfill the spirit and purpose of this Agreement;

(xii) The death of the Independent Contractor; and

(xiii) The failure of the Independent Contractor to obtain or continuously provide the basic medical malpractice insurance coverage as required by paragraph 9 of this Agreement.

ii.     Notwithstanding any such termination of this Agreement, the Independent Contractor shall be required to carry out any provisions hereof which contemplate performance subsequent to any such termination, and any such termination shall not affect any liability or obligation of the Independent Contractor which shall have accrued prior to such termination, including, but not limited to, any liability for loss or damage on account of default.

i.     **Malpractice Insurance.**  The Independent Contractor shall obtain and continually maintain professional liability insurance, from carriers acceptable to Company, in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring itself for liability in performance of Independent Contractor's duties under this Agreement.  Such insurance shall be on a "claims made" basis and shall provide that it is the primary coverage to the named insured, solely, in regard to the liability of the Independent Contractor.  At request of Company or the hospital, Independent Contractor shall present evidence that the premiums are paid and that the policies are in full force and effect.  Upon termination of Independent Contractor's obligations under this agreement, Independent Contractor agrees to purchase the optional extension period coverage available to it under its professional liability insurance policy contemplated by this section (or other equivalent policy acceptable to Company).  After the first two (2) years of

4

**AERAS 1189**

signed contract it is agreed that proof of purchase of such continuing coverage may be required prior to payment by Company of any sums owed to Independent Contractor upon termination of this Agreement. Should Independent Contractor fail to obtain such coverage effective upon the termination of this Agreement, Company may elect (but has no obligation) to obtain such coverage on Independent Contractor's behalf and apply any amounts owed Independent Contractor under this Agreement against the premium for such policy. In such event, Independent Contractor shall remain liable to Company for the difference between the amount of Independent Contractor's fees which have been applied by Company against the premium and the actual cost of the insurance premium.

**j.    Indemnification.** Anything contained in this entire Agreement to the contrary notwithstanding, the Independent Contractor agrees to indemnify and save Company, as well as its officers, directors, shareholders, employees, agents and representatives, harmless from any and all liability, loss or damage suffered as a result of claims, demands, settlements, costs (including attorney's fees and expenses), or judgments arising from any acts or omissions of the Independent Contractor while performing services pursuant to this Agreement, including, without being limited to, errors, omissions or willful or wanton acts outside the Independent Contractor's duties hereunder. This indemnification of Company, its officers, directors, shareholders, employees, agents and representatives, by the Independent Contractor, constitutes a material consideration for the initial and continuing contractual relationship between the Parties, and it shall survive, as to all such acts or omissions of the Independent Contractor occurring prior to the termination of this Agreement, even if any such claim is not actually made during the term of this Agreement, but, instead, may be made after the term of this Agreement.

**k.    Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend

5

AERAS 1190

that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

    **l.**    **Independent Contractor's Warranties**. The Independent Contractor hereby represents and warrants that the Independent Contractor has met all requirements prescribed by the Alabama Medical Association and, at the Independent Contractor's sole expense, shall meet such additional educational requirements as may be prescribed by that organization at any time whatsoever during the term of this Agreement.

    **m.**    **Maintain Certifications**. The Independent Contractor agrees that the Independent Contractor shall maintain and provide Company, not later than January 15th of each year during the term hereof, with copies of the following:

        (a)    BNDD Registration;
        (b)    Medical License; Controlled Substance
        (c)    Advance Cardiac Life Support Provider Level Card;
        (f)    A written summary of Continuing Education Activity to include an itemization of courses attended and lectures given.

    **n.**    **Outside Professional Activities**. It is specifically acknowledged that at times when the Independent Contractor is not required to be on duty at the Providers, the Independent Contractor may render medical and surgical services to others at locations other than the Providers, and the Independent Contractor shall be entitled to retain the fees collected for such services, if the rendering of such services does not hinder or interfere with the Independent

AERAS 1191

Contractor's duties under this Agreement. However, it is understood that, except as is otherwise specifically provided herein, the Independent Contractor shall have the sole and exclusive right of management over his professional duties and obligations hereunder. The Independent Contractor otherwise also agrees to fully indemnify (including attorney's fees and expenses), save and hold Company harmless in all matters, of whatsoever kind and nature, arising with respect to the other business and/or professional practices the Independent Contractor may conduct, and the Independent Contractor shall also be solely responsible for any and all expenses incurred by the Independent Contractor in any of his such other businesses and/or professional practices, responsibilities or activities.

     **o.**    **Confidential, Trade Secret Information**. The Independent Contractor acknowledges that he will acquire or have access to billing and other related administrative information of Company, which is of a highly confidential and trade secret nature, and accordingly, for the term of this Agreement, and thereafter, the Independent Contractor shall keep and maintain such information confidential and secret.

     **p.**    **Agency**. Company, and its employees and agents, shall have no authority to enter into any Contracts or other Agreements on behalf of the Independent Contractor, or to create any obligations on the part of the Independent Contractor unless specifically authorized to do so by Independent Contractor in writing. Likewise, the Independent Contractor shall have no authority to enter into any Contracts or other Agreements on behalf of Company, or to create any obligations on the part of Company.

     **q.**    **Restrictive Covenant**.
       i.    Company must necessarily undertake hereto to impart to the Independent Contractor confidential information and knowledge about billing and other related administrative information of Company. The independent contractor relationship contemplated herein, of necessity, requires such disclosure, and the Parties hereto acknowledge that the Independent Contractor will become familiar with and possess such information as to the manner, method, trade secrets and other confidential information of Company during the term of this Agreement. Additionally, Company has made a substantial investment in time and money in developing and maintaining contracts and business relationships with Providers and physicians. In consideration of this Agreement, and the disclosure and referral by Company to the Independent Contractor of such knowledge and information described above, the Independent Contractor makes the covenant hereinafter set forth. The Independent Contractor understand and acknowledges that such covenants are required for the fair and reasonable protection of such information of Company and that without the limited restriction on the Independent Contractor's activities imposed by these covenants, Company would suffer irreparable and immeasurable damage. The covenants herein given on the part of the Independent Contractor shall be construed as an Agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Company of said covenants. Therefore, the Independent Contractor hereby expressly covenants and agrees that during the term of this Agreement, and for

7

AERAS 1192

a period of three (3) years immediately following the termination of this Agreement, for any reason whatsoever, the Independent Contractor will not, within the territory hereinafter defined, directly or indirectly, for himself, or on behalf of others, as an individual, or on his account, or as an officer, director, shareholder, employee, agent, independent contractor or representative for himself or any other person, partnership, firm or corporation, do as follows:

(i) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, employ or attempt to take away any employees, staff, independent contractors or Medical Directors of Company, or induce or attempt to induce any such employees, staff, independent contractors or Medical Directors to quit their relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such employees, staff, independent contractors or Medical Directors;

(ii) On behalf of himself, or on behalf of any other person, firm or corporation, solicit, entice, divert, contract or attempt to take away any Providers of Company, or induce or attempt to induce any such hospital to quit its relationship, contractual or otherwise, with Company, or interfere with or disrupt, in any way, Company's relationship, contractual or otherwise, with any such Providers;

(iii) Deprecate, disparage or cast aspersions upon Company or any of Company's respective principals, employees, agents, shareholders, officers or directors, whomsoever, or in any way whatsoever; or

(iv) Keep and maintain all such billing and other related administrative information confidential and secret in every way.

ii.    The territory referred to in this section shall be designated as the State of Alabama.

iii.    Each restrictive covenant set forth herein is separate and distinct from any other restrictive covenant set forth in this section. In the event of the invalidity of any covenant, the remaining obligation shall be deemed independent and divisible. The Parties hereto agree that this provision of this Agreement is reasonable and necessary for the protection of Company and that this Agreement and the restrictive covenants contained herein are part of an integral business association leading to the execution of this Agreement, which execution was, in great part, conditioned upon inclusion of such restrictive covenant contained herein.

r.    **Injunctive Relief.**
i.    Irreparable harm shall be presumed if the Independent Contractor breaches any covenants of this Agreement. The faithful performance of all covenants of this Agreement are an essential condition to Company entering into this Agreement with the Independent Contractor. Company depends upon the Independent Contractor's absolute compliance with all provisions hereof. Damages would be very difficult, if not impossible, to ascertain if the Independent Contractor breaches any covenants of this Agreement.

8

AERAS 1193

    ii.     In light of same, the Independent Contractor hereby waives all jurisdiction and venue defenses and agrees that the Circuit Court for Montgomery county, Alabama may immediately enjoin any breach of this Agreement, upon the request of Company, and the Independent Contractor also hereby specifically releases Company from any requirement to post any bond or security of any kind or nature whatsoever, in any amount whatsoever, in connection with any temporary, interlocutory or permanent injunctive relief hereafter sought by Company, and the Independent Contractor further specifically waives all such defenses in any such action.

    iii.     In the event of a breach or threatened breach by the Independent Contractor of any such of the covenants of this Agreement, Company shall hereby be deemed so entitled to an injunction restraining the Independent Contractor, or any person or entity acting in concert with the Independent Contractor, from violating any of the provisions hereof.

    iv.     Nothing herein contained shall be construed as prohibiting Company from simultaneously pursuing, in the same Court, any other remedies available to Company for such breach or threatened breach, including the recovery of compensatory and punitive damages from the Independent Contractor, or anyone acting in concert with the Independent Contractor, in regard to any breach or any of the provisions hereof.

    **s.**    **Notices**. Any notices requests, instructions and demands, which may be given by any Party hereto in the course of the transactions contemplated hereunder, shall be in writing and shall be deemed given when either served by personal service or deposited and posted, by Certified Mail, Return Receipt Requested, and addressed to the respective Party as follows:

    **Independent Contractor:**

    **Company:**                **PRIME CARE, P.C.**
                                  Paul K. Tanaka, M.D.
                                  President
                                  4160 Carmichael Road,
                                  Suite 104
                                  Montgomery, AL 36106

    **With a copy to:**           Gerald W. Hartley, Esq.
                                  Hill, Hill, Carter, Franco,
                                        Cole & Black, P.C.
                                  425 South Perry Street
                                  Montgomery, AL 36104

    **t.**    **Waiver of Breach**. No waiver of a breach by either Party hereunder shall be valid unless such waiver shall be in writing and signed by the Party against whom enforcement of any

**AERAS 1194**

waiver is sought.  No waiver by a Party of a breach of any provision of this Agreement by the other Party shall be construed as a waiver of any subsequent breach by such Party.  No delay or omission on the part of either Party in exercising any right or remedy shall operate as a waiver thereof, and no single or partial exercise by a Party of any right or remedy shall preclude any other or further exercise of any other right or remedy.  Any waiver of a condition shall not constitute a permanent or continuing waiver.

   **u.**  **Completion and Execution of Additional Documents**.  Independent Contractor shall complete in a timely manner all applications, forms or records necessary to carry out this Agreement.  Independent Contractor also agrees to execute such agreements and/or assignments agreement with the Providers being served by the Independent Contractor as may be required in order for Independent Contractor and Company to carry out their respective obligations under this Agreement; provided however, that the language of this paragraph shall not be construed as relieving Independent Contractor of the restrictions contained in Paragraph 17 herein.

   **v.**  **Captions**.  The title of this Agreement, as well as the paragraph headings and captions in this Agreement, are used for convenience and reference purposes only, and they shall not be deemed controlling in interpreting this Agreement.

   **w.**  **Reconciliation Clause**.  To the extent required by law, Company and the Independent Contractor hereby agree that for a period of four (4) years after this Agreement terminates, they shall make available, upon written request of the Secretary of Health and Human Services, or any duly authorized representative thereof, this Agreement and the books, documents and records that may be necessary to certify the nature and extent of the costs related to this Agreement.

   **x.**  **Patient Medical and Surgical Records**.  Medical and surgical records of and for patients treated by the Independent Contractor shall be maintained and shall be the property of the individual facility at which the Independent Contractor is providing services; provided, however, the Independent Contractor, at all times during the term of this Agreement, shall have access to such records.  Upon termination of this Agreement, the Independent Contractor shall not be entitled to receive any patient's charts or professional records except pursuant to the specific written instructions of any patient as to the disposition of such patient's particular charts or records.

   **y.**  **Assignment; Binding Agreement**.  This Agreement shall be binding upon the Parties, their heirs, legal representatives and successors-in-interest.  Company depends upon the personal services of the Independent Contractor, and the Independent Contractor shall not assign this Agreement without the prior, express, written consent of Company, nor shall the Independent Contractor delegate any of the Independent Contractor's obligations hereunder to any other person or corporation without the prior, express, written consent of Company.  Any such attempted assignment or delegation by the Independent Contractor, without the prior, express, written consent of Company, shall be deemed null, void and of no effect.

10

AERAS 1195

**z.**    **Entire Agreement**.   This Agreement contains the entire Agreement between the Parties hereto with respect to the specific subject matter hereof, and there are no agreements, promises, covenants or conditions, oral or otherwise, except as are expressly set forth herein. This Agreement supersedes any and all other understandings and agreements, of whatsoever kind and nature, between the Parties, either oral or otherwise.  It may be amended at any time only by a written instrument executed by all Parties hereto.  Furthermore, this Agreement shall be binding upon, and inure to the benefit of the respective Parties hereto, and to their respective heirs, executors, administrators, representatives, successors and assigns, whomsoever, forever.

**aa.**    **Severability of Provisions**.  The invalidity of any term, covenant or condition of this Agreement shall not affect any other term, covenant or condition hereof, and the Agreement shall be interpreted as though such invalid provision did not exist.

**bb.**    **Prior Agreements**.  This Agreement supersedes any prior Agreement of the Parties.

**cc.**    **Governing Law**.  This Agreement shall be governed, whether as to its validity, construction, capacity, performance or otherwise, under the laws of the State of Alabama.

**dd.**    **Construction**.  Whenever the context requires, the masculine shall include the feminine and neuter, and the singular shall include the plural.

**ee.**    **Time is of the Essence**.  Time is of the essence as to this Agreement and in case any Party shall fail to perform this Agreement at the time fixed for the performance of same, the other Party hereto may, at their election, terminate this Agreement, or consider that a default has occurred, entitling the aggrieved Party to proceed as this Agreement and the law in such instances provide.

**ff.**    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be construed as an original.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the day and year first above written.

**ATTEST:**                                    **PRIME CARE, PC.**

AERAS 1196

_____          By:_____

Secretary                                   Paul K. Tanaka,  M.D.
                                                Its President
                                                "Company"

          (Corporate Seal)


Witness:


_____          _____
                                                "Independent Contractor"


## EXHIBIT 1

## CONTRACT AMOUNT/PRIME CARE, PC


During the term of this Agreement, **PRIME CARE** shall pay to the **Independent Contractor** monthly, no later than the fifteenth day after each calendar month for which such

12

**AERAS 1197**

payment is due, **40%** of the Adjusted gross professional charges, which are Office and Surgery, paid by **Baptist Ventures, Inc.** to **PRIME CARE** for professional services provided hereunder by the **Independent Contractor.** Vaughn Road, Atlanta Hwy, Silver Hills are all Fee For Service facilities. The **Independent Contractor** will be guaranteed a minimum of **$75** per hour at Wetumpka facility only until **September 20, 2001**. The balance of such fees actually paid **PRIME CARE** shall be retained by **PRIME CARE** as compensation for its services hereunder. A deduction of $.25 per hour is deducted for holiday bonus pay, which will be escrowed into an account and paid to those individuals who work the agreed holidays.


_____                    _____
     "Independent Contractor"                                      Date



_____                    _____
     Paul Tanaka, MD                                              Date
      Its President
       "Company"

13

**AERAS 1198**

Nichols TXEN

AERAS 1199

# Nichols
### T X E N

# *Hospitalist, P.C.*
## *(Baptist Downtown)*
### Practice Management Administration (PMA)

Nichols TXEN Corporation manages all pro fee billing for the Hospitalist, P.C. portion of Baptist Downtown.

> **Overview: Practice Management Administration** is a complete billing and collection package offered to physicians who choose to free themselves from all administrative responsibilities of a billing office. The physicians code their work, and our staff enters all information necessary to generate insurance claims, statements, and financial reports. We also handle all filing and refiling of claims as well as collection from insurance carriers and patients. The charge for this service is based on a percentage of net receipts. All billing inquiries are directed to our toll-free number.

## BILLING MANAGEMENT CHARGE:          10% of Net Receipts

Net Receipts:     =     Gross Collection $
-Refunds
-Outside Collection Agency Receivables
**Net Receipts**

## IMPLEMENTATION CHARGE:          Waived

## MINIMUM MONTHLY FEE:          $2,500.00

## AVAILABILITY:     Unless otherwise stated, availability is 60 Days from receipt of the signed agreement.

## TERMS:     A deposit check is required to cover one month's estimated billing fee of $3,750.00.

**October 16, 1998**

**AERAS 1200**

# PROFESSIONAL SERVICES AGREEMENT

**Baptist Downtown**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Hospitalist, P.C., located at 301 South Ripley, Montgomery, Alabama 36104 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

### 1.   Engagement.

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement. The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

### 2.   Term.

The term of this Agreement shall commence on November 1, 1998 and continue until October 31, 2000. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

*[handwritten: Jan 1999]*

### 3.   Duties of the Company.

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer. The bill shall include all services performed by Customer and for its preparation the Customer shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms. In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies. If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c)    The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d)    The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder. In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account. For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the suspense period selected by the Company to allow for third party payment.

**AERAS 1201**

6.    **Performance Warranty**

(a)  The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards. Responsibility for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the Company or to malfunction of the Company's software and/or equipment; provided that written notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b)  EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.    **Limitation of Liability**.

(a)  The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above. The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b)  The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company. Customer shall forthwith indemnify the Company with respect to any such claim.

(c)  The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

8.    **Property Rights**.

(a)  Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer. The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b)  Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

(c)  Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company during the course of this Agreement shall be exclusive property of the Company. Customer agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

9.    **Storage and Return of Customer Information**.

(a)  The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided. At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement. In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs. The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b)  Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c)  In the event of expiration or earlier termination of this Agreement,

(i)  the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii)  the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of

31898

**AERAS 1202**

13.     Miscellaneous.

(a)  This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b)  This Agreement contains the entire understanding of the parties with respect to the matters set forth herein.  There are no promises, covenants or undertakings other than those specifically set forth herein.  This Agreement may not be modified or amended except by writing signed by Customer and the Company.

(c)  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d)  Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above.  Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e)  No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented.  Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f)  This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g)  In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h)  During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to  employ or seek to employ any persons currently employed by Nichols TXEN to perform services as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

**Nichols TXEN Corporation**

By:_____

Title:_____

Date:_____

**Hospitalist, P.C.**

By:_____

Title:_____

Date:_____

**AERAS 1203**

## Exhibit "A

**Information provided by hospital:**

1. Patient's name

2. Patient's sex

3. Patient's date of birth

4. Patient's status (single, married, other)

5. Responsible party's name

6. Responsible party's address

7. Responsible party's telephone number

8. Responsible party's employer

9. Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20 Copies of insurance card or cards (front and back)

21. Copy of emergency registration log

**AERAS 1204**

31898

22. Date of service

23. Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1. Chief complaint documented by physician

2. Medical history (past medical, family and social history)

3. Treatment - Itemized for billing purposes

4. Diagnosis

5. Discharge status

6. In-house code blue sheets with demographic information (if applicable)

7. Physicians' notes regarding discussion with patient, family or others.

**AERAS 1205**

31898

## Hospitalist Collections Estimate

| CPT Code | Charge | Total Count | Total Revenue | Per Cent Usage | Medicare Allowed | Medicare Pro Rata 28% | Blue Cross Allowed | B/C Pro Rata 15% | Comm. Ins. Allowed | Comm. Pro Rata 25% | Medicaid Allowed | Medicaid Pro Rata 17% | Self Pay "Allowed" | Self Pay Pro Rata 15% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 99217 | 84.00 | 1 | 84.00 | 0.12% | 61.35 | 17.18 | 63.00 | 9.45 | 63.00 | 15.75 | 15.34 | 2.61 | 84.00 | 1.26 |
| 99218 | 92.00 | 1 | 92.00 | 0.14% | 66.65 | 18.66 | 74.00 | 11.1 | 69.00 | 17.25 | 16.66 | 2.83 | 92.00 | 1.38 |
| 99222 | 149.00 | 2 | 298.00 | 0.45% | 107.53 | 60.22 | 94.00 | 28.2 | 111.75 | 55.88 | 26.88 | 9.14 | 149.00 | 4.47 |
| 99223 | 192.00 | 144 | 27,648.00 | 42.16% | 140.79 | 5,676.65 | 135.00 | 2916 | 144.00 | 5,184.00 | 35.20 | 861.63 | 192.00 | 414.72 |
| 99231 | 48.00 | 254 | 12,215.00 | 18.62% | 33.70 | 2,396.74 | 39.00 | 1485.9 | 36.00 | 2,286.00 | 8.43 | 363.79 | 48.00 | 182.88 |
| 99232 | 71.00 | 132 | 9,555.00 | 14.57% | 51.15 | 1,890.50 | 49.00 | 970.2 | 53.25 | 1,757.25 | 12.79 | 286.95 | 71.00 | 140.58 |
| 99233 | 99.00 | 7 | 693.00 | 1.05% | 71.74 | 140.61 | 68.00 | 71.4 | 74.25 | 129.94 | 17.94 | 21.34 | 99.00 | 10.40 |
| 99238 | 84.00 | 137 | 11,508.00 | 17.54% | 61.20 | 2,347.63 | 63.00 | 1294.65 | 63.00 | 2,157.75 | 15.30 | 356.34 | 84.00 | 172.62 |
| 99252 | 99.00 | 1 | 99.00 | 0.15% | 71.04 | 19.89 | 91.00 | 13.65 | 74.25 | 18.56 | 17.76 | 3.02 | 99.00 | 1.49 |
| 99253 | 131.00 | 10 | 1,310.00 | 1.99% | 94.84 | 265.55 | 106.00 | 159 | 98.25 | 245.63 | 23.71 | 40.31 | 131.00 | 19.65 |
| 99291 | 254.00 | 7 | 1,716.00 | 2.61% | 184.26 | 361.15 | 142.00 | 149.1 | 190.50 | 333.38 | 46.07 | 54.82 | 254.00 | 26.67 |
| 99235 | 0.00 | 1 | - | 0.00% | 154.41 | 43.23 | 133.00 | 19.95 | - | - | 38.60 | 6.56 | - | - |
| 99254 | 180.00 | 3 | 360.00 | 0.54% | 131.48 | 110.44 | 137.00 | 61.65 | 135.00 | 101.25 | 32.87 | 16.76 | 180.00 | 8.10 |
|  |  | 700 | 65,578.00 | 99.94% |  | 13,348.47 |  | 7190.25 |  | 12,302.63 |  | 2,026.11 |  | 984.21 |

**Total Encounters** 692 → 94.77 (Net per Payor)

**Avg. Monthly Enc.** 231

**Avg. Gross Revenue** 21,859.33 per month

**Potential Net Revenue Range** 9,574.26 — Net per Payor: Medicare Allowed 11,967.82, Medicare Pro Rata 4,455.92, B/C Pro Rata 2,400.21, Comm. Pro Rata 4,106.80, Medicaid Pro Rata 676.35, Self Pay Pro Rata 328.54

**Collections Estimate Based on the Following:**

| | |
|---|---|
| Medicare | 28% |
| Medicaid | 17% |
| Blue Cross | 15% |
| Commercia | 25% |
| Self Pay* | 15% |

* Estimated Collections - 10% of charges

3/22/99

Page 1

Nichols TXEN Confidential

**AERAS 1206**

## John D. Moorehouse

| | |
|---|---|
| **From:** | Sandy D. Morgan |
| **Sent:** | Friday, March 19, 1999 4:02 PM |
| **To:** | 'Pat Satterfield'; 'Mike Molony' |
| **Cc:** | 'John Moorehouse MD'; 'Wallace Falero MD'; John D. Moorehouse; Jeanie K. Shaw; CThomason; Theresa D. hunter |
| **Subject:** | compliance |

Pat,

It would really be beneficial if you could bring your compliance officer to the meeting next week.  John has several questions for him, such as:

1) Is your compliance officer (or someone from his/her department) willing to do a presentation on Nichols compliance program to our physicians?

2) How long has this program been in place?

3) What was the process (and why) for implementing your compliance program, and does your company routinely conduct compliance risk assessments?

4) How are compliance issues monitored, tracked, and resolved?  To what extent would Nichols inform AERAS of compliance inquiries that involve professional services?  What type of issues would your company resolve without our input, and what type of issues would they inform AERAS of prior to resolution?

5) Does your billing company perform periodic audits of Nichols' employees coding?

6) Is there a formal process that includes standards that medical coders must meet?

7) Is the audit function contained within the coding department or is it a separate function?

8) Has your compliance program been reviewed or audited by an independent outside consultant? If so, does your company have a summary of those results that is not privileged or proprietary?

I'm sure that you guys will have to turn most of these questions over to the compliance officer and the coding department.  I just thought you'd like to have these before Tuesday.

See you soon.  Sandy

*[handwritten notes:]*

*Submit to*

*1. Medical Data Systems*

*2. Medaphis*

1

**AERAS 1207**

# PROFESSIONAL SERVICES AGREEMENT

**Jackson Hospital**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Hospitalist, P.C., located at 1235 Forest Avenue, Montgomery, Alabama 36106 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

1.    <u>Engagement</u>.

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement. The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

2.    <u>Term</u>.

The term of this Agreement shall commence on January 20, 1999 and continue until January 19, 2000. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

3.    <u>Duties of the Company</u>.

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer. The bill shall include all services performed by Customer and for its preparation the Customer shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms. In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies. If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c) The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d) The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder. In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account. For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the suspense period selected by the Company to allow for third party payment.

**AERAS 1208**

(e) The Company will prepare and deliver to the Customer a written monthly report reflecting all patient accounts billed on behalf of Customer during the preceding month; all payments made by or on behalf of the Customer's patients during said month with respect to accounts billed by the Company; the patient accounts that have been billed on behalf of the Customer, an aging of said accounts at the end of said preceding month; adjustments in billings, insurance rejections; and other pertinent information with respect to the billings and collections of the Customer's accounts for the preceding month. The Company shall also provide the Customer with such other information reasonably requested by the Customer with respect to services rendered by the Company under this Agreement.

(f) The Company shall, at its expense, hire, train and supervise all the employees required for the services provided herein and provide the necessary office facilities for such personnel. The Company shall pay all the expenses incurred in connection with the services rendered herein, both direct and indirect, including but not limited to postage, forms, printing, office personnel salaries, executive salaries, rent of office facilities for billing, equipment cost and utility cost, provided, however, that the charge for each account billed by the Company shall be increased to reflect increases in the basic postage rate over 32 cents per ounce for mailing of U.S. first class mail.

4.    Duties of the Customer.

The Customer shall during the term of this Agreement deliver all of the accounts of its patients for billing and collection by the Company as herein provided. The obligations of the Customer shall include the following:

(a) Customer shall, at its expense, arrange for a "lock box" or other suitable arrangement for the collection of funds paid on the accounts of the patients of the Customer and shall authorize the person responsible for the collection of such funds to furnish the Company information regarding such collections. The Customer shall report to the Company any funds that are paid directly to the Customer on any account that has been delivered by the Customer to the Company for billing and collection hereunder. The Company shall deposit all funds delivered to the Company for the accounts of patients of Customer into the "lock box" or other arrangement established hereunder.

(b) Customer shall advise the Company of the commercial insurance carriers and other third party payers with whom the Customer has direct billing arrangements for the payment of accounts of its patients. Customer will, at its expense, provide the Company such information and authorization as shall be necessary to enable the company to bill such insurance carriers or other payers directly for the accounts of Customer's patients.

5.    Charges for Services.
(a)    The Customer shall pay to the Company a one-time charge of __N/A__ for the conversion of the Customer's billing operations to the Company's system and/or N/A set up fee. These one-time charges shall be due and payable upon the execution of this Agreement.

(b) Subject to the minimum charge set forth in subparagraph (c) below, the Customer shall pay to the Company $6.00 Per Billable Encounter (Does Include Coding). The Company will render invoices for its services monthly. The invoices shall be due and payable in full on receipt by the Customer.

(c) The Company may, at any time after the expiration of one year from the commencement of the initial Term, increase the prices charged by delivery of a written notice at least (90) days prior to effecting any such increase; provided that such increase will not exceed (on a cumulative basis) ten percent (10%) annually.

(d) The Customer shall pay the Company a minimum charge of N/A per month during the term of this Agreement or any extension thereof. Said minimum payment shall be applied against the amount due pursuant to subparagraph (b) above.

(e) In the event the Customer fails to pay in accordance with the terms of this Agreement, the Company may, after 30 days prior notice to the Customer, impose service charges at the rate of 1-1/2% per month on the amounts past due.

(f) There shall be added to any charge or fees payable by Customer this Agreement (i) an amount equal to any local, state or federal sales, use, excise, personal property or other similar taxes or duties and such taxes shall be assumed and paid by the Customer; and (ii) an amount equal to any increase in the postage paid in connection with the performance of the services hereunder which is attributable to a change in the postage rates after the date hereof.

(g) Customer shall pay all collection costs and expenses, including reasonable attorneys fees, incurred by Company in collecting or attempting to collect any past due account.

6.    Performance Warranty.

(a)    The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards. Responsibility for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the

**AERAS 1209**

Company or to malfunction of the Company's software and/or equipment; provided that written notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b)    EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.    Limitation of Liability.

(a)    The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above. The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b)    The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company. Customer shall forthwith indemnify the Company with respect to any such claim.

(c)    The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

8.    Property Rights.

(a)    Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer. The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b)    Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

(c)    Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company

during the course of this Agreement shall be exclusive property of the Company. Customer agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

9.    Storage and Return of Customer Information.

(a)    The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided. At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement. In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs. The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b)    Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c)    In the event of expiration or earlier termination of this Agreement,

(i)    the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii)    the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of the Company's services and the return of the Company's proprietary information, the Customer and such other data processing company, if any, shall be required as a condition to such access to execute an agreement, in form reasonably acceptable to the Company, that acknowledges that the software programs, report formats, and user manuals used by the Company in the performance of its services are proprietary to the Company and constitute trade secret and confidential information

31898

AERAS 1210

and that limits access to, or disclosure of, such programs and related materials to those employees of the Customer whose job description require access thereto consistent with past practice. The Customer shall pay the Company, at its then current

### 10.    Default.

(a)  In the event that the Customer shall fail to pay any amounts due to the Company hereunder, or if either party shall fail to perform any of its other material obligations to the other hereunder, and such payment is not made, or other default cured within 30 days after the giving of written notice thereof, then the party who shall have given notice of such default may terminate this Agreement immediately by giving the other party written notice of termination.  It is understood and agreed that the failure of the Customer to deliver Billing Information the Company in a medium and format reasonably acceptable to the Company pursuant to Section 3(a) above shall be deemed to be a default of a material obligation hereunder.

(b)  No termination pursuant to any of the provisions of this paragraph shall relieve either party of its respective obligations to the other hereunder that arose prior to the effective date of termination.

(c)  The provisions of this Section 10 shall not be in limitation of any other right or remedy available at law or in equity to the nondefaulting party.

### 11.    Mandatory Arbitration.

(a)  The Company and Customer agree that any controversy or claim arising out of or relating to this Agreement, which the parties hereto are unable to resolve, shall be resolved exclusively by arbitration.  The parties expressly waive all rights to file suit over such matters, except as provided in subparagraph (b) below and those other instances in which such right is expressly preserved herein.  The party desiring to invoke arbitration shall give written notice to the other party to this Agreement and to the American Arbitration Association.    An arbitration pursuant to this Section shall permit no right of appeal or trial de novo in a court of law and shall take place in Birmingham, Alabama.  The American Arbitration Association shall select one person who is knowledgeable in data processing systems to determine any controversy or claim submitted by either party hereunder.  The decision of the arbitrator is final, and it shall not be set aside except for fraud, misconduct or gross mistake amounting to bad faith by him.  The arbitrator is hereby authorized to make any award of relief, including damages.    All procedures and facts of arbitration not specifically enumerated in this Agreement shall be settled in accordance with the Commercial Arbitration rules of the American Arbitration Association, and judgment upon the award or decision rendered by the arbitrator may be entered in any court having jurisdiction

rates for time and materials, for staff time spent in providing such assistance, for machine time, for the cost of the media on which the data is stored, for the copying costs, and for transportation costs.

thereof.  Any party who does not prevail on an issue submitted to the arbitrator for decision shall bear all costs and expenses of the arbitration and shall reimburse the prevailing party for costs and expenses (including attorneys' and experts' fees) incurred in connection therewith.  The arbitrator shall undertake to decide any issue submitted to it pursuant to this Agreement within 90 days of it submission.

(b)  The Company and the Customer agree that a violation by either party, their successor or assigns of certain of their respective covenants and obligations contained in this Agreement, including without limitation Sections 8, 9 and 12 can cause irreparable injury to the other party not adequately compensable by money damages, and that each of the parties hereto shall be entitled, without the necessity of posting bond or proving actual damages, in addition to any other rights and remedies they may have hereunder pursuant to the mandatory arbitration provisions, to seek (i) specific performance by the other party of its obligations under this Agreement and (ii) temporary or permanent injunctive relief enjoining and restraining the other party from doing or continuing to do any such act and any other violation or threatened violation thereof.

### 12.    Audit.

The Company recognizes that the Billing Information and statement of accounts rendered by the Company to patients of the Customer may be subject to examination by Medicare, Medicaid, commercial insurers and other third party payers with whom Customer has a billing relationship.  The Company shall provide Customer and any other person authorized by Customer access to Customer's data during normal business hours upon at least 10 days advance written notice to the Company; provided that such request for access will not unreasonable disrupt the Company's business operations.  The Company shall charge and Customer hereby agrees to pay for the cost of any services or materials used by the Company in supplying such audit assistance, including making copies of such information, at the Company's then current rates for time and materials.

### 13.    Miscellaneous.

(a)  This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b)  This Agreement contains the entire understanding of the parties with respect to the matters set forth herein.  There are no promises,

31898

**AERAS 1211**

covenants or undertakings other than those specifically set forth herein. This Agreement may not be modified or amended except by writing signed by Customer and the Company.

(c) This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d) Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above. Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e) No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f) This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g) In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h) During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to employ or seek to employ any persons currently employed by Nichols TXEN to perform services as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

Nichols TXEN Corporation

By: _____

Title: VP & GM

Date: 2/24/1999

Hospitalist, P.C.

By: _____

Title: _____

Date: _____

AERAS 1212

## Exhibit "A"

**Information provided by hospital:**

1.  Patient's name

2.  Patient's sex

3.  Patient's date of birth

4.  Patient's status (single, married, other)

5.  Responsible party's name

6.  Responsible party's address

7.  Responsible party's telephone number

8.  Responsible party's employer

9.  Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20. Copies of insurance card or cards (front and back)

21. Copy of emergency registration log

31898

**AERAS 1213**

22. Date of service

23. Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1. Chief complaint documented by physician

2. Medical history (past medical, family and social history)

3. Treatment - Itemized for billing purposes

4. Diagnosis

5. Discharge status

6. In-house code blue sheets with demographic information (if applicable)

7. Physicians' notes regarding discussion with patient, family or others.

31898

**AERAS 1214**

# PROFESSIONAL SERVICES AGREEMENT

**Baptist East**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Hospitalist, P.C., located at 400 Taylor Road, Montgomery, Alabama 36117 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

**1.    Engagement**.

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement.  The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

**2.    Term**.

The term of this Agreement shall commence on April 1, 1999 and continue until March 31, 2000. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

**3.    Duties of the Company**.

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer.  The bill shall include all services performed by Customer and for its preparation the Customer  shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms.  In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies.  If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c)    The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d)    The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder.  In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account.  For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the

**AERAS 1215**

suspense period selected by the Company to allow for third party payment.

(e) The Company will prepare and deliver to the Customer a written monthly report reflecting all patient accounts billed on behalf of Customer during the preceding month; all payments made by or on behalf of the Customer's patients during said month with respect to accounts billed by the Company; the patient accounts that have been billed on behalf of the Customer, an aging of said accounts at the end of said preceding month; adjustments in billings, insurance rejections; and other pertinent information with respect to the billings and collections of the Customer's accounts for the preceding month. The Company shall also provide the Customer with such other information reasonably requested by the Customer with respect to services rendered by the Company under this Agreement.

(f) The Company shall, at its expense, hire, train and supervise all the employees required for the services provided herein and provide the necessary office facilities for such personnel. The Company shall pay all the expenses incurred in connection with the services rendered herein, both direct and indirect, including but not limited to postage, forms, printing, office personnel salaries, executive salaries, rent of office facilities for billing, equipment cost and utility cost, provided, however, that the charge for each account billed by the Company shall be increased to reflect increases in the basic postage rate over 32 cents per ounce for mailing of U.S. first class mail.

4.    **Duties of the Customer.**

The Customer shall during the term of this Agreement deliver all of the accounts of its patients for billing and collection by the Company as herein provided. The obligations of the Customer shall include the following:

(a) Customer shall, at its expense, arrange for a "lock box" or other suitable arrangement for the collection of funds paid on the accounts of the patients of the Customer and shall authorize the person responsible for the collection of such funds to furnish the Company information regarding such collections. The Customer shall report to the Company any funds that are paid directly to the Customer on any account that has been delivered by the Customer to the Company for billing and collection hereunder. The Company shall deposit all funds delivered to the Company for the accounts of patients of Customer into the "lock box" or other arrangement established hereunder.

(b) Customer shall advise the Company of the commercial insurance carriers and other third party payers with whom the Customer has direct billing arrangements for the payment of accounts of its patients. Customer will, at its expense, provide the Company such information and authorization as shall be necessary to enable the company to bill such insurance carriers or other payers directly for the accounts of Customer's patients.

5.    **Charges for Services.**
(a) The Customer shall pay to the Company a one-time charge of  N/A  for the conversion of the Customer's billing operations to the Company's system and/or N/A set up fee.  These one-time charges shall be due and payable upon the execution of this Agreement.

(b) Subject to the minimum charge set forth in subparagraph (c) below, the Customer shall pay to the Company $6.00 Per Billable Encounter (Does Include Coding). The Company will render invoices for its services monthly.  The invoices shall be due and payable in full on receipt by the Customer.

(c) The Company may, at any time after the expiration of one year from the commencement of the initial Term, increase the prices charged by delivery of a written notice at least (90) days prior to effecting any such increase; provided that such increase will not exceed (on a cumulative basis) ten percent (10%) annually.

(d) The Customer shall pay the Company a minimum charge of  N/A  per month during the term of this Agreement or any extension thereof.  Said minimum payment shall be applied against the amount due pursuant to subparagraph (b) above.

(e) In the event the Customer fails to pay in accordance with the terms of this Agreement, the Company may, after 30 days prior notice to the Customer, impose service charges at the rate of 1-1/2% per month on the amounts past due.

(f) There shall be added to any charge or fees payable by Customer this Agreement (i) an amount equal to any local, state or federal sales, use, excise, personal property or other similar taxes or duties and such taxes shall be assumed and paid by the Customer; and (ii) an amount equal to any increase in the postage paid in connection with the performance of the services hereunder which is attributable to a change in the postage rates after the date hereof.

(g) Customer shall pay all collection costs and expenses, including reasonable attorneys fees, incurred by Company in collecting or attempting to collect any past due account.

6.    **Performance Warranty.**

(a) The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards.  Responsibility

31898

**AERAS 1216**

for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the Company or to malfunction of the Company's software and/or equipment; provided that written notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b) EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.    **Limitation of Liability**.

(a) The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above. The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b) The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company. Customer shall forthwith indemnify the Company with respect to any such claim.

*O. m. r*
*jr—*

(c) The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

8.    **Property Rights**.

(a) Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer. The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b) Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

31898

(c) Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company during the course of this Agreement shall be exclusive property of the Company. Customer agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

9.    **Storage and Return of Customer Information**.

(a) The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided. At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement. In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs. The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b) Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c) In the event of expiration or earlier termination of this Agreement,

(i) the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii) the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of the Company's services and the return of the Company's proprietary information, the Customer and such other data processing company, if any, shall be required as a condition to such access to execute an agreement, in form reasonably acceptable to the

**AERAS 1217**

Company, that acknowledges that the software programs, report formats, and user manuals used by the Company in the performance of its services are proprietary to the Company and constitute trade secret and confidential information and that limits access to, or disclosure of, such programs and related materials to those employees of the Customer whose job description require access thereto

10.    **Default.**

(a)  In the event that the Customer shall fail to pay any amounts due to the Company hereunder, or if either party shall fail to perform any of its other material obligations to the other hereunder, and such payment is not made, or other default cured within 30 days after the giving of written notice thereof, then the party who shall have given notice of such default may terminate this Agreement immediately by giving the other party written notice of termination.   It is understood and agreed that the failure of the Customer to deliver Billing Information the Company in a medium and format reasonably acceptable to the Company pursuant to Section 3(a) above shall be deemed to be a default of a material obligation hereunder.

(b)  No termination pursuant to any of the provisions of this paragraph shall relieve either party of its respective obligations to the other hereunder that arose prior to the effective date of termination.

(c)  The provisions of this Section 10 shall not be in limitation of any other right or remedy available at law or in equity to the nondefaulting party.

11.    **Mandatory Arbitration.**

(a)  The Company and Customer agree that any controversy or claim arising out of or relating to this Agreement, which the parties hereto are unable to resolve, shall be resolved exclusively by arbitration. The parties expressly waive all rights to file suit over such matters, except as provided in subparagraph (b) below and those other instances in which such right is expressly preserved herein. The party desiring to invoke arbitration shall give written notice to the other party to this Agreement and to the American Arbitration Association.   An arbitration pursuant to this Section shall permit no right of appeal or trial de novo in a court of law and shall take place in Birmingham, Alabama.    The American Arbitration Association shall select one person who is knowledgeable in data processing systems to determine any controversy or claim submitted by either party hereunder. The decision of the arbitrator is final, and it shall not be set aside except for fraud, misconduct or gross mistake amounting to bad faith by him. The arbitrator is hereby authorized to make any award of relief, including damages.    All procedures and facts of arbitration not specifically enumerated in this Agreement shall be settled in

consistent with past practice.  The Customer shall pay the Company, at its then current rates for time and materials, for staff time spent in providing such assistance, for machine time, for the cost of the media on which the data is stored, for the copying costs, and for transportation costs.

accordance with the Commercial Arbitration rules of the American Arbitration Association, and judgment upon the award or decision rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Any party who does not prevail on an issue submitted to the arbitrator for decision shall bear all costs and expenses of the arbitration and shall reimburse the prevailing party for costs and expenses (including attorneys' and experts' fees) incurred in connection therewith.  The arbitrator shall undertake to decide any issue submitted to it pursuant to this Agreement within 90 days of it submission.

(b)  The Company and the Customer agree that a violation by either party, their successor or assigns of certain of their respective covenants and obligations contained in this Agreement, including without limitation Sections 8, 9 and 12 can cause irreparable injury to the other party not adequately compensable by money damages, and that each of the parties hereto shall be entitled, without the necessity of posting bond or proving actual damages, in addition to any other rights and remedies they may have hereunder pursuant to the mandatory arbitration provisions, to seek (i) specific performance by the other party of its obligations under this Agreement and (ii) temporary or permanent injunctive relief enjoining and restraining the other party from doing or continuing to do any such act and any other violation or threatened violation thereof.

12.    **Audit.**

The Company recognizes that the Billing Information and statement of accounts rendered by the Company to patients of the Customer may be subject to examination by Medicare, Medicaid, commercial insurers and other third party payers with whom Customer has a billing relationship. The Company shall provide Customer and any other person authorized by Customer access to Customer's data during normal business hours upon at least 10 days advance written notice to the Company; provided that such request for access will not unreasonable disrupt the Company's business operations.  The Company shall charge and Customer hereby agrees to pay for the cost of any services or materials used by the Company in supplying such audit assistance, including making copies of such information, at the Company's then current rates for time and materials.

13.    **Miscellaneous.**

31898

**AERAS 1218**

(a)  This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b)  This Agreement contains the entire understanding of the parties with respect to the matters set forth herein.  There are no promises, covenants or undertakings other than those specifically set forth herein.  This Agreement may not be modified or amended except by writing signed by Customer and the Company.

(c)  This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d)  Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above.  Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e)  No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented.  Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f)  This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g)  In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h)  During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to  employ or seek to employ any persons currently employed by Nichols TXEN  to perform services  as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

**Nichols TXEN Corporation**

By: _William L. Cooler_

Title: _VP & GM_

Date: _1/22/1999_

**Hospitalist, P.C.**

By: _John Morehance MD_

Title: _President_

Date: _1/22/99_

31898

**AERAS 1219**

# Exhibit "A

**Information provided by hospital:**

1. Patient's name

2. Patient's sex

3. Patient's date of birth

4. Patient's status (single, married, other)

5. Responsible party's name

6. Responsible party's address

7. Responsible party's telephone number

8. Responsible party's employer

9. Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20. Copies of insurance card or cards (front and back)

31898

**AERAS 1220**

21. Copy of emergency registration log

22. Date of service

23. Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1. Chief complaint documented by physician

2. Medical history (past medical, family and social history)

3. Treatment - Itemized for billing purposes

4. Diagnosis

5. Discharge status

6. In-house code blue sheets with demographic information (if applicable)

7. Physicians' notes regarding discussion with patient, family or others.

**AERAS 1221**

# PROFESSIONAL SERVICES AGREEMENT

**Baptist Downtown**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Hospitalist, P.C., located at 301 South Ripley, Montgomery, Alabama 36104 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

**1.    Engagement.**

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement. The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

**2.    Term.**

The term of this Agreement shall commence on November 1, 1998 and continue until October 31, 1999. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

**3.    Duties of the Company.**

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer. The bill shall include all services performed by Customer and for its preparation the Customer shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms. In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies. If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c) The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d) The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder. In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account. For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the suspense period selected by the Company to allow for third party payment.

**AERAS 1222**

(e) The Company will prepare and deliver to the Customer a written monthly report reflecting all patient accounts billed on behalf of Customer during the preceding month; all payments made by or on behalf of the Customer's patients during said month with respect to accounts billed by the Company; the patient accounts that have been billed on behalf of the Customer, an aging of said accounts at the end of said preceding month; adjustments in billings, insurance rejections; and other pertinent information with respect to the billings and collections of the Customer's accounts for the preceding month. The Company shall also provide the Customer with such other information reasonably requested by the Customer with respect to services rendered by the Company under this Agreement.

(f) The Company shall, at its expense, hire, train and supervise all the employees required for the services provided herein and provide the necessary office facilities for such personnel. The Company shall pay all the expenses incurred in connection with the services rendered herein, both direct and indirect, including but not limited to postage, forms, printing, office personnel salaries, executive salaries, rent of office facilities for billing, equipment cost and utility cost, provided, however, that the charge for each account billed by the Company shall be increased to reflect increases in the basic postage rate over 32 cents per ounce for mailing of U.S. first class mail.

4.    Duties of the Customer.

The Customer shall during the term of this Agreement deliver all of the accounts of its patients for billing and collection by the Company as herein provided. The obligations of the Customer shall include the following:

(a) Customer shall, at its expense, arrange for a "lock box" or other suitable arrangement for the collection of funds paid on the accounts of the patients of the Customer and shall authorize the person responsible for the collection of such funds to furnish the Company information regarding such collections. The Customer shall report to the Company any funds that are paid directly to the Customer on any account that has been delivered by the Customer to the Company for billing and collection hereunder. The Company shall deposit all funds delivered to the Company for the accounts of patients of Customer into the "lock box" or other arrangement established hereunder.

(b) Customer shall advise the Company of the commercial insurance carriers and other third party payers with whom the Customer has direct billing arrangements for the payment of accounts of its patients. Customer will, at its expense, provide the Company such information and authorization as shall be necessary to enable the company to bill such insurance carriers or other payers directly for the accounts of Customer's patients.

5.    Charges for Services.

(a) The Customer shall pay to the Company a one-time charge of _N/A_ for the conversion of the Customer's billing operations to the Company's system and/or N/A set up fee. These one-time charges shall be due and payable upon the execution of this Agreement.

(b) Subject to the minimum charge set forth in subparagraph (c) below, the Customer shall pay to the Company $6.00 Per Billable Encounter (Does Include Coding). The Company will render invoices for its services monthly. The invoices shall be due and payable in full on receipt by the Customer.

(c) The Company may, at any time after the expiration of one year from the commencement of the initial Term, increase the prices charged by delivery of a written notice at least (90) days prior to effecting any such increase; provided that such increase will not exceed (on a cumulative basis) ten percent (10%) annually.

(d) The Customer shall pay the Company a minimum charge of N/A per month during the term of this Agreement or any extension thereof. Said minimum payment shall be applied against the amount due pursuant to subparagraph (b) above.

(e) In the event the Customer fails to pay in accordance with the terms of this Agreement, the Company may, after 30 days prior notice to the Customer, impose service charges at the rate of 1-1/2% per month on the amounts past due.

(f) There shall be added to any charge or fees payable by Customer this Agreement (i) an amount equal to any local, state or federal sales, use, excise, personal property or other similar taxes or duties and such taxes shall be assumed and paid by the Customer; and (ii) an amount equal to any increase in the postage paid in connection with the performance of the services hereunder which is attributable to a change in the postage rates after the date hereof.

(g) Customer shall pay all collection costs and expenses, including reasonable attorneys fees, incurred by Company in collecting or attempting to collect any past due account.

6.    Performance Warranty.

(a) The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards. Responsibility for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the

31898

**AERAS 1223**

Company or to malfunction of the Company's software and/or equipment; provided that written notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b)    EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## 7.    Limitation of Liability.

(a)    The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above. The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b)    The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company. Customer shall forthwith indemnify the Company with respect to any such claim.

(c)    The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

## 8.    Property Rights.

(a)    Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer. The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b)    Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

(c)    Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company

during the course of this Agreement shall be exclusive property of the Company. Customer agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

## 9.    Storage and Return of Customer Information.

(a)    The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided. At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement. In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs. The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b)    Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c)    In the event of expiration or earlier termination of this Agreement,

(i) the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii) the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of the Company's services and the return of the Company's proprietary information, the Customer and such other data processing company, if any, shall be required as a condition to such access to execute an agreement, in form reasonably acceptable to the Company, that acknowledges that the software programs, report formats, and user manuals used by the Company in the performance of its services are proprietary to the Company and constitute trade secret and confidential information

31898

**AERAS 1224**

and that limits access to, or disclosure of, such programs and related materials to those employees of the Customer whose job description require access thereto consistent with past practice. The Customer shall pay the Company, at its then current

**10.    Default.**

(a) In the event that the Customer shall fail to pay any amounts due to the Company hereunder, or if either party shall fail to perform any of its other material obligations to the other hereunder, and such payment is not made, or other default cured within 30 days after the giving of written notice thereof, then the party who shall have given notice of such default may terminate this Agreement immediately by giving the other party written notice of termination. It is understood and agreed that the failure of the Customer to deliver Billing Information the Company in a medium and format reasonably acceptable to the Company pursuant to Section 3(a) above shall be deemed to be a default of a material obligation hereunder.

(b) No termination pursuant to any of the provisions of this paragraph shall relieve either party of its respective obligations to the other hereunder that arose prior to the effective date of termination.

(c) The provisions of this Section 10 shall not be in limitation of any other right or remedy available at law or in equity to the nondefaulting party.

**11.    Mandatory Arbitration.**

(a) The Company and Customer agree that any controversy or claim arising out of or relating to this Agreement, which the parties hereto are unable to resolve, shall be resolved exclusively by arbitration. The parties expressly waive all rights to file suit over such matters, except as provided in subparagraph (b) below and those other instances in which such right is expressly preserved herein. The party desiring to invoke arbitration shall give written notice to the other party to this Agreement and to the American Arbitration Association. An arbitration pursuant to this Section shall permit no right of appeal or trial de novo in a court of law and shall take place in Birmingham, Alabama. The American Arbitration Association shall select one person who is knowledgeable in data processing systems to determine any controversy or claim submitted by either party hereunder. The decision of the arbitrator is final, and it shall not be set aside except for fraud, misconduct or gross mistake amounting to bad faith by him. The arbitrator is hereby authorized to make any award of relief, including damages. All procedures and facts of arbitration not specifically enumerated in this Agreement shall be settled in accordance with the Commercial Arbitration rules of the American Arbitration Association, and judgment upon the award or decision rendered by the arbitrator may be entered in any court having jurisdiction

rates for time and materials, for staff time spent in providing such assistance, for machine time, for the cost of the media on which the data is stored, for the copying costs, and for transportation costs.

thereof. Any party who does not prevail on an issue submitted to the arbitrator for decision shall bear all costs and expenses of the arbitration and shall reimburse the prevailing party for costs and expenses (including attorneys' and experts' fees) incurred in connection therewith. The arbitrator shall undertake to decide any issue submitted to it pursuant to this Agreement within 90 days of it submission.

(b) The Company and the Customer agree that a violation by either party, their successor or assigns of certain of their respective covenants and obligations contained in this Agreement, including without limitation Sections 8, 9 and 12 can cause irreparable injury to the other party not adequately compensable by money damages, and that each of the parties hereto shall be entitled, without the necessity of posting bond or proving actual damages, in addition to any other rights and remedies they may have hereunder pursuant to the mandatory arbitration provisions, to seek (i) specific performance by the other party of its obligations under this Agreement and (ii) temporary or permanent injunctive relief enjoining and restraining the other party from doing or continuing to do any such act and any other violation or threatened violation thereof.

**12.    Audit.**

The Company recognizes that the Billing Information and statement of accounts rendered by the Company to patients of the Customer may be subject to examination by Medicare, Medicaid, commercial insurers and other third party payers with whom Customer has a billing relationship. The Company shall provide Customer and any other person authorized by Customer access to Customer's data during normal business hours upon at least 10 days advance written notice to the Company; provided that such request for access will not unreasonable disrupt the Company's business operations. The Company shall charge and Customer hereby agrees to pay for the cost of any services or materials used by the Company in supplying such audit assistance, including making copies of such information, at the Company's then current rates for time and materials.

**13.    Miscellaneous.**

(a) This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b) This Agreement contains the entire understanding of the parties with respect to the matters set forth herein. There are no promises,

31898

**AERAS 1225**

covenants or undertakings other than those specifically set forth herein. This Agreement may not be modified or amended except by writing signed by Customer and the Company.

(c) This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d) Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above. Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e) No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by 'he party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f) This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g) In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h) During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to employ or seek to employ any persons currently employed by Nichols TXEN to perform services as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

Nichols TXEN Corporation

By: _____

Title: _VP & GM_____

Date: _11/1/1998_____

Hospitalist, P.C.

By: _____

Title: _President_____

Date: _11/01/99_____

31898

**AERAS 1226**

# Exhibit "A"

**Information provided by hospital:**

1. Patient's name

2. Patient's sex

3. Patient's date of birth

4. Patient's status (single, married, other)

5. Responsible party's name

6. Responsible party's address

7. Responsible party's telephone number

8. Responsible party's employer

9. Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20. Copies of insurance card or cards (front and back)

21. Copy of emergency registration log

31898

**AERAS 1227**

22. Date of service

23  Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1.  Chief complaint documented by physician

2.  Medical history (past medical, family and social history)

3.  Treatment - Itemized for billing purposes

4.  Diagnosis

5.  Discharge status

6.  In-house code blue sheets with demographic information (if applicable)

7.  Physicians' notes regarding discussion with patient, family or others.

**AERAS 1228**

# PROFESSIONAL SERVICES AGREEMENT

**Baptist East**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Alabama ER Administrative Services, P.C., located at 400 Taylor Road, Montgomery, Alabama 36117 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NOW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

1. **Engagement**.

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement. The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

2. **Term**.

The term of this Agreement shall commence on April 1, 1999 and continue until March 31, 2000. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

3. **Duties of the Company**

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer. The bill shall include all services performed by Customer and for its preparation the Customer shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms. In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies. If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c) The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d) The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder. In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account. For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the suspense period selected by the Company to allow for third party payment.

**AERAS 1229**

(e) The Company will prepare and deliver to the Customer a written monthly report reflecting all patient accounts billed on behalf of Customer during the preceding month; all payments made by or on behalf of the Customer's patients during said month with respect to accounts billed by the Company; the patient accounts that have been billed on behalf of the Customer, an aging of said accounts at the end of said preceding month; adjustments in billings, insurance rejections; and other pertinent information with respect to the billings and collections of the Customer's accounts for the preceding month. The Company shall also provide the Customer with such other information reasonably requested by the Customer with respect to services rendered by the Company under this Agreement.

(f) The Company shall, at its expense, hire, train and supervise all the employees required for the services provided herein and provide the necessary office facilities for such personnel. The Company shall pay all the expenses incurred in connection with the services rendered herein, both direct and indirect, including but not limited to postage, forms, printing, office personnel salaries, executive salaries, rent of office facilities for billing, equipment cost and utility cost, provided, however, that the charge for each account billed by the Company shall be increased to reflect increases in the basic postage rate over 32 cents per ounce for mailing of U.S. first class mail.

4.     **Duties of the Customer.**

The Customer shall during the term of this Agreement deliver all of the accounts of its patients for billing and collection by the Company as herein provided. The obligations of the Customer shall include the following:

(a) Customer shall, at its expense, arrange for a "lock box" or other suitable arrangement for the collection of funds paid on the accounts of the patients of the Customer and shall authorize the person responsible for the collection of such funds to furnish the Company information regarding such collections. The Customer shall report to the Company any funds that are paid directly to the Customer on any account that has been delivered by the Customer to the Company for billing and collection hereunder. The Company shall deposit all funds delivered to the Company for the accounts of patients of Customer into the "lock box" or other arrangement established hereunder.

(b) Customer shall advise the Company of the commercial insurance carriers and other third party payers with whom the Customer has direct billing arrangements for the payment of accounts of its patients. Customer will, at its expense, provide the Company such information and authorization as shall be necessary to enable the company to bill such insurance carriers or other payers directly for the accounts of Customer's patients.

5.     **Charges for Services.**
(a)     The Customer shall pay to the Company a one-time charge of __N/A__ for the conversion of the Customer's billing operations to the Company's system and/or N/A set up fee.  These one-time charges shall be due and payable upon the execution of this Agreement.

(b) Subject to the minimum charge set forth in subparagraph (c) below, the Customer shall pay to the Company $7.50 Per Billable Chart (Does Include Coding). The Company will render invoices for its services monthly.  The invoices shall be due and payable in full on receipt by the Customer.

(c) The Company may, at any time after the expiration of one year from the commencement of the initial Term, increase the prices charged by delivery of a written notice at least (90) days prior to effecting any such increase; provided that such increase will not exceed (on a cumulative basis) ten percent (10%) annually.

(d) The Customer shall pay the Company a minimum charge of N/A per month during the term of this Agreement or any extension thereof. Said minimum payment shall be applied against the amount due pursuant to subparagraph (b) above.

(e) In the event the Customer fails to pay in accordance with the terms of this Agreement, the Company may, after 30 days prior notice to the Customer, impose service charges at the rate of 1-1/2% per month on the amounts past due.

(f) There shall be added to any charge or fees payable by Customer this Agreement (i) an amount equal to any local, state or federal sales, use, excise, personal property or other similar taxes or duties and such taxes shall be assumed and paid by the Customer; and (ii) an amount equal to any increase in the postage paid in connection with the performance of the services hereunder which is attributable to a change in the postage rates after the date hereof.

(g) Customer shall pay all collection costs and expenses, including reasonable attorneys fees, incurred by Company in collecting or attempting to collect any past due account.

6.     **Performance Warranty.**

(a)     The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards.  Responsibility for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the Company or to malfunction of the Company's software and/or equipment; provided that written

31898

*AERAS* 1230

notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b)    EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 7.    Limitation of Liability.

(a)  The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above.  The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b)  The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company.  ~~Customer shall forthwith indemnify~~ the Company with respect to any such claim.

(c)    The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

### 8.    Property Rights.

(a)  Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer.  The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b)  Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

(c)  Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company during the course of this Agreement shall be exclusive property of the Company.  Customer

agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

### 9.    Storage and Return of Customer Information.

(a)    The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided.  At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement.  In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs.  The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b)  Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c)  In the event of expiration or earlier termination of this Agreement,

(i)  the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii)  the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of the Company's services and the return of the Company's proprietary information, the Customer and such other data processing company, if any, shall be required as a condition to such access to execute an agreement, in form reasonably acceptable to the Company, that acknowledges that the software programs, report formats, and user manuals used by the Company in the performance of its services are proprietary to the Company and constitute trade secret and confidential information and that limits access to, or disclosure of, such programs and related materials to those employees

31898

AERAS 1231

of the Customer whose job description require access thereto consistent with past practice. The Customer shall pay the Company, at its then current rates for time and materials, for staff time spent in

### 10. Default.

(a) In the event that the Customer shall fail to pay any amounts due to the Company hereunder, or if either party shall fail to perform any of its other material obligations to the other hereunder, and such payment is not made, or other default cured within 30 days after the giving of written notice thereof, then the party who shall have given notice of such default may terminate this Agreement immediately by giving the other party written notice of termination. It is understood and agreed that the failure of the Customer to deliver Billing Information the Company in a medium and format reasonably acceptable to the Company pursuant to Section 3(a) above shall be deemed to be a default of a material obligation hereunder.

(b) No termination pursuant to any of the provisions of this paragraph shall relieve either party of its respective obligations to the other hereunder that arose prior to the effective date of termination.

(c) The provisions of this Section 10 shall not be in limitation of any other right or remedy available at law or in equity to the nondefaulting party.

### 11. Mandatory Arbitration.

(a) The Company and Customer agree that any controversy or claim arising out of or relating to this Agreement, which the parties hereto are unable to resolve, shall be resolved exclusively by arbitration. The parties expressly waive all rights to file suit over such matters, except as provided in subparagraph (b) below and those other instances in which such right is expressly preserved herein. The party desiring to invoke arbitration shall give written notice to the other party to this Agreement and to the American Arbitration Association. An arbitration pursuant to this Section shall permit no right of appeal or trial de novo in a court of law and shall take place in Birmingham, Alabama. The American Arbitration Association shall select one person who is knowledgeable in data processing systems to determine any controversy or claim submitted by either party hereunder. The decision of the arbitrator is final, and it shall not be set aside except for fraud, misconduct or gross mistake amounting to bad faith by him. The arbitrator is hereby authorized to make any award of relief, including damages. All procedures and facts of arbitration not specifically enumerated in this Agreement shall be settled in accordance with the Commercial Arbitration rules of the American Arbitration Association, and judgment upon the award or decision rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any party who does not prevail on an issue

providing such assistance, for machine time, for the cost of the media on which the data is stored, for the copying costs, and for transportation costs.

submitted to the arbitrator for decision shall bear all costs and expenses of the arbitration and shall reimburse the prevailing party for costs and expenses (including attorneys' and experts' fees) incurred in connection therewith. The arbitrator shall undertake to decide any issue submitted to it pursuant to this Agreement within 90 days of it submission.

(b) The Company and the Customer agree that a violation by either party, their successor or assigns of certain of their respective covenants and obligations contained in this Agreement, including without limitation Sections 8, 9 and 12 can cause irreparable injury to the other party not adequately compensable by money damages, and that each of the parties hereto shall be entitled, without the necessity of posting bond or proving actual damages, in addition to any other rights and remedies they may have hereunder pursuant to the mandatory arbitration provisions, to seek (i) specific performance by the other party of its obligations under this Agreement and (ii) temporary or permanent injunctive relief enjoining and restraining the other party from doing or continuing to do any such act and any other violation or threatened violation thereof.

### 12. Audit.

The Company recognizes that the Billing Information and statement of accounts rendered by the Company to patients of the Customer may be subject to examination by Medicare, Medicaid, commercial insurers and other third party payers with whom Customer has a billing relationship. The Company shall provide Customer and any other person authorized by Customer access to Customer's data during normal business hours upon at least 10 days advance written notice to the Company; provided that such request for access will not unreasonable disrupt the Company's business operations. The Company shall charge and Customer hereby agrees to pay for the cost of any services or materials used by the Company in supplying such audit assistance, including making copies of such information, at the Company's then current rates for time and materials.

### 13. Miscellaneous.

(a) This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b) This Agreement contains the entire understanding of the parties with respect to the matters set forth herein. There are no promises, covenants or undertakings other than those specifically set forth herein. This Agreement may not

31898

be modified or amended except by writing signed by Customer and the Company.

(c) This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d) Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above. Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e) No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f) This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g) In the event any one or more of the provisions of this Agreement shall for any reason be

held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h) During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to employ or seek to employ any persons currently employed by Nichols TXEN to perform services as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

**Nichols TXEN Corporation**

By: _William L. Cooler_

Title: _VP & GM_

Date: _1/22/1999_

**Alabama ER Administrative Services, P.C.**

By: _[signature]_

Title: _President_

Date: _1/22/99_

AERAS 1233

# Exhibit "A"

**Information provided by hospital:**

1.  Patient's name

2.  Patient's sex

3.  Patient's date of birth

4.  Patient's status (single, married, other)

5.  Responsible party's name

6.  Responsible party's address

7.  Responsible party's telephone number

8.  Responsible party's employer

9.  Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20. Copies of insurance card or cards (front and back)

21. Copy of emergency registration log

31898

**AERAS 1234**

22. Date of service

23. Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1. Chief complaint documented by physician

2. Medical history (past medical, family and social history)

3. Treatment - Itemized for billing purposes

4. Diagnosis

5. Discharge status

6. In-house code blue sheets with demographic information (if applicable)

7. Physicians' notes regarding discussion with patient, family or others.

AERAS 1235

# PROFESSIONAL SERVICES AGREEMENT

**Baptist Prattville**

THIS AGREEMENT is made and entered into by and between Nichols TXEN Corporation, a corporation with its principal offices located at 31 Inverness Center, Suite 500, Birmingham, Alabama 35242 (hereinafter the "Company") and Alabama ER Administrative Services, P.C., located at 124 South Memorial Drive, Prattville, Alabama 36067 (hereinafter the "Customer");

## RECITALS

The Company is engaged in providing billing and collection services for physician practice groups. The Customer desires to retain the services provided by the Company. Customer and the Company have entered into this Agreement to evidence the terms and conditions upon which such services will be provided.

## AGREEMENT

NCW, THEREFORE, in consideration of the aforesaid premises and the mutual covenants and conditions herein contained, the parties do hereby agree as follows:

1. **Engagement**.

Customer hereby designates and appoints the Company as its agent and attorney-in-fact for billing and collecting the accounts of patients of the Customer on the terms and conditions of this Agreement. The Company hereby accepts such appointment and designation and agrees to provide billing and collection services for the Customer on the terms and conditions hereinafter provided.

2. **Term**.

The term of this Agreement shall commence on November 1, 1998 and continue until October 31, ~~2000~~ *1999*. Thereafter, this Agreement shall be automatically renewed for successive terms of one year each unless terminated by either party upon written notice to the other party not less than 120 days prior to the last day of the term of this Agreement or any renewal term hereof, as the case may be.

3. **Duties of the Company**.

The Company shall provide billing and collection services for the accounts of patients of the Customer during the term of this Agreement as herein provided. The obligations of the Company shall include the following:

(a) The Company shall promptly prepare an appropriate bill based on fee schedules as shall be provided to Company by Customer. The bill shall include all services performed by Customer and for its preparation the Customer shall forward to the Company the patient record. The patient record shall contain all information listed in "Exhibit A".

(b) The bill shall be sent to the patient, third party responsible for payment or the patient's insurance carrier, along with appropriate insurance forms. In addition, Company shall, as necessary, rebill on behalf of Customer, all such patients, third party or insurance companies. If the bill remains unpaid the Company shall initiate additional collection procedures with an outside collection agency or as directed by the Customer.

(c) The Company will respond to reasonable telephone and written inquiries from persons to whom statements are mailed by the Company, maintain information currently on accounts of patients of Customer billed by the Company, indicating those paid and unpaid, process insurance rejections, and process and mail additional information reasonably required by individual patients, Medicare, Medicaid, commercial insurance companies or any other person obligated to make payment for services rendered by the Customer for the account of its patient.

(d) The Company will use reasonable efforts and due care in the collection of the accounts of patients of Customer billed by the Company hereunder. In the event that a patient's account is not collected within ninety (90) days after the preparation and delivery of a statement for such account, the Company shall, at the request of Customer, assign the collection of the account to a collection agency designated by the Customer, and the Company shall have no further obligation with respect to the collection of said assigned account. For purposes hereof, delivery of a statement for a patient's account shall be deemed to have occurred when the statement delivered to the patient first demands payment from the patient after the expiration of the suspense period selected by the Company to allow for third party payment.

**AERAS 1236**

(e) The Company will prepare and deliver to the Customer a written monthly report reflecting all patient accounts billed on behalf of Customer during the preceding month; all payments made by or on behalf of the Customer's patients during said month with respect to accounts billed by the Company; the patient accounts that have been billed on behalf of the Customer, an aging of said accounts at the end of said preceding month; adjustments in billings, insurance rejections; and other pertinent information with respect to the billings and collections of the Customer's accounts for the preceding month. The Company shall also provide the Customer with such other information reasonably requested by the Customer with respect to services rendered by the Company under this Agreement.

(f) The Company shall, at its expense, hire, train and supervise all the employees required for the services provided herein and provide the necessary office facilities for such personnel.   The Company shall pay all the expenses incurred in connection with the services rendered herein, both direct and indirect, including but not limited to postage, forms, printing, office personnel salaries, executive salaries, rent of office facilities for billing, equipment cost and utility cost, provided, however, that the charge for each account billed by the Company shall be increased to reflect increases in the basic postage rate over 32 cents per ounce for mailing of U.S. first class mail.

## 4.    Duties of the Customer.

The Customer shall during the term of this Agreement deliver all of the accounts of its patients for billing and collection by the Company as herein provided.   The obligations of the Customer shall include the following:

(a) Customer shall, at its expense, arrange for a "lock box" or other suitable arrangement for the collection of funds paid on the accounts of the patients of the Customer and shall authorize the person responsible for the collection of such funds to furnish the Company information regarding such collections.   The Customer shall report to the Company any funds that are paid directly to the Customer on any account that has been delivered by the Customer to the Company for billing and collection hereunder. The Customer shall deposit all funds delivered to the Company for the accounts of patients of Customer into the "lock box" or other arrangement established hereunder.

(b) Customer shall advise the Company of the commercial insurance carriers and other third party payers with whom the Customer has direct billing arrangements for the payment of accounts of its patients.  Customer will, at its expense, provide the Company such information and authorization as shall be necessary to enable the company to bill

such insurance carriers or other payers directly for the accounts of Customer's patients.

## 5.    Charges for Services.

(a)    The Customer shall pay to the Company a one-time charge of __N/A__ for the conversion of the Customer's billing operations to the Company's system and/or $2,500.00 set up fee. These one-time charges shall be due and payable upon the execution of this Agreement.

(b) Subject to the minimum charge set forth in subparagraph (c) below, the Customer shall pay to the Company $7.50 Per Billable Chart (Does Include Coding). The Company will render invoices for its services monthly.   The invoices shall be due and payable in full on receipt by the Customer.

(c) The Company may, at any time after the expiration of one year from the commencement of the initial Term, increase the prices charged by delivery of a written notice at least (90) days prior to effecting any such increase; provided that such increase will not exceed (on a cumulative basis) ten percent (10%) annually.

(d) The Customer shall pay the Company a minimum charge of N/A per month during the term of this Agreement or any extension thereof. Said minimum payment shall be applied against the amount due pursuant to subparagraph (b) above.

(e) In the event the Customer fails to pay in accordance with the terms of this Agreement, the Company may, after 30 days prior notice to the Customer, impose service charges at the rate of 1-1/2% per month on the amounts past due.

(f) There shall be added to any charge or fees payable by Customer this Agreement (i) an amount equal to any local, state or federal sales, use, excise, personal property or other similar taxes or duties and such taxes shall be assumed and paid by the Customer; and (ii) an amount equal to any increase in the postage paid in connection with the performance of the services hereunder which is attributable to a change in the postage rates after the date hereof.

(g) Customer shall pay all collection costs and expenses, including reasonable attorneys fees, incurred by Company in collecting or attempting to collect any past due account.

## 6.    Performance Warranty.

(a)  The Company agrees to use its best efforts in the exercise of due care in the performance of its obligations hereunder, which care shall conform to proper data processing standards.  Responsibility for due care and the performance of the services by the Company shall be limited to the correction of any errors which are due to mistakes by employees of the

AERAS 1237

Company or to malfunction of the Company's software and/or equipment; provided that written notice of such error(s) is delivered to the Company within 30 days after discovery thereof by Customer but in no event later than 90 days after delivery of a report or statement to the Customer.

(b) EXCEPT FOR THE WARRANTIES HEREIN SET FORTH, THE COMPANY DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

### 7.    Limitation of Liability.

(a) The Company shall not be responsible for the correction of any error or omission resulting directly or indirectly from failure by the Customer to properly execute any of its responsibilities under Section 4 above. The Company shall in no event be liable for consequential damages suffered by the Customer as a result of the performance of the services under this Agreement.

(b) The Company shall not be liable to the Customer or any other person for noncompliance with any applicable law or regulation regarding Billing Information provided by the Customer for processing by the Company. Customer shall forthwith indemnify the Company with respect to any such claim.

(c) The Company shall not be liable or deemed to be in default for any failure in performance of this Agreement resulting directly or indirectly from acts of God, civil or military authority, acts of public enemy, war, accidents, fires, explosions, earthquakes, floods, the elements, electrical failures, strikes, labor disputes, shortages of suitable parts, materials, transportation, or any similar or dissimilar causes beyond the reasonable control of the Company; provided that the Company shall use its best efforts to minimize and/or to eliminate any disruption in services.

### 8.    Property Rights.

(a) Any data furnished by the Customer for use by the Company or generated as a result of services performed under this Agreement shall remain the sole property of the Customer. The Company agrees to exercise reasonable care in maintaining the confidential nature of such information.

(b) Any media, including magnetic tapes, furnished by Customer pursuant to this Agreement shall remain the sole property of the Customer.

(c) Any ideas, concepts, know how, or techniques relating to data processing or other handling of data developed or used by the Company

during the course of this Agreement shall be exclusive property of the Company. Customer agrees to treat such information as the Company's intangible proprietary information, intellectual property, and a trade secret and to use reasonable care in maintaining the confidentiality of such information.

### 9.    Storage and Return of Customer Information.

(a) The Company shall store, at its expense, the Billing Information delivered by the Customer to the Company until returned and disposed of as herein provided. At the Customer's request, the Billing Information shall be returned to the Customer upon termination of this Agreement. In the absence of specific instructions concerning the disposition of the Billing Information, such records may be destroyed in the discretion of the Company on or after 7 years after delivery of such information to the Company or 90 days after the date of termination of this Agreement, whichever first occurs. The Company shall not destroy such information without providing Customer with 30 days prior written notice of its intention to destroy such information.

(b) Except as provided in subparagraph (a) above, the Company shall have no responsibility for the backup storage of Customer's Billing Information and the monthly reports provided hereunder.

(c) In the event of expiration or earlier termination of this Agreement,

(i) the Customer shall promptly return to the Company all of its proprietary information including, without limitation, user manuals and report formats; and

(ii) the Company shall, at the request of the Customer, reasonable assist the Customer in transferring the information provided by the Customer for processing and the files and processed data therefrom to the Customer or to another data processing company in a manner that is consistent with usual and customary practices in the computer services industry.

In the event that Customer desires to provide another data processing company access to the premises of the Customer at any time prior to the termination of the Company's services and the return of the Company's proprietary information, the Customer and such other data processing company, if any, shall be required as a condition to such access to execute an agreement, in form reasonably acceptable to the Company, that acknowledges that the software programs, report formats, and user manuals used by the Company in the performance of its services are proprietary to the Company and constitute trade secret and confidential information

31898

AERAS 1238

and that limits access to, or disclosure of, such programs and related materials to those employees of the Customer whose job description require access thereto consistent with past practice. The Customer shall pay the Company, at its then current

**10.    Default.**

(a)  In the event that the Customer shall fail to pay any amounts due to the Company hereunder, or if either party shall fail to perform any of its other material obligations to the other hereunder, and such payment is not made, or other default cured within 30 days after the giving of written notice thereof, then the party who shall have given notice of such default may terminate this Agreement immediately by giving the other party written notice of termination. It is understood and agreed that the failure of the Customer to deliver Billing Information the Company in a medium and format reasonably acceptable to the Company pursuant to Section 3(a) above shall be deemed to be a default of a material obligation hereunder.

(b)  No termination pursuant to any of the provisions of this paragraph shall relieve either party of its respective obligations to the other hereunder that arose prior to the effective date of termination.

(c)  The provisions of this Section 10 shall not be in limitation of any other right or remedy available at law or in equity to the nondefaulting party.

**11.    Mandatory Arbitration.**

(a)  The Company and Customer agree that any controversy or claim arising out of or relating to this Agreement, which the parties hereto are unable to resolve, shall be resolved exclusively by arbitration. The parties expressly waive all rights to file suit over such matters, except as provided in subparagraph (b) below and those other instances in which such right is expressly preserved herein. The party desiring to invoke arbitration shall give written notice to the other party to this Agreement and to the American Arbitration Association. An arbitration pursuant to this Section shall permit no right of appeal or trial de novo in a court of law and shall take place in Birmingham, Alabama. The American Arbitration Association shall select one person who is knowledgeable in data processing systems to determine any controversy or claim submitted by either party hereunder. The decision of the arbitrator is final, and it shall not be set aside except for fraud, misconduct or gross mistake amounting to bad faith by him. The arbitrator is hereby authorized to make any award of relief, including damages. All procedures and facts of arbitration not specifically enumerated in this Agreement shall be settled in accordance with the Commercial Arbitration rules of the American Arbitration Association, and judgment upon the award or decision rendered by the arbitrator may be entered in any court having jurisdiction

rates for time and materials, for staff time spent in providing such assistance, for machine time, for the cost of the media on which the data is stored, for the copying costs, and for transportation costs.

thereof. Any party who does not prevail on an issue submitted to the arbitrator for decision shall bear all costs and expenses of the arbitration and shall reimburse the prevailing party for costs and expenses (including attorneys' and experts' fees) incurred in connection therewith. The arbitrator shall undertake to decide any issue submitted to it pursuant to this Agreement within 90 days of it submission.

(b)  The Company and the Customer agree that a violation by either party, their successor or assigns of certain of their respective covenants and obligations contained in this Agreement, including without limitation Sections 8, 9 and 12 can cause irreparable injury to the other party not adequately compensable by money damages, and that each of the parties hereto shall be entitled, without the necessity of posting bond or proving actual damages, in addition to any other rights and remedies they may have hereunder pursuant to the mandatory arbitration provisions, to seek (i) specific performance by the other party of its obligations under this Agreement and (ii) temporary or permanent injunctive relief enjoining and restraining the other party from doing or continuing to do any such act and any other violation or threatened violation thereof.

**12.    Audit.**

The Company recognizes that the Billing Information and statement of accounts rendered by the Company to patients of the Customer may be subject to examination by Medicare, Medicaid, commercial insurers and other third party payers with whom Customer has a billing relationship. The Company shall provide Customer and any other person authorized by Customer access to Customer's data during normal business hours upon at least 10 days advance written notice to the Company; provided that such request for access will not unreasonable disrupt the Company's business operations. The Company shall charge and Customer hereby agrees to pay for the cost of any services or materials used by the Company in supplying such audit assistance, including making copies of such information, at the Company's then current rates for time and materials.

**13.    Miscellaneous.**

(a)  This Agreement shall be governed by and construed accordance with the laws of the State of Alabama.

(b)  This Agreement contains the entire understanding of the parties with respect to the matters set forth herein. There are no promises,

31898

**AERAS 1239**

covenants or undertakings other than those specifically set forth herein. This Agreement may not be modified or amended except by writing signed by Customer and the Company.

(c) This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective successors and assigns.

(d) Any notice required or permitted to be sent under this Agreement shall be delivered by hand or mailed by certified mail, return receipt requested, postage prepaid, to the address of the parties set forth above. Notice so sent will be deemed effective when personally delivered or two days after being so deposited in the mail; provided that a notice not given as above provided shall be deemed to be delivered upon actual receipt of the party to whom it is addressed.

(e) No term or provision hereof shall be deemed to be waived and no breach excused unless such waiver or consent shall be in writing and signed by the party claimed to have waived or consented. Any consent by any party to, or waiver of, a breach by the other, whether express or implied, shall not constitute a consent to, waiver of, or excuse for any other different or subsequent breach.

(f) This Agreement may be executed in counterparts each of which when so executed shall be deemed to be an original, but all of which shall constitute one and the same instrument.

(g) In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the remaining provisions of this Agreement shall be unimpaired.

(h) During the term of this Agreement, and any renewals or extensions hereof, and for a period of six (6) months thereafter, the Customer agrees not to employ or seek to employ any persons currently employed by Nichols TXEN to perform services as employees, independent contractors, or otherwise. Any such violation will result in a $10,000 fee.

IN WITNESS WHEREOF, the undersigned, each acting under due and proper authority, have executed this Agreement as of the date indicated below.

**Nichols TXEN Corporation**

By: _R.C. _____

Title: VP & GM _____

Date: 11/1/1998 _____

**Alabama ER Administrative Services, P.C.**

By: _____

Title: Pres./Dir. _____

Date: 11/1/98 _____

# Exhibit "A

**Information provided by hospital:**

1. Patient's name

2. Patient's sex

3. Patient's date of birth

4. Patient's status (single, married, other)

5. Responsible party's name

6. Responsible party's address

7. Responsible party's telephone number

8. Responsible party's employer

9. Insured's name (if different from patient)

10. Insured's sex

11. Insured's date of birth

12. Insured's address

13. Relationship to insured

14. Insured's employer (if group policy)

15. Insured's employer's address

16. Name of insurance company

17. Address of insurance company

18. Policy certificate number

19. Group policy number

20 Copies of insurance card or cards (front and back)

21. Copy of emergency registration log

31898

**AERAS 1241**

22. Date of service

23. Dictation

24. Copy of release of information and insurance assignment of benefits

25. HMO / PPO authorization numbers approvals (if applicable)

26. Copy of paid at time of service receipt (if applicable)

27. Radiology reports

28. Triage Notes

**Information provided by physician:**

1. Chief complaint documented by physician

2. Medical history (past medical, family and social history)

3. Treatment - Itemized for billing purposes

4. Diagnosis

5. Discharge status

6. In-house code blue sheets with demographic information (if applicable)

7. Physicians' notes regarding discussion with patient, family or others.

31898

**AERAS 1242**

Lockboxes

AERAS 1243

102

# WHOLESALE LOCKBOX REMITTANCE PROCESSING SERVICE AGREEMENT

This Agreement is entered into this ____5____ day of __November__, year of __1998__, between AmSouth Bank, an Alabama banking corporation and a member of the Federal Reserve System, *Hospitality PC* with its principal place of business at 1900 5th Avenue North, Birmingham, Alabama 35203 ("Bank") and __Alabama Emergency Room Administrative Services, PC__ with its principal place of business at __4160 Carmichael Rd, Suite 04, Mtg, AL 36106__ ("Client").

WHEREAS, Bank, through its computer operations and facilities offers a remittance processing service which is designed to receive and process payments which are sent by credit customers of the Client, to certain lockboxes, or locations, located in Birmingham, Alabama, or as otherwise designated; and

WHEREAS, Client desires to utilize such services under the terms and conditions hereinbelow set forth; and

WHEREAS, Client desires to use Bank as a depository agent for payments received through Bank's remittance processing service, and

WHEREAS, Bank is willing to be Client's depository agent for such payments pursuant to the terms and conditions of this Agreement:

NOW THEREFORE, in consideration of these mutual premises and benefits and for good and valuable consideration, the sufficiency of which is herein acknowledged, the parties hereto agree as follows:

## SECTION I
## SERVICES PROVIDED BY BANK

A.      Bank will provide Client with captured remittance data, documents, address changes and customer correspondence, deposit information and control reports, and shall deposit all processed remittances to Client's designated accounts at Bank's offices in Birmingham, Alabama, all as more particularly described in the "Remittance Processing Definition" (the Definition) which is attached hereto as Exhibit "A" and incorporated herein by reference. Any revisions or updates to the Definition which may be made by Bank or Client from time to time shall be incorporated into the Definition and shall become effective after both parties have agreed on said changes and both parties have signed the revised Definition.

B.      In performing the services defined within this Agreement, and in the selection and use of facilities, equipment, machines and personnel required for such performance, and in the custody and safekeeping of materials furnished by Client, Bank shall exercise ordinary care and diligence, subject to the limitations set forth in this paragraph. The parties recognize that there are no existing industry standards which are commonly accepted as a standard of ordinary care and diligence for the performance of services encompassed by this Agreement. Accordingly, Client agrees that Bank shall be deemed to be exercising ordinary care and diligence in the performance of the duties required of Bank under this Agreement if Bank substantially follows the procedures and practices set forth in the Definition.

C.      Bank agrees to act as depository agent for Client pursuant to the provisions of this Agreement for the term hereof, as it may be extended. In addition, Client shall be bound by all rules and regulations of Bank relating to Checking Accounts (and other depository accounts) as such rules may be amended by Bank from time to time. Bank agrees to accept for deposit all remittance payments which may be provided during the term of this Agreement at a rate per item received that shall be equal to current applicable service charge schedule rates. Refer to Section III for specific pricing terms. Charges for Remittance Processing (as set forth in the Definition) are contained in Exhibit B, the Remittance Processing Fee Schedule ("Fee Schedule") attached hereto and incorporated herein by reference.

## SECTION II
## OBLIGATIONS OF CLIENT

A.      Client agrees to provide Bank with unrestricted and exclusive access to Client's designated lockbox locations, in order that Bank might receive all remittance documents printed according to the

**AERAS 1244**

specifications outlined in the Definition. Documents and envelopes containing the remittance documents must be of a size and paper quality so as to be properly processed through Bank's equipment without damage. Such standards will be mutually agreed upon by Bank and Client.

B.    Insofar as the performance of services under this Agreement by Bank requires data, documents, information or materials of any nature to be furnished by Client, or for personnel, Client hereby agrees to furnish all data, documents, information and materials and to perform all such acts and to make appropriate personnel, records, and facilities available to Bank, all within such time and in such form or manner as may reasonably be necessary in order to enable Bank to perform the required services promptly and in a workmanlike manner.

C.    In the event the equipment used by Bank to render services hereunder rejects any remittance document because such document is defective, the parties agree that the charges for document rejects under the Fee Schedule then in effect will apply.

## SECTION III
## PRICES FOR SERVICES

A.    Bank's fees and charges for the services provided herein are set forth in the Fee Schedule. The method of billing for services provided herein is set forth in Exhibit "A". Bank may render a statement for all services and reimbursements defined by this Agreement from time to time following the commencement of said services, and Client shall pay the same to Bank within thirty (30) days. If the payment is not received within thirty (30) days, Bank will assess a one and one half percent (1.5%) late fee to the balance due per month until such time that the balance due is paid in full.

B.    It is understood and agreed between the parties hereto that the fees and charges provided for in this Agreement and set out in the Fee Schedule, are exclusive of any applicable taxes or assessments, however designated, which may be levied upon or assessed by any governmental or taxing authority having jurisdiction in the matter, and exclusive of the cost of any printed forms, envelopes, postage or materials which, by the terms hereof, are to be furnished by Client at its own expense. In the event any such tax, assessment, form, postage, envelope or other material is advanced or supplied by the Bank at Client's request, Client shall reimburse Bank for the expense thus incurred within thirty (30) days from the date such charges are invoiced to Client.

C.    Bank shall have the right to increase or decrease charges imposed for services rendered hereunder by sixty (60) days prior written notice. The Client shall have the option to reject such price increase and terminate this contract within six (6) months after notification of any increase by the Bank. In the event the Client chooses to terminate this Agreement due to a price increase, the price(s) currently in effect at the time of the notification shall apply until this Agreement is actually terminated. Additionally, the Bank reserves the exclusive and uncontested right to at any time setoff and apply any and all deposits, credits, allowances, funds, securities, assets, and properties for all accounts of the Client now or hereafter owing or existing under this Agreement, whether or not matured or liquidated.

D.    If overtime or special handling is requested by Client, or is required to meet the terms and conditions of this Agreement because of delays, not the fault of Bank, in receipt of data, documents, input material or other materials to be furnished by Client under this Agreement (such as postal service or other transport delivery delays), Client agrees to pay Bank, at its established rates in effect at that time, for the out-of-pocket expense related thereto. If, because of such circumstances, it becomes necessary for Bank to return the finished product to Client by special carrier, special courier, or special messenger, Client shall likewise pay or reimburse Bank for the expense thereby incurred. Any and all such reimbursements, charges and expenses shall be included in and payable as part of the statement provided for herein.

AERAS 1245

## SECTION IV
## TERM OF AGREEMENT

A.    This Agreement shall be effective as of the date hereof and shall continue in full force and effect for a period of one (1) year.

B.    This Agreement shall be automatically renewed for consecutive one (1) year terms, unless terminated by Bank or Client as follows:

(1)    This Agreement may be terminated at any time by the mutual agreement of the parties hereto;

(2)    Either party may terminate this Agreement at any time by giving at least ninety (90) days prior written notice to the other.

(3)    If the Bank or Client (i) ceases to conduct business in the ordinary sense, (ii) fails to observe, keep or perform any term or condition of this Agreement required to be observed, kept or performed by that party; (iii) files a petition in bankruptcy, petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets or commences any proceeding under any bankruptcy, dissolution or reorganization law or statute or should there have been filed any such petition or application or any such proceeding against it and such petition or application or proceeding remains undismissed for a period of thirty (30) days or more; or (iv) becomes insolvent or generally does not pay its debts as they become due or makes a general assignment for the benefit of creditors; or (v) has any substantial part of its property become subject to any levy, seizure, assignment, application for sale for or by any creditor or governmental agency; or (vi) be a party to an acquisition or substantially impairs its ability to perform its obligations under this Agreement; or (vii) defaults under any other agreement between the parties, the other party shall have the right to terminate this Agreement; provided, however, that the party seeking to terminate the Agreement gives the other party a written notice of any and all such failure(s) claimed to be a breach of the terms or conditions of this Agreement, and the party receiving said notices fails to remedy the breach within ten (10) days after its receipt of said notice(s). Upon the termination of the ten (10) day period provided for above, the non-defaulting party may immediately terminate this Agreement by giving the defaulting party written notice. Upon termination, this Agreement shall have no further force and effect, except as reserved below, and any property or rights of the other party, tangible or intangible, shall forthwith be returned to it within thirty (30) days after the later to occur of (a) termination of the Agreement, or (b) the last date that Bank receives any such property or rights.

C.    Termination of this Agreement shall not terminate Client's obligation to pay Bank for all services performed under the Agreement prior to discontinuance of performance by Bank due to termination. Upon termination, Bank shall complete in a timely fashion, in accordance with the Agreement, all servicing, deliveries, and other obligations, required to be performed by it under the terms of this Agreement and return any lockbox keys belonging to Client.

## SECTION V
## CONFIDENTIAL INFORMATION AND
## PROPRIETARY RIGHT IN DATA

A.    All information of a business nature relating to the assets, liabilities or other business affairs disclosed to Bank by Client and Client's customers in connection with this Agreement is confidential. Bank shall not, without the express prior written consent of Client, disclose, or permit access to any such information by any person, firm or corporation and Bank shall cause its officers, employees and agents to take such action as shall be necessary or advisable, to preserve and protect the confidentiality of disclosing such information to persons required to have access thereto for the performance of this Agreement, or to any other party to which the Bank may be required by law to report such information.

AERAS 1246

B.    Client agrees to hold confidential and to use only in connection with the services provided under this Agreement all information furnished to Client by Bank, including, but not limited to Bank's product and service pricing structure, system design, programming techniques or other unique techniques.

C.    Bank's and Client's obligations and agreements under this paragraph shall not apply to any information supplied that:

(1)    was known to either party prior to the disclosures by the other, or
(2)    is or becomes generally available to the public other than by breach of this Agreement, or
(3)    otherwise becomes lawfully available on a non-confidential basis from a third-party who is not under an obligation of confidence to either party.

D.    Not withstanding anything to the contrary contained herein, it is authorized and agreed by the parties hereto that the performance of said services are or might be subject to regulation and examination by authorized representatives of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Board of Directors of the Federal Deposit Insurance Corporation, and/or State regulatory agency reports, information, assurances, or other data as may be required by them under applicable laws and regulations.

E.    Client agrees that any specifications or programs developed by Bank in connection with this Agreement or supplied or made available to Client by Bank are the exclusive property of Bank, its agents, suppliers, or contractors, and further agrees that such material shall not be copied or used in any manner or for any purpose without the express written consent of Bank.  This clause shall survive the termination of the Agreement.

F.    All agreements in Section V relating to confidential or proprietary information shall survive the termination of this Agreement.

## SECTION VI
## RISK OF LOSS AND INDEMNIFICATION

A.    Bank agrees to be responsible for damage, destruction, theft or loss of all remittance payments of Client's customers while such payments are in the Bank's possession.  The Bank shall be deemed to have possession of such remittance payments only at that point in time when the Bank has established sufficient data (to include the microfilming of all checks or other items received as payments and the placement of the Bank's endorsement on such checks and items) to enable the Bank to transfer to Client those funds represented by the remittances received by the Bank.  Bank shall, however, be responsible for theft or loss of remittance payments prior to the time of possession as defined above if such theft or loss is proven to be the direct result of Bank employee fraud.

Bank will make all reasonable efforts to properly process and control remittance payments received in cash or in the form of gift certificates.  Bank shall not, however, be responsible for any claimed loss or mysterious disappearance of cash, gift certificates or other payments in bearer form unless such loss is proven to be the direct result of employee fraud or employee theft.  The Bank shall not be responsible for the loss, theft or disappearances of remittance payments of any kind or description while such payments are in the possession of the United States Postal Service, Purolator Courier, Federal Express or any other independent courier.

B.    Client agrees the liability of Bank shall in every event be limited to the amount of actual direct damages, if any sustained by Client and Client further agrees the liability of Bank shall not extend to any indirect, special or consequential damages, if any, sustained by Client as a result of the services provided under this Agreement or the risks assumed by Bank as stated in Paragraph A above.

AERAS 1247

C.     Client shall indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including but not limited to reasonable legal and accounting fees and expenses) or claims asserted against Bank by third parties and:

(1)     arising out of information provided to Bank by Client, or;

(2)     arising out of information provided to Bank by officers, employees or agents of Client, or;

(3)     arising out of the use of such information when furnished by Bank to Client, or;

(4)     arising out of the use of such information when furnished by Bank to other third persons at Client's request, or;

(5)     arising out of the use of such information furnished by Bank to officers, employees or agents of Client.

D.     Bank shall not be liable in any form for the insolvency, neglect, misconduct, mistake or default of any collection or correspondence bank or for the loss or destruction of payment(s) in transit or under the possession of others.

E.     In no event shall Bank be liable with respect to the following:

(1)     Suspension of performance of all of Bank's obligations, responsibilities and covenants hereunder, whether expressed or implied, if at any time, or from time to time, compliance therewith should be prevented or hindered by, or be in conflict with, any federal or state law, regulation or rule, the order of any court of competent jurisdiction, any act of God or of the public enemy, war, epidemic, strike, or work stoppages of the U.S. Postal Service and commercial carrier(s), or courier(s), lockout, riot, weather conditions, equipment failure or malfunction, material shortage, electric power disruption or shortage, telecommunication failure or other conditions or circumstances not wholly controlled by the Bank and which would prohibit substantial performance under this Agreement.

(2)     Reliance upon and use without verification, of any and all information, data and instructions at any time submitted by Client, the accuracy or inaccuracy thereof, for the wording or text authored or submitted by Client to Bank for any mailers, or periodic statements to be furnished by Client to Bank, or for the noncompliance of such information, data, instructions, wording or text with applicable laws and regulations.

(3)     Conditional, stale-dated (older than six months), and future-dated remittances processed through the lockbox. These remittances include instruments coded as "Paid in Full." The high speed nature of lockbox processing will not allow for segregating these types of payments. Bank will be in no way responsible for payments of this nature which are deposited into Client's account. Client will be responsible for notifying their payors to send directly to client any payments which should not be processed through the lockbox given the limitations stated above.

(4)     The deposit of checks or other items made payable to multiple parties. If Bank deposits a check or item made payable to multiple parties, Client agrees to indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including, but not limited to, reasonable legal and accounting fees and expenses) arising from such deposit or claims asserted against the Bank by any joint payee of the check or any other third party as a result of the handling or deposit of the check.

**AERAS 1248**

## SECTIONS VII
## NOTICES

Any written notice required or permitted to be given by Client to Bank hereunder shall be addressed to:

AMSOUTH BANK
P. O. Box 11007
Birmingham, AL  35288

Any written notice required or permitted to be given by Bank to Client under this Agreement shall be delivered to the address for Client listed in Exhibit A.  All written notices shall be delivered in person to the above mentioned entities or shall be sent by certified mail with a return receipt requested, postage prepaid and addressed as provided above.  The foregoing requirement shall not apply to routine correspondence, or correspondence transmitted on a regular basis such as bills, reports, etc.  The parties to this Agreement, by notice in writing, may designate another address or office to which notices shall be given pursuant to this Agreement.

## SECTION VIII
## ADDITIONAL PROVISIONS

A.    Nothing herein contained shall be construed as constituting a partnership, joint venture or agency relationship between Client and Bank, except for Bank's status as Client's depository agent.

B.    This Agreement shall not be assignable in whole or in part by either party without the other party's prior written consent, which consent shall not be unreasonably withheld.  However, Bank may assign this Agreement to any successors or subsidiaries of Bank or of the parent company of Bank, AmSouth Bancorporation, without obtaining such consent from Client.

C.    Each party to this Agreement hereby represents and warrants to the other that it has the full right, power and authority to enter into and perform this Agreement in accordance with all the terms, provisions, covenants and conditions hereof, and that the execution and delivery of this Agreement has been duly authorized by proper corporate action.

D.    Any delay, waiver, or omission by Client or Bank to exercise any right or power arising from any breach of default of the other party in any terms, provisions, or covenants of this Agreement shall not be construed to be a waiver by Client or Bank of any subsequent breach or default of the same or other party.

E.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns subject to prohibitions against assignment listed above.

F.    This Agreement (including exhibits attached hereto) constitutes the entire agreement between parties hereto relating to the subject matter hereof, and all prior negotiations, agreements and understandings, whether oral or written, are superseded hereby.  No modification or amendment of this Agreement shall be effective unless and until set forth in writing and signed by the parties hereto other than any pricing modifications as provided for in Section III or any modifications to Account Rules as provided for in Section I.

G.    Bank agrees to allow Client, its agents or employees reasonable access to Bank's facilities in order to audit and review Client's documents and records in the custody of Bank.  Client agrees to notify Bank in writing of the names of such employees or agents who are authorized to have access to such records at least 2 days prior to the requested date of such inspections.

H.    This Agreement shall be governed in all respects by and construed in accordance with the laws of the State of Alabama.

AERAS 1249

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers, as of the day and year first above written.

AmSouth Bank

Signature: _Mindy Taylor_

Print Name: _Mindy Taylor_

Its: _Asst Vice President_

Client: _AERAS, PC_

Signature: _Lisa Dobbins_

Print Name: _____

Its: _Bookkeeper_

**AERAS 1250**

EXHIBIT "A"
## WHOLESALE REMITTANCE PROCESSING DEFINITION

The Bank's function in remittance processing is to act as agent for the Client by collecting and processing remittance payments. The Bank, as acting depository agent of the Client, will collect from the post office, or other points, all mail which contains remittance payments, and process remittance payments under the operating parameters set forth in this exhibit.

## PROCESSING INFORMATION

**Lockbox Depository Account Number:** *Hospitalist, PC   Bnc-downtown*
*0222 7479*

Any correspondence between the Client and the Bank concerning normal operations of the remittance processing service shall be addressed as follows:

Name: *Nichols TREN*                 Contact Name: *Suzie Cooper*
Address: *1861  1st Ave. South*                              *205*
*Midtown Center #400*
*Birmingham, AL  35233*    Telephone: *256 - 320 · 2562*

Deliver to Alternate Address: ___   Return Package (Photocopies of checks, envelopes, all other documents received with payment.)
___   Dishonored Items (Deposited items returned for insufficient funds will be redeposited. Items returned a second time for insufficient funds will be returned to the Client and charged against the depository account.)

Alternate Address: _____

_____

Contact Name & Phone: _____

Package Delivery Service: ___ U.S. Mail First Class  ___ U.S. Express Mail ___ Airborne Express

___ UPS     ___ FedEx  *X*  Customer Pickup  *OPS Center*  ___ Other _____

*For FedEx, UPS or Airborne Express, please specify client billing number _____*
*NOTE: All delivery issues should be resolved with your chosen package delivery service.*

**Client's Remittance Address**          Drawer *102*
(Provided by Bank)                  P. O. Box 11407
Birmingham, AL  35246-*0102*

## I. STANDARD SERVICE

Includes opening envelopes as received from Post Office, depositing checks, and returning all specified information to Client.

◆  The Bank will provide one check photocopy and return to the customer. If more than one copy is needed, please specify. ___ Single copy matched back to document  ___ Copies bundled
___ Additional copies - _____

**AERAS 1251**

- ◆ The Bank will endorse deposited items with standard Bank endorsement.
- ◆ Envelopes in which remittance payments are received along with contents will be returned to the customer with the check photocopy attached.
- ◆ The Bank will provide a credit advice indicating item count and deposit total for each processing date.

## II. ACCOUNT INFORMATION

**Acceptable Payees:**

Definition - The Bank will process remittances, with up to seven (7) different payees, as acting agent of the Client. Acceptable Payees should be listed below. Any payment _not_ made out to the following acceptable Payees will not be processed and the document and payment shall be returned to the Client at the address stated above.          *See attached List*

1. _____
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____

## III. Optional Services

___ Detail Deposit Report - check from the following the fields to be included

   ___ Item Amount   ___ Check Number   ___ Invoice Number   ___ Routing Number   ___ Payor DDA

   ___ Payor Name   ___ Payor Address   ___ Customer Account Number   ___ Other

___ Multiple Photocopies - specify number of additional copies per remittance - _____

___ Transmission (detail only)   ___ ACCESS Plus   ___ Fax

## IV. Billing Information:

Billing Account Number: _____    *Hospitalist, PC.*

Billing Method:   ___ Analysis    * Invoicing Address   *4160 Carmichael Rd*

   ___ Direct Debit           *# 200*

   X Invoice *                 *Montgomery, AL 36106*

TM Specialist: *Mindy Taylor*   RM *Jon Howe*   Cost Center   *067320*
Estimated Number of Items per Month   *2500 +*                *077320*

Page 9                                    **AERAS 1252**

## Exhibit "B"
### WHOLESALE LOCKBOX SERVICE CHARGES
### Effective January 1, 1998

| | |
|---|---|
| **Monthly Maintenance for Standard Service (1)** | $100.00/month |
| **Item Fees** | |
| Standard Service (2) | $0.40/item |
| Additional Photocopy | $0.15/item |
| Unprocessable payments (3) | $0.15/item |
| **Return Package Delivery (3)** | |
| Postage First Class | $65.00/month |
| Same Day Local Courier | $185.00/month |
| Overnight Delivery | Cost Plus 10% |
| Bank Courier | $175.00/month |
| Customer Pick-up | $15.00/month |
| **Capture of Detail Payment Information (4)** | $0.05/field |
| **Delivery of Detail Payment Information** | |
| Detail Payment Info via Hardcopy | $20.00/lockbox/mo. |
| Detail Payment Info via ACCESS Plus (5) | $20.00/lockbox/mo. |
| Transmission (6) | $50.00/month |
| Per Record | $0.02/record |
| Fax | $30.00/lockbox/mo. |
| **Reporting of Deposit Information** | |
| Same Day Deposit Amount | |
| via AmSouth ACCESS TouchTone | $25.00/acct/mo. |
| Same Day Deposit Amount with Float (7) | |
| via AmSouth ACCESS Plus | $20.00/acct/mo. |
| Fax - Deposit Slip | $30.00/lockbox/month |
| **Miscellaneous Services** | |
| Duplicate Deposit Ticket Mailed | |
| to a Secondary Address | $25.00/month |
| **Customized Programming** | $125.00/hour |

(1) Monthly Maintenance for standard service represents 6 deposits made throughout the processing day.

(2) Standard service includes mail pick-ups, automated envelope opening and extraction, deposit & check processing, one image photocopy, tape listing of all deposited items, and one copy of the deposit ticket.

(3) Fees for unprocessable payments and postage will continue to be charged for items delivered to Bank after contract has been cancelled by Bank or Client.

(4) A "field" is defined as a piece of information related to the payment record, such as date, invoice number, check amount, payor name, etc.

(5) Delivery of Detail Payment info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

(6) Transmission requirements should be discussed with Treasury Management Systems Support.

(7) Delivery of Same Day Deposit info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

AERAS 1253

*Acceptable Payees*

### Baptist – Prattville, AL

| | |
|---|---|
| Steven L. Allen, M.D. | Thomas L. Arnold, JR., MD |
| Jesse W. Austin, Jr., MD | Thomas J. DeCaro, MD |
| Wallace G. Falero, MD | Norman A. Garrison, MD |
| Joseph Kaplan, MD (Part-timer) | Henry Kurusz, III, MD |
| A. Jack Mahurin, DO | |
| John D. Moorehouse, MD | Julio E. Rios, MD |
| William Sargeant, DO | Ronald A. Shaw, MD |
| Joel Sullivan, MD | Paul K. Tanaka, MD |
| Joseph Zemis, MD | Endy Chung, MD |
| Alan Kitchens, MD | Rogert Page, MD |
| Scott Naley, MD | |

### BMC – Downtown

| | |
|---|---|
| Steven L. Allen, M.D. | Thomas L. Arnold, JR., MD |
| Jesse W. Austin, Jr., MD | Thomas J. DeCaro, MD |
| Wallace G. Falero, MD | Norman A. Garrison, MD |
| Joseph Kaplan, MD (Part-timer) | Henry Kurusz, III, MD |
| A. Jack Mahurin, DO | John D. Moorehouse, MD |
| Julio E. Rios, MD | Edward P. Daugherty, MD |
| William Sargeant, DO | Ronald A. Shaw, MD |
| Joel Sullivan, MD | Paul K. Tanaka, MD |
| Joseph Zemis, MD | Gilberto Sanchez, MD |

### Hospitalist, PC – BMC Downtown

Peter A. Lodewick, MD
Gilberto Sanchez, MD
Praful Patel, MD

AERAS 1254

103

## WHOLESALE LOCKBOX REMITTANCE PROCESSING SERVICE AGREEMENT

This Agreement is entered into this ___5th___ day of ___November___, year of ___1998___, between AmSouth Bank, an Alabama banking corporation and a member of the Federal Reserve System, with its principal place of business at 1900 5th Avenue North, Birmingham, Alabama 35203 ("Bank") and _Alabama Emergency Room Administrative Services_ with its principal place of business at _4160 Carmichael Rd, Montgomery AL 36106_ ("Client").

WHEREAS, Bank, through its computer operations and facilities offers a remittance processing service which is designed to receive and process payments which are sent by credit customers of the Client, to certain lockboxes, or locations, located in Birmingham, Alabama, or as otherwise designated; and

WHEREAS, Client desires to utilize such services under the terms and conditions hereinbelow set forth; and

WHEREAS, Client desires to use Bank as a depository agent for payments received through Bank's remittance processing service, and

WHEREAS, Bank is willing to be Client's depository agent for such payments pursuant to the terms and conditions of this Agreement:

NOW THEREFORE, in consideration of these mutual premises and benefits and for good and valuable consideration, the sufficiency of which is herein acknowledged, the parties hereto agree as follows:

## SECTION I
## SERVICES PROVIDED BY BANK

A.    Bank will provide Client with captured remittance data, documents, address changes and customer correspondence, deposit information and control reports, and shall deposit all processed remittances to Client's designated accounts at Bank's offices in Birmingham, Alabama, all as more particularly described in the "Remittance Processing Definition" (the Definition) which is attached hereto as Exhibit "A" and incorporated herein by reference. Any revisions or updates to the Definition which may be made by Bank or Client from time to time shall be incorporated into the Definition and shall become effective after both parties have agreed on said changes and both parties have signed the revised Definition.

B.    In performing the services defined within this Agreement, and in the selection and use of facilities, equipment, machines and personnel required for such performance, and in the custody and safekeeping of materials furnished by Client, Bank shall exercise ordinary care and diligence, subject to the limitations set forth in this paragraph. The parties recognize that there are no existing industry standards which are commonly accepted as a standard of ordinary care and diligence for the performance of services encompassed by this Agreement. Accordingly, Client agrees that Bank shall be deemed to be exercising ordinary care and diligence in the performance of the duties required of Bank under this Agreement if Bank substantially follows the procedures and practices set forth in the Definition.

C.    Bank agrees to act as depository agent for Client pursuant to the provisions of this Agreement for the term hereof, as it may be extended. In addition, Client shall be bound by all rules and regulations of Bank relating to Checking Accounts (and other depository accounts) as such rules may be amended by Bank from time to time. Bank agrees to accept for deposit all remittance payments which may be provided during the term of this Agreement at a rate per item received that shall be equal to current applicable service charge schedule rates. Refer to Section III for specific pricing terms. Charges for Remittance Processing (as set forth in the Definition) are contained in Exhibit B, the Remittance Processing Fee Schedule ("Fee Schedule") attached hereto and incorporated herein by reference.

## SECTION II
## OBLIGATIONS OF CLIENT

A.    Client agrees to provide Bank with unrestricted and exclusive access to Client's designated lockbox locations, in order that Bank might receive all remittance documents printed according to the

Page 1

**AERAS 1255**

specifications outlined in the Definition. Documents and envelopes containing the remittance documents must be of a size and paper quality so as to be properly processed through Bank's equipment without damage. Such standards will be mutually agreed upon by Bank and Client.

B.    Insofar as the performance of services under this Agreement by Bank requires data, documents, information or materials of any nature to be furnished by Client, or for personnel, Client hereby agrees to furnish all data, documents, information and materials and to perform all such acts and to make appropriate personnel, records, and facilities available to Bank, all within such time and in such form or manner as may reasonably be necessary in order to enable Bank to perform the required services promptly and in a workmanlike manner.

C.    In the event the equipment used by Bank to render services hereunder rejects any remittance document because such document is defective, the parties agree that the charges for document rejects under the Fee Schedule then in effect will apply.

## SECTION III
## PRICES FOR SERVICES

A.    Bank's fees and charges for the services provided herein are set forth in the Fee Schedule. The method of billing for services provided herein is set forth in Exhibit "A". Bank may render a statement for all services and reimbursements defined by this Agreement from time to time following the commencement of said services, and Client shall pay the same to Bank within thirty (30) days. If the payment is not received within thirty (30) days, Bank will assess a one and one half percent (1.5%) late fee to the balance due per month until such time that the balance due is paid in full.

B.    It is understood and agreed between the parties hereto that the fees and charges provided for in this Agreement and set out in the Fee Schedule, are exclusive of any applicable taxes or assessments, however designated, which may be levied upon or assessed by any governmental or taxing authority having jurisdiction in the matter, and exclusive of the cost of any printed forms, envelopes, postage or materials which, by the terms hereof, are to be furnished by Client at its own expense. In the event any such tax, assessment, form, postage, envelope or other material is advanced or supplied by the Bank at Client's request, Client shall reimburse Bank for the expense thus incurred within thirty (30) days from the date such charges are invoiced to Client.

C.    Bank shall have the right to increase or decrease charges imposed for services rendered hereunder by sixty (60) days prior written notice. The Client shall have the option to reject such price increase and terminate this contract within six (6) months after notification of any increase by the Bank. In the event the Client chooses to terminate this Agreement due to a price increase, the price(s) currently in effect at the time of the notification shall apply until this Agreement is actually terminated. Additionally, the Bank reserves the exclusive and uncontested right to at any time setoff and apply any and all deposits, credits, allowances, funds, securities, assets, and properties for all accounts of the Client now or hereafter owing or existing under this Agreement, whether or not matured or liquidated.

D.    If overtime or special handling is requested by Client, or is required to meet the terms and conditions of this Agreement because of delays, not the fault of Bank, in receipt of data, documents, input material or other materials to be furnished by Client under this Agreement (such as postal service or other transport delivery delays), Client agrees to pay Bank, at its established rates in effect at that time, for the out-of-pocket expense related thereto. If, because of such circumstances, it becomes necessary for Bank to return the finished product to Client by special carrier, special courier, or special messenger, Client shall likewise pay or reimburse Bank for the expense thereby incurred. Any and all such reimbursements, charges and expenses shall be included in and payable as part of the statement provided for herein.

AERAS 1256

## SECTION IV
## TERM OF AGREEMENT

A.    This Agreement shall be effective as of the date hereof and shall continue in full force and effect for a period of one (1) year.

B.    This Agreement shall be automatically renewed for consecutive one (1) year terms, unless terminated by Bank or Client as follows:

(1)    This Agreement may be terminated at any time by the mutual agreement of the parties hereto;

(2)    Either party may terminate this Agreement at any time by giving at least ninety (90) days prior written notice to the other.

(3)    If the Bank or Client (i) ceases to conduct business in the ordinary sense, (ii) fails to observe, keep or perform any term or condition of this Agreement required to be observed, kept or performed by that party; (iii) files a petition in bankruptcy, petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets or commences any proceeding under any bankruptcy, dissolution or reorganization law or statute or should there have been filed any such petition or application or any such proceeding against it and such petition or application or proceeding remains undismissed for a period of thirty (30) days or more; or (iv) becomes insolvent or generally does not pay its debts as they become due or makes a general assignment for the benefit of creditors; or (v) has any substantial part of its property become subject to any levy, seizure, assignment, application for sale for or by any creditor or governmental agency; or (vi) be a party to an acquisition or substantially impairs its ability to perform its obligations under this Agreement; or (vii) defaults under any other agreement between the parties, the other party shall have the right to terminate this Agreement; provided, however, that the party seeking to terminate the Agreement gives the other party a written notice of any and all such failure(s) claimed to be a breach of the terms or conditions of this Agreement, and the party receiving said notices fails to remedy the breach within ten (10) days after its receipt of said notice(s).  Upon the termination of the ten (10) day period provided for above, the non-defaulting party may immediately terminate this Agreement by giving the defaulting party written notice.  Upon termination, this Agreement shall have no further force and effect, except as reserved below, and any property or rights of the other party, tangible or intangible, shall forthwith be returned to it within thirty (30) days after the later to occur of (a) termination of the Agreement, or (b) the last date that Bank receives any such property or rights.

C.    Termination of this Agreement shall not terminate Client's obligation to pay Bank for all services performed under the Agreement prior to discontinuance of performance by Bank due to termination.  Upon termination, Bank shall complete in a timely fashion, in accordance with the Agreement, all servicing, deliveries, and other obligations, required to be performed by it under the terms of this Agreement and return any lockbox keys belonging to Client.

## SECTION V
## CONFIDENTIAL INFORMATION AND
## PROPRIETARY RIGHT IN DATA

A.    All information of a business nature relating to the assets, liabilities or other business affairs disclosed to Bank by Client and Client's customers in connection with this Agreement is confidential.  Bank shall not, without the express prior written consent of Client, disclose, or permit access to any such information by any person, firm or corporation and Bank shall cause its officers, employees and agents to take such action as shall be necessary or advisable, to preserve and protect the confidentiality of disclosing such information to persons required to have access thereto for the performance of this Agreement, or to any other party to which the Bank may be required by law to report such information.

AERAS 1257

B.    Client agrees to hold confidential and to use only in connection with the services provided under this Agreement all information furnished to Client by Bank, including, but not limited to Bank's product and service pricing structure, system design, programming techniques or other unique techniques.

C.    Bank's and Client's obligations and agreements under this paragraph shall not apply to any information supplied that:

(1)    was known to either party prior to the disclosures by the other, or
(2)    is or becomes generally available to the public other than by breach of this Agreement, or
(3)    otherwise becomes lawfully available on a non-confidential basis from a third-party who is not under an obligation of confidence to either party.

D.    Not withstanding anything to the contrary contained herein, it is authorized and agreed by the parties hereto that the performance of said services are or might be subject to regulation and examination by authorized representatives of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Board of Directors of the Federal Deposit Insurance Corporation, and/or State regulatory agency reports, information, assurances, or other data as may be required by them under applicable laws and regulations.

E.    Client agrees that any specifications or programs developed by Bank in connection with this Agreement or supplied or made available to Client by Bank are the exclusive property of Bank, its agents, suppliers, or contractors, and further agrees that such material shall not be copied or used in any manner or for any purpose without the express written consent of Bank.  This clause shall survive the termination of the Agreement.

F.    All agreements in Section V relating to confidential or proprietary information shall survive the termination of this Agreement.

## SECTION VI
## RISK OF LOSS AND INDEMNIFICATION

A.    Bank agrees to be responsible for damage, destruction, theft or loss of all remittance payments of Client's customers while such payments are in the Bank's possession.  The Bank shall be deemed to have possession of such remittance payments only at that point in time when the Bank has established sufficient data (to include the microfilming of all checks or other items received as payments and the placement of the Bank's endorsement on such checks and items) to enable the Bank to transfer to Client those funds represented by the remittances received by the Bank.  Bank shall, however, be responsible for theft or loss of remittance payments prior to the time of possession as defined above if such theft or loss is proven to be the direct result of Bank employee fraud.

Bank will make all reasonable efforts to properly process and control remittance payments received in cash or in the form of gift certificates.  Bank shall not, however, be responsible for any claimed loss or mysterious disappearance of cash, gift certificates or other payments in bearer form unless such loss is proven to be the direct result of employee fraud or employee theft.  The Bank shall not be responsible for the loss, theft or disappearances of remittance payments of any kind or description while such payments are in the possession of the United States Postal Service, Purolator Courier, Federal Express or any other independent courier.

B.    Client agrees the liability of Bank shall in every event be limited to the amount of actual direct damages, if any sustained by Client and Client further agrees the liability of Bank shall not extend to any indirect, special or consequential damages, if any, sustained by Client as a result of the services provided under this Agreement or the risks assumed by Bank as stated in Paragraph A above.

Page 4

**AERAS 1258**

C.    Client shall indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including but not limited to reasonable legal and accounting fees and expenses) or claims asserted against Bank by third parties and:

(1)    arising out of information provided to Bank by Client, or;

(2)    arising out of information provided to Bank by officers, employees or agents of Client, or;

(3)    arising out of the use of such information when furnished by Bank to Client, or;

(4)    arising out of the use of such information when furnished by Bank to other third persons at Client's request, or;

(5)    arising out of the use of such information furnished by Bank to officers, employees or agents of Client.

D.    Bank shall not be liable in any form for the insolvency, neglect, misconduct, mistake or default of any collection or correspondence bank or for the loss or destruction of payment(s) in transit or under the possession of others.

E.    In no event shall Bank be liable with respect to the following:

(1).    Suspension of performance of all of Bank's obligations, responsibilities and covenants hereunder, whether expressed or implied, if at any time, or from time to time, compliance therewith should be prevented or hindered by, or be in conflict with, any federal or state law, regulation or rule, the order of any court of competent jurisdiction, any act of God or of the public enemy, war, epidemic, strike, or work stoppages of the U.S. Postal Service and commercial carrier(s), or courier(s), lockout, riot, weather conditions, equipment failure or malfunction, material shortage, electric power disruption or shortage, telecommunication failure or other conditions or circumstances not wholly controlled by the Bank and which would prohibit substantial performance under this Agreement.

(2)    Reliance upon and use without verification, of any and all information, data and instructions at any time submitted by Client, the accuracy or inaccuracy thereof, for the wording or text authored or submitted by Client to Bank for any mailers, or periodic statements to be furnished by Client to Bank, or for the noncompliance of such information, data, instructions, wording or text with applicable laws and regulations.

(3)    Conditional, stale-dated (older than six months), and future-dated remittances processed through the lockbox. These remittances include instruments coded as "Paid in Full." The high speed nature of lockbox processing will not allow for segregating these types of payments. Bank will be in no way responsible for payments of this nature which are deposited into Client's account. Client will be responsible for notifying their payors to send directly to client any payments which should not be processed through the lockbox given the limitations stated above.

(4)    The deposit of checks or other items made payable to multiple parties. If Bank deposits a check or item made payable to multiple parties, Client agrees to indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including, but not limited to, reasonable legal and accounting fees and expenses) arising from such deposit or claims asserted against the Bank by any joint payee of the check or any other third party as a result of the handling or deposit of the check.

**AERAS 1259**

SECTIONS VII
NOTICES

Any written notice required or permitted to be given by Client to Bank hereunder shall be addressed to:

AMSOUTH BANK
P. O. Box 11007
Birmingham, AL  35288

Any written notice required or permitted to be given by Bank to Client under this Agreement shall be delivered to the address for Client listed in Exhibit A.  All written notices shall be delivered in person to the above mentioned entities or shall be sent by certified mail with a return receipt requested, postage prepaid and addressed as provided above.  The foregoing requirement shall not apply to routine correspondence, or correspondence transmitted on a regular basis such as bills, reports, etc.  The parties to this Agreement, by notice in writing, may designate another address or office to which notices shall be given pursuant to this Agreement.

# SECTION VIII
## ADDITIONAL PROVISIONS

A.      Nothing herein contained shall be construed as constituting a partnership, joint venture or agency relationship between Client and Bank, except for Bank's status as Client's depository agent.

B.      This Agreement shall not be assignable in whole or in part by either party without the other party's prior written consent, which consent shall not be unreasonably withheld.  However, Bank may assign this Agreement to any successors or subsidiaries of Bank or of the parent company of Bank, AmSouth Bancorporation, without obtaining such consent from Client.

C.      Each party to this Agreement hereby represents and warrants to the other that it has the full right, power and authority to enter into and perform this Agreement in accordance with all the terms, provisions, covenants and conditions hereof, and that the execution and delivery of this Agreement has been duly authorized by proper corporate action.

D.      Any delay, waiver, or omission by Client or Bank to exercise any right or power arising from any breach of default of the other party in any terms, provisions, or covenants of this Agreement shall not be construed to be a waiver by Client or Bank of any subsequent breach or default of the same or other party.

E.      This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns subject to prohibitions against assignment listed above.

F.      This Agreement (including exhibits attached hereto) constitutes the entire agreement between parties hereto relating to the subject matter hereof, and all prior negotiations, agreements and understandings, whether oral or written, are superseded hereby.  No modification or amendment of this Agreement shall be effective unless and until set forth in writing and signed by the parties hereto other than any pricing modifications as provided for in Section III or any modifications to Account Rules as provided for in Section I.

G.      Bank agrees to allow Client, its agents or employees reasonable access to Bank's facilities in order to audit and review Client's documents and records in the custody of Bank.  Client agrees to notify Bank in writing of the names of such employees or agents who are authorized to have access to such records at least 2 days prior to the requested date of such inspections.

H.      This Agreement shall be governed in all respects by and construed in accordance with the laws of the State of Alabama.

**AERAS 1260**

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers, as of the day and year first above written.

AmSouth Bank

Signature: _Mindy Taylor_

Print Name: _Mindy Taylor_

Its: _Asst. Vice President_

Client: _Alabama Emergency Room Adm. Serv._

Signature: _Lisa Dobb_

Print Name: _Lisa Dobbins_

Its: _Bookkeeper_

AERAS 1261

EXHIBIT "A"
## WHOLESALE REMITTANCE PROCESSING DEFINITION

The Bank's function in remittance processing is to act as agent for the Client by collecting and processing remittance payments. The Bank, as acting depository agent of the Client, will collect from the post office, or other points, all mail which contains remittance payments, and process remittance payments under the operating parameters set forth in this exhibit.

**PROCESSING INFORMATION**    AERAS, PC - BMC - Prattville

**Lockbox Depository Account Number:**    0222 7460

Any correspondence between the Client and the Bank concerning normal operations of the remittance processing service shall be addressed as follows:

Name: Nichols TXEN

Address: 1801 1st Ave, South
midtown Ctr Suite 400
Birmingham, al 35233

Contact Name: Suzie Cooper

Telephone: (205) 320 - 2526

Deliver to Alternate Address: ___    Return Package (Photocopies of checks, envelopes, all other documents received with payment.)

___    Dishonored Items (Deposited items returned for insufficient funds will be redeposited. Items returned a second time for insufficient funds will be returned to the Client and charged against the depository account.)

Alternate Address: _____

_____

Contact Name & Phone: _____

Package Delivery Service: ___  U.S. Mail First Class  ___  U.S. Express Mail  ___  Airborne Express

___  UPS  ___  FedEx  _X_  Customer Pickup  ___  Other _____
ops Center

*For FedEx, UPS or Airborne Express, please specify client billing number* _____
*NOTE: All delivery issues should be resolved with your chosen package delivery service.*

**Client's Remittance Address**    Drawer 103
(Provided by Bank)    P. O. Box 11407
Birmingham, AL  35246-0103

## I. STANDARD SERVICE

Includes opening envelopes as received from Post Office, depositing checks, and returning all specified information to Client.

* The Bank will provide one check photocopy and return to the customer. If more than one copy is needed, please specify. ___  Single copy matched back to document  ___  Copies bundled
___  Additional copies - _____

**AERAS 1262**

- ◆ The Bank will endorse deposited items with standard Bank endorsement.
- ◆ Envelopes in which remittance payments are received along with contents will be returned to the customer with the check photocopy attached.
- ◆ The Bank will provide a credit advice indicating item count and deposit total for each processing date.

## II. ACCOUNT INFORMATION

**Acceptable Payees:**

Definition - The Bank will process remittances, with up to seven (7) different payees, as acting agent of the Client. Acceptable Payees should be listed below. Any payment not made out to the following acceptable Payees will not be processed and the document and payment shall be returned to the Client at the address stated above.

1. _See Attached List_
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____

## III. Optional Services

___ Detail Deposit Report - check from the following the fields to be included

     ___ Item Amount ___ Check Number ___ Invoice Number ___ Routing Number ___ Payor DDA

     ___ Payor Name ___ Payor Address ___ Customer Account Number ___ Other

___ Multiple Photocopies - specify number of additional copies per remittance - _____

___ Transmission (detail only) ___ ACCESS Plus ___ Fax

## IV. Billing Information:

Billing Account Number: _____

Billing Method: ___ Analysis    * Invoicing Address _AERAS, PC_

           ___ Direct Debit                      _4160 Carmichael Rd Ste 104_

           _X_ Invoice *                    _Montgomery, AL 36106_

TM Specialist: _Mindy Taylor_    RM _John House_    Cost Center _077320_

Estimated Number of Items per Month _2500_

**AERAS 1263**

## Exhibit "B"
## WHOLESALE LOCKBOX SERVICE CHARGES
### Effective January 1, 1998

| | |
|---|---|
| **Monthly Maintenance for Standard Service (1)** | $100.00/month |

**Item Fees**

| | |
|---|---|
| Standard Service (2) | $0.40/item |
| Additional Photocopy | $0.15/item |
| Unprocessable payments (3) | $0.15/item |

**Return Package Delivery (3)**

| | |
|---|---|
| Postage First Class | $65.00/month |
| Same Day Local Courier | $185.00/month |
| Overnight Delivery | Cost Plus 10% |
| Bank Courier | $175.00/month |
| Customer Pick-up | $15.00/month |

| | |
|---|---|
| **Capture of Detail Payment Information (4)** | $0.05/field |

**Delivery of Detail Payment Information**

| | |
|---|---|
| Detail Payment Info via Hardcopy | $20.00/lockbox/mo. |
| Detail Payment Info via ACCESS Plus (5) | $20.00/lockbox/mo. |
| Transmission (6) | $50.00/month |
| Per Record | $0.02/record |
| Fax | $30.00/lockbox/mo. |

**Reporting of Deposit Information**

| | |
|---|---|
| Same Day Deposit Amount via AmSouth ACCESS TouchTone | $25.00/acct/mo. |
| Same Day Deposit Amount with Float (7) via AmSouth ACCESS Plus | $20.00/acct/mo. |
| Fax - Deposit Slip | $30.00/lockbox/month |

**Miscellaneous Services**

| | |
|---|---|
| Duplicate Deposit Ticket Mailed to a Secondary Address | $25.00/month |

| | |
|---|---|
| **Customized Programming** | $125.00/hour |

(1) Monthly Maintenance for standard service represents 6 deposits made throughout the processing day.

(2) Standard service includes mail pick-ups, automated envelope opening and extraction, deposit & check processing, one image photocopy, tape listing of all deposited items, and one copy of the deposit ticket.

(3) Fees for unprocessable payments and postage will continue to be charged for items delivered to Bank after contract has been cancelled by Bank or Client.

(4) A "field" is defined as a piece of information related to the payment record, such as date, invoice number, check amount, payor name, etc.

(5) Delivery of Detail Payment info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

(6) Transmission requirements should be discussed with Treasury Management Systems Support.

(7) Delivery of Same Day Deposit info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

AERAS 1264

*Acceptable Payers*

Baptist – Prattville, AL

Steven L. Allen, M.D.              Thomas L. Arnold, JR., MD
Jesse W. Austin, Jr., MD          Thomas J. DeCaro, MD
Wallace G. Falero, MD             Norman A. Garrison, MD
Joseph Kaplan, MD (Part-timer)    Henry Kurusz, III, MD
A. Jack Mahurin, DO
John D. Moorehouse, MD            Julio E. Rios, MD
William Sargeant, DO              Ronald A. Shaw, MD
Joel Sullivan, MD                 Paul K. Tanaka, MD
Joseph Zemis, MD                  Endy Chung, MD
Alan Kitchens, MD                 Rogert Page, MD
Scott Naley, MD

BMC – Downtown

Steven L. Allen, M.D.             Thomas L. Arnold, JR., MD
Jesse W. Austin, Jr., MD          Thomas J. DeCaro, MD
Wallace G. Falero, MD             Norman A. Garrison, MD
Joseph Kaplan, MD (Part-timer)    Henry Kurusz, III, MD
A. Jack Mahurin, DO               John D. Moorehouse, MD
Julio E. Rios, MD                 Edward P. Daugherty, MD
William Sargeant, DO              Ronald A. Shaw, MD
Joel Sullivan, MD                 Paul K. Tanaka, MD
Joseph Zemis, MD                  Gilberto Sanchez, MD

Hospitalist, PC – BMC Downtown

Peter A. Lodewick, MD
Gilberto Sanchez, MD
Praful Patel, MD

**AERAS 1265**



## WHOLESALE LOCKBOX REMITTANCE PROCESSING SERVICE AGREEMENT

This Agreement is entered into this ____5____ day of __November__, year of _1998_, between AmSouth Bank, an Alabama banking corporation and a member of the Federal Reserve System, with its principal place of business at 1900 5th Avenue North, Birmingham, Alabama 35203 ("Bank") and _Alabama Emergency Room Administrative Services_ with its principal place of business at __4160 Carmichael Road, Mtgy, AL_____ ("Client").

WHEREAS, Bank, through its computer operations and facilities offers a remittance processing service which is designed to receive and process payments which are sent by credit customers of the Client, to certain lockboxes, or locations, located in Birmingham, Alabama, or as otherwise designated; and

WHEREAS, Client desires to utilize such services under the terms and conditions hereinbelow set forth; and

WHEREAS, Client desires to use Bank as a depository agent for payments received through Bank's remittance processing service, and

WHEREAS, Bank is willing to be Client's depository agent for such payments pursuant to the terms and conditions of this Agreement:

NOW THEREFORE, in consideration of these mutual premises and benefits and for good and valuable consideration, the sufficiency of which is herein acknowledged, the parties hereto agree as follows:

## SECTION I
## SERVICES PROVIDED BY BANK

A.    Bank will provide Client with captured remittance data, documents, address changes and customer correspondence, deposit information and control reports, and shall deposit all processed remittances to Client's designated accounts at Bank's offices in Birmingham, Alabama, all as more particularly described in the "Remittance Processing Definition" (the Definition) which is attached hereto as Exhibit "A" and incorporated herein by reference. Any revisions or updates to the Definition which may be made by Bank or Client from time to time shall be incorporated into the Definition and shall become effective after both parties have agreed on said changes and both parties have signed the revised Definition.

B.    In performing the services defined within this Agreement, and in the selection and use of facilities, equipment, machines and personnel required for such performance, and in the custody and safekeeping of materials furnished by Client, Bank shall exercise ordinary care and diligence, subject to the limitations set forth in this paragraph. The parties recognize that there are no existing industry standards which are commonly accepted as a standard of ordinary care and diligence for the performance of services encompassed by this Agreement. Accordingly, Client agrees that Bank shall be deemed to be exercising ordinary care and diligence in the performance of the duties required of Bank under this Agreement if Bank substantially follows the procedures and practices set forth in the Definition.

C.    Bank agrees to act as depository agent for Client pursuant to the provisions of this Agreement for the term hereof, as it may be extended. In addition, Client shall be bound by all rules and regulations of Bank relating to Checking Accounts (and other depository accounts) as such rules may be amended by Bank from time to time. Bank agrees to accept for deposit all remittance payments which may be provided during the term of this Agreement at a rate per item received that shall be equal to current applicable service charge schedule rates. Refer to Section III for specific pricing terms. Charges for Remittance Processing (as set forth in the Definition) are contained in Exhibit B, the Remittance Processing Fee Schedule ("Fee Schedule") attached hereto and incorporated herein by reference.

## SECTION II
## OBLIGATIONS OF CLIENT

A.    Client agrees to provide Bank with unrestricted and exclusive access to Client's designated lockbox locations, in order that Bank might receive all remittance documents printed according to the

AERAS 1266

specifications outlined in the Definition.  Documents and envelopes containing the remittance documents must be of a size and paper quality so as to be properly processed through Bank's equipment without damage.  Such standards will be mutually agreed upon by Bank and Client.

B.      Insofar as the performance of services under this Agreement by Bank requires data, documents, information or materials of any nature to be furnished by Client, or for personnel, Client hereby agrees to furnish all data, documents, information and materials and to perform all such acts and to make appropriate personnel, records, and facilities available to Bank, all within such time and in such form or manner as may reasonably be necessary in order to enable Bank to perform the required services promptly and in a workmanlike manner.

C.      In the event the equipment used by Bank to render services hereunder rejects any remittance document because such document is defective, the parties agree that the charges for document rejects under the Fee Schedule then in effect will apply.

## SECTION III
## PRICES FOR SERVICES

A.      Bank's fees and charges for the services provided herein are set forth in the Fee Schedule. The method of billing for services provided herein is set forth in Exhibit "A".  Bank may render a statement for all services and reimbursements defined by this Agreement from time to time following the commencement of said services, and Client shall pay the same to Bank within thirty (30) days.  If the payment is not received within thirty (30) days, Bank will assess a one and one half percent (1.5%) late fee to the balance due per month until such time that the balance due is paid in full.

B.      It is understood and agreed between the parties hereto that the fees and charges provided for in this Agreement and set out in the Fee Schedule, are exclusive of any applicable taxes or assessments, however designated, which may be levied upon or assessed by any governmental or taxing authority having jurisdiction in the matter, and exclusive of the cost of any printed forms, envelopes, postage or materials which, by the terms hereof, are to be furnished by Client at its own expense.  In the event any such tax, assessment, form, postage, envelope or other material is advanced or supplied by the Bank at Client's request, Client shall reimburse Bank for the expense thus incurred within thirty (30) days from the date such charges are invoiced to Client.

C.      Bank shall have the right to increase or decrease charges imposed for services rendered hereunder by sixty (60) days prior written notice.  The Client shall have the option to reject such price increase and terminate this contract within six (6) months after notification of any increase by the Bank.  In the event the Client chooses to terminate this Agreement due to a price increase, the price(s) currently in effect at the time of the notification shall apply until this Agreement is actually terminated.  Additionally, the Bank reserves the exclusive and uncontested right to at any time setoff and apply any and all deposits, credits, allowances, funds, securities, assets, and properties for all accounts of the Client now or hereafter owing or existing under this Agreement, whether or not matured or liquidated.

D.      If overtime or special handling is requested by Client, or is required to meet the terms and conditions of this Agreement because of delays, not the fault of Bank, in receipt of data, documents, input material or other materials to be furnished by Client under this Agreement (such as postal service or other transport delivery delays), Client agrees to pay Bank, at its established rates in effect at that time, for the out-of-pocket expense related thereto.  If, because of such circumstances, it becomes necessary for Bank to return the finished product to Client by special carrier, special courier, or special messenger, Client shall likewise pay or reimburse Bank for the expense thereby incurred.  Any and all such reimbursements, charges and expenses shall be included in and payable as part of the statement provided for herein.

**AERAS 1267**

## SECTION IV
## TERM OF AGREEMENT

A.    This Agreement shall be effective as of the date hereof and shall continue in full force and effect for a period of one (1) year.

B.    This Agreement shall be automatically renewed for consecutive one (1) year terms, unless terminated by Bank or Client as follows:

(1)    This Agreement may be terminated at any time by the mutual agreement of the parties hereto;

(2)    Either party may terminate this Agreement at any time by giving at least ninety (90) days prior written notice to the other.

(3)    If the Bank or Client (i) ceases to conduct business in the ordinary sense, (ii) fails to observe, keep or perform any term or condition of this Agreement required to be observed, kept or performed by that party; (iii) files a petition in bankruptcy, petitions or applies to any tribunal for the appointment of a custodian, receiver or trustee for it or a substantial part of its assets or commences any proceeding under any bankruptcy, dissolution or reorganization law or statute or should there have been filed any such petition or application or any such proceeding against it and such petition or application or proceeding remains undismissed for a period of thirty (30) days or more; or (iv) becomes insolvent or generally does not pay its debts as they become due or makes a general assignment for the benefit of creditors; or (v) has any substantial part of its property become subject to any levy, seizure, assignment, application for sale for or by any creditor or governmental agency; or (vi) be a party to an acquisition or substantially impairs its ability to perform its obligations under this Agreement; or (vii) defaults under any other agreement between the parties, the other party shall have the right to terminate this Agreement; provided, however, that the party seeking to terminate the Agreement gives the other party a written notice of any and all such failure(s) claimed to be a breach of the terms or conditions of this Agreement, and the party receiving said notices fails to remedy the breach within ten (10) days after its receipt of said notice(s).  Upon the termination of the ten (10) day period provided for above, the non-defaulting party may immediately terminate this Agreement by giving the defaulting party written notice.  Upon termination, this Agreement shall have no further force and effect, except as reserved below, and any property or rights of the other party, tangible or intangible, shall forthwith be returned to it within thirty (30) days after the later to occur of (a) termination of the Agreement, or (b) the last date that Bank receives any such property or rights.

C.    Termination of this Agreement shall not terminate Client's obligation to pay Bank for all services performed under the Agreement prior to discontinuance of performance by Bank due to termination. Upon termination, Bank shall complete in a timely fashion, in accordance with the Agreement, all servicing, deliveries, and other obligations, required to be performed by it under the terms of this Agreement and return any lockbox keys belonging to Client.

## SECTION V
## CONFIDENTIAL INFORMATION AND
## PROPRIETARY RIGHT IN DATA

A.    All information of a business nature relating to the assets, liabilities or other business affairs disclosed to Bank by Client and Client's customers in connection with this Agreement is confidential.  Bank shall not, without the express prior written consent of Client, disclose, or permit access to any such information by any person, firm or corporation and Bank shall cause its officers, employees and agents to take such action as shall be necessary or advisable, to preserve and protect the confidentiality of disclosing such information to persons required to have access thereto for the performance of this Agreement, or to any other party to which the Bank may be required by law to report such information.

**AERAS 1268**

B.    Client agrees to hold confidential and to use only in connection with the services provided under this Agreement all information furnished to Client by Bank, including, but not limited to Bank's product and service pricing structure, system design, programming techniques or other unique techniques.

C.    Bank's and Client's obligations and agreements under this paragraph shall not apply to any information supplied that:

(1)    was known to either party prior to the disclosures by the other, or

(2)    is or becomes generally available to the public other than by breach of this Agreement, or

(3)    otherwise becomes lawfully available on a non-confidential basis from a third-party who is not under an obligation of confidence to either party.

D.    Not withstanding anything to the contrary contained herein, it is authorized and agreed by the parties hereto that the performance of said services are or might be subject to regulation and examination by authorized representatives of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Board of Directors of the Federal Deposit Insurance Corporation, and/or State regulatory agency reports, information, assurances, or other data as may be required by them under applicable laws and regulations.

E.    Client agrees that any specifications or programs developed by Bank in connection with this Agreement or supplied or made available to Client by Bank are the exclusive property of Bank, its agents, suppliers, or contractors, and further agrees that such material shall not be copied or used in any manner or for any purpose without the express written consent of Bank.  This clause shall survive the termination of the Agreement.

F.    All agreements in Section V relating to confidential or proprietary information shall survive the termination of this Agreement.

## SECTION VI
## RISK OF LOSS AND INDEMNIFICATION

A.    Bank agrees to be responsible for damage, destruction, theft or loss of all remittance payments of Client's customers while such payments are in the Bank's possession. The Bank shall be deemed to have possession of such remittance payments only at that point in time when the Bank has established sufficient data (to include the microfilming of all checks or other items received as payments and the placement of the Bank's endorsement on such checks and items) to enable the Bank to transfer to Client those funds represented by the remittances received by the Bank. Bank shall, however, be responsible for theft or loss of remittance payments prior to the time of possession as defined above if such theft or loss is proven to be the direct result of Bank employee fraud.

Bank will make all reasonable efforts to properly process and control remittance payments received in cash or in the form of gift certificates. Bank shall not, however, be responsible for any claimed loss or mysterious disappearance of cash, gift certificates or other payments in bearer form unless such loss is proven to be the direct result of employee fraud or employee theft. The Bank shall not be responsible for the loss, theft or disappearances of remittance payments of any kind or description while such payments are in the possession of the United States Postal Service, Purolator Courier, Federal Express or any other independent courier.

B.    Client agrees the liability of Bank shall in every event be limited to the amount of actual direct damages, if any sustained by Client and Client further agrees the liability of Bank shall not extend to any indirect, special or consequential damages, if any, sustained by Client as a result of the services provided under this Agreement or the risks assumed by Bank as stated in Paragraph A above.

AERAS 1269

C.    Client shall indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including but not limited to reasonable legal and accounting fees and expenses) or claims asserted against Bank by third parties and:

(1)    arising out of information provided to Bank by Client, or;

(2)    arising out of information provided to Bank by officers, employees or agents of Client, or;

(3)    arising out of the use of such information when furnished by Bank to Client, or;

(4)    arising out of the use of such information when furnished by Bank to other third persons at Client's request, or;

(5)    arising out of the use of such information furnished by Bank to officers, employees or agents of Client.

D.    Bank shall not be liable in any form for the insolvency, neglect, misconduct, mistake or default of any collection or correspondence bank or for the loss or destruction of payment(s) in transit or under the possession of others.

E.    In no event shall Bank be liable with respect to the following:

(1)    Suspension of performance of all of Bank's obligations, responsibilities and covenants hereunder, whether expressed or implied, if at any time, or from time to time, compliance therewith should be prevented or hindered by, or be in conflict with, any federal or state law, regulation or rule, the order of any court of competent jurisdiction, any act of God or of the public enemy, war, epidemic, strike, or work stoppages of the U.S. Postal Service and commercial carrier(s), or courier(s), lockout, riot, weather conditions, equipment failure or malfunction, material shortage, electric power disruption or shortage, telecommunication failure or other conditions or circumstances not wholly controlled by the Bank and which would prohibit substantial performance under this Agreement.

(2)    Reliance upon and use without verification, of any and all information, data and instructions at any time submitted by Client, the accuracy or inaccuracy thereof, for the wording or text authored or submitted by Client to Bank for any mailers, or periodic statements to be furnished by Client to Bank, or for the noncompliance of such information, data, instructions, wording or text with applicable laws and regulations.

(3)    Conditional, stale-dated (older than six months), and future-dated remittances processed through the lockbox. These remittances include instruments coded as "Paid in Full." The high speed nature of lockbox processing will not allow for segregating these types of payments. Bank will be in no way responsible for payments of this nature which are deposited into Client's account. Client will be responsible for notifying their payors to send directly to client any payments which should not be processed through the lockbox given the limitations stated above.

(4)    The deposit of checks or other items made payable to multiple parties. If Bank deposits a check or item made payable to multiple parties, Client agrees to indemnify and hold Bank harmless from and against any loss, liability, cost, damage, expense (including, but not limited to, reasonable legal and accounting fees and expenses) arising from such deposit or claims asserted against the Bank by any joint payee of the check or any other third party as a result of the handling or deposit of the check.

**AERAS 1270**

## SECTIONS VII
## NOTICES

Any written notice required or permitted to be given by Client to Bank hereunder shall be addressed to:

AMSOUTH BANK
P. O. Box 11007
Birmingham, AL  35288

Any written notice required or permitted to be given by Bank to Client under this Agreement shall be delivered to the address for Client listed in Exhibit A. All written notices shall be delivered in person to the above mentioned entities or shall be sent by certified mail with a return receipt requested, postage prepaid and addressed as provided above. The foregoing requirement shall not apply to routine correspondence, or correspondence transmitted on a regular basis such as bills, reports, etc. The parties to this Agreement, by notice in writing, may designate another address or office to which notices shall be given pursuant to this Agreement.

## SECTION VIII
## ADDITIONAL PROVISIONS

A.    Nothing herein contained shall be construed as constituting a partnership, joint venture or agency relationship between Client and Bank, except for Bank's status as Client's depository agent.

B.    This Agreement shall not be assignable in whole or in part by either party without the other party's prior written consent, which consent shall not be unreasonably withheld. However, Bank may assign this Agreement to any successors or subsidiaries of Bank or of the parent company of Bank, AmSouth Bancorporation, without obtaining such consent from Client.

C.    Each party to this Agreement hereby represents and warrants to the other that it has the full right, power and authority to enter into and perform this Agreement in accordance with all the terms, provisions, covenants and conditions hereof, and that the execution and delivery of this Agreement has been duly authorized by proper corporate action.

D.    Any delay, waiver, or omission by Client or Bank to exercise any right or power arising from any breach of default of the other party in any terms, provisions, or covenants of this Agreement shall not be construed to be a waiver by Client or Bank of any subsequent breach or default of the same or other party.

E.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns subject to prohibitions against assignment listed above.

F.    This Agreement (including exhibits attached hereto) constitutes the entire agreement between parties hereto relating to the subject matter hereof, and all prior negotiations, agreements and understandings, whether oral or written, are superseded hereby. No modification or amendment of this Agreement shall be effective unless and until set forth in writing and signed by the parties hereto other than any pricing modifications as provided for in Section III or any modifications to Account Rules as provided for in Section I.

G.    Bank agrees to allow Client, its agents or employees reasonable access to Bank's facilities in order to audit and review Client's documents and records in the custody of Bank. Client agrees to notify Bank in writing of the names of such employees or agents who are authorized to have access to such records at least 2 days prior to the requested date of such inspections.

H.    This Agreement shall be governed in all respects by and construed in accordance with the laws of the State of Alabama.

**AERAS 1271**

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed on its behalf by its duly authorized officers, as of the day and year first above written.

AmSouth Bank

Signature: _Mindy Taylor_

Print Name: _Mindy Taylor_

Its: _Asst. Vice President_

Client: _Alabama Emergency Room Admin. Serv._

Signature: _Lisa K Dobbins_

Print Name: _Lisa Dobbins_

Its: _Bookkeeper_

AERAS 1272

EXHIBIT "A"
## WHOLESALE REMITTANCE PROCESSING DEFINITION

The Bank's function in remittance processing is to act as agent for the Client by collecting and processing remittance payments.  The Bank, as acting depository agent of the Client, will collect from the post office, or other points, all mail which contains remittance payments, and process remittance payments under the operating parameters set forth in this exhibit.

## PROCESSING INFORMATION            AERAS PC - BMC downtown

**Lockbox Depository Account Number:**   _0222 7487_

Any correspondence between the Client and the Bank concerning normal operations of the remittance processing service shall be addressed as follows:

Name: _Nichols TXEN_                    Contact Name: _Suzie Cooper_

Address: _1801 1st Avenue South_
_Midtown Center, Suite 400_            Telephone: _(205) 320-2562_
_Birmingham, AL 35233_

Deliver to Alternate Address: ___    Return Package (Photocopies of checks, envelopes, all other documents received with payment.)

___    Dishonored Items (Deposited items returned for insufficient funds will be redeposited.  Items returned a second time for insufficient funds will be returned to the Client and charged against the depository account.)

Alternate Address:            _____

_____

Contact Name & Phone: _____

Package Delivery Service: ___ U.S. Mail First Class  ___ U.S. Express Mail  ___ Airborne Express

___ UPS  ___ FedEx  _X_ Customer Pickup   Ops Center   ___ Other _____

*For FedEx, UPS or Airborne Express, please specify client billing number* _____
*NOTE:  All delivery issues should be resolved with your chosen package delivery service.*

**Client's Remittance Address**        Drawer _101_
(Provided by Bank)                P. O. Box 11407
Birmingham, AL  35246-_0101_

## I. STANDARD SERVICE

Includes opening envelopes as received from Post Office, depositing checks, and returning all specified information to Client.

* The Bank will provide one check photocopy and return to the customer.  If more than one copy is needed, please specify. ___ Single copy matched back to document  ___ Copies bundled
___ Additional copies - _____

**AERAS 1273**

- The Bank will endorse deposited items with standard Bank endorsement.
- Envelopes in which remittance payments are received along with contents will be returned to the customer with the check photocopy attached.
- The Bank will provide a credit advice indicating item count and deposit total for each processing date.

## II. ACCOUNT INFORMATION

**Acceptable Payees:**

Definition - The Bank will process remittances, with up to seven (7) different payees, as acting agent of the Client. Acceptable Payees should be listed below. Any payment <u>not</u> made out to the following acceptable Payees will not be processed and the document and payment shall be returned to the Client at the address stated above.

1. _See Attached Listing_
2. _____
3. _____
4. _____
5. _____
6. _____
7. _____

## III. Optional Services

___ Detail Deposit Report - check from the following the fields to be included

    ___ Item Amount ___ Check Number ___ Invoice Number ___ Routing Number ___ Payor DDA

    ___ Payor Name ___ Payor Address ___ Customer Account Number ___ Other

___ Multiple Photocopies - specify number of additional copies per remittance - _____

___ Transmission (detail only) ___ ACCESS Plus ___ Fax

## IV. Billing Information:

Billing Account Number: _____

Billing Method: ___ Analysis    * Invoicing Address   AERAS PC  BHC Downtown

           ___ Direct Debit             4160 Carmichael Road, Suite 104

            X Invoice *               Montgomery, AL 36106

TM Specialist: _Mindy Taylor_ RM _Jon Howe_ Cost Center _077320_

Estimated Number of Items per Month _2500_

**AERAS 1274**

## Exhibit "B"
## WHOLESALE LOCKBOX SERVICE CHARGES
### Effective January 1, 1998

| | |
|---|---|
| **Monthly Maintenance for Standard Service (1)** | **$100.00/month** |
| | |
| **Item Fees** | |
| Standard Service (2) | $0.40/item |
| Additional Photocopy | $0.15/item |
| Unprocessable payments (3) | $0.15/item |
| | |
| **Return Package Delivery (3)** | |
| Postage First Class | $65.00/month |
| Same Day Local Courier | $185.00/month |
| Overnight Delivery | Cost Plus 10% |
| Bank Courier | $175.00/month |
| Customer Pick-up | $15.00/month |
| | |
| **Capture of Detail Payment Information (4)** | **$0.05/field** |
| | |
| **Delivery of Detail Payment Information** | |
| Detail Payment Info via Hardcopy | $20.00/lockbox/mo. |
| Detail Payment Info via ACCESS Plus (5) | $20.00/lockbox/mo. |
| Transmission (6) | $50.00/month |
| Per Record | $0.02/record |
| Fax | $30.00/lockbox/mo. |
| | |
| **Reporting of Deposit Information** | |
| Same Day Deposit Amount | |
| via AmSouth ACCESS TouchTone | $25.00/acct/mo. |
| Same Day Deposit Amount with Float (7) | |
| via AmSouth ACCESS Plus | $20.00/acct/mo. |
| Fax - Deposit Slip | $30.00/lockbox/month |
| | |
| **Miscellaneous Services** | |
| Duplicate Deposit Ticket Mailed | |
| to a Secondary Address | $25.00/month |
| | |
| **Customized Programming** | $125.00/hour |

(1) Monthly Maintenance for standard service represents 6 deposits made throughout the processing day.

(2) Standard service includes mail pick-ups, automated envelope opening and extraction, deposit & check processing, one image photocopy, tape listing of all deposited items, and one copy of the deposit ticket.

(3) Fees for unprocessable payments and postage will continue to be charged for items delivered to Bank after contract has been cancelled by Bank or Client.

(4) A "field" is defined as a piece of information related to the payment record, such as date, invoice number, check amount, payor name, etc.

(5) Delivery of Detail Payment info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

(6) Transmission requirements should be discussed with Treasury Management Systems Support.

(7) Delivery of Same Day Deposit info through AmSouth ACCESS Plus requires set up for Level II reporting on that product. Refer to AmSouth ACCESS Plus application for current pricing.

AERAS 1275

Acceptable Payees

Baptist – Prattville, AL

Steven L. Allen, M.D.            Thomas L. Arnold, JR., MD
Jesse W. Austin, Jr., MD         Thomas J. DeCaro, MD
Wallace G. Falero, MD            Norman A. Garrison, MD
Joseph Kaplan, MD (Part-timer)   Henry Kurusz, III, MD
A. Jack Mahurin, DO
John D. Moorehouse, MD           Julio E. Rios, MD
William Sargeant, DO             Ronald A. Shaw, MD
Joel Sullivan, MD                Paul K. Tanaka, MD
Joseph Zemis, MD                 Endy Chung, MD
Alan Kitchens, MD                Rogert Page, MD
Scott Naley, MD

BMC – Downtown

Steven L. Allen, M.D.            Thomas L. Arnold, JR., MD
Jesse W. Austin, Jr., MD         Thomas J. DeCaro, MD
Wallace G. Falero, MD            Norman A. Garrison, MD
Joseph Kaplan, MD (Part-timer)   Henry Kurusz, III, MD
A. Jack Mahurin, DO              John D. Moorehouse, MD
Julio E. Rios, MD                Edward P. Daugherty, MD
William Sargeant, DO             Ronald A. Shaw, MD
Joel Sullivan, MD                Paul K. Tanaka, MD
Joseph Zemis, MD                 Gilberto Sanchez, MD

Hospitalist, PC – BMC Downtown

Peter A. Ledewick, MD
Gilberto Sanchez, MD
Praful Patel, MD

**AERAS 1276**