IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2008 JUL 11  P 2:57

| | |
|---|---|
| CONTINENTAL CASUALTY COMPANY, § <br> § <br> Plaintiff, § <br> § <br> vs. § <br> § <br> § <br> ALABAMA EMERGENCY ROOM § <br> ADMINISTRATIVE SERVICES, P.C., § <br> § <br> Defendant. § | CIVIL ACTION NO.: <br><br> 2:07-CV-221-WHA |

## RESPONSE TO COURT'S OCTOBER 29, 2007 ORDER – AGREED STATEMENT OF FACTS

COMES NOW Plaintiff Continental Casualty Company ("Continental Casualty") and, pursuant to this Court's October 29, 2007 Order, files the following Agreed Statement of Facts:

1. This action arises from workers' compensation insurance coverage that was provided to AERAS under a policy issued by Continental Casualty Company from May 3, 2005 to March 16, 2006. [Doc. 1].

2. AERAS is an S-Chapter corporation, with Dr. John Moorehouse serving as President, Dr. Wallace Falero as Vice-President, and Mark Platt as Secretary/Treasurer. [Exhibit 122, pp. 7-8].

3. AERAS is a staffing company, which provides physicians, nurse practitioners, and physician assistants to Montgomery-area emergency departments twenty-four hours a day, seven days a week. [Exhibit 122, pp. 11-12].

4. AERAS contracts with Montgomery-area hospitals to provide physicians, nurse practitioners, and physician assistants for emergency departments. [Exhibits 8, 9, 10, 11].

5. In particular, AERAS provides physicians, nurse practitioners, and physician assistants for the emergency departments at Baptist Medical Center - South, Baptist Medical Center - East, and Prattville Baptist Hospital. [Exhibits 8, 10, 11].

6. On February 21, 2005, AERAS's previous workers' compensation insurer, Williamsburg National Insurance Company, notified AERAS that it was nonrenewing the coverage and that the coverage would expire on March 1, 2005. [Exhibit 159, p. 3].

7. Although the coverage was set to expire on March 1, 2005, Williamsburg agreed to write a short-term policy until such time as AERAS could secure other coverage. [Exhibit 159].

8. AERAS's insurance agent, Colonial Insurance Agency, attempted to secure workers' compensation coverage. [Exhibit 159].

9. AERAS applied for coverage in the assigned risk market. [Exhibit 159].

10. To secure coverage in the assigned risk market, AERAS forwarded an application and other information to NCCI, Inc., the administrator for the assigned risk market for workers' compensation coverage in Alabama. [Exhibit 159; Doc. 1].

11. AERAS's application for workers' compensation coverage stated that it had five (5) employees, which it classified as "clerical office employees," and seven (7) employees that it classified as "hospital: professional employees." [Exhibit 35; Exhibit 135].

12. AERAS further stated that the estimated annual remuneration for the "clerical office employees" was $230,665, while the estimated annual remuneration for the "hospital: professional employees" was $440,425. [Exhibit 35; Exhibit 135].

13. Workers' compensation coverage was secured for AERAS through the assigned risk plan, and coverage was bound effective May 5, 2005. [Exhibit 162; Exhibit 35; Exhibit 36].

14. Continental Casualty issued the Workers Compensation and Employers Liability Policy to AERAS, policy number 6BS59UB-7603B64-6-05, for the policy period of May 3, 2005 to May 3, 2006. [Exhibit 36].

15. The Continental Casualty policy, in pertinent part, provides:

**PART ONE - WORKERS COMPENSATION INSURANCE**

. . . .

B.   **We Will Pay**
We will pay promptly when due the benefits required of you by the workers compensation law.

C.   **We Will Defend**
We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.
We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

D.   **We Will Also Pay**
We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:
1. reasonable expenses incurred at our request, but not loss of earnings;
2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;
3. litigation costs taxed against you;
4. interest on a judgment as required by law until we offer the amount due under this insurance; and
5. expenses we incur.

. . . .

## PART FIVE – PREMIUM

. . . .

**B.**    **Classifications**
Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

**C.**    **Remuneration**
Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
   1. All your officers and employees engaged in work covered by this policy; and
   2. All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

. . . .

**E.**    **Final Premium**
The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy. . . .

. . . .

> **G.    Audit**
> You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. ...

[Exhibit 36, p. 4 of 5 (bold in original)].

16.    On June 8, 2005, Continental Casualty sent a letter to AERAS advising that it would conduct a preliminary audit. [Exhibit 34].

17.    The purpose of the preliminary audit was to provide AERAS with a premium estimate that reflected the true exposure of the account. [Exhibit 34].

18.    In a June 8, 2005 letter to AERAS, Continental Casualty advised AERAS that information regarding employee classification and payroll, claims, and loss prevention would be important during the preliminary audit. [Exhibit 34].

19.    Also on June 8, 2005, Continental Casualty forwarded a second letter to AERAS in which it advised that the estimated annual remuneration of the "clerical office employees" would be reclassified as "hospital: professional employees" and that an additional premium bill and policy documentation would be forwarded reflecting this change. [Exhibit 32].

20.    That same day, Continental Casualty forwarded a "Supplementary Underwriting Information Request" to AERAS, which requested that AERAS provide a signed copy of all 941 or 1099 tax forms; provide a copy of the contract between AERAS and its "employees/health workers"; confirm the legal status of AERAS; identify the officers of the corporation; and provide Alabama Unemployment Wage Reports for the previous four quarters. [Exhibit 33].

21. On June 15, 2005, AERAS responded, and provided the documentation and information requested. [Exhibit 24].

22. In its June 15, 2005 response, AERAS specifically stated that its "physicians who work in the emergency room operate as independent contractors." [Exhibit 24].

23. A preliminary audit of AERAS's books and records was performed on or about July 5, 2005. [Exhibit 121, pp. 22-23, 63; see also Exhibit 15].

24. The preliminary audit was conducted by Tom Dyer on behalf of Continental Casualty. [Exhibit 121, p. 22].

25. On September 12, 2005, Continental Casualty advised AERAS that there were discrepancies between the contract application provided by the insured and the audit results. [Exhibit 15].

26. In its September 12, 2005 letter to AERAS, Continental Casualty requested that AERAS answer the following five (5) questions:

    1. Do the doctors/independent contractors set their own schedule or does the hospital?

    2. What type of supervision, if any, is provided for independent contractors at each location? Is there onsite senior medical staff at each location providing supervision?

    3. In examining your records, benefits are provided to independent contractors such as 401K, malpractice insurance, health insurance, and dental insurance. What are the terms and conditions in which [AERAS] is providing these benefits to independent contractors? What are the circumstances in which [AERAS] is offering 401K?

    4. What other benefits is [AERAS] providing for independent contractors?

      5.    One inconsistency between our audit notes and your contract is that the contract specifies that independent contractors are responsible for their own malpractice insurance, but [the] audit states that [AERAS] provides this benefit. Please clarify.

[Exhibit 15].

27. On or about September 19, 2005, AERAS responded to the questions posed by Continental Casualty. [Exhibit 52; Exhibit 123, Pltf's Ex. 7].

28. In its September 19, 2005 response, AERAS provided the following responses:

1. Do the doctors/independent contractors set their own schedule or does the hospital?
**Independent contractors set their own schedule by giving their days to work to the AERAS, P.C. scheduler.**

2. What type of supervision, if any, is provided for independent contractors at each location? Is there onsite senior medical staff at each location providing supervision?
**When hired the independent contractor works under the supervision of an AERAS, P.C. medical director until that medical director feels the independent contractor received appropriate orientation. This process is usually a month. The medical directors are available 24 hours a day.**

3. In examining your records, benefits are provided to independent contractors such as 401K, malpractice insurance, health insurance, and dental insurance. What are the terms and conditions in which [AERAS] is providing these benefits to independent contractors? What are the circumstances in which [AERAS] is offering 401K?
**AERAS, P.C. does not provide any of the above mentioned benefits to the independent contractors. AERAS, P.C. does not partake in a 401K plan. The malpractice insurance, health insurance and dental insurance are paid for by AERAS, P.C. through monthly accounts payable statements. The independent contractor is then deducted from their monthly compensation the amounts paid for by AERAS, P.C. for malpractice insurance, health insurance, and dental insurance.**

4. What other benefits is [AERAS] providing for independent contractors?
**AERAS, P.C. provides strictly administrative services for the independent contractors.**

        5.      One inconsistency between our audit notes and your contract is that the contract specifies that independent contractors are responsible for their own malpractice insurance, but [the] audit states that [AERAS] provides this benefit. Please clarify.
**As stated above, AERAS, P.C. pays for the independent contractors malpractice on a monthly basis via accounts payable statement. In turn, independent contractors are deducted from their monthly compensation the amount of malpractice insurance paid for by AERAS, P.C.**

[Exhibit 52].

29. On September 30, 2005, Continental Casualty requested that AERAS provide copies of its contracts with the provider hospitals. [Exhibit 14].

30. On or about November 2, 2005, AERAS's agent, Colonial Insurance Agency, provided the requested contracts. [Exhibits 7-11].

31. On November 30, 2005, Continental Casualty amended the policy. [Exhibit 130, p. 1].

32. The estimated premium for the policy increased to $172,819 from $21,271. [Exhibit 130].

33. On December 1, 2005, Continental Casualty issued a Premium Notice in the amount of $126,289, which represented the amount of increased premium from the inception of the policy on May 5, 2005 to December of 2005. [Exhibit 38; Exhibit 126].

34. On December 29, 2005, AERAS's Chief Operations Officer Mark Platt wrote to Continental Casualty and disputed the preliminary audit that was conducted. [Exhibit 5; Exhibit 45; Exhibit 123, Pltf's Ex. 8].

35. In the December 29, 2005 letter, AERAS contended that each physician was an independent contractor of AERAS. [Exhibit 5; Exhibit 45; Exhibit 123, Pltf's Ex. 8].

36. Continental Casualty responded to AERAS's audit dispute letter on February 1, 2006. [Exhibit 13].

37. In its February 1, 2006 letter, Continental Casualty advised that it had completed its review of AERAS's position, and determined that the preliminary audit was correct. [Exhibit 13].

38. Continental Casualty continued to issue Premium Notices to AERAS for the outstanding premium. [Exhibit 41; Exhibit 39].

39. AERAS remitted no payment for the increased premium. [Exhibit 37; Exhibit 41; Exhibit 39].

40. On February 21, 2006, Continental Casualty issued a Past Due Premium Notice to AERAS. [Exhibit 49].

41. The February 21, 2006 Notice advised that AERAS's Workers Compensation and Employers Liability Policy would cancel if the entire past due premium amount of $151,548 was not paid by March 13, 2006. [Exhibit 49].

42. On June 21, 2006, AERAS wrote to Continental Casualty and canceled the workers' compensation coverage effective March 16, 2006. [Exhibit 6].

43. Tom Dyer conducted a final premium audit on May 4, 2006. [Exhibit 3; Exhibit 121, pp. 18-19].

44. On May 10, 2006, Continental Casualty issued a Premium Adjustment Notice reflecting the adjusted premiums based on the May 4, 2006 audit. [Exhibit 43].

45. Based on the total exposure basis of $4,830,060, the audited premium totaled $151,573. [Exhibit 43].

46. On January 26, 2007, Continental Casualty issued an additional Premium Adjustment Notice, which altered the rate applied to a portion of the AERAS exposure basis. [Exhibit 2; compare Exhibit 43].

47. The January 26, 2007 Premium Adjustment Notice identified the audited premium on the policy as $151,782. [Exhibit 2].

48. To date, AERAS has paid a total of $21,721 in premium on policy number 6BS59UB-7603B64-6-05. [Exhibit 1; Exhibit 37].

49. Continental Casualty contends that the balance owed on the policy is $130,511. [Exhibit 1; Doc. 1].

50. On February 6, 2007, The Colonial Insurance Agency wrote to Continental Casualty and returned the January 26, 2007 Premium Adjustment Notice "uncollectible" based on AERAS's dispute of the preliminary audit and its cancellation of coverage effective March 16, 2006. [Exhibit 4].

51. On February 26, 2007, Receivable Management Services forwarded a collection notice to AERAS for the outstanding premium of $130,511 due on policy number 6BS59UB-7603B64-6-05.

52. Continental Casualty instituted this action on March 13, 2007. [Doc. 1].

53. In its Petition for Declaratory Judgment, Continental Casualty seeks the payment of the outstanding premium of $130,511. [Doc. 1].

54. Continental Casualty also seeks any incidental damages to which it may be entitled. [Doc. 1].

55. The physicians who provide medical services in the emergency departments execute Independent Contractor Agreements with AERAS. [Exhibits 54-68].

56. All of the Independent Contractor Agreements signed by the physicians are essentially the same. [Exhibit 122, p. 65].

57. The Independent Contractor Agreements contain the following language:

> **k.    Independent Contractor Relationship.** Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, join ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any

way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by the Company, nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

[Exhibits 54-68, pp. 5-6].

58.     AERAS entered into a contract with Baptist Medical Center (South) on or about September 8, 1992; AERAS entered into a contract with Baptist Medical Center d/b/a Baptist Medical Center East on April 1, 1999; and it entered into a contract with Baptist Medical Center d/b/a Prattville Baptist Hospital on or about October 30, 1998. [Exhibits 8, 10, and 11].

59.     The duties and obligations of AERAS under its contracts with each of these hospitals are essentially the same. [Exhibit 122, p. 16; Exhibits 8, 10, 11].

60.     The hospital contracts state that AERAS and its physicians are not employees or agents of the respective hospitals. [Exhibit 8 § 1.3; Exhibit 10 § 1.3; Exhibit 11 § 1.3].

61.     Prior to its policy with Continental Casualty, AERAS obtained workers' compensation insurance from Williamsburg National Insurance Company and Reciprocal of America. [Exhibit 136; Exhibit 142].

62.     Reciprocal of America provided workers' compensation coverage for AERAS from January 1, 2002 to March 1, 2003. [Exhibit 142; Exhibit 146; Exhibit 163; Exhibit 136].

63.     AERAS secured workers' compensation coverage with Williamsburg National Insurance Company from March 1, 2003 to May 4, 2005. [Exhibit 136; Exhibit 159].

64.     On or about March 7, 2006, AERAS submitted an application to the Alabama Workers' Compensation Self-Insurance Fund ("AlaCOMP"). [Exhibit 187, p. 20; Exhibit 187, Pltf's Ex. 1].

65.     Business Insurance Group manages the AlaCOMP fund. [Exhibit 187, p. 14].

66.     AlaCOMP's workers' compensation coverage for AERAS became effective on March 15, 2006. [Exhibit 187, pp. 32-33; Exhibit 187, Pltf's Ex. 5 and 6].

                                        Respectfully submitted,

                                        */s/ Candace Hudson*

                                        Brenen G. Ely (0366-E54B)
                                        Joel S. Isenberg (8855-N76J)
                                        Candace L. Hudson (8314-N66H)
                                        Attorneys for Plaintiff Continental Casualty
                                        Company

**OF COUNSEL:**
ELY & ISENBERG, L.L.C.
600 Beacon Parkway West, Suite 104
Birmingham, Alabama 35209
Telephone:   (205) 313-1200
Facsimile:    (205) 313-1201

### CERTIFICATE OF SERVICE

I do hereby certify that a true and accurate copy of the foregoing has been on all parties of record by:

      _____    Hand Delivery
      _____    U.S. Mail
      _____    Overnight Delivery
      _____    Facsimile
        X      E-File

on this the 11th day of July, 2008.

                                        */s/ Candace Hudson*
                                        OF COUNSEL

cc:    Michael Cohan
       HILL, HILL, CARTER, FRANCO,
         COLE & BLACK, P.C.
       Post Office Box 116
       Montgomery, AL 36101