**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

RECEIVED

2008 JUL 11 P 2: 57

|  |  |  |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO.: |
| vs. | § | |
| | § | 2:07-CV-221-WHA |
| | § | |
| ALABAMA EMERGENCY ROOM | § | |
| ADMINISTRATIVE SERVICES, P.C., | § | |
| | § | |
| Defendant. | § | |

**RESPONSE TO THE COURT'S OCTOBER 29, 2007 ORDER –
BRIEF IN SUPPORT OF CONTINENTAL CASUALTY'S MOTION
FOR FINDINGS OF FACT AND ENTRY OF JUDGMENT**

COMES NOW Plaintiff Continental Casualty Company ("Continental Casualty") and,

pursuant to this Court's October 29, 2007 Order, submits the following Brief in Support of its

Motion for Findings of Fact and Entry of Judgment:

**INTRODUCTION**

This is a case about risk under an insurance policy issued by Continental Casualty and

whether a category of physicians working for AERAS fall within that risk. To decide this case, the

Court need not conclusively determine that an "employer-employee" relationship exists between

AERAS and its physicians. Rather, the narrow issue for decision is whether the AERAS physicians

are "persons engaged in work that *could* make Continental Casualty liable" to pay the cost to defend

or pay any judgment entered in a workers' compensation claim by one of the physicians. For the

AERAS physicians to fall within the "risk" insured by the policy, Continental Casualty need only

establish that, in the event of a claim by one of the physicians, the duties under the policy to either

defend or indemnify AERAS would have been triggered. In other words, if a question of fact exists as to whether AERAS maintains an "employer-employee" relationship with its physicians, the physicians could have made a claim for which the policy would provide coverage. To determine whether such a question of fact exists, the Court must look to the four factors that Alabama courts apply in determining whether a workers' compensation claimant is an "employee."

Because the objective evidence in this case establishes that AERAS maintained a right of control over its physicians, the physicians are "persons engaged in work that *could* make Continental Casualty liable" under the policy. Thus, the AERAS physicians fall within the risk of the policy, and Continental Casualty's inclusion of the physicians' remuneration for the purpose of calculating premium was both warranted and correct. Accordingly, under the express terms of the policy, AERAS owes the full, final premium as calculated, and Continental Casualty respectfully requests that this Honorable Court enter findings of fact and judgment in favor of Continental Casualty and against AERAS.[1]

## STATEMENT OF FACTS

Pursuant to this Court's October 29, 2007 Order, counsel for Continental Casualty conferred with counsel for AERAS regarding the Statement of Facts. In addition to those facts that AERAS agreed to include in the "Agreed Statement of Facts," Continental Casualty submits the following facts in support of its Motion for Findings of Fact and Entry of Judgment under Federal Rule of Civil Procedure 52:

---

[1]Continental Casualty also respectfully requests that upon the entry of judgment in Continental Casualty's favor, the Court will permit it to present evidence to the Court regarding the extent of additional, incidental damages to which Continental Casualty may be entitled, including, but not limited to pre-judgment interest and attorney fees.

**AERAS's Procurement of the Continental Casualty Policy**

1.    In the Spring of 2005, AERAS learned that its workers' compensation insurer at that time, Williamsburg National Insuring Company was non-renewing the coverage for the 2005-2006 policy year. [Exhibit 159, pp. 2-3].

2.    In its official Notice of Nonrenewal of Workers' Compensation Insurance, Williamsburg stated that it was non-renewing the policy because AERAS was an "employee staffing company," and Williamsburg no longer wished to write this class of business.  [Exhibit 159, pp. 2-3].

3.    AERAS's agent could find no other insurer willing to accept the risk because AERAS's business was considered a "leasing operation." [Exhibit 159].

4.    Because AERAS was unable to secure workers' compensation coverage in the voluntary market, AERAS applied for coverage in the assigned risk market. [Exhibit 159].

5.    In its application and the information submitted to NCCI, AERAS stated that the nature of its business was to supply "medical staff (Physicians Assistants) for Emergency Rooms" and provide billings for same. [Exhibit 158; Exhibit 159; Exhibit 160; see also Exhibit 135, 161].

6.    AERAS advised NCCI that it did not use subcontractors to perform any of its work. [Exhibit 135; Exhibit 160; Exhibit 161, p. 2, question 6.].

**The Preliminary Audit**

7.    During the audit, the auditor verifies the payroll estimates and confirms that the classification codes are correct on the policy. [Exhibit 121, pp. 22-23].

8.    The auditor also reviews payroll records, 941 tax returns, state unemployment reports, a detailed general ledger, and income tax returns. [Exhibit 121, pp. 22-23].

3

9.    During the preliminary audit, Mr. Dyer verified the payroll estimates and confirmed whether the classification codes were correct on the policy. [Exhibit 121, pp. 22-23].

10.    During the preliminary audit, Mr. Dyer reviewed AERAS's "payroll journal, 941s, state unemployment returns, [and] detailed general ledger" to determine the "remuneration for [the] people that work[ed] for [AERAS]." [Exhibit 121, p. 25].

11.    Mr. Dyer also classified the type of business that AERAS was. [Exhibit 121, pp. 27-28].

12.    Because AERAS "provide[s] emergency room physicians and staff at . . . several local hospitals in Montgomery," Mr. Dyer determined that it was a hospital-type or "class 8833" business [Exhibit 121, pp. 27-28].

13.    Mr. Dyer also determined that the staff that AERAS provides to local hospitals includes "[n]urse practitioners, physicians assistants, and emergency room doctors." [Exhibit 121, p. 28].

14.    Part of Mr. Dyer's duties in a preliminary audit were to determine whether an employee/employer relationship existed between AERAS and the doctors that could make Continental Casualty responsible for worker's compensation claims. [Exhibit 121, pp. 28-31, 43].

15.    Mr. Dyer needed to determine whether the doctors were employees versus independent contractors because he needed to determine who was a potential claimant under the workers' compensation policy and the potential exposure that the doctors created. [Exhibit 121, p. 44].

16.     During the preliminary audit, Mr. Dyer reviewed the records provided by AERAS and asked questions of AERAS to determine whether the doctors were employees or independent contractors. [Exhibit 121, pp. 28-29].

17.     Mr. Dyer reviewed the "[y]ear-to-date earnings, records for each of the emergency room doctors, [and the] general ledger." [Exhibit 121, p. 29].

18.     Regarding his review of the documents produced during the preliminary audit, Mr. Dyer testified as follows:

Q.     **What is it in the earnings records that led you to determine that the doctors were employees?**

A.     From the total amount that was paid to the doctors, there are several items that were deducted from the gross pay, which led to a bottom figure, or net pay, that was actually the check written to the doctors.

Q.     **What things that were deducted led you to believe that the doctors were employees versus independent contractors?**

A.     From the gross pay, malpractice insurance was withheld, health insurance was withheld, dental insurance was withheld, disability insurance was withheld, cafeteria deductions were made, and advances were deducted.  And APP fees, slash, other were also deducted.

. . . .

Q.     **. . . What in the general ledger led you to believe that the ER doctors were employees?**

A.     The frequency of payments made to the doctors.

Q.     **What is it about the frequency of payments that has significance in the determination as to whether or not they're employees?**

A.     They were paid on a weekly or monthly basis.

Q.     **And what difference does that make?**

5

> A.    They are paid the same way as an employee is paid, on a weekly or monthly basis.

[Exhibit 121, pp. 29-31].

19.    Mr. Dyer also met with Ashley Rogers during the preliminary audit. [Exhibit 121, pp. 32].

20.    Ashley Rogers was the comptroller for AERAS. [Exhibit 123, pp. 25-26].

21.    In her position as comptroller, Ms. Rogers's responsibilities included "mak[ing] sure that payroll was done for the employees" and "manag[ing] the books." [Exhibit 123, p. 26].

22.    During the audit, Ms. Rogers provided information regarding who scheduled the physicians to work, how the physicians were paid, and the times that the physicians worked. [Exhibit 121, pp. 32-33].

23.    Mr. Dyer understood that scheduling "was a joint effort between AERAS and the doctors." [Exhibit 121, p. 33].

24.    Regarding the manner in which the AERAS physicians were paid, Ms. Rogers advised Mr. Dyer that "the doctors are paid a percentage from the charges incurred from the procedures that the doctors perform on the patients . . . [a]nd the doctor is guaranteed to make a minimum hourly fee if they don't see any patients in that hour." [Exhibit 121, p. 34; see also Exhibit 122, pp. 67-68; Exhibits 54-68, Ex. 1 "Contract Amount"].

25.    In determining whether the physicians in an employer-employee relationship with AERAS, Mr. Dyer relied on the Alabama workers' compensation statutes and the IRS guidelines. [Exhibit 121, pp. 34-35].

6

26.     The factors he considered included: whether the business scheduled when and where the work was to be performed; how the business paid the worker; and whether the business provided the worker with employee-type benefits such as insurance, pension plan, vacation pay, or sick pay. [Exhibit 121, pp. 37-39].

27.     None of the AERAS physicians had their own individual workers' compensation insurance. [Exhibit 121, p. 45].

### Information Provided After the Preliminary Audit, Continental Casualty's Decision to Include Physician Remuneration in the Premium Basis, and the Final Premium Audit

28.     After reviewing the preliminary audit, the additional underwriting information provided by AERAS, and the hospital contracts, Continental Casualty determined that the policy should be amended to include the estimated annual remuneration of the AERAS physicians. [Exhibit 130].

29.     On November 30, 2005, Continental Casualty amended the policy to reflect the exposures and/or classifications that were discovered in the preliminary audit. [Exhibit 130, p. 1].

30.     With the inclusion of the estimated annual remuneration of the AERAS physicians during the policy period, the estimated premium for the policy increased to $172,819 from $21,271. [Exhibit 130].

31.     AERAS disputed the results of the preliminary audit, and contended that the physicians should not be included because they are "independent contractors." [Exhibit 5; Exhibits 123, Pltf's Ex. 8].

32.     As support for its position, AERAS stated that AERAS contracted with each individual "to provide administrative support for the physicians . . . in the emergency room"; that

"[e]ach physician has his or her own medical malpractice and health insurance policies, which [are paid] for individually"; that AERAS is "compensated for supplying the personnel to aid [the physicians] in purchasing these policies"; and that "[e]ach physician received a 1099 at year-end." [Exhibit 5; Exhibit 45; Exhibit 123, Pltf's Ex. 8].

33.    Continental Casualty determined that "[b]ased upon the contract between AERAS and the hospitals, . . . AERAS reserves the right to control the manner in which the ER doctors perform their work." [Exhibit 13].

34.    In specific response to AERAS's contention that its physicians are "independent contractors," Continental Casualty stated that "AERAS provides a full time ER Director who is charged with managing the ER doctors and the professional and medical issues involved with the ER . . . [including] clinical direction of the ER as well as continuous education and training of ER doctors." [Exhibit 13].

35.    Because these factors, as well as others not specifically set forth in Continental Casualty's February 1, 2006 letter, could lead to the conclusion that the AERAS physicians are employees, Continental Casualty determined that its premium audit was correct. [Exhibit 13].

36.    The physicians whose remuneration was included in the preliminary and final premium audits were: Dr. David G. "Greg" Alexander; Dr. Jessie Austin; Dr. Victoria Beckman; Dr. James Bradwell; Dr. Dante DeJesus; Dr. Wallace Falero; Dr. Joseph Foster; Dr. Carlos Gutierrez; Dr. Josh Kotouc; Dr. Julian Mahaganasan; Dr. John Moorehouse; Dr. Julio Rios; Dr. Ronald Shaw; Dr. George Smith; and Dr. Joel Sullivan. [Exhibit 3].

8

37.    With the inclusion of the physicians' payroll, Mr. Dyer determined that the actual exposure during the policy period of May 5, 2005 to March 16, 2006 was $4,830,060. [Exhibit 3, at CNA0014, CNA0016].

## AERAS's Independent Contractor Agreements

**A.    Contract Duties**

38.    The principal duties of the "Independent Contractor," as outlined in the Agreements, are "to perform, hospital medical and surgical services for and on behalf of [AERAS]." [Exhibits 54-68, p. 1].

39.    Pursuant to the Agreements, the physicians are required to "render medical and surgical services to all members of the general public presenting at [the hospitals], and at all other places designated by [AERAS] and approved by [the hospitals]." [Exhibits 54-68, p. 1].

40.    The Agreements further provide: "All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations of [the hospitals]." [Exhibits 54-68, p. 1].

41.    The Agreements require the contracting physician to "maintain complete and accurate patient medical and surgical records," and to "perform all things reasonably desirable to maintain and improve [his or her] professional skills" at the expense of the physician." [Exhibits 54-68, p. 2].

42.    Under the terms of the Agreements, AERAS is required to "provide the Independent Contractor all of the day-to-day clerical, billing and administrative assistance required by the

9

Independent Contractor in connection with the Independent Contractor's provision of services under [the] Agreement." [Exhibits 54-68, p. 2].

**B.    Malpractice Insurance**

43.    The Agreements require the contracting physician to "obtain and continually maintain professional liability insurance, from carriers acceptable to [AERAS], in the amount of at least ONE MILLION DOLLARS ($1,000,000.00) single limit, each incident and THREE MILLION DOLLARS ($3,000,000.00) annual aggregate insuring [the physician] for liability in performance of the Independent Contractor's duties under [the] Agreement." [Exhibits 54-68, p. 4].

44.    AERAS has a group malpractice policy. [Exhibit 123, p. 32].

45.    All of the AERAS physicians are required to have malpractice insurance. [Exhibit 123, p. 32; Exhibits 54-68].

46.    If an AERAS physician is on the AERAS group malpractice policy, the premium for the policy is deducted out of the physicians' paycheck. [Exhibit 123, p. 32].

47.    From February 20, 2003 to February 20, 2007, the majority of the AERAS physicians were insured under the same group malpractice policy. [Exhibits 153-156].

48.    The following physicians were covered under the professional liability policy, policy number MP44122, issued by Mutual Assurance to Alabama Emergency Room Administrative Services, P.C. during the policy periods of February 20, 2005 to February 20, 2006 and February 20, 2006 to February 20, 2007: Dr. Carlos Gutierrez; Dr. Dante DeJesus; Dr. Julian Mahaganasan; Dr. James Bradwell; Dr. Joel Sullivan; Dr. Ronald Shaw; Dr. Julio Rios; Dr. John Moorehouse; Dr. Wallace Falero; Dr. Jesse Austin; Dr. David Gregory Alexanders; Dr. Joshua Kotouc, Dr. Joseph Foster; Dr. Victoria Beckman; Dr. George Smith. [Exhibits 155-156].

10

C.     **AERAS's Group Health Policy**

49.     AERAS has a group health plan through Blue Cross and Blue Shield of Alabama. [Exhibit 123, p. 32].

50.     AERAS applied for its current group health plan on or about October 10, 1994. [Exhibit 168].

51.     The Blue Cross and Blue Shield of Alabama Application for Group Health Benefits Contract completed by AERAS classifies eligible employees as "full-time employees." [Exhibit 168, p. 1].

52.     The Application for Group Health Benefits Contract completed by AERAS further describes "Full-time Employees" as one who works a minimum of 30 hours per week. [Exhibit 168, p. 1].

53.     The Application defines an "employee" as "a permanent, active employee who is not on layoff, leave of absence, or sick leave," and requires that the employee "be employed by employer in a bona fide employer-employee relationship." [Exhibit 168, p. 1].

54.     On or about March 1, 1999, AERAS completed another application to establish a Small Group Health Benefits Contract. [Exhibit 169].

55.     In the March 1, 1999 Application, AERAS classified the employees eligible for the group health coverage as "[a]ll full-time employees." [Exhibit 169, p. 1].

56.     The March 1, 1999 Application defined a "full-time employee" as one who worked "30 hours (minimum) per week." [Exhibit 169, p. 1].

11

57.     Further, the "Employee must be a permanent, active employee who is not on layoff, leave of absence, or sick leave" and "employed by employer in a bona fide employer-employee relationship." [Exhibit 169, p. 1].

58.     The Blue Cross and Blue Shield of Alabama group health benefits contract that was in effect during May 1, 2005 to March 13, 2006 is the "579 Plan." [Exhibit 170-171; Exhibit 167].

59.     The Blue Cross and Blue Shield of Alabama 579 Plan specifically provides "[y]ou are eligible to enroll in this plan if . . . you are an employee of your employer and are treated as an employee (as opposed to an independent contractor) by your employer." [Exhibit 170, p. 7; Exhibit 171, p. 7].

60.     Although the provision of health insurance is not discussed in the agreements that AERAS executes with its physicians, the Blue Cross and Blue Shield of Alabama group health plan is offered to the contracting physicians. [Exhibit 123, p. 32].

61.     Should an AERAS physician elect to have coverage under the Blue Cross and Blue Shield of Alabama group health plan, the premiums are deducted from the physician's monthly paycheck. [Exhibit 123, p. 32].

62.     The contracting physicians who were enrolled in AERAS's group health plan with Blue Cross and Blue Shield of Alabama during May 1, 2005 to March 13, 2006 include: Dr. John Moorehouse; Dr. David G. Alexander; Dr. Victoria Beckman; Dr. James Bradwell; Dr. Carlos Gutierrez; Dr. Julian Mahaganasan; Dr. Julio Rios; and Dr. Ronald Shaw. [Exhibits 172-173, 175-180].

63.     The physicians who were enrolled in AERAS's group health plan with Blue Cross and Blue Shield of Alabama completed "Applications for Enrollment." [Exhibits 172-180].

12

64.    The Applications for Enrollment completed by the physicians designate the physicians as the "employee" seeking coverage, and AERAS as the "employer." [Exhibits 172-180].

65.    In the Applications for Enrollment, each of the physicians certify that they are "eligible" for the Group Health Benefits Certificate or Group Agreement for which they are applying. [Exhibits 173-180].

### AERAS's Contracts with the Hospitals

**A.    Physician Coverage and Scheduling**

66.    Principally, AERAS is required to "provide physician[s] . . . for the Emergency Department . . . on a continuous, uninterrupted basis, twenty-four (24) hours each day, seven (7) days each week." [Exhibit 8 § 1.1; Exhibit 10 § 1.1; Exhibit 11 § 1.1].

67.    AERAS generates the schedule for the physicians. [Exhibit 123, p. 27].

68.    Mark Platt, the Chief Operations Officer for AERAS, testified that "the physicians give the days that they would like to work or be off to the scheduler, [Jeanie] Shaw, and she would do her best to comply with all that." [Exhibit 123, pp. 26-27].

69.    The schedule for the AERAS physicians is posted about two weeks before the first of the month. [Exhibit 123, p. 27; Exhibit 122, p. 33].

70.    AERAS also keeps up with the hours of its physicians by maintaining sign-in sheets for the physicians at the emergency departments. [Exhibit 122, p. 105].

71.    The sign-in sheets also permit AERAS to know how many hours their services are covering in the emergency departments. [Exhibit 122, p. 105].

13

72.    When new physicians begin working, AERAS schedules the new physician to work around the same times "that the medical directors are working so that there is some overlap there if there are any questions or issues about the emergency room, about some of the processes within the emergency room, [or] about the documentation system." [Exhibit 123, p. 30].

73.    The purpose for scheduling new physicians with the emergency medical director is so that the new physician has a "resource person" to go to in the event of questions about processes in the emergency room and the documentation system. [Exhibit 123, p. 30].

**B.    AERAS and Its Physicians Are Not Employees or Agents of the Hospitals**

74.    The contracts provide that neither AERAS nor its physicians "shall have any claim . . . for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind." [Exhibit 8 § 1.3; Exhibit 10 § 1.4; Exhibit 11 § 1.3].

**C.    Core Group of Physicians**

75.    Under the hospital contracts, AERAS is required to "maintain a stable core group of full-time Emergency Physicians to work in the Emergency Department on a regular basis." [Exhibit 8 § 1.4; Exhibit 10 § 1.5; Exhibit 11 § 1.4].

76.    AERAS agrees to have some of the same physicians at each facility on a regular basis. [Exhibit 122, p. 28].

**D.    Emergency Medical Directors**

14

77.    AERAS is further required to "designate an Emergency Medical Director" for each hospital who will work full-time in the Emergency Department and provide management of the AERAS physicians.  [Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5].

78.    The Emergency Medical Director is an AERAS employee who is responsible for several things under the hospital contracts, including, but not limited to:  clinical direction of the Emergency Department; review and implementation of medical protocols for the Emergency Department; monitoring the quality of care delivered in the Emergency Department; assisting in the education and training of Emergency Department personnel; orientation of the AERAS physicians; coordination of the Emergency Department's schedule; and evaluation of the performance of the AERAS physicians. [Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5; Exhibit 122, pp. 33-35].

79.    The AERAS Emergency Medical Directors are employees of AERAS "for that portion of their professional responsibility." [Exhibit 122, p. 34-35].

80.    The medical directors "provide direction for the emergency room in terms of processes, patient throughput, flows, and those things." [Exhibit 123, p. 42].

81.    The Emergency Medical Directors help coordinate, implement, and provide insight into the established protocols and guidelines. [Exhibit 122, pp. 42-43].

82.    It is also the responsibility of each physician to review the protocols and guidelines. [Exhibit 122, pp. 42-43].

**E.    Orientation of New Physicians**

83.    Dr. Wallace Falero is the AERAS physician who is responsible for orienting new emergency department physicians. [Exhibit 122, pp. 48, 50].

84.    Orientation of physicians is done in a formal setting. [Exhibit 122, p. 49].

15

85.     When a newly-contracted physician comes into the emergency room, AERAS orients the physician on the documentation system, about the scheduling, and the different facilities; introduces the physician to people and the basic format of AERAS; and gets them oriented with who they will be working with, the AERAS bylaws, and what is expected of them. [Exhibit 122, p. 48].

86.     AERAS's orientation includes the information that is provided by the T-System Company, which is an in-depth explanation about how to do the documentation in the charting process. [Exhibit 122, p. 50].

87.     Dr. Falero conducts the orientation on the T-System manual. [Exhibit 122, p. 51].

88.     Dr. Moorehouse monitors whether the physicians are adequately documenting their patient care. [Exhibit 122, p. 52].

**F.     Quality Assurance and Annual Reviews**

89.     If an AERAS physician deviates from the standard of care, the AERAS medical director will coach the physician. [Exhibit 123, p. 41].

90.     If there is any type of quality issue, AERAS's Emergency Medical Director will first review it with the particular physician.  [Exhibit 122, p. 46].

91.     If the quality issue is significant, it will also be reviewed by the quality assurance committee at the hospital. [Exhibit 122, pp. 46-47].

92.     The hospital contracts also require AERAS to "provide a continuing review and an annual evaluation of the professional performance" of each AERAS physician. [Exhibit 8 § 1.11; Exhibit 10 § 1.12; Exhibit 11 § 1.11].

93.     Annual reviews of the emergency department physicians by AERAS are required by the medical staff credentialing office. [Exhibit 122, p. 62-63].

G.    **Corporate Compliance**

94.    AERAS also has a corporate compliance program in place. [Exhibit 122, pp. 73-74].

95.    AERAS is required by law to review its corporate compliance with each of its physicians. [Exhibit 122, p. 79].

96.    The AERAS Corporate Compliance Handbook was written to ensure that AERAS has proper, ethical billing practices in place. [Exhibit 122, pp. 73-74].

97.    The AERAS Corporate Compliance Handbook "is intended as a guide for employees, officers, directors, and agents of AERAS . . . as well as every other individual offering medical care, services or supplies through AERAS, including non-employee physicians and other health care providers (collectively, the 'AERAS Colleagues') so that AERAS may fulfill its obligation to observe the laws and public policies affecting its business." [Exhibit 106, p. 3; Exhibit 122, Pltf's Ex. 6, p. 3].

98.    AERAS's "Compliance Officer is responsible for the overall implementation and operation of the Compliance Program." [Exhibit 106, p. 5; Exhibit 122, Pltf's Ex. 6, p. 5].

99.    AERAS's corporate compliance officer is Dr. Wallace Falero. [Exhibit 122, p. 80].

100.    The compliance officer's primary responsibilities include overseeing, developing, monitoring, and implementing the compliance program. [Exhibit 106, p. 5; Exhibit 122, Pltf's Ex. 6, p. 5].

101.    The Compliance Officer also develops, coordinates, and participates in "multifaceted education and training programs that focus on the elements of [the] compliance program, and seek[s] to ensure that all appropriate AERAS Colleagues are knowledgeable of, and comply with, pertinent federal and state standards." [Exhibit 106, p. 6; Exhibit 122, Pltf's Ex. 6, p. 6].

17

102.    Dr. Falero reviews the AERAS corporate compliance manual with each physician. [Exhibit 122, p. 80].

103.    If there is a new compliance issue that has been mandated to which AERAS must adhere, AERAS will coordinate that education for the physicians. [Exhibit 122, p. 90].

104.    If Dr. Falero determines that there are deficiencies in a physician's record-keeping or adherence to established protocols, AERAS will coach the physician. [Exhibit 122, p. 101].

105.    The Corporate Compliance Handbook provides for the formation of a Corporate Compliance Committee. [Exhibit 106, p. 7; Exhibit 122, Pltf's Ex. 6, p. 7].

106.    The Corporate Compliance Committee is primarily comprised of the officers of AERAS. [Exhibit 122, p. 86].

107.    "AERAS's Compliance Program requires that the promotion of, and adherence to, the elements of the Compliance Program be a factor in evaluating the job performance of AERAS Colleagues." [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11].

108.    All AERAS physicians are "trained in new compliance guidelines." [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11].

109.    All AERAS physicians "must strictly comply with [the Compliance] guidelines, which are a condition of their contractual agreement/employment with AERAS." [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11].

110.    Every AERAS physician "is expected to comply with AERAS and government requirements regarding record keeping." [Exhibit 106, p. 12; Exhibit 122, Pltf's Ex. 6, p. 12].

111.    With respect to "Education and Communication," the AERAS Corporate Compliance Manual provides:

18

- The Compliance policy and program will be routinely communicated to all AERAS Colleagues through the physician or employee orientation program, AERAS newsletter, in-services and meetings, and other methods of communication.

. . . .

A formal training program will be conducted on at least an annual basis, and will include:

- Review of the organization's Compliance Program summarizing fraud and abuse laws, coding requirements, claim development and submission processes, marketing, and practices that reflect current legal and program standards.
- Communicating the Compliance Program standards and procedures to all AERAS Colleagues by requiring participation in training programs and disseminating publications that explain in a practical manner specific requirements.
- Training for new employees or physicians.
- Documentation by the Compliance Officer of all training.

. . . .

Failure to comply with training requirements will result in disciplinary action, including possible termination, when such failure is serious in nature. Adherence to provisions of the Compliance Program, such as training requirements, will be a factor in the annual evaluation of each employee, as well as contract re-negotiations of a physician.

[Exhibit 106, pp. 16-17].

112.    The Corporate Compliance Manual further states that

upon reports or reasonable indications of suspected noncompliance, the Compliance Officer will . . . initiate prompt steps to investigate the conduct in question to determine whether a material violation of applicable law or the requirements of this Compliance Program has occurred.  If a violation is detected, he of she will take steps to correct the problem.

. . . .

In the event an investigation reveals what appears to be criminal activity on the part of any AERAS Colleague, AERAS shall proceed as follows:

19

–    AERAS shall immediately correct the improper practice;
–    AERAS shall discipline the person(s) responsible for the offending practice(s);

. . . .

–    AERAS shall institute education and other actions to avoid recurrence of the problem; and/or
–    AERAS shall take such other actions and steps necessary to address the offending practice deemed appropriate under the circumstances.

. . . .

In the event an investigation reveals what appears to be conduct, which is not criminal in nature, but nonetheless a violation of the standards and procedures set forth in this Compliance Program and/or applicable law, AERAS shall address the problem within sixty (60) days following the determination of evidence of the impropriety.  Such action shall include, as appropriate:

. . . .

–    Correction of the improper practices;
–    Disciplinary action against the person(s) responsible for the offending practice(s);
–    The institution of education and other actions to avoid recurrence of the problem; and/or
–    Such other action and steps deemed necessary and appropriate under the circumstances.

[Exhibit 106, pp. 21-22].

**H.    Equipment.**

113.    Under the hospital contracts, each hospital is required to provide the space necessary for an emergency department, "such equipment as is required" for the emergency department, and "utilities, housekeeping, laundry and other supplies for the proper and efficient operation of the department." [Exhibit 8 § 2.1; Exhibit 10 § 2.1; Exhibit 11 § 2.1].

114.    It is understood between AERAS and its physicians that equipment such as MRIs, ultrasounds, and hospital beds will be provided at the hospital. [Exhibit 122, p. 104].

115.   The physicians are not responsible for providing equipment such as MRIs, ultrasounds, and hospital beds. [Exhibit 122, p. 104].

116.   In essence, all equipment, including otoscopes, laryngoscopes, modern equipment, lab facilities, and x-ray facilities are provided by the hospitals. [Exhibit 122, p. 64].

**I.    Malpractice Insurance**

117.   The hospitals require AERAS and the AERAS physicians to provide their own professional liability insurance with coverage limits of $1 million/$3 million for each physician who provides services at each hospital. [Exhibit 8 § 4.4; Exhibit 10 § 4.4; Exhibit 11 § 4.4].

**AERAS's Workers' Compensation Coverage Before Continental Casualty**

**A.    Reciprocal of America**

118.   In the Application that AERAS submitted to Reciprocal of America for coverage effective January 1, 2002, AERAS stated that it does use "contract labor" and that "these workers have evidence of Workers' Compensation coverage." [Exhibit 143, p. 2].

119.   In the Application that AERAS submitted to Reciprocal of America for coverage effective January 1, 2003, AERAS again stated that it does use "contract labor" and that "these workers have evidence of Workers' Compensation coverage." [Exhibit 144, p. 2].

**B.    Williamsburg National Insurance Company**

120.   The Williamsburg policy contained the following language:

**PART FIVE – PREMIUM**

. . . .

**B.    Classifications**
Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications.  These classifications were

21

assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

C.    **Remuneration**
Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1.    all your officers and employees engaged in work covered by this policy; and

2.    all other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

. . . .

E.    **Final Premium**
The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy. . . .

. . . .

G.    **Audit**
You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs

22

> for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. . . .

[Exhibit 136, p. 5 (bold in original)].

121.    The Extension of Information page of the Williamsburg policy identifies the estimated annual remuneration for AERAS's class 8833 Hospital: Professional Employees as $447,000. [Exhibit 136, p. 2].

122.    On April 13, 2004, Wilkinson Insurance Services performed an audit of AERAS regarding the policy issued by Williamsburg National Insurance Company. [Exhibit 137].

123.    In the April 13, 2004 audit, the exposure was determined to be $534,748 for class 8833 Hospital: Professional Employees. [Exhibit 137, p. 1].

124.    The April 13, 2004 audit also identified exposure for class 8833 Hospital: Professional Employees - MD as $4,555,016. [Exhibit 137, p. 1].

125.    The audit contains an "Underwriting Alert" section, which states "[t]he exposure increase is due to growth of the business and the inclusion of the physicians." [Exhibit 137].

126.    The "Description of Operations" contained in the April 13, 2004 audit states:

> The insured is a management company that provides the staff for the Baptist hospital system emergency rooms, this includes physicians, nurses, and the corporate headquarters which maintains the records, does the case files, and payroll functions. The physicians are paid by [AERAS] but they stated the physicians are covered by the hospital for [workers' compensation] purposes. Nobody could provide proof of coverage so I have shown the money paid to the physicians on the sub worksheet but have not included in the exposure pending [underwriting review].

> . . . .

23

The MD's are paid by the insured[.] I am adding the exposure to the audit until proof is given that the[y] are covered for [workers' compensation] by the hospitals. . . .

[Exhibit 137].

127.    On June 4, 2004, Williamsburg National Insurance Company issued an Audit Invoice advising that the Final Audited Premium was $141,828. [Exhibit 138].

128.    On June 14, 2004, AERAS disputed the results of the Williamsburg audit. [Exhibit 166].

129.    On June 15, 2004, the audit for the Williamsburg policy was revised. [Exhibit 139].

130.    The "Underwriting Alert" section of the revised audit states that the audit is being revised because the "insured faxed . . . proof of coverage for the MD's." [Exhibit 139].

131.    On June 16, 2004, Williamsburg issued an additional Audit Invoice, which identified the Final Audited Premium for the March 1, 2003 to March 1, 2004 policy year to be $17,841. [Exhibit 140].

### AERAS's Workers' Compensation Coverage After Continental Casualty

132.    In March of 2006, before it canceled the Continental Casualty policy, AERAS began the process of finding another workers' compensation insurer. [Exhibit 48; Exhibit 123, Pltf's Ex. 13-14; Exhibit 147; Exhibit 187, Pltf's Ex.1-2].

133.    When AERAS sought workers' compensation coverage in March of 2006, it included its physicians' estimated annual remuneration in the applications that it forwarded to other workers' compensation insurers. [Exhibit 123, Pltf's Ex. 13-14; Exhibit 147; Exhibit 187, Pltf's Ex. 1-2].

24

134.    Although AERAS did not want the physicians' payroll included in its workers' compensation coverage, no one would quote the coverage unless the physicians were included in the policy. [Exhibit 123, pp. 57-59].

135.    In its March 7, 2006 application to AlaCOMP, AERAS stated that it had a total of twenty-two (22) employees. [Exhibit 187, Pltf's Ex. 1].

136.    Of the twenty-two employees, AERAS stated that it had fifteen (15) full time employees who were class 8833 "hospital professional employees." [Exhibit 187, Pltf's Ex. 1].

137.    The class 8833 "hospital professional employees" included the AERAS physicians. [Exhibit 187, pp. 23-24, 26].

138.    AERAS also stated that it had seven (7) full time employees who were classified as "clerical" employees. [Exhibit 187, Pltf's Ex. 1].

139.    AERAS estimated the annual remuneration for the "hospital professional employees" was $4,600,000 and the annual remuneration for the "clerical" employees was $350,000. [Exhibit 187, Pltf's Ex. 1].

140.    On March 14, 2006, AlaCOMP issued a quotation for workers' compensation coverage to AERAS based on the information that had been provided. [Exhibit 187, pp. 31; Exhibit 187, Pltf's Ex. 4].

141.    The March 14, 2006 quotation from AlaCOMP was based on the total estimated annual remuneration of $4,600,000 for "hospital professional employees" and $350,000 for "clerical employees." [Exhibit 187, Pltf's Ex. 1 and 4].

142.    Workers' compensation coverage under AlaCOMP is different from traditional workers' compensation insurance coverage.  [Exhibit 187, pp. 12-14].

25

143.    AlaCOMP is essentially an insurance organization that operates under the direct supervision of the Department of Industrial Relations. [Exhibit 187, p. 13].

144.    AlaCOMP does not issue a workers' compensation "policy." [Exhibit 187, p. 15].

145.    AlaCOMP members sign a Participation Agreement in which the member accepts the rules of the fund. [Exhibit 187, p. 15; Exhibit 187, Pltf's Ex. 7].

146.    AlaCOMP also issues a declarations or information page where the basic terms of the coverage are set out. [Exhibit 187, p. 15; Exhibit 187, Pltf's Ex. 6].

147.    A premium under AlaCOMP is calculated by multiplying a member company's payroll with the established rate for the employees' classifications. [Exhibit 187, pp. 15-16].

148.    Just as with the voluntary market, AlaCOMP's member companies are subject to premium audits. [Exhibit 187, pp. 16-17].

149.    The purpose for the premium audit is to determine what the true exposure was during the policy period. [Exhibit 187, pp. 17-18].

150.    At the time it applied for coverage through AlaCOMP, AERAS did not request that the remuneration for the physicians be excluded from the premium basis. [Exhibit 187, p. 32; Exhibit 187, Pltf's Ex. 1].

151.    On March 27, 2006, AERAS's attorney Gerald Hartley wrote a letter in which AERAS requested that AlaCOMP "reconsider its position and delete any requirement that AERAS cover the independent contracting physicians under the workers compensation policy and adjust the premiums accordingly." [Exhibit 187, pp. 41; Exhibit 187, Pltf's Ex. 9].

152.    The letter was forwarded to Joe Lanoux, the Senior Underwriter at Business Insurance Group. [Exhibit 187, pp. 9-10, 41].

153.    In his position as Senior Underwriter, Mr. Lanoux must evaluate the account and balance the premium with the risk. [Exhibit 187, pp. 11-12, 45].

154.    When he initially received AERAS's request to omit the physicians' payrolls from the premium basis, Mr. Lanoux was unpersuaded by the arguments provided. [Exhibit 187, p. 43].

155.    It was unnecessary for Mr. Lanoux to determine whether the physicians were independent contractors or employees. [Exhibit 187, p. 44].

156.    Mr. Lanoux reasoned that if the physician payrolls were deducted, the premium for the coverage would be very small and would not cover the potential of defending any kind of a claim, even if the claim was defeated. [Exhibit 187, pp. 43-44, 45].

157.    Mr. Lanoux testified that "if all of the doctors' payrolls are taken out . . . there's a tiny premium that would be left and . . . we would have an awful lot of . . . highly paid credentialed profession[als], whose injury could conceivably be a serious result for [AlaCOMP] . . . and yet [AlaCOMP] would not be receiving any premium for that potential exposure." [Exhibit 187, p. 43].

158.    Mr. Lanoux further testified that although "there are many insurance companies in America who . . . would be interested in doing this," this was a risk that AlaCOMP was not willing to take. [Exhibit 187, p. 44].

159.    On April 26, 2006, Mr. Lanoux responded to AERAS's request, stating:

> The inclusion of independent contractors in worker's compensation coverage and charging for that coverage is common. . . . Independent contractors are included in coverage where insurance providers routinely lose claims suits to uninsured independent contractors.
>
> In this case it is not necessary for us to reach a determination of whether or not the doctors involved are independent contractors or employees. In either case we believe we would lose a suit for a serious worker's compensation claim. Therefore, we must charge premium for the doctor's payrolls.

[Exhibit 187, p. 47; Exhibit 187, Pltf's Ex. 11].

160.    On May 19, 2006, AlaCOMP's counsel, Dean Mooty, provided a further response to

AERAS's request. [Exhibit 187, p. 49; Exhibit 187, Pltf's Ex. 12].

161.    In his May 19, 2006 letter, Mr. Mooty stated:

> [R]egardless of however slight the risk might be that a physician was
> successful on a work comp claim, . . . [AlaCOMP] simply [is] unwilling to
> exclude the doctors and stay on the risk due to what [it sees] as an imbalance
> between the risk and the return. Otherwise, AERAS needs to find a willing
> carrier who can accept and insure the account the way AERAS desires.
> AlaCOMP is unwilling to do so. As you know, the law is pretty clear that if
> you accept a premium on a worker, you've insured them. This is regardless
> of their status otherwise as an independent contractor, be it a physician, a
> construction worker, or whatever.

[Exhibit 187, Pltf's Ex. 12].

162.    AERAS continued its workers' compensation coverage with AlaCOMP. [Exhibit

123, pp. 66-67; Exhibit 187, Pltf's Ex. 16 and 18].

163.    AERAS paid AlaCOMP a total premium of $72,386 for workers' compensation

coverage from March 15, 2006 to January 1, 2007. [Exhibit 187, pp. 65-66].

164.    AERAS paid AlaCOMP a total premium of $87,316 for workers' compensation

coverage from January 1, 2007 to January 1, 2008. [Exhibit 187, pp. 65-66].

165.    When it issued the renewal quotation for the 2008 policy year, AlaCOMP agreed to

allow reduction of the physician payrolls. [Exhibit 187, p. 57].

166.    Senior Underwriter Joe Lanoux testified that AlaCOMP was willing to reduce the

physician payrolls for the 2008 policy year because it had "built up a cushion, a margin of safety, so

to speak from the prior years, so . . . the risk was lower . . . so [AlaCOMP] agreed to reduce the

price." [Exhibit 187, p. 58].

28

167. At the time AlaCOMP allowed the reduction of the physician payrolls, AlaCOMP had received premiums for the AERAS doctors for a year and three quarters. [Exhibit 187, p. 61].

168. Another factor that was critical to AlaCOMP's decision to permit reduction of the physician payrolls was the fact that some of the physicians would remain on the payroll. [Exhibit 187, pp. 61-62].

169. Mr. Lanoux testified that "[i]f there had not been some doctor payrolls in there, [AlaCOMP] would not be insuring [AERAS]." [Exhibit 187, p. 62].

## ARGUMENT

### I.     CONTINENTAL CASUALTY'S POLICY.

Continental Casualty's principal obligations under the policy are outlined in the section entitled "Part One - Workers Compensation Insurance." Under that section, Continental Casualty agrees to "pay promptly . . . the benefits required of [AERAS] by the workers compensation law." [Exhibit 36 at CNA0145]. Part One further provides that Continental Casualty "will have the right and duty to defend at [its] expense any claim, proceeding, or suit against [AERAS] for benefits payable by this insurance." [Exhibit 36 at CNA 0145].

In exchange for accepting the risk of a claim that Continental Casualty must defend or pay, Continental Casualty's policy included the following terms with respect to calculation of premium and determination of the actual exposure insured against:

### PART FIVE – PREMIUM

. . . .

**B.     Classifications**
Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly

29

described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

**C.    Remuneration**

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1.    All your officers and employees engaged in work covered by this policy; and

2.    All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.

. . . .

**E.    Final Premium**

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

. . . .

**G.    Audit**

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium.    . . .

30

[Exhibit 36 at CNA 0148].

### A.    Continental Casualty's Preliminary Audit.

After being assigned this risk by NCCI, Continental Casualty conducted a preliminary audit to ensure that the business was properly classified and to verify the payroll amounts submitted by AERAS in the workers' compensation application. [Exhibit 121, pp. 22-23]. Continental Casualty's auditor, Tom Dyer, conducted the preliminary audit on July 5, 2005. [Exhibit 121, pp. 22-23, 63; see also Exhibit 15].

During the preliminary audit, Mr. Dyer learned that AERAS was in the business of providing emergency room physicians, nurse practitioners, and physician assistants to several hospitals in the Montgomery area. [Exhibit 121, pp. 27-28]. Based on the information provided by AERAS, Mr. Dyer determined that AERAS was a hospital-type or "class 8833" business. [Exhibit 121, pp. 27-28].

To verify that AERAS correctly stated the estimated annual remuneration of its employees on the assigned-risk application, Mr. Dyer reviewed AERAS's payroll journal, 941 tax forms, state unemployment returns, and detailed general ledger. [Exhibit 121, p. 25]. However, during his review, Mr. Dyer discovered that AERAS relied upon physician contractors to perform services on behalf of AERAS at Montgomery-area hospitals. [Exhibit 121, pp. 27-28].

After reviewing the year-to-date earnings records for the AERAS physicians and the general ledger, several factors led Mr. Dyer to conclude that the physicians created additional exposure under the Continental Casualty policy. [Exhibit 121, p. 29]. AERAS deducted benefits such as malpractice insurance, health insurance, and dental insurance from the amounts that it paid its physicians. [Exhibit 121, pp. 29-31]. AERAS also paid the physicians on the same days of the month that it paid

31

its other employees. [Exhibit 121, pp. 29-31].   In addition, AERAS scheduled the specific times that the physicians worked. [Exhibit 121, p. 34; Exhibit 122, pp. 19-21].   Finally, AERAS paid the physicians a percentage from the charges incurred from the procedures that they performed, and guaranteed the physicians a minimum hourly fee if they did not see any patients in that hour. [Exhibit 121, p. 34; Exhibit 122, pp. 66-68 ].

Based on his review of the documents and information provided, Mr. Dyer determined that the AERAS physicians were employees and, therefore, could make Continental Casualty liable for any workers' compensation claim under the policy. Accordingly, he included the estimated annual remuneration of the fifteen (15) AERAS physicians in the exposure basis for the calculation of the policy's premium.

**B.    Continental Casualty's Requests for Information to Confirm the Audit Findings.**

After receiving the results of the preliminary audit, Continental Casualty sought to confirm Mr. Dyer's conclusion, and issued two requests for supplemental underwriting information to AERAS. [Exhibit 14; Exhibit 15].   The information that AERAS provided included copies of AERAS's contracts with the Montgomery-area hospitals, as well as copies of the agreements under which the AERAS physicians were working. [Exhibits 7-11]. Based on its review of the audit and the supplemental information provided by AERAS, Continental Casualty determined that the physicians were "persons engaged in work that could make [Continental Casualty] liable" for any workers' compensation claim filed by the physicians. [Exhibit 13].   Accordingly, Continental Casualty amended the policy to include the estimated annual remuneration for the physicians, and

32

Continental Casualty increased the premium to accurately reflect the risk and exposure that the policy covered. [Exhibit 130; Exhibit 126; Exhibit 38].

AERAS disputed the audit, and continues to dispute it, on the ground that its physicians are "independent contractors." [Exhibit 5; Exhibit 45].   Continental Casualty contends that the physicians are not independent contractors.  However, it is unnecessary for this Court to conclusively determine the employment relationship between AERAS and its physicians in order to enter judgment in favor of Continental Casualty.  Rather, the scope of the Continental Casualty policy is broad, and includes all "persons engaged in work that *could* make [Continental Casualty] liable." See Exhibit 36 at CNA0148 (emphasis added).  The policy "does not require dispositive proof of liability, but, rather, merely the possibility of liability" on the part of Continental Casualty.  See Wausau Gen. Ins. Co. v. Kim's Trucking, Inc., 289 Ill. App. 3d 201, 204, 682 N.E.2d 190, 192 (Ill. App. 1st Dist. 1997).  Thus, if the objective evidence establishes that a question of fact exists with respect to the relationship between AERAS and its physicians, the physicians fall within the risk of the policy and Continental Casualty's decision to include them in the policy for purposes of determining premium was appropriate.

## II.   THE AERAS PHYSICIANS ARE "PERSONS ENGAGED IN CONDUCT THAT COULD MAKE CONTINENTAL CASUALTY LIABLE." THEREFORE, CONTINENTAL CASUALTY'S INCLUSION OF THE AERAS PHYSICIANS WAS CORRECT.

This Court is not required to conclusively determine whether the AERAS physicians are "employees" of AERAS.  However, if a question of fact exists as to whether the physicians could be considered employees under Alabama law, that is sufficient to grant judgment in favor of Continental Casualty.  In this respect, Alabama law provides significant guidance with respect to

those facts that will establish a question of fact in the present case that an "employer-employee" relationship exists for purposes of workers' compensation.

"[I]n determining whether an employer-employee relationship exists, the court looks to the right of control, either actually exercised or reserved." Ex parte Curry, 607 So. 2d 230, 232 (Ala. 1992)(citations omitted). The four factors that demonstrate an employer's right of control are:

(1)    Direct evidence that demonstrates a right or the exercise of control;

(2)    The method by which the alleged employee received payment for his services;

(3)    Whether the equipment is furnished by the alleged employer or not; and

(4)    Whether the alleged employee has the right to terminate.

Ex parte Curry, 607 So. 2d 230, 232-33 (Ala. 1992)(citing White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978)).

As addressed more fully below, the record in this case includes direct evidence that AERAS controlled or reserved the right to control the physicians in performance of their duties under the contracts, that AERAS paid its physicians in the same manner as it paid its other employees, that AERAS provided the equipment necessary for the physicians to perform the medical services for which they were hired, and that each AERAS physician maintained the right to terminate his contract. Because the record contains evidence that would create a question of fact whether an "employer-employee" relationship exists between AERAS and its physicians, the physicians are persons engaged in work that could make Continental Casualty liable under the policy.

34

### A.     AERAS maintained and exercised a right of control over its physicians.

AERAS's own contracts are direct evidence of its right of control over the physicians. AERAS's right of control over the physicians is established in the specific language of both the physician contracts and the contracts AERAS made with the Montgomery-area hospitals. The language of these documents, and the duties they create, compel the conclusion that AERAS maintained the right to control its physicians.

Under its contracts with the hospitals, AERAS is responsible for providing physician services for the emergency departments on a twenty-four hour per day, seven-day per week basis. [Exhibit 8 § 1.1; Exhibit 10 § 1.1; Exhibit 11 § 1.1]. To provide physician services on a continuous, uninterrupted basis to the hospitals, AERAS, in turn, executes agreements with its physicians. The AERAS physician contracts require the physician to "perform, hospital medical and surgical services for and on behalf of [AERAS]" at the hospitals and at "all other places designated" by AERAS. [Exhibits 54-68, p. 1].

AERAS generates the schedule of the times that each of its physicians must work, and it keeps records of the actual times worked. [Exhibit 123, p. 27; Exhibit 122, pp. 18-21, 105]. Moreover, in an effort to monitor the hours that the physicians work as well as the physician services that AERAS is providing to each hospital, AERAS maintains sign-in sheets for the physicians at each emergency department. [Exhibits 122, p. 105; Exhibits 71-105]. The physicians are required to sign the sign-in sheets. [See Exhibits 71-105].

In addition to requiring that the physician provide services at the times and places required by AERAS, the physician agreements require the physician to provide services that are "consistent with the facilities available and the standards established in the medical community, as well as the

rules and regulations" of the hospitals. [Exhibits 54-68, p. 1]. A review of AERAS's contracts with the hospitals reveals that AERAS itself is, in large part, responsible for the promulgation, review, and enforcement of many of the policies in place in the emergency departments.

Prime examples of this are the provisions of the hospital contract with respect to the appointment and responsibilities of an "Emergency Medical Director" to serve at each hospital. Under the hospital contracts, AERAS appoints one of its physicians as the Emergency Medical Director. He or she is then specifically required to work full-time in the emergency department and devote his time "to the proper management of [the] [e]mergency [p]hysicians." [Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5]. AERAS's contract with the hospital also list specific "responsibilities" for AERAS's physician designated as the Emergency Medical Director. These include, but are not limited to:

1.    Clinical direction of the Emergency Department;

2.    Reviewing and implementing of medical protocols for the Emergency Department;

3.    Coordinating of the Quality Assurance Program within the Emergency Department;

4.    Monitoring the quality of care delivered in the Emergency Department;

5.    Assisting in the education and training of Emergency Department personnel;

6.    Orienting the AERAS physicians;

7.    Coordinating the Emergency Department's schedule; and

8.    Evaluating the performance of the AERAS physicians.

[Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5; Exhibit 122, pp. 33-35].

36

When asked to describe the general duties of the Emergency Medical Directors, Dr. Moorehouse, AERAS's President, testified that they "provide direction for the emergency room in terms of processes, patient throughput, flows, and those things" and help to coordinate, implement, and provide insight into the established protocols and guidelines. [Exhibit 122, pp. 42-43]. The Emergency Medical Directors also train the new physicians. Whenever a new physician is hired, AERAS requires that physician to work along side the Emergency Medical Directors, and sets his schedule accordingly, so that the new physician has a "resource person" to answer any questions or discuss issues about the emergency room, its processes, or the documentation system. [Exhibit 123, p. 30].

In addition to the hands-on training that AERAS requires that each of its new physicians receive from the Emergency Medical Director, AERAS also has a formal orientation program in place for its physicians. [Exhibit 122, p. 49]. Dr. Wallace Falero, an Emergency Medical Director for AERAS, is responsible for orienting new emergency department physicians. [Exhibit 122, pp. 48, 50]. AERAS orients its new physicians on the documentation system it uses; the manner in which it schedules the physicians; the different facilities to which it provides services; and the expectations that AERAS has of its physicians. [Exhibit 122, p. 48]. Among the items specifically discussed during orientation is the T-System manual, which provides specific instructions on how the AERAS physicians are required to document the medical services that they provide. [Exhibit 122, p. 50]. Once a physician begins working, AERAS requires that its physicians comply with the documentation guidelines outlined in the T-System manual and monitors whether the physician is doing so. [Exhibit 122, p. 52].

In addition to the T-System manual for charting, Dr. Falero also reviews AERAS's "Corporate Compliance Handbook" with each physician. [Exhibit 122, p. 80]. AERAS's Corporate Compliance Handbook states that it "is intended as a guide for employees, officers, directors, and agents of AERAS . . . as well as every other individual offering medical care, services or supplies through AERAS, including non-employee physicians and other health care providers (collectively, the 'AERAS Colleagues') so that AERAS may fulfill its obligation to observe the laws and public policies affecting its business." [Exhibit 106, p. 3; Exhibit 122, Pltf's Ex. 6, p. 3]. In order to achieve this goal, AERAS's Corporate Compliance Handbook outlines the manner in which AERAS develops, coordinates, and conducts education and training programs to ensure compliance with all pertinent federal and state standards. [Exhibit 106, p. 6; Exhibit 122, Pltf's Ex. 6, p. 6].

According to the specific terms of the Corporate Compliance Handbook, the AERAS physicians are not only trained and educated with respect to new guidelines or protocols, but their adherence to and compliance with the guidelines of the "Compliance Program" is required and is "a factor in evaluating the job performance" of the physicians. [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11]. With respect to "Education and Communication," the AERAS Corporate Compliance Manual specifically provides that "[a] formal training program will be conducted on at least an annual basis" and the failure of a physician to comply with the training requirements could result in termination. [Exhibit 106, pp. 16-17].

Just as AERAS's own Corporate Compliance Handbook requires annual training of its physicians, AERAS's contracts with the hospitals require AERAS to "provide a continuing review and an annual evaluation of the professional performance" of each AERAS physician. [Exhibit 8 § 1.11; Exhibit 10 § 1.12; Exhibit 11 § 1.11]. If there is a quality issue or an AERAS physician

38

deviates from the standard of care, the AERAS medical director will review the issue with the physician and "coach" him or her to the correct problem. [Exhibit 123, pp. 41, 46].

AERAS's contracts with both its physicians and the hospitals provide direct evidence that AERAS does not permit the physicians to deviate from their instructions. See Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 So. 2d 266, 270-71 (Ala. Civ. App. 2006)(evidence that the purported employees were not permitted to deviate from instructions of purported employer demonstrated control by purported employer). Pursuant to its contracts with the hospitals, AERAS appoints someone to "manage" the physicians and to conduct annual reviews of its physicians. Moreover, the AERAS physicians are not permitted to conduct their work at any time they wish. Rather, AERAS schedules the hours that each physician must work, and each physician must make a notation on the sign-in sheets that AERAS maintains at each emergency department. Finally, AERAS requires that its physicians comply with the regulations of the policies and procedures of the hospitals, as well as the provisions of both the T-System Manual and Corporate Compliance Handbook. In the event of a deviation from these policies, AERAS provides training, education, and/or coaching to the physician to correct the problem and to ensure that the physician complies with all of these work requirements.

The record contains direct evidence of AERAS's right to control its physicians. Therefore, a question of fact exists as to whether the physicians constitute "employees" for purposes of workers' compensation. As such, the AERAS physicians are persons who *could* make Continental Casualty liable under the policy issued to AERAS.

**B.      The method by which AERAS paid its physicians is further evidence that the AERAS physicians fall within the risk of the Continental Casualty policy.**

Another factor that is relevant in determining whether a question of fact exists regarding the relationship between AERAS and its physicians is the method in which the physicians were paid. Ex parte Curry, 607 So. 2d 230, 232-33 (Ala. 1992)(citing White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978)).  It was the review of this particular factor that initially led Continental Casualty to consider whether the physicians fell within the risk of the policy.

When Continental Casualty's auditor, Tom Dyer, reviewed AERAS's general ledger during the preliminary audit, he discovered that AERAS had fifteen (15) physicians whose services AERAS provided to Montgomery-area hospitals. [Exhibit 121, pp. 27-31].  AERAS advised Mr. Dyer that the physicians were paid a percentage of the charges generated by the procedures that they performed and, if the doctor saw no patients in an hour, he was guaranteed an hourly fee. [Exhibit 121, p. 34; see also Exhibit 122, pp. 66-68].

Alabama courts have found that this "productivity model" of paying an alleged employee a percentage of the gross amount that the alleged employer receives is sufficient evidence of an employer's right of control. See Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 So. 2d 266, 270-71 (Ala. Civ. App. 2006)(evidence that alleged employees were paid a percentage of the gross amount paid to the business for the service demonstrated control of the alleged employees by the business sufficient to create a question of fact as to existence of an employer-employee relationship); see also Ex parte Curry, 607 So. 2d 230, 233 (Ala. 1992)(evidence that the business assigned jobs to the alleged employee and payment to alleged employee was a percentage of the total amount that

40

business received for the service was substantial evidence that the business controlled payment to the alleged employees and, therefore, evidence of an employer-employee relationship existed).

In addition to noting the method that AERAS uses to pay its physicians, several things in the physicians' earning records led Mr. Dyer to conclude that the physicians increased the exposure under Continental Casualty's policy. First, AERAS paid its physicians with the same frequency as AERAS's other employees. [Exhibit 121, pp. 29-31]. Second, and perhaps most telling, AERAS deducted items such as health insurance, dental insurance, and malpractice insurance from the amounts it paid its physicians. [Exhibit 121, pp. 29-31]. AERAS contends that these deductions, however, are simply reimbursement for premiums paid by AERAS and are not employee "benefits." [Exhibit 52].

Although AERAS admits that it permits its physicians to participate in its group health and dental plan,[2] AERAS denies that this demonstrates the existence of an employer-employee relationship. However, the evidence obtained from Blue Cross and Blue Shield of Alabama is further proof that a question of fact exists as to whether AERAS's contention is correct. AERAS first applied for its group health and dental plan with Blue Cross and Blue Shield of Alabama in 1994, and applied for a "Small Business Group Health Benefits Contract" in 1999. [Exhibit 168; Exhibit 169]. In both of its applications, AERAS identifies the eligible employees for the coverage as "full-time employees." [Exhibit 168, p. 1; Exhibit 169, p. 1]. Pursuant to the applications, a full-time employee is one who works a minimum of 30 hours per week and is "a permanent, active employee who is not on layoff, leave of absence, or sick leave" . . . that is "employed by employer in a bona fide employer-employee relationship." [Exhibit 168, p. 1; Exhibit 169, p. 1]. Moreover,

_____

[2] See Exhibit 123, p. 32.

41

the specific terms of the group health benefits contracts that were in effect for AERAS during the 2005-2006 policy year provide "[y]ou are eligible to enroll in this plan if . . . you are an employee of your employer and are treated as an employee (as opposed to an independent contractor) by your employer."    [Exhibit 170, p. 7; Exhibit 171, p. 7].    Each physician enrolled in AERAS's group health plan with Blue Cross and Blue Shield of Alabama completed "Applications for Enrollment" in which he or she confirmed that they were "eligible" for the plan, were designated as "employees," and identified AERAS as their "employer."    [Exhibits 172-180].

These are specific requirements in the contract that AERAS entered with Blue Cross and Blue Shield of Alabama.    The Blue Cross and Blue Shield of Alabama contract does not permit anyone other than an "employee" of AERAS to obtain health insurance.    AERAS accepted this contract.    AERAS offered this health insurance to its physicians under this contract.    Now, AERAS wants to claim that the physicians are not employees for purposes of workers' compensation insurance.    AERAS cannot have it both ways.    It classified its physicians as "employees" for purposes of health insurance.    It cannot now deny the same status in order to avoid paying the appropriate workers' compensation premium.

Much like it interprets the group health benefits it offers, AERAS contends that it does not "provide" malpractice insurance to its physicians.    See Exhibit 5.    With respect to this issue, direct evidence demonstrates the question of fact.    AERAS's agreements with the physicians require each physician to "obtain and continually maintain professional liability insurance . . . insuring [the physician] for liability in performance of [his or her] duties under [the] Agreement."    [See Exhibits 54-68, p. 4; Exhibit 123, p. 32].    However, AERAS admits that it secures the coverage for each physician through a group policy.    [Exhibit 123, p. 32].    Moreover, for the 2005 and 2006 policy

42

years, the majority of the AERAS physicians were insured under AERAS's group malpractice policy. [Exhibits 153-156]. AERAS pays for the coverage, and AERAS deducts the premium for the policy from the physicians' paychecks. [Exhibit 52; Exhibit 123, p. 32]. The direct evidence in this case demonstrates a contradiction in the terms outlined in the contract and the manner in which the terms are actually met. This contradiction provides further evidence of the question of fact that exists regarding the "employer-employee" relationship between AERAS and its physicians.

AERAS contends that its physicians are independent contractors because it deducts no taxes from the physicians' pay and issues a 1099 tax form to the physicians at year end. [Exhibit 5]. However, the frequency of the payments to the physicians, the manner in which their pay is calculated, and the benefits that are offered through payroll deduction constitute objective evidence that creates a question of fact as to whether an employer-employee relationship exists. Accordingly, the AERAS physicians fall within the risk of the policy, and assessment of premium based on their remuneration during the policy period was appropriate.

**C.    AERAS provided the equipment necessary for its physicians to provide the medical services they were contracted to provide.**

The third factor for the Court to consider in determining whether the AERAS physicians were persons who could make Continental Casualty liable under the policy is whether the physicians or AERAS provided the equipment necessary to perform the services in the emergency departments. See Ex parte Curry, 607 So. 2d 230, 232-33 (Ala. 1992)(citing White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978)). The answer to this issue is clearly and succinctly provided in the AERAS hospital contracts. Each of the AERAS hospital contracts states that the hospital "shall make available . . . the space designated for the Emergency Department and such equipment as is

43

required for the proper operation and conduct of the Emergency Department." [Exhibit 8 § 2.1; Exhibit 10 § 2.1; Exhibit 11 § 2.1].    Therefore, AERAS, through its contracts with the various hospitals provides to the physicians the equipment necessary to perform their services.  Moreover, it is understood between AERAS and its physicians that AERAS requires the hospitals to provide all equipment, from otoscopes and laryngoscopes to MRIs, ultrasounds, lab facilities, and x-ray facilities for the physicians' use. [Exhibit 122, pp. 64, 104].  Although this equipment is necessary for the performance of medical services, the physicians are not responsible for providing this type of equipment. [See Exhibit 122, p. 104].  Rather, the only equipment that the physicians are required to provide is a stethoscope and a pen for writing. [Exhibit 122, p. 64].

The evidence demonstrates that AERAS requires the hospitals to provide to the physicians for and on behalf of AERAS, the equipment necessary for the physicians to perform their jobs.  This evidence creates a question of fact regarding AERAS's relationship with its physicians.  Therefore, the physicians are persons who *could* make Continental Casualty liable under the policy and thus, increase the risk insured by the policy.

### D.    The AERAS physicians maintained the right to terminate the relationship.

The final factor that a court should consider when determining whether an employer-employee relationship exists for purposes of workers' compensation is whether the alleged independent contractor maintained the right to terminate the contract. Ex parte Curry, 607 so. 2d 230, 232-33 (Ala. 1992)(citing White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978)).  The evidence in this case includes direct evidence that the AERAS physicians did, in fact, maintain this right.  The contracts do not specify performance of a particular job or completion of a specific project as the trigger for termination of the agreement as is the case for most independent contractor

44

relationships. [Exhibits 54-68, pp. 3-4]. Rather, the agreements specifically state "this Agreement may be terminated at any time by either Party upon sixty (90)[sic] days prior written notice." [Exhibits 54-68, p. 3]. Moreover, AERAS maintains the right to immediately terminate any physician, without notice, upon the occurrence of certain events such as poor performance or failure to provide the services required under the contract. [Exhibits 54-68, pp. 3-4].

The fact that each physician has the right to terminate his contract with AERAS is only further evidence of the employer-employee relationship that existed between these parties. Similar to any other employment contract, AERAS requires its physicians to provide notice of termination of the agreement, and AERAS, under certain circumstances, may terminate without notice.

This evidence, when considered with the other evidence regarding right of control, method of payment, and equipment provided, effectively creates a question of fact as to whether an "employer-employee" relationship existed between AERAS and its physicians. Accordingly, the physicians are persons that *could* make Continental Casualty liable under the policy it issued to AERAS. Because the physicians fall within the risk of the policy, the physicians' remuneration was properly included in the premium basis and the assessed premium is due and properly payable.

## III.    AERAS'S EFFORT TO AVOID ITS CONTRACTUAL OBLIGATION TO PAY THE PREMIUM DUE.

Since December of 2005, AERAS has disputed Continental Casualty's inclusion of the physicians in the premium basis for the policy. [Exhibit 5]. AERAS contends that the physicians should not be included because it alleges they are "independent contractors" and have been designated as such in the physician contracts. However, the designation of the physicians as "independent contractors" is not controlling on whether an "employer-employee" relationship exists.

45

See Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 So. 2d 266, 270-71 (Ala. Civ. App. 2006).

Moreover, in the face of the direct evidence establishing the existence of an employer-employee

relationship, AERAS's contract language designating the physicians as independent contractors is

substantial evidence creating a question of fact regarding the relationship between AERAS and its

physicians.  Id.  Accordingly, a court presented with this conflicting evidence could not grant

summary judgment on this issue in any workers' compensation case.  See Id.  Because a question

of fact exists regarding the relationship between AERAS and its physicians, the physicians fall

within the risk insured under the Continental Casualty policy.

Although benefits under Alabama's workers' compensation law are set by statute, the

complexities of the Continental Casualty policy are governed by general insurance law principles.

Under these principles, the premium paid for coverage by an employer "is the consideration paid an

insurer for undertaking to indemnify the insured against a specified peril" – that is, to obtain

coverage against any potential claim by its employees.  See  5 Couch on Ins. § 69:1 (3d ed.).  It is

well-settled that "[t]he amount of the premium varies in proportion to the risk assumed."  Id.

Therefore, "[t]he payment of the premium by the insured and the assumption of a specified risk by

the insurer are the essential elements of the contract of insurance."  Id. at § 69:2.

Because the "specified risk" under a workers' compensation policy expands or contracts

according to the movement of the insured's business within the policy year, insurers may provide

for the premium to be set retrospectively based upon total payroll or "remuneration" during the

policy period.  Id. at § 69:15.  In these situations, it is common for the insurer to conduct an audit

either during or after the policy period, then apply the standard insurance premium rates to the risk

that it actually undertook during the policy period.  Id. at § 69:15.  Disputes regarding premium

calculations based on audits are not uncommon. However, should such a dispute arise, "the burden ordinarily falls on the insured, who usually has custody of the relevant information, to establish that [the employees] should be excluded from premium consideration." Id. at § 69:15.

The scenario presented above is precisely what has developed in this case: AERAS's coverage was bound with Continental Casualty through the assigned risk market. Continental Casualty sought to verify the risk, and, upon finding that the risk was substantially greater than originally represented, assessed an appropriate, corresponding premium that AERAS refused to pay. However, this scenario was not unfamiliar to AERAS.

In 2003, prior to obtaining its coverage with Continental Casualty, AERAS secured its workers' compensation through the voluntary market. [Exhibit 136]. AERAS purchased its coverage for the 2003-2004 policy year with Williamsburg National Insurance Company. [Exhibit 136]. As is common in the insurance industry, Williamsburg conducted a final premium audit at the conclusion of its policy period. [Exhibit 137]. During its audit, Williamsburg's auditor discovered the additional risk and exposure that the AERAS physicians represented. [Exhibit 137]. Accordingly, in his audit, the auditor included the actual remuneration for the AERAS physicians in the exposure basis, and Williamsburg premium increased significantly. [Exhibit 137]. Just as in this case, AERAS disputed the audit results when it received the increased premium notice. [Exhibit 166]. Soon thereafter, Williamsburg agreed to reduce the premium and take out the physician remuneration, but only because AERAS forwarded "proof of coverage for the MDs." [Exhibit 139 (emphasis added)]. Such is not the case here. AERAS never provided proof that its physicians were covered under any other workers' compensation policy during the Continental Casualty policy period.

47

AERAS continued its coverage with Williamsburg until 2004, when Williamsburg notified AERAS that it was non-renewing the coverage because AERAS was an "employee staffing company," and Williamsburg no longer wished to write this class of business. [Exhibit 159, pp. 2-3]. Unable to secure coverage in the voluntary market, AERAS sought coverage through the assigned risk market.[3] However, AERAS was confronted again with the issue of its physicians being included in the premium basis for its policy – this time by Continental Casualty, a carrier who stood by its position.

In 2006, after Continental Casualty conducted the preliminary audit and increased the premium, AERAS was unable to return to the assigned risk market.[4] At that time, AERAS's new insurance agent, The Frederick Agency, began searching for new coverage. AERAS quickly learned, however, that no one would quote the coverage unless the physicians were included in the policy. [Exhibit 123, pp. 57-59]. On or about March 7, 2006, AERAS submitted an application to the Alabama Workers' Compensation Self-Insurance Fund ("AlaCOMP"). [Exhibit 187, p. 20; Exhibit 187, Pltf's Ex. 1]. The AERAS application included the physicians' estimated annual remuneration – the very position it opposes under Continental Casualty's policy. [Exhibit 187, Pltf's Ex. 1; Exhibit 187, pp. 23-24, 26]. Based on the information that AERAS provided, including the physicians as employees, AlaCOMP issued a quote for coverage for the policy period of March 15, 2006 to

---

[3]Unlike the voluntary market, when coverage is bound through the assigned risk market, the insurer is required to provide the coverage requested and must insure a risk that it might otherwise reject. See 1 Couch on Ins. § 2:35 (3d ed.).

[4]The Acord Workers Compensation Insurance Plan Application for the Assigned Risk Section requires an application to certify that it "has had no difficulties with any . . . company in regard to: (a) payroll records; (b) the amount of premium charged; (©) the payment of premium; (d) the carrying out of any recommendation made for the purpose of safeguarding employees; (3) the handling of any claim or accident report. . .." See Exhibit 161, p. 2.

48

January 1, 2007. [Exhibit 187, Pltf's Ex. 4]. AERAS accepted the quote on this basis, and the workers' compensation coverage with AlaCOMP became effective on March 15, 2006. [Exhibit 187, pp. 32-33; Exhibit 187, Pltf's Ex. 5 and 6].

Although AlaCOMP is not an "insurer," premiums under AlaCOMP are calculated the same way as in the insurance industry – by multiplying a member company's payroll with the established rate for the employees' classifications. [Exhibit 187, pp. 15-16]. Also similar to the insurance industry, AlaCOMP conducts premium audits at the conclusion of a policy period to determine what the true exposure was during the policy period. [Exhibit 187, pp. 17-18].

While AERAS did not request that the remuneration for the AERAS physicians be excluded from the premium basis at the time it sought coverage from AlaCOMP, AERAS's efforts to have the physicians removed from the coverage began less than two weeks after the coverage was bound. [Exhibit 187, p. 32; Exhibit 187, Pltf's Ex. 1]. Joe Lanoux, a Senior Underwriter with Business Insurance Group, the manager of the AlaCOMP fund, evaluated and considered AERAS's request to have the physicians removed from the coverage. [Exhibit 187, pp. 9-10, 41]. Mr. Lanoux's first reaction when receiving the request was that it should be denied. [Exhibit 187, p. 43]. As in this case, it was unnecessary for Mr. Lanoux to determine whether the physicians were independent contractors or employees. [Exhibit 187, p. 44]. Rather, Mr. Lanoux reasoned that reduction of the physician payrolls would result in a very small premium, which would not cover the risk associated with any potential claim, even if the claim was defeated. [Exhibit 187, pp. 43-44, 45]. In his formal response to AERAS's request, Mr. Lanoux stated:

> The inclusion of independent contractors in worker's compensation coverage and charging for that coverage is common. . . . Independent contractors are

included in coverage where insurance providers routinely lose claims suits to uninsured independent contractors.

In this case it is not necessary for us to reach a determination of whether or not the doctors involved are independent contractors or employees. In either case we believe we would lose a suit for a serious worker's compensation claim. Therefore, we must charge premium for the doctor's payrolls.

[Exhibit 187, p. 47; Exhibit 187, Pltf's Ex. 11].

Although AlaCOMP refused to take out the physician payrolls, AERAS maintained its coverage with AlaCOMP. [Exhibit 123, pp. 66-67; Exhibit 187, Pltf's Ex. 16 and 18]. However, with respect to the same risk insured by Continental Casualty, AERAS maintains that its physicians are independent contractors and refuses to pay Continental Casualty a premium that corresponds to the risk that it insured.

## CONCLUSION

There are "no hard and fast rules which can be used" to determine whether an employer-employee relationship exists. White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978). The Court should consider all of the facts regarding the employment relationship together, and determination of whether an employer-employee relationship exists is made on a case-by-case basis. Id.

All of the facts presented in the documents and testimony taken in this case demonstrate that a question of fact exists as to whether the physicians are "employees" of AERAS for purposes of workers' compensation. Therefore, the AERAS physicians are persons engaged in work that *could* make Continental Casualty liable under the policy. Because the physicians fall within the risk insured by the policy, Continental Casualty's assessment of the increased premium was appropriate and warranted.

50

Based on the evidence and argument submitted, Continental Casualty respectfully requests that this Honorable Court enter judgment in favor of Continental Casualty and against AERAS in the amount of $130,511. Continental Casualty further requests that the Court permit it to present evidence regarding the incidental damages to which it may be entitled, including pre-judgment interest and attorney fees.

Respectfully submitted,

Brenen G. Ely (0366-E54B)
Joel S. Isenberg (8855-N76J)
Candace L. Hudson (8314-N66H)
Attorneys for Plaintiff Continental Casualty
Company

OF COUNSEL:
ELY & ISENBERG, L.L.C.
600 Beacon Parkway West, Suite 104
Birmingham, Alabama 35209
Telephone:     (205) 313-1200
Facsimile:     (205) 313-1201

51

## CERTIFICATE OF SERVICE

I do hereby certify that a true and accurate copy of the foregoing has been on all parties of record by:

| | |
|---|---|
| _____ | Hand Delivery |
| _____ | U.S. Mail |
| _____ | Overnight Delivery |
| _____ | Facsimile |
| __X__ | E-File |

on this the 11th day of July, 2008.

_____
OF COUNSEL

cc:    Michael Cohan
       HILL, HILL, CARTER, FRANCO,
          COLE & BLACK, P.C.
       Post Office Box 116
       Montgomery, AL 36101

52