**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **CONTINENTAL CASUALTY COMPANY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO.:   2:07cv221-WHA** |
| ) | |
| **ALABAMA EMERGENCY ROOM** ) | |
| **ADMINISTRATIVE SERVICES, P.C.** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S *RESPONSE TO THE COURT'S
OCTOBER 29, 2007 ORDER - BRIEF IN SUPPORT OF CONTINENTAL CASUALTY'S
MOTION FOR FINDINGS OF FACT AND ENTRY OF JUDGMENT***

COMES NOW Defendant Alabama Emergency Room Administrative Services, P.C.

(AERAS) and responds to Plaintiff's *Response to the Court's October 29, 2007 Order - Brief in*

*Support of Continental Casualty's Motion for Findings of Fact and Entry of Judgment* as follows:

INTRODUCTION / STATEMENT OF FACTS[1]

Plaintiff begins its brief by misstating the issues before this Court.  This matter was filed by

Plaintiff on March 13, 2007, seeking this Court's determination as to whether Defendant AERAS

owes $130,511.00 in premiums claimed by Plaintiff for a policy of workers' compensation insurance

sold by Plaintiff to Defendant. [Doc. 1]  To determine such, this Court must determine the issue of

whether certain physicians are employees or independent contractors.  This issue has been before

---

[1] Pursuant to the Order of this Court [Doc. 21], the parties submitted jointly stipulated facts and evidence [Doc. 36]; therefore, AERAS has not restated such herein.  While Plaintiff has spent 26 pages stating certain additional "facts", which AERAS does not dispute, AERAS relies upon the jointly stipulated facts previously agreed upon by the parties and those additional facts set forth herein throughout this brief.

1

this Court since the inception of this matter and Plaintiff has repeatedly asserted such in numerous pleadings filed in this matter. [See, Doc. 20, 22, 28]  Only upon filing of its *Response to the Court's October 29, 2007 Order - Brief in Support of Continental Casualty's Motion for Findings of Fact and Entry of Judgment* does Plaintiff attempt to cloud this issue and asks this Court to somehow find in its favor without deciding the status of these physicians.  As is set forth herein, this position is taken by Plaintiff because the overwhelming evidence and applicable law demands this Court find in favor of Defendant.

As background, Plaintiff issued a policy of workers' compensation insurance to Defendant on May 3, 2005. [Doc. 1]  AERAS is a Montgomery, Alabama company that contracts with local hospitals to ensure that the hospitals are staffed with emergency room physicians and other medical professionals. [Exh. 30]  AERAS, in turn, contracts with various physicians who are "placed" with the hospitals to serve their emergency room needs.  AERAS, pursuant to the Workers' Compensation Act of Alabama, *Alabama Code* (1975) § 25-5-1, *et seq.*, is required to maintain coverage for its workers' compensation liability to its employees.

Initially, Plaintiff agreed and contracted to provide necessary workers' compensation insurance (and other) coverage to AERAS, for which AERAS would pay a premium of $21,271.00.  After audits, as provided for in the policy of insurance issued by Plaintiff, adjustments to the premiums originally agreed upon were made, with the increased premium at issue being $151,782.00. [Doc. 1][2]  Plaintiff, at all times material hereto, gave as reason for the huge increase

---

[2] AERAS does not dispute the fact that audits were provided for in the policy of insurance issued by Plaintiff; however, as set forth herein, the audits were not conducted in a manner consistent with the policy and applicable law, and certainly did not justify the conclusion that the AERAS physicians are employees, the reason given by Plaintiff for the premium hike.

in premium charged being that they had determined that the physicians with whom AERAS contracted were "employees" rather than "independent contractors" and thus subjected Plaintiff to payment for claims by such physicians under the Workers' Compensation Act of Alabama. [Doc. 1, 20, 22, 28; Exh. 13, 15, 16, 34]   AERAS disputed this assertion and the premium increase, presenting ample evidence that these physicians were in fact independent contractors and thus not subjecting AERAS to workers' compensation liability and thus not subjecting Plaintiff to the possibility of paying claims asserted by said physicians. [Exh. 5, 12, 24, 45, 52]  Not accepting such facts and the workers' compensation laws of Alabama, Plaintiff filed the instant suit. [Doc. 1]

Again, despite the fact that Plaintiff has maintained throughout this litigation that the issue before the Court is the status of the physicians contracting with AERAS as employees versus independent contractors, Plaintiff now asserts that this determination is not necessary, but rather the issue is whether these physicians "could make" Plaintiff liable to pay workers' compensation benefits.  While worded differently, it is the same thing.  In order for AERAS or Plaintiff to be liable to pay benefits under the Workers' Compensation Act of Alabama, the claim must be brought by an employee of AERAS.  The Workers' Compensation Act of Alabama does not cover independent contractors, but only employees as defined by the Act.  *Alabama Code* (1975) § 25-5-1(4) and (5).

As set forth herein, the physicians with whom AERAS contracts are clearly independent contractors and not employees.  Thus, Plaintiff's claims against AERAS fail and judgment is due to be entered in favor of Defendant AERAS.

<u>ARGUMENT</u>

As is the burden upon a party asserting any agency relationship in Alabama, the burden upon the Plaintiff in the instant case should be one of substantial evidence supporting their claim that the

contracted physicians are employees of AERAS, justifying Plaintiff's classification of the physicians as such and supporting their claims in the instant suit for premiums due from AERAS. Dickinson v. City of Huntsville, 822 So. 2d 411, 416 (Ala. 2001). Regardless of the level of burden placed upon Plaintiff, as addressed herein Plaintiff's claims fail as there is no evidence supporting such.

I.      The Workers' Compensation Act of Alabama

Alabama's workers' compensation laws are statutorily defined as set forth by the Legislature (*Alabama Code* (1975) § 25-5-1, *et seq*) and interpreted through the appellate decisions of this state.

One of the basic premises to the workers' compensation laws of Alabama is that there must be an employee and employer relationship between the parties for there to be coverage under the Act. An employer is defined as "[e]very person who employs another to perform a service for hire and pays wages directly to the person." *Alabama Code* (1975) § 25-5-1(4). An employee is defined as "every person in the service of another under any contract of hire, express or implied, oral or written..." *Alabama Code* (1975) § 25-5-1(5). Independent contractors are excluded from the Act. "The compensation law does not apply where the injured person is an independent contractor and the relation of employer and employee does not exist." Birmingham Post Co. v. Sturgeon, 227 Ala. 162, 165, 149 So. 2d 74, 76 (1933).

The policy at issue was one for coverage for benefits due employees of AERAS under the Workers' Compensation Act of Alabama. In fact, Plaintiff argues in its brief that their obligations under the policy are "to 'pay promptly ... the benefits required of [AERAS] **by the workers compensation law**'" (emphasis added) and further that "Part One further provides that Continental Casualty 'will have the right and duty to defend at [its] expense any claim, proceeding, or suit against [AERAS] **for benefits payable** by this insurance'" (emphasis added). [Doc. 38, p. 29]

4

Thus, by the plain language of the policy, drafted by Plaintiff, and as quoted by Plaintiff in their brief, the coverage for which AERAS was paying premiums was only as to that covered "by the workers compensation law" of Alabama. As set forth above, only claims by an employee against an employer for on-the-job accidents and injuries are so covered. Claims, if made, by an independent contractor, or other non-employee, are not so covered under the Act and thus Plaintiff would not provide coverage under the policy for such. It is disingenuous for an insurance company to argue that they should be permitted to charge premiums for "potential" claims that are not covered under the law which they themselves state limit the coverage afforded under the policy. Clearly, if presented with a claim for which there is no coverage under the policy issued, the insurance company would deny coverage for such, citing the specific policy provisions related to such, as Plaintiff has done in its brief. Plaintiff cites this policy language to somehow support their position that the independent contractors "might" bring a claim which Plaintiff "might" cover, despite clear policy language excluding such coverage.

As the Workers' Compensation Act of Alabama clearly states, coverage under such is limited to claims by employees as against their employer (and with limited exception against co-employees). *Alabama Code* (1975) § 25-5-1, *et seq.* It is undisputed that the coverage sold by Plaintiff and paid for by AERAS was one for claims brought under the Workers' Compensation Act of Alabama. Thus, if the physicians are not employees, there is no coverage for them under the policy and thus no legitimate reason for their inclusion in the determination of premium.

II.    Employee versus independent contractor

The "'right-of-control test' determines whether a particular person is an employee and subject to the Workers' Compensation Act [of Alabama] or is an independent contractor and not

subject to the Act." Ex Parte A-O Machine Co., Inc. v. A-O Machine Co. Inc., 749 So. 2d 1268 (Ala. 1999)(citing Ex Parte Stewart, 518 So. 2d 118 (Ala. 1987)). See Curry v. Interstate Express, Inc., 607 So. 2d 230 (Ala. 1992); Hooker Constr., Inc. v. Walker, 825 So. 2d 838 (Ala. Civ. App. 2001); Lacey v. Am. Shell Co., Inc. 628 So. 2d 684 (Ala. Civ. App. 1993).

> "As the law stands now, '"[f]or one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished or, in other words, not only what shall be done, but how it shall be done."'"

Atchison v. Boone Newspapers, Inc., ---So. 2d ----, 2007 WL 268504 at *3 (Ala. Civ. App. 2007)(quoting White v. Henshaw, 363 So. 2d 986, 988 (Ala. Civ. App. 1978)(quoting Weeks v. C.L. Dickert Lumber Co., 121 So. 2d 894, 895 (1960))) See Liberty Mut. Ins. Co. v. D & G Trucking, Inc., 966 So. 2d 266, 268 (Ala. 2007); Martin v. Lawrence County, 628 So. 2d 652, 654 (Ala. Civ. App. 1993) ("An employer-employee relationship is not established if the right of control does not extend any farther than directing what is to be ultimately accomplished. But if an individual retains the right to direct the manner in which the task is to be done or if that individual does in fact dictate the manner of operation, then an employer-employee relationship is established"); Boyd v. Hinkle Roofing & Sheet Metal, Inc., 596 So. 2d 947, 948-49 (Ala. Civ. App. 1992); Turnipseed v. McCafferty, 521 So. 2d 31, 32-33 (Ala. Civ. App. 1987); White v. Henshaw, 363 So. 2d 986, 988 (Ala. 1978). "In determining 'whether [an individual] is an independent contractor or whether an employer-employee relationship exists, the court looks to the reserved right of control rather than the actual exercise of control.'" Id. (quoting Turnipseed, 521 So. at 32). See Sartin v. Madden, 955 So. 2d 1024, 1027 (Ala. 2006); Wheeler v. Wright, 668 So. 2d 779, 781 (Ala. Civ. App. 1995); Martin, 628 So. 2d at 654; Miller v. Mayfield Timber Co., Inc., 624 So. 2d 185, 186 (Ala. Civ. App. 1993); Turnipseed, 521 So. 2d at 32; White, 363 So. 2d at 988.

6

The Court further states,

> "If the right of control extends no further than directing what is to be ultimately accomplished, an employer-employee relationship is not established; however, 'if an individual retains the right to direct the manner in which the task is to be done or if that individual does in fact dictate the manner of operation, then an employer-employee relationship is established.'"

Id. (quoting Turnipseed, 521 So. 2d at 33). See Sartin, 955 So. 2d at 1027; Miller, 624 So. 2d at 186.

> "The factors tending to demonstrate a right of control are: (1) direct evidence that demonstrates a right of the exercise of control, (2) the method by which the injured individual received payment for his services, (3) whether the equipment is furnished by the alleged employer or not, and (4) whether the individual has the right to terminate."

Curry, 607 So. 2d at 232-33 (citing White, 363 So. 2d at 988). See Atchison, 2007 WL 2684504 at *3; Liberty Mut. Ins. Co., 966 So. 2d at 268 (quoting White, 363 So. 2d at 988) ("'[t]he principal factors showing a right to control are (1) direct evidence of right or exercise of control, (2) method of payment, (3) furnishing of equipment, and (4) the right to fire'"); Sartin, 955 So. 2d at 1027; Wheeler, 668 So. 2d at 781; Martin, 628 So. 2d at 654; Miller, 624 So. 2d at 186-87; Boyd, 596 So. 2d at 949; Turnipseed, 521 So. 2d at 33; White, 363 So. 2d at 988 (citing 1B A. Larson, The Law of Workmen's Compensation s 44.00 (1978)).

Alabama's Court of Civil Appeals also noted, "'if the right of control of details goes no further than is necessary to ensure a satisfactory end result, it does not establish employment.'" Liberty Mut. Ins. Co., 966 So. 2d at 268 (quoting White, 363 So. 2d at 988); White, 363 So. 2d at 988.

"'[T]he retention of control necessary to establish employee status is determined on a case-by-case basis. No one fact by itself can create an employer-employee relationship.'" Sartin, 955

So. 2d at 1027 (quoting <u>Luallen v. Noojin</u>, 545 So. 2d 775, 776 (Ala. Civ. App. 1989)); <u>Boyd</u>, 596

So. 2d at 948; <u>White</u>, 363 So. 2d at 988.

A recent Alabama appellate decision dealt with this issue. In <u>Atchison v. Boone</u>

<u>Newspapers, Inc.</u>, ---So. 2d ----, 2007 WL 268504 (Ala. Civ. App. 2007), Alabama's Court of Civil

Appeals upheld a trial court's decision to grant summary judgment where the trial court based its

decision on a finding that a newspaper delivery person maintained the status of an independent

contractor. <u>Atchison</u>, 2007 WL 2684504 at *5. The Court of Civil Appeals explained that the

contract between newspaper companies and the delivery person did not contain language that

reserved certain items of control:

> "the right [of the companies] to control the means and agencies by which [the
> delivery person] delivered the newspapers or resolved delivery complaints; that the
> companies did not directly supervise or otherwise control the manner in which [the
> delivery person] accomplished her duties under the delivery contracts; that the
> companies paid [the delivery person] on the number of papers delivered rather than
> on the number of hours worked or the level of [the delivery person's] performance;
> that the companies did not provide any of [the delivery person's] equipment; and that
> the contracts could be terminated only with 30 days' notice or immediately for cause.
> The contracts further allowed [the delivery person] to perform work for other persons
> or entities and to select her own helpers. The tax forms show that [the newspaper
> company] treated [the delivery person] as a nonemployee. All of these factors
> indicate that [the delivery person] was an independent contractor."

<u>Id.</u> at *4. The plaintiffs argued that delivery person maintained the status of an employee. They

argued:

> "that the companies reserved the right to control [the delivery person's] work by
> designating the time and place she picked up the newspapers; by defining her
> delivery territory; by requiring her to use her best efforts to increase the circulation
> of the newspapers; by reserving the right to terminate the contract for cause, i.e., in
> the event the subscriptions in [the delivery person's] territory decreased by 10%, in
> the event [the delivery person] received too many complaints, or in the event [the
> delivery person] failed to deliver the newspapers; by requiring [the delivery person]
> to deliver the newspapers by 6:30 a.m. in a safe, complete, and dry condition."

Id. However, the Court noted, "those requirements are directed at assuring the end result, not the method by which the employee achieved that result. If the right of control extends no further than to the end result, and not to the manner in which the work goal is accomplished, then no employer-employee relationship is established." Id.

In Lacey v. Am. Shell Co., Inc., 628 So. 2d 684 (Ala. Civ. App. 1993), the Court affirmed a summary judgment, which found an electrician who performed work for a company maintained the status of an independent contractor. 628 So. 2d at 686. The court explained that although the company paid the electrician on an hourly basis, the electrician reported his own income, used his own tools chose what time he reported to work, chose the number of hours that he worked per day, "never had taxes taken out of the monies paid to him by" the company, and "billed [the company] for labor and materials on invoices" that displayed the electrician's name. Id. at 686. "Moreover, Lacey performed other projects for different individuals while doing electrical work for the [company]." Id.

In Martin v. Lawrence County, 628 So. 2d 652, 654 (Ala. Civ. App. 1993), the court found independent contractor status for attorney who performed work for a county commission. The court explained that the attorney,

> "set his own hours, [was] not on the county payroll. . . the county with[held] no taxes from his compensation . . . the heading on [the attorney's] invoices to the county read, 'D.L. Martin, Attorney at Law' . . . the county [did] not provide him with a vehicle, except occasionally when he accompanie[d] commission members to out-of-town engagements; [the county did] not provide him with office space, supplies or equipment; and . . . [the attorney had] exclusive control over his only employee. The administrator for the . . . county commission testified that the county commission [did] not reserve control over the details of [the attorney's] legal work and [did] not instruct him how to perform his duties as a legal representative. [The attorney] also testified that he list[ed] the county commission as one of his representative clients . . ."

Id.  See also Miller, 624 So. 2d at 187 (court found timber cutter did not maintain status of timber company employee where the timber cutter used truck, equipment, and fuel of acquaintance rather than of company.  Although timber company showed cutter "which wood to cut . . . there were no other instructions on when to start and stop cutting, when to take breaks, when and where to haul the timber, or how much timber to haul"); Boyd, 596 So. 2d at 948-49 (where first party contracted with second party to build house and second party contracted with third party to help, court found third party independent contractor because first party "(1)reserved no right of control over [third party's] job performance, (2) did not pay [third party's salary], and (3) clearly could not terminate [third party's] employment.")

        In Turnipseed v. McCafferty, 521 So. 2d 31, 33 (Ala. Civ. App. 1987), the court reversed a lower court's judgment that an employer-employee relationship existed between the driver of a logging truck and a timber cutter.  The Court explained:

> "the driver] . . . was not carried on [the cutter's] payroll.  [The driver] provided the truck, trailer, gasoline, and oil required for the job.  [The cutter] did not set any working hours for [the driver], nor did he prescribe any work rules or require that [the driver] haul any particular number of cords per day.  [the driver] did not get paid if he did not haul the logs to a destination specified by [the cutter], but [the cutter] could not force [the driver] to haul the logs if he did not want to."

Id.  The driver argued that an employer-employee relationship existed – "[the cutter] told him where to deliver the logs and because [the cutter] had advised [the driver] on occasion not to stack the logs so high on his truck, that this was evidence of his control."  Id.  However, the court noted, "[the cutter] was only controlling the end result by giving such instructions."  Id.  See also White, 363 So. 2d at 988-89 (court affirmed lower court's finding that truck driver did not maintain an employee status where truck driver "was paid only when he made a haul . . . owned his own truck . . . [and trucking company] did not have the right to fire [driver].").

III.    The AERAS physicians

    A.    The contract between AERAS and the physician

Plaintiff asserts that "AERAS's own contracts are direct evidence of its right of control over the physicians" and thus that the physicians are employees. [Doc. 38, p. 35] However, the only portion of any physician contracts that Plaintiff cites in its brief, in support of this position is: "The AERAS physician contracts require the physician to 'perform, hospital medical and surgical services for and on behalf of [AERAS]' at the hospitals and at 'all other places designated' by AERAS." [Doc. 38, p. 35; Exh. 54][3]  This section of the "Medical Services Independent Contractor Agreement" contract between AERAS and the physician is titled "Duties of the Independent Contractor" and contains several provisions which, in a nutshell, state that the physician will perform services as designated by the hospital where he or she is working and that such services will be in compliance with all laws and standards governing their medical practice. There is nothing in this section, or within the entire "Medical Services Independent Contractor Agreement", that remotely equates to "direct evidence of [AERAS's] right of control over the physicians" as asserted by Plaintiff . To be fair, the entire section of the contract states as follows:

> **b.**    **<u>Duties of the Independent Contractor</u>**.  Company hereby engages the Independent Contractor, and the Independent Contractor hereby agrees to perform, hospital medical and surgical services for and on behalf of Company [AERAS] subject to the following:
>
> I.    The Independent Contractor shall render medical and surgical services to all members of the general public presenting at such Providers [hospitals], and at all other places designated by Company and approved by such Providers;
>
> ii.    All services required of, and rendered by, the Independent Contractor shall be consistent with the facilities available and the standards established in the

---

[3] Several contracts are submitted as joint exhibits to this matter [Exh. 54-68].  These contracts are virtually identical as between AERAS and several physicians, at least as to the pertinent portions applicable to this matter.

medical community, as well as the rules and regulations of such Providers. The Independent Contractor hereto shall perform the services called for under the terms of this Agreement in accordance with the highest standards of professional ethics and practice as may, from time to time, be applicable during the term of this Agreement, as may otherwise be provided under the laws of the State of Alabama, and as applicable to the professional obligations of the Independent Contractor. The Independent Contractor further agrees to comply with all existing laws, ordinances, rules and regulations that govern or regulate, in any way whatsoever, the conduct of the Independent Contractor's professional practice, whether pursuant to this Agreement or otherwise;

iii.    The Independent Contractor shall maintain complete and accurate patient medical and surgical records including the completion of written records on forms provided by Company or such Providers; and

iv.    The Independent Contractor shall perform all things reasonably desirable to maintain and improve the Independent Contractor's professional skills. This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so.

[Exh. 54]

What is in fact contained in the "Medical Services Independent Contractor Agreement" between AERAS and the physicians is a provision that clearly outlines the relationship between the parties and defines the physicians as independent contractors:

**k.    Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the Parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. **The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation**, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other Party to this Agreement or due and owing by either Parties' employees. The Parties hereto further hereby agree that the **Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor** of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be

12

considered as an employee, partner, joint venturers or business associate of Company for any purpose whatsoever. **Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer**, agent or principal, or partnership between the Independent Contractor and Company. None of the Parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever. The Parties hereto intend that only an independent contractor relationship be created by this Agreement. Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor. It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such other professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by company, **nor shall any such individual, including the Independent Contractor, be deemed to be employed by Company for the purpose of** any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration , or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to employment, or employment, disability, or compensation for employment, **workers' compensation** or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and /or contributions, in any form whatsoever imposed by Federal. State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, dully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

[Exh. 54] (emphasis added)

Not only does the unambiguous language above set forth the fact that the physicians contracting with AERAS are independent contractors, it specifically addresses the issue with regard to liability for workers' compensation.

The above language, and all contracts between the physicians and AERAS, were available to Plaintiff for review. However, Plaintiff chose not to review but one, according to the individual

conducting the audit for Plaintiff upon which they made the determination to classify the physicians as employees and increase the premium accordingly. [Exh. 121, pp. 40-42] Even though the auditor chose to ignore this plain language and proof of independent contractor status, such was provided by AERAS, through counsel, when the classification and premium change was contested. [Exh. 12]

Nothing in the contracts between AERAS and the physicians indicates any relationship other than that of independent contractor. Specifically, nothing in these agreements indicates any employee and employer relationship between the two.

B.      The contract between AERAS and the hospital

Plaintiff cites to the contracts between the hospitals and AERAS as providing "direct evidence" of an employee-employer relationship between AERAS and the physicians.[4] Specifically, it states that the contract requires AERAS to provide physician services to the emergency room departments "on a twenty-four hour per day, seven-day per week basis". [Doc. 38, p. 35] AERAS does not dispute that the basic purpose of the "Emergency Department Services Agreement" is to "provide physician staffing" for the hospital's emergency rooms. As such, they would need to provide such on a 24/7 basis as that is when emergency rooms operate. AERAS is at a loss as to how this provision of the "Emergency Department Services Agreement" provides "direct evidence" that the physicians are employees of AERAS. It should also be noted, though obvious, that the "Emergency Department Services Agreement" is a contract between the hospital and AERAS, not the physicians.

In addition to the above, Plaintiff cites to provisions of the "Emergency Department Services

---

[4] As with those with the physicians, several hospital contracts are submitted as joint exhibits to this matter [Exh. 8, 9, 10, 11]. These contracts are likewise virtually identical as between AERAS and the hospitals, at least as to the pertinent portions applicable to this matter.

Agreement" dealing with the appointment of an "Emergency Medical Director" for each hospital. While Plaintiff fails to mention, it is undisputed that these individuals are not at issue in this matter. It is undisputed that the "Emergency Medical Director" is not what AERAS argues is an independent contractor. Plaintiff attempts to muddy the water by throwing this argument in the mix, primarily because, as with the physician/AERAS contracts, there are no provisions in the hospital contracts with AERAS to support Plaintiff's position. AERAS admits and takes no issue with the fact that medical directors (of which there are only three (3)) are employees, to the extent they operate as such; however, their remuneration for such is minimal as compared to the remuneration for serving as an independent contractor. As the deposition testimony of Dr. John Moorehouse, President of AERAS, states:

> Q.    I understand. How many emergency medical directors does AERAS currently employ?
>
> A.    We have one for each facility [3].
>
> Q.    Okay. And are these – how are these folks paid?
>
> A.    They're paid on – by a monthly stipend.
>
> Q.    And I could be wrong, but as I understood your description, these are not also independent – these are not contracted physicians –
>
> A.    No.
>
> Q.    – per that – these are different folks?
>
> A.    Right.
>
> Q.    Does AERAS consider these people employees?
>
> A.    Yes.
>
> Q.    Okay.

15

> A.    Only for that portion of their professional responsibility. Their physician care that they give and render while they're working seeing patients is an independent contractor status. So there's actually two separate arrangements for that person.

[Exh. 122, pp. 34-35]

As to the three (3) physicians (out of over twenty (20)) who have minimal status as an employee when working under the separate title of "medical director", Plaintiff uses this as reason for all physicians contracting with AERAS to be considered employees. Again, never has AERAS indicated that the limited time of these physicians should not be considered as employment. Nor has AERAS ever reported or maintained a position to any insurer, or otherwise, that they were not employees for this limited time.

While the medical director issue has no application and is used by Plaintiff to cloud the facts, AERAS must further point out the following should this Court find some merit in this argument. Looking at the provision cited by Plaintiff in the "Emergency Department Services Agreement", there are a total of nineteen (19) different responsibilities of the medical director; however, Plaintiff has picked eight (8) to show "direct evidence" of control by AERAS, presumably because these eight (8) must be the strongest to support Plaintiff's argument. What Plaintiff misses is that these are requirements of one doctor, appointed as the medical director, and that such does not apply to all AERAS independent contractors. Further, Plaintiff misses the fact that, in that it is a contract with the hospital, these are requirements of the medical director to the hospital, not AERAS. The physicians are not parties to the "Emergency Department Services Agreement" and thus the provisions cited by Plaintiff are provisions that are only enforceable under that contract, as between AERAS and the hospital. A review of the provisions, whether the eight (8) pointed to by Plaintiff, or all nineteen (19) contained in the "Emergency Department Services Agreement", shows that these

16

are requirements of the hospital which the emergency room physician appointed as medical director would perform for the hospital, not AERAS. In no way do any of these provisions indicate "direct evidence of control".

Again, these provisions do not apply to the physicians whose status as independent contractors is being challenged and at issue in this matter. Thus, the Court should disregard these arguments by Plaintiff as they have no application and no bearing on the instant issue.

Plaintiff cites no further provisions of the "Emergency Department Services Agreement" contracts between AERAS and the hospitals to support their contention that these "contracts are direct evidence of its right of control over the physicians". Further, the auditor who made the determination for Plaintiff that the physicians were employees never reviewed one such agreement and found no importance in such in making his determination. [Exh. 121, pp. 41] Thus, Plaintiff cannot now use this as a reason for the premium increase.

Additionally, Plaintiff after reviewing these documents still ignores the clear language of the hospital contract that again defines the AERAS physicians as independent contractors:

> 1.3 <u>Independent Contractors</u>. In the performance of emergency medical services hereunto, AERAS and Emergency Physicians shall at all times act as independent contractors practicing their profession, and not as employee(s) or agents(s) of [the hospital]. Neither AERAS nor Emergency Physicians performing services for AERAS under this Agreement, whether said Emergency Physicians be members, partners, employees, subcontractors, or otherwise, shall have any claim under this Agreement or otherwise against [the hospital] for vacation pay, sick leave, salary or other form of compensation, professional liability insurance, retirement benefits, Social Security, worker's compensation, disability benefits, unemployment benefits, or employee benefits of any kind.

[Exh. 8]

Thus, the agreement between the hospitals and AERAS actually provides "direct evidence" of their status as independent contractors, rather than employees.

17

C.    The schedule of the physicians

Plaintiff attempts to argue that the fact AERAS creates the schedule of the days and hours that the physicians work at the respective hospitals creates "direct evidence of its right of control over the physicians".

AERAS does not dispute that the physicians are required to keep track of their hours and days worked, that it "keeps records" of the amount work performed by the physicians and that AERAS generates a schedule for work by the physicians to the hospitals.  However, unlike an employee, the independent contractor physicians control their own work schedule.  Mark Platt, Chief Operating Officer for AERAS, was specifically questioned about this in his deposition:

> Q.    Okay.  Question 1: Do the doctors/independent contractors set their own schedule or does the hospital?  The answer: Independent contractors set their own schedule by giving their days to work to AERAS, P.C., scheduler.  So you have any disagreement with that?
>
> A.    What I understand that to say is that the physicians give the days that they would like to work or be off to the scheduler, Ms. Shaw, and she would do her best to comply with all that.
> ...
>
> Q.    If there's a doctor's request that cannot be met – just say two doctors don't want to work at the same time.  You've got one spot to fill and you've got two guys who can fill it.  A decision has to be made as to how to fill that spot and it's going to run afoul of one of the doctor's request.  Is that a decision that AERAS makes?
>
> A.    The way that typically works is if two docs say, I can't work that shift, we call around, ask for another physician who would be interested in pulling that shift.  And ultimately if it can't get filled, then one of the medical directors will work it.

[Exh. 123, pp. 26-29]

The lack of control by AERAS over the physicians is further shown through the testimony of Dr. John Moorehouse, President of AERAS, showing that even where the physician works is up

18

to the individual and not AERAS:

> Q.    In terms of assignments to the hospitals, is that something that AERAS does?
>
> A.    It depends on the physician's request, desire, and then the basic needs and abilities of physicians and, you know, where they want to work.
>
> Q.    Okay.  So the assignment to a specific hospital is something that the physicians will also request?
>
> A.    Correct.  I mean, there's give and take on that because it's a group practice, but yes.

[Exh. 122, pp. 20-21]

Thus, the scheduling of the physicians by AERAS is a service provided pursuant to their agreement with the hospitals to have their emergency rooms staffed.  The compilation of a schedule, with the physicians having control over where they work, whether they work and when and how long they work, cannot possibly be construed as any control over the physicians by AERAS.  As set out in the above testimony, it is entirely up to the independent contractor physicians as to whether and when they work.  No doctor is told where or when to work and any conflict or gap in the schedule is filled by the employee medical director.

Again, this area of the AERAS and physician relationship provides "direct evidence" of the physicians' status as independent contractors, rather than employees.

D.    The services of the physicians

Without more than a single quote from the physician and AERAS contract, Plaintiff opines that the requirement by AERAS that the physician "provide services that are 'consistent with the facilities available and the standards established in the medical community, as well as the rules and regulations' of the hospitals" somehow is evidence of control by AERAS. [Doc. 38, pp. 35-36] Interestingly, this is under the section titled "Duties of the Independent Contractor". [Exh. 54]

19

Requiring a doctor to follow the "standards" of his or her profession hardly constitutes control. This requirement, and others under the same heading in the Medical Services Independent Contractor Agreement, are akin to requiring the emergency room physician to be a licensed doctor. It borders on the ridiculous to think that such a requirement of the independent contractor to follow the "rules and regulations" of the hospital makes them employees of AERAS.

Here, AERAS seeks to ensure a satisfactory end result in the performance of the physicians' rendering emergency room care, and nothing more. Once again, this argument falls woefully short of showing "direct evidence of its right of control over the physicians".

      E.      Training and orientation of physicians

Plaintiff attempts to create an employee relationship between the physicians and AERAS by "creating" a training program and direction over the newly contracting physicians, when in fact one doesn't exist, with AERAS providing no more than general guidance for the new physician, without exercising any control over the individual. Taken from that which the Plaintiff cited in support of this argument is Dr. Moorehouse's explanation of the "training" of independent contractors:

Q.      Okay. Are there any formal training sessions that involve –

A.      Training sessions?

Q.      Yes.

A.      I wouldn't say there's any training sessions. I mean if I need more training, I have to go get that training. Example, to learn ultrasound, then it's my responsibility as a physician to become knowledgeable in ultrasound, which is – we do now. I mean, up until a few years ago, none of us were doing ultrasounds in the emergency department, now most all of us do ultrasound in the emergency department. It's very specific entities. So it's the responsibility for me to learn that modality on my own.

[Exh. 122, pp. 49-50]

In addition, Plaintiff argues that an "orientation" for the new independent contracting physicians equates to some sort of control by AERAS. This "orientation", again explained by Dr. Moorehouse in the Plaintiff's cited portions of his deposition, is little more than an introduction to the hospitals, and explanation of forms utilized, record keeping procedures used and general paperwork requirements of AERAS and/or the hospitals:

> Q.    Okay. Subsection (1) talks about orienting new emergency department physicians. What is AERAS's procedure for a newly-contracted physician when he comes in to an emergency room?
>
> A.    Well, basically, we orient them on the documentation system, you know because these are what's called template system for charting. Orient them about, you know, the scheduling. Basically orient them to the different facilities and the places and visit and introduce them to people and the basic format of our group. And get them oriented with who they'll be working with and sort of what the bylaws are and what's expected so they're not going in cold.

[Exh. 122, pp.47-48]

...

> Q.    Are there any documents generated as a result of these – of the orientation procedures with Dr. Falero?
>
> A.    There — we have – about the only real document – we did have sort of an orientation, but that includes the information that's provided by the T-System Company primarily. That really goes into depth about how to do the documentation on the charting process. That's available online.

[Exh. 122, pp. 50]

...

> Q.    Does anyone go through this document with them or are they responsible for doing that on their own?
>
> A.    No, we go through, you know, just to show them. I mean, if you don't do that chart right, then you can't document the patient's care right. And it's pretty simple, actually.

21

Q.    And Dr. Falero goes through all that with them?

A.    He does orientation on that.  They still have to do it themselves, though.

[Exh. 122, pp. 51-52]

...

Q.    And you mentioned an orientation booklet.  Is this –

A.    That's the only booklet that I'm aware of.  We have orientation booklets for residents that do rotations with us, but they're not on contract with us.  We're just – they're attending.

Q.    So as far as you know, Exhibit 4 [T-System Training Manual for Emergency Physicians] is the only document that a new physician, new contracting physician, will get?

A.    Correct.  Because their ability to get paid depends on their ability to document.  The business side of it requires the medical record to code and to charge for.  And since they get paid on what they see, then they need to know how to submit their bills, if you will.  That's kind of what it represents on the business side.

[Exh. 122, pp. 52-53]

The above is from what Plaintiff cites as evidence to support for their contention that AERAS maintains some extensive training and orientation program for its physicians that amounts to "direct evidence of its right of control over the physicians".  This just simply isn't the case, as shown by the testimony of Dr. Moorehouse.  Plaintiff, again, is overreaching to attempt to justify its incorrect position that these physicians are anything other than independent contractors.


F.    Method of payment to physicians

Plaintiff claims that "the method in which the physicians were paid" gives rise to "a question of fact" as to whether the AERAS physicians are employees or independent contractors.  While it

22

is unclear at this stage in the case as to what significance it is that this is a "question of fact"[5], regardless, the method of payment does not make these physicians employees of AERAS.

Further, Plaintiff claims that it was the method of payment that gave rise to their decision to classify the physicians as employees because, Plaintiff argues, the physicians were paid based upon a "productivity model" that evidences a "right of control" and cites Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 so. 2d 266, 270-271 (Ala. Civ. App. 2006) as support for such. [Doc. 38, pp. 40-41]. Contrary to Plaintiff's assertion, the law in Alabama is not such that this method of payment "is sufficient evidence of an employer's right of control". As this case, and numerous others cited herein, states, "method of payment" is but one of four factors to determine whether there is a "right of control" sufficient to create an employer-employee relationship. 966 So. 2d at 268. This case also found that "there is substantial evidence tending to demonstrate an employment relationship in three of the four criteria". Id. at 270. Finally, it should be noted that this case involved the Court reviewing the trial court's granting of summary judgment in favor of the party seeking independent contractor status in a suit similar to the instant case, wherein a workers' compensation carrier sought to increase premiums by reclassifying individuals as employees rather than independent contractors. The Court closed its opinion by stating, "As in our recent opinion in Sartin v. Madden, 955 So. 2d 1024, 1030-31 (Ala. Civ. App. 2006), 'our opinion should not be misread to compel any particular conclusion regarding whether an independent-contractor relationship or an employer-employee relationship existed .... Rather, we merely direct the trier of

---

[5] Plaintiff raises several points throughout its brief that it contends are "questions of fact". Plaintiff seems mistaken that this matter is before the Court on a motion for summary judgment, when in fact it is before the Court to determine all issues pending based upon the briefs and evidence submitted by the parties.

fact to weigh the evidence and reach its own conclusion based upon all the evidence.'" Id. at 271. Similarly, this Court is required to do the same.

In Lacey, the Alabama Court of Civil Appeals found that a mussel shell processor was an independent contractor and thus not entitled to workers' compensation benefits, even though "Lacey was paid on an hourly basis" in that the company "did not control the time Lacey reported to work, nor the number of hours per day he worked. Also, Lacey never had taxes taken out of the monies paid to him by [the company], but rather, Lacey reported his own income." 628 So. 2d at 686. See also, Martin, 628 So. 2d at 654.

Thus, the method of the payment of the physicians is not determinative of their status as independent contractors versus employees. What is supportive of them being independent contractors is the fact that each contracting physician receives an IRS Form 1099 from AERAS with regard to their pay received for performance under the "Medical Services Independent Contractor Agreement". [Exh. 54] These physicians utilize such in reporting their income to the Department of Revenue of the State of Alabama and the Internal Revenue Service of the United States of America. Plaintiff cites nothing from either of these governmental institutions to suggest that they find these physicians to be employees rather than independent contractors. In addition, from their pay, no income taxes, social security, Medicare or unemployment taxes are paid or withheld. [Exh. 54]

Plaintiff cites to the fact that some of the physicians are paid an hourly fee, rather than a per-patient, service-based fee. As with a lawyer, for example, an hourly fee paid for services rendered does not make the physician an employee. See, DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE, PUBLICATION 15-A (2008), Cat. No. 21453T, Employer's Supplemental Tax

Guide ((Supplement to Publication 15 (Circular E), Employer's Tax Guide)), 6-7 ("However, it is common in some professions, such as law, to pay independent contractors hourly.").

As Plaintiff noted, the deductions from the physician's pay of insurance (health, dental and professional liability) are of no consequence in the determination of the physicians' status as such is merely done as an accounting service by AERAS as the entity pays these premiums up front and the deduction from the physician's pay is merely their reimbursement, in full, for such.  [Exhibit 121, pp. 31-33; Exhibit 52]  Thus, they are not employee benefits.  This fact is undisputed, although Plaintiff sees fit to include it in its brief, stating "perhaps most telling, AERAS deducted items such as health insurance, dental insurance, and malpractice insurance from the amounts it paid its physicians." [Doc. 38, p. 41] It might be "most telling" if one ignored the undisputed fact that the physicians reimburse AERAS every penny spent on these amounts withheld.

There is nothing in the method of payment of the physicians by AERAS that gives reason to classify these individuals as employees of the company, as opposed to independent contractors. Thus, this argument, as do the others of Plaintiff, fails to support their position and premiums charged.

G.    Group health insurance for physicians

As stated above, the health and dental insurance provided through AERAS is done as a convenience for the physicians and not a benefit. Every premium amount expended by AERAS is reimbursed in full by the physician. [Exh. 121, pp. 31-33; Exh. 52] Showing the stretch that Plaintiff has had to make in this case, it now points to a form generated by Blue Cross and Blue Shield of Alabama, related to a group benefits application where blocks pre-printed by this insurer as "employee" and "employer" are executed by AERAS and the physicians. [Exh. 172-180] This borders on the ridiculous. While clearly Plaintiff is reaching, what is pertinent is that this information was not even reviewed by Plaintiff when the audits were done and the premiums increased. Only on May 12, 2008, when counsel for Plaintiff reviewed several files maintained at AERAS, did this information come to light.[6] Thus, Plaintiff made no decision regarding the physicians' status, nor increasing the premiums charged to AERAS, based upon these Blue Cross forms.

This factor was looked at in the case of <u>Martin v. Lawrence County</u>, where the Alabama Court of Civil Appeals dealt with the issue of whether a county attorney was an employee or independent contractor for purposes of workers' compensation benefits. In that case, the health insurer's "plan's benefit booklet lists 'county attorney' as an 'eligible employee' for the plan"; however, the county's attorneys were "not intended, by that designation, to be considered as county employees for workmen's compensation benefits." 628 So. 2d 652, 655 (Ala. Civ App. 1993). Finding the attorney to be an independent contractor, the Court stated:

---

[6] Such information was also obtained on or about June 16, 2008 from Blue Cross via non-party subpoena issued by Plaintiff. [Exh. 167]

26

> [The attorney's] argument that he is an employee for workmen's compensation purposes because he is considered an employee for purposes of the county health insurance plan is unpersuasive. The health insurance coverage is merely a contractual benefit which [the attorney] received associated to his relationship with the county, and it is not in contravention of Ala. Code 1975, § 11-91-1 et seq. Therefore, the trial court correctly held that [the attorney] is entitled to payment of the medical expenses, pursuant to the policy.

Id.

As in Martin, the fact that the physicians are listed as "employees" on health insurance forms does not make them employees for any further purpose as claimed by Plaintiff in this case.

H.    Professional liability insurance for physicians

Again stating that it "demonstrates the question of fact", Plaintiff makes a similar argument as that with the health insurance, claiming that a group malpractice policy, paid for in its entirety by the physicians, somehow creates the status of employee for the physicians. Plaintiff admits the undisputed evidence that the premiums are paid by the physicians, but argues because AERAS obtained a "group policy", they are now the employer. This, again, is a stretch and was also not information available or relied upon by Plaintiff when they increased AERAS's premiums, such information being obtained through non-party subpoenas issued to professional liability carriers in this matter. [Exh. 153-156]

I.    Equipment of physicians

The third factor in determining whether the Plaintiff is justified in classifying the physicians as employees is whether AERAS furnished equipment to them. Plaintiff cites to the contracts between the hospitals and AERAS in support of their contention that AERAS provides equipment; however, as cited, these contracts clearly state that the hospital "shall make available ... the space designated for the Emergency Department and such equipment as is required for the proper

operation and conduct of the Emergency Department". [Doc. 38, pp 43-44, citing Exh. 8 § 2.1; Exh. 10 § 2.1; Exh. 11 § 2.1]   These contracts also require the hospitals to provide non-physician and nursing staff for the physicians [Exh. 8 § 2.4], as well as other needed support:

> 2.5   <u>Physician Room</u>.   [The hospital] shall make available a room within the Emergency Department, containing a bed, lockers, desk, lamp, and telephone, television, video machine, dictation equipment and a personal computer terminal, if possible, access [to] the World Wide Web and the Micromedex data base.

[Exh. 8]

Despite this clear language that the hospital provides equipment, Plaintiff still argues that this equates to AERAS providing such.  This is simply not true.  AERAS provides absolutely no equipment to these physicians and there is no evidence to suggest otherwise.  The evidence only shows that the physicians themselves and the hospitals provide equipment.

Thus, as to the third factor, providing equipment, Plaintiff's assertion that the physicians are employees fails.

J.    Termination of physicians

The final factor cited by Plaintiff is AERAS's right to terminate the physicians.  As Plaintiff points out, the contracts between AERAS and the physicians could only be terminated with certain notice or for cause. [Doc. 38, p. 45, citing Exh. 54-68]  This does not equate to termination of an employee, which needs neither notice nor cause.

The Alabama Court of Civil Appeals addressed similar contractual provisions in finding independent contractor status of a newspaper delivery person.  In <u>Atchison v. Boone Newspapers, Inc.</u>, like the instant case, "the contracts could be terminated only with 30 days' notice or immediately for cause."   2007 WL 268504 at *4.

Thus, in that the physicians' relationship cannot be terminated "at will", the contractual

provisions limiting the termination by either party is evidence of independent contractor status, and not that of employee.

IV.    Other arguments of Plaintiff

    A.    What other insurers do

In addition to the failed arguments that there is evidence to support classifying the physicians as employees, Plaintiff argues that the Court should look to what other insurers have done with regard to such classification of AERAS doctors.  What other insurance companies do should have no bearing on this matter, especially since Plaintiff never took such into account until after this suit was filed.

While Plaintiff cites to the decision making of AlaCOMP, the current provider of AERAS's workers' compensation coverage, it should be noted that AlaCOMP is not an insurance company. [Exh. 187, pp. 12-14] In addition, the underwriter for AlaCOMP testified that the company made no decision as to the status of the physicians as it merely needed to charge an increased premium as less would not have been economically feasible.  [Exhibit 187, pp. 68] AlaCOMP was honest and up front about the need for more premium, incidentally such totaling $72,386.00 as opposed to Plaintiff's $151,782.00 for the same purported coverage.  AlaCOMP's decision is not what Plaintiff did.  What Plaintiff did was try to back-door justify an excessive premium increase by classifying the physicians as employees versus independent contractors after the policy was issued.  Further, AlaCOMP stated that it has a policy to pay for claims by individuals such as the independent contractor physicians, regardless of what the law may say.   [Exhibit 187, pp. 77-79]   Plaintiff makes no such assertion.

Similarly, Plaintiff argues that AERAS's prior insurer, Williamsburg National Insurance

Company, classified all the physicians as employees. This is an incorrect statement and, as Plaintiff admits, once the facts and applicable law were presented to that insurer by AERAS, the physicians were properly classified as independent contractors and the premium appropriately adjusted, something Plaintiff refuses to do. [Doc. 38, p. 47; Exh. 139]

As with so many arguments of Plaintiff, the information of what AlaCOMP or Williamsburg did or didn't do was not available, nor utilized by Plaintiff, when they decided to increase the premiums charged to AERAS. The claim that other insurance companies "do it, too" has no bearing on the instant matter and, simply is misplaced when the entire circumstances of the other insurers' actions and decision making are compared to that of Plaintiff.

B.      The audit

There were allegedly two separate audits conducted in this matter by Plaintiff, both by Thomas Dyer, an employee of Plaintiff. Although Plaintiff claims a "preliminary audit" was conducted "to ensure that the business was properly classified and to verify the payroll amounts submitted by AERAS", Mr. Dyer has no idea when the audit was conducted. [Doc. 38, p. 31; Exh. 121, p. 23] In any event, Plaintiff claims that during this preliminary audit, sometime after the policy at issue was written and issued, it first "learned that AERAS was in the business of providing emergency room physicians ... to several hospitals in the Montgomery area". [Doc. 38, p. 31] To accept this statement is to believe Plaintiff wrote and issued a policy of workers' compensation insurance coverage without knowing the insured's business. If such is true, one has to wonder if the initial premium charged was merely one to entice AERAS to purchase the policy, only to use an audit afterward to justify substantially increasing the premium. Although later testifying to an additional "preliminary audit", Mr. Dyer initially testified that the only times audits are done by

30

Plaintiff is upon the expiration or cancellation of the policy.

> Q.    You said that this is done -- the auditing is done when policies expire?
>
> A.    Expire or cancelled.
>
> Q.    Is there any time that an audit is done outside of the expiration or cancellation of a policy?
>
> A.    Not that I'm aware of.

[Exh. 121, pp. 9-10]  Again, it raises the question of why Plaintiff saw fit to conduct an audit prior to the cancellation or expiration of AERAS's policy.

Despite Plaintiff's reference in its brief to the term "hospital-type" as describing what it determined AERAS's business was, the fact is Mr. Dyer determined that AERAS was a "hospital" for purposes of determining their premium. [Doc. 38, p. 31; Exh. 121, pp. 26, 28]  To this day, Plaintiff maintains AERAS is a "hospital" and claims premiums associated with such.  It is undisputed, however, that AERAS is not a hospital, but rather contracts with hospitals to provide emergency room staffing.

The "second" audit, and the one Plaintiff actually knows was conducted at a time certain, was performed in May, 2006, after AERAS had cancelled the policy of insurance due to Plaintiff's increased premiums and classification of the physicians as employees. [Exh. 121, p. 18]

The audits, according to Plaintiff's employee, Mr. Dyer, were conducted by reviewing "[p]ayroll journal, 941s, state unemployment returns, detailed general ledger" for the purpose of finding out what pay is received by "people that work for [AERAS]". [Exh. 121, pp. 24-25]

As to the specific issue of whether the AERAS contracted physicians were employees or independent contractors,  Mr. Dyer only looked at "[y]ear-to-date earnings, records for each of the emergency room doctors, the general ledger". [Exh. 121, p. 29]  Significant in his (and Plaintiff's)

decision that the physicians were employees was that premiums for certain insurance were deducted from the physicians' payments by AERAS. As explained herein, however, these "deductions" were repaid in full by the physicians. [Exh. 121, p. 30; Exh. 52] Mr. Dyer was not aware of such, nor did he inquire as to such. [Exh. 121, p. 39] Although he lists this as a factor in determining the employee status of the physicians, Mr. Dyer testified that, even if these were not benefits provided by AERAS as the facts show, it wouldn't have mattered. [Id.] He went so far to testify that it only matters that there was a deduction from the pay, regardless of the actual facts surrounding such, including that full repayment was made by the physicians to AERAS. [Exh. 121, p. 40] Nothing else in the "earnings records" led Mr. Dyer to conclude that the physicians were employees. [Exh. 121, pp. 30-31]

Mr. Dyer also reviewed the general ledger and determined that since the physicians were "paid on a weekly or monthly basis" they were employees, since the actual employees were also paid on a regular basis. [Exh. 121, p. 31] Nothing else in the general ledger was considered. [Id.]

Mr. Dyer had a conversation with one single AERAS employee regarding information used in his audit, asking how the physicians' schedules were determined. Although contrary to the facts showing that the physicians determined their scheduled work times, as set out herein, Mr. Dyer claims he was told it was a "joint effort between AERAS and the doctors". [Exh. 121, p. 33] Inquiring no further, Mr. Dyer concluded the "joint effort" equates the physicians to employees. [Id.] Although initially given as a reason for determining the status of the physicians as employees, once learning that the schedules were determined by the physicians, Mr. Dyer testified that such was no longer a determining factor. [Exh. 121, p. 39]

In conducting his audits, Mr. Dyer looked at one contract between AERAS and a physician,

but reviewed none of the contracts between AERAS and the hospitals. [Exh. 121, pp. 40-42] This

makes sense only because Mr. Dyer did not find the contracts of any importance to his decision

making:

> Q.    Did you not think it was an important factor as to how the doctors felt
>        whether they were employees or independent contractors?
>
> A.    No.
>
> Q.    Did you not find it important the contractual relationship between AERAS
>        and the medical care providers or hospitals?
>
> A.    No.

[Exh. 121, p. 41]

The testimony above is incredible, considering that Plaintiff relied upon the audit(s) of Mr.

Dyer to make its determination that the physicians of AERAS were employees and that the premium

charged for workers' compensation coverage to AERAS needed to be increased over seven (7) times

the initial premium amount.  In addition, although Plaintiff asked AERAS several questions in an

attempt to show the physicians to be employees, and AERAS responded showing that they were

independent contractors as set out herein, this information was never presented to the auditor, Mr.

Dyer, who was actually making the determination as to the status of the physicians. [Exh. 121, pp.

62-67 and exhibits 5-8].

Mr. Dyer testified that the determination of whether an individual is an employee or an

independent contractor is significant to Plaintiff as it has a direct bearing on the potential claims

brought under the Workers' Compensation Act of Alabama and, therefore, has a direct bearing on

the premiums charged by Plaintiff.

> Q.    You mentioned that the insurer could be responsible for worker's
>        compensation claims.  Is that essentially what you're looking for when

you're determining whether somebody is an employee versus independent contractor?

A.     Yes.

Q.     That's the goal.  I mean, you need to determine who's a potential claimant for the worker's compensation policy; correct?

A.     Correct.

Q.     And that's how premiums are determined?

A.     Yes.

[Exh. 121, p. 44]

Although admittedly looking during the audit(s) to the status of the physicians as employees or independent contractors, and that such a determination determines premiums charged, what is incredible is the testimony of Mr. Dyer as to how he and Plaintiff actually determine whether an individual is an employee versus an independent contractor:

Q.     Is there some sort of guidelines or chart or book or anything that you refer to when you are determining whether or not doctors such as this are employees versus independent contracts?

A.     Yes.

Q.     And what is that?

A.     The State of Alabama, in their regulations for workers' comp, they state that Alabama goes by the IRS guidelines in determining an employer/employee relationship.

Q.     Regulations for workers' comp.  What specifically are you referring to?

A.     The Alabama Worker's Comp Act.

Q.     Any particular section of the act that you're referring to?

A.     25-5-50, and under H.

[Exh. 121, pp. 34-35]

What Plaintiff, and Mr. Dyer, apparently don't realize is that *Alabama Code* (1975) § 25-5-50(h) does not govern the determination of independent contractor status versus employee under the Workers' Compensation Act of Alabama as to any profession other than home builders.  While § 25-5-50 sets out specific exemptions from the Act, the section relied upon by Plaintiff and Mr. Dyer states:

> (h) An independent contractor, as defined by the guidelines of the United States Internal Revenue  Service, who regularly employs less than five employees in any one business, **and who is engaged in the business of constructing or assisting on-site in the construction of single-family, detached residential dwellings**, may file with the Department of Industrial Relations, Workers' Compensation Division an affidavit of exemption from workers compensation coverage ...

*Alabama Code* (1975) § 25-5-50(h) (emphasis added).

Thus, the entire premise upon which the auditor, and ultimately Plaintiff, relies to justify its classification of the AERAS physicians as employees is fatally flawed in that the Alabama Code section relied upon has no application to this business, nor the physicians at issue.  In actuality, the determination of the status of an individual as an employee or independent contractor is governed by the Act's basic requirement that only employees may recover workers' compensation benefits, with employees being defined by *Alabama Code* (1975) § 25-5-1(5) and the case law set forth herein addressing such.

Therefore, Plaintiff's citing to the audit(s) in an effort to justify its actions, and to support its claim of employee status for the physicians, is without merit and does nothing more than highlight the error of Plaintiff in its determination of the physicians' status, premium increase and filing of this action.

<u>CONCLUSION</u>

35

Plaintiff has filed this action in an attempt to have this Court find that it was justified in increasing the premium originally agreed upon and contracted for of $21,271.00 to an astronomical amount of $151,782.00.  Throughout this litigation, Plaintiff has maintained that it correctly classified AERAS's contract physicians as employees, based upon the audit(s) conducted by Mr. Dyer, and thus the premium was due to be increased seven fold.   As set forth herein, Plaintiff's claims fail in that the physicians are clearly independent contractors as originally determined and agreed upon by the parties.  Further, any subsequent determination by Plaintiff that they were employees is not supported by the facts or law governing such.  Finally, Plaintiff has failed to show any evidence to support its position in this case and thus the relief sought in the Complaint filed in this matter is due to be denied, with judgment being entered in favor of Defendant AERAS.

Respectfully submitted this the 8th day of August, 2008.


/s/ Michael J. Cohan
MICHAEL J. COHAN (ASB-6887-A56M)
Attorney for Defendant


OF COUNSEL:

Hill, Hill, Carter,
Franco, Cole & Black, P.C.
Post Office Box 116
Montgomery, Alabama 36101-0116
Telephone: (334) 834-7600
Facsimile: (343) 832-7419
Email: mcohan@hillhillcarter.com

36

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have served a copy of the above and foregoing upon all parties by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification to the following via email this the 8th day of August, 2008.

Brenen G. Ely, Esq.
Joel S. Isenberg, Esq.
Candace L. Hudson, Esq.
Ely & Isenberg, LLC
600 Beacon Parkway West
Suite 104
Birmingham, Alabama 35209

/s/ Michael J. Cohan
OF COUNSEL