**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **CONTINENTAL CASUALTY COMPANY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO.:** |
| **vs.** | § | |
| | § | **2:07-CV-221-WHA** |
| | § | |
| **ALABAMA EMERGENCY ROOM** | § | |
| **ADMINISTRATIVE SERVICES, P.C.,** | § | |
| | § | |
| **Defendant.** | § | |

**REPLY TO DEFENDANT'S BRIEF IN RESPONSE TO**
**CONTINENTAL CASUALTY'S PRINCIPAL BRIEF**

COMES NOW Plaintiff Continental Casualty Company ("Continental Casualty"), and submits the following reply to Defendant Alabama Emergency Room Administrative Services, P.C.'s ("AERAS") Response to Continental Casualty's brief in support of its Motion for Findings of Fact and Entry of Judgment.

Despite AERAS's invitation for the Court to engage in a game of semantics, this case is and always has been about one thing – whether the physicians working for AERAS fall within the risk insured by the Continental Casualty policy. At its heart, this case is a simple breach-of-contract action. Continental Casualty has never represented that this Court must conclusively determine that the AERAS physicians are actually "employees" under the Alabama Workers' Compensation law. Rather, the issue presented to this Court by both parties is "whether the physicians *qualify* as employees *for the purposes of workers compensation insurance* and, therefore, *should be included*

*in the assessment of the premium* for the workers' compensation policy." [Doc. 20 at ¶ 2 (emphasis added); Doc. 28 at ¶ 2 (emphasis added); <u>see</u> <u>also</u> Doc. 22 at p. 2].

To determine whether the physicians qualify as employees for the purposes of *workers compensation insurance*, the Court's inquiry must be guided by the insurance contract. The Continental Casualty policy is clear and unequivocal – the premium basis includes all remuneration paid or payable during the policy period to "[a]ll . . . persons engaged in work that *could* make [Continental Casualty] liable under Part One (Workers Compensation Insurance) of this policy." [Exhibit 36 at CNA 0148 (emphasis added)]. Thus, this Court is faced with one succinct issue: Do the AERAS physicians constitute persons engaged in work that *could* make Continental Casualty liable to pay workers' compensation benefits under the insurance contract? Based upon the clear, undisputed evidence presented in this case, the answer to this question is yes.[1] Therefore, Continental Casualty is entitled to entry of judgment in its favor, and an award of the full premium due under the policy as well as any additional, incidental damages to which it may be entitled.

---

[1]In its brief, AERAS attempts to diminish certain facts by stating that they were not made a part of the Agreed Statement of Facts, but were included in Continental Casualty's brief. [Doc. 58, p. 1., n.1]. However, AERAS admits that each and every fact, whether contained in the Agreed Statement of Facts [Doc. 21] or Continental Casualty's principal brief [Doc. 38, pp. 2-29], is undisputed. [Doc. 58, p. 1, n. 1]. What AERAS neglects to advise this Court is that Continental Casualty proposed that these same, undisputed facts be included in the Agreed Statement of Facts prior to the submission of that document. Despite the fact that it did not then, and does not now, dispute any facts presented by Continental Casualty, AERAS refused to have the facts included in the Agreed Statement of Facts ordered by this Court. Instead, AERAS demanded that those undisputed facts that it would not agree to include in the joint submission be separately submitted in Continental Casualty's principal brief. Thus, in accordance with AERAS's request, Continental Casualty included the accurate, undisputed facts in the brief it filed pursuant to this Court's October 29, 2007 Order.

## STANDARD OF REVIEW

The parties agreed to try this case on stipulated facts and briefs. "A trial on the briefs is treated as a bench trial rather than a motion for summary judgment and is therefore governed by Federal Rule of Civil Procedure 52(a)." Adams v. Metropolitan Life Ins. Co., 549 F. Supp. 2d 775, 777 (M.D. La. 2007)(citing Davis Oil Co. v. Mills, 873 F.2d 774, 777 (5th Cir. 1989); St. Tammany Parish Tax Collector v. Barnesandnoble.com, 481 F. Supp. 2d 575, 576-577 (E.D. La. 2007)). Because the parties agreed to try this case on the briefs, "the Court therefore uses the legal standard applicable at trial, not the summary judgment standard. Plaintiff therefore bears the burden of proof by a preponderance of the evidence." See St. Tammany Parish Tax Collector v. Barnesandnoble.com, 481 F. Supp. 2d 575, 576 (E.D. La. 2007).

In its responsive brief, AERAS overlooks the procedural standards of this Court, and argues instead that Continental Casualty must present "substantial evidence" to recover in this case. In support of its argument, AERAS erroneously concludes that this is an agency case. However, this is a straightforward breach-of-contract action. A valid contract was in place, binding both Continental Casualty and AERAS. [Exhibit 36]. Continental Casualty provided coverage pursuant to the contract; AERAS breached the contract by failing to remit payment for premium that was calculated pursuant to the express terms of the contract; and Continental Casualty was damaged as a result of AERAS's breach. [See Doc. 1; see also Hooper v. Columbus Regional Healthcare Syst., Inc., 956 So. 2d 1135, 1139 (Ala. 2006)(to establish a breach-of-contract claim, a plaintiff must show (1) the existence of a valid contract binding the parties; (2) his own performance under the contract; (3) the defendant's nonperformance; and (4) damages)]. Because this case is a breach-of-contract action, it is not subject to the "substantial evidence" standard.

3

Moreover, as AERAS itself repeatedly points out in its brief, this case is not before the Court on a summary judgment motion. Accordingly, Continental Casualty is not required to present substantial evidence of its breach-of-contract claim to be entitled to judgment in this case.

Rather, because the preponderance of the evidence in this case demonstrates that a question of fact would exist in a workers' compensation case regarding the employment status of the AERAS physicians, the physicians constitute persons who could make Continental Casualty liable to pay benefits under the policy. Therefore, the AERAS physicians are properly included in the premium basis of the policy, and the increased premium is appropriate. Thus, AERAS's refusal to pay the increased premium amounts to a material breach of the contract, and Continental Casualty is entitled to the entry of judgment in its favor.

## ARGUMENT

### I.    The Continental Casualty Policy Clearly Provides For The Inclusion Of The AERAS Physicians In The Premium Basis.

In its policy, Continental Casualty assumes the risk to AERAS for those workers' compensation claims brought during the policy period for which coverage is provided. [See Exhibit 36 at CNA 0145]. The risk that Continental Casualty assumes under the policy includes not only the risk of any settlement or judgment in a workers' compensation claim that AERAS incurs during the policy period, but also the risk of any attorneys fees or defense costs incurred in defending any workers' compensation claim that is brought against AERAS. [See Exhibit 36 at CNA 0145].

As with every insurance policy, the premium charged for coverage should reflect the actual risk or exposure that is assumed by the insurer. Workers' compensation policies, in particular, provide specific guidelines regarding the calculation of premium. The clear, unequivocal language

4

of the Continental Casualty policy states that premium is calculated by multiplying an appropriate rate by the premium basis. [Exhibit 36 at CNA 0148]. The Continental Casualty policy defines the "premium basis" to include "payroll and all other remuneration that is paid or payable during the policy period." [Exhibit 36 at CNA 0148]. However, contrary to AERAS's contention, this premium basis is not limited to only those officers and employees of AERAS. [See Exhibit 36 at CNA 0148]. Rather, the policy specifically and unequivocally expands the premium basis of the policy to include "[a]ll other persons engaged in work that *could* make [Continental Casualty] liable" for the workers' compensation benefits provided in Part One [the workers' compensation portion] of the policy. [See Exhibit 36 at CNA 0148]. Part One of the policy requires Continental Casualty to "pay promptly . . . the benefits required of [AERAS] by the workers compensation law" and to defend AERAS against "any claim, proceeding, or suit against [AERAS] for benefits payable by this insurance." [Exhibit 36 at CNA 0145].

In its brief, AERAS argues that because its physicians are not employees, they are not entitled to benefits under Alabama workers' compensation law and, thus, the Continental Casualty policy would not provide coverage for any claim by AERAS's physicians. This argument flies in the face of the well-established Alabama coverage law.

The Alabama Supreme Court consistently holds:

> It is well settled "that '[an] insurer's duty to defend is more extensive than its duty to [indemnify].' United States Fid. & Guar. Co. v. Armstrong, 479 So. 2d 1164, 1168 (Ala. 1985)(further citations omitted). Whether an insurance company owes its insured a duty to provide a defense in proceedings instituted against the insured is determined primarily by **the allegations** contained in the complaint. Id. at 1168. **If the allegations of the injured party's complaint show an accident or occurrence within the coverage of the policy, then the insurer is obligated to defend, regardless of the ultimate liability of the insured**. Ladner & Co. v. Southern Guar.

5

Ins. Co., 347 So. 2d 100, 102 (Ala. 1977)(citing Goldberg v. Lumber Mut.<br>Cas. Ins. Co., 297 N.Y. 148, 77 N.E.2d 131 (1948)).

Hartford Cas. Ins. Co. v. Merchants & Farmers Bank, 928 So. 2d 1006, 1009 (Ala. 2005)(emphasis added).  Thus, if any plaintiff alleged that it was an employee of AERAS, Continental Casualty would have had to offer AERAS a defense, regardless of whether the plaintiff was an actual employee.  It is enough under Alabama coverage law that the plaintiff allege that he is an employee to trigger the duty to defend under the workers' compensation policy.  Thus, each such plaintiff *could* make Continental Casualty liable to pay benefits under the workers' compensation portion of the policy.  Yet, despite the clear mandates of Alabama law, AERAS encourages this Court to find that Continental Casualty could simply deny coverage, including the duty to defend, in any workers' compensation action in which the employer contends that the employee is an independent contractor.  Such an action by Continental Casualty, or any other workers' compensation insurer, would violate Alabama's well-settled coverage law and would surely be met with heated opposition from AERAS or any other similarly-situated employer.  It is disingenuous for AERAS to contend that it would not expect Continental Casualty to defend such an action if one were brought.   AERAS would most certainly seek coverage in an effort to avoid defense costs, just as it now seeks to avoid paying a premium for the coverage that was provided.  Continental Casualty would be obligated under Alabama law to defend AERAS for an action in which the plaintiff alleged that he was an AERAS employee who sustained an on-the-job injury during the policy period.  Therefore, AERAS's contention that Continental Casualty is attempting to obtain a premium for coverage it would never have provided is without merit, not based upon the law, and should be swiftly disregarded.

Rather, this case is resolved by the determination of one issue – whether the AERAS physicians constitute persons engaged in work that ***could*** make Continental Casualty liable to pay benefits, i.e., to defend or indemnify AERAS, for any workers' compensation claim. To reach a determination of this issue, the Court need not conclude that the AERAS physicians are, in fact, employees of AERAS. Instead, the Court must only conclude that a question of fact exists as to the employment status of the AERAS physicians. If such a question of fact exists, then the physicians constitute persons engaged in work that ***could*** make Continental Casualty liable to pay workers' compensation benefits on behalf of AERAS.

A preponderance of the undisputed evidence proves that the AERAS physicians ***could*** make Continental Casualty liable to defend and/or indemnify AERAS under the workers' compensation policy. The overwhelming amount of evidence presented to this Court meets, and exceeds, the burden placed upon Continental Casualty. Specifically, the evidence establishes that AERAS maintains or reserves a right of control over its physicians sufficient to create a question of fact as to the status of the AERAS physician in the event that a workers' compensation claim is alleged during the policy period. As the AERAS physicians constitute persons engaged in work that ***could*** make Continental Casualty liable, their inclusion in the premium basis was appropriate and warranted, and AERAS's refusal to remit the premium due is a material breach of the insurance contract. Therefore, Continental Casualty is entitled to judgment in its favor, and an award of the full premium due as well as any additional, incidental damages to which it is entitled.

II.    **AERAS Reserves And Exercises A Right Of Control Over Its Physicians Sufficient To Create A Question Of Fact As To Their Status As Employees Versus Independent Contractors.**

Although this Court is not required to conclusively determine the employment status of the AERAS physicians to find in favor of Continental Casualty, the evidence in this case clearly demonstrates AERAS's right of control over its physicians.  AERAS's right of control is found not only in its contracts with its physicians and the hospitals, but it is also clearly illustrated in the manner in which AERAS actually conducts its day-to-day operations.  Despite AERAS's attempt to define its relationship with its physicians as one of an "independent contractor," AERAS's contracts and its actions clearly establish that a question of fact exists as to the true status of the AERAS physicians.

A.    **The Undisputed Evidence In This Case Establishes That A Question Of Fact Exists As To The AERAS Physicians' Employment Status Under Alabama Law.**

Alabama law is clear:  to determine "whether an employer-employee relationship exists, the court looks to the right of control, either actually exercised or reserved."  Ex parte Curry, 607 So. 2d 230, 232 (Ala. 1992)(citations omitted).  The Alabama cases outline four factors that demonstrate an employer's right of control:

(1)    Direct evidence that demonstrates a right or the exercise of control;

(2)    The method by which the alleged employee received payment for his services;

(3)    Whether the equipment is furnished by the alleged employer or not; and

(4)    Whether the alleged employee has the right to terminate.

8

Ex parte Curry, 607 So. 2d 230, 232-33 (Ala. 1992)(citing White v. Henshaw, 363 So. 2d 986, 988

(Ala. Civ. App. 1978)).

Taking these four factors one step further, AERAS cites several cases that it contends

demonstrate that the AERAS physicians were independent contractors as a matter of law. However,

a close review of the cases cited, when compared with the undisputed facts presented here, clearly

establish that a question of fact exists as to the status of AERAS's physicians.

In particular, AERAS cites this Court to Atchison v. Boone Newspapers, Inc., ___ So. 2d

___, 2007 WL 368504 (Ala. Civ. App. 2007), Lacey v. American Shell Co., Inc., 628 So. 2d 684

(Ala. Civ. App. 1993), Martin v. Lawrence County, 628 So. 2d 652, 654 (Ala. Civ. App. 1993), and

Turnipseed v. McCafferty, 521 So. 2d 31, 33 (Ala. Civ. App. 1987) as support for its position that

the AERAS physicians are, in fact, independent contractors. In each of these cases, the Alabama

Court of Civil Appeals found the following factors relevant to their decision regarding whether a

right of control existed:

1.   Whether the defendant controlled the means in which the work was
     performed or by which complaints were resolved;

2.   Whether the defendant supervised or otherwise controlled the manner
     in which the injured party performed his job;

3.   Whether the defendant set the schedule for the injured party to
     perform his work;

4.   Whether the defendant paid the injured party based on the number of
     hours she worked;

5.   Whether the defendant provided any equipment for the injured party;

6.   Whether the defendant controlled termination of the contract.

See Atchison v. Boone Newspapers, Inc., ___ So. 2d ___, 2007 WL 368504 at *4 (Ala. Civ. App. 2007), Lacey v. American Shell Co., Inc., 628 So. 2d 684, 686 (Ala. Civ. App. 1993), Martin v. Lawrence County, 628 So. 2d 652, 654 (Ala. Civ. App. 1993), and Turnipseed v. McCafferty, 521 So. 2d 31, 33 (Ala. Civ. App. 1987).

Even applying these factors to the undisputed facts in this case demonstrates that a question of fact exists with regard to the actual employment status of the AERAS physicians. The record in this case is replete with undisputed facts proving that AERAS *did* control the manner in which its physicians performed their work; *did* control the manner in which complaints were resolved; *did* supervise the methods by which its physicians performed their duties; *did* require its physicians to work according to a schedule; and *did* provide equipment to its physicians. As set forth more fully in Continental Casualty's principal brief and the arguments that follow, AERAS's contracts with the physicians and the hospitals, as well as its own handbook and procedure manual, demonstrate that AERAS did manage, supervise, educate, and train the AERAS physicians. [Doc. 38, pp. 35-39; Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5; Exhibit 122, pp. 33-35, 42-43, 48-50, 52, 80; Exhibit 106, pp. 6, 11, 16-17]. AERAS also generated the schedule for its physicians. [Exhibit 122, pp. 18-21-105; Exhibit 123, p. 27]. Moreover, AERAS works with its physicians to resolve complaints. [See Exhibit 123, p.41; Exhibit 122, p. 46-47]. Finally, it is undisputed that AERAS provides the equipment necessary for its physicians to perform their jobs. [Exhibit 8 § 2.1; Exhibit 10 § 2.1; Exhibit 11 § 2.1; Exhibit 122, p. 64, 104].[2]

---

[2]AERAS's contention in its brief that it does not provide equipment for its physicians is not supported by the evidence in this case. In fact, AERAS's President, Dr. John Moorehouse, admitted that the equipment is provided by the hospitals in his deposition. [Exhibit 122, p. 104]. Whether it owns the equipment, leases it, or contracts for it, the fact remains that the AERAS physicians are not required to provide their own equipment and AERAS has taken steps to ensure that the equipment

Because the preponderance of the evidence in this case establishes that a question of fact would exist as to the employment status of the AERAS physicians in any workers' compensation action, the AERAS physicians constitute persons engaged in work that *could* make Continental Casualty liable to pay benefits under the workers' compensation portion of the policy.

        **1.**        **AERAS's Right of Control Over Its Physicians Is Demonstrated In The Physician Contracts, Its Contracts With The Hospitals, And Its Own Policy Handbook.**

AERAS repeatedly contends that it does not control the manner in which its physicians perform their work and denies the suggestion that it employs a training program.  However, AERAS's own documents belie these contentions.  AERAS's control over its physicians can be seen not only through the language of its physician and hospital contracts, but also in the actual manner in which it interacts with its physicians and the public on a daily basis.

Pursuant to its contracts with the hospitals, AERAS must provide physician services for emergency departments on a twenty-four hour per day, seven-day per week basis. [Exhibit 8§ 1.1; Exhibit 10 § 1.1; Exhibit 11 § 1.1].  To accomplish this goal, AERAS contracted with physicians to perform this work.  [Exhibits 54-68].  The AERAS physician contracts clearly require the physician to "perform . . . services for and on behalf of [AERAS]" at the hospitals **and any other place designated by AERAS**." [Exhibits 54-68, p. 1 (emphasis added)].  Moreover, the schedule for the AERAS physicians, which is generated by AERAS, is confirmed through the use of sign-in sheets that are maintained at each hospital. [Exhibit 122, pp. 18-21, 105; Exhibit 123, p. 27; Exhibit 71-105].

---

is there and available for the physicians to use. See Section II.A.3., pp. 17-18, infra.

AERAS's right and duty to control its physicians is clearly demonstrated by the contractual obligations its undertakes in each of its contracts with the hospitals. Specifically, AERAS is required to appoint and provide an Emergency Medical Director who must devote his time to "proper management of [the] [e]mergency [p]hysicians." [Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5]. The Emergency Medical Director is also responsible for "[m]onitoring the quality of care delivered in the Emergency Department; . . . [a]ssisting in the education and training of Emergency Department personnel; . . . [o]rienting the AERAS physicians; . . . [c]oordinating the Emergency Department's schedule; . . . and [e]valuating the performance of the AERAS physicians." [Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5; Exhibit 122, pp. 33-35].

In its brief, AERAS attempts to shift this Court's focus from the evidence of control over the physicians that is found in the hospital contracts. AERAS attempts to do so by arguing that it has only three (3) Emergency Medical Directors, all of whom it admits are employees while performing their duties as Emergency Medical Directors. However, the employment status of the Emergency Medical Directors, while performing their duties in that position, is immaterial. The issue in this case does not center on whether the Emergency Medical Directors are employees. Rather, for purposes of the hospital contracts, the issue becomes whether AERAS's contractual obligations evidence that it retains a right of control over its physicians. On this, the hospital contracts are clear – AERAS is to provide management of the emergency physicians, including training, orientation, and evaluation of those physicians. [See Exhibit 8 § 1.5; Exhibit 10 § 1.6; Exhibit 11 § 1.5].

Moreover, AERAS's own procedure manual demonstrates its right to control its physicians. AERAS's Corporate Compliance Handbook is designed to document and ensure that all AERAS physicians engage in proper ethical billing practices. [Exhibit 122, pp. 73-74]. The handbook is

12

required by the Centers for Medicaid/Medicare Services of the federal government. [Exhibit 122, pp. 73-74]. In its Corporate Compliance Handbook, AERAS states that it has a "Compliance Officer" who is responsible for overseeing, developing, monitoring, and implementing AERAS's Compliance Plan. [Exhibit 106, p. 5; Exhibit 122, Pltf's Ex. 6, p. 5]. The AERAS Compliance Officer also develops, coordinates, and participates in "multifaceted education and training programs that focus on the elements of [the] compliance program, and seek[s] to ensure that all appropriate AERAS Colleagues are knowledgeable of, and comply with, pertinent federal and state standards." [Exhibit 106, p. 6; Exhibit 122, Pltf's Ex. 6, p. 6].

Not only are the AERAS physicians trained in the compliance guidelines, but adherence to AERAS's Compliance Program is a factor that AERAS uses in evaluating the job performance of its physicians. [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11]. In fact, adherence to AERAS's Compliance guidelines is a condition of each physicians' contractual agreement/employment with AERAS. [Exhibit 106, p. 11; Exhibit 122, Pltf's Ex. 6, p. 11]. If, at any time, the Compliance Officer determines that one of the AERAS physicians has failed to adhere to the established protocols, AERAS will "coach" the physician. [Exhibit 122, p. 101].

With respect to training and education of the AERAS physicians, the AERAS Corporate Compliance Handbook specifically provides:

> A formal training program will be conducted on at least an annual basis, and will include:
>
> •     Review of the organization's Compliance Program summarizing fraud and abuse laws, coding requirements, claim development and submission processes, marketing, and practices that reflect current legal and program standards.
> •     Communicating the Compliance Program standards and procedures to all AERAS Colleagues by requiring participation in training

> programs and disseminating publications that explain in a practical
> manner specific requirements.
> •     Training for new employees or physicians.
> •     Documentation by the Compliance Officer of all training.
>
> . . . .
>
> Failure to comply with training requirements will result in disciplinary action,
> including possible termination, when such failure is serious in nature.
> Adherence to provisions of the Compliance Program, such as training
> requirements, will be a factor in the annual evaluation of each employee, as
> well as contract re-negotiations of a physician.

[Exhibit 106, pp. 16-17].

Disregarding the clear language of its own handbook, AERAS argues in its brief that Continental Casualty is attempting to create a training program where none exists. [See Doc. 58, p. 20]. Yet, at the same time, AERAS admits that it is required to have a compliance program in place by the federal government's Centers for Medicaid/Medicare Services. [Exhibit 122, pp. 73-74]. At this point, it appears that AERAS is representing one thing to this Court, and another thing to the federal government's Centers for Medicaid/Medicare Services.

Regardless, the preponderance of the evidence, when combined with the lack of credibility of AERAS's argument, clearly demonstrates that AERAS maintained a right of control over its physicians sufficient to create a question of fact as to the employment status of the physicians in any workers' compensation action. Accordingly, the AERAS physicians constitute persons who ***could*** make Continental Casualty liable to pay benefits under the workers' compensation policy.

14

      2.      **AERAS's Right Of Control Over Its Physicians Is Also Established By The Way In Which It Compensates Its Physicians.**

Although AERAS attempts to minimize this issue, the importance of the manner in which AERAS compensates its physicians also demonstrates its right to control its physicians. It is undisputed that the AERAS physicians are paid based on a "productivity model." [Exhibit 122, pp. 66-68]. In other words, the AERAS physicians are paid a percentage of the charges generated by the procedures they perform. [Exhibit 122, pp. 66-68]. Under Alabama law, AERAS's policy of paying its physicians based on a "productivity model" is sufficient evidence to create a question of fact as to the employment status of the AERAS physicians in a workers' compensation action. See Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 So. 2d 266, 270-71 (Ala. Civ. App. 2006)(evidence that alleged employees were paid a percentage of the gross amount that the business received for the service demonstrated a right of control by the business sufficient to create a question of fact as to existence of an employer-employee relationship).

While the undisputed evidence is enough to create a question of fact as to the employment status of the AERAS physicians in any workers' compensation action, perhaps even better evidence of AERAS's right of control is the fact that its contracts also provide a guaranteed hourly fee for each physician in the event that he sees no patients in that hour. [See Exhibit 122, pp. 66-68]. Many of the Alabama cases in which the courts consider method of payment as indicative of employment status involve the trucking or logging industry. See Ex parte Curry, 607 So. 2d 230 (Ala. 1992); see also Liberty Mut. Ins. Co. v. D&G Trucking, Inc., 966 So. 2d 266 (Ala. Civ. App. 2006); Turnipseed v. McCafferty, 521 So. 2d 31 (Ala. Civ. App. 1987); and White v. Henshaw, 363 So. 2d 986 (Ala. Civ. App. 1978). In none of these cases was evidence presented that the alleged employee was paid

15

even when he was not performing services. See Turnipseed v. McCafferty, 521 So. 2d 31 (Ala. Civ. App. 1987); see also White v. Henshaw, 363 So. 2d 986 (Ala. Civ. App. 1978). By contrast, the undisputed facts in this case prove that the AERAS physicians are *guaranteed* to make a minimum hourly fee, even if they perform no services. [See Exhibit 122, pp. 66-68; Exhibits 54, 55, 57-61, 63, 66-68 at Ex. or Add. 1].

In addition to providing its physicians with a guaranteed hourly rate, AERAS provides other benefits to its physicians. Despite their alleged "independent-contractor" status, AERAS permits its physicians to participate in the health and dental coverage that AERAS secures for its employees and pays. [Exhibit 123, p. 32]. In order to permit its physicians to participate, AERAS must represent to the insurer that the physicians are "employees." [See Exhibit 168, p. 1; Exhibit 169, p.1; Exhibit 170, p. 7; Exhibit 171, p.7]. Moreover, the physicians themselves must confirm that they are "employees" of AERAS to obtain the coverage. [See Exhibits 172-180; Exhibit 170, p. 7; Exhibit 171, p. 7].

In its brief, AERAS invites this Court to overlook the fact that it represents both to the public and to other insurers that its physicians are "employees" simply because the physicians repay the premiums. AERAS cannot have it both ways. If AERAS truly intends for its physicians to be and remain independent contractors, it should treat them as such. It is disingenuous for AERAS to stand before this Court and argue that the physicians are independent contractors for purposes of one type of coverage, when it clearly represents that its physicians are "employees" under another type of coverage.

AERAS also invites this Court to disregard the fact that it secures medical malpractice insurance for each of its physicians. Although each of its physician contracts specifically require the

16

physician to secure and maintain medical malpractice insurance, the undisputed facts reveal a different story. [See Exhibits 54-68, p. 4; Exhibit 123, p. 32]. Both before and following the policy period for the Continental Casualty coverage, AERAS secured and paid the premium for medical malpractice coverage for its physicians. [See 153-156; Exhibit 123, p. 32]. Again, AERAS argues that, because the premiums for the medical malpractice coverage are reimbursed through payroll deduction, this somehow eliminates or minimizes the fact that AERAS's actions contradict the express terms of its contracts. However, this contradiction is further evidence that a question of fact exists as to the employment status of the AERAS physicians.

Taken together, all of AERAS's actions, representations, and contradictions with respect to the method in which it compensates its physicians are proof that a question of fact would exist as to the employment status of the physicians in any workers' compensation action. Because no Alabama court faced with these undisputed facts could conclude as a matter of law that the AERAS physicians were "independent contractors," the AERAS physicians constitute persons engaged in work that *could* make Continental Casualty liable to pay workers' compensation benefits under the policy.

3.    **AERAS's Right Of Control Over Its Physicians Is Also Demonstrated By The Fact That AERAS Provides The Equipment Necessary For Its Physicians To Perform Their Services.**

In its brief, AERAS states that it provides no equipment for its physicians to use. This argument, however, is not supported by any fact presented to this Court. It is undisputed that the physicians are not responsible for providing necessary equipment such as MRIs, ultrasounds, and hospital beds. [Exhibit 122, p. 104]. Rather, AERAS, not the individual physicians, contracted with each hospital to provide the equipment necessary for patient care, including otoscopes,

17

laryngoscopes, modern equipment, lab facilities, and x-ray facilities. [See Exhibit 8 § 2.1; Exhibit 10 § 2.1; Exhibit 11 § 2.1; Exhibit 122, p. 64]. Moreover, AERAS itself expressly agrees that it "shall provide to [the physician] the use of such office equipment, furnishings and fixtures as shall be deemed reasonably necessary to [the physician's] rendition of services to patients at [the hospitals]." [Exhibits 54-68, p. 2].

The facts in this case are undisputed. AERAS agreed to provide, and did provide, its physicians with the equipment necessary for them to complete their jobs. AERAS ensured that the equipment necessary for its physicians to treat patients was provided when it expressly contracted for the provision of equipment by the hospitals. AERAS did not require its physicians to separately contract with the hospitals in order to use the equipment. Rather, AERAS made this agreement with the hospitals for the benefit of its physicians.

Try though it might, AERAS cannot be removed from the scenario that it created, and the argument that it makes on this issue is without merit. AERAS's agreement to provide equipment for its physicians' use is still further evidence that a question of fact exists as to the employment status of the physicians. Therefore, the physicians constitute persons who *could* make Continental Casualty liable to pay workers' compensation benefits on behalf of AERAS. Accordingly, the physicians were properly included in the premium basis, and AERAS's refusal to pay the premium due is a clear breach of the insurance contract.

### III.   AERAS's Argument That The Audits Were Flawed Is Without Merit And Not Supported By Any Evidence.

In an attempt to shift attention from the conclusion that the overwhelming, undisputed facts establish in this case, AERAS contends that the audits performed by Tom Dyer were somehow

incorrect or improper. Specifically, AERAS argues that "the audits were not conducted in a manner consistent with the policy and applicable law, and . . . did not justify the conclusion that the AERAS physicians are employees." [Doc. 58, p. 2, n. 2]. However, AERAS failed to present any evidence proving its contention.

First, AERAS contends that the audits were not consistent with the policy. However, it is undisputed that the Continental Casualty clearly and unequivocally provides that audits will be used to determine the appropriate premium basis and exposure for the policy. [See Exhibit 36 at CNA 0148].

Second, AERAS alleges that the audits were "fatally flawed," and therefore, Continental Casualty cannot recover in this action. AERAS presents no testimony or evidence that establishes that the auditor's findings or conclusions were incorrect or not consistent with policies and procedures within the insurance industry. Rather, AERAS bases its allegation on one statement by Tom Dyer, the auditor, in which he referenced a statute, which AERAS alleges is applicable. However, AERAS take the testimony out of context and fails to address the fact that Mr. Dyer's conclusions were not based on the workers' compensation statutes alone. In fact, in response to AERAS's questions at deposition, Mr. Dyer testified as follows:

> **Q.** **And you stated that that – in your opinion, [Section 25-5-50] states that Alabama goes by the IRS guidelines; correct?**
>
> **A.** Yes.
>
> **Q.** **And have you – do you utilize the IRS guidelines in determining whether someone is an employee versus independent contractor?**
>
> **A.** Yes.
>
> **Q.** **And did you use that in your audit with regard to AERAS?**

19

A.     Yes.

**Q.     What specifically in the IRS guidelines do you utilize in determining employee versus independent contractor?**

A.     There's approximately twenty examples, or questions, that the IRS sets out to determine whether the person is an employee or independent contractor.

. . . .

**Q.     Where is it that the IRS addresses the scheduling of the physician's [sic] work as a determining factor as to whether somebody's an employee versus independent contractor?**

A.     The first one states when and where to do the work.

. . . .

A.     That would be one of the determining factors.

**Q.     Does the IRS address the method in which doctors are paid as a determining factor?**

A.     Yes.

. . . .

**Q.     What made you determine that the hourly fee paid to these physician made them an employee?**

A.     . . . An independent contractor is usually paid by a flat fee for the job, and this wasn't a job per se.  You had a start date and an end date. These doctors were continually working for AERAS.

**Q.     . . . You listed several deductions that were made from the payments to the doctors as a determining factor.  How does the IRS address the deductions as a determining factor?**

A.     . . . it says, Whether or not the business provides the worker with employee-type benefits such as insurance, pension plan, vacation pay or sick pay.

20

[Exhibit 121, pp. 35-39 (bold in original)].  Thus, contrary to AERAS's argument, Mr. Dyer did not rely solely on the workers' compensation statute cited.  Rather, his audit conclusions were based on his review of the facts as well as the workers' compensation statutes and the IRS guidelines.

AERAS's argument that the audits were "fatally flawed" amounts to nothing more than a red herring.  This an action for breach-of-contract.  Thus, to consider whether AERAS breached the contract, the Court reviews the undisputed facts in conjunction with the express, unequivocal policy provisions.

As discussed more fully above, the policy expressly provides that the premium basis will include not only AERAS's officers and employees, but also "all persons engaged in work that could make [Continental Casualty] liable" under the workers' compensation portion of the policy. [Exhibit 36 at CNA 0148].  Moreover, the policy states that if the actual exposures are not properly described in the policy, Continental Casualty will assign the proper premium basis by endorsement to the policy. [Exhibit 36 at CNA 0148].

The audits were but one tool that Continental Casualty used to determine whether the AERAS physicians should be included in the premium basis for this policy. Following AERAS's dispute of the increased premiums, Continental Casualty underwriters sought and reviewed additional information provided by AERAS.  [Exhibits 7-11, 14, 15, 24, 33, and 52].  However, as the overwhelming, undisputed facts in this case clearly prove, a questions of fact exists as to the employment status of the AERAS physicians such that no could enter judgment as a matter of law on the issue in a workers' compensation action.  Because the AERAS physicians constitute persons engaged in work that *could* make Continental Casualty liable to pay benefits under the workers'

compensation portion of the policy, these physicians fall within the risk of the policy. Accordingly, they are properly included in the premium basis.

IV.    **AERAS's Contention That Continental Casualty Wrongfully Increased AERAS's Premium Is Without Any Basis In Fact.**

Confronted with the overwhelming and undisputed facts in this case, AERAS resorts to accusations that are without any basis in fact. AERAS begins by contending that Continental Casualty tried to "back-door justify" the increase of the policy premium. [Doc. 58, p. 29]. One page later, AERAS suggests that Continental Casualty charged the initial premium "merely to entice AERAS to purchase the policy." [Doc. 58, p. 30]. Both statements are completely devoid of any basis in fact, and are meant only to distract this Court from the clear, undisputed facts.

Contrary to the fiction that AERAS attempts to weave, Continental Casualty enticed AERAS to do nothing. AERAS has conveniently forgotten to mention that this policy was not secured through the voluntary market. Rather, AERAS was unable to secure coverage through a voluntary company, and coverage was placed with Continental Casualty through the assigned risk market. [Exhibits 158, 159, 160]. Unlike the voluntary market, an insurer in the assigned risk market cannot refuse to cover high-risk insureds such as AERAS. See 1 Couch on Ins. § 2:35 (3d ed.). Thus, Continental Casualty had no choice but to provide the workers' compensation coverage that AERAS sought. Moreover, the assessment of the initial premium was directly based upon the information provided by AERAS and AERAS alone. Continental Casualty did no independent underwriting of the policy at its inception, since it was required to rely on the information initially provided by AERAS in its application for coverage through the assigned risk program. Once Continental Casualty discovered that the information AERAS provided was incorrect, Continental Casualty

amended the premium basis to reflect the actual exposure during the policy period in accordance with the express terms of its policy. Thus, Continental Casualty engaged in none of the "back-door" tactics that AERAS alleges. Rather, Continental Casualty's actions have always been taken pursuant to the express terms of the insurance contract to which AERAS agreed.

## CONCLUSION

Even the inflammatory and meritless comments of AERAS cannot change the undisputed facts in this case – or the reality that the AERAS physicians fall within the risk insured by the Continental Casualty policy. As the undisputed facts prove, AERAS maintains and exercises a right of control over its physicians. Therefore, a question of fact exists regarding the employment status of the AERAS physicians such that they *could* make Continental Casualty liable to pay benefits in any workers' compensation action.

Continental Casualty does not bear the burden of proving that the physicians definitely *would* make Continental Casualty liable. Instead, all that Continental Casualty must prove, by a preponderance of the evidence, is that the AERAS physicians *could* make Continental Casualty liable under the workers' compensation policy. Continental Casualty has done so. Accordingly, the increased premium amount is due and payable, and AERAS's refusal to submit such amounts to a material breach of the insurance contract.

Pursuant to Federal Rule of Civil Procedure 52, Plaintiff Continental Casualty respectfully requests that this Honorable Court enter findings of fact and judgment in favor of Continental Casualty, and award monetary damages in the amount of $130,511. Continental Casualty further requests that, following the entry of judgment, the Court permit it to present evidence regarding the incidental damages to which it may be entitled, including pre-judgment interest and attorney fees,

which amounts cannot be conclusively determined until judgment is entered and a sum certain for each can be established.

Respectfully submitted,

/s/ Candace L. Hudson
Brenen G. Ely (0366-E54B)
Joel S. Isenberg (8855-N76J)
Candace L. Hudson (8314-N66H)
Attorneys for Plaintiff Continental Casualty Company

**OF COUNSEL:**
ELY & ISENBERG, L.L.C.
600 Beacon Parkway West, Suite 104
Birmingham, Alabama 35209
Telephone:    (205) 313-1200
Facsimile:    (205) 313-1201

## CERTIFICATE OF SERVICE

I do hereby certify that a true and accurate copy of the foregoing has been on all parties of record by:

| | |
|---|---|
| _____ | Hand Delivery |
| _____ | U.S. Mail |
| _____ | Overnight Delivery |
| _____ | Facsimile |
| X | E-File |

on this the 15th day of August, 2008.

/s/ Candace L. Hudson
OF COUNSEL

cc:    Michael Cohan
        HILL, HILL, CARTER, FRANCO,
            COLE & BLACK, P.C.
        Post Office Box 116
        Montgomery, AL 36101

24