IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CONTINENTAL CASUALTY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:07cv221-WHA |
| | ) | |
| ALABAMA EMERGENCY ROOM | ) | |
| ADMINISTRATIVE SERVICES, P.C., | ) | (WO) |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court for determination on an Agreed Statement of Facts, Agreed

Submission of Exhibits, and on briefs.  The Plaintiff, Continental Casualty Company

("Continental"), filed its Petition for Declaratory Judgment on March, 13, 2007, through which it

asks this court "to determine the rights, duties and legal relations of the parties" under an

insurance policy it issued to the Defendant, Alabama Emergency Room Administrative Services,

P.C. ("AERAS").  The court has jurisdiction based on diversity of citizenship.

In the Joint Motion for Extension of Deadline and to Continue Trial (Doc. # 20), filed on

October 29, 2007, the parties requested that the case be submitted to the court on an Agreed

Statement of Facts and Exhibits, and briefs, and the court so ordered (Doc. # 21).  On July 11,

2008, the court received the Agreed Statement of Facts (Doc. # 36), Agreed Submission of

Exhibits (Doc. #35), and Continental's Motion for Findings of Fact and Entry of Judgment (Doc.

# 37).

The case has been fully briefed and is now under submission.  The court has carefully considered the stipulated facts, the two hundred thirty-three exhibits contained in twelve volumes, the briefs of the parties, and all applicable law, and now makes the following findings:

## II.  STANDARD OF PROOF

The parties have agreed for this court, without a jury, to try this case on stipulated facts, exhibits, and briefs, so the court applies the legal standard that would apply at a bench trial. "That this case was brought as a declaratory judgment action does not alter the burden of proof. Rather, the evidentiary burden applies as it would in ordinary proceedings involving the legal matters in dispute." *Provident Life and Ins. Co. v. Futch*, No. CV207-063, 2008 WL 4724827, at *4 (S.D. Ga. October 24, 2008).

Since Continental is seeking to establish its right to premium payments under the insurance policy, Continental bears the burden of proving that right.

## III.  FINDINGS OF FACT

The following facts are a chronological account of the dealings between the two parties in this case.[1]

AERAS is a staffing company, which contracts with Montgomery-area hospitals to provide physicians, nurse practitioners, and physician assistants for their emergency rooms. After AERAS's previous workers' compensation insurer, Williamsburg National Insurance

---

[1]Additional facts regarding the business operations of AERAS relevant to determining the employment status of the physicians in question will be noted where relevant in the "Discussion" section of this Memorandum Opinion and Order.

2

Company, elected not to renew AERAS's coverage, AERAS applied for coverage on the assigned risk market for workers' compensation insurance in Alabama.  In its application for coverage submitted to the risk market administrator, AERAS stated that it had five clerical employees and seven employees it classified as "health: professional employees." AERAS further stated that the estimated annual remuneration for the "clerical" employees was $230,665, and the estimated annual remuneration for the "professional" employees was $440,425.  The risk market administrator assigned the coverage to Continental.  Continental entered into a contract with AERAS to provide AERAS with workers' compensation insurance coverage from May 3, 2005 to May 3, 2006.  Based on information provided by AERAS in its initial application, Continental set the policy premium at $21, 271.

### A.  The Policy

Part One of  the workers' compensation policy provides that "[Continental] will pay promptly when due the benefits required of [AERAS] by the workers' compensation law."  *See* Exhibit # 36, p. CNA0145. The policy also  states that Continental has a duty to defend as follows: "[Continental] ha[s] the right and the duty to defend at [Continental's] expense any claim, proceeding or suit against [AERAS] for benefits payable by this insurance. [Continental] has the right to investigate and settle these claims, proceedings or suits." *Id.* The policy then provides, however, that "[Continental has] no duty to defend a claim, proceeding or suit that is not covered by this insurance."  *Id.*

Part Five - Premium, subsection B states:

**B.    Classifications**
Item 4 of the Information Page shows the rate and premium basis
for certain business or work classifications.  These classifications

were assigned based on an estimate of the exposures [AERAS] would have during the policy period. If [AERAS's] actual exposures are not properly described by those classifications, [Continental] will assign proper classifications, rates and premium basis by endorsement to this policy.

Under the policy, the policy premium is calculated by the remuneration method. Part Five, subsection C, states:

> **C.    Remuneration**
> Premium for each work classification is determined by multiplying a rate times and premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:
>
> 1.    All [AERAS's] officers and employees engaged in work covered by this policy; and
> 2.    All other persons engaged in work that could make [Continental] liable under Part One (Workers Compensation Insurance) of this policy. If [AERAS] do[es] not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if [AERAS] give[s] [Continental] proof that the employers of these persons lawfully secured their workers compensation obligations.

Part Five, subsection E, states:

> **E.    Final Premium**
> The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium [AERAS] paid to [Continental], [AERAS] must pay [Continental] the balance. If it is less, [Continental] will refund the balance to [AERAS]. The final premium will not be less than the highest

4

minimum premium for the classifications covered
by this policy . . . .

The policy also provides for audits to aid in determining the final premium, which is not

final until after the policy has expired.  *Id.* at CNA0148.  Audits may be conducted during regular

business hours during the policy period and within three years after the policy period ends.  *Id.*

## B.  The Audit

On June 8, 2005, Continental advised AERAS that it would conduct a preliminary audit

with the purpose of creating an estimate that reflected the account's true exposure.  To that end,

Continental requested information from AERAS, including employee classification and payroll,

employee claims, loss prevention, tax forms, employment contracts, and Alabama

Unemployment Wage Reports.  The requested information was furnished, and Continental

performed the preliminary audit on July 5, 2005.

On September 12, 2005, Continental advised AERAS that there were discrepancies

between the contract application provided by it and the audit results, and requested additional

information from AERAS regarding the emergency room physicians furnished to hospitals by

AERAS and classified by it as independent contractors.  Exhibit # 15, p. 1.  AERAS maintained

throughout the auditing process that the physicians who worked in emergency rooms were

independent contractors, and not employees, citing language in "Medical Services Independent

Contractor Agreement" between AERAS and the physicians stating that the physicians are

independent contractors.  Therefore, AERAS contended that it had correctly not included

remuneration to these emergency room doctors in its application for the workers' compensation

policy.  Continental then requested copies of AERAS's contracts with provider hospitals, Exhibit #14, p. 1, and received the requested contracts on or about November 2, 2005.

On November 30, 2005, based on its audit, Continental amended its policy with AERAS, increasing the estimated premium from $21,271 to $172,819, and on December 1, 2005, Continental issued AERAS a corresponding Premium Notice in the amount of $126,289, representing an increased premium from May 5, 2005 to December of 2005, with a payment due date of December 28, 2005.  This change was based on classifying the ER doctors as employees of AERAS and including their remuneration for premium purposes under Part V, C2 of the policy.

On December 29, 2005, AERAS's Chief Operating Officer Mark Platt wrote Continental to dispute the preliminary audit, maintaining that each physician was an independent contractor of AERAS and, therefore, not to be included for workers' compensation coverage.  Continental responded on February 1, 2006, advising that it had completed its review of AERAS's position, and determined that the results of the preliminary audit were correct, because the ER doctors could be held to be employees of AERAS for workers' compensation purposes.

### C.  The Billing

Continental continued to issue Premium Notices and Premium Bills to AERAS for the outstanding and new balances.  On February 21, 2006, when AERAS had remitted no payment for the increased premium, Continental issued a Past Due Premium Notice, advising that the policy would be canceled if the entire past due premium amount of $151,548 was not paid by March 13, 2006.  On June 21, 2006, AERAS wrote Continental and canceled the workers' compensation coverage effective March 16, 2006.

6

Continental conducted a final premium audit on May 4, 2006, and issued a Premium Adjustment Notice on May 10, 2006 reflecting a total premium of $151,573.  On January 26, 2007, Continental issued its final amended premium notice, reflecting an alteration in the rate applicable to a portion of AERAS's exposure basis, and set the final premium at $151,782. AERAS was billed for the difference between the initial premium, $21,271, which AERAS has paid, and the final premium of $151,782.  Continental then filed this suit for declaratory judgment on March 13, 2007.  The amount Continental claims is due on the policy is $130,511.

## IV.  DISCUSSION

### A.  The Issue

Continental states in its reply brief that "the issue presented to this court by both parties is 'whether the physicians **qualify** as employees **for the purposes of workers' compensation insurance** and, therefore, **should be included in the assessment of the premium** for the workers' compensation policy." Doc. # 60, pp. 1-2 (emphasis in brief).  The court agrees that this is the issue for it to determine.  Continental and AERAS disagree, however, on just how this issue is to be determined.  AERAS contends that, in order for the court to determine the rights and duties of the parties under the insurance policy, it must determine whether, under the Alabama Workers' Compensation Act ("the Act"), Ala. Code §§ 25-5-1 to -340,  its physicians are employees or independent contractors.  Continental, on the other hand, contends that the court need only decide whether the physicians were persons engaged in work that, in a separate suit for workers' compensation benefits, "could" be held to make Continental liable under the policy, pointing out that premiums are determined based on potential liability assumed.

7

The court agrees with Continental that the issue before it is whether AERAS's physicians qualify as employees for the purposes of workers' compensation insurance, or, in other words, were persons engaged in work that could make Continental liable under its workers' compensation insurance policy coverage of AERAS.  The court finds, however, that to do so it must determine as a fact whether the ER physicians are independent contractors or employees, since, if they are independent contractors, they do not qualify as employees, and Continental could not be held liable under the policy.

Because general rules of contract law and interpretation govern the interpretation of an insurance policy, *Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.*, 817 So.2d 687, 691 (Ala. 2001), the court must assign the insurance policy its clear and plain meaning and interpret it to give effect to all terms and provisions.  *See Brewbaker Motors, Inc. v. Belser*, 776 So. 2d 110, 112 (Ala. 2000); *Bd. of Water & Sewer Comm'rs of Mobile v. Bill Harbert Constr. Co.*, 870 So. 2d 699, 710 (Ala. 2003).   If an insurance policy is ambiguous, or its meaning is in doubt or uncertain, it is construed against the insurer.  *Scottsdale Ins. Co. v. National Security Fire and Casualty Ins. Co.*, 741 So.2d 424, 426, 427 (Ala.Civ.App. 1999).

The policy establishes two classes of persons that calculation of the policy premium takes into consideration: (1) "officers and employees engaged in work covered by this policy;" and (2) "persons engaged in work that could make [Continental] liable under Part One (Workers Compensation Insurance) of this policy."  Continental contends that (2) applies here, and requires remuneration of the doctors to be included in the premium computation if a fact issue exists as to their employment status.  The argument is that, under the policy, Continental is required to do more than indemnify the insured against valid policy claims; it is also required to defend claims

brought by persons who may, or may not, ultimately be determined not to be employees. Accordingly, a person, even if he or she is not necessarily an employee, may expose Continental under the workers' compensation policy, though not necessarily require it to pay out on that person's claim, but, either way, to have the expense of defending against the claim, thus making it reasonable for the policy to take into account the risk posed by persons who "could be" held to be employees under the Act in calculating the policy premium.

### B.  Who Decides the Fact Issue

The court rejects Continental's contention that, if there is a fact issue as to whether the emergency room doctors are employees of AERAS or independent contractors, this court goes no further, and Continental is entitled to additional premiums.  This is a declaratory judgment action in which Continental has asked this court to determine the rights of the parties under the insurance policy.  To do so, the court looks first to the clear language of the contract.

The coverage provided by the policy is, first, to pay "the benefits required of [the insured] by the workers' compensation law."  It is the long-established law in Alabama that "[t]he compensation law does not apply where the injured person is an independent contractor and the relation of employer and employee does not exist."  *Birmingham Post Co. v. Sturgeon*, 227 Ala. 162, 149 So. 74 (1933).  Thus, if the doctors are independent contractors, the workers' compensation law does not require AERAS to provide them with benefits, and Continental has no exposure to indemnity.

Second, the policy provides AERAS with a defense, at Continental's expense, against claims or suits against it "for benefits payable by this insurance."  Again, if the doctors are independent contractors, no workers' compensation benefits are payable under the indemnity

coverage of the policy.  And, the policy provides that Continental is "under no duty to defend a claim, proceeding or suit that is not covered by this insurance."

Accordingly, the question of independent contractor vs. employee is a fact that must be determined by this court, according to Alabama law, in order to declare whether the physicians are "engaged in work that could make [Continental] liable" under the workers' compensation coverage of the policy.

That this must be resolved by this court, rather than accepting Continental's contention that, if a fact issue exists as to employment status, that is an issue that would have to be decided in another suit for workers' compensation benefits, and, therefore, the physicians "could" make it liable, is in keeping with Alabama law.

The case of *Liberty Mutual Ins. Co. v. D & G Trucking, Inc.,* 966 So. 2d 266 (Ala. Civ. App. 2006)[2] is a case in point on this issue.  There, the insured under a workers' compensation policy brought a declaratory judgment action against its insurance company seeking a declaration that it did not owe additional premiums based on remuneration to workers it contended were independent contractors.  Liberty Mutual contended that it was entitled to retrospective premium adjustments based on policy language identical to that in the policy in this case, i.e., "remuneration paid or payable during the policy period for . . . all [of D & G Trucking's] officers and employees" and **all** other **persons engaged** in **work** that **could make** [Liberty Mutual] **liable** under Part One (Workers' Compensation Insurance) of th[e] policy."  (Boldface and brackets in opinion.)

_____

[2] The Court of Civil Appeals of Alabama has exclusive appellate jurisdiction of all appeals in workers' compensation cases. Ala. Code § 12-3-10.

Both sides moved for summary judgment.  The trial court granted summary judgment in favor of D & G Trucking, and denied the motion of Liberty Mutual.

On cross appeals, the Court of Civil Appeals, after discussing the factors to be considered in determining a worker's status as an employee or independent contractor, held that a fact issue was presented as to that, which precluded summary judgment in favor of D & G, and reversed.  It also held that summary judgment was not appropriate for Liberty Mutual, and remanded the case to the trial court, "for further proceedings consistent with this opinion."  In doing so, it stated: "As in our recent opinion in *Sartin v. Madden*, 955 So. 2d 1024, 1030-31 (Ala. Civ. App. 2006), 'our opinion should not be misread to compel any particular conclusion regarding whether an independent-contractor relationship or an employer-employee relationship existed. . . .  Rather, we merely direct the trier of fact to weigh the evidence and reach its own conclusion based upon all of the evidence.'"  That is what this trier of fact will do in this case.

## C.  Discussion of Employment Status

Having determined the question to be before the court, the court turns to answering whether the physicians are persons engaged in work that could make Continental liable under the workers' compensation insurance policy, i.e., whether the physicians are "employees" or "workers," covered by the Act or independent contractors, excluded from the protections of the Alabama workers' compensation law.[3]

An "employee" or "worker" for the purpose of Alabama workers' compensation law, is "every person in the service of another under any contract of hire, express or implied, oral or

---

[3] The court does not speculate on who, other than these physicians, might come under the "other persons" provision of the remuneration section of the policy.

11

written . . . ." Ala. Code § 25-5-1(5).  In *White v. Henshaw*, 363 So. 2d 986 (Ala. Civ. App. 1978), the Alabama Court of Civil Appeals, noted the "settled" test for establishing an employer-employee relationship under the Act: "'For one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished or, in other words, not only what shall be done, but how it shall be done.'" 363 So.2d at 988 (quoting *Weeks v. C.L. Dickert Lumber Co.*, 270 Ala. 713, 714 (1960)).  If the right of control "goes no further than is necessary to ensure a satisfactory end result, then it does not establish employment."  *Id.*

The *White* court also established that "[t]he principal factors showing right to control are (1) direct evidence of right or exercise of control, (2) method of payment, (3) furnishing of equipment, and (4) the right to fire." *Id.  See also Ex Parte Curry*, 607 So. 2d 230 (Ala. 1992); *D & G Trucking*, 966 So. 2d at 268.  The court, however, cautioned that there are no hard and fast rules for determining whether an employer-employee relationship exists, that each case will be judged on its facts, and that no one factor is outcome determinative.  *White*, 363 So.2d at 988.

The Alabama appellate courts have never addressed this issue in the context of physicians in a hospital setting, and the realities of the relationship here are not easily analogous to those in cases  involving deliverers of newspapers and drivers of trucks.  Nevertheless, the court will analyze the "right to control" question by addressing the four principal factors set out in the cases, recognizing that they are only factors to consider in reaching a final determination as to whether these particular physicians, under the facts of this case, are, in fact, employees of AERAS, and not independent contractors.

## 1.  The Hospital Contracts[4]

AERAS contracts with hospitals in the Montgomery area to provide physician staffing for the Emergency Departments of the hospitals twenty-four hours a day, seven days a week.

AERAS designates one of its physicians in each hospital to serve as Emergency Medical Director, to work full time in the Emergency Department, and to manage the Emergency Department.  This person is paid a stipend by AERAS for this work, in addition to remuneration as an emergency room physician.  AERAS agrees that the Director is an employee for the work done in that capacity, and the stipends were included by it in remuneration paid to its "health: professional employees" in its initial application.  The only issue regarding the Emergency Room Directors is whether their actions in that capacity with the physicians show control over the physicians by AERAS.  This will be discussed later.

Under the hospital contracts, AERAS collects fees for services of the emergency room physicians, and the hospitals guarantee a minimum hourly rate.

AERAS then enters into contracts with physicians to provide this emergency room service to the hospitals.

## 2.  Factor One - Direct Evidence

The most important direct evidence of the right of control is the contract itself, which formally establishes the relationship between AERAS and the physicians.[5]

---

[4] Although the contracts vary in some ways, the significant provisions are of the same effect.  The parties do not distinguish among the separate contracts, and neither will the court.

[5] As with the hospital contracts, some of these vary in insignificant ways.  The parties have considered, and the court will consider, all of them be the same for the purpose of resolving

13

The contracts are labeled "Medical Services Independent Contractor Agreement," and the physicians are referred to throughout as "Independent Contractors." Although such a characterization in a contract is not, in and of itself, dispositive, and must be considered along with other facts, it is "substantial evidence" of independent contractor status. *D & G Trucking*, 966 So.2d at 271.

The relationship is described as follows in the contracts signed by the physicians and AERAS.

> **Independent Contractor Relationship**. Anything contained in this entire Agreement to the contrary notwithstanding, it is the intent and purpose of the parties hereto that the relationship of each to the other shall be that of an independent contractor. Company shall neither have, nor exercise or reserve, any control or direction, or right to control or direct, over the methods by which the Independent Contractor shall perform the services required under this Agreement. The Independent Contractor shall not be entitled to any benefits in the nature of employee benefits, including workman's compensation, from Company. Neither Company nor the Independent Contractor shall be responsible for the withholding or payment of any income withholding taxes, FICA, FUTA or other taxes due and owing by the other party to this Agreement or due and owing by either party employees. The parties hereto further hereby agree that the Independent Contractor shall not be deemed to be an employee of Company, but shall only be deemed a non-exclusive independent contractor of Company, and that this Agreement calls for the performance of services by the Independent Contractor as an independent contractor, and that at no time shall the Independent Contractor be considered as an employee, partner, joint ventures or business associate of Company for any purpose whatsoever. Nothing herein contained shall in any way be considered or construed as creating the legal relationship of employee or employer, agent or principal, or partnership between the Independent Contractor and Company. None of the parties hereto is to be considered a partner, an agent or an employee of the other, and/or of the principals thereof, for any purpose whatsoever.

the issues in this case. Here, the court refers to Exhibit 66.

The parties hereto intend that only an independent contractor relationship be created by this Agreement.  Company is interested only in the results to be achieved, and the conduct and control of the professional duties and responsibilities of the Independent Contractor arising herefrom will lie solely with the Independent Contractor.  It is further understood that the Independent Contractor and Company are free to contract similar services to be performed for others, while still under contract with one another hereunder, as well as to carry on such professional duties and obligations as they deem appropriate, either as sole practitioners or in the service of others, whomsoever, or in any way whatsoever. Further, neither the Independent Contractor, nor any individual whose compensation for services is paid by the Independent Contractor, is, in any way, directly or indirectly, expressly, or by implication, employed by Company for the purposes of any tax, withholding or contribution levied by the Federal Government or any agency thereof, including, but not limited to, the Internal Revenue Service and/or the Federal Society Administration, or by any State or City government or agency thereof, or by any Federal, State and/or Local law, with respect to the employment, or unemployment, disability, or compensation for employment, workers' compensation or otherwise, and the Independent Contractor accepts exclusive liability for any and all such payroll taxes, income tax withholdings and/or contributions, in any form whatsoever imposed by Federal, State or Local governmental law and/or any agencies thereof, not only with respect to the Independent Contractor but also with respect to any and all such individuals whose compensation for services is paid by the Independent Contractor, thereby saving, fully indemnifying (including attorney's fees and expenses) and holding Company harmless therefrom.

It is quite significant that, in establishing their relationship, the parties specifically addressed the matter of workers' compensation coverage, and agreed that it was not due to be provided.

Continental contends that other facts concerning this relationship, however, show that AERAS actually retained a right of, or exercised, control in a manner that, in spite of this

contract language, could cause these physicians who signed the contracts to be entitled to workers' compensation benefits if they were injured on the job.

Continental points to evidence that the physicians perform their services "for and on behalf of [AERAS]" at the hospitals designated by AERAS, under the language of the hospital contracts; that they work at times set in a schedule generated by AERAS; that they sign sign-in sheets maintained by AERAS at each emergency department; and that their contracts require them to provide services "consistent with the facilities available and the standards established in the medical community and rules and regulations" of the hospitals.  The court finds from the evidence that the work times and places, although in a schedule generated by AERAS, are determined based primarily on requests of the physicians (e.g. Exhibits 122 at pp. 20-21 and 123 at pp. 26-29), and simply for the purpose of assuring that the hospitals' emergency rooms are staffed at all times by competent doctors.  The sign-in sheets are merely a part of record keeping in regard to guaranteed minimum payments which are part of the negotiated contracts.

It is argued that the role of the Emergency Medical Directors appointed for each emergency department by AERAS provides direct evidence of control.  Continental points to eight of the nineteen responsibilities of the Director, set out in the hospital contracts: clinical direction of the Emergency Department, reviewing and implementing medical protocols for the Emergency Department, coordinating of the Quality Assurance Program within the Emergency Department, monitoring the quality of care delivered in the Emergency Department, assisting in the education and training of Emergency Department personnel, orienting the new AERAS physicians, coordinating the Emergency Departments schedule, and evaluating the performance of the AERAS physicians.  (E.g. Exhibit 8, §1.5).

16

New physicians work shifts with the Emergency Room Directors, usually for a month, so that they have a "resource person" they can go to if there are any questions or issues about the emergency room, some of the processes within the emergency room, or the documentation system.  (Exhibit 123 at p.30).  The orientation program for new physicians involves their being taught the template charting system used in the emergency rooms, shown the facilities where services are provided and meeting the people there, and being told what was expected of them in the facilities.  (Exhibit 122 at pp. 48-50.)

A thorough review of all the direct evidence convinces the court that whatever controls are retained and exercised by AERAS over the physicians are primarily for the purpose of carrying out its administrative responsibilities to both the hospitals and the physicians themselves, and to seeing that hospital emergency room care, by competent physicians, is provided at all times to those who come there for medical help.  This "goes no further than is necessary to ensure a satisfactory end result" and therefore, "it does not establish employment." *White*, 363 So.2d at 988.


### 3.  Factor Two - Method of Payment

Continental contends that AERAS's right of control over the physicians is shown by the way in which the physicians are compensated.  This, it is argued, is shown by evidence that the physicians are paid on the same schedule as AERAS's employees, receive a percentage of the gross fees charged for their services, are guaranteed a minimum income based on hours worked, and are allowed to participate in AERAS's group health and medical malpractice insurance coverage.  Billing is handled by AERAS and AERAS receives payments.  Monthly, AERAS

remits to the physicians their contractual share of receipts, keeps its contractual share for administrative services, and deducts any insurance premiums it has paid for group insurance on behalf of physicians who have elected to purchase coverage under those policies.

While a "productivity model" of payment has been held to be an indicator of the right to control, *D & G Trucking*, 966 So. 2d at 270-71, the compensation agreement between the physicians and AERAS in this professional setting is quite different from the payment of truck drivers. Under the contracts, AERAS agrees to provide administrative services and the physicians agree to provide medical services, with each receiving a percentage of gross receipts from charges made in the emergency rooms. AERAS is guaranteed by the hospitals that there will be a minimum amount of gross receipts, based on number of hours, and the physicians are guaranteed by AERAS that they will receive income at least equal to a negotiated hourly rate. The court finds nothing in that arrangement to indicate a right of control by AERAS over the physicians.

As to health and medical malpractice insurance, the physicians are given the opportunity to participate in AERAS's group coverage, but not all of them do. If they do, they reimburse AERAS fully for their premiums. They are required by their contracts to maintain medical malpractice insurance, which is required for them to practice in the hospitals, but at their own expense. Continental points to the fact that, although any physicians who choose to participate in the group medical insurance coverage are required to reimburse AERAS for their premiums, their applications for such coverage designate them as "employees", which is required for them to be eligible for the coverage. While the court finds that to be true, it further finds that the question here is limited to employment status for the purpose of workers' compensation coverage. For

18

aught that the evidence shows, there may be an entirely different standard of classification by the health insurance carrier.  Therefore, while there may be some inconsistency on the part of AREAS in the use of terms, the court gives it little weight.

### 4.  Factor Three - Furnishing of Equipment

Continental contends that this factor weighs in favor of an employer-employee relationship, because the physicians are required to supply only their own pens and stethoscopes. It is true that the evidence shows that the hospitals, as agreed to in their contracts with AERAS, provide the emergency rooms themselves and the equipment necessary there for patient care, such as beds, octoscopes, laryngoscopes, modern equipment, lab facilities, x-ray facilities, etc., but it ignores reality to suggest that, under any circumstances, emergency room physicians might furnish these kinds of things themselves.  Also, AERAS furnishes such things as computers and forms for record-keeping and charting, but the court finds this to be for the purpose of billing and other administrative services which they have agreed to perform, in addition to use by the physicians for required charting on patients.  Nothing in the furnishing of equipment, given the realities of emergency room physicians practicing in hospitals, shows a retention of control of a kind to suggest an employer-employee relationship.

### 5.  Factor Four - The Right to Fire

AERAS cannot terminate the physicians at will, as is typical in an employer-employee relationship.  The agreement between AERAS and the physicians allow the agreement to be

19

terminated by either party upon 90 days' written notice,[6] or by AERAS at any time for specified causes.  In *Atchison v. Boone Newspapers, Inc.*, 981 So. 2d 427, 430 (Ala. Civ. App. 2007), the court stated that the contract provision allowing either party to terminate the contract only with 30 days' notice or immediately for cause was an indicator that the deceased was an independent contractor.  The terms of the *Atchison* agreement and AERAS's agreement with the physicians are the same in structure and effect, leaving the court to conclude that this factor is indicative of an independent contractor relationship.


## 6.  Other Facts

Other facts which the court finds from the evidence point to an independent contractor status include:

> While the contracts require the physicians to maintain and improve their professional skills, they further provide that: "This shall be done solely at the expense of the Independent Contractor, and also done when, where and how the Independent Contractor determines it best to do so."  (E.g. Exhibit 66, b.iv.)

> AERAS does not pay or withhold income taxes, FICA, or FUTA on the physicians (Exhibit 66, k).  *See Atchison*, 981 So. 2d, at 432.

> The physicians are free, so long as it does not hinder of interfer with their work as emergency room doctors under their agreement, to render medical and surgical services to others, at other locations.  (Exhibit 66, n).  *See Atchison*, 981 So. 2d at 432.

---

[6] One of the agreements states that the agreement may be terminated "upon sixty (90) days" written notice, but later agreements correct the language to say "upon ninety (90) days" written notice.

> All codes of professional conduct, as well as the ancient Hippocratic Oath, require physicians to exercise independent judgment in making decisions about treatment.  AERAS agrees to provide the hospitals with competent emergency room physicians, and the physicians agree to provide competent care and treatment to all who seek medical help in the emergency rooms.  How a physician treats and cares for the patient in the emergency room competently is, and must be, the independent decision of the physician.  "As the law stands now,

> '[f]or one to be an employee, the other party must retain the right to direct the manner in which the business shall be done, as well as the result to be accomplished or, in other words, not only what shall be done, but how it shall be done.'"  *Atchison*, 981 So. 2d at 431, quoting *White*, 363 So.2d, at 988.

## 7.  FACTUAL CONCLUSION

Based on the findings of fact and reasons discussed above, the court finds as a fact that the physicians furnished to the hospital emergency rooms are independent contractors and, as such, are not covered by the Alabama workers' compensation law.

## V.  CONCLUSIONS OF LAW

Since the physicians are independent contractors, they are not entitled to benefits under the workers' compensation law.  Because of that, they are not, and could not be considered to be, persons engaged in work that could make Continental liable under the workers' compensation coverage provided in the insurance policy at issue, and their remuneration is not properly included in the policy's formula for computing a premium.

## <u>CONCLUSION AND ORDER</u>

Based on the foregoing findings of fact and conclusions of law, the court finds that Continental has failed to prove its entitlement to any premium payments from AERAS in excess of the amount already paid.

It is ORDERED that declaratory judgment shall be issued in accordance with this Memorandum Opinion and Order.

DONE this 10th day April, 2009.


 /s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE